ORIGINAL

Approved: *Russell Capone*
MARTIN S. BELL / RUSSELL CAPONE / KAN M. NAWADAY
Assistant United States Attorneys

Before: HONORABLE ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

**16 MAG 3626**

- - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

    - v. -

NORMAN SEABROOK and
MURRAY HUBERFELD,

    Defendants.

- - - - - - - - - - - - - - - -x,

SEALED COMPLAINT

Violations of
18 U.S.C. §§ 1343, 1346,
1349, 2

County of Offense:
New York



SOUTHERN DISTRICT OF NEW YORK, ss.:

    BLAIRE TOLEMAN, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

### COUNT ONE

#### (Conspiracy to Commit Honest Services Wire Fraud)

    1. From in or about November 2013, up to and including in or about 2015, in the Southern District of New York and elsewhere, NORMAN SEABROOK and MURRAY HUBERFELD, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

    2. It was a part and an object of the conspiracy that NORMAN SEABROOK and MURRAY HUBERFELD, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive members of the Correction Officers' Benevolent Association ("COBA" or the "Union") of their

intangible right to the honest services of SEABROOK, its President, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, HUBERFELD agreed to pay kickbacks to SEABROOK in exchange for SEABROOK's agreement to direct wire transfers of millions of dollars of COBA retiree benefit and operating funds to a Manhattan hedge fund operated by HUBERFELD and others.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Honest Services Fraud)

3. From in or about November 2013, up to and including in or about 2015, in the Southern District of New York and elsewhere, NORMAN SEABROOK and MURRAY HUBERFELD, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive COBA of its intangible right to SEABROOK's honest services, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HUBERFELD paid a kickback to SEABROOK in exchange for SEABROOK's agreement to direct wire transfers of millions of dollars of COBA retiree benefit and operating funds to a Manhattan hedge fund operated by HUBERFELD and others.

(Title 18, United States Code, Sections 1343, 1346, and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4. I have been a Special Agent with the FBI for approximately four years. I am currently assigned to a public corruption squad in the FBI's New York Field Office. As a Special Agent, I have participated in investigations involving the bribing of public officials, law enforcement officers, and others.

5. Since at least in or about 2014, I have been involved in an investigation being conducted jointly by the FBI and the Internal Affairs Bureau ("IAB") of the New York City Police Department (the "NYPD") into, among other things,

allegations of misconduct by NORMAN SEABROOK, the defendant, among others.

6. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents. Because this affidavit is prepared for limited purposes, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part.

## Overview

7. As set forth in more detail below, NORMAN SEABROOK and MURRAY HUBERFELD, the defendants, conspired to deprive and in fact deprived the members of COBA, the largest municipal jail union in the United States, of the honest services of SEABROOK, their president. For 21 years, SEABROOK has been the President of COBA, and, as such, has power over COBA's financial affairs and retirement funds. HUBERFELD founded and helps manage Platinum Partners, L.P. ("Platinum"), a Manhattan hedge fund with largely individual investors that in 2013 and 2014 was seeking institutional investors such as retirement funds. In or about December 2013, after SEABROOK complained to a man who knew both SEABROOK and HUBERFELD, and who is now cooperating with the Government ("CW-1"), about not getting any personal financial benefit for investing COBA money, CW-1 introduced SEABROOK to HUBERFELD to facilitate an investment by COBA in Platinum. SEABROOK made clear that if COBA were to invest in Platinum, SEABROOK would need to be paid a bribe. Ultimately, HUBERFELD agreed to pay SEABROOK bribes that were expected to total hundreds of thousands of dollars. Using CW-1 as an intermediary, HUBERFELD paid an initial kickback to SEABROOK of $60,000 in cash in exchange for SEABROOK directing COBA monies to Platinum, and HUBERFELD continued to seek additional COBA investments after this kickback payment. In 2014, SEABROOK directed a total of $20 million of COBA money to Platinum. After Platinum and COBA received federal grand jury subpoenas in May 2015 seeking documents relating to COBA's investment in Platinum, no further COBA monies were invested with Platinum.

