JUDGE CARTER    ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- v. -

NORMAN SEABROOK and
MURRAY HUBERFELD,

           Defendants.

- - - - - - - - - - - - - - - - - x

**16 CRIM 467**

INDICTMENT

16 Cr. ___

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUL 0 7 2016

**COUNT ONE**

(Conspiracy to Commit Honest Services Wire Fraud)

The Grand Jury charges:

### Relevant Individuals and Entities

1. The Correction Officers Benevolent Association ("COBA") is New York City's largest correction officers union and the largest municipal jail union in the United States. COBA represents more than 9,000 correction officers employed at Riker's Island and other facilities. COBA is managed by an Executive Board of approximately 10 members and five trustees.

2. NORMAN SEABROOK, the defendant, was, from approximately 1995 through June 2016, the President of COBA and served on its Executive Board.

3. Treasurer-1 is a correction officer who, as of July 2016, had been the Treasurer of COBA since 2010.

4.  Platinum Partners ("Platinum") is a Manhattan-based private investment fund, or "hedge fund," that draws from a limited number of sophisticated individual or institutional investors and employs high-risk methods in hopes of realizing large capital gains. As of July 2016, Platinum's principal funds were the Platinum Partners Value Arbitrage Fund ("PPVA") and the Platinum Partners Credit Opportunities Fund ("PPCO").

5.  MURRAY HUBERFELD, the defendant, was a founder of Platinum and investor in Platinum's funds, and at relevant times participated in the management of Platinum.

6.  CW-1 is a cooperating witness for the Government who, as indicated herein, facilitated a kickback scheme between NORMAN SEABROOK and MURRAY HUBERFELD, the defendants.

## COBA and the Annuity Fund

7.  COBA is governed, in principle, by an Executive Board consisting of the President, a First Vice President, a Second Vice President, a Third Vice President, a Treasurer, a Recording Secretary, a Corresponding Secretary, a Financial Secretary, a Legislative Chairperson, a Sergeant-at-Arms, a First City-Wide Trustee, and Borough Trustees for four of the five boroughs of the City of New York. The Brooklyn trustee also represents Staten Island.

8. Under its bylaws, COBA's President is authorized to conduct the affairs of COBA in consultation with the Executive Board, including to sign authorizations for expenditures and to write checks. However, checks must be cosigned by the President and the Treasurer, and COBA monies may be deposited only in such banks or other financial institutions "as may be selected or approved by the Executive Board."

9. The COBA "General Fund" is COBA's operating account, which is managed by the Executive Board primarily through an annual budgeting process. In or around June 2014, the General Fund account contained approximately $8 million in cash.

10. The COBA "Annuity Fund" is an employee retirement benefits fund, funded primarily by the City of New York. The Annuity Fund is managed by a separate board (the "Annuity Fund Board") that, in 2014, consisted of NORMAN SEABROOK, the defendant; Treasurer-1; and approximately two other members of the COBA Executive Board. COBA had also hired an investment adviser ("Advisor-1") to advise on investing the Annuity Fund's money. Advisor-1 had advised COBA in that capacity for several years prior to the end of 2013.

11. At the end of 2013, the Annuity Fund held approximately $81 million in assets. Of that amount, approximately $72 million was invested through three investment management groups hired by COBA with the assistance of Advisor-1. These investments

were allocated principally to common stocks, corporate bonds and notes, U.S. government obligations, mutual funds, and a real estate trust fund. The Annuity Fund had not invested in any hedge funds.

### The Kickback Scheme

12. In late 2013, NORMAN SEABROOK, the defendant, met CW-1 through a mutual acquaintance who was a high-level official in the New York City Police Department.

13. During a vacation to the Dominican Republic in late 2013 paid for by CW-1, NORMAN SEABROOK, the defendant, told CW-1, in substance and in part, that SEABROOK worked hard to invest COBA's money and got nothing for it, and that it was time SEABROOK started getting paid.

14. Upon CW-1's return to New York, in or about December 2014, CW-1 met with MURRAY HUBERFELD, the defendant, whom CW-1 knew to participate in the management of Platinum. CW-1 was aware that HUBERFELD and Platinum were seeking to attract institutional investors for its funds, and that at the time, Platinum had been largely unsuccessful in attracting institutional investors, such as COBA. CW-1 and HUBERFELD agreed that if NORMAN SEABROOK, the defendant, could direct COBA money into Platinum, Platinum would be willing to pay SEABROOK personally in exchange for facilitating the investment.

4

15. MURRAY HUBERFELD and NORMAN SEABROOK, the defendants, and CW-1 ultimately agreed that SEABROOK would cause COBA money to be invested in Platinum in exchange for a kickback in the amount of between $100,000 and $150,000 per year paid to SEABROOK personally, depending on how much money COBA invested.

