**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X
                                :

UNITED STATES OF AMERICA        :     ECF Case
                                :

         v.                    :     No. 16 Cr. 467 (ALC)

NORMAN SEABROOK           :

         and              :

MURRAY HUBERFELD,        :

         Defendants.      :
------------------------------------------------------- X

**DEFENDANT MURRAY HUBERFELD'S MEMORANDUM OF LAW IN SUPPORT OF PRE-TRIAL MOTIONS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 5

    I.     THE INDICTMENT MUST BE DISMISSED, OR RECORDINGS
        MUST BE SUPPRESSED, BECAUSE THE GOVERNMENT
        VIOLATED THE PROVISIONS OF TITLE III. .................................................... 5

        A.     The Indictment Must Be Dismissed Because the Government
              Failed to Obtain the Judicial Approval Required to Disclose or Use
              Intercepted Oral Communications Relating to Mr. Huberfeld's
              Alleged Crimes. ....................................................................................... 5

              1.     Mr. Huberfeld is Charged With Crimes Other Than Those
                    Specified in the Wiretap Authorization Orders, and Neither
                    the Wiretap Applications, the Affidavits Submitted in
                    Support Thereof, nor the Wiretap Authorization Orders
                    Relate in Any Way to the Crimes With Which Mr.
                    Huberfeld is Charged. .................................................................. 8

                    (a) <u>The charges and allegations against Mr. Huberfeld do not relate
                    to the crimes for which the wiretaps were authorized.</u> ................... 8

                    (b) <u>The wiretap applications, supporting affidavits, and
                      authorization orders do not relate to the crimes charged against Mr.
                    Huberfeld.</u> ..................................................................................... 10

              2.     The Indictment Must be Dismissed Because the
                    Government Failed to Obtain Judicial Approval to Use the
                    Contents and Evidence Derived from Intercepted Calls to
                    Which Huberfeld was a Party. ..................................................... 12

         B.     The Intercepted Oral Communications to Which Huberfeld Was a
               Party Must Be Suppressed Because the Government Failed to
               Obtain Required Judicial Approval. ......................................................... 16

         C.     All Non-Minimized, Non-Pertinent Intercepted Oral
               Communications to Which Defendant Murray Huberfeld Was a
               Party Must Be Suppressed Because the Government Failed to
               Comply With Title III's Minimization Requirement. ............................... 17

1.    Title III Requires Minimization of Non-Pertinent Calls, and
      the Failure to Minimize Warrants Suppression. .......................... 17

2.    The Minimization Errors Require Suppression. .......................... 19

      (a) Mr. Huberfeld Has Standing to Challenge Minimization. ...... 19

      (b) The Government's Failure to Minimize Mr. Huberfeld's Calls
      was Objectively Unreasonable and Suppression of the Non-
      Minimized Calls is Appropriate. .................................................. 19

II.   THE COURT SHOULD DISMISS THE INDICTMENT BECAUSE THE
      FEDERAL HONEST SERVICES STATUTE IS
      UNCONSTITUTIONALLY VAGUE AS APPLIED TO DEFENDANT
      SEABROOK'S RELATIONSHIP TO COBA. ................................................... 21

      A.    The Indictment is Void for Vagueness as Applied to Defendants
            Because the Honest Services Statute Fails to Define the Scope of
            Fiduciary Duty. ....................................................................... 22

            1.    The Second Circuit and Other Federal Circuits Have Failed
                  to Specify the Nature, Scope, and Source of the Fiduciary
                  Duty Obligation Underlying the Honest Services Statute. .......... 25

            2.    Because the Scope and Content of the Fiduciary Duty
                  Owed in the Context of Defendant Seabrook's Relationship
                  with COBA is Left Undefined in the § 1346 Statute, it is
                  Unconstitutionally Vague as Applied to the Allegations in
                  this Indictment. ............................................................. 29

      B.    To the Extent that the Government's Allegations of Honest
            Services Fraud Rests on a Gratuity Theory, the Indictment Must
            Be Dismissed. ......................................................................... 33

      C.    The Court Should Dismiss the Government's Theory of Liability
            Against Defendant Huberfeld in Count Two Based on Principal
            Liability Because Huberfeld Did Not Owe Fiduciary Duty to
            COBA. .................................................................................... 35

III.  THE COURT SHOULD COMPEL THE GOVERNMENT TO MAKE
      IMMEDIATE *BRADY/GIGLIO* DISCLOSURES. ............................................... 36

CONCLUSION .................................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brady v. Maryland*,
   373 U.S. 83 (1963) ............................................................................... *passim*

*Cone v. Bell*,
   556 U.S. 449 (2009) ........................................................................................38

*Kyles v. Whitley*,
   514 U.S. 419 (1995) ........................................................................................38

*Leka v. Portuondo*,
   257 F.3d 89 (2d Cir. 2001) .......................................................................37, 38

*McDonnell v. United States*,
   136 S. Ct. 2355 (2016) .......................................................................22, 29, 33

*McNally v. United States*,
   483 U.S. 350 (1987) ....................................................................... *passim*

*Skilling v. United States*,
   561 U.S. 358 (2010) ....................................................................... *passim*

*Turner v. United States*,
   __ S. Ct. __, Nos. 15-1503, 15-1504, *slip op.* (June 22, 2017) ..............................37

*United States v. Agurs*,
   427 U.S. 97 (1976) ..........................................................................................37

*United States v. Aloi*,
   449 F. Supp. 698 (E.D.N.Y. 1977) .............................................................6, 16

*United States v. Bahel*,
   662 F.3d 610 (2d Cir. 2011) ...........................................................................34

*United States v. Brodson*,
   528 F.2d 214 (7th Cir. 1975) .....................................................................13, 15

*United States v. Brown*,
   459 F.3d 509 (5th Cir. 2006) ..........................................................................26

*United States v. Brumley*,
   116 F.3d 728 (5th Cir. 1997) (en banc) ..........................................................26

*United States v. Burford*,
755 F. Supp. 607 (S.D.N.Y. 1991) ........................................................................19

*United States v. Burke*,
571 F.3d 1048 (10th Cir. 2009) ............................................................................39

*United States v. Ciavarella*,
716 F.3d 705 (3d Cir. 2013) .................................................................................34

*United States v. DeMizio*,
741 F.3d 373 (2d Cir. 2014) .................................................................................31

*United States v. deVegter*,
198 F.3d 1324 (11th Cir. 1999) ............................................................................27

*United States v. Ervasti*,
201 F.3d 1029 (8th Cir. 2000) ..............................................................................26

*United States v. Fallon*,
348 F.3d 248 (7th Cir. 2003) ................................................................................37

*United States v. Feola*,
651 F. Supp. 1068 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989) ................14

*United States v. Fleishman*,
No. 11 CR. 32 JSR, 2011 WL 4000987 (S.D.N.Y. Aug. 31, 2011), *aff'd sub nom. United States v. Nguyen*, 507 F. App'x 64 (2d Cir. 2013) ...............................18

*United States v. Frost*,
125 F.3d 346 (6th Cir. 1997) ................................................................................27

*United States v. Goffer*,
756 F. Supp. 2d 588 (S.D.N.Y. 2011), *aff'd*, 721 F.3d 113 (2d Cir. 2013) .............19

*United States v. Golyansky*,
291 F.3d 1245 (10th Cir. 2002) ............................................................................37

*United States v. Gotti*,
42 F. Supp. 2d 252 (S.D.N.Y. 1999).....................................................................17

*United States v. Halloran*,
821 F.3d 321 (2d Cir. 2016).............................................................................27, 28

*United States v. Hawkins*,
777 F.3d 880 (7th Cir. 2015) ................................................................................34

*United States v. Higgs*,
713 F.2d 39 (3d Cir. 1983).....................................................................................38

*United States v. Ianniello*,
    621 F. Supp. 1455 (S.D.N.Y. 1985), *aff'd*, 824 F.2d 203 (2d Cir. 1987) ...............................18

*United States v. Langford*,
    647 F.3d 1309 (11th Cir. 2011) ...............................................................36

*United States v. Marion*,
    535 F.2d 697 (2d Cir. 1976)................................................................ *passim*

*United States v. Masciarelli*,
    558 F.2d 1064 (2d Cir. 1977)...............................................................6, 7, 13, 14

*United States v. Milovanovic*,
    678 F.3d 713 (9th Cir. 2012) (en banc) ...............................................27, 28

*United States v. Mitrow*,
    No. S3 13 Cr. 633 (PAE), 2015 WL 5245281 (S.D.N.Y. Sept. 8, 2015) ...............................32

*United States v. Murphy*,
    323 F.3d 102 (3d Cir. 2003)...............................................................27

*United States v. Nelson*,
    712 F.3d 498 (11th Cir. 2013) ...............................................................29

*United States v. Poindexter*,
    951 F.2d 369 (D.C. Cir. 1991) ...............................................................32

*United States v. Rajaratnam*,
    No. 09 Cr. 1184 (RJH), 2010 WL 4867402 (S.D.N.Y. Nov. 24, 2010) ...............................6, 18

*United States v. Rodriguez*,
    734 F. Supp. 116 (S.D.N.Y. 1990), *aff'd*, 968 F.2d 130 (2d Cir. 1992) ...............................19

*United States v. Rosen*,
    716 F.3d 691 (2d Cir. 2013)................................................................25

*United States v. Ruggiero*,
    824 F. Supp. 379 (S.D.N.Y. 1993) ...............................................................15

*United States v. Rybicki*,
    354 F.3d 124, 144 & n.19 (2d Cir. 2003) (en banc) ...............................................27

*United States v. Sancho*,
    157 F.3d 918 (2d Cir. 1998), *overruled on other grounds by United States v.*
    *Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc)...............................................26

*United States v. Sawyer*,
    239 F.3d 31 (1st Cir. 2001)...............................................................27

v

*United States v. Simels*,
    No. 08-CR-640 (JG), 2009 WL 1924746 (E.D.N.Y. July 2, 2009), *aff'd*, 654
    F.3d 161 (2d Cir. 2011)..................................................................................................18

*United States v. Sorich*,
    523 F.3d 702 (7th Cir. 2008) ........................................................................................27

*United States v. Teel*,
    691 F.3d 578 (5th Cir. 2012) ........................................................................................29

*United States v. Terry*,
    707 F.3d 607 (6th Cir. 2013) ........................................................................................36

*United States v. Tortorello*,
    480 F.2d 764 (2d Cir. 1973), *cert. denied*, 414 U.S. 866 (1974)...........................................15

