UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

   - v. -

NORMAN SEABROOK and
MURRAY HUBERFELD,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16 Cr. 467 (ALC)

 

**GOVERNMENT'S OPPOSITION TO
DEFENDANTS' PRETRIAL MOTIONS**

<br>

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Martin S. Bell
Kan M. Nawaday
Russell Capone
Assistant United States Attorneys
     - Of Counsel –

## **Contents**

PRELIMINARY STATEMENT .................................................................................................. 2

BACKGROUND .................................................................................................................... 3

ARGUMENT ......................................................................................................................... 4

    I.    THE FEDERAL HONEST SERVICES FRAUD STATUTE IS NOT
UNCONSTITUTIONALLY VAGUE AS APPLIED TO DEFENDANTS' CONDUCT ......... 4

        A.    Applicable Law ......................................................................................... 4

        B.    Discussion ................................................................................................. 6

    II.    DEFENDANTS' MOTION TO DISMISS THE INDICTMENT OR SUPPRESS THE
WIRETAP EVIDENCE SHOULD BE DENIED .................................................... 14

        A.    There Was No Violation of Title III and the Remedies Sought are Inappropriate in Any
Event ...................................................................................................... 14

        1.    Applicable Law .................................................................................... 15

        2.    Relevant Facts ..................................................................................... 18

        3.    Discussion ........................................................................................... 21

        B.    Huberfeld Does Not Have Standing to Challenge Minimization, and Even If He Did,
the Government's Minimization Efforts Were Reasonable .................................. 27

        1.    Applicable Law .................................................................................... 27

        2.    Relevant Facts ..................................................................................... 30

        3.    Discussion ........................................................................................... 32

    III.    THE COURT SHOULD DENY THE DEFENDANTS' REQUEST FOR EARLY
DISCLOSURE OF IMPEACHMENT MATERIAL ................................................ 36

        A.    Applicable Law ....................................................................................... 36

        B.    Relevant Facts ......................................................................................... 38

CONCLUSION ...................................................................................................................... 40

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the pretrial motions filed by defendant Murray Huberfeld, dated June 30, 2017, in which defendant Norman Seabrook joins (the "Br.").

The defendants move the Court to (i) dismiss the Indictment on the basis that the honest services fraud statute is unconstitutionally vague as applied to their conduct; (ii) dismiss the Indictment or, in the alternative, suppress recordings obtained as a result of judicially authorized wiretap orders, on the basis that the Government did not have authority to use the evidence derived from those wiretaps in connection with the charges in this case, and on the basis of alleged improper minimization; and (iii) order early production of certain impeachment material.

As set forth in detail below, the Court should deny the defendants' motions.

First, the federal honest services fraud statute, even as narrowed by the Supreme Court in *Skilling* v. *United States*, 561 U.S. 358, 404 (2010), applies squarely to the kickback scheme alleged in the Indictment between Seabrook and Huberfeld, and the defendants cannot credibly maintain that the statute suffers from any vagueness in its application to their conduct.

Second, the Government complied with all applicable law in using the evidence derived from the wiretaps in connection with the instant case against Seabrook and Huberfeld, and even if it did not, suppression or dismissal is not an available remedy.  Further, the defendant does not have standing to challenge the Government's minimization efforts, which, in any event, were at all times reasonable under the law.

Finally, the defendants are not entitled to early production of the impeachment material they now seek, although the Government will provide such material with respect to a particular cooperating witness two weeks before trial.

2

# BACKGROUND

Seabrook and Huberfeld were charged in a Complaint dated June 7, 2016, 16 Mag. 3626, and arrested the following day.  Both defendants were indicted on July 7, 2016 and charged in two counts with (i) conspiring to commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1349, 1346, and 1349; and (ii) substantive honest services wire fraud, in violation of Title 18, United States Code, Sections 1346 and 1343.

As alleged in the Indictment, Norman Seabrook was the President of the Correction Officers Benevolent Association ("COBA") – New York City's largest correction officers union – from 1995 through June 2016.  (Indictment ¶ 1.)  In late 2013, Seabrook told an individual who is now a cooperating witness for the Government ("CW-1") that Seabrook wanted to get paid for investing COBA members' retirement money.  (Indictment ¶ 12.)  CW-1 then approached Murray Huberfeld, who participated in managing the hedge fund Platinum Partners ("Platinum"), and who "agreed that if [Seabrook] could direct COBA money into Platinum, Platinum would be willing to pay Seabrook personally in exchange for facilitating the investment."  (Indictment ¶ 14.)

After negotiations, all three individuals "ultimately agreed that Seabrook would cause COBA money to be invested in Platinum in exchange for a kickback in the amount of between $100,000 and $150,000 per year paid to Seabrook personally, depending on how much money COBA invested."  (Indictment ¶ 15.)  Seabrook then directed $10 million from an annuity fund consisting of union members' retirement money to be invested into Platinum in or about March 2014, and followed it with two additional $5 million investments (one from the same annuity fund, and one from COBA's operating budget) in Platinum later that year.  (Indictment ¶¶ 16-17.)

On or about December 11, 2014, CW-1 met with Seabrook to make the first kickback payment to Seabrook, as approved by Huberfeld.  (Indictment ¶¶ 18-19.)  CW-1 gave Seabrook $60,000, which was less than the amount originally promised to Seabrook.  (*Id.*)  Huberfeld then reimbursed CW-1 with a $60,000 check from Platinum, a bribe that Huberfeld and CW-1 concealed by creating a fake invoice suggesting that the $60,000 payment was for New York Knicks tickets that CW-1 had sold to Platinum.  (Indictment ¶ 20.)

## ARGUMENT

### I.    THE FEDERAL HONEST SERVICES FRAUD STATUTE IS NOT UNCONSTITUTIONALLY VAGUE AS APPLIED TO DEFENDANTS' CONDUCT

Huberfeld and Seabrook argue that the honest services fraud statute is unconstitutionally vague as applied to their conduct because Seabrook was not on notice that his fiduciary duty to COBA included a duty not to accept "third party payments."  (Br. at 22-24.)  As set forth in more detail below, a quid pro quo kickback – the type of "third party payment" at issue here – is among *the* paradigmatic violations of the honest services fraud statute, and the defendants were therefore on notice that their conduct was unlawful.

#### A.    Applicable Law

The void-for-vagueness doctrine requires that a "penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States* v. *Nadirashvili*, 655 F.3d 114, 121 (2d Cir. 2011) (quotation omitted); *see also McDonnell* v. *United States*, 136 S. Ct. 2355, 2373 (2016).

The wire fraud statute prohibits the use of interstate wires by one who has "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by

4

means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1343, or "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Section 1346 proscribes "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Skilling* v. *United States*, 561 U.S. 358, 404 (2010). "[T]o violate the right to honest services, the charged conduct must involve a quid pro quo, *i.e.*, an 'intent to give or receive something of value in exchange for an . . . act.'" *United States* v. *Nouri*, 711 F.3d 129, 139 (2d Cir. 2013) (quoting *United States* v. *Bruno*, 661 F.3d 733, 743-44 (2d Cir. 2011)); *see also United States* v. *Bahel*, 662 F.3d 610, 635-36 (2d Cir. 2011) ("the 'corrupt' intent necessary to a bribery conviction is in the nature of a quid pro quo requirement; that is, there must be a specific intent to give something of value in exchange for an official act." (internal quotations and modifications omitted)). Kickback schemes that violate Section 1346 "typically involve[] an employee's steering business of his employer to a third party in exchange for a share of the third party's profits on that business." *United States* v. *DeMizio*, 741 F.3d 373, 381 (2d Cir. 2014).

A quid pro quo bribe or kickback only violates the honest services statute if the individual who received it was under a fiduciary duty to the entity on whose behalf he or she acted. *Skilling*, 561 U.S. at 590 (describing the honest services "doctrine's solid core" as involving "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes"); *see also United States* v. *Milanovic*, 678 F.3d 713, 722 (9th Cir. 2012) (en banc); *United States* v. *Nayack*, 769 F.3d 978, 979 n.1 (7th Cir. 2014). For such fiduciaries, as the Supreme Court held in narrowing the honest services fraud statute to bribery and kickback schemes, "it has always been as plain as a pikestaff that bribes and kickbacks constitute honest

services fraud." *Skilling*, 561 U.S. at 412 (quoting *Williams* v. *United States*, 341 U.S. 97, 101 (1951) (internal quotation marks omitted)).

### B.   Discussion

The defendants argue that, while Seabrook owed a fiduciary duty to COBA, the honest services fraud statute does not make clear "when the receipt of third-party payments or transfers of value become criminal" violations of that duty.  (Br. at 25.)  They further note that Seabrook was not prohibited by COBA policies, by-laws, or some other source from accepting "third party payments," underscoring his apparent difficulty in discerning which such payments would be illegal.  (Br. at 24.)

