HANPSEA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

       v.                                16 Cr. 467 ALC

NORMAN SEABROOK AND MURRAY HUBERFELD,

         Defendants.

------------------------------x

                            October 23, 2017
                            9:20 a.m.

Before:

            HON. ANDREW L. CARTER, JR.,

                          District Judge
                           and a jury

                    APPEARANCES

JOON H. KIM,
    United States Attorney for the
    Southern District of New York
KAN MIN NAWADAY,
MARTIN BELL,
RUSSELL CAPONE,
    Assistant United States Attorneys

```
 1

 2                         APPEARANCES (Continued)

 3

 4    BRACEWELL, LLP,
           Attorneys for defendant Seabrook
 5    BY:  PAUL LEWIS SHECHTMAN, Esq.
           MARGARET EMMA LYNAUGH, Esq.
 6                      Of counsel

 7

 8    MAZUREK LIPTON, LLP
           Attorneys for defendant Huberfeld
 9    BY:  HENRY EDWARD MAZUREK, Esq.
           EVAN LOREN LIPTON, Esq.
10                      Of counsel

11

12    Also Present:
           BARD HUBBARD, Special Agent FBI
13         YOLANDA BUSTILLO, Paralegal USAO
           AUGUSTA GRANQUIST, Paralegal
14

15

16

17              (In open court)

18              (Case called)

19              MR. CAPONE:  Russell Capone for the government, and

20    with me at counsel table is AUSA Kan Nawaday, Special Agent

21    Bard Hubbard from the FBI, Paralegal Specialist Yolanda

22    Bustillo.  Good morning, your Honor.

23              THE COURT:  Good morning.

24              MR. SHECHTMAN:  Paul Shechtman for Mr. Seabrook, who

25    is also present, and Maggie Lynaugh.
```

1          THE COURT:  Okay.

2          MR. MAZUREK:  Good morning, your Honor.  Henry Mazurek

3    and Evan Lipton on behalf of my client, Murray Huberfeld, and

4    also with us is Kimberly Meilun and Debra Sloane, who will

5    assist during the trial.

6          THE COURT:  Good morning.

7          MR. SHECHTMAN:  With me is Gussie Granquist, and I

8    think Gussie should be added as paralegal.  I'll be calling on

9    her during the trial to help me with putting things up on the

10   screen.  I think her name should be added to the list of people

11   we ask the jurors about.

12         THE COURT:  Okay.  Counsel for the government and

13   Mr. Huberfeld, are there any other individuals who will be

14   helping you with the trial whose names have not been included?

15         MR. MAZUREK:  Your Honor, we submitted to your Honor

16   by e-mail earlier this morning a list of potential names.  I

17   can hand that list up to you, write in Gussie's name.

18         THE COURT:  Okay.  Yes, please do that and hand that

19   up to me.  Okay.  While that's happening let's place this on

20   the record.  We had this conversation before just about

21   scheduling.  The jurors are on notice that we're going to be

22   using this 9:00 to 2:30 schedule; so the jurors are expecting

23   to be dismissed at 2:30 today and we will do that.

24         We had previously talked about having a conference to

25   discuss this motion to quash subpoenas at 1:00.  We're going to

1    need to move that to 3:00 today, and we'll also deal with the

2    other matters concerning the remaining issues relevant to

3    motions in limine.  We'll do that starting at 3:00 as well.

4            Some other preliminary things.  First of all, this was

5    touched upon briefly on Friday.  Let's get into this a little

6    bit more.  I'm going to do an allocution regarding the

7    rejection of guilty plea offers, to the extent there was an

8    offer, or the rejection of the opportunity to plead guilty.

9    I'm going to address this to Mr. Seabrook and Mr. Huberfeld; so

10   both of you, please, listen closely, as well as your attorneys.

11           Let me ask counsel for the government and counsel for

12   the defense this question.  Did the government extend a plea

13   offer to either defendant?

14           MR. CAPONE:  No, no formal plea offer or anything in

15   writing was submitted to the defendants.

16           THE COURT:  Okay.  Was there a Pimentel letter given

17   to either of the defendants?

18           MR. CAPONE:  No, your Honor.

19           THE COURT:  Okay.  In the government's view, what is

20   the defendant's sentencing exposure if they proceed --

21           MR. SHECHTMAN:  Judge?

22           THE COURT:  Yes.

23           MR. SHECHTMAN:  I understand.  I mean, we have a

24   high-publicity case raising an issue that I want to talk to the

25   Court about.  I'm not sure that there's a reason to put what

1  the government thinks is a sentencing exposure in a case that

2  there was no offer, none was requested, none was sought.  Both

3  defendants will confirm that, and unless your Honor feels

4  there's a compelling need, I prefer it to not to be on the

5  record.

6          MR. MAZUREK:  I agree with my colleague.

7          THE COURT:  All right.  Then let me ask this question.

8  I understand that no offer has been made by the government to

9  either defendant.  I want to ensure that both defendants are

10  aware of the fact that they have a right to go to trial.  They

11  also have a right to plead guilty, if they choose to do so.  Do

12  you understand that, Mr. Seabrook?

13          THE DEFENDANT:  Good morning, your Honor.  Yes, I do

14  understand that.  I have had no conversations with the

15  government whatsoever from the time I was arrested in my home.

16          THE COURT:  Okay.  Again, I'm not asking about the

17  conversations with the government.  What I want to make sure

18  that you, Mr. Seabrook and Mr. Huberfeld, understand is that if

19  you were to plead guilty, you could do that, and under the

20  guidelines, there are reductions appropriate for acceptance of

21  responsibility.

22          In Federal Court there is no promise as to what your

23  guideline range will be, nor will there be any promise as to

24  what your sentence would be.  Sentencing would be up to me.  I

25  just want to make sure that you understand that in addition to

1    having the right to go to trial, you have a right to plead

2    guilty regardless of whether or not the government makes an

3    offer.  You understand that, Mr. Seabrook?

4              THE DEFENDANT:  Yes, sir.  I do.

5              THE COURT:  And have you discussed that with your

6    attorney?

7              THE DEFENDANT:  Yes, sir.  I have.

8              THE COURT:  Do you understand that, Mr. Huberfeld?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  And have you discussed that with your

11   attorney?

12             THE DEFENDANT:  I have.  Thank you.

13             THE COURT:  Okay.  Counsel for Mr. Seabrook and

14   Mr. Huberfeld, is that correct, have you discussed that with

15   your clients?

16             MR. SHECHTMAN:  We have, your Honor, in the most

17   general sense.  Mr. Seabrook very much wants a trial.

18             THE COURT:  Okay.

19             MR. MAZUREK:  I also have discussed it my client, and

20   my client insists on a plea of not guilty.

21             THE COURT:  Okay.  Any further allocution requested in

22   this regard by the government or the defense?

23             MR. CAPONE:  No, your Honor.

24             THE COURT:  Okay.

25             MR. SHECHTMAN:  May I be heard on a matter?

7

1          THE COURT:  Sure.  Is this about --

2          MR. SHECHTMAN:  Jury selection.

3          THE COURT:  Right.  Is this about peremptory

4    challenges?