## Relevant Entities and Individuals

8. Based on my review of publicly available information, I know the following:

3

        a.   COBA is New York City's largest correction officers union and the largest municipal jail union in the United States. COBA represents more than 9,000 correction officers employed at Riker's Island and other facilities. The Union is managed by an Executive Board of approximately 10 members and five trustees.

        b.   NORMAN SEABROOK, the defendant, is the President of COBA and serves on its Executive Board. He has held this position for 21 years. SEABROOK is himself a correction officer for the New York City Department of Corrections and has been since 1985.

        c.   Treasurer-1 is a correction officer and has been the Treasurer of COBA for 6 years.

        d.   Platinum is a Manhattan-based hedge fund that describes itself as an investment manager whose business is to manage multiple funds. Platinum's principal funds are the Platinum Partners Value Arbitrage Fund ("PPVA") and the Platinum Partners Credit Opportunities Fund ("PPCO").

        e.   MURRAY HUBERFELD, the defendant, was a founder of Platinum and is a current investor in Platinum's funds. Based on information provided by Platinum, I know that HUBERFELD is also, through a trust, a part-owner of Platinum itself.

        f.   CW-1 has pleaded guilty to conspiring to commit honest services fraud in connection with, among other things, this matter and is providing information to the Government in the hope of obtaining leniency when he is sentenced. Information provided by CW-1 has been reliable and corroborated by independent evidence. CW-1 has done business with HUBERFELD.

        g.   CC-1 is a co-conspirator not charged herein who participated in, among other things, the scheme described herein with CW-1, SEABROOK, and HUBERFELD.

### COBA and NORMAN SEABROOK's Role As President

9.   Based on my review of materials provided by COBA, including the bylaws under which COBA operates (the "Bylaws"), I have learned the following:

4

a. COBA represents more than 9,000 correction officers. Union members are required to pay $45 to COBA each two-week pay period, for a total cost of more than $1,000 per year.

b. In principle, COBA is governed by an Executive Board consisting of the President, a First Vice President, a Second Vice President, a Third Vice President, a Treasurer, a Recording Secretary, a Corresponding Secretary, a Financial Secretary, a Legislative Chairperson, a Sergeant-at-Arms, a First City-Wide Trustee, and Borough Trustees for four of the five boroughs. The Brooklyn trustee also represents Staten Island.

c. COBA's bylaws detail the duties of the COBA President, the position now held by NORMAN SEABROOK, the defendant. Those duties include "conduct[ing] the affairs of [COBA] in accordance with [the Bylaws] and with the decisions of the membership and the Executive Board" and presiding over meetings of the Executive Board. The Bylaws permit the COBA President to sign or countersign authorizations for expenditures, contracts, checks, and official documents of the Union. However, the Bylaws also provide that checks must be cosigned by the President and the Treasurer, that Union monies may be deposited only in such banks or other financial institutions "as may be selected or approved by the Executive Board," and that Union funds must be handled "in the manner required of fiduciaries by law."

d. The COBA "Annuity Fund" is an employee retirement benefits fund, funded primarily by the City of New York (the "City"). By contract, the City contributes approximately $845 per year to the Annuity Fund for each correction officer who has been employed by the City for five years or less, and $1,411 per year for each correction officer who has been employed for more than five years. Upon a Union member's retirement, the Annuity Fund provides the member with an annuity based on, among other factors, the member's length of service. If a Union member is terminated for any reason, the Annuity Fund provides the member with a lump sum benefit. The Annuity Fund is managed by a separate board (the "Annuity Fund Board") consisting of SEABROOK, Treasurer-1, and approximately two other members of the COBA Executive Board.