16. In or about January 2014, Platinum personnel were invited to a meeting at COBA with the Annuity Fund Board in order to present formally the investment opportunity. After this January 2014 presentation, the Annuity Fund Board, largely deferring to NORMAN SEABROOK, the defendant, agreed to invest $10 million of Annuity Fund money into the PPVA, a Platinum fund. The investment was made in or about March 2014. In or about August 2014, the Annuity Fund Board, again largely deferring to SEABROOK, agreed to and did invest a further $5 million into the PPVA.

17. In or about June 2014, NORMAN SEABROOK, the defendant, decided to and did invest $5 million from COBA's General Fund into the PPVA. SEABROOK did not seek prior approval of the Executive Board or consult with Treasurer-1 or other Executive Board members before making this investment. This $5 million investment tied up approximately 40 percent of COBA's operating funds into Platinum.

## The $60,000 Kickback Payment

18. In or about December 2014, NORMAN SEABROOK, the defendant, began demanding his first kickback payment from Platinum. MURRAY HUBERFELD, the defendant, agreed to facilitate an initial payment of $60,000 to SEABROOK on Platinum's behalf, using CW-1 as an intermediary who would hand the money directly to SEABROOK.

19. On or about December 11, 2014, CW-1 arranged to meet NORMAN SEABROOK, the defendant, to pay SEABROOK his $60,000 kickback. Before the meeting, CW-1 went to Salvatore Ferragamo, a luxury goods store in Manhattan, and purchased an expensive bag (the "Ferragamo Bag"). CW-1 later placed $60,000 in cash in the Ferragamo Bag, and met SEABROOK in the vicinity of Lexington Avenue and 39th Street in Manhattan, where CW-1 gave SEABROOK the cash-filled Ferragamo Bag.

20. Days later, MURRAY HUBERFELD, the defendant, initiated a payment of $60,000 from Platinum to CW-1's company via check, as reimbursement for the kickback payment to NORMAN SEABROOK, the defendant. To make this $60,000 payment appear legitimate, HUBERFELD arranged for CW-1's company to create a fake invoice in which CW-1's company appeared to sell Knicks tickets to Platinum for $60,000. CW-1 arranged for the invoice to be created, and sent the invoice by e-mail to Platinum, via HUBERFELD.

6

## Statutory Allegations

21. From in or about November 2013, up to and including in or about 2015, in the Southern District of New York and elsewhere, NORMAN SEABROOK and MURRAY HUBERFELD, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

22. It was a part and an object of the conspiracy that NORMAN SEABROOK and MURRAY HUBERFELD, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive members of COBA of their intangible right to the honest services of SEABROOK, its President, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, HUBERFELD agreed to pay kickbacks to SEABROOK in exchange for SEABROOK's agreement to direct wire transfers of millions of dollars of COBA funds to a Manhattan hedge fund operated by HUBERFELD and others.

(Title 18, United States Code, Section 1349.)

## COUNT TWO

### (Honest Services Wire Fraud)

The Grand Jury further charges:

23. The allegations contained in paragraphs 1 to 20 of this Superseding Indictment are repeated and realleged as if fully set forth herein.

24. From in or about November 2013, up to and including in or about 2015, in the Southern District of New York and elsewhere, NORMAN SEABROOK and MURRAY HUBERFELD, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive COBA of its intangible right to SEABROOK's honest services, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HUBERFELD arranged for the payment of a kickback to SEABROOK in exchange for SEABROOK's agreement to direct wire transfers of millions of dollars of COBA funds to a Manhattan hedge fund operated by HUBERFELD and others.

(Title 18, United States Code, Sections 1343, 1346, and 2.)

### FORFEITURE ALLEGATION

25. As a result of committing one or more of the offenses alleged in Counts One and Two of this Superseding Indictment, NORMAN SEABROOK and MURRAY HUBERFELD, the defendants, shall forfeit to the

United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to one or more of the offenses alleged in Counts One and Two of this Indictment.

### Substitute Asset Provision

26. If any of the above-described forfeitable property, as a result of any act or omission of NORMAN SEABROOK and MURRAY HUBERFELD, the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

>(Title 18, United States Code, Section 981,
>Title 21, United States Code, Section 853, and
>Title 28, United States Code, Section 2461.)

_____
FOREPERSON

Deputy

_____
PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

**NORMAN SEABROOK and
MURRAY HUBERFELD,**

Defendants.

---

INDICTMENT

16 Cr. \_\_\_

(Title 18, United States Code, Sections
1343, 1346, 1349 and 2.)

_____          PREET BHARARA
     Foreperson.              United States Attorney.

Deputy

July 7, 2016

Filed Indictment. Case assigned to Judge Carter

U.S.MJ, Debra Freeman