*United States v. Urciuoli*,
    613 F.3d 11 (1st Cir. 2010) ...........................................................................................27

*United States v. Weyrauch*,
    548 F.3d 1237 (9th Cir. 2008), *vacated and remanded in light of Skilling*, 561
    U.S. 476 (2010)..............................................................................................................27

*United States v. Zemlyansky*,
    945 F. Supp. 2d 438 (S.D.N.Y. 2013)......................................................................18, 21

**Statutes**

18 U.S.C. § 2..........................................................................................................................35

18 U.S.C. § 201......................................................................................................................34

18 U.S.C. § 666......................................................................................................................34

18 U.S.C. § 1341....................................................................................................................34

18 U.S.C. § 1343.........................................................................................................9, 21, 35

18 U.S.C. § 1346 .......................................................................................................... *passim*

18 U.S.C. § 2510(11) .............................................................................................................19

18 U.S.C. §§ 2510-2522 .............................................................................................. *passim*

18 U.S.C. § 2515....................................................................................................................16

18 U.S.C. § 2516......................................................................................................................7

18 U.S.C. § 2517........................................................................................................6, 7, 8, 14

18 U.S.C. § 2517(3) ......................................................................................6

18 U.S.C. § 2517(5) ................................................................................ *passim*

18 U.S.C. § 2518(5) ..................................................................................5, 18

18 U.S.C. §§ 2518(10)(a) ...............................................................................8

**Other Authorities**

2 Clifford S. Fishman & Anne T. McKenna, *Wiretapping and Eavesdropping* §
    16:23 (Supp. Dec. 2016) ......................................................................16

Criminal Justice Standards Comm., Am. Bar Ass'n, *Standards for Criminal
    Justice*, Standard 301.2(c) (3d ed. 1993) ...........................................39

# INTRODUCTION

Murray Huberfeld submits this memorandum of law in support of his motions: (1) to dismiss the Indictment because the government failed to obtain the necessary judicial approval pursuant to 18 U.S.C. § 2517(5) before presenting to the grand jury electronically intercepted oral communications evidencing the crimes charged in the Indictment; (2) in the alternative, to suppress all electronically intercepted oral communications to which Mr. Huberfeld was a party because of the government's failure to comply with 18 U.S.C. § 2517(5); (3) to suppress all non-minimized, non-pertinent electronically intercepted oral communications to which Mr. Huberfeld was a party because of the government's failure to comply with Title III's minimization requirement; (4) to dismiss the Indictment because the federal honest services statute is unconstitutionally vague as applied; and (5) to order the immediate production of discovery materials pursuant to *Brady v. Maryland*.

# BACKGROUND

Murray Huberfeld, a 56-year-old businessman, investor, and former hedge fund manager, has been engaged in various successful business activity, including real estate investment, corporate management and consulting, finance, and investments in the food and beverage industry, for over 30 years. He is a well-regarded member of the Orthodox Jewish community in Lawrence, New York, where he has lived with his wife, Laura, for 27 years. He is also the founder of the Huberfeld Family Foundation, which engages in local, community-based philanthropy, feeding and financially supporting low-income community members, and funds Jewish cultural and educational institutions. The Huberfelds have three daughters, ages 24, 23, and 18; and two sons, ages 21 and 12.

On June 8, 2016 Mr. Huberfeld was arrested and charged with having engaged in a scheme to personally enrich Norman Seabrook, then president of the Corrections Officers Benevolent Association ("COBA"), in return for Mr. Seabrook facilitating investments by COBA's Annuity Fund into the hedge fund in which Huberfeld also invested—Platinum Partners, L.P. ("Platinum"). The allegations forming the factual basis for the government's case are set out in detail in the Complaint. (*See* D.E. No. 1, Complaint ("Compl.").) In general, the government alleges that Huberfeld conspired to and did deprive COBA members of the honest services of Seabrook, a defendant in this case charged with the same crimes as Mr. Huberfeld. (*Id.* ¶¶ 7, 8(b).) The government alleges that Mr. Huberfeld did this by paying kickbacks to Seabrook "for the purpose of facilitating an investment by COBA in Platinum." (*Id.* ¶ 13(a).)

As detailed in the government's Title III applications and summarized herein, the government initially sought wiretap authorization for an investigation into wire fraud, illegal liquor distribution, money laundering and narcotics distribution, among other offenses. Two months into the wiretap, the government sought and received additional authorization to expand the investigation to examine alleged honest services fraud involving high-ranking members of the New York City Police Department ("NYPD"). The Peralta/NYPD investigation—although initially unrelated to the Seabrook/Huberfeld Indictment—eventually led to the charges here. Hamlet Peralta, a one-time Harlem restaurant owner, was central to that investigation, as were Jona Rechnitz and Jeremy Reichberg. Peralta was suspected of purchasing large quantities of high-end liquor outside of New York and then importing that liquor into New York and selling it, non-taxed, at a discount to other restaurants and businesses. Rechnitz and Reichberg were suspected investors in the scheme, as were certain NYPD officers. The profits from the illegal sale and distribution of that liquor were suspected to be funding narcotics distribution operations.

The government was also investigating the payment of NYPD officers and officials by Peralta, Rechnitz, and Reichberg in return for those officers' and officials' assistance.[1]

The government sought Title III authorization to listen to and record the cellular telephones used by Peralta, Rechnitz, and Reichberg, which was granted, and wiretaps were conducted between October 30, 2014 and May 2015. Despite no probable cause ever being shown that Huberfeld was suspected to be or was engaged in the commission of *any* offense (much less the offense specified in the wiretap applications), and despite Huberfeld never being named a target of the investigation, the government captured Huberfeld's conversations over a period of four months while intercepting calls on Rechnitz's and Reichberg's phones. The authorization orders, tailored to Peralta, Rechnitz, and Reichberg and their suspected crimes, were used to intercept Huberfeld's conversations, despite there being no evidence whatsoever that Huberfeld was involved in any of the offenses for which the government had sought Title III authorization. Indeed, to this date, there has not been any allegation or evidence of any kind to connect Mr. Huberfeld to any of the original offenses that were the subject of prior judicial authorizations.

Mr. Huberfeld's captured conversations were innocuous. But the government has deemed some of them to be probative of the honest services fraud charges in this Indictment. (*See, e.g.*, Compl. ¶¶ 20(b)-(d).) In fact, in the Complaint, the government referenced three calls in which Huberfeld was a participant to support its allegations. (*See id.*) It is likely almost to a

---

[1] Hamlet Peralta was arrested on April 8, 2016 and charged with having run a 'Ponzi' scheme victimizing investors in his liquor business. *See* No. 16 Cr. 354 (KBF). He pleaded guilty on May 11, 2017, and is awaiting sentence. Despite the clearly illegal object of this scheme – selling untaxed, black market liquor – he has not, on information and belief, been charged with any liquor offenses. Jona Rechnitz, who recruited investors for Peralta's scheme and received percentages of those investments as commissions from Peralta, is a cooperating witness. He was scheduled to testify in Peralta's trial, and will be the chief government witness against Messrs. Huberfeld and Seabrook. Jeremy Reichberg was separately charged with the NYPD honest services scheme and is awaiting trial, currently scheduled for April 30, 2018. Two NYPD members, James Grant and Michael Harrington, are also charged in that matter.

point of certainty, then, that the government used the contents of those calls to secure the subsequent Indictment against Huberfeld, and that those calls will be part of the government's case at trial.

But the case against Mr. Huberfeld should not reach trial; the Indictment must be dismissed. Title III, which stringently governs and limits the manner and scope of permissible wiretaps, requires that the government obtain judicial approval when it intercepts calls containing evidence of crimes not specified in the orders for which wiretap authorization was granted—otherwise, the government may not disclose or use that evidence in any proceedings, including before the grand jury. *See* 18 U.S.C. § 2517(5); *United States v. Marion*, 535 F.2d 697 (2d Cir. 1976). Dismissal is the appropriate remedy for the government's disclosure of Huberfeld's calls in the Complaint and its use of those calls in securing an Indictment against him because the contents of those calls, which the government says provides evidence of the charges against Mr. Huberfeld, required judicial approval before disclosure.

Alternatively, those intercepted calls that the government deems probative of Huberfeld's crimes must be suppressed. Again, the calls were intercepted pursuant to authorization orders relating to entirely different offenses involving an entirely different cast of characters—the only link is that Huberfeld happened to speak to Rechnitz and Reichberg on their phones. When the government discovered evidence through those wiretaps that it suspected was probative of other crimes involving Mr. Huberfeld, it was required by Title III to seek judicial authorization. Because it never has, the government cannot use such evidence at trial. 18 U.S.C. § 2517(5).

Additionally, all of the calls that the government deemed "non-pertinent" should have been minimized during the surveillance, but were not. In fact, the government minimized only 10 out of 84 non-pertinent calls. In light of the innocent nature of those calls and Mr.

Huberfeld's conversations generally, the failure to minimize was unreasonable, and the non-pertinent, non-minimized calls must be suppressed.  *See* 18 U.S.C. § 2518(5).

The Court must also find the honest services statute void-for-vagueness as applied in this case because the statute fails to define the source, scope and content of the fiduciary duty owed in the business relationships presented here.  For this additional reason, the Indictment must be dismissed.

Finally, the Court should order the government to make immediate disclosures of all *Brady* material it presently possesses relating to its tainted witness, Jona Rechnitz.  Immediate production is necessary to ensure adequate time for the defendants to use this material in preparation for trial.

For all of these reasons, and as detailed below, the Indictment must be dismissed and the intercepted calls containing Mr. Huberfeld's conversations must be suppressed.[2]

## ARGUMENT

I.    **THE INDICTMENT MUST BE DISMISSED, OR RECORDINGS MUST BE SUPPRESSED, BECAUSE THE GOVERNMENT VIOLATED THE PROVISIONS OF TITLE III.**

A.    **The Indictment Must Be Dismissed Because the Government Failed to Obtain the Judicial Approval Required to Disclose or Use Intercepted Oral Communications Relating to Mr. Huberfeld's Alleged Crimes.**

"'Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices.'"  *United States v. Marion*, 535 F.2d 697, 700 (2d Cir. 1976) (quoting *Berger v. New York*, 388 U.S. 41, 63 (1967)).  With that overriding principle in mind, Congress

---

[2] Pursuant to search warrants, the government seized data from several of Mr. Huberfeld's electronic devices.  The government has indicated that it does not presently intend to use at trial evidence seized from these devices.  Accordingly, the defense will not burden the Court with additional motions seeking exclusion of that evidence.  However, with the consent of the government, Huberfeld respectfully requests leave of the Court to file supplemental motions to challenge the admissibility of that evidence at a later time should the government seek admission at trial of materials from these seizures.

set out in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522, to provide for the narrow circumstances in which the interception of the public's communications may be permitted, and the procedures that the government must follow in order to effect such surveillance. *See Marion*, 535 F.2d at 700; *see also United States v. Masciarelli*, 558 F.2d 1064, 1066-67 (2d Cir. 1977) (noting requirement of "scrupulous particularity as to the circumstances and reasons for an electronic search"). "Unless authorized by Title III, all interceptions of wire and oral communications are prohibited." *United States v. Aloi*, 449 F. Supp. 698, 715 (E.D.N.Y. 1977) (citing *Gelbard v. United States*, 408 U.S. 41, 46 (1972)).