This argument should be rejected.  Section 1346, as clarified in *Skilling*, is abundantly clear as to what types of "third party payments" – to use the defendants' innocuous phraseology – are illegal: bribes and kickbacks given to a fiduciary in exchange for official actions undertaken on behalf of the entity to whom the recipient owes that fiduciary duty.  While the defendants point to some ambiguity in the law as to where a court should look to determine whether a fiduciary duty exists in the first place—a principle not in dispute here—there is no ambiguity with respect to the notion that a quid-pro-quo kickback constitutes a violation of one's fiduciary duty and a crime pursuant to Section 1346.

### i.   *Seabrook Owed a Fiduciary Duty to COBA*

As the President of COBA, Norman Seabrook was under a fiduciary duty to act in the union's interests.[1]  This does not appear to be a point in dispute.  Indeed, the defendants' motion

---

[1] "At the heart of the fiduciary relationship lies reliance, de facto control, and dominance."  *United State* v. *Chestman*, 947 F.2d 551, at 568 (2d Cir. 1991); *see also United States* v. *Halloran*, 821 F.3d 321, 338 (2d Cir. 2016).  Further, "[a] fiduciary is generally defined as 'a person who is required to act for the benefit of another person on all matters within the scope of their relationship.'"  *Id.* (quoting *United States* v. *Milovanovic*, 678 F.3d 712, 722 (9th Cir. 2012) (quoting Black's Law Dictionary (9th Ed. 2009))).

states that "Seabrook was President of COBA . . . in this capacity, he concededly owed COBA a duty of loyalty." (Br. at at 22.) In any event, the case law makes clear that a union president such as Seabrook owes a fiduciary duty to his or her union. *See United States* v. *Gotti*, 459 F.3d 296, 331 (2d Cir. 2006) (noting that "federal law imposes special duties of loyalty on union officials"); *United States* v. *Reifler*, 446 F.3d 65, 72 (2d Cir. 2006) (upholding convictions where defendants "engage[d] in fraudulent activity with respect to pension funds of three unions," including one that handled an annuity fund for New York City Police Department detectives); *United States* v. *Turner*, 465 F.3d 667, 671 (6th Cir. 2006) ("Defendants whose schemes involved deprivations of 'intangible rights' included . . . private persons with clear fiduciary duties who defrauded their employers or unions by accepting kickbacks.").

Here, as the Indictment sets forth, Seabrook was the head of an Executive Board that conducted the affairs of COBA, including, as pertinent here, all of its financial affairs. (Indictment ¶¶ 8-10.) As such, there can be no dispute that Seabrook owed a fiduciary duty to COBA, including with respect to the union's financial affairs.

In addition to these principles of federal law, New York labor law specifies that union officers owe duties of loyalty to their unions, consistent with which they cannot engage in financial transactions that conflict with that duty. Specifically, the law – which includes public sector unions, see N.Y. Lab. Law § 721 – states that "[r]esponsible leaders of the labor movement have recognized that union officers and agents have a fiduciary duty to serve the members of the union honestly and faithfully," N.Y. Lab. Law § 720, and goes on to set forth the following prohibitions:

> No officer or agent of a labor organization shall, directly or indirectly
>
> 1. Have or acquire any pecuniary or personal interest which would conflict with his fiduciary obligation to such organization;

2.   Engage in any business or financial transaction which conflicts with his fiduciary obligation;  or

3.   Act in any way which subordinates the interests of such labor organization to his own pecuniary or personal interests.[2]

*Id.* Accordingly, it is clear – and undisputed here – that Seabrook owed a fiduciary duty to COBA.

### ii.   Section 1346 Squarely Prohibits Quid Pro Quo Kickback Schemes By Fiduciaries

As noted above, the Supreme Court in *Skilling* held that the honest services fraud statute proscribes "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived."  561 U.S. at 404.  In so holding, the Court acknowledged that by enacting 18 U.S.C. § 1346, Congress intended to revive the "intangible-rights theory of [honest services fraud]" that had been recognized by Courts of Appeals prior to the Supreme Court having invalidated it in *McNally* v. *United States*, 483 U.S. 350 (1987).  *Skilling*, 561 U.S. at 404.  The *Skilling* Court noted that the vast majority of intangible rights cases that existed pre-*McNally* concerned bribes or kickbacks, but that some pre-*McNally* case law had extended the theory further.  *Id.* at 408.  Because reading Section 1346 to encompass such "a wider range of offensive conduct" beyond bribes and kickbacks would "raise the due process concerns underlying the vagueness doctrine," the Court held that limiting the statute to schemes involving the pre-*McNally* core of bribes and kickbacks "preserve[d] the statute without transgressing constitutional limitations."  *Id.* at 409.  Specifically, the Court held that "interpreted to encompass only bribery and kickback schemes, Section 1346 is not unconstitutionally vague."  *Id.* at 412.

---

[2] New York law, similar to federal law, also more generally adopts the principle that "a fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."  *Oddo Asset Mgmtm.* v. *Barclays Bank PLC*, 19 N.Y.3d 584 (2012).

It is against that backdrop that the defendants somehow argue that, as applied to their kickback scheme, Section 1346 is unconstitutionally vague.  Specifically, noting that *Skilling* held that a bribery or kickback scheme must be perpetrated "in violation of a fiduciary duty," the defendants assert that nothing in the COBA bylaws or policies prohibited Seabrook from receiving "third party payments," and Seabrook had no other fair notice that receiving such payments would violate his fiduciary duty.  (Br. at 22-25.)  As support, the defense principally cites Justice Scalia's non-binding concurrence in *Skilling*, which argued that even limiting the criminalized conduct under Section 1346 to bribes and kickbacks did "not solve the most fundamental [pre-*McNally*] indeterminacy: 'the character of the fiduciary capacity' to which the bribery and kickback restriction applies."  *Skilling*, 561 U.S. at 421.  This argument should be rejected for several reasons.

First, the *Skilling* majority made clear that by narrowing the proscribed conduct to bribes and kickbacks, it had ameliorated any vagueness concerns with respect to Section 1346.  *Skilling*, 561 U.S. at 404 ("As to fair notice, 'whatever the school of thought concerning the scope and meaning of § 1346, it has always been 'as plain as a pikestaff that' bribes and kickbacks constitute honest-services fraud'" (quoting *Williams* v. *United States*, 341 U.S. 97, 101 (1951))).  Specifically addressing Justice Scalia's concurrence and its "emphasi[s on] divisions in the Courts of Appeals regarding the source and scope of fiduciary duties" – relied upon so heavily by the defendants here – the Court held that "the existence of a fiduciary relationship, under any definition of that term, was usually beyond dispute" in bribery and kickback cases.  *Skilling*, 561 U.S. at 407 n.41.  As the *Skilling* majority plainly understood it, *if* one owes a fiduciary duty, it is a criminal violation of that duty to engage in a quid-pro-quo bribery or kickback scheme with respect to the entity to which one owes the duty.  This has always been "plain as pikestaff," *id.* at

404, and no corporate by-laws or other independent proscription is necessary to provide fair warning of criminality.

Indeed, since *Skilling*, myriad decisions across the Circuits have applied Section 1346 to conduct where, as here, individuals accepted kickback payments to conduct actions on behalf of the entities to which they owed fiduciary duties. *See*, *e.g.*, *United States* v. *Pinson*, No. 15-4311, 2017 U.S. App. LEXIS 10766 at *28–31 (4th Cir. June 19, 2017) (upholding conviction of a defendant who deprived his employer and the public of his honest services by influencing a public university to award contracts to companies that gave a portion of the proceeds to the defendant); *United States* v. *Aunspaugh*, 792 F.3d 1302, 1306–07 (11th Cir. 2015) (noting that the defendant's conduct in directing work to an unsuitable contractor in exchange for $200,000 "was a classic kickback scheme—precisely the kind of scheme that is prohibited under *Skilling*'s construction of § 1346"); *United States* v. *Johnson*, 588 F. App'x 743, 743 (9th Cir. 2014) (*Skilling* applies to "a fiduciary who deprives a victim of the right to honest services by receiving a bribe or kickback" and "a fiduciary who does the same by paying a bribe or kickback"); *United States* v. *Nouri*, 711 F.3d 129 (2d Cir. 2013) (upholding conviction of employees of an online company who paid a stockbroker in exchange for the broker purchasing shares of the company's stock for his customers); *United States* v. *Grose*, 461 F. App'x 786, 800 (10th Cir. 2012); *United States* v. *Lupton*, 620 F.3d 790, 805 (7th Cir. 2010) (ruling that the defendant's conduct, which included receiving kickback payments from a company he assisted in receiving a state contract, "placed him squarely within even the recently narrowed [post-*Skilling*] parameters of § 1346"); *United States* v. *Cantrell,* 617 F.3d 919, 921 (7th Cir. 2010) ("By failing to fairly, honestly, and candidly award contracts, [the defendant] defrauded North Township and its citizens of their

right to his honest services. This was clearly a kickback scheme, so § 1346 – even as pared down by *Skilling* – applies to [the defendant].").

Second, though the defendants claim that "disagreement as to the nature, scope, and source of the fiduciary obligation" was "pervasive before *Skilling* and remains so after it," the cases they cite do no more than suggest modest disagreement as to whether courts should employ state or federal law in identifying whether a fiduciary duty exists in the first place.  No cases have been identified – because none exist – in which, assuming the defendant had a fiduciary duty, questions have been raised as to whether Section 1346 criminalizes the exchange of a kickback for action undertaken by the fiduciary.