5          MR. SHECHTMAN:  No.

6          THE COURT:  All right.  Let me hear you.

7          MR. SHECHTMAN:  Last night, I learned that one of our

8    local papers had a story that relates to the 404(b) issue, if

9    you remember that was before your Honor, that the government

10   wound up -- we filed a letter.  We asked that it be under seal.

11   The Court decided against us on that.  The government

12   eventually withdrew that 404(b) application.

13          Well, one of our papers has a story about that.  It

14   identifies the potential witness in the case, who's a prominent

15   member of the New York community, and it's on Page 6, with a

16   large headline that says "Union Bribe Bid" and then the name of

17   the witness.

18          As your Honor knows, we thought the whole issue was

19   highly prejudicial at the time, enough to make the unusual

20   request.  My feeling is anybody who's read this, really can't

21   be a fair juror, and so we would ask that your Honor do two

22   things; one is, ask the jurors whether they have read anything

23   about the case since completing the questionnaire last week.

24   And if the answer to that is yes, then -- and I say this

25   regrettably because no one wants to start this trial more

expeditiously than Mr. Seabrook -- to do individual voir dire

because you can't say, after you have read the story in this

mornings' newspaper on this topic without effecting the entire

jury.

          And, again, I think if they have, at the very least,

the obvious question is:  Can you put it out of your mind?

Because it was, in my view, patently inadmissible to begin

with.  Your Honor had ruled expressly on the point.  It's not

coming in in this case, and if you read it, I think it's highly

prejudicial.  So I apologize to the Court because I don't want

individual voir dire, but I don't know any other way to handle

it.

          I have spoken to the government.  They will express

their views, but I think they're not unsympathetic here.  I can

tell your Honor the following, the defense did not leak this.

I spoke to Mr. Capone last night.  I have the greatest respect

for him.  I'm sure he didn't leak it, but it didn't come from

us.

          THE COURT:  Okay.  Government?

          MR. CAPONE:  We agree, your Honor.  It is unfortunate

that it's in the paper, and we have no objection to the

voir dire that Mr. Shechtman asked for.

          THE COURT:  Okay.  May I see it?

          MR. SHECHTMAN:  Yes.

          THE COURT:  Okay.  You can give this back to counsel.

1          MR. SHECHTMAN:  Your Honor, I should say it is what

2     our President would call "fake news," but I think it's still

3     highly prejudicial.

4          THE COURT:  Okay.  Let me get a sense from counsel,

5     defense counsel, as to what sort of inquiry you would want me

6     to make if, in fact, a juror says that they've read something

7     or heard something about this case.  I will ask the question

8     more generally:  Has anyone read anything or seen anything or

9     heard anything about this case since the questionnaire was

10    filled out?  If someone says, yes, I understand you want me to

11    bring this person in individually and what do you want me to

12    ask them?

13         MR. SHECHTMAN:  I think it could be as simple as the

14    following, your Honor:  There were stories in two other

15    newspapers this morning.  One said that jury selection was

16    going to begin this morning.  The other repeated stories about

17    Mr. Seabrook and his success and his reputation in the

18    community.  Those are fine.  I mean, those are old news, old

19    hat.

20         So I think your Honor could literally say to a juror:

21    In what paper did you read it?  And if the answer is Daily News

22    or The New York Times, I think we can send that person back.

23    If the answer is The Post, right, then I think the question is:

24    What did you read?  And I'll be candid.  If the answer is:  I

25    read that article, we think you should strike that person for

1    cause.

2              But I really do think, because no one wants to waste

3    your time, that once you have somebody at sidebar, this is a

4    one-question inquiry:  What paper did you read?  And if the

5    answer is:  The New York Times, I think the response is:  Great

6    newspaper, and just send that person back.  If it's The Post,

7    I'm not even sure your Honor has to -- if it's The Post, follow

8    up with:  What did you read?  And if the answer is:  I read

9    about this, then we can figure out whether you say:  Can you

10   still be fair?  We'll do a challenge for cause at that point,

11   but certainly if your Honor wants to ask that question, that's

12   fine.  But I don't think it needs to be more elaborate than

13   that.

14             THE COURT:  Okay.  Government?

15             MR. CAPONE:  With the exception, your Honor, that I

16   don't necessarily agree that having read the article

17   automatically makes a juror prejudice, and I do think your

18   Honor should follow up, if they say they read the article.  I

19   agree with the rest of what Mr. Shechtman said.

20             THE COURT:  All right.  Let me just also state this.

21   There are several people here in the audience, which is fine.

22   We have an overflow room.  We're reserving this space in here,

23   for today's purposes, for family members, the press and people

24   who are also associated with working on the case.

25             For the folks who are also working on the case, who I

```
 1   see sort of towards the front of the courtroom, when the
 2   potential jurors come in, everyone is going to have to get to
 3   the back so that we have the first few rows available for the
 4   potential jurors.
 5        I also want to instruct everyone not to say anything
 6   about the case while you're in the courtroom.  Don't make any
 7   comments, even if you're making innocent comments.  It could be
 8   misconstrued.  We don't want to say anything that could
 9   possibly influence any jurors.  And that goes for also when
10   you're out of the courtroom, when we're on a break, if you're
11   out in the halls, don't say anything about this case.
12        Is there anything else that we need to deal with
13   before we bring the jurors in?  It's going to take some time to
14   get them in here.  I know they've seen the video, but we've got
15   to go through all those numbers and bring them in.  Is there
16   anything else we need to discuss before we bring the jury in?
17             MR. SHECHTMAN:  Judge, the number of peremptories?
18             THE COURT:  Okay.  I've read the parties' submissions,
19   and I think the government has the better of the argument.  I'm
20   going to deny the defense request.  Although, I do have
21   discretion to grant additional peremptories, I'm going to deny
22   that request.
23        Is there anything else that we need to discuss before
24   we bring the jurors in?
25             MR. CAPONE:  Not from the government, your Honor.
```

```
 1                 THE COURT:  Okay.

 2                 MR. SHECHTMAN:  No, your Honor.

 3                 MR. MAZUREK:  No, your Honor.

 4                 THE COURT:  Soon, if you don't have it yet, you will

 5       get a copy of the individual questions that the jurors will get

 6       after I ask my general questions to the jury panel, and in all,

 7       we have 36 jurors who haven't been excused for cause at that

 8       point.  We'll hand them the copies of this individual

 9       questionnaire.  They will not fill it out.  They will just

10       answer the questions orally as they pass the microphone back

11       and forth.

12                 Again, I will let counsel know, I'm not intending to

13       repeat any questions that have been covered in some way in the

14       questionnaire, except for updates as it relates to the names

15       they may hear and news coverage and the like because, as

16       counsel who are all experienced trial lawyers know, when you

17       ask the same witness the same question twice, it's not a good

18       idea.  The best you're going to get is that they're going to

19       repeat their answer.  More than likely, especially if they are

20       an adverse witness, they're going to realize, hmm, there must

21       have been something problematic or something that the other

22       side really liked in my answer and I need to change it.  So I

23       don't intend to go down that path.

24                 All right.  So we'll wait until the jurors get here,

25       and we'll start soon.  Anything else from anyone?  Are we all
```

1     good with the technical things?  Are all the technical glitches

2     worked out?