10. Based on my review of documents provided by COBA, my discussions with various members of the COBA Executive Board, and my review of reports written by other FBI agents about their discussions with other members of the COBA Executive Board, I learned the following:

5

a.      Despite the existence of an Executive Board, NORMAN SEABROOK, the defendant, makes many significant decisions affecting COBA, including financial decisions, unilaterally. Members of the Executive Board rarely question SEABROOK because SEABROOK has the power to make decisions that can affect their livelihood, for example, by stripping them of their status as board members (and the accompanying salary), sending them back to work as correction officers at a jail, or altering their hours.

b.      SEABROOK's control over the financial affairs of COBA extends to the Annuity Fund. SEABROOK decides how to invest the Annuity Fund's money in conjunction with an investment consultant hired by the Annuity Fund (the "Annuity Fund Advisor"), typically without input from the Annuity Fund Board or the Executive Board.

c.      At the end of 2013, the Annuity Fund held approximately $81 million in assets. Of that amount, approximately $72 million was invested through three investment management groups hired by COBA with the assistance of the Annuity Fund Advisor. These investments were allocated principally to common stocks, corporate bonds and notes, U.S. government obligations, mutual funds, and a real estate trust fund. A memorandum prepared in SEABROOK's name stated that the Annuity Fund was invested in "bonds, mortgages, common stocks, and other proper securities."

### COBA's Investment in Platinum

11.     Based on Platinum promotional literature and reports of interviews of the Platinum Director of Marketing (the "Marketing Director") and the President of Platinum's PPVA Fund (the "PPVA President"), I have learned the following:

a.      Platinum primarily administers two funds, the PPVA and the PPCO.

b.      The PPVA is described as a multi-strategy fund which includes asset-based financing in energy, mining, and other industries; energy-related and Asia-based arbitrage opportunities; and event-driven investing in corporations. The PPCO is described as a single-strategy fund that invests in asset-based loans in areas such as natural resources, energy, litigation, life insurance settlements, and receivables.

    c. According to the Marketing Director and PPVA President, MURRAY HUBERFELD, the defendant, is an investor who purportedly plays no significant role in the daily affairs of Platinum, the PPVA, or the PPCO.

    d. PPVA and PPCO investors are mostly high net worth individuals, rather than institutional investors. Before 2014, the funds had no municipal investors. Attracting municipal institutional investors was among Platinum's goals.

   12. As set forth above, before 2014, COBA's funds were invested principally in common stocks, corporate bonds and notes, U.S. government obligations, mutual funds, and a real estate trust fund. Neither COBA nor its Annuity Fund had invested in hedge funds or similar vehicles. During 2014, however, COBA — through both its operating account and its Annuity Fund — became Platinum's most significant institutional investor. Specifically, over three tranches of investments, COBA directed $20 million dollars to the PPVA in 2014.

   13. Based on my review of reports prepared by other agents of discussions with the Marketing Director and the PPVA President, my discussions with Treasurer-1, and my review of documents provided by Platinum and COBA, I have learned the following:

    a. COBA first became a prospective investor in Platinum in or about December 2013. According to the PPVA President, CW-1, who was friendly with both MURRAY HUBERFELD and NORMAN SEABROOK, the defendants, introduced them for the purpose of facilitating an investment by COBA in Platinum.

    b. After this introduction, Platinum met with the Annuity Fund Board members, including SEABROOK, in January 2014. After Platinum's pitch, the Annuity Fund Advisor and attorneys for COBA conducted due diligence on Platinum. Based on that due diligence, COBA's attorneys wrote to Platinum in February 2014 and explained that the Annuity Fund, as an employee retirement benefits fund, invests as a "prudent man acting in like capacity," and noted that "to our knowledge, none of the prudent men in like capacity, that is, similar New York City supplemental retirement funds, have invested in the type of investment you propose. The Annuity Fund, however, is not adverse to being a trendsetter." The letter went on to note certain questions and concerns, including the fact that Platinum's subscription agreement required the Annuity Fund to acknowledge that it had "the financial ability