Under Section 2517 of Title III, evidence obtained through electronic surveillance relating to crimes that were not set forth in the authorization orders cannot be used as evidence in any proceeding unless judicial approval is timely secured by the government. 18 U.S.C. § 2517(5);[3] *Masciarelli*, 558 F.2d at 1067; *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 4867402, at *3 (S.D.N.Y. Nov. 24, 2010) ("Under the terms of Section 2517(5), the

---

[3] Section 2517(5) provides as follows:

> When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

Section 2517(3), referred to in subsection (5), quoted above, states:

> Any person who has received, by any means authorized by this chapter, any information concerning a wire, oral, or electronic communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

government can only use wiretap evidence of crimes 'other than those specified' in the authorization order or in Section 2516 by obtaining judicial approval 'as soon as practicable.'"). Indeed, as the Second Circuit has explained:

> In permitting court authorization for electronic interceptions in investigations into certain types of crime, Congress provided that the court authorization must specify the offenses in connection with which the permission was granted and, should the law enforcement officer, in the course of conducting the authorized interception, come across communications relating to offenses other than those specified in the order of authorization or approval, he must obtain the authorization or approval of a court of competent jurisdiction as soon as practicable before the communications might be used in connection with the unspecified offense.

*Masciarelli*, 558 F.2d at 1067.

The importance of Section 2517 cannot be overstated. It forms an integral part of Title III, and strict compliance with that Section is required "'in order to carry out the purpose of the Congress and make certain that the privacy of the individual is protected as so provided.'" *Marion*, 535 F.2d at 706 (quoting *Gelbard*, 408 U.S. at 50). In enacting Section 2517, Congress sought "to prevent evasion of the several restrictions upon original applications (e.g., showing of probable cause, enumerated serious crime, ineffectiveness of other investigatory techniques as to that offense). Otherwise, the applicant could easily name one crime while in fact he may have anticipated intercepting evidence of a different crime for which the prerequisites could not be satisfied." *Id.* at 700-01; *see also Masciarelli*, 558 F.2d at 1066-67 ("[Congress] . . . recognized that unless stringent detail were required the government might obtain an overly broad wiretap authorization for one offense as a pretext for gaining information with respect to offenses for which probable cause could not be established or for which wiretap authorization would be unavailable."). Section 2517 vindicates Title III's overall purpose by requiring the government

to obtain approval for the interception of crimes not specified in the authorization order and thus ensuring that the authorization to intercept does not transform into "the electronic equivalent . . . of a 'general search warrant.'" *Marion*, 535 F.2d at 701 (quoting *United States v. Brodson*, 528 F.2d 214 (7th Cir. 1975)).

Here, the government violated Section 2517. As more fully discussed below, Mr. Huberfeld's intercepted conversations[4]—which the government alleges in the Complaint are evidence of the crimes for which he was indicted and which the government will undoubtedly seek to use to prove its case at trial—have nothing to do with the crimes for which the orders authorizing those interceptions were approved. Indeed, the government never even mentioned to a judicial officer that its surveillance had uncovered evidence of Huberfeld's alleged crimes, much less did it seek judicial approval as Section 2517(5) requires. The government nevertheless disclosed such allegedly incriminating evidence in the Complaint and likely used it to secure an Indictment against Huberfeld. For those and the following reasons, the Indictment must be dismissed.

      1. *Mr. Huberfeld is Charged With Crimes Other Than Those Specified in the Wiretap Authorization Orders, and Neither the Wiretap Applications, the Affidavits Submitted in Support Thereof, nor the Wiretap Authorization Orders Relate in Any Way to the Crimes With Which Mr. Huberfeld is Charged.*

        (a) <u>The charges and allegations against Mr. Huberfeld do not relate to the crimes for which the wiretaps were authorized.</u>

Mr. Huberfeld is charged with one count of conspiracy to commit honest services wire fraud and one count of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346. (D.E. No. 10, Indictment ("Indict.").) In general, the government alleges that Huberfeld

---

[4] As a party to the intercepted communications, Mr. Huberfeld has standing to challenge the evidence obtained in violation of Section 2517 as an "aggrieved person" under Title III. *See* 18 U.S.C. §§ 2518(10)(a) ("Any aggrieved person in any trial, hearing, or proceeding . . . may move to suppress the contents of any wire or oral communication . . . . ."); 2510(11) (defining "aggrieved person" as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed").

conspired to and did deprive members of COBA of the honest services of Seabrook by paying kickbacks to Seabrook in return for Seabrook investing COBA monies with Platinum. (*Id.* ¶¶ 7, 8(b).)

As part of the allegations to support the charges in the Complaint, the government describes conversations in four separate calls that were intercepted "pursuant to a Court-authorized wiretap order." (*Id.* ¶ 20(a)-(d).) Three of those calls intercepted Mr. Huberfeld's conversations.[5] (*See id.*)

The first, a call made around January 27, 2015, was between Huberfeld and Reichberg. Huberfeld asked Reichberg, "what are we doing about speaking about gelt," alleged to be a reference to money. (*See id.* ¶ 20(b).) Also during that call, Huberfeld said Reichberg should speak to "CW-1" (Rechnitz, an associate of Reichberg) and ask him "What are we doing about getting Murray more money February 1." (*See id.*) The government alleges that conversation reflects Huberfeld "pressuring CC-1 to lobby SEABROOK to invest more money in Platinum as of February 1, 2015." (*See id.*) The government also alleges that "CC-1 speculated that CW-1 and SEABROOK were waiting to finalize the money owed from the prior year, 2014, before facilitating a further investment by COBA in Platinum." (*See id.*)

The second call, made on January 27, 2015, was also between Huberfeld and Reichberg. Reichberg said he would be meeting Mr. Seabrook. (*See id.* ¶ 20(c).) Huberfeld said "Whatever you can do for February 1 would be helpful" and "I'm [Huberfeld] under some pressure." (*See id.*) Huberfeld told Reichberg to "See if you can close it up"; Reichberg responded, "I will, but I told you how we're gonna have to do it." (*See id.*)

---

[5] The remaining call, made around January 26, 2015, allegedly intercepted "CC-1" (Reichberg, an unindicted co-conspirator who allegedly facilitated the bribery and kickback scheme between Seabrook and Huberfeld) discussing how he had brought Huberfeld's fund investor money. (*See id.* ¶ 20(a).)

The last call, made around February 4, 2015, was between Huberfeld and Reichberg. Reichberg said that Rechnitz spoke to Seabrook and "there's no money now" because of an "internal problem with a guy." (*See id.* ¶ 20(d).) The government interprets the "internal problem with a guy" statement as a reference to a suit filed against COBA, Seabrook, and others by the former Recording Secretary of the COBA Executive Board. (*See id.* ¶ 21.)

(b) <u>The wiretap applications, supporting affidavits, and authorization orders do not relate to the crimes charged against Mr. Huberfeld.</u>

Neither the "Court-authorized wiretap order" nor any of the supporting affidavits and applications used to intercept Mr. Huberfeld's conversations have anything to do with Huberfeld or the crimes for which he has been indicted. Review of those materials makes clear that the investigation for which the government sought the wiretaps involved entirely different crimes committed by an entirely different set of actors, although Rechnitz and Reichberg figure prominently in that investigation, as well.

That investigation revolved around Hamlet Peralta and an alleged Ponzi scheme relating to his restaurant and liquor distribution business, suspected drug trafficking, and bribery of NYPD officers. The development of that investigation is detailed in the applications for wiretaps, the affidavits supporting those applications, the wiretap orders, and numerous periodic reports submitted during the surveillance.[6]

---

[6] Specifically, the government applied for, and received, five separate wiretap orders on five separate dates—October 30, 2014; December 5, 2014; January 10, 2015; February 19, 2015, and April 10, 2015. The government's applications and supporting affidavits bear dates corresponding to the wiretap orders. The government supplied seven separate periodic reports on November 10, 2014 and November 20, 2014 to report on the October 30, 2014 wiretap; on December 15, 2014 and December 23, 2014 to report on the December 5, 2014 wiretap; on January 22, 2015 and February 2, 2015 to report on the January 10, 2015 wiretap; and on March 2, 2015 to report on the February 19, 2015 wiretap. (*See generally* 11-10-14 Periodic Report; 11-20-14 Periodic Report; 12-15-14 Periodic Report; 12-23-14 Periodic Report; 1-22-15 Periodic Report; 2-2-15 Periodic Report; 3-2-25 Periodic Report.) These documents have previously been filed with the Court. To the extent the Court seeks additional copies of these materials, we can prepare electronic courtesy copies for delivery directly to chambers.

These materials all share the same common characteristics. The authorization orders list as target subjects, among others, Peralta, Rechnitz, and Reichberg, but never Huberfeld.[7] (*See* 10-30-14 Order, at 3, 5; 12-5-14 Order, at 3-4, 5; 1-10-15 Order, at 3, 5-6; 2-19-15 Order, at 4, 5-6; 4-10-15 Order, at 4, 6.) The authorization orders identify the target offenses for which probable cause exists, listing wire fraud, money laundering, currency structuring, narcotics distribution, and honest services wire fraud.[8] (*See id.*) The accompanying affidavits in support of the applications show exactly what it was the government was investigating and the conduct it believed supported its investigation of the target subjects and offenses: Peralta's illegal liquor distribution scheme; currency structuring and money laundering to conceal the sources of funding for the scheme; the use of proceeds from the scheme to fund narcotics distribution; and the use of proceeds from the scheme to pay one or more NYPD officers for assistance in their official capacities. (*See* 10-30-14 Affidavit, at 12-29; 12-5-14 Affidavit, at 13-28; 1-10-15 Affidavit, at 14-36; 2-19-15 Affidavit, at 15-46; 4-10-15 Affidavit, at 21-37.)