For example, in *United States* v. *Halloran*, 821 F.3d 321, 338 (2d Cir. 2016), cited by Huberfeld, former City Council Member Daniel Halloran argued that Section 1346 was unconstitutionally vague because "it does not make clear whether the Republican County chairs were under a cognizable fiduciary duty to their party not to accept [kickback] payments," and because federal and state law differed on that question.  The Second Circuit held that federal and state law did not differ in treating Republican County chairs as fiduciaries, such that the kickback payments violated Section 1346 regardless of whether federal or state fiduciary law applied.  *Id.* at 338-339.  The *Halloran* decision did not state or intimate that any vagueness existed as to whether a kickback scheme perpetrated by a fiduciary violated Section 1346.  Nor do the other cases defendants cite, all of which involve questions as to the *source* of the fiduciary duty, not whether a kickback scheme violates it.  *See United States* v. *Teel*, 691 F.3d 578 (5th Cir. 2012), *United States* v. *Milanovic*, 678 F.3d 713, 722 (9th Cir. 2012), and *United States* v. *Nelson*, 712 F.3d 498, 509 (11th Cir. 2013).  Indeed, even Justice Scalia's *Skilling* concurrence – the lynchpin of defendant's argument – acknowledges that the *Skilling* majority's holding "would solve

[perhaps] the indeterminacy of *what acts constitute a breach* of the 'honest services' obligation,"
but would not solve questions such as whether the obligation applied to public officials, private
individuals who contract with the government, or all private individuals.  *Skilling*, 516 U.S. at
421 (Scalia, J., concurring) (emphasis added).  In other words, Justice Scalia acknowledged that
*Skilling* likely provided certainty as to what acts constituted an illegal breach of fiduciary duty in
violation of Section 1346, but not as to who is a fiduciary in the first place.  The defendants do
not dispute that Seabrook was a fiduciary; the post-*Skilling* case law permits no uncertainty as to
whether Seabrook was a fiduciary; and there is no vagueness surrounding the question whether a
kickback scheme violates such a duty.

Finally, the defendant's argument that there is no fair "criterion of guilt" by which
Seabrook could understand whether the acceptance of a third party payment is unlawful is also
belied by the case law.  The defense brief asks: "If Seabrook, as a COBA officer, was not
precluded from receiving payments from third parties, even involving matters related to COBA,
how would an ordinary person know that the payment alleged in the indictment violated Section
1346?"  The answer is that such "third party payments" – to use the defendant's terminology –
are corrupt and illegal when they are given as kickbacks specifically *in exchange* for undertaking
official action.  *See McDonnell* v. *United States*, 136 S. Ct. 2355, 2371 (2016); *United States v.
Bahel*, 662 F.3d 610, 635-36 (2d Cir. 2011) ("the 'corrupt' intent necessary to a bribery
conviction is in the nature of a quid pro quo requirement; that is, there must be a specific intent
to give something of value in exchange for an official act." (internal quotations and
modifications omitted)).

On this point, too, even the cases cited by the defendants are instructive.  Specifically,
*United States* v. *DeMizio*, 741 F.3d 373 (2d Cir. 2014), did not involve a vagueness challenge to

Section 1346. Rather, the defendant in that case argued that the payments he received were not illegal kickbacks, and that they were given in exchange for at least some work. *Id.* at 381. The Second Circuit, defining a kickback scheme as "typically involv[ing] an employee's steering business of his employer to a third party in exchange for a share of the third party's profits on that business," held that performing a small amount of work in connection with a kickback payment did not otherwise legitimize it. *Id.* at 383 ("[W]e agree with the district court that there was ample evidence from which a reasonable jury could have inferred that the payments . . . were kickbacks," including because the recipients of those payments performed minimal work of poor quality). In other words, *DeMizio* dealt with the question whether, as an evidentiary matter, a payment was a quid pro quo kickback, and assumed that if the payment was a quid pro quo kickback, it would violate the fiduciary duty. Similarly, if Huberfeld and Seabrook believe that the payment from Platinum to Seabrook was not made "in exchange" for "steering business of [COBA] to [Platinum]" but was bona fide for some other reason, they are free to bring that evidence to a jury. They have cited no cases, however, that suggest any statutory ambiguity as to whether a quid-pro-quo kickback by a fiduciary is illegal.[3]

### 1. *The Indictment Is Not Premised on a Gratuity Theory*

The defendants point to the Indictment's allegation that Seabrook was paid months *after* he directed COBA's money to Platinum, and assert that the Government cannot proceed on a gratuity theory because *Skilling* limited violations of honest services fraud to bribes and kickbacks. The present Indictment does not advance a theory that the payment to Seabrook was a gratuity as opposed to a kickback.

---

[3] The only other case on this point cited by defendants is *United States* v. *Mitrow*, No. S3 13 Cr. 633 (PAE), 2015 U.S. Dist. LEXIS 119093, at * (S.D.N.Y. Sept. 8, 2015). *Mitrow*, a sentencing opinion, again resolved questions such as whether certain payments made were in exchange for actions, i.e., whether they were kickbacks. *Id.* at *11-13.

The Indictment plainly alleges that, prior to Seabrook receiving the bribes, he and Huberfeld entered into a quid pro quo agreement whereby Seabrook would direct COBA money to Platinum in exchange for a future kickback payment.  (Indictment ¶ 15 ("Murray Huberfeld and Norman Seabrook, the defendants, and CW-1 ultimately agreed that Seabrook would cause COBA money to be invested in Platinum in exchange for a kickback in the amount of between $100,000 and $150,000 per year paid to SEABROOK personally, depending on how much money COBA invested.")  That the money was to be paid in the future, potentially after COBA's investment began yielding returns, does not convert a bribery payment into a gratuity.[4]

## II.   DEFENDANTS' MOTION TO DISMISS THE INDICTMENT OR SUPPRESS THE WIRETAP EVIDENCE SHOULD BE DENIED

### A.   There Was No Violation of Title III and the Remedies Sought are Inappropriate in Any Event

Huberfeld, joined by Seabrook, asks the Court to dismiss the Indictment or, in the alternative, to suppress certain wiretap conversations on the basis of alleged violations of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522.  Specifically, Huberfeld contends that (i) the Government did not have authorization to use evidence obtained from the wiretaps to charge Seabrook and Huberfeld with offenses not contemplated in the wiretap applications and orders; (ii) the Government inappropriately used this evidence in grand jury proceedings seeking the Indictment; and (iii) the calls obtained pursuant to the relevant wiretaps were improperly minimized.

---

[4] The defendants also assert that the Court should dismiss the Government's theory of principal liability against Huberfeld on Count Two, which charges substantive honest services fraud, because Huberfeld did not owe a fiduciary duty to COBA.  As the court is aware, when charging a principal and an accessory in a single count, the Government customarily cites both the substantive statute and 18 U.S.C. § 2, the accessory statute, as it did here. (Indictment ¶ 24.)  The Government concedes that Huberfeld's liability on Count Two is as an accessory, not a principal, and the jury can be properly instructed on this point.

The Court should deny this request for several reasons.  First, the Government did not obtain the wiretaps or use evidence derived from them in violation of Title III.  Second, even were the Court to find otherwise, neither dismissal nor suppression should be granted because the calls were intercepted in good faith and because neither remedy is appropriate under the law.  Finally, Huberfeld's argument that the Indictment should be dismissed because the calls at issue – which he himself describes as "innocuous" – may have been used to secure it from the grand jury is utterly conclusory and without any support in the record.

## 1. **Applicable Law**

### (i)      **Section 2517(5)**

Section 2517(5) of Title III governs the disclosure and use of evidence obtained on a wiretap "relating to offenses other than those specified in the order of authorization or approval." 18 U.S.C. § 2517(5).  It provides that evidence gathered through a lawful interception order that relates to offenses other than those specified in the order may be disclosed only when authorized or approved by a judge of competent jurisdiction.  See 18 U.S.C. § 2517(5); *see also United States* v. *Marion*, 535 F.2d 697, 700 (2d Cir. 1976) (noting that the application made to a judge of competent jurisdiction demonstrates "the good faith of the original application.").  Section 2517(5) was specifically enacted to prevent "subterfuge searches," in which "the [G]overnment uses a warrant authorizing seizure of one type of evidence as a license to collect evidence of an offense not covered by the authorization."  *United States* v. *Goffer*, 721 F.3d 113, 122 (2d Cir. 2013); *see also United States* v. *Wager*, No. 00 Cr. 629 (TPG), 2002 WL 31106351 (S.D.N.Y. Sept. 20, 2002), at *4.  The Second Circuit has affirmed the principle that "disclosure or use of communications intercepted incidentally to an otherwise lawful, good faith wiretap application

does not violate Title III" provided that the Government forthrightly discloses "the probability of intercepting 'communications relating to other offenses' ex ante." *Goffer*, 721 F.3d at 123.