3              MR. CAPONE:  I think we are.

4              MR. MAZUREK:  Just logistically, your Honor sits the

5     16 in the first -- first 16 in the jury box, and then I imagine

6     down the two rows.

7              THE COURT:  Correct.  And the next 20 will be in the

8     first two rows.  Okay?  And then the others will be behind

9     them.

10             MR. MAZUREK:  Thank you.

11             MR. SHECHTMAN:  Judge, we're hoping to use that 2:30

12    to 3:00 spot to just check out the equipment in the courtroom,

13    to make sure we know how it works.  If it's possible for the

14    courtroom deputy to be present during that, that would be

15    great.  If not, I understand.

16             THE COURT:  Okay.  All right.  See you soon.

17             (Recess)

18             THE COURT:  While we're waiting, why don't we go ahead

19    and let me get from counsel the specific questions they want me

20    to ask of jurors 10, et cetera.  Have counsel conferred about

21    this?  Are counsel on the same page?  Let me get a sense of

22    what you want me to ask.

23             MR. SHECHTMAN:  Judge, if you give us two or three

24    minutes, we may be able to do that.

25             THE COURT:  Okay.  You've got it.  I'll be back.

1          (Recess)

2          THE COURT:  Go ahead, counsel.

3          MR. SHECHTMAN:  Judge, juror No. 10 --

4          THE COURT:  Yes.

5          MR. SHECHTMAN:  -- the question that gave us pause on

6    juror No. 10 is question 13, and the juror wrote:  In my

7    opinion, unions in general are not helping the American economy

8    anyway.  Views regarding unions make it difficult for the jury

9    to be fair and impartial.  That's juror No. 10.

10         And at least one side would like you to inquire as to

11   whether those beliefs are deep seeded enough that the juror

12   really couldn't carry out his juror duties.  So on 10, it is a

13   question about fairness.

14         18, your Honor, there are a series of questions here,

15   but you see they relate.  Her opinions about criminal defense

16   attorneys might make it difficult for her to be fair and

17   impartial.  And her opinions about unions and hedge funds might

18   make it difficult for her to be fair and impartial.  She says

19   her husband is a PBA member.  She works for a white-collar

20   attorney, who was a former prosecutor for the Southern District

21   of New York.  They have many hedge fund cases with the SEC.

22   Her father -- a father of the daughter's friend is a CO at

23   Rikers.  So in specific, it is questions about criminal defense

24   attorneys and fairness, and union and hedge funds and fairness,

25   and I think that probably picks up the last question as well.

1          THE COURT:  Okay.

2          MR. SHECHTMAN:  27, she was a law school classmates

3    with Preet and Joon at Columbia.  She says nothing about what

4    kind of students they were.  She said she is currently

5    litigating a case with several significant filings over the

6    next four weeks.  It would be difficult for me to meet my case

7    obligations.  There's really two questions, whether her

8    law-school relationship causes any fairness problem and it's a

9    hardship issue.

10         THE COURT:  Okay.

11         MR. SHECHTMAN:  No. 30, she is an orthopedic nurse at

12   Westchester Medical Center.  The four weeks of a trial give her

13   concern about patient care; so it's a hardship issue for her.

14         THE COURT:  Okay.

15         MR. SHECHTMAN:  No. 37 we have agreed to strike.

16         THE COURT:  Okay.

17         MR. SHECHTMAN:  56, we have agreed to strike.

18         THE COURT:  Okay.

19         MR. SHECHTMAN:  57, she learned about the case from

20   1010 WINS Radio, recalls hearing about the apparent theft.  Has

21   opinions about the U.S. Attorney's Office for the Southern

22   District of New York that might make it difficult for be fair

23   and impartial.  So it's really a question what did she hear,

24   did it affect her, and would her opinions about the Southern

25   District of New York prevent her from being fair and impartial.

1          THE COURT:  And on 57, was it opinions about --

2          MR. SHECHTMAN:  About southern District of New York.

3          THE COURT:  The U.S. Attorney's Office?

4          MR. SHECHTMAN:  U.S. Attorney's Office, yes.  I

5     apologize.

6          THE COURT:  Okay.

7          MR. CAPONE:  Without saying one way or the other which

8     way those opinions go.

9          THE COURT:  Okay.

10          MR. SHECHTMAN:  78, it's a hardship issue.  Her job

11     doesn't pay for jury duty.

12          91 says, generally, that the nature of the case would

13     make it difficult for her to be fair and impartial.  She has

14     relatives in law enforcement, and she has some relatives with

15     union connections.  She has a trip in December, but that

16     shouldn't be a problem.  So it really is what does she mean by

17     the nature of the case, her law enforcement connections and her

18     union connections.

19          THE COURT:  Okay.  All right.  That should keep us

20     busy for a while.  I think that should be good for now.  Then

21     we'll deal with the others.

22          MR. SHECHTMAN:  There are four left, your Honor.

23          THE COURT:  Sure.  Hold on.  Hold on.

24          MR. SHECHTMAN:  Should I do them?

25          THE COURT:  Yes.  Let me just make sure I have enough

1    space to jot all of this down.  Okay.  What are the others?

2              MR. SHECHTMAN:  Has opinions about the criminal --

3              THE COURT:  Which number is this?

4              MR. SHECHTMAN:  98.  I apologize.  Has opinions about

5    the criminal justice system that make it difficult for him or

6    her to be fair and impartial.  Too many innocent people get

7    locked up.  She's worked on wrongful conviction cases, and she

8    may have hardship issues.

9              THE COURT:  Okay.  We're still waiting for four jurors

10   to show up.

11             MR. SHECHTMAN:  118, she's applying for jobs in

12   Washington and a four-week delay may be difficult; so she's a

13   hardship issue.

14             THE COURT:  What would you like me to ask her?

15             MR. SHECHTMAN:  I think it's just generally -- I mean,

16   in a lot of these hardship cases, one side or the other had the

17   sense that jury duty is important, that this doesn't seem that

18   demanding; so the real question is will -- this should be a

19   three-week trial, will you be able to do this without serious

20   damage to your career in Washington.  If it's going to cause

21   her serious damage, nobody wants her.  But if the answer is,

22   look, I can start interviewing in mid-November, she may be an

23   acceptable juror.

24             THE COURT:  Okay.

25             MR. SHECHTMAN:  121, sometimes has difficulty hearing;

so there is a hearing issue here, and some sense that she may

have to work, depending on her boyfriend's schedule.  So it's a

hardship issue.

          THE COURT:  Now, what would you like me to ask her

about her hearing issue?