7

to bear the economic risk of losing its entire investment," which the Annuity Fund could not acknowledge.

            c.    Despite these concerns, the Annuity Fund made an initial $10 million investment in the PPVA as of March 1, 2014. According to Treasurer-1 and another member of the Annuity Fund Board, it was SEABROOK who decided the Annuity Fund should invest in Platinum, and the other board members deferred to his decision.

            d.    In June 2014, COBA itself (separate and apart from its Annuity Fund) made an additional $5 million investment in the PPVA. According to Treasurer-1, no Executive Board meeting or other internal deliberation preceded this investment. Instead, the investment decision was made by SEABROOK alone. In fact, Treasurer-1 learned of the investment only when the bank initiating the wire transfer on behalf of COBA called him and said that his signature was needed.

            e.    At the time of the June 2014 investment, COBA had a total of approximately $12.4 million in assets, including more than $8 million in cash. SEABROOK's unilateral decision to invest $5 million into Platinum thus tied up more than 40 percent of COBA's assets in Platinum, and left COBA with just over $3 million in cash on hand for the Union.

            f.    In August 2014, the Annuity Fund invested an additional $5 million in the PPVA. According to Treasurer-1 and another member of the Annuity Fund Board, this investment decision again was made by SEABROOK alone. As a result of this investment, SEABROOK had directed a total of $20 million of COBA funds ($15 million from the Annuity Fund and $5 million from the Union's general fund) into Platinum.

### COBA's Investments in Platinum Were the Result of a Bribe Arrangement between HUBERFELD, SEABROOK, and CW-1

        14.    As set forth above, CW-1 has pleaded guilty to participating in a conspiracy to commit honest services fraud that included CW-1's participation in the scheme set forth herein. CW-1 is cooperating with the Government, and I have participated in extensive debriefings with him, during which he has confirmed, among other things, that (a) he provided valuable personal and financial benefits to NORMAN SEABROOK, the defendant, in order to, among other things, help maintain the relationship with SEABROOK in light of, among other things, COBA's ongoing investment in Platinum, a firm in which MURRAY HUBERFELD, the defendant, who was

8

CW-1's friend and sometimes business partner, was a significant investor; and (b) he helped facilitate the payment of a substantial kickback to SEABROOK from HUBERFELD and Platinum that was paid in exchange for SEABROOK directing tens of millions of dollars of COBA funds into Platinum.

15. More specifically, based on my participation in debriefings of CW-1 and discussions with other agents who have debriefed CW-1, along with my review of bank and credit card records, travel records, and e-mails of CW-1, CC-1, and NORMAN SEABROOK, the defendant, I learned the following:

   a. CW-1 has known MURRAY HUBERFELD, the defendant, for several years, and has participated in business transactions with HUBERFELD.

   b. CW-1 spent significant time in HUBERFELD's office at Platinum Partners during the 2013-2014 time period and believed, based on his knowledge of HUBERFELD and his own observations, that HUBERFELD ran Platinum and that employees at Platinum answered to HUBERFELD. CW-1 believes that HUBERFELD was not publicly acknowledged as playing any significant role at Platinum because CW-1 understood that HUBERFELD had a prior lawsuit or investigation relating to a fund HUBERFELD previously ran.

   c. CW-1 met NORMAN SEABROOK, the defendant, in late 2013 through an NYPD officer (the "NYPD Officer"). In November of 2013, CW-1, CC-1, SEABROOK, and the NYPD Officer traveled to the Dominican Republic. The airfare was paid for by CW-1 and not reimbursed.

   d. Also in November of 2013, CW-1 purchased airfare to London, England for a trip for CW-1, CC-1, and SEABROOK; they ultimately did not go on this trip.

   e. In December of 2013, CW-1 went on a trip with CC-1, SEABROOK, the NYPD Officer, and a fifth individual to the Dominican Republic; CW-1 paid all of the airfare for this trip and was not reimbursed.