The affidavits make no mention of honest services wire fraud in the context of the allegations made here against Seabrook or Huberfeld. Instead, the honest services fraud contemplated in the affidavits related to potential payments to NYPD officials, such as Peralta's possible payments to Ruel Stephenson for assistance in Stephenson's official capacity (*see, e.g.*, 12-5-14 Affidavit, at 13, 19-26), Peralta's payments to Lenin Garcia for assistance in Garcia's

---

[7] The materials in support of the October 30, 2014 and December 5, 2014 Orders and those Orders themselves do not identify Reichberg as a target. Reichberg is first named as a target subject in a December 23, 2014 Periodic Report, which updated the issuing judge on the progress of the December 5, 2014 wiretap. (*See* 12-23-14 Periodic Report, at 1.) Reichberg is named in each subsequent affidavit, application and order.

[8] Honest services wire fraud is not listed as a target offense until the December 5, 2014 authorization order. As discussed herein, the honest services wire fraud for which judicial authorization was sought and received involved payment to NYPD officials for their assistance in their official capacities as police officers, not to the crimes alleged here against Huberfeld and Seabrook.

official capacity (*see, e.g.*, 1-10-15 Affidavit, at 15, 29-32), and the attempts to get certain NYPD officials promoted to favorable positions (*see, e.g.*, 2-19-15 Affidavit, at 28-46).

The April 10, 2015 Affidavit includes the only reference to Huberfeld in all of the materials submitted to judges in support of obtaining the wiretaps that intercepted Huberfeld's communications.[9]  That reference relates to a phone call intercepted around March 9, 2015, in which Huberfeld asked Reichberg "how much Reichberg would charge to put an individual named 'Izzy' on retainer," to which Reichberg responded "$10-15,000 per month."  (*See* 4-10-15 Affidavit, at 34.)  The government interpreted that "retainer" to mean the amount Reichberg charges for calling in favors with the NYPD.  (*See* 4-10-15 Affidavit, at 35.)  That lone reference to Mr. Huberfeld does not relate to the honest services wire fraud with which he is charged, which, as detailed above, involves Huberfeld's alleged payment to Mr. Seabrook in return for Seabrook's assistance to seek COBA investments in Platinum.

> **2.**  *The Indictment Must be Dismissed Because the Government Failed to Obtain Judicial Approval to Use the Contents and Evidence Derived from Intercepted Calls to Which Huberfeld was a Party.*

The government believes that at least some of Mr. Huberfeld's calls constitute evidence of the crimes now charged against him—indeed, three of those calls are specified in the Complaint as evidence supporting the allegations.  (*See* Compl. ¶¶ 20(b)-(d).)  Accordingly, it is likely that the government used those calls to secure the Indictment against Huberfeld.  And, it is likely that the government will attempt to introduce those intercepted calls at Huberfeld's trial in an effort to secure a conviction.

---

[9] Similar to the bulk of the affidavits, applications, and wiretap orders relating to the Peralta investigation, the periodic reports that the government submitted to judges during the wiretap do not reference Huberfeld or any of the alleged activities that the government says support the charges against him.  (*See* Periodic Reports of November 10, 2014; November 20, 2014; December 15, 2014; December 23, 2014; January 22, 2015; February 2, 2015; and March 2, 2015.)

But, as stated above, the government never obtained judicial approval to disclose or use calls it says are now evidence of Huberfeld's alleged offenses. And, as a review of the documents relating to the Peralta, Rechnitz, and Reichberg wiretaps makes clear, the crimes charged against Huberfeld are not even hinted at in any of the government's submissions to judges. Further, *a fortiori*, no facts are included in any of the government's submissions that suggest the existence of probable cause to target Huberfeld's communications for interception, or the existence of probable cause to suggest Huberfeld committed honest services wire fraud. Mr. Huberfeld was never named as a target subject. The interception of his communications was never authorized. He was mentioned only once in the government's submissions, totally unrelated to the subsequent charges here.

Moreover, as shown above, the crimes specified in the wiretap authorization orders are not the crimes with which Huberfeld is charged. *See Brodson*, 528 F.2d at 216 (finding government is required to make an application under Section 2517(5) where the offenses underlying the wiretap order "require different evidence" than the offense for which the intercepted evidence will be used and, thus, "the two offenses are wholly separate and distinct"); *Marion*, 535 F.2d at 704 & n.13 (determining that the offense charged (transportation and transfer of unregistered firearm in interstate commerce) was distinct from that specified in the wiretap order (possession of dangerous weapons), despite the crimes arguably being provable with the same evidence).[10]

---

[10] Despite the fact that several of the wiretap authorization orders listed honest services fraud as a target offense, the mere use of the honest services statute as the basis of charges against Huberfeld does not magically transform the government's prior judicial approval requests to include the specific offenses now charged here. In light of Congress's desire to prevent the evasion of wiretap restrictions (such as showing probable cause and the necessity of a wiretap as opposed to other investigative techniques), *see Marion*, 535 F.2d at 700-01; *Masciarelli*, 558 F.2d at 1066-67, it would defeat the purpose of Section 2517 to approve the interception of Huberfeld's calls without having a judge determine whether the particular facts supporting the alleged honest services fraud violations satisfied the strictures of Title III. In other words, what matters most is that a judge review the specific facts and evidence

Section 2517(5) mandates that the government secure judicial approval before disclosing or using the contents of and evidence derived from calls relating to alleged crimes not specified in the authorization order. *See Marion*, 535 F.2d at 703 ("When an investigative or law enforcement officer engaged in an authorized electronic surveillance operation 'intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval,' subsequent judicial approval *must be obtained before the contents of such communications may be disclosed or used in any criminal or grand jury proceeding*." (emphasis added; quoting 18 U.S.C. § 2517(5))). To obtain judicial authorization, the government was required to show that "the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order." *Id.* at 700. And, the government was required to make such a showing in seeking authorization "as soon as practicable." *See* 18 U.S.C. § 2517(5); *see also Marion*, 535 F.2d at 704 n.14 (noting that with respect to the "as soon as practicable" requirement, "[i]n all events, . . . approval of the serendipitous interceptions must be obtained before their contents or fruits are used, pursuant to [Section] 2517(3), in any criminal or grand jury proceeding").

The government failed to fulfill any of these obligations.[11]

It cannot even be said that the use of the evidence was implicitly authorized. *See Masciarelli*, 558 F.2d at 1068 ("[T]he disclosure in subsequent affidavits to the issuing judge of material facts constituting or clearly relating to other offenses satisfies the requirements of

---

supporting a claim of probable cause to believe specific offenses are being committed before authorizing interception. It is irrelevant what criminal statute is being invoked based on that evidence.

[11] Even if the government had sought and obtained judicial approval, such an order would be of no effect if the government had used the evidence in obtaining the indictment before obtaining the order. *See United States v. Feola*, 651 F. Supp. 1068, 1101 (S.D.N.Y. 1987) (noting that 2517(5) orders issued after "other crime" evidence "had been presented to the grand jury" are "retroactive and thus of no effect" (citing *Marion*, 535 F.2d at 704 n.14)), *aff'd*, 875 F.2d 857 (2d Cir. 1989).

[Section] 2517(5)."); *United States v. Tortorello*, 480 F.2d 764, 781-83 (2d Cir. 1973) (determining that implicit authorization was given where judge issued renewal wiretap orders referencing affidavits in which evidence of the non-specified crime was set forth), *cert. denied*, 414 U.S. 866 (1974).  Here, however, there is no suggestion in the Peralta, Rechnitz, and Reichberg materials that the government had come across evidence of Mr. Huberfeld's alleged commission of honest services wire fraud.  No judge could have implicitly authorized the use of calls containing such evidence because the existence of such evidence is entirely absent from the wiretap applications, supporting affidavits, and authorizing orders.

Courts reviewing wiretap orders presume that the authorizing judge "'will scrutinize any application and will scrupulously impose the restrictions required by statute.'"  *United States v. Ruggiero*, 824 F. Supp. 379, 399 (S.D.N.Y. 1993) (quoting *Masciarelli*, 558 F.2d 1064, 1068).  But here the government never gave any judge the opportunity to pass on the propriety of its interception of calls relating to this other alleged crime.  And now, the precise harm that Section 2517(5) seeks to avoid has crystallized:  Mr. Huberfeld is being prosecuted on the basis of intercepted conversations for which probable cause was never established and for which compliance with Title III was never confirmed.  Permitting the government to flout Section 2517(5)'s restriction "is to place in peril our cherished personal liberties."  *Marion*, 535 F.2d at 706.

Therefore, dismissal of the Indictment is appropriate here.  *See id.* (reversing denial of motion to dismiss indictment where the government failed to obtain subsequent judicial approval to use evidence of non-specified offense in grand jury proceedings); *Brodson*, 528 F.2d at 215-17 (affirming dismissal of indictment where government applied for judicial approval eight months

after indictment was returned by a grand jury that considered intercepted conversations relating to an offense not specified in the wiretap authorization order).

**B.  The Intercepted Oral Communications to Which Huberfeld Was a Party Must Be Suppressed Because the Government Failed to Obtain Required Judicial Approval.**

Dismissal of the Indictment is appropriate and warranted for the government's blatant violation of Section 2517(5).  But if the court disagrees that the Indictment should be dismissed, the intercepted calls—which were not intercepted in accordance with Title III's procedures—must be suppressed.  In particular, this Court must suppress any of Mr. Huberfeld's intercepted calls that the government used to secure its Indictment against him and any such calls that the government contends are evidence of the crimes charged in that Indictment.  The government's failure to satisfy the requirements of Section 2517(5) renders the non-approved interceptions inadmissible.  *See* 18 U.S.C. § 2515 ("[N]o part of the contents of [an intercepted] communication and no evidence derived therefrom may be received in evidence . . . if the disclosure of that information would be in violation of this chapter."); *Aloi*, 449 F. Supp. at 720 (noting that the remedies for violation of Section 2517(5) are dismissal of the indictment or suppression of the non-authorized calls); *see also* 2 Clifford S. Fishman & Anne T. McKenna, *Wiretapping and Eavesdropping* § 16:23 (Supp. Dec. 2016) ("Many courts have held, properly, that failure to comply with 18 U.S.C.A. § 2517(5) requires suppression of evidence.").

If this Court somehow determines that dismissal of the Indictment is inappropriate, then, at the very least, the non-authorized intercepted calls of Mr. Huberfeld must be suppressed.