It is settled law in the Second Circuit that authorization for the use of intercepted conversations to charge an unenumerated offense is implicitly given when the issuing judge approves continuation of a wiretap after being advised of the essential facts constituting the unspecified violation. *See United States* v. *Masciarelli*, 558 F.2d 1064 (2d Cir. 1977); *United States* v. *Tortorello*, 480 F.2d 764 (2d Cir. 1973). Therefore, "although a subsequent court authorization or approval issued after express delineation of offenses unquestionably satisfies [Section] 2517(5), it does not represent the only method of compliance. We have adhered to the view that the disclosure in subsequent affidavits to the issuing judge of material facts constituting or clearly relating to other offenses satisfies the requirements of [Section] 2715(5) under the 'Tortorello' rationale of implicit authorization." *Masciarelli*, 558 F.2d at 1068. In *Masciarelli*, for example, the original wiretap application sought evidence of an illegal gambling operation; in an update report to the Court, the Government noted that it had intercepted a call regarding the interstate transmission of wagering information. *Id.* at 1066. The Second Circuit ruled that the Government had implicit authority to use evidence derived from the wiretap to charge interstate transmission of wagering information due to the Court's continued authorization of the wiretap subsequent to the Government's update. *Id.* at 1068.

Further, the plain view doctrine under the Fourth Amendment applies to Title III wiretap interceptions. The Second Circuit has observed that when "a law enforcement officer lawfully engage[d] in a search for evidence of one crime inadvertently comes upon evidence of another crime[,] the public interest militates against his being required to ignore what is in plain view." *Masciarelli*, 558 F.2d at 1067; *see also United States* v. *Giordano*, 259 F.Supp.2d 146, 154

(D.Conn. 2003), *aff'd*, *United States* v. *Giordano*, 172 Fed. Appx. 340 (2d Cir. 2006) (noting application of plain view doctrine).

Finally, and importantly, there is no suppression remedy available for a purportedly unlawful disclosure under Section 2517(5).  *See United States* v. *Barnes*, 47 F.3d 963, 964-5 (8th Cir. 1995).  "Although 18 U.S.C. § 2515 prohibits introduction of wiretap evidence before a grand jury 'if the disclosure of that information would be in violation of this chapter,' 528 F.2d at 216, the statute does not provide for suppression for illegal disclosure, only for illegal interception."  *Id*. (citing 18 U.S.C. § 2518(10)(a)).  A motion to suppress "does not appear to lie when the complaint is one of improper disclosure, rather than one of unlawful interception."  *United States* v. *Vento*, 533 F.2d 838, 855 (3d Cir. 1976).  The only statutory remedy for improper disclosure is a suit for civil damages, not suppression.  *Barnes*, 47 F.3d at 965; *see also United States* v. *Chan*, No. 96-350 (WBS), 2006 WL 278582 (S.D.N.Y. Feb. 3, 2006); *United States* v. *Williams*, 124 F.3d 411, 426 (3d Cir. 1997).

### (ii)     The Grand Jury Presentation and the Integrity of the Indictment

The secrecy of grand jury proceedings is central to our system of criminal justice. *See*, *e.g.*, *United States* v. *Procter & Gamble*, 356 U.S. 677, 682 (1958).  Grand jury proceedings carry a "presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process."  *United States* v. *R. Enterprises*, Inc., 498 U.S. 292, 301 (1991) (*quoting United States* v. *Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring); *see also*, *e.g.*, *Hamling* v. *United States*, 418 U.S. 87, 139 n. 23 (1974); *United States* v. *Leung*, 40 F.3d 577, 581 (2d Cir. 1994).  A defendant seeking to overcome the strong presumption of regularity faces a high bar, which can be met only in "truly extreme cases."  *United States* v. *Broward*, 594 F.2d 345, 351 (2d Cir. 1979).  Indeed, a defendant cannot carry

that burden without demonstrating "some grossly prejudicial irregularity or some other particularized need or compelling necessity" that outweighs the Government's and the grand jury's substantial interest in secrecy. *United States* v. *Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001); *see also Dennis* v. *United States*, 384 U.S. 855, 869, 871-72 (1966). Thus, a court will not authorize inspection of grand jury minutes when the defendant alleges "mere speculation as to what occurred in front of the grand jury." *United States* v. *Brown*, 98 Cr. 168, 1995 WL 387698, at *7 (S.D.N.Y. June 30, 1995). Rather, a defendant must present "concrete allegations of Government misconduct" for a court to allow inspection of grand jury minutes. *Leung*, 40 F.3d at 582.

## 2.  Relevant Facts

During the course of this investigation, the Government obtained approval for wiretaps on three individuals. First, pursuant to multiple interception orders, the Government obtained approval to intercept telephone conversations over two telephones used by an individual named Hamlet Peralta ("Peralta").[5] In its applications to intercept the Peralta telephone lines, the Government articulated, and the relevant judicial authorities found, probable cause that Peralta and others, including Jona Rechnitz and several high-level members of the New York City Police Department ("NYPD"), were involved in a wire fraud scheme. Specifically, the Government presented facts demonstrating probable cause to believe that Peralta, funded by Rechnitz and members of the NYPD, was involved in a scheme to resell illegally wholesale quantities of untaxed liquor that tended to defraud New York State of tax revenue.

Beginning in January 2015, the Government sought, in addition to the interception of wire communications of Peralta's telephones, interceptions of communications over a cellular

---

[5] The Hamlet Peralta interceptions are not implicated directly by the instant motion practice.

telephone belonging to Rechnitz (the "Rechnitz Phone") and a cellular telephone belonging to Jeremy Reichberg (the "Reichberg Phone").   Interception on both the Rechnitz Phone and the Reichberg Phone began pursuant to an order, dated January 10, 2015, signed by the Honorable Valerie E. Caproni (the "January 2015 Order"), and continued pursuant to an order, dated February 19, 2015, signed by this Court (the "February 2015 Order"), and an order, dated April 10, 2015, signed by the Honorable Robert W. Sweet (the "April 2015 Order").   These orders are attached as Exhibits 1, 2, and 3 to the Declaration of Special Agent Joseph Downs (the "Downs Decl.").[6]   The orders were entered upon the affidavits of Special Agent Downs, dated January 10, 2015, February 19, 2015, and April 10, 2015 (the "January 2015 Aff.", "February 2015 Aff.", and "April 2015 Aff.," attached as Exhibits 1A, 2A, and 3A to the Declaration of Special Agent Downs).

During the interception period relating to each of the orders of interception, the Government submitted to the district court periodic reports describing the progress of the interception.   These periodic reports were submitted to the district court on January 22, 2015, February 2, 2015, March 2, 2015, March 12, 2015, April 22, 2015, and May 7, 2015.   The April 22, 2015 report is attached as Exhibit 4 to the Downs Declaration.   These periodic reports set forth, among other things, interception statistics for the Rechnitz Phone and Reichberg Phone, such as number of intercepted calls, number of calls flagged pertinent, number of calls longer than 2 minutes, and number of calls minimized.   (*See, e.g,* Ex. 4 at 2-3, April 22 report). Monitoring logs, i.e., linesheets, were also contemporaneously created, providing brief synopses of the intercepted calls.   (Downs Decl. ¶ 7.)

---

[6]   Because the TIII paperwork is subject to the protective order in this case, the Government will not file on ECF the paperwork attached to the Downs Declaration, but will submit those exhibits to the Court in hardcopy.

Consistent with its obligations, the Government supplemented its list of target offenses as it discovered evidence of additional crimes.  In particular, in the February 2015 Aff., Special Agent Downs added "honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346" among the "Target Offenses," (Ex 2A, at 5), while maintaining Rechnitz's name in the list of "Target Subjects," (Ex 2A, at 4).  The February 2015 Aff. disclosed numerous calls that appeared to show that high-level law enforcement officers were assisting Rechnitz, Reichberg, and others with respect to the suspected alcohol scheme.  (Ex 2A, at 16-46.)  The subsequent April 2015 Aff. similarly listed honest services wire fraud among the Target Offenses and disclosed further calls regarding the involvement of high-level law enforcement officers in the scheme.  (Ex 3A, at 4-5, 23-37.)

As the defendants note, the April 2015 Aff. contained the first specific reference to Huberfeld.  In that affidavit, Special Agent Downs noted a March 9, 2015 call from Huberfeld, described as "the owner of a small New York hedge fund who, in 1990, was arrested for sending another individual to take his broker-license exam." (Ex. 3A at 34.)  Special Agent Downs further noted that Huberfeld asked Reichberg how much Reichberg would charge to put an individual named "Izzy" on retainer, and described monetary and durational terms that the two men had discussed.  *Id*.  Special Agent Downs noted that the "retainer" likely referred to the amount Reichberg charged people who wanted Reichberg to call in favors with NYPD personnel.  (*Id*. at 35.)