          MR. SHECHTMAN:  I think all of us, or at least some of

us, weren't quite sure what it means to say sometimes I have

difficulty hearing.  If she's really not going to hear

anything, if she's going to miss things during the trial, she

should be excused, but I think all of us sometimes have

difficulty hearing, including the court reporter, depending on

who's close to a mic or not.  It's just how serious is the

hearing issue.  If it really will prevent her from hearing, she

should go.  So if your Honor just inquires generally how bad

her hearing is.

          THE COURT:  What specifically would you like me to

say?

          MR. SHECHTMAN:  If everybody will have a microphone,

would she have difficulty hearing in the courtroom?  If her

answer is yes, we're okay with her being excused.

          THE COURT:  My concern is that this courtroom is a

beautiful courtroom, but the acoustics aren't great; so people

who have perfect hearing may have difficulty at times.

          MR. SHECHTMAN:  Your Honor, we'll strike her, then.

Both sides are agreeable to that.

1          THE COURT:  Okay.

2          MR. SHECHTMAN:  Okay?  So 121 is stricken for cause.

3          THE COURT:  Okay.

4          MR. SHECHTMAN:  And 123 says he's a partner at Cravath

5    with serious responsibilities, and serving on a jury could

6    cause serious damage to his career.  And I think all parties

7    would like you to ask why Cravath is so special.

8          THE COURT:  Well, I won't ask it like that, but what

9    is it that you want me to ask him?

10         MR. SHECHTMAN:  Look, I mean, there's not a lawyer in

11   this city who isn't busy, and I think our feeling is we all

12   have responsibilities.  If he really says it's going to cause

13   him substantial harm, what are we going to do?  But there are

14   some cases, and this may be one of them, where we're going to

15   have a lawyer on the jury.

16         THE COURT:  Okay.

17         MR. SHECHTMAN:  So it's just a question of how serious

18   of a hardship are those postponed events.

19         THE COURT:  Okay.

20         MR. SHECHTMAN:  And if I could talk to Mr. Capone for

21   a second.

22         (Pause)

23         MR. SHECHTMAN:  Judge, so those are the people, Judge.

24         THE COURT:  Okay.  So just as an update, we're still

25   waiting on three jurors to show up.

1          MR. SHECHTMAN:  Judge, are we going to question these

2     people individually?

3          THE COURT:  That's what I'm about to ask counsel.  It

4     may make sense to go ahead and bring in these jurors

5     individually.  We'll swear them individually and start

6     questioning them.

7          The other thing is, with the number of jurors that

8     we're going to need to bring in here, we're going to basically

9     need all of the benches; so I'll ask counsel what their

10     thoughts are on this.  We can either have the people in those

11     last couple of rows stand on the sides, or we can direct them

12     to the overflow room.  Again, this will be a temporary

13     situation because once we make some real headway with jury

14     selection, things will open up here.

15          MR. SHECHTMAN:  Judge, I think what we'd ask is to

16     leave it up to the family members.  If they're comfortable

17     standing, we're fine.  There's at least one, Mr. Huberfeld's

18     mother is here, who is old, she may prefer to be in the other

19     room, but if you'll give the others the choice, that would be

20     great.

21          MR. MAZUREK:  Your Honor, I would ask that the family

22     members have the option to remain in the courtroom.  Obviously,

23     this is one of the most important days of Mr. Huberfeld's life,

24     and the people who are close to him want to be in the process.

25          THE COURT:  Let me make this clear, in case it's not

1    clear.  The overflow room has a video feed.  It's not a

2    situation in which they wouldn't be able to see.

3              MR. SHECHTMAN:  I understand completely, but I think

4    if we give them the choice, some of them will head to the

5    overflow room.

6              THE COURT:  All right.  Government?

7              MR. CAPONE:  No objection to that, your Honor.

8              THE COURT:  I guess we'll make that same option

9    available for the members of the press as well.

10             MR. SHECHTMAN:  That's fine.

11             THE COURT:  Okay.  So that's what we'll do.  So folks

12   are allowed to stand.  You may be more comfortable going to the

13   overflow room.  Obviously, you don't need to stand up now,

14   until we bring in all the jurors, but when the jurors come in,

15   you may want to go to the overflow room.  Okay.

16             All right.  So, counsel, just give me the numbers

17   again, jurors 10?

18             MR. SHECHTMAN:  10, 18, 27, 30, 57, 78, 91, 98, 118,

19   123.

20             THE COURT:  Okay.

21             MR. SHECHTMAN:  And you can excuse 37, 56 and 121.

22             THE COURT:  Okay.  So I will send my deputy and go and

23   bring those jurors in.  Again, what we're going to do now, if

24   it's okay, is -- everyone can be seated now.  Because what

25   we're going to do right now is just bring in these ten jurors,

1    one at a time; so you can go ahead and sit down, but when the

2    entire panel comes in, you'll need to stand off to the side or

3    go to the overflow room.

4           (Pause)

5           THE COURT:  So those ten jurors are here.  We're still

6    waiting on one other juror.  It may be that we just go on

7    without that person, but the other ten are here in the hallway,

8    I believe.  Is that where they are, Tara?

9           THE DEPUTY CLERK:  Yes.

10          THE COURT:  What seems to me to make sense is we bring

11   all ten of them in first and ask them those general questions

12   in terms of the updated list of names and newspaper articles

13   and the like, any other information that they've seen or read

14   about this case, and then send nine of them out and go one at a

15   time like that.  Make sense?  We'll also swear them when they

16   come in.  Anyone have any objection to that?

17          MR. CAPONE:  That's fine.

18          MR. SHECHTMAN:  No problem.

19          THE COURT:  All right.  Let's bring those ten in.

20          (A jury of 12 and 4 alternates was impaneled)

21          (In open court; jury not present)

22          THE COURT:  Let's just make sure all the jurors are

23   gone.  Okay?  All right.  So there's some legal matters we need

24   to discuss.  I don't know about counsel.  I could use two

25   minutes and 42 seconds just to kind of get myself together.  If

HANPSEA1b                        Trial

1   counsel want a seven-minute break to use the facilities and get

2   their thoughts together, we can do that.  If not, I'll take two

3   minutes and 42 seconds.  How do counsel --

4              MR. SHECHTMAN:  I think we'll take the seven, if

5   you'll give it to us.

6              THE COURT:  All right.  Sounds good.  See you in seven

7   minutes.