   f. One night during either the November or December 2013 trip to the Dominican Republic, after he had been drinking, SEABROOK complained to CW-1 in CW-1's hotel room that SEABROOK worked hard to invest COBA's money and did not get anything personally from it. SEABROOK said that it was time that

"Norman Seabrook got paid." At the time, the Annuity Fund was largely invested in conventional stock and bond funds, and had never invested in any hedge fund.

        g. CW-1 was aware that HUBERFELD and Platinum wanted to attract institutional investors. When CW-1 returned to New York from the Dominican Republic, he met with HUBERFELD and told HUBERFELD that he believed he could convince SEABROOK to invest COBA money in Platinum, but that SEABROOK would need to be financially compensated. HUBERFELD responded, in substance, that compensating SEABROOK would not be a problem, and asked CW-1 to follow up with SEABROOK.

        h. In or about December 2013, HUBERFELD confirmed to CW-1 that Platinum was willing to make substantial payments to SEABROOK in order to secure COBA's investment into Platinum. Specifically, HUBERFELD told CW-1 that if COBA invested with Platinum, Platinum would receive as part of its compensation 20 percent of the profit on COBA's investment, and that Platinum was willing to pay SEABROOK 10 percent of its 20 percent share (i.e., 2 percent of the profit). CW-1 conveyed this offer to SEABROOK, who responded by asking CW-1, in sum and substance, "How much is Norman Seabrook going to get paid?" CW-1, after consulting with HUBERFELD, told SEABROOK that while it depended on the investment amount and the profit, the amount could be between $100,000 and $150,000 per year.

        i. CW-1 then arranged a meeting for late December 2013 between SEABROOK and HUBERFELD at Platinum's offices in Manhattan. CW-1 did not attend this meeting. Around this time, the financial arrangement between SEABROOK and HUBERFELD was confirmed.

        j. CW-1 is aware that in March 2014, COBA made an initial $10 million investment in Platinum. That month, CW-1, CC-1, SEABROOK, and the NYPD Officer took a trip to Israel. The airfare was paid for by CW-1.

        k. CW-1 is also aware that in or about June of 2014, SEABROOK directed an additional $5 million of COBA money into Platinum. That month, CW-1, through his business, made a $10,000 donation to a charity in which SEABROOK was involved in connection with a dinner at which SEABROOK was honored.

l. In July 2014, CW-1, CC-1, SEABROOK, and the NYPD Officer traveled to Las Vegas and then Burbank, California. The airfare was paid for by CW-1.

m. In August 2014, SEABROOK directed an additional $5 million investment from the COBA Annuity Fund into Platinum.[1]

n. Toward the end of 2014, in conversations with CW-1, SEABROOK began demanding to receive his initial kickback from Platinum. CW-1 in turn told HUBERFELD that HUBERFELD would have to pay CW-1. HUBERFELD responded that the PPVA was not doing as well as expected, and that he could not pay SEABROOK as much as SEABROOK expected. HUBERFELD told CW-1 that he could pay SEABROOK $60,000. HUBERFELD also said that he wanted to pay CW-1 and CC-1 due to their connection to SEABROOK. CW-1 told HUBERFELD that he should provide money to charitable causes at CW-1 and CC-1's direction instead of paying them directly. CW-1 did anticipate, however, that if he continued to assist HUBERFELD in bringing in business from COBA and other potential investors, he would at some point receive personal compensation.