**C. All Non-Minimized, Non-Pertinent Intercepted Oral Communications to Which Defendant Murray Huberfeld Was a Party Must Be Suppressed Because the Government Failed to Comply With Title III's Minimization Requirement.**

Between January 12, 2015 and May 12, 2015, the government intercepted 173 calls containing Huberfeld's conversations.[12]  Eighty-nine of those calls were labeled "pertinent"; 84 of those calls were labeled "non-pertinent."  Of the 84 non-pertinent calls, only 10 were minimized.  This is despite the fact that those non-pertinent, non-minimized calls included such clearly personal topics as Huberfeld's weight and diet,[13] Huberfeld's travel plans,[14] and logistics about how parties to the call will meet.[15]  As discussed below, this failure to minimize 74 non-pertinent calls in which Huberfeld participated was unreasonable, and those calls should be suppressed.

1. *Title III Requires Minimization of Non-Pertinent Calls, and the Failure to Minimize Warrants Suppression.*

Title III's minimization provision requires the government to conduct its surveillance in a way that minimizes the interception of non-relevant conversations.  *See United States v. Gotti*, 42 F. Supp. 2d 252, 268 (S.D.N.Y. 1999) (quoting *Scott v. United States*, 436 U.S. 128, 140 (1978)).  "Minimization" means "to terminate the monitoring when [the government] determine[s] that a

---

[12] The government intercepted 220 total calls relating to Mr. Huberfeld—47 of those calls were either not answered, rang until voicemail picked up and the caller did not leave a message, did not connect, or ended without a participant speaking, leaving 173 calls in which Mr. Huberfeld actually conversed.  For reference, defendant Huberfeld refers to specific calls with the prefix identifying the surveillance session in which they were intercepted: "Rechnitz Sess." indicates calls intercepted during surveillance of Jona Rechnitz's phone; "Reichberg Sess." indicates calls intercepted during surveillance of Jeremy Reichberg's phone.

[13] Seven separate calls, only two of which were minimized.  (Rechnitz Sess. 1841; Reichberg Sess. 4170; 4922 (MINIMIZED); 8149 (MINIMIZED); 8851; 8854; 8855.)

[14] Four separate, non-pertinent calls, only one was minimized.  (Reichberg Sess. 2997; 3893; 4170; 4992 (MINIMIZED).)  Five non-minimized calls relating to Mr. Huberfeld's travel were inexplicably labeled "pertinent," despite having nothing to do with any of the crimes for which interception was authorized.  (Reichberg Sess. 5400, 5478; Rechnitz Sess. 1292, 1906, 3062.)

[15] Seven separate, non-pertinent calls, none minimized.  (Reichberg Sess. 2672; 3409; 5604; 6523; 6535; 8257; 10562.)

conversation [i]s unrelated to communications subject to interception." *United States v. Fleishman*, No. 11 CR. 32 JSR, 2011 WL 4000987, at *3 (S.D.N.Y. Aug. 31, 2011), *aff'd sub nom. United States v. Nguyen*, 507 F. App'x 64 (2d Cir. 2013).  The minimization requirement is a central piece of Title III's stringent scheme that seeks to balance law-enforcement interests against privacy rights.  *See United States v. Simels*, No. 08-CR-640 (JG), 2009 WL 1924746, at *11 (E.D.N.Y. July 2, 2009) ("[T]he mandated effort to identify and not intercept [innocent] conversations plays 'a central role in the statutory scheme.'"  (quoting *United States v. Giordano*, 416 U.S. 505, 528 (1974))), *aff'd*, 654 F.3d 161 (2d Cir. 2011).

The government bears the burden to make a prima facie showing of compliance with Section 2518(5)'s minimization requirements.  *Rajaratnam*, 2010 WL 4867402, at *27 (citing *United States v. Rizzo*, 491 F.2d 215, 217 n.7 (2d Cir. 1974)).  Once a prima facie showing is made, the burden shifts to the defendant to show that, despite a good faith compliance with the minimization requirements, "a substantial unreasonable interception of non-pertinent conversations occurred" that warrants suppression of the evidence.  *United States v. Ianniello*, 621 F. Supp. 1455, 1470 (S.D.N.Y. 1985), *aff'd*, 824 F.2d 203 (2d Cir. 1987).

That determination of reasonableness depends on the assessment of all of the circumstances, including "(1) the length of non-pertinent calls; (2) whether the non-pertinent calls were 'one-time' calls; (3) the ambiguous nature of the conversations or pattern of calls; (4) whether the investigated conduct involved a widespread conspiracy; (5) the public or private nature of the target phone; and (6) the stage of the surveillance."  *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 478 (S.D.N.Y. 2013) (citing *Scott*, 436 U.S. at 140-42).

In this case, the government has evinced "a pervasive disregard of the minimization requirement" warranting suppression. *United States v. Goffer*, 756 F. Supp. 2d 588 (S.D.N.Y. 2011) (citation and internal quotation marks omitted), *aff'd*, 721 F.3d 113 (2d Cir. 2013).

2. *The Minimization Errors Require Suppression.*

(a) Mr. Huberfeld Has Standing to Challenge Minimization.

Because Huberfeld was a party to the conversations that he is challenging on minimization grounds, he is an "aggrieved person" within the meaning of Title III. *See* 18 U.S.C. § 2510(11). Indeed, notwithstanding some property-based Second Circuit case law to the contrary, *see United States v. Burford*, 755 F. Supp. 607, 613 (S.D.N.Y. 1991); *United States v. Rodriguez*, 734 F. Supp. 116, 122 (S.D.N.Y. 1990), *aff'd*, 968 F.2d 130 (2d Cir. 1992), he is in the precise class of persons that Congress sought to protect by defining an aggrieved person as it did. Accordingly, Huberfeld has standing to challenge the government's failure to minimize his calls.

(b) The Government's Failure to Minimize Mr. Huberfeld's Calls was Objectively Unreasonable and Suppression of the Non-Minimized Calls is Appropriate.

Almost half of the 173 calls involving Mr. Huberfeld were labeled non-pertinent. Specifically, even the government agents conducting the surveillance thought that about 49% of the conversations in which Huberfeld participated were not pertinent to the crimes they were investigating. That is for good reason—numerous conversations involve Huberfeld's diet, leisure travel plans, and discussions about real estate investments and opportunities that clearly do not relate to any law enforcement investigation.

But despite Huberfeld's conversations being innocuous almost half of the time, only 10 out of 84 non-pertinent calls—about 12%—were minimized. The less-than-two-minute length of many of the non-pertinent calls cannot excuse the government's failure to properly minimize

those calls; indeed, the presence of Huberfeld as a conversant who engaged in pertinent discussion only half the time, plus the totally irrelevant content of the calls, should have made it plain to surveillance agents that the non-pertinent calls needed to be minimized, regardless of whether they reached the arbitrary two-minute threshold.

To illustrate this point, agents minimized only 1 of the 62 non-pertinent calls—1.6%—lasting less than two minutes. Those non-minimized interceptions provided such helpful information as where to meet at the airport (Reichberg Sess. 3409), opportunities in the energy industry (Rechnitz Sess. 3082), whether Reichberg is coming to dinner (Reichberg Sess. 7212), buying tickets for a boxing match (Rechnitz Sess. 5771), and complaints about Teaneck, NJ (Rechnitz Sess. 7692).

Given the nature and content of these recordings, all of the non-minimized non-pertinent calls (74 in total) should be suppressed for failure to minimize.[16] That failure cannot be considered objectively reasonable where the non-pertinent calls between Mr. Huberfeld and Reichberg or Rechnitz were not "one-time" calls in which the intercepting agent was unfamiliar with the speakers; where the nature of the calls were clearly innocent and the pattern suggested that Huberfeld did not discuss relevant topics in his calls; where the Rechnitz and Reichberg phones were private, thus limiting the potential speakers who might appear; and where the non-pertinent calls were intercepted over a period of four months, belying any suggestion that agents continued to be unfamiliar with the nature of calls from Huberfeld. *See Zemlyansky*, 945 F.

---

[16] Even setting aside the non-pertinent calls that lasted less than two minutes, the government minimized only 9 out of those 22 non-pertinent calls. This is inexplicable. The 13 non-pertinent, non-minimized calls that lasted two-minutes or more include a discussion about an Atlanta energy company (Rechnitz Sess. 1993), a discussion about real estate investments (Rechnitz Sess. 3978; 4760; 5710; 5733), a discussion about certain people who are difficult to deal with in business (Rechnitz Sess. 4195), the marital issues of a couple with whom Huberfeld and Rechnitz are acquainted (Rechnitz Sess. 4798), and discussions about dieting (Reichberg Sess. 8854; 8855). All of these 13 calls should have been minimized when it was clear that the topic was innocuous—just like the non-pertinent, non-minimized calls that lasted less than two minutes—and they certainly should have been minimized at two minutes. But they were not. These calls must be suppressed for the government's unreasonable failure to comply with the minimization requirements of Title III and the wiretap authorization orders.

Supp. 2d at 478 (listing factors to be considered in assessing reasonableness of minimization procedures).

On balance, the totality of the circumstances weighs in favor of suppressing the non-minimized calls, and this Court should enter such an order. This request is reasonable—Huberfeld does not seek blanket suppression of the entire wiretap as a result of the government's failure to properly minimize calls. Instead, Huberfeld asks this Court to suppress what should never have been heard—the 74 non-pertinent, non-minimized calls in which Huberfeld's conversations were intercepted.

## II. THE COURT SHOULD DISMISS THE INDICTMENT BECAUSE THE FEDERAL HONEST SERVICES STATUTE IS UNCONSTITUTIONALLY VAGUE AS APPLIED TO DEFENDANT SEABROOK'S RELATIONSHIP TO COBA.

Counts One and Two of the Indictment charge defendants with a conspiracy to commit and the commission of honest services fraud in connection with investments made by COBA into the Platinum investment fund. A person commits wire fraud when, "having devised or intending to devise any scheme or artifice to defraud," he uses interstate wires "for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343. Section 1346, the honest services fraud statute, defines the term "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services," *id.* § 1346, which the Supreme Court in turn has held to encompass "only bribery and kickback schemes," *Skilling v. United States*, 561 U.S. 358, 368 (2010).

The *Skilling* decision also identified (and by doing so resolved conflicting federal case law) another element of honest services fraud: a violation of fiduciary duty. *See id.* at 407 (describing the "solid core" of the honest services doctrine as involving "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes"). However, because

the honest services statute fails to define the source, scope and content of the fiduciary duty

owed in the business relationships presented here, the Court must dismiss the Indictment and

find it void-for-vagueness as applied.