The Government also made specific reference to Huberfeld in its April 22, 2015 ten-day report to the Honorable Naomi Reice Buchwald, noting an additional call, this time between Huberfeld and Rechnitz, that took place on April 15, 2015.  That entry consisted of the following report:

> On or about April 15, 2015, at approximately 6:21 p.m. (session 5029), RECHNITZ spoke with MURRAY HUBERFELD.  RECHNITZ said that "I feel like I'm losing money." HUBERFELD said that "they" are running their business very poorly.  HUBERFELD said that he would have a price by Monday, April 20.  Based on their training and experience, and participation in the investigation, the agents believe that this call demonstrates the business ties between RECHNITZ and HUBERFELD, the latter of whom has had apparent conversations with REICHBERG about putting NYPD personnel "on retainer" – meaning doing paid favors outside of work – *and who appears to have been involved in setting up investments with other high-level law enforcement officials, including Norman Seabrook of the Correction Officers Benevolent Association*.

Ex. 4 at 5 (emphasis added).  Judge Buchwald signed the order, and the interception of calls on the Peralta, Rechnitz, and Reichberg Phones continued until the end of that monthly period.

### 3.  Discussion

The Court should deny Huberfeld's motion to dismiss the indictment or suppress based on the Government's alleged failure to comply with 18 U.S.C. § 2517(5).  First, Huberfeld is incorrect in his contention that the distribution or use of the intercepted calls ran afoul of Section 2517(5).  Second, Huberfeld cannot support his contention that the indictment should be dismissed because the grand jury purportedly heard the intercepted calls at issue.  Finally, even assuming, *arguendo*, that a violation of Section 2517(5) occurred, the remedy requested by Huberfeld – suppression –finds no support in the law.

#### (i)  *The Disclosure of the Relevant Recordings Did Not Constitute a Violation of Title III*

Huberfeld does not argue that the relevant telephone calls were unlawfully intercepted.  Rather, he cites a purported failure to comply with the strictures of Section 2517(5), which require that the Government obtain judicial approval to intercept calls containing evidence of crimes not specified in the original orders for which wiretap authorization was granted.  But there was no such violation here.

21

As an initial matter, the telephone calls at issue *were* evidence of crimes specified in the orders for which wiretap authorization was granted.  Starting on February 19, 2015, the Government was authorized to intercept calls based on the showing that the Target Subjects (including Rechnitz and Reichberg) were involved in certain enumerated Target Offenses, including honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346.  *See* Ex. 2 (Feb. 2015 Order).  The February 2015 Order contained a specific finding that there was probable cause to believe that the interception authorized would reveal "the nature, extent, and methods of the Target Subjects' commission of the Target Offenses… the identities of the Target Subjects, to the extent currently unknown, as well as their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities…" and other details of the schemes alleged – in other words, the nature of the honest services fraud activities to the extent that they were not already understood.  (E.g., Ex 2, at 4-5.)  In addition, the authorization orders stated an expectation that the intercepted calls would "constitute admissible evidence of the commission of the Target Offenses."  (E.g., Ex 2, at 5.)  The calls are, simply put, evidence tying additional participants – Huberfeld and Seabrook – into the Rechnitz/Reichberg web of honest services wire fraud, precisely as the order contemplated.[7]

But even if the Court were to find Section 2517(5) applicable, and thus require the Government to have advised the judicial officer of the facts constituting the new, previously

---

[7] Huberfeld's appeal to *United States* v. *Brodson*, 528 F.2d 214 (7th Cir. 1975), is unavailing, and not merely because the case is not controlling authority in this Circuit.  First, the *Brodson* case discusses two entirely different statutes, transmissions of wagers and wagering information in interstate commerce (Title 18, United States Code, Section 1084), for which the defendant in that case was prosecuted, and operation of an illegal gambling business (Title 18, United States Code, Section 1955), for which interception had been authorized.  Here, of course, honest services fraud was both the crime of authorization and the offense ultimately charged.  Second, Brodson's offenses were "wholly separate and distinct; they involve dissimilar elements and require different evidence."  Honest services fraud, involving either the NYPD or Huberfeld and Seabrook would still require the same elements because the statute is the same and be susceptible to the same proof – the testimony of Rechnitz.  In fact, it is expected that the testimony of Rechnitz will factor into both this trial and in the forthcoming trial of *United States* v. *Harrington, Grant and Reichberg*, 16 Cr. 468 (GHW), which stemmed from the same monitoring period.

unspecified violation, the law does not require the court to have approved expressly the interception of telephone calls related to the additional crimes.  Rather, where "there has been a showing that the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and the communication was in fact incidentally intercepted during the course of a lawfully intercepted order," "nothing in the statute requires that the supplemental court authorization be express rather than implied."  *United States* v. *Masciarello*, 558, F.2d 1064, 1068 (2d Cir. 1977).  In other words, authorization with respect to the unenumerated offense is implicitly obtained by the Government when the issuing judge approves continuation of the wiretap after being advised of the essential facts constituting the unspecified violation. *Id.*; *see also United States* v. *Tortorello*, 480 F.2d 764 (2d Cir. 1973).

Huberfeld does not, and cannot, argue that the original order was not lawfully obtained; that it was not sought in good faith; and that his communications with Rechnitz and Reichberg were not intercepted lawfully.  Moreover, in disclosing the two Huberfeld conversations with Rechnitz and Reichberg in its updates to the reviewing courts, the Government provided a basis to believe that Huberfeld was involved in the honest services fraud conspiracy with Reichberg and Seabrook.  These updates pointed specifically to (1) Huberfeld's apparent request to put law enforcement personnel on personal retainer; (2) Huberfeld's knowledge of Reichberg's business affairs, where earlier applications had shown Reichberg to be involved in the business of paying off law enforcement personnel for favors; and (3) Huberfeld's involvement, as later detailed in the Complaint, in deals involving other law enforcement entities, specifically, co-defendant Norman Seabrook and COBA.

The defendants' claim that "the allegations make no mention of honest services wire fraud in the context of the allegations made here against Seabrook or Huberfeld," Br. at 11, is

simply not true.  Having disclosed the above details to the approving judge, who is presumed to have "scrutinize[d] any application and… scrupulously impose[d] the restrictions required by statute," *United States* v. *Ruggiero*, 824 F. Supp. 379, 399 (S.D.N.Y. 1993) (*quoting Masciarelli*, 558 F.2d at1068), the Government was free to subsequently use and disclose these communications in the course of a prosecution of honest services wire fraud that involved Rechnitz and Reichberg, as this one did.

Certainly, there is no evidence on this record that the search was, in any way, the sort of pretextual affair that Section 2517(5) is supposed to prevent.  The defense does not, and cannot credibly, suggest that probable cause did not exist for the wire fraud scheme originally alleged or for the honest services fraud formally articulated in the February 2015 Aff.  When calls were later intercepted that would broaden the scope of the honest services fraud to include the defendants in this case, there was no reason for the Government to avert its gaze from what it would ultimately understand as further proof of the fraud.

### (ii) There Is No Basis for Huberfeld's Claim That the Grand Jury Relied Upon the Intercepted Calls, Or For An Inquiry Into the Grand Jury Process

Huberfeld's motion to dismiss the indictment based on the Government's purported disclosure of certain intercepted telephone calls to the grand jury should be denied.  As a threshold matter, his claim hinges on a Title III violation that did not take place.  See Section (i), *supra*.  But even if one were to (incorrectly) assume that such a violation occurred, Huberfeld's support for the remedy he seeks consists almost entirely of unfounded speculation as to how the intercepted calls at issue were used.

Huberfeld surmises that, because the Government cited three telephone calls in the Complaint against him and Seabrook, "it is likely that the government used those calls to secure the Indictment against Huberfeld."  (Br. at 12.)  Elsewhere in his brief, Huberfeld, for reasons

that are unclear, determines that the likelihood the Government relied on such calls to obtain the Indictment "is likely almost to a point of certainty." (Br. at 3-4.)  The defendant does not explain, however, how he reconciles any prejudice that he claims he suffered with his simultaneous assertion that the relevant conversations "were innocuous." (Br. at 3.)  Of course, Huberfeld does not, in fact, know whether the statements were used in obtaining the Indictment. Nor is he entitiled to know.  Under the law, Huberfeld does not get to lift the curtain on grand jury proceedings to get an answer, let alone obtain dismissal of the Indictment based on his mere hunch.

As described above, grand jury proceedings carry a "presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States* v. *R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) (quoting *United States* v. *Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring); *see also United States* v. *Broward*, 594 F.2d 345, 351 (2d Cir. 1979).  Indeed, a defendant cannot carry that burden without demonstrating "some grossly prejudicial irregularity or some other particularized need or compelling necessity" that outweighs the Government's and the grand jury's substantial interest in secrecy.  *United States* v. *Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001).  A court will not authorize inspection of grand jury minutes when the defendant alleges "mere speculation as to what occurred in front of the grand jury." *United States* v. *Brown*, 98 Cr. 168, 1995 WL 387698, at *7 (S.D.N.Y. June 30, 1995).  Rather, a defendant must present "concrete allegations of Government misconduct" for a court to allow inspection of grand jury minutes.  *United States* v. *Leung*, 40 F.3d 577, 582 (2d Cir. 1994).