8              (Recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court; jury not present)
 2              THE COURT:  Okay.  Is everyone here?  Are counsel for
 3     the non-parties here?
 4              MR. BELL:  They are, your Honor.
 5              THE COURT:  Come on up.
 6              Let me start off with a question to Huberfeld's
 7     counsel regarding Request No. 8.
 8              MR. MAZUREK:  On which?
 9              THE COURT:  On the Rechnitz subpoena.
10              MR. MAZUREK:  Regarding the --
11              THE COURT:  Yes.  You say that this is relevant to
12     bias or motive.  Can you tell me more about why you feel this
13     is relevant to bias and motive as opposed to general
14     impeachment.
15              MR. MAZUREK:  Your Honor, the health insurance fraud
16     is one crime that Mr. Rechnitz was given coverage and his
17     recollection for the government.  It is something that we do
18     not have any Rule 16 discovery about, so typically I do believe
19     that if the government has given a witness coverage for
20     something for a crime he knows he will not have to plead guilty
21     to, he is not going to face punishment for, typically we know
22     more what that crime actually was other than a line or two in
23     the cooperation agreement.  In this instance, unfortunately, we
24     don't have that information in the Rule 16 discovery.
25              In order to evaluate the bias or motive of this
```

witness in terms of reasonably perspective of this crime that
the government is giving him a pass on, we are trying to obtain
the information so that we can properly put that information
before the jury so that they can evaluate whether, in the list
of crimes that he is given coverage for, this is what his
conduct actually was.

THE COURT:  What my question is, I understand you want
the information, you feel you don't have the information.  My
question is why is it that you feel that this information,
whatever it is, goes to bias or motive, especially if this
witness has coverage for it?

You made a big stink before about the government
essentially suggesting to a jury that a witness has a motive to
tell the truth because of their agreement with the government.

If the witness is covered for this crime, how does
other information about that crime for which the witness is
covered give that witness a motive to lie or a bias for the
government or against Mr. Huberfeld?

MR. MAZUREK:  It shows he has already received a
benefit, your Honor; and, therefore, the jury, if they
understand how big a benefit he has received for telling things
that the government are happy with him telling, then that could
go to his bias, that he has a particular interest in satisfying
the government at the time that he entered into the cooperation
agreement because they're giving him a pass on a federal crime.

1            MR. SHECHTMAN:  Could I add to that, I mentioned in

2     that short letter we wrote to the court, I take it his motive

3     differs if this is a hundred dollar health insurance fraud or

4     10,000 or hundred thousand dollars health insurance fraud,

5     whether it is a more or less important for him to curry favor.

6     We have no idea.  He says I committed insurance fraud.

7            If we say to him how big was it, and he says a hundred

8     dollars, we are stuck with the answer without these records.

9            So the question here is what is the scope of the

10    wrongdoing?  And what is the scope of the wrongdoing he had

11    coverage for?  And how many lies are there?  And are there lies

12    on each one?  Are there separate years because if they're

13    separate years, then we have three separate crimes he got

14    coverage for.  All we want to know is what were the lies and

15    how much were people defrauded and were they in one year or

16    three because presumably if I get coverage for a big crime, I

17    am more likely to tell a big lie.

18            THE COURT:  That is what I had thought might be the

19    theory, but I wanted to get confirmation because again there is

20    no requirement that there be sort of a consistent theory of

21    prevarication, but it does seem it is slightly inconsistent

22    with at least what counsel for Huberfeld was pushing in the

23    last couple of weeks.

24            If what we are saying here is this goes to his bias in

25    favor of the government as opposed to a bias against Mr.

HANJSEA2

1   Huberfeld and Mr. Seabrook, he has this very valuable coverage

2   and you want to probe how valuable this coverage is, that

3   certainly seems that is a bias that this person could have in

4   order to please the government.

5        It does seem we are going to get right back into this

6   situation in which perhaps, I don't know, I am not psychic, but

7   the government might say because this witness has coverage for

8   this, the only thing that harms him regarding this is if he

9   were to lie about it; and, therefore, he has a motive to tell

10  the truth.

11       I wanted to make sure that is where we were and we are

12  on that same page because I want to be prepared in case I start

13  getting that objection again to this.  That does seem sort of

14  incongruous with your earlier theory of prevarication and your

15  theory as to the nature of this cooperation agreement.  Let me

16  hear from the non-parties on this in terms of any response to

17  this proffered reason for Request No. 8.

18       MS. BIRGER:  With respect to that question, your

19  Honor, I actually didn't hear an articulated motive for bias in

20  that answer.  I think the court's question kind of puts it

21  neatly, which is that if Mr. Rechnitz was covered for this, he

22  has no motive to lie.  The second issue as to what Mr.

23  Schechtman said about needing to know essentially the dollar

24  value of the fraud.  That is pure impeachment information.  All

25  they're looking for is more evidence of extrinsic evidence of a

1   collateral act, and the dollar value says nothing about the

2   nature of the crime.

3           The second issue is this is exactly the kind of thing

4   people routinely inquire into on cross-examination.  They will

5   hear what the answer is, and if the answer gives rise to the

6   need for documents which I would be shocked to hear, we can

7   deal with that.

8           The third thing is, I am in a slight disadvantage.  I

9   have not seen the 3500 material, but I think the defense is

10  probably being somewhat disingenuous because I would be shocked

11  if the dollar amount and the description of what the nature of

12  the fraud was was not in the 3500 material.  I suspect that it

13  is.  I am the wrong party to ask.

14          THE COURT:  I don't think the defense is necessarily

15  cabining their request to the dollar amount of the fraud.  I

16  think what they're saying, if we take this as an analogy,

17  instead of coverage for criminal activity, let's say the

18  government were paying a witness -- obviously, this is a

19  strange analogy, but instead of giving coverage for a crime,

20  the government were paying a witness, and if the government

21  paid a witness $100.00 to testify, perhaps that witness has

22  some motive to curry favor with the government or to show

23  gratitude for this wonderful gift that they have been given as

24  opposed to if this witness is paid $300 million.  In that

25  situation, the government, to make this analogy, is a more

1    generous sort of benefactor, and that might cause the witness

2    to have a greater desire to please the government and a greater

3    sense of loyalty to the government.

4             I think that is what the defense is saying.

5             MS. BIRGER:  I think you're right.  I didn't think to

6    build it that way.  What they're looking for this is the

7    conduct and conduct.  The details would include more

8    information about the conduct and dollar amount.  That is what

9    they have articulated and that is what they're asking for.  I

10   think that is probably in the 3500 material.

11            Even if it is not --

12            THE COURT:  Hold on.

13            MR. SHECHTMAN:  It is --

14            THE COURT:  Counsel, hold on.

15            (Multiple voices)

16            THE COURT:  You may want to just, if you haven't been

17   able to figure that out yet, you are winning on this and you

18   may want to stop.  Let me hear from counsel more on that.

19            MS. BIRGER:  I don't know what is in the 3500

20   material.  I know it was disclosed at the meetings.  I can't

21   speak to what is actually written down in 3500 material.  The