o. After discussions with HUBERFELD, and upon receiving continued pressure from SEABROOK to get paid for his direction of COBA funds into Platinum, CW-1 agreed to use his own cash to pay SEABROOK, and HUBERFELD promised to reimburse CW-1 on Platinum's behalf. In order to create a mechanism for that reimbursement, HUBERFELD suggested that CW-1's company create a sham invoice. CW-1 had season tickets to the Knicks, and HUBERFELD suggested creating paperwork that reflected that CW-1 sold Platinum several games worth of tickets, for a total of $60,000. This would allow CW-1 to invoice Platinum for $60,000, and thereby allow Platinum to reimburse CW-1 for paying SEABROOK. CW-1, however, would never in fact provide Knicks tickets to Platinum. CW-1 agreed to this proposal, and met with SEABROOK on the evening of December 11, 2014 to pay him.

p. Before meeting SEABROOK on December 11, 2014, CW-1 went to Salvatore Ferragamo ("Ferragamo"), SEABROOK's favorite luxury goods store in Manhattan, and purchased an expensive bag for SEABROOK. CW-1 then placed $60,000 in cash in the Ferragamo bag and met SEABROOK several blocks away from the

---

[1] Although CW-1 was not personally aware of this additional investment of COBA funds, my review of documents provided by COBA and Platinum revealed this additional $5 million investment.

11

Ferragamo store. When CW-1 told SEABROOK how much money was in the bag, SEABROOK was angry that it was not as much money as he was initially promised.

      q. After giving SEABROOK the Ferragamo bag containing $60,000 in cash, CW-1 and SEABROOK met CC-1 and the NYPD Officer for dinner. That night, CW-1, SEABROOK, CC-1 and the NYPD Officer also attended a nearby Torah dedication ceremony at a synagogue, which had been previously planned.

    16. I have reviewed telephone records, license plate reader databases, a receipt from Ferragamo, and calendar entries for CW-1, and learned the following which corroborates CW-1's description of the payment of the $60,000 kickback to SEABROOK:

      a. Based on data provided by Verizon Wireless for CW-1's cellphone, CW-1 was in contact numerous times on December 11, 2014 with both SEABROOK and HUBERFELD.

      b. At approximately 5:50 p.m. on December 11, 2014, CW-1 called SEABROOK.

      c. At approximately 6:02 p.m. on December 11, 2014, CW-1 purchased a bag for $820.00, including tax, from Ferragamo. I have reviewed a copy of the receipt provided by Ferragamo for this transaction.

      d. At approximately 6:09 p.m. on December 11, 2014, SEABROOK's Chevrolet Suburban, registered to COBA, traveled to Manhattan over the Robert F. Kennedy ("RFK") Bridge, f/k/a the Triboro Bridge, as reflected in NYPD License Plate Reader data.

      e. At approximately 6:33 p.m. on December 11, 2014, HUBERFELD called CW-1.

      f. At approximately 6:40 p.m. on December 11, 2014, CW-1 called SEABROOK. CW-1's electronic calendar, obtained pursuant to a search warrant, shows that CW-1 was due to attend a Torah dedication ceremony that evening. Based on phone records, I know that CW-1 and SEABROOK exchanged no further calls after this 6:40 p.m. call, which I believe to be because they were together first in SEABROOK's Chevrolet Suburban when CW-1 was giving SEABROOK the kickback payment and later at dinner and the Torah dedication ceremony.

      g. CW-1 called HUBERFELD at 7:03 p.m. on December 11, 2014.

h. At approximately 11:30 p.m. on December 11, 2014, SEABROOK's Chevrolet Suburban traveled out of Manhattan via the RFK Bridge, as reflected in NYPD License Plate Reader data.

17. Based on my review of CW-1's e-mails, and documents provided by Platinum Partners, I am aware of the following, which corroborates CW-1's description of how he was compensated by HUBERFELD for the $60,000 kickback to SEABROOK:

a. On or about December 11, 2014, CW-1's assistant drafted an invoice from CW-1's company to Platinum Partners, in the amount of $60,000, for "8 Knicks Games @ 7500 per game" for two seats.[2]

b. CW-1's assistant e-mailed CW-1 this invoice at approximately 6:27 p.m. on December 11, 2014. Moments later, just before contacting NORMAN SEABROOK, the defendant, at 6:40 p.m., CW-1 forwarded the invoice by e-mail to MURRAY HUBERFELD, the defendant. At around the same times - at 6:33 p.m. and at 7:03 p.m. - CW-1 spoke by phone with HUBERFELD.