The Due Process Clause requires statutory terms to be "defined 'with sufficient

definiteness that ordinary people can understand what conduct is prohibited,' [and] 'in a manner

that does not encourage arbitrary and discriminatory enforcement.'" *McDonnell v. United*

*States*, 136 S. Ct. 2355, 2373 (2016) (quoting *Skilling*, 561 U.S. at 402-03). That standard is not

met here.

### A. The Indictment is Void for Vagueness as Applied to Defendants Because the Honest Services Statute Fails to Define the Scope of Fiduciary Duty.

Defendant Norman Seabrook was President of COBA during the relevant period charged

in the Indictment. In this capacity, he concededly owed COBA a duty of loyalty. However, the

question this Indictment does not answer is whether that duty prevented him from receiving

money from a third party "for facilitating" (Indict. ¶ 14) the introduction of an investment fund

to the COBA pension fund. Or, more importantly, whether by accepting money from a third

party (taking the government's allegation as true only for purposes of these motions), such

conduct constitutes the federal crime of honest services fraud. Because this statute remains

hopelessly ambiguous on the scope of the fiduciary duty owed between corporate officer and

corporation as an element of a "corrupt" kickback, it cannot be constitutionally applied to the

accusations in this Indictment.

The honest services wire fraud statute, 18 U.S.C. § 1346, prohibits engaging in a "scheme

or artifice to deprive another of the intangible right of honest services." Because this broad and

vague language triggers substantial due process concerns, the Supreme Court in *Skilling* limited

its application to "fraudulent schemes to deprive another of honest services through bribes or

kickbacks supplied by a third party who had not been deceived." *Skilling*, 561 U.S. at 404. To

read the statute "to proscribe a wider range of offensive conduct" would, the Court

acknowledged, "raise the due process concerns underlying the vagueness doctrine." *Id.* at 408.

In narrowing the statute, the Supreme Court sought to avoid leaving open questions about

the scope of the honest services prohibition. Thus, the Court rejected the government's proposed

formulation, that the statute be read to prohibit the "taking of official action by the employee that

furthers his own undisclosed financial interests while purporting to act in the interests of those to

whom he owes a fiduciary duty, so long as the employee acts with a specific intent to deceive

and the undisclosed conduct could influence the victim to change its behavior." *Id.* at 411 n.44.

That formulation, the Court noted, "leaves many questions unanswered. How direct or

significant does the conflicting financial interest have to be? To what extent does the official

action have to further that interest in order to amount to fraud?" *Id.* In other words, under the

government's formulation, it would have been difficult to draw the line between permitted and

proscribed conduct or to determine at what point a defendant had breached his fiduciary duty.

The proposed broader reading of the statute was therefore rejected as impermissibly vague. *See

id.*

The *Skilling* majority concluded that such vagueness concerns were alleviated by limiting

the statute only to bribes and kickbacks. Justice Scalia, in a concurring opinion, cautioned

however that the Court's limiting construction would not cure the vagueness at the heart of the

statute because it would "not solve the most fundamental indeterminancy: the character of the

'fiduciary capacity,' to which the bribery and kickback restriction applies." *Skilling*, 561 U.S. at

421 (Scalia, J., concurring in part and concurring in the judgment). In other words, "even with

the bribery and kickback limitation the statute does not answer the question 'What is the criterion

of guilt?'" *Id.* Does the government have to show an intent to harm the party to whom a fiduciary duty is owed? Does the statute impose a threshold standard that requires a finding that the personal payment received by a party owing fiduciary duty to another outweighs the financial incentives in a defendant's relationship with that fiduciary? Or, even more simply, does the honest services statute require some showing other than receipt of a third-party payment related to a matter involving the officer's corporate duties?

All of these questions attempt to define or delineate what actually constitutes a bribe or kickback. The criteria for answering this question must be tied to a defendant's fiduciary duty to the alleged victim. However, the honest services statute does not provide such criteria to ordinary persons to determine what conduct is actually prohibited by the statute.

In this case, Norman Seabrook was not prohibited by the COBA by-laws or any other corporate policies from taking compensation or payments from a third party during his term as officer at COBA. (*See generally* Exhibit A, attached to Mazurek Declaration in Support of Motions.) Accordingly, the mere receipt of payment from a third party alone *would not* be sufficient to constitute a prohibited "bribe or kickback." Such payments were not even restricted by internal corporate governance rules. To be criminal, there must be something more. A payment must be tied, at least, to a finding of a defendant's intent to be corruptly influenced in carrying out his official action on behalf of the entity to which he owes a duty of loyalty. Thus, an unlawful *quid pro quo,* or intent to be corruptly influenced by a third-party payment is what appears to divide permitted conduct from crime. *United States v. Rosen*, 716 F.3d 691, 699-700 (2d Cir. 2013) (requiring that a bribe be "in exchange" for a particular act under the honest services fraud statute).

However, if "corrupt intent" is largely defined by taking personal payments that relate to a matter involving the entity to whom loyalty is owed, the finding of "corruption" becomes circular. It reduces corrupt intent to receiving third-party payments. In such context, corrupt intent does not provide a coherent standard to remedy any vagueness problem: a jury effectively can find that the defendant took a "bribe or kickback" if he had the intent to do so, and he had the requisite intent if, in fact, he took a "bribe."

Absent clear criteria for defining the scope of fiduciary duty owed by an officer to a corporation, it becomes impossible for an ordinary person to understand what conduct is, in fact, prohibited by the federal honest services statute. This gap in the statute also encourages arbitrary and discriminatory law enforcement action. *See Rosen*, 716 F.3d at 699 (identifying elements of void-for-vagueness doctrine).

The honest services statute gives no fair notice and warning to a corporate officer of when the receipt of third-party payments or transfers of value become criminal.

1. *The Second Circuit and Other Federal Circuits Have Failed to Specify the Nature, Scope, and Source of the Fiduciary Duty Obligation Underlying the Honest Services Statute.*

Disagreement as to the nature, scope, and source of the fiduciary obligation, violation of which constitutes a breach of the duty of honest services, was pervasive before *Skilling* and remains so after it, despite the limits set in that case. This conflict in the circuits existed before *McNally*,[17] between *McNally* and *Skilling*, and continues to this day. That the courts of appeals continue to disagree on the underlying conduct required to violate the honest services statute, *i.e.*, on the duty that must be breached to violate the statute, illustrates the fact that even so narrowed, the statute remains plagued by vagueness when applied in many different contexts.

---

[17] *McNally v. United States*, 483 U.S. 350 (1987).

Prior to *McNally*, "[n]one of the 'honest services' cases, neither those pertaining to public officials nor those pertaining to private employees, defined the nature and content of the fiduciary duty central to the 'fraud' offense." *Skilling*, 561 U.S. at 417 (Scalia, J., concurring). These pre-*Skilling* cases variously located the fiduciary duty in "positive state or federal law," *id.* (citing *United States v. Rabbitt*, 583 F.2d 1014, 1026 (8th Cir. 1978)), "general principles," *id.* (citing *United States v. Lemire*, 720 F.2d 1327, 1336 (D.C. Cir. 1983)), in "trust law," *id.* at 417-18 (citing *United States v. Gray*, 790 F.2d 1290, 1294 (6th Cir. 1986)), and even the "general law of agency," *id.* at 418 (citing *United States v. Ballard,* 663 F.2d 534, 543, n. 22 (5th Cir. 1981)). Where courts relied on a "federal, common-law fiduciary duty[,] the duty remained hopelessly undefined," with courts describing the duty "in astoundingly broad language." *Id.* And "[m]any courts held that some *je-ne-sais-quoi* beyond a mere breach of fiduciary duty was needed to establish honest-services fraud," although "there was disagreement as to what the addition should be." *Id.* at 419.

After *McNally* and before *Skilling*, the circuits remained split as to the fiduciary duty requirements. The Second and Eighth Circuits concluded that breach of a fiduciary duty was not even an element of an honest services violation. *United States v. Ervasti*, 201 F.3d 1029, 1036 (8th Cir. 2000); *United States v. Sancho*, 157 F.3d 918, 920 (2d Cir. 1998), *overruled on other grounds by United States v. Rybicki*, 354 F.3d 124, 144 & n.19 (2d Cir. 2003) (en banc); *see also Rybicki*, 354 F.3d at 155 (Raggi, J., concurring). The Fifth Circuit required a state law violation to sustain an honest services conviction, *United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1997) (en banc); *see also United States v. Brown*, 459 F.3d 509, 519 (5th Cir. 2006) (honest services owed under state law include "fiduciary duties defined by the employer-employee relationship"), while the First, Third, and Seventh Circuits concluded that state law could be used

to supply the fiduciary obligation but was not necessarily required, *see United States v. Sorich*, 523 F.3d 702, 712 (7th Cir. 2008); *United States v. Murphy*, 323 F.3d 102, 116-17 (3d Cir. 2003); *United States v. Sawyer*, 239 F.3d 31, 41-42 (1st Cir. 2001). By contrast, the Sixth, Ninth and Eleventh Circuits explicitly held that "[f]ederal law governs the existence of fiduciary duty under the mail fraud statute." *United States v. Frost*, 125 F.3d 346, 366 (6th Cir. 1997); *see also United States v. Weyrauch*, 548 F.3d 1237, 1248 (9th Cir. 2008) (honest services statute establishes a uniform federal standard), *vacated and remanded in light of Skilling*, 561 U.S. 476 (2010); *United States v. deVegter*, 198 F.3d 1324, 1329 (11th Cir. 1999) ("The nature and interpretation of the duty owed is a question of federal law.").

Since *Skilling* adopted its limiting construction of the statute – and in doing so purported to establish a "uniform national standard," 561 U.S. at 411 – the courts of appeal that addressed fiduciary duty, including the Second Circuit, have acknowledged breach of such a duty *is required* to establish an honest services violation. *See United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016); *United States v. Milovanovic*, 678 F.3d 713, 722 (9th Cir. 2012) (en banc); *United States v. Urciuoli*, 613 F.3d 11, 17-18 (1st Cir. 2010).

However, beyond that basic point, the courts of appeal continue – as before *McNally* and *Skilling* – to disagree about the nature, source and scope of that duty.