Here, Huberfeld does not even come close to offering the "articulized proof of irregularities" that is necessary to lift the veil of grand jury secrecy.  *United States* v. *R.*

*Enterprises, Inc.*, 498 U.S. at 301.  Huberfeld's mere speculation that because a factual allegation appeared in the Complaint, it must have been presented to the grand jury, is exactly that: speculation.  Nor does Huberfeld advance a compelling need to overcome the presumption of grand jury regularity.  Huberfeld's baseless conjecture simply is not sufficient to support an inquiry into the grand jury process to which he is not entitled.  *See United States* v. *Brown*, 1995 WL 387698, at *7.

### *(iii) Even If The Court Were to Find a Title III Violation, There Is No Appropriate Suppression Remedy*

Because Huberfeld cannot show a violation of Title III, his motion to suppress the telephone calls at issue fails.  But even if the Court were to find such a violation, suppression is not an available remedy.

Title III provides that suppression is warranted in three specific circumstances delineated by the statute, to wit, where (1) the interception is unlawful, (2) an order of authorization is insufficient on its face, or (3) an interception is not made in conformity with the order of authorization or approval.  18 U.S.C. § 2518(10)(a); § 2518(10)(c) (limiting the remedies and sanctions available to those specifically articulated within Title III).  Huberfeld alleges none of these.  The purported violation that he alleges – unlawful disclosure – simply is not a basis for suppression under Title III because Section 2515 "does not provide for suppression for illegal disclosure, only for illegal interception."  *United States* v. *Barnes*, 47 F.3d 963, 964-5 (8th Cir. 1995) (citing 18 U.S.C. § 2518(10)(a)); *see also United States* v. *Vento*, 533 F.2d 838, 855 (3d Cir. 1976) (a motion to suppress "does not appear to lie when the complaint is one of improper disclosure, rather than one of unlawful interception").

The only statutory remedy for improper disclosure is a suit for civil damages, not suppression.  *Barnes*, 47 F.3d at 965; *see also United States* v. *Chan*, No. 96-350 (WBS), 2006

26

WL 278582 (S.D.N.Y. Feb. 3, 2006); *United States* v. *Williams*, 124 F.3d 411, 426 (3d Cir. 1997).  While such a lawsuit would likewise be without merit, there is assuredly no suppression remedy available here.

**B.  Huberfeld Does Not Have Standing to Challenge Minimization, and Even If He Did, the Government's Minimization Efforts Were Reasonable**

The Court should reject Huberfeld's motion to suppress non-pertinent calls intercepted on the Rechnitz Phone and the Reichberg Phone.  The law of this Circuit is clear: Huberfeld lacks standing to challenge the minimization procedures conducted on cellular telephones in which he has no possessory interest.  Further, even if Huberfeld had standing, the Government's minimization efforts were reasonable under the relevant law.

**1.  Applicable Law**

*(i) Standing*

It is well-settled that only a person with a possessory or proprietary interest in a telephone whose calls are being intercepted pursuant to a wiretap may challenge the minimization of calls intercepted on that telephone.  *United States* v. *Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991) (holding that movants had no standing to challenge minimization of wiretap on someone else's home and telephone); *United States* v. *Gallo*, 863 F.2d 185, 192 (2d Cir. 1988); *United States* v. *Fury*, 554 F.2d 522, 526 (2d Cir. 1977); *United States* v. *Salas*, No. 07 Cr. 557(JGK), 2008 WL 4840872, at *8–9 (S.D.N.Y. Nov. 5, 2008) ("[O]nly an individual with a privacy interest in the subject telephone, or in the premises in which the telephone is located, has standing to contest the minimization procedures employed by law enforcement agents."); *United States* v. *Columbo*, No. 04 Cr. 273 (NRB), 2006 WL 2012511, at *8 (S.D.N.Y. July 18, 2006) ("While any confirmed interceptee or target of a wiretap has standing to seek suppression on probably cause

or necessity grounds, *only* individuals with a proprietary or possessory interest in the premises on which the subject telephone is located have standing to challenge minimization procedures.") (emphasis added); *United States* v. *Menendez*, No. 04 Cr. 219 (DAB), 2005 WL 1384027, at *2-*3 (S.D.N.Y. June 8, 2004).

### (ii) Minimization Requirements

Title III provides that every wiretap order must "contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). "The minimization requirement 'does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations.'" *United States* v. *Kazarian*, No. 10 Cr. 895 (PGG), 2012 WL 1810214, at *13 (S.D.N.Y. May 18, 2012) (quoting *Scott* v. *United States*, 436 U.S. 128, 140 (1978)).

In *Scott*, the Court endorsed and adopted the position that whether there has been a violation of Title III's minimization requirement in any given case "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." 436 U.S. at 136. Focusing on the language of Title III (among other things), the Supreme Court explained that in any evaluation of whether the statutory requirements were violated, "Congress . . . made it clear that the focus was to be on the agents' actions[,] not their motives." *Id.* at 139. The Government's performance of this duty must be objectively reasonable and reflect "honest effort." *United States* v. *Uribe*, 890 F.2d 554, 557 (1st Cir. 1989). But "perfection is usually not attainable, and is certainly not legally required." *Id.*

With respect to how courts should engage in the "determination of reasonableness," the Supreme Court explained that "[b]ecause of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case." *Scott*, 436 U.S. at 139. The Supreme Court did, however, provide some guidance through its analysis of the particular case before it. First, in looking at the issue of whether monitoring agents excessively monitored non-pertinent calls, the Supreme Court noted that comparing "percentages [of pertinent and non-pertinent calls] may provide assistance," but that reference to percentages alone was "not a sure guide to the correct answer." *Id.* at 140. Second, the Supreme Court explained that consideration of "the circumstances of the wiretap" was "important," including whether the conspiracy under investigation is "widespread" and the "type of use to which the telephone [being monitored] is normally put." *Id.* Finally, the Supreme Court observed that "[o]ther factors may also play a significant part in a particular case." *Id.* at 141. In particular, the Supreme Court found that "it may be important to determine at exactly what point during the authorized period the interception was made," because the lack of information "[d]uring the early stages of surveillance" may make the interceptions of calls reasonable at that stage, even though "[i]nterception of those same types of calls might be unreasonable later on." *Id.* at 141.

"Courts applying *Scott*'s objective reasonableness standard have evaluated the government's minimization efforts in the context of the entire wiretap, as opposed to a chat-by-chat analysis." *United States* v. *Goffer*, 756 F. Supp. 2d 588, 592 (S.D.N.Y. 2011) (internal quotation marks omitted). "[T]he mere fact that every conversation is monitored does not necessarily render the surveillance violative of the minimization requirement of the statute . . . . [N]o electronic surveillance can be so conducted that innocent conversation can be totally eliminated." *United States* v. *Bynum*, 485 F.2d 490, 500 (2d Cir. 1973), *vacated on other*

*grounds*, 417 U.S. 903 (1974).  Moreover, the minimization requirement does not extend to calls lasting two minutes or less.  *See United States* v. *Capra*, 501 F.2d 267, 276 (2d Cir. 1974).

In addition, courts have identified several measures which, if taken by the Government, support a finding of compliance with the minimization requirement of § 2518(5).  These include: (1) maintenance of monitoring logs; (2) judicial supervision of the progress of the surveillance; (3) provision of written and oral instructions to monitoring personnel regarding the legal requirements for minimization; (4) requiring all monitoring personnel to read the court orders and applications, and posting of the minimization instructions, court orders and applications at the monitoring plant; and (5) supervision by the prosecutor.  *See, e.g., United States* v. *Marroquin-Corzo*, No. S1 10 Cr. 892 (DAB), 2012 WL 3245473, at *7 (S.D.N.Y. Aug. 7, 2012); *Kazarian*, 2012 WL 1810214, at *15-16; *United States* v. *Salas*, No. 07 Cr. 557 (JGK), 2008 WL 4840872, at *8 (S.D.N.Y. Nov. 5, 2008).

"Once a prima facie showing is made, the burden shifts to the defendant to show that, despite a good faith compliance with the minimization requirements, a substantial number of non-pertinent conversations have been intercepted unreasonably." *United States* v. *Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 4867402, at *27 (S.D.N.Y. Nov. 24, 2010).  "Where a defendant cannot make such a showing, courts generally reject a claim of improper minimization without a hearing." *Kazarian*, 2012 WL 1810214, at *14 (citing cases).

## 2.  Relevant Facts

With regard to minimization procedures, each of the orders set forth, among other things, that interception be conducted to minimize the interception of non-pertinent calls.  (*See* Ex. 1 at 7; Ex. 2 at 7-8; Ex. 3 at 7-8)  Prior to the interception of calls pursuant to each of the January 2015 Order, the February 2015 Order, and the April 2015 Order, written minimization

instructions were provided and read to monitoring agents by one of the Assistant United States Attorneys supervising the interception.  (*See* Downs Decl. at ¶ 6).  The minimization instructions relating to each of the orders of interception are attached to the Declaration of Special Agent Joseph Downs as Exhibits 1B, 2B, and 3B.  Besides being read to agents prior to the commencement of interception, the minimization instructions, along with the interception orders and agent affidavits, were posted in the wire room where interception was conducted, and all monitoring agents were required to sign a document that confirmed that the agents had reviewed the instructions.  The names and contact information of the supervising Assistant United States Attorneys were also provided to the monitoring agents.  (*See* Downs Decl. ¶ 6).