22   government can certainly answer that question.

23            What I can say is that this is exactly the kind of

24   thing where the government routinely will have a witness get

25   immunized for some robbery that is not part of the charges.  If

HANJSEA2

1    you're talking about a non-white collar case or fraud not part

2    of the charges, and it is not part of the Rule 16 discovery

3    because it is not part of the case and the witness gets on the

4    stand and the witness talks about the conduct, the defense uses

5    cross-examination to find out more if they want to based on the

6    3500 material.

7            There is no case that they have cited that involves

8    using a trial subpoena to get evidence that has nothing to do

9    with the charged crimes and only has to do with a prior bad act

10   that has already been admitted by the defendant.  There is not

11   a single case.

12           THE COURT:  Okay.  Let's talk about the other request,

13   and let me hear from counsel for the defendants about the other

14   request.  Again, Request 8 did seem to be an outlier.  It did

15   seem to be different from the other requests.  The other

16   requests did seem to me to be more quintessential about

17   standard impeachment.  Let me hear from counsel from the

18   defense on that with the other request.

19           MR. SHECHTMAN:  Judge, the income tax returns I think

20   fall into the same category.  As your Honor may know, there is

21   a sort of historical oddity in this district, and that is that

22   they can't give coverage for tax crimes because that can only

23   happen through Washington.  So the plea agreements standardly

24   carve-out taxes.

25           I have done this for 30 years on both sides, and your

1    Honor has experience.  I have never known a cooperator who

2    testified with a cooperation agreement who the tax division

3    then brought charges against.  I have had cooperators who said

4    to me but I am not covered for tax crimes.  If it is a CJA

5    case, I am just covered for the bank robbery, but not covered

6    for tax crimes, are they going to come after me.  I have said

7    for 30 years I have done this, no one has, no one will.

8              So I think what is absolutely true in this case is for

9    lack of a better word, implicit coverage here, the coverage

10   that every lawyer knows this person got is for tax crimes.  The

11   question is how big are those?

12             Now, I know that a lot of what is going on here has

13   not been reported.  This is a person who was with Nissen said

14   he got as much as $8 million, $6 million, it changes, $4

15   million.  The chance of that being on a tax return strikes me

16   as zero.  At times what he has said is I had to pay people off

17   who lost money; and, therefore, it is a wash.  Well, that is

18   not an ordinary business experience.  It probably isn't in the

19   same year anyway.

20             I think there is a massive tax fraud here.  This is a

21   person who got Nissen to write him a loan document totally

22   fabricated in order to cover the fact that he was getting

23   income from Nissen.  It is a fella who got Nissen to pay his

24   American Express bills to the tune of I think a million dollars

25   so he wouldn't have tax liability.  There is a major tax crime

1   here.  We can inquire into it, but we are in the exact same

2   position of not knowing the full scope of it without seeing

3   those returns.

4           If people say look, there is some personal things on

5   there to be redacted, that is fine.  My real question is what

6   did he report as income?  Because I am prepared to bet the

7   answer is very little of what we know he got and he really does

8   have coverage for that in the practical sense that in the

9   history of the Southern District of New York, no cooperator

10  with a cooperation agreement has ever been prosecuted for a tax

11  crime.

12          Maybe somebody will tell me that Mr. Rechnitz will be

13  the first, but I would bet heavily against it.

14          THE COURT:  Just to break this down for me, give me a

15  sense of what it is you generally -- what your inquiry of this

16  witness would be and why these records are necessary and why

17  these records aren't again just quintessentially for

18  impeachment.

19          MR. SHECHTMAN:  The question will be exactly the same,

20  which is one of your motives in cooperating here, right, was

21  because you were committing major tax crimes throughout this

22  period and you knew that if you cooperated, even though it

23  wouldn't formally be in this agreement, you knew that you were

24  going to get coverage for it, that the Department of Justice

25  was not coming after you.

1          And how much, Mr. Rechnitz, was that tax fraud?  To

2     which the answer is X, and we are stuck with that.  So I think

3     this is on all fours, which is how big is this crime that in

4     effect, for practical effect, in the history of this district

5     you have coverage for.

6          THE COURT:  What if the witness says something

7     different in response to those questions?  You're banking on

8     the witness saying that, yes, this is not in the cooperation

9     agreement, but I believe, because I was told by counsel, my

10    belief is that I will informally be covered for this.

11         If the witness doesn't say that, what is the relevance

12    of any of this if the witness said I am not covered and I don't

13    believe I am covered for this.

14         MR. SHECHTMAN:  Your Honor, if he says the following.

15    No one has given me any impression I am likely to be covered

16    for this and, God, I am scared to death that the Department of

17    Justice is going to come after me, then my view is we don't get

18    the tax returns.

19         If he says what I think he is going to say and what

20    they know is the reality, then I think we should get the

21    returns.  What I am saying is at the very least, and I think

22    Ms. Birger said this, we should have the returns here, they

23    should be available, and if the question goes the way I think

24    it, we should be able to get them.  They will be going to be

25    complicated because there are lots of corporations.

1          The issue is simple because there is lots of income.

2     I am willing to do it that way and see what he answers.  If he

3     answers the way I think, if he says uncharacteristically

4     truthfully, then I think we are entitled to them.

5          THE COURT:  Back up for me.

6          Is it your belief -- and again I don't want to try to

7     make you put out your entire cross-examination here and divulge

8     that to the government.  Let me get a sense of if the witness

9     testifies that he is not covered for any tax fraud -- backing

10    up even further that.

11         If the witness is asked whether or not these

12    ill-gotten gains were reported on his tax returns, I think that

13    you are probably suspecting that the witness is going to say

14    no, that he did not report them, correct?

15         MR. SCHECHTMAN:  I don't know what he will say.  In

16    this sense it is like the health insurance.  If he says how big

17    was the health insurance fraud?  Ah, a hundred dollars, it was

18    one year what I think your Honor hasn't ruled yet, but I think

19    what your Honor is saying is because that is so closely tied to

20    what the deal is and how rich this deal is, we should be able

21    to explore it and I will be stuck with his -- and not be stuck

22    with his answer because bias is never collateral.  This is the

23    same.

24         If he says I have been led to believe or I believe

25    that I won't be prosecuted for tax fraud, right, then I think

 1    at that point the tax returns are ours for the same reason that

 2    I hope the health insurance documents are for us.  I am saying,

 3    your Honor, he may say I think I have exposure, I can't go to

 4    sleep at night because of it.  If he says that, we lose.

 5             THE COURT:  Okay.  Anything from Huberfeld's counsel

 6    on this?

 7             MR. MAZUREK:  I will just add one wrinkle to this

 8    issue in this particular case, and that is because in the

 9    discovery in the case the government produced a slew of emails

10    from this witness' business accounts, these emails contain

11    partial information.

12             For example, as attachments to some of the these

13    emails are draft tax returns, there are parts and pieces of tax