18. Based on my review of data provided by Sterling National Bank for bank accounts in the name of Platinum Partners and its affiliated funds, I am aware of the following:

a. On or about December 14, 2014, Platinum wrote a $60,000 check to CW-1's company. Based on my discussions with CW-1 and participation in the investigation, as discussed above, I believe this check was created to appear to be payment for the supposed sale of Knicks tickets from CW-1 to Platinum, but in reality was reimbursement to CW-1 for the kickback to NORMAN SEABROOK, the defendant.

b. On or about December 15, 2014, Platinum wrote an $18,000 check to a private school affiliated with CW-1. Based on my discussions with CW-1 and participation in the investigation, as discussed above, I believe this check to constitute compensation to CW-1 in the form of a charitable donation for CW-1's assistance in soliciting COBA's business to Platinum.

---

[2] At the time of this supposed payment of $7,500 per game, the New York Knicks' record was 4-20.

13

## PLATINUM AND HUBERFELD CONTINUE TO SOLICIT COBA'S BUSINESS IN 2015 THROUGH CC-1

19. From my debriefings of CW-1, I have learned that CC-1 knew about the bribe arrangement between NORMAN SEABROOK and MURRAY HUBERFELD, the defendants. According to CW-1, CC-1 also expected, given his relationship to CW-1 and to SEABROOK, to receive compensation for COBA's investment in Platinum, at least in the form of the charitable donation that had been promised by HUBERFELD. In January 2015, CW-1 traveled to Los Angeles for an extensive period of time, and from that point forward played no significant role in soliciting SEABROOK for further investments in Platinum.

20. From in or about January 2015 until and including in or about May 12, 2015, the FBI intercepted phone calls over a phone used by CC-1 pursuant to a Court-authorized wiretap order. Based on my review of those intercepts, I have learned that MURRAY HUBERFELD, the defendant, and CC-1 had extensive discussions about continued investments by COBA in Platinum, through NORMAN SEABROOK, the defendant. For example, I have listened to the following recorded phone calls:

    a. On or about January 26, 2015, CC-1 told an unknown male who was with him that "I have the right connections, and I might as well use mine. . . . I brought Murray, Murray's fund" investor money. CC-1 then said that he was "pissed" and that he "really got hurt" because "Murray told me, I'm gonna make . . . at least, minimum, five, six, seven hundred thousand dollars," but CC-1 had not been paid.

    b. On or about January 27, 2015, at approximately 1:31 p.m., HUBERFELD placed a call to CC-1. During the call, HUBERFELD told CC-1 "what are we doing about speaking about gelt," which I believe to be a reference to money. CC-1 responded: "I told you, regarding Norman [who I believe to be SEABROOK], he has to finalize with [CW-1]." HUBERFELD then asked CC-1 to speak to CW-1 and ask CW-1 "What are we doing about getting Murray more money February 1." CC-1 offered to call SEABROOK from HUBERFELD's office on speakerphone, and HUBERFELD responded, in substance, that he did not want to speak to SEABROOK and that CC-1 and CW-1 should arrange it themselves. Based on my training, experience, and participation in the investigation, I believe that during this call, HUBERFELD was pressuring CC-1 to lobby SEABROOK to invest more money in Platinum as of February 1, 2015. CC-1 speculated that CW-1 and SEABROOK were waiting to finalize the money owed

from the prior year, 2014, before facilitating a further investment by COBA in Platinum.

        c. At approximately 6:52 p.m. on the same day, January 27, 2015, HUBERFELD again called CC-1. During the call, CC-1 told HUBERFELD he would be meeting SEABROOK for lunch. HUBERFELD said that "Whatever you can do for February 1 would be helpful" because "I'm under some pressure" to have more money for February 1. HUBERFELD told CC-1 to "See if you can close it up," to which CC-1 responded: "I will, but I told you how we're gonna have to do it."

        d. On or about February 4, 2015, at approximately 11:03 p.m., HUBERFELD placed a call to CC-1. During the call, CC-1 said that CW-1 had spoken to "Norman [SEABROOK]," and that "there's no money now" because of an "internal problem with a guy."