The Second Circuit has left these issues unanswered. In *Halloran*, the court expressly referred to Justice Scalia's concurrence in *Skilling*, in which he "emphasized the lingering ambiguities in § 1346," particularly arising out of the failure to define the nature and content of the fiduciary duty central to the fraud offense. *Halloran*, 821 F.3d at 337. The *Halloran* court also referred back to Judge Jacobs's dissent in the Second Circuit's en banc decision in *Rybicki*. *Id.* In doing so, the court identified the remaining gaps in the statute's definition. *Id.* (citing

*Rybicki*, 354 F.3d at 163 (en banc) (Jacobs, J., dissenting) (noting the majority's failure to define the type of duty that must be breached to violate § 1346, or to decide whether the source of the duty was state or federal law)). The *Halloran* court, however, did not reach these issues in rejecting the defendant's claim that Section 1346 was void-for-vagueness as applied to the facts in that case.

In *Halloran*, the defendant Daniel J. Halloran, a Republican member of the New York City Council, challenged his honest services conviction by claiming that the federal law was impermissibly vague because it did not make clear whether the Republican county party chairs were under a cognizable fiduciary duty to their party not to accept payments in exchange for approving a non-party member's nomination to a city-wide office under New York election laws. *Id.* at 337-38. Halloran claimed on appeal that the answer to that question differed depending on whether the fiduciary duty for purposes of § 1346 arose out of federal or New York State law. *Id.* at 338. Because the Second Circuit decided that there was no difference in the application of federal or state law principles of fiduciary duty under the facts of that case, the defendant's claims were defeated without the need to establish the actual source and scope of fiduciary duty law that should generally apply to interpretations of Section 1346. *Id.* at 338-39.

Other Circuits also have struggled with this issue post-*Skilling*. The Fifth Circuit seems to still require violations of a state law duty to sustain a federal honest services conviction. *See United States v. Teel*, 691 F.3d 578, 584 (5th Cir. 2012) ("[W]e read *Skilling* as recognizing that § 1346 prosecutions may involve misconduct that is also a violation of state law."). Meanwhile, the Ninth Circuit has held that the fiduciary duty required to be breached "is not limited to a formal 'fiduciary' relationship well-known in the law." *Milovanovic*, 678 F.3d at 724 (en banc). The Eleventh Circuit has described the duty broadly, stating that public officials "inherently"

owe a duty, the scope of which was left largely undefined. *United States v. Nelson*, 712 F.3d 498, 509 (11th Cir. 2013) (citing *deVegter*, 198 F.3d at 1328).

Most recently, also in the context of public official prosecutions under the federal honest services statute, the Supreme Court has further limited post-*Skilling* convictions to schemes involving a specific intent to give or receive something of value in exchange for taking "official acts." *McDonnell v. United States*, 136 S. Ct. 2355, 2371-72 (2016).

Thus, even after *Skilling*, the courts of appeal cannot agree on the nature or scope of the duty whose breach violates the honest services statute. This continued inconsistency – indeed incoherence – among the circuits underscores the due process concerns raised by Huberfeld here, namely that the statute failed to provide him adequate notice of the distinction between permitted and proscribed conduct. The vagueness inherent in the honest services doctrine, recognized by the Supreme Court in *McNally* and *Skilling*, has now shifted to the fiduciary duty requirement, which, lacking a defined scope or content, is susceptible to wide-ranging and inconsistent interpretations that might differently apply depending on the circumstances and types of relationships that are presented.

   2.   *Because the Scope and Content of the Fiduciary Duty Owed in the Context of Defendant Seabrook's Relationship with COBA is Left Undefined in the § 1346 Statute, it is Unconstitutionally Vague as Applied to the Allegations in this Indictment.*

As explained above, because the COBA by-laws did not prevent Seabrook from accepting payments from third parties, even if related to matters involving COBA, the question remains after *Skilling*, what "is the criterion of guilt?" *Skilling*, 561 U.S. at 421 (Scalia, J., concurring). If Seabrook could take payments from third parties without running afoul of COBA's rules and by-laws, where is the line that defines when taking such payments violates the

federal honest services statute, and did the defendants in this case have adequate notice of that line?

The allegations in the criminal Complaint and the Indictment against defendants Seabrook and Huberfeld are fairly straightforward. In essence, the Indictment generally alleges that defendant Huberfeld and CW-1 (known to the parties as Jona Rechnitz) allegedly agreed that the hedge fund "Platinum [Partners] would be willing to pay Seabrook personally in exchange for facilitating [COBA's] investment" into Platinum. (Indict. ¶ 14.) As President of COBA, Seabrook had the ability to give Platinum access to COBA's Executive Board, and more specifically, to the Annuity Fund Board, which had authority under COBA's by-laws to make investment decisions for the fund. (Indict. ¶¶ 8, 10; Compl. ¶ 9(c)-(d).) The Annuity Fund Board "in 2014, consisted of Norman Seabrook, the defendant; Treasurer-1; and approximately two other members of the COBA Executive Board. COBA had also hired an investment advisor [ ] to advise on investing the Annuity Fund's money." (Indict. ¶ 10.)

According to the Indictment, Platinum made a presentation to the COBA Annuity Fund Board in January 2014, which eventually led to the Board's approval of investing fund proceeds in the Platinum PPVA, a specific fund strategy within Platinum. (Indict. ¶ 16.) The COBA Annuity Fund made two separate investments into the PPVA Fund at Platinum in the amounts of $10 million in March 2014 and another $5 million in August 2014. (Indict. ¶ 16.) Also, the COBA General Fund made a $5 million investment in Platinum in June 2014. (Indict. ¶ 17.)

The misconduct alleged in the Indictment involved a single purported payment of $60,000 made to Seabrook from Rechnitz on or about December 11, 2014. (Indict. ¶ 18.) The Indictment alleges this purported payment was "in exchange for" Seabrook's agreement to cause COBA to invest in Platinum. (Indict. ¶ 22.)

The question arising from this allegation of a payment from Platinum to Seabrook through Rechnitz is whether an ordinary person, taking the Indictment's allegations at face value for purposes of this motion, would be on notice that Seabrook's receipt of money from Platinum amounted to "bribe or kickback"-taking in violation of the federal honest services statute. More specifically, is what is alleged in the Indictment sufficient to identify the corrupt intent required under the statute to make the alleged "exchange" a corrupt one.

If Seabrook, as a COBA officer, was not precluded from receiving payments from third parties, even involving matters related to COBA, how would an ordinary person know that the payment alleged in the Indictment violated Section 1346? What is the something more that the statute requires above and beyond receipt of payment? Must Seabrook know that by taking the money he is doing something wrong? Is there a requirement that Seabrook must have acted with the specific intent to harm COBA? Is there a further requirement that the personal financial interest has to be significant enough to outweigh the defendant's interest in maintaining loyalty to the entity to which he owes a fiduciary duty? The scope of any fiduciary duty required by Section 1346 should answer these questions. However, as explained above, Congress failed to give this direction in the statute, and the courts have not provided a limiting construction on this issue. Accordingly, an ordinary person in defendants' position would not have fair notice of what additional conduct was required to violate the statute in addition to receipt of payment.

Under one perspective, Seabrook could be deemed to have earned a "finder's fee" for facilitating Platinum's access to the COBA Annuity Fund Board, and the alleged payment was made in "exchange for" that service. Under another, the government claims that the payment was a "corrupt" one, bringing it within the category of an unearned "bribe or kickback." *See United States v. DeMizio*, 741 F.3d 373, 383 (2d Cir. 2014) (declining bright line rule in private

employment context to determine whether payments to defendant's father and brother were kickbacks or legitimate fees for services; instead compared reasonable value of services performed with amounts actually paid); *see also United States v. Mitrow*, No. S3 13 Cr. 633 (PAE), 2015 WL 5245281, at *11-13 (S.D.N.Y. Sept. 8, 2015) (finding evidence of corrupt "kickback" payments because payments were to cover personal expenses of defendant, which could not be justified based on reasonable business practices). In this case, because Seabrook was not prohibited by COBA's by-laws from receiving payments for services rendered to third parties during his term as COBA's President, the payment alleged – without more – cannot be sufficient to violate the fiduciary duty element of the federal honest services statute.

The question therefore remains whether ordinary persons, placed in Seabrook and Huberfeld's positions, had adequate notice of the point at which the alleged conduct crossed the line. Does the honest services statute in the private sector context require violations of the private entity's by-laws or other corporate rules? Does it require a violation of state law or some federal common-law theory of fiduciary duty? Is the measure of whether the conduct crossed the line depend on the *mens rea* of the defendant when he accepted the payment? If so, what is the legal requirement of "corruption"? "[O]n its face, the word 'corruptly' is vague," and "in the absence of some narrowing gloss, people must 'guess at its meaning and differ as to its application.'" *United States v. Poindexter*, 951 F.2d 369, 378 (D.C. Cir. 1991) (citations omitted). An action is corrupt if illegal and illegal if corrupt. This definition is hopelessly circular and fails to remedy any vagueness problem.

In the context of this case, the duties of the corporate official, Seabrook, are far from clear, as the Indictment points to no specific duty or proscription that COBA placed on its

officers from receiving outside compensation.  And the honest services statute does not import one from state or federal law or regulation.

The government cannot be allowed to invoke "'so shapeless a provision to condemn someone to prison'" for up to 20 years.  *McDonnell*, 136 S. Ct. at 2373 (quoting *Johnson v. United States*, 135 S. Ct. 2251, 2560 (2015)).  The government's view here that the alleged payment to Seabrook was a "kickback" because it was paid, fails to address the fundamental indeterminancy in this case:  what is a kickback?  Due process requires a standard that clearly differentiates a legitimate business relationship from a violation of the statute.  Absent a definition of fiduciary duty, a breach of which constitutes a violation of the honest services statute, the statute remains unconstitutionally vague as applied.  To avoid constitutional due process problems, the statute's application here should be construed not to cover the conduct alleged against the defendants in the Indictment.

### B.  To the Extent that the Government's Allegations of Honest Services Fraud Rests on a Gratuity Theory, the Indictment Must Be Dismissed.

The allegations in the Indictment suggest that the purported payment to Seabrook occurred in December 2014, some nine months *after* the COBA Annuity Fund first invested in the Platinum PPVA fund. (Indict. ¶¶ 16, 18.)  Despite this timing of the payment, the Indictment labeled it as a "kickback." (*Id.* ¶ 19.)

In the statutory allegations in paragraphs 22 and 24, the Indictment appears to allege an unlawful *quid pro quo*:  "Huberfeld agreed to pay kickbacks to Seabrook in exchange for Seabrook's agreement to direct wire transfers of millions of dollars of COBA funds to a Manhattan hedge fund operated by Huberfeld and others." (*Id.* ¶¶ 22, 24.)  This language omits the corrupt intent requirement traditionally connected to the payment or receipt of "bribes or kickbacks." *See* 18 U.S.C. §§ 201, 666 (federal bribery statutes that inform honest services

elements).  Corrupt intent, as explained in the section *supra*, is often what divides permitted from prohibited conduct.  This element has been described in the case law as an intent to influence or be influenced in the official action of some business, transaction or series of transactions.  *See United States v. Bahel*, 662 F.3d 610, 633-34 (2d Cir. 2011) (distinguishing intent requirement between bribes and gratuities).

The Indictment's "kickback" allegation rests on a claim that Seabrook was corruptly influenced at the time he recommended the Platinum investment to the COBA Annuity Fund board.  This is in contrast to a gift or gratuity that is intended to reward an actor *after* the taking of official action.  *See United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015) ("[A]n agent's secret receipt of a gratuity (a "reward" in the language of § 666) does *not* violate § 1341, for a payment that does not entail a plan to change how the employee or agent does his job is neither a bribe nor a kickback.").  Because *Skilling* limited violations of honest services fraud to "bribes and kickbacks," a gratuity theory of liability is no longer encompassed in the statute. *Skilling*, 561 U.S. at 412.  The *Skilling* majority thought that bribery entails a specific *quid pro quo,* not just a receipt of money.  *See also United States v. Ciavarella*, 716 F.3d 705, 729 (3d Cir. 2013) ("The bribery-and-kickback theory of honest services fraud requires 'a *quid pro quo*, that is, a specific intent to give or receive something of value in *exchange* for an official act.'" (citation omitted)).

To the extent the government's proof only alleges or indicates a post-investment receipt of money by Seabrook, this conduct is not prohibited by Sections 1343 and 1346.  Any reliance on a gratuity theory of liability in Counts One and Two, therefore, must be dismissed.

**C. The Court Should Dismiss the Government's Theory of Liability Against Defendant Huberfeld in Count Two Based on Principal Liability Because Huberfeld Did Not Owe Fiduciary Duty to COBA.**

In Count Two, the Indictment charges Mr. Huberfeld with substantive honest services fraud in violation of 18 U.S.C. §§ 1343, 1346, and 2. This count alleges two theories of liability under these statutes: principal and accessory liability. The Indictment's theory of principal liability against Mr. Huberfeld is that by allegedly arranging for payment to Seabrook, Huberfeld deprived COBA of honest services of its President. (Indict. ¶ 24.)

This theory is fundamentally at odds with the limitations imposed on the honest services statute by *Skilling*. The only honest services duty identified by the Indictment was the duty owed to COBA and its members. No one contends, nor could they, that Huberfeld owed that duty – he was not in a fiduciary position with respect to COBA. Huberfeld therefore could not and did not breach the only honest services duty at issue in this case. And for that reason he could not properly be convicted of substantive honest service fraud under a principal theory of liability after *Skilling*.

As *Skilling* explains, the "core pre-*McNally* applications," 561 U.S. at 408, of § 1346 "involve[d] offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes," *id.* at 407. In such schemes, *Skilling* emphasizes, "the *offender profited*" from bribes or kickbacks and thus defrauded the "betrayed party" out of the *offender's* honest services, while "a third party, who had not been deceived, provided the enrichment." *Id.* at 400 (emphasis added); *see id.* at 400 ("[T]he pre-*McNally* cases involved fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived."). To avoid vagueness concerns, *Skilling* limits § 1346 to the pre-*McNally* core as a "prohibition on fraudulently depriving another of one's honest services by accepting bribes or kickbacks." *Id.* at 412; *see id.* at 416 (Scalia, J., concurring in the judgment) ("The Court

maintains that 'the intangible right of honest services' means the right not to have one's fiduciaries accept 'bribes or kickbacks.'").

This limitation imposed by *Skilling* has found endorsements by the Sixth and Eleventh Circuits in the context of public officials.[18]  Both of these circuit courts of appeal have found that a "public official can commit honest services fraud only by accepting a bribe or a kickback." *United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013); *United States v. Langford*, 647 F.3d 1309, 1321 (11th Cir. 2011) ("[I]n order to prove that [the defendant] defrauded the public of his honest services, the government had to prove beyond a reasonable doubt that [he] was in fact a public official and that he accepted bribes that he did not disclose to the public.").  It simply makes no sense that defendant Huberfeld could be convicted as a principal of substantive honest services fraud when he owed no fiduciary duty to the alleged victim in the Indictment:  COBA and its members.

The Court therefore should dismiss that part of Count Two which charges Mr. Huberfeld as a principal in violation of substantive honest services fraud.

## III.     THE COURT SHOULD COMPEL THE GOVERNMENT TO MAKE IMMEDIATE *BRADY/GIGLIO* DISCLOSURES.

In *Brady v. Maryland*, the Supreme Court held that criminal defendants have a due process right to access exculpatory and material evidence in the government's possession with sufficient time to make use of that evidence at trial.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]").  Whether a delayed disclosure violates *Brady* depends on the nature of the evidence and the length of the delay, both of which affect the defendant's ability to make use of the evidence at

---

[18] The case law provides no reason to distinguish the statute in this regard between private and public fiduciary duties.

trial.  *See United States v. Golyansky*, 291 F.3d 1245, 1248-50 (10th Cir. 2002); *Leka v. Portuondo*, 257 F.3d 89, 100-01 (2d Cir. 2001).  When assessing materiality, the Court must address whether there is a "reasonable possibility that timely disclosure of the evidence would have changed the result of the proceeding."  *United States v. Fallon*, 348 F.3d 248, 252 (7th Cir. 2003).

In this case, the government has failed to produce materials that are in its possession and are favorable to the defendants, either because they are exculpatory or impeaching, and are material to their defense.  "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different."  *Turner v. United States*, __ S. Ct. __, Nos. 15-1503, 15-1504, *slip op.* at 10 (June 22, 2017) (citing *Cone v. Bell*, 556 U.S. 449, 469-70 (2009)).  Whether evidence tends to create this doubt is case-specific; if the other evidence in the case is relatively weak, "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v. Agurs*, 427 U.S. 97, 113 (1976).

Here, the government's entire case rests on the uncorroborated words of a single witness, Jona Rechnitz, a confessed felon who signed a cooperation agreement with the government. Rechnitz provides the only evidence that any payment was made to Seabrook relating to COBA's Platinum investment, or that Huberfeld arranged it.  Without his testimony, the government has no case.  Thus, evidence that undermines the credibility of Rechnitz takes on paramount importance to ensure the reliability and fairness of these proceedings.  If the government possesses information that reveals Rechnitz has lied in the past, and continues to lie even to his government handlers, this information clearly has a "reasonable probability" of

shifting even one juror's vote.  *Cone*, 556 U.S. at 452, 470; *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The defense therefore demands the government produce Rechnitz impeachment evidence, which we believe is presently in the government's possession or can be obtained through the exercise of due diligence, and which was first requested directly from the government in our letter dated June 20, 2017.  (*See* Exhibit B, attached to Mazurek Decl. in Support of Motions ("Ex. B. to Mazurek Decl.").)  To date, the government has not responded to any of our requests.

The attached requests seek information that is either directly exculpatory or impeachment material related to the government's tainted witness.  Much of this information, including information related to Rechnitz's continued participation in a large-scale Ponzi scheme during the period of his government cooperation, his attempts to cover-up or minimize his involvement, and his ability to steer the government away from his own culpability by fingering the defendants in this case, all contain information that is not merely useful as grist for cross-examination, but is useful to the defendants here "in a general pretrial investigation."  *United States v. Higgs*, 713 F.2d 39, 45 (3d Cir. 1983).  It will become increasingly more difficult for the defendants to assimilate substantial amounts of evidence regarding additional Rechnitz fraud and cover-up schemes at later stages of the case.  *Leka*, 257 F.3d at 101 (noting that "new witnesses or developments tend to throw existing strategies and preparation into disarray").  This information should be disclosed now when the defendants could use it in their investigation and preparation for trial.  *Id.* at 100 ("[O]nce trial comes, the prosecution may not assume that the defense is still in the investigatory mode.")

The government's evidence against defendants is weak.  It relies solely on the testimony of Rechnitz, a shadowy figure who only recently was disclosed to have orchestrated and

managed a second Ponzi scheme (other than the Peralta liquor sales fraud) relating to a national sports and entertainment ticket reseller business. It also calls into question the government's lack of action relating to apparent breaches by Rechnitz of his cooperation agreement.

Other than Rechnitz's testimony, there is no physical or forensic evidence that the defendants charged in this case did as Rechnitz claims. Given Rechnitz's outsized role in the government's evidence, this Court should order the immediate production of the requested items in the defense letter. Defense counsel should have the opportunity to review the government's information in its file and use it to uncover new leads which could identify additional evidence to undermine Rechnitz's proffered testimony against the defendants in this case.

"The duty of the prosecutor is to seek justice, not merely to convict," and the government undermines the possibility of a just trial by continuing to withhold substantial and new impeachment material it has recently learned about its "star" witness. Criminal Justice Standards Comm., Am. Bar Ass'n, *Standards for Criminal Justice*, Standard 301.2(c) (3d ed. 1993).) District courts have wide discretion to fashion an appropriate remedy for a *Brady/Giglio* violation, including the granting of a continuance, suppression of evidence, "exclusion of [a] witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial." *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009).

This Court should inquire of the government as to which of the requested information it has in its possession, or could be obtained through the exercise of due diligence, and order immediate disclosure of those items. (*See* Ex. B to Mazurek Decl.)

## CONCLUSION

For the foregoing reasons, Murray Huberfeld requests that this Court dismiss the Indictment against him and, in the alternative, to suppress all intercepted calls to which he was a

party.  Also, he requests the immediate disclosure of all *Brady* material now in the government's

possession, custody and control.

Dated: New York, New York
      June 30, 2017

Respectfully submitted,

HENRY E. MAZUREK
EVAN L. LIPTON
EVAN C. MILLER

By: */s/ Henry E. Mazurek*

    Henry E. Mazurek
    CLAYMAN & ROSENBERG LLP
    305 Madison Avenue
    New York, New York 10165
    (212) 922-1080 (phone)
    (212) 949-8255 (fax)

    Evan L. Lipton
    Evan C. Miller
    WINSTON & STRAWN LLP
    200 Park Avenue
    New York, New York 10166
    (212) 294-6700 (phone)
    (212) 294-4700 (fax)

    *Counsel For Defendant*
    *Murray Huberfeld*