During the course of the 90-day period of interception of the Rechnitz Phone and the Reichberg Phone, the Government intercepted over 3,000 calls over each of the Rechnitz Phone and the Reichberg Phone, totaling over 6,000 calls.

With respect to calls involving defendant Huberfeld only, on both the Rechnitz Phone and the Reichberg Phone there were a total of 293 calls intercepted, including 3 non-pertinent calls that were greater than 2 minutes in length and were not minimized, as follows:

**Rechnitz Phone**

| | |
|---|---|
| Number of intercepted calls: | 170 |
| Number of calls marked pertinent: | 69 |
| Number of calls marked non-pertinent: | 101 |
| Number of calls greater than 2 minutes: | 54 |
| Number of non-pertinent calls greater than 2 minutes *not* minimized | 3 |

**Reichberg Phone**

| | |
|---|---|
| Number of intercepted calls: | 123 |
| Number of calls marked pertinent: | 38 |
| Number of calls marked non-pertinent: | 85 |
| Number of calls greater than 2 minutes: | 20 |
| Number of non-pertinent calls greater than 2 minutes *not* minimized | 0 |

(Downs Decl. ¶ 8).

### 3. Discussion

#### (i)   *Huberfeld Does Not Have Standing to Challenge Minimization*

Both defendants lack standing to mount a minimization challenge because the orders of interception related to the cellular telephones belonging to Jona Rechnitz and Jeremy Reichberg – phones in which neither Huberfeld nor Seabrook had any possessory or proprietary interest.

While Huberfeld was intercepted over these telephones and therefore may challenge the probable cause and necessity requirements of the wiretap orders, as noted above, the law in this Circuit is clear that Huberfeld cannot challenge the wiretaps on minimization grounds. "While any confirmed interceptee or target of a wiretap has standing to seek suppression on probable cause or necessity grounds, *only* individuals with a proprietary or possessory interest in the premises on which the subject telephone is located have standing to challenge minimization procedures." *United States* v. *Columbo*, No. 04 Cr. 273 (NRB), 2006 WL 2012511, at *8 (S.D.N.Y. July 18, 2006)(emphasis added) (citing *United States* v. *Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991) and *United States* v. *Gallo*, 863 F.2d 185, 192 (2d Cir. 1988)); *see also United States* v. *Salas*, No. 07 Cr. 557(JGK), 2008 WL 4840872, at *8–9 (S.D.N.Y. Nov. 5, 2008) (same).[8]  Accordingly, courts in this Circuit have uniformly rejected, on standing grounds, attempts by individuals who did not own the wiretapped cellphone to challenge minimization. This Court should do the same and find that Huberfeld "lacks possessory or proprietary interest

---

[8]     Notably, Huberfeld acknowledges only that there is "some" Second Circuit case law that precludes his claim on standing grounds. (*See* Def. Br. at 19).  This statement by Huberfeld that "some" courts of this Circuit recognize this standing rule is a gross understatement.  All courts in this Circuit are in accord on this issue - persons who have no possessory or proprietary interest in the telephones being tapped lack standing to bring minimization challenges.  *See* cases cited *supra* pp 26-27.  Huberfeld does not cite a single case to the contrary, because one does not exist.

in the [Rechnitz and Reichberg] [c]ellphone[s] and therefore cannot challenge minimization procedures for calls over the [Rechnitz and Reichberg] [c]ellphones." *United States* v. *Menendez*, No. 04 Cr. 219 (DAB), 2005 WL 1384027, at *2-*3 (S.D.N.Y. June 8, 2004).

### (ii)   *The Government Complied With The Minimization Requirement*

Even if Huberfeld had standing to challenge the minimization procedures for the interception of the Rechnitz Phone and Reichberg Phone, the measures taken by the Government to minimize non-pertinent communications over these cellular telephones readily establish *prima facie* compliance with the minimization requirement.  Such measures included providing written and oral minimization instructions to agents and translators; requiring all agents and translators to read the court orders and applications; posting minimization instructions, court orders, and affidavits in the wire room; maintenance of contemporaneous monitoring logs (i.e., line sheets); submission of periodic reports to the court; and supervision by Assistant United States Attorneys. (*See* Downs Decl. ¶¶ 6-7).  In short, the Government took all measures that have been recognized by courts to "increase the likelihood of compliance with § 2518(5)." *Salas*, 2008 WL 4840872, at *8; *see also, e.g., Marroquin-Corzo*, 2012 WL 3245473, at *7; *Kazarian*, 2012 WL 1810214, at *15-16. Accordingly, the Government has met its burden of demonstrating prima facie compliance with the minimization requirement.

Nor can Huberfeld rebut this *prima facie* showing of compliance by showing that a "substantial number of non-pertinent conversations have been intercepted unreasonably." *United States* v. *Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 4867402, at *27 (S.D.N.Y. Nov. 24, 2010); *accord United States* v. *Goffer*, 756 F. Supp. 2d 588, 592-93 (S.D.N.Y. 2011).  This is so for several reasons.

*First*, Huberfeld's analysis is based on several false premises.  For one, Huberfeld's contention that numerous non-pertinent calls were not minimized relies almost exclusively on calls that lasted fewer than two minutes.  (Def. Br. at 19 & 20 (claiming that only 10 of 84 non-pertinent calls were minimized, and thus 74 non-pertinent calls were not minimized and pointing to 60 calls that were not minimized but were less than two minutes in length)).  In this regard, Huberfeld ignores the long-standing rule that calls that are less than two minutes are not subject to minimization.  *See United States* v. *Capra*, 501 F.2d 267, 275-76 (2d Cir. 1974) (minimization is not required in calls under two minutes); *Rajaratnam*, 2010 WL 4867402, at *27 (same); *Salas*, 2008 WL 4840872, at *6 (same); *Menendez*, 2005 WL 1384027, at *3 (citing and quoting *United States* v. *Capra*, 501 F.2d 267, 275-76 (2d Cir. 1974)); *United States* v. *Gangi*, 33 F.Supp 2d 303, 308-309 (S.D.N.Y. Jan. 27, 1999) (Chin, D.J.).  Thus, Huberfeld's "numerical argument proves nothing . . . because *inter alia* he ignores the fact that the vast majority of calls were less than two minutes, and thus were not subject to a minimization requirement."  *Kazarian*, 2012 WL 1810214, at *27.[9]

Here, there were only three calls involving Huberfeld that were greater than two minutes *and* were not minimized, representing only 1% of the 293 calls intercepted involving Huberfeld, which is a far cry from the close to 74 calls that Huberfeld claims were improperly minimized.

---

[9]     It bears noting that Huberfeld appears to acknowledge, albeit in a footnote and in an oblique fashion, the two minute rule.  In that footnote, Huberfeld alleges that – according to his accounting – there were 13 non-pertinent calls greater than 2 minutes that should have been minimized.  (Def. Br. at 20, n.16).  The Government disagrees.  There were only three such calls – not 13 – that were not minimized.

Huberfeld's error is highlighted by the particular sessions he calls into question.  He cites nine calls as greater than two minutes, which, according to him, should have been minimized.  Huberfeld is wrong about eight of these calls: (i) five were in fact minimized (Rechnitz Phone Sessions 4195, 4760, 4798, and 5733; Reichberg Phone Session 8854); (ii) two have actual content of less than two minutes, and therefore need not have been minimized (Rechnitz Phone Sessions 1993 and 3987); and (iii) and one was a call with no content (Reichberg Phone Session 8855).  The Government can make these calls or linesheets available to the Court upon request.

(Def. Br. at 20).  Accordingly, Huberfeld fails to rebut the Government's *prima facie* showing of good faith compliance with the minimization requirement and, therefore, his motion to suppress should be denied.  *Marroquin-Corzo*, 2012 WL 3245473, at *9 (internal quotation marks omitted) (finding 2.1% of non-minimized, non-pertinent calls reasonable).  *See also Goffer*, 756 F. Supp. 2d at 592, 595, 597 (finding 18 "potentially violative" calls out of "more than 1,000" intercepted calls reasonable).

     *Second*, the *Scott* factors further support a finding that the Government acted reasonably with regard to minimizing non-pertinent wire communications over the Rechnitz and Reichberg phones.  In *Scott*, the Supreme Court instructed courts to look at: (1) the length of non-pertinent calls; (2) whether the non-pertinent calls were "one-time" calls; (3) the ambiguous nature of the conversations or pattern of calls, including the use of coded language; (4) whether the conduct being investigated involved a widespread conspiracy; (5) the public or private nature of the target phone; and (6) the stage of the surveillance.  *See Scott*, 436 U.S. at 140–42.

     Aside from the length of the non-pertinent calls, the Government's minimization was also reasonable in light of other circumstances faced by the monitoring agents.  For one, the conspiracy being investigated was wide ranging and involved multiple potential targets and offenses.  Given the breadth of the authorized purpose of the wiretap, agents were permitted to intercept a correspondingly broad array of calls, and therefore "more extensive surveillance [was] justified in an attempt to determine the precise scope of the enterprise." *Scott*, 436 U.S. at 140; *see also United States* v. *DePalma*, 461 F. Supp. 778, 820 (S.D.N.Y. 1978).

     Thus, when viewed in the context of the entire wiretap, the Government's minimization efforts were objectively reasonable.

## III.   THE COURT SHOULD DENY THE DEFENDANTS' REQUEST FOR EARLY DISCLOSURE OF IMPEACHMENT MATERIAL

The Court should reject the defense's request for early disclosure of impeachment material relating to Jona Rechnitz, a potential government cooperating witness.  Such impeachment material, which would largely consist of notes of statements of Rechnitz to the Government, are not subject to mandatory disclosure in advance of trial, let alone at this stage of the proceedings.  *United States* v. *Frank*, 11 F. Supp. 2d 322, 325 (S.D.N.Y. 1998) ("the very nature of *Giglio* material dictates a different timetable for its effective use"); *United States* v. *Griffin*, 1996 WL 140073, at *17 (S.D.N.Y. Mar. 27, 1996) ("it is well established that impeachment information need not be disclosed until the witness is called to testify at trial").

Typically in this District, such impeachment and Jencks Act material is produced the Friday before trial.  However, in this case, the Government advised defense counsel on July 25, 2017, that it is willing to produce to the defense *Giglio* and 3500 material for Rechnitz two weeks before trial.

### A.   Applicable Law

There is no right to pre-trial discovery of impeachment material, because "[g]enerally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *United States* v. *Nixon*, 418 U.S. 683, 701 (1974); *see United States* v. *Cuthberson*, 630 F.2d 139, 144 (3d Cir. 1980) (*Giglio* material "ripen[s] into evidentiary impeachment material" only when witness testifies).  Thus, *Brady* and *Giglio* generally do not give rise to pretrial remedies, *see Weatherford* v. *Bursey*,429 U.S. 545, 559 (1977); *United States* v. *Evanchik*, 413 F.2d 950, 953 (2d Cir. 1969) (requiring only that the defendant receive *Brady* and *Giglio* material in time for its effective use at trial).

36

In this regard, the Second Circuit in *United States* v. *Coppa*, 267 F.3d 132 (2d Cir. 2001) rejected the premise that the Government need disclose impeachment material pursuant to *Brady* v. *Maryland*, 373 U.S. 83, 86 (1963), *Giglio* v. *United States*, 405 U.S. 150 (1972) or the Jencks Act either at the time of indictment or upon request of the defendant.  Rather, the *Coppa* court held that such material need be disclosed in time for its effective us at trial by the defense. *Coppa*, 267 F.3d at 142; s*ee also United States* v. *Morgan*, 690 F. Supp. 2d 274, 286 & n.61 (S.D.N.Y. 2010) (collecting authorities); *United States* v. *Rodriguez-Perez*, No. 10 Cr. 905 (LTS), 2012 WL 3578721, at *10-11 (S.D.N.Y. Aug. 16, 2012); *United States* v. *Trippe*, 171 F. Supp. 2d 230, 237 (S.D.N.Y. 2001); *United States* v. *Rueb*, 00 Cr. 91, 2001 WL 96177 (RWS), at *6-7 (S.D.N.Y. Feb. 5, 2001).

Accordingly, under this long-standing precedent concerning impeachment material, courts routinely hold that the Government is not required to provide impeachment material prior to trial.  *See, e.g., United States* v. *Nixon*, 418 U.S. 683, 701 (1974); *Coppa*, 267 F.3d at 144; *United States* v. *Higgs*, 713 F.2d 39, 44 (3d Cir. 1983); *United States* v. *Jacques Dessange, Inc.*, 2000 WL 280050, *9 (S.D.N.Y. Mar. 14, 2000); *United States* v. *Frank*, 11 F. Supp. 2d 322, 325 (S.D.N.Y. 1998); *United States* v. *Griffin*, 1996 WL 140073, at *17 (S.D.N.Y. Mar. 27, 1996).

With respect to prior statements of witnesses – meaning material covered by Title 18, United States Code, Section 3500 – the Government is under no obligation to produce such Jencks Act material until after a witness has testified on direct examination at trial. *See* 18 U.S.C. § 3500(a).  In this regard, district courts lack authority to compel early disclosure.  *In re United States*, 834 F.2d 283, 287 (1987).  That said, customarily in this District, the Government produces 3500 material the Friday prior to trial.  As noted, in this case the Government will produce 3500 and *Giglio* material with respect to Rechnitz two weeks prior to trial.

37

### B.    Relevant Facts

On or about June 20, 2017, the defense submitted a letter to the Government requesting early disclosure of alleged impeachment materials pertaining to Rechnitz.  (*See* Ex. B. to Mazurek Decl.).  According to the defense, Rechnitz is an "apparent co-conspirator" of Jason Nissen, who was recently charged in this District with operating a Ponzi scheme through Nissen's ticket brokerage business.  (Ex. B to Mazurek Decl., at 1).  Thus, the defense argued that it is entitled to pretrial disclosure of alleged impeachment material pertaining to Rechnitz such as, among other things, "whether Jona Rechnitz disclosed his involvement in the Nissen scheme at the time he began cooperating with the government or thereafter . . . any information from Nissen or other witnesses interviewed by the government that contradicts or is material inconsistent with Rechnitz's statements to the government . . . all versions of Rechnitz's cooperation agreement with Rechnitz . . . [and] all information identifying Rechnitz's disclosures to the government, including the date of such disclosures and who was present at the time of disclosures…." (Ex. B. to Mazurek Decl., at 2).

Nissen's case captioned is *United States* v. *Jason Nissen*, 17 Mag. 4096 (S.D.N.Y.).  He is the only named defendant.  The complaint does not identify Rechnitz, by name or anonymously, as a co-conspirator who participated in Nissen's alleged Ponzi scheme.

### C.    Discussion

The Court should deny the defense request for early disclosure of impeachment material as "it is well established that impeachment information need not be disclosed until the witness is called to testify at trial." *United States* v. *Griffin*, 1996 WL 140073, at *17 (S.D.N.Y. Mar. 27, 1996).  Moreover, the Government's offer to disclose, in its discretion, Jencks Act and *Giglio*

materials two weeks prior to trial will provide the defense with more than a reasonable opportunity to prepare for trial.

As an initial matter, the Government disputes the defense characterization of Rechnitz as an "apparent co-conspirator" of Nissen (Ex. B. to Mazurek Decl. at 1), which appears to rely on two media articles that do not support such a characterization. Further, the Government has already produced to the defense all of the e-mail communications that it possesses of Rechnitz, which include communications between Nissen and Rechnitz, the contents of which similarly belie such a characterization. Those materials are word-searchable.

With respect to the defense's motion, the Government first notes that it is aware of its obligations pursuant to *Brady* v. *Maryland*, 373 U.S. 83, 86 (1963), *Giglio* v. *United States*, 405 U.S. 150 (1972), and the Jencks Act, 18 U.S.C. § 3500. Moreover, the Government is unaware of any exculpatory *Brady* material.

Further, it is plain that the defendants seek impeachment material, which, under settled precedent, the Government is not required to produce, approximately three months before trial. In *Coppa*, the Circuit rejected this very premise that the Government need disclose impeachment material pursuant to *Brady*, *Giglio*, or the Jencks Act either at the time of indictment or upon request of the defendant. Rather, the Court held that such material need be disclosed in time for its effective us at trial by the defense. *Coppa*, 267 F.3d at 142; *see also Morgan*, 690 F. Supp. 2d at 286 & n.61 (collecting authorities); *Rodriguez-Perez*, 2012 WL 3578721, at *10-11; *Trippe*, 171 F. Supp. 2d at 237; *Rueb*, 2001 WL 96177 (RWS), at *6-7. That is because the very nature of "*Giglio* material dictates a different timetable for its effective use," such that "impeachment information need not be disclosed until the witness is called to testify at trial," *Griffin*, 1996 WL 140073, at *17.

Moreover, the volume of material at issue in no manner necessitates its disclosure at this point.  The defense already possesses all electronic communications between Nissen and Rechnitz in the Government's possession.   The additional material now requested would largely be comprised of notes that, to the extent they impeach Rechnitz at all, would not take a significant amount of time to review.  Notably, the defense has not requested all such notes or impeachment material for other witnesses, presumably because they are aware that *Coppa* and related case law does not require its production at this time.  That the *Nissen* matter, in particular, has appeared in two newspaper articles does not require treating any impeachment material in respect of that matter differently.

Finally, it is the Government's practice, which has been approved by numerous courts of this District, to provide impeachment *Giglio* impeachment material closer to trial when 3500 material is provided, typically on the Friday before the start of trial.  As noted, however, the Government has no objection to providing such material in this case two weeks before trial.

## CONCLUSION

For the foregoing reasons, the Court should deny each of the defendants' motions.


Dated:  New York, New York
        July 28, 2017

                                        Respectfully submitted,

                                        JOON H.  KIM
                                        Acting United States Attorney

                        By:     /s/
                                        Martin S. Bell, Russell Capone, and
                                        Kan M. Nawaday
                                        Assistant United States Attorneys
                                        Tel.: (212) 637-2463/2247/2311


Cc: Defense counsel (By ECF).