14    returns and there is correspondence, for example, between the

15    witness and his accountant where the witness is attempting to

16    convince his accountant to change things on his tax return.

17             So the addition I would just like to raise here is

18    that in the case where this witness, we get to question him on

19    whether he, in fact, reported ill-gotten gains or directed his

20    accountant not to report certain income or to change the

21    characterization of monies he was receiving from two different

22    financial frauds he was involved in, and we know that that was

23    going on and how the end product results it, as a result of how

24    the tax return was eventually filed is left open, I think there

25    is a real fairness issue here that the government can't on one

1    hand give us this information and we don't know how fully it

2    turned out so I could be asking these questions, and then the

3    witness gives an answer and at that point in time perhaps the

4    final return will become relevant in any case as a prior

5    inconsistent statement that could be admitted under 615.

6             MR. SCHECHTMAN:  I would add the returns we have don't

7    go past 2013, and the Nissen fraud and -- (inaudible) -- fraud

8    2013, 2015.

9             THE COURT:  Let me hear from the non-party.

10            MS. BIRGER:  Your Honor, this is nothing but a string

11   of assumptions.  The first thing is that Mr. Schechtman started

12   off by saying this is in the same category as the health

13   insurance benefits, and it is the exact opposite category

14   because, as the court noted, he has not been immunized for this

15   conduct.

16            So the first big assumption is Mr. Schechtman is

17   assuming there is tax fraud.  There is zero evidence of a tax

18   fraud.  This was conceded in the letter to the court by

19   Mr. Huberfeld's counsel.  He said we believe there is a tax

20   fraud.  We are starting from this premise that they are hopeful

21   there is a tax crime here that they will be able to prove if

22   they can see the tax returns.

23            Second, they are assuming that Mr. Rechnitz was

24   implicitly covered and immunized for something that he was

25   explicitly told he is not covered for.  This is something the

HANJSEA2

1    exception that swallows the rule, your Honor.  Every single

2    case in this district would now be well, yes, they say he is

3    not covered for tax frauds, but we all know he really is

4    covered for tax frauds.  That is not the case, practicing in

5    this district and not the case you can take an agreement and

6    say I assume the exact opposite.

7            The third thing is they're assuming if they can get

8    the tax returns, these will somehow become evidentiary and

9    useful and something admissible.  It is very hard to spin that

10   out into how exactly that will come to be, that the tax returns

11   would be admissible evidence in this trial which has nothing

12   whatsoever to do with Mr. Rechnitz's taxes, and so we are going

13   from assumption to assumption to assumption to assumption and

14   saying let's have the tax returns just in case.  That is not

15   what Rule 17 is for, your Honor.

16           We are in unchartered waters.

17           MR. SCHECHTMAN:  I will say this about the waters.

18           We have a cooperating witness who we know for the

19   Nissen fraud asked for a loan document be created to cover the

20   fact that he was getting at least a million dollars in income.

21   That is in the discovery material of that document.  It is

22   Rechnitz 101, and we know that he asked Nissen to pay his

23   American Express bill so he wouldn't have to have income show

24   up on his taxes, and I can tell you, I don't want to disclose

25   cross-examination, but there are three other examples of things

1    he did to avoid tax fraud.

2           To begin and say he doesn't have a tax fraud on him, I

3    know Ms. Birger attended a lot of these sessions.  She called

4    me disingenuous, but I don't think anybody could look at what

5    Mr. Rechnitz said to the government and think at least he

6    didn't set out to make sure that he was reporting far less

7    income than he had.

8           The second thing is in terms of the practice in this

9    district, I think the court knows, I think the government here

10   knows, there has never been a cooperating witness prosecuted

11   for tax cases.  It is carved out because the Department of

12   Justice requires it.  The tax division is separate from the

13   Southern District.  It just doesn't happen.  I have had insider

14   trading cases and cooperating witnesses say to me look, I got a

15   lot of money.  Do I have to worry about taxes?

16          The answer is amend your returns, do what is

17   appropriate.  I am not going to tell you not to deal with it,

18   but the Department of Justice has never prosecuted any client

19   of mine or any client of any lawyer I know for tax charges.

20          So I don't think, I don't know what the word was that

21   we were hoping the door here.  This is a very narrow, specific

22   door and the only question here is are we going to allow form

23   to triumph over substance because the substance here is this

24   fellow will not be prosecuted for taxes.  If the government

25   wants to get up and say he will be prosecuted for tax charges,

1    this is the exception for that, we referred it to the

2    Department of Justice, they told us they're going to bring tax

3    charges, maybe we shouldn't be here, but that is not going to

4    happen.  That is the reality, and it is important.

5          There is a wonderful quote from Judge Friendly that

6    says judges aren't required to ignore things every man and

7    woman knows.  Every man and woman knows he will not be

8    prosecuted for taxes.  I do this is on all fours.

9          THE COURT:  Again, I will say this.  I am not sure

10   that every man and every woman knows that.  It may be that it

11   is the practice in this district.  It may be that people who

12   practice frequently in federal court know that or believe that.

13   It does seem to me what is critical here is what the witness

14   believes, not what actually may be true.  Even if it is the

15   case that folks typically don't get charged with tax fraud who

16   are cooperators, what matters is what the witness believes.

17         If the witness believes he will be prosecuted, that is

18   what matters.  Conversely, if it is the case that everyone who

19   cooperates with the government were to get prosecuted for tax

20   fraud, if the witness believed that that wasn't the case, that

21   is really what is critical here, is going toward what this

22   witness believes.  Let me find out from the government since

23   you're here, too, in terms of timing.  When is Rechnitz

24   scheduled to testify in terms of the weeks of this trial?

25         (Off-the-record discussion)

HANJSEA2

| 1 | THE COURT:  Give me a sense whether you plan it to be |

1              THE COURT:  Give me a sense whether you plan it to be
2    this week.
3              MR. CAPONE:  We do plan it to be at least start this
4    week potentially on Wednesday.  It could be Thursday, but
5    potentially Wednesday.
6              THE COURT:  Let me find out this.  I want to rule on
7    this.  I want to rule on this properly, not just expeditiously.
8    My sense the ruling on this won't affect either side's opening
9    statements or am I wrong there?  Let me hear from --
10              MR. SCHECHTMAN:  I won't, and certainly if your Honor
11    is reserving on this, it definitely won't.
12              MR. CAPONE:  Not the government's, your Honor.
13              MR. MAZUREK:  No, your Honor.
14              THE COURT:  Along those lines, there is another open
15    issue regarding -- putting aside the subpoenas for the time
16    being -- there is another issue regarding emails that the
17    parties were not able to agree on and whether or not these
18    emails should be allowed in evidence.  The defense had
19    previously filed a motion to exclude these.  The government
20    filed a letter on October 21st.  As of last night at least I
21    didn't see anything from the defense filed.
22              Did the defense file any letter on that?  And do you
23    wish to file a letter?
24              MR. MAZUREK:  I was going to file it at the end of the
25    court day today, if that is okay?

HANJSEA2

1          THE COURT:  Yes.

2          MR. CAPONE:  Your Honor, although we will adjust if we

3    have to, that could affect a very, very small portion of the

4    opening.  If we can hash it out tomorrow morning after your

5    Honor receives the letter, that would be helpful.

6          THE COURT:  How soon today can -- let's do this.  Can

7    you get me that letter by 7:30 tonight, counsel?

8          MR. MAZUREK:  Yes.

9          THE COURT:  I will say, I am open to having my mind

10   changed.  My inclination is to allow this evidence in, as I do

11   think it is relevant to the state of mind, but I will let

12   counsel submit something on that.

13         Is there anything else we need to deal with today?

14   We'll go back to the subpoena issue in a second and I will

15   think about that more.  Is there anything else we need to deal

16   with today, counsel for the government?

17         MR. CAPONE:  No.

18         MR. SCHECHTMAN:  Nothing, your Honor.

19         MR. MAZUREK:  No, your Honor.

20         THE COURT:  Let me hear if there is anything else from

21   the non-parties regarding -- again if it is not clear, my

22   inclination at this point -- again I am open to perhaps

23   changing my mind -- is to quash the subpoena regarding the

24   defense request with the exception of Request No. 8 as it

25   relates to Rechnitz.  That is my inclination.  Do counsel for

HANJSEA2

 1    the non-parties have anything else you want to say about the

 2    subpoenas at this point?

 3             MS. BIRGER:  The only thing I would say is perhaps a

 4    request for clarity, and if we don't need the court, I can work

 5    this out with the defense lawyers.

 6             The request for Request No. 8, they want records of

 7    payments for health insurance benefits.  Then it says including

 8    but not limited to -- I take that back.  I take that back.  It

 9    is relatively clear.  So I withdraw that.

10             So just clarity would be the request is for the

11    documents related to the payments or benefits which is how I

12    have understood it and not, for example, I initially read the

13    subpoena it asked for every co-payment from an individual

14    family member's visit to a doctor which would show what the

15    medical procedure was, what the billing was and what the

16    payment was.  I don't think that is what the defense is

17    requesting, but if it is, that is both far more voluminous and

18    far more intrusive.

19             THE COURT:  Defense counsel?  Government?

20             MR. CAPONE:  Just with respect to this request, I

21    wanted to add that I believe there is at least something in the

22    3500 on it, and to the extent it helps resolve the issue, we

23    can provide whatever other information we know about and what

24    we can do, put what this witness would testify about in a

25    letter to the defense.

HANJSEA2

1          MS. BIRGER:  And to add to that, I actually -- again

2     if not in the 3500 material, but I don't think Ms. Rechnitz has

3     documents about this.  It may be production would be the

4     occasional check.  The more complete description is likely to

5     be in the 3500 material.  I will produce whatever the court

6     orders me to produce.  It is full in disclosure I will give the

7     defense what they're looking for.

8          MR. SCHECHTMAN:  The more complete discussion is that

9     300 material.  The 3500 material said I lied about my health

10    insurance.

11         THE COURT:  My sense is what the government is saying

12    is that the government might be in possession of some more

13    documents.  Is that right?  Am I correct?

14         MR. CAPONE:  Certain documents, your Honor, but I

15    believe we have more information that we can convey to the

16    defense in a letter in terms of what we think the defendant

17    would testify to.  I think the notes had more than that.  If

18    they don't, we can flush it out for them.

19         THE COURT:  My sense is that -- again I don't want to

20    put words in counsel's mouth -- my sense is the defense won't

21    object to the government giving them information, but I also

22    don't think that this -- I am not optimistic this will resolve

23    everything.  Defense counsel, anything you want to add to that?

24         MR. SCHECHTMAN:  No.  If there are documents, I hope

25    we can get them.  May I add one thing?

HANJSEA2

1           THE COURT:  Sure.

2           MR. SCHECHTMAN:  I thought you were leaning on the

3    taxes to see where he was on cross-examination, and if I am at

4    all right about that, could you ask the non-party to just

5    gather those documents so if the door is opened to them, for

6    the same reason, we don't have to wait a date to get them.

7           THE COURT:  Let me get a sense from the defense as to

8    really what you're looking for from these documents.  Are you

9    really looking for just statements on the returns related to

10   reported income?  Is that really what we are talking about

11   here?

12           (Off-the-record discussion)

13           MR. SHECHTMAN:  He has S Corporations I think that

14   flow through.  I don't know if we need all the S Corporations,

15   and we probably need forensic analysis to do it.

16           For example, there is one year we do have in which his

17   charitable contributions exceed his income.  That can happen, I

18   guess, but it is surprising.  I think if we can get the basic

19   1099 for those three years, '14, '15 -- 1040s, rather, for

20   those three years and whatever W-2s or 1099s he has, that would

21   be useful, too.

22           It would be the basic return, which isn't that big a

23   document.  None of the S Corp.  The basic return and the W-2s

24   that he is showing and 1099s.

25           THE COURT:  For which years to be clear again?

 1            MR. SCHECHTMAN:  Partial on '13.  It would be '13,

 2     '14, '15, '16.

 3            THE COURT:  Okay.  Let me hear from the non-party.  It

 4     seems it may make sense from an efficiency standpoint to have

 5     those documents ready just in case they end up needing to be

 6     turned over.

 7            MS. BIRGER:  I don't mind doing that.  I will do what

 8     I have to do to make sure they're ready.  I vigorously oppose

 9     having to turn them over.  Whittling it down to page 1040, 1040

10     is a pretty lengthy document for somebody who runs a business.

11     There is a lot in there that is completely extraneous.  We

12     started with all I need to see is the reported income and now

13     we have gone to basically I want to see the whole return.

14            THE COURT:  I think counsel may be talking past you.

15            MS. BIRGER:  Are we talking about a two-page part of

16     1040 or full return?

17            THE COURT:  I don't think defense counsel is looking

18     for the entire return.  I think the defense counsel is looking

19     for those lines on the return in which income would be

20     reported, which would be quite a few lines, but not an enormous

21     amount of lines.  Let's hear from defense counsel.

22            MR. SCHECHTMAN:  That is fine, Judge, if I could get

23     the first four pages of each return, we could have a pretty

24     good idea what his tax situation is.  I don't need all the

25     detail, but I would like to know what he is reporting and what

 1   is he showing the source of the income for.

 2          So that is it.  I don't think this is a voluminous

 3   request, and if there is anything that is remotely private,

 4   just tell us, tell the court.  We don't want --

 5          MS. BIRGER:  I will gather them, your Honor.  I will

 6   do what needs to be done and see what transpires.

 7          THE COURT:  Okay.  All right.  I will reserve on this.

 8          Is there anything else we need to deal with today,

 9   counsel for the government and the defense?

10          MR. CAPONE:  No, your Honor.

11          THE COURT:  Again I don't want to make counsel for the

12   non-party come back again unnecessarily.  Is there anything

13   else you wish to say while you're here today regarding the

14   motion to quash?

15          MS. BIRGER:  No, your Honor.

16          THE COURT:  Let's do this.  Have counsel try to get

17   here tomorrow, say, 10 minutes to 9:00 to avoid unnecessary

18   bumping into jurors and counsel, and if you can speak to the

19   tech people this afternoon.

20          Anything else from the government and the defense?

21          MR. CAPONE:  No, Judge.

22          THE COURT:  All right.  See you tomorrow.

23          (Court adjourned until Tuesday, October 24, 2017, at

24   8:50 a.m.)

25