    21. Based on my review of publicly available information, I am aware that in January 2015 - shortly before the February 4, 2015 call in which CC-1 noted that he had spoken to "Norman" and that "there's no money now" because of an "internal problem with a guy" - the former Recording Secretary of the COBA Executive Board, who had been removed by NORMAN SEABROOK, the defendant, sued COBA, SEABROOK, and others, alleging a variety of violations of union rules, and made specific reference to COBA's investments in Platinum.

    22. Based on my review of documents provided in response to a subpoena served on Platinum, I have learned the following:

        a. During the 15 months preceding COBA's original investment in the PPVA in March 2014, the PPVA had redeemed more money at investors' request than it had taken in money from new investors.

        b. At the end of March 2014 - the same month that COBA made its initial $10 million investment in Platinum - the PPVA faced requests for several million dollars' worth of redemptions. In addition, a review of Platinum's bank records show that on the same day that the $10 million COBA investment was made, PPVA funds were transferred in order to pay out approximately $4.5 million in redemption requests from the prior month.

     c. As of August 2014 — the month of COBA's final investment in Platinum — COBA was the PPVA's largest investor for the time period 2013 through August 2014, and had provided the PPVA with more than half of its incoming funding for 2014.

     d. On November 27, 2014, the Managing Partner at Platinum sent an e-mail to another executive at Platinum in which he stated, "I really need PPVA. I know Murray [HUBERFELD, the defendant] was working on COBA. On the horizon we have 44 million dec 31 reds there."

     e. Based on my training, experience, and participation in the investigation, I believe that in this e-mail, the Managing Partner indicated that HUBERFELD was attempting to solicit a further investment from COBA, at a time period approximately two weeks before HUBERFELD facilitated the initial $60,000 kickback payment to NORMAN SEABROOK, the defendant, for COBA's original investment. The Managing Partner stressed the importance of bringing in more COBA money because of $44 million in looming redemptions from the PPVA at year end 2014.

     f. On or about April 1, 2015, the Marketing Director of Platinum sent an e-mail to the Managing Partner and other executives at Platinum indicating that "For April 1, $30mm in new subs for PPVA." The Managing Partner responded: "I don't think coba has been confirmed. Let's bring in another 5-10 so we won't feel sting [if] it doesn't come in." Two days later, the Managing Partner e-mailed the Marketing Director and wrote "We lost coba unfortunately. Any last minute people we shd be contacting? I think they have until end of next week." The Marketing Director responded "I'm trying. . . Did anyone speak with Norman [SEABROOK]?" The Managing Partner responded "it's being worked. Hopefully may 1."

     g. On May 19, 2015, the Marketing Director of Platinum sent an e-mail to the Managing Partner and other executives at Platinum in which he noted that a "meeting with COBA went great" and that SEABROOK "said he will send us more money shortly." The Managing Partner responded by asking what "shortly" meant, to which the Marketing Director responded "couldn't press him in meeting in front of all."

    23. On or about May 20, 2015, the United States Attorney's Office for the Southern District of New York served subpoenas on, among other entities, COBA and Platinum Partners.

16

No further investments were made by COBA or the Annuity Fund into the PPVA.

WHEREFORE, the deponent prays that arrest warrants be issued for NORMAN SEABROOK and MURRAY HUBERFELD, the defendants, and that they be imprisoned or bailed, as the case may be.

_____
BLAIRE TOLEMAN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
7th day of June, 2016

_____
THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK