HAOJSEA1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                              16 Cr. 467 ALC

5   NORMAN SEABROOK AND MURRAY HUBERFELD,

6              Defendants.

7   ------------------------------x

8

9

10                                           October 24, 2017
                                             8:50 a.m.
11

12

13  Before:

14                  HON. ANDREW L. CARTER, JR.,

15                                           District Judge
                                               and a jury
16

17

18                          APPEARANCES

19  JOON H. KIM,
         United States Attorney for the
20       Southern District of New York
    KAN MIN NAWADAY,
21  MARTIN BELL,
    RUSSELL CAPONE,
22       Assistant United States Attorneys

23

24

25

1

2                          APPEARANCES (Continued)

3

4    BRACEWELL, LLP,
           Attorneys for defendant Seabrook
5    BY:  PAUL LEWIS SHECHTMAN, Esq.
           MARGARET EMMA LYNAUGH, Esq.
6                     Of counsel

7

8    MAZUREK LIPTON, LLP
           Attorneys for defendant Huberfeld
9    BY:  HENRY EDWARD MAZUREK, Esq.
           EVAN LOREN LIPTON, Esq.
10                    Of counsel

11

12   Also Present:
           BARD HUBBARD, Special Agent FBI
13         YOLANDA BUSTILLO, Paralegal USAO
           AUGUSTA GRANQUIST, Paralegal
14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court; jury not present)

2        MR. SHECHTMAN:  I got a call from Mr. Mazurek, who

3   said --

4        THE COURT:  You have to speak up, counsel.  Speak into

5   the mike.

6        MR. SCHECHTMAN:  -- I got a call from Mr. Mazurek, who

7   said he and Mr. Lipton were on the West Side Highway where

8   traffic does not seem to be very good and they said they would

9   be closer to 9:00.  We may be closer to 9:00 already.  They

10  knew they were running somewhat late.

11       THE COURT:  Okay.  I'll hang out back here.  Let me

12  know as soon as counsel gets here.

13       MR. BELL:  Your Honor, once counsel does get here, can

14  we have a brief sidebar in the robing room, very briefly?

15       MR. SCHECHTMAN:  We know what it is about.  We think

16  the robing room probably is appropriate.

17       THE COURT:  Okay.

18       MR. SCHECHTMAN:  We should probably wait.  I know Mr.

19  Mazurek's position on it.  If it is useful, we can go forward

20  and he can just confirm.  I leave it up to the court.

21       MR. BELL:  It may be wise for us to wait until Mr.

22  Mazurek gets here.  It will be quick once it happens.

23       THE COURT:  Okay.  All right.

24       (Recess)

25       THE COURT:  All right.  Is counsel here yet?  We have

1   got a call Mr. Mazurek was downstairs, so I guess he should be

2   up here soon.  Everyone can sit down.  As soon as he gets here,

3   we'll go in the robing room and discuss what it is that counsel

4   want to discuss.

5              (Pause)

6              (Mr. Mazurek and Mr. Lipton entered the courtroom)

7              THE COURT:  Counsel are here.  Let's go in the robing

8   room and discuss this matter.

9              (In the robing room)

10             THE COURT:  What is up?

11             MR. CAPONE:  Briefly, your Honor, with respect to one

12   of the witnesses who will be our second witness, likely

13   testifying today, Gilad Kalter, your Honor has signed an

14   immunity order for him.  I wanted to bring up two issues:

15             First, neither party intends to elicit his immunity,

16   and that is because he has no exposure in this case.  The

17   immunity was as a result of the specter of exposure in the

18   Eastern District case, which I think both sides have agreed

19   unless any doors are opened, not to get into that case at all.

20             I wanted to put on the record, and I think everyone

21   agrees we are not going to elicit, neither side will elicit he

22   has been immunized.  That is the first issue.

23             MR. SCHECHTMAN:  That's correct.

24             MR. MAZUREK:  Yes.

25             THE COURT:  Okay.

1          MR. CAPONE:  So he has to formally invoke, which is

2     typically outside the presence of the jury.  I am passing along

3     from his lawyer, not my request, but his attorney Joana

4     Hendon's request he invoke in the robing room at some point

5     today before his testimony potentially during the lunch break.

6          I don't know what the defenses position is?

7          MR. SCHECHTMAN:  We leave that to the court.  No

8     objection if the court wants to do it that way.

9          MR. MAZUREK:  That's correct.

10          THE COURT:  First of all, it is fine to let me know

11     that counsel don't wish to bring this out.  He does need to be

12     allocuted on the immunity agreement.  It seems to me, I am not

13     sure why this needs to be done in the robing room.  This is a

14     public courtroom.  It seems to me that this should be done in

15     public, certainly out of the presence of the jury, but it seems

16     to me this can be done publicly.

17          Do counsel have anything they want to say anything

18     about that?

19          MR. CAPONE:  Ms. Hendon will be here by noon.  I don't

20     think the witness will be on by then.  Perhaps if she wants to

21     articulate to the court her concern is press articles about his

22     immunity in the Eastern District case and the same kind of

23     thing that happened on Monday.  I will let her -- it is not our

24     concern -- I will let her raise it with the court.  I don't

25     think we will have gotten to Mr. Kalter by the lunch break

1    today.

2              THE COURT:  Okay.  All right.  Thanks.  Anything else

3    we need to discuss privately?

4              MR. MAZUREK:  I apologize.  We have to get better with

5    our logistics and make sure we are here on time tomorrow.

6              THE COURT:  All right.  Let's get back outside.

7              (In open court)

8              THE COURT:  Counsel, can everyone hear me?

9              So, counsel, I understand we are waiting on a couple

10   of jurors.  They're at the end of the line now.  They should be

11   up soon.  Let's take care of some other preliminary matters.

12             First of all, let me get a sense from the government

13   as to how many witnesses you have scheduled for today and a

14   sense of who those witnesses are.

15             MR. BELL:  It should be two, your Honor.  The first of

16   those witnesses will be Elias Husamudeen, currently the

17   president of the union.  The second of those would be Mr.

18   Kalter, Gilad Kalter.  We strongly suspect that that will take

19   us to the end of the day.  In the event that it does not, we

20   would expect to call Captain Michael Joy of the NYPD, who is a

21   relatively short witness.  Again we don't expect it to go that

22   far.

23             THE COURT:  Can I get a sense, an offer of proof on

24   this first witness, what is this witness expected to testify

25   about?  Give me a sense of how long or short his direct

HAOJSEA1                    Trial

1  testimony will be.

2          MR. BELL:  We expect Mr. Husamudeen's testimony will

3  be in the order of about an hour and a half long, maybe a

4  little longer.  Some of what he is testifying to is his

5  background, the union, correction officers generally, how the

6  union's funds work and what they were.

7          Mr. Husamudeen is also a witness as to the particular

8  circumstances of how the various tranches of money that made

9  their way from the union to the hedge fund actually got there

10  and defendant Seabrook was involved in that.

11          THE COURT:  From defense counsel, do you have a rough

12  estimate as to how long your cross-examination, if any, of this

13  witness will be?

14          MR. SCHECHTMAN:  I wouldn't think more than half an

15  hour, Judge.

16          MR. MAZUREK:  I don't think there is going to be much

17  by Mr. Huberfeld's counsel on cross.

18          THE COURT:  All right.  So I received a letter from

19  defense counsel last night withdrawing their previous objection

20  to those emails coming in, so that is no longer an issue.  You

21  should have seen, I believe I posted it last night, our

22  decision regarding the subpoenas.  That has been dealt with.

23          Let me just ask a couple of quick questions.  In terms

24  of preliminary instructions that I will give the jury after we

25  swear the jury, let me find out how counsel want to proceed.  I

1    don't intend to get into any detail at all about the charges in

2    the indictment.  It seems to me it is not necessary to do that.

3         The indictment was summarized when the jurors filled

4    out the original questionnaire.  I can say to the jurors that

5    the indictment is not evidence.  I can say to them generally

6    the defendants have been charged with conspiracy to commit

7    honest services fraud as well as honest services fraud, but I

8    don't know if that really means anything to the jury at this

9    point, telling them that since it is still somewhat -- it

10   hasn't been totally made clear even by our beloved Second

11   Circuit and Supreme Court as to what that necessarily entails.

12   I don't know if it is important to say that to the jury at this

13   point.

14        What is counsel's view on whether or not I should say

15   anything at all about the charges in my preliminary

16   instructions.  I know counsel will probably address this in

17   their open statements.

18        MR. SCHECHTMAN:  At least from my point of view, I

19   don't think Mr. Mazurek will be different, less is more, as

20   your Honor suggests.  You could say the indictment is just an

21   accusation, that would be helpful.  Saying more about it I

22   don't think is necessary.  The openings should lay it all out.

23        MR. BELL:  I think that's right, your Honor.

24        THE COURT:  All right.  The next question then is

25   about open statements.  Do counsel plan on using any sort of

HAOJSEA1                    Trial

1    demonstrative evidence?  Do counsel plan on using any other

2    sort of evidence in the opening?  Has that been cleared with

3    opposing counsel?  Where are we with that?

4              MR. BELL:  We don't plan to use anything.  This will

5    be unplugged.

6              THE COURT:  Defense counsel?

7              MR. SCHECHTMAN:  No demonstratives, your Honor.

8              MR. MAZUREK:  None from us, your Honor.

9              THE COURT:  That sounds good.  We'll wait for the jury

10   to get here and I will be back out when they get here.  See you

11   soon.

12             (Recess)

13             THE COURT:  Here is the update.  We are still waiting

14   on one juror.  There may have been a miss, mistaken ID over in

15   the jury room, and they thought perhaps -- we are waiting on

16   Juror No. 1.  All the other jurors are here and my deputy

17   called the number she had for Juror No. 1, spoke to someone

18   there who confirmed that juror did leave and was on way to

19   court.

20             When that juror gets here, we'll go.  It is my

21   intention to wait a little bit longer for this juror to get

22   here, and in 30 minutes at the latest we may need to revisit

23   this.  We do have alternate jurors, but I intend to wait for a

24   while.  Let me hear from counsel.  What are your thoughts on

25   this?

1          MR. BELL:  Waiting sounds fine for now, your Honor.

2          MR. SCHECHTMAN:  The same, your Honor.

3          MR. MAZUREK:  Yes, your Honor.

4          THE COURT:  See you soon.

5          (Recess)

6          THE COURT:  Okay.  Counsel, I have been informed that

7   the juror is in the line and has been moved to the front of the

8   line and is on his way up.

9          I don't want to do anything at this point to kind of

10  single this juror out, but it does seem that it might be a good

11  idea at the end of the day today to sort of remind the jurors

12  that we need to make sure everyone gets here on time so that we

13  can start on time, unless counsel have another idea.  What do

14  counsel want to do about that?

15         MR. BELL:  That seems fine, your Honor.

16         MR. SCHECHTMAN:  That is fine.  One of us lawyers had

17  the modest suggestion of saying to the jurors if they're late,

18  we are going to run past 2:30 to make up, which might put some

19  collective pressure on them.  If the court wants to do that,

20  there is no objection.

21         THE COURT:  Okay.  All right.  I don't want to do that

22  right now.  Again I want to get started.  I don't want to draw

23  unnecessary attention to that juror, but I do think that

24  perhaps it makes sense -- we'll see where we are.

25         For today we'll just, I will just make sure the jury

1    knows it is really important we start on time so we can finish

2    on time.  If we have further issues with this, with any other

3    jurors, it may make sense to tell them if we start late, we are

4    going to go late.  We'll wait for the juror to come up and be

5    ready to start up with everybody good.  The mikes have been

6    checked and everything?  Okay, good.  The juror is here, so

7    let's bring in the jury.

8            (Jury present)

9            THE COURT:  Please be seated.

10           Good morning, everyone.

11           THE JURY:  Good morning.

12           THE COURT:  Is the jury properly seated, counsel for

13   the government?

14           MR. BELL:  Yes, your Honor.

15           THE COURT:  Counsel for the defense?

16           MR. SCHECHTMAN:  Yes, your Honor.

17           MR. MAZUREK:  Yes, your Honor.

18           THE COURT:  Okay.  One second.

19           (Pause)

20           THE COURT:  While we're waiting for my Deputy, what is

21   going to happen, my wonderful and talented Deputy will come out

22   and give you your oath as jurors.  Once that happens, I will

23   give you preliminary instructions and we'll proceed to opening

24   statements.

25           The acoustics here aren't great, so we want to do a

1    couple of quick mike checks.  I am hearing a little reverb over

2    there from one of the tables.  Let me just, if we can get

3    counsel to just give us a testing one or two or three on that

4    mike.

5              MR. BELL:  I also think the mikes are no longer

6    operative for whatever reason.  We were doing great and now

7    we're not.

8              THE COURT:  All right.

9              (Pause)

10             MR. BELL:  We have lost everything, your Honor.

11             THE COURT:  Hold on.

12             (Pause)

13             THE COURT:  Try the lectern now.

14             MR. BELL:  Test, test.  The lectern?

15             THE COURT:  Yes, the lectern.

16             MR. BELL:  Test, test.  I think it is a power issue.

17             It is a light itself here isn't actually on on either

18   mike.

19             THE COURT:  Let's do this.  Let's ask you to go back

20   into the jury room for just a moment while we deal with these

21   technical issues.  Don't discuss the case amongst yourself or

22   with anyone else.  We'll see you in about six minutes, okay?

23             (Jury excused)

24             (Pause)

25             THE COURT:  Counsel, here is what we'll do.  IT is on

1    the way.  I hope they can resolve this quickly.

2              MR. BELL:  We may have bootlegged something.  We are

3    going to move our desk's mike over here, and it seems to work

4    at least for the moment.

5              MR. SCHECHTMAN:  Mr. Nawaday has an engineering

6    degree.

7              THE COURT:  Let's break and bring with the jurors out.

8              Here is what we can do when counsel start their

9    opening statement.  In the event there is some technical

10   difficulties, you can use the cordless mike that is there.  If

11   that doesn't work, instead of sending the jury back in and

12   trying to deal with this again, what counsel can do is a little

13   unusual, I won't take any offense at this, you can come and use

14   my mike.  It is here and you can use this mike.  Let's get this

15   opening done, okay?  All right?  Sound good?

16             MR. BELL:  For what it is worth, the cordless doesn't

17   seem to be working right now.  We are a heartbeat away.

18             THE COURT:  If that doesn't work again, feel free to

19   let me know, I'll step down and you come up here and you can

20   use this mike.  Ready to bring the jury in?

21             MR. BELL:  Yes, your Honor.

22             THE COURT:  Bring the jury in.

23             (Jury present)

24             THE COURT:  Please be seated.  I'll ask my wonderful

25   and talented Deputy to administer the oath to the jurors.

1          (The jury was duly sworn and affirmed)

2          THE CLERK:  You may be seated.

3          THE COURT:  So I am going to give you some preliminary

4    instructions and then we'll proceed with the opening

5    statements.  After that, you'll start hearing evidence in this

6    case.

7          My job at this point and my job at the end of this

8    case is going to be to instruct you as to the law that governs

9    or controls this case, and I will give you those final legal

10   instructions at the end of the trial.  There are a few things I

11   want to talk about now.

12         This is a criminal case.  Both defendants have been

13   indicted, and although they have been indicted, the indictment

14   itself is not evidence.  An indictment simply contains the

15   charges that the government is required to prove to the

16   satisfaction of you, the trial jury, beyond a reasonable doubt.

17         The law presumes the defendants to be innocent of all

18   the charges against them.  The burden is upon the prosecution

19   to establish guilt beyond a reasonable doubt with respect to

20   each element of the offenses charged.  The burden of proof

21   never shifts to a defendant in a criminal case and the law

22   never imposes on a defendant the obligation of doing anything

23   in a criminal trial.

24         You must pay close attention to all the evidence

25   presented.  Evidence consists only of the testimony of

witnesses, documents and other things admitted in evidence or stipulations agreed to by the attorneys.

Certain things are not evidence and must not be considered by you. I will list them for you now. Statements, arguments and questions by lawyers are not evidence, nor are my own statements to you. Objections to questions are not evidence.

Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by my ruling on it. If the objection is sustained, ignore the question and any answer that may have been given. If it its overruled, treat the answer like any other. Testimony that I exclude is not evidence and must not be considered. Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom.

You will use your common sense and good judgment to evaluate the testimony based on all the circumstances. You must keep an open mind until the trial is over. You should not reach any conclusions until you have all the evidence before you. In order to ensure that you decide the case only on the evidence and that you are not influenced in any way by anything that might occur outside the courtroom, I must give you a

1    specific set of instructions.

2           Do not discuss this case amongst yourselves or with

3    any other person.  You will have the opportunity -- indeed, the

4    duty -- to discuss the case among yourselves after all the

5    evidence is in and the case is given to you to discuss inside

6    in the jury room.  You are not to read anything in the

7    newspapers or elsewhere about this case.  You are not to listen

8    to or view any reporting about this case if it should be

9    broadcast on TV, over the radio or over the internet.  You are

10   not to conduct any research about this case.  It is a violation

11   of your oath as a juror to seek out your own information about

12   the people and events in this case or to research the law.

13          Your considerations must be based only on what you

14   hear and observe in the courtroom.  Do not receive or send any

15   electronic communications about the case.  That includes

16   texting, emailing, blogging, posting information on social

17   network websites or using any other means to communicate or

18   discuss or even mention this case.  That means no

19   communications even with fellow jurors.

20          If it becomes necessary to send me a note about

21   something you saw or heard or about any other matter, do not

22   share the content of the note with your fellow jurors.  You are

23   not to allow anyone to speak to you about this case.  If you

24   are approached by anyone who asks you to speak about it, you

25   will tell them I have instructed you not to do so.  If any

1   person seeks to contact you about the case, you are required to

2   report the incident promptly to me.

3           Also be sure to let me know if any person you know

4   comes into the courtroom.  This is a public trial, so this

5   could happen.  It is important that you do not hear from them

6   what may have happened in the court while the jury was not

7   present.  If you should see a friend or relative come into the

8   court, please send a note to me, through my Deputy, at your

9   first opportunity.

10          Let's talk briefly about trial procedure.  First

11  lawyers have an opportunity but are not required to make

12  opening statements.  These statements are not evidence.

13  They're simply a preview of what they believe the evidence in

14  this case will show.  Following that, there will be testimony

15  and other evidence presented to you.  Following that, there

16  will be closing arguments.  After that, I will give you the

17  instructions on the law.

18          We will now proceed with opening statements by

19  counsel.  Counsel for the government, you may begin first.

20          MR. BELL:  Thank you, your Honor.

21          MR. BELL:  Just one moment, your Honor?

22          THE COURT:  Sure.

23          (Pause)

24          THE COURT:  Okay.  Could you give us a Testing 1, 2, 3

25  to make sure we're good here.

1          MR. BELL:  Sure thing.  Testing 1, 2, 3.

2          THE COURT:  All right, counsel.

3          MR. BELL:  May I proceed?

4          THE COURT:  Yes.

5          MR. BELL:  This man is Norman Seabrook, a powerful

6    union leader who was willing to betray the workers who trusted

7    him and to jeopardize their retirement benefits in exchange for

8    a bag filled with cash.

9          This is Murray Huberfeld, a millionaire who was

10   willing to pay a bribe in order to boost his business, to pay a

11   bribe to Mr. Seabrook.

12         This case is about how greed, pure greed brought these

13   men together, uniting them in a criminal scheme.  It is about

14   how these two powerful men from different corners of the city

15   agreed to treat the union members' retirement money as a tool

16   for their personal gain, and it is about what happened when the

17   union leader, Mr. Seabrook, decided that his responsibilities

18   to the rank and file workers he represented were nothing more

19   than a thing to be bought and sold.

20         For two decades Mr. Seabrook was president of the

21   union, the Correction Officers Benevolent Association, or COBA.

22   As president of the union, Seabrook represented over 10,000

23   correction officers, men and women with hard, dangerous jobs.

24   Seabrook had a lot of power of the union, and with that power

25   came a duty to those correction officers.  The union members

1    gave up portions of their salaries to the union, part of every

2    paycheck.  In turn, they depended on the union to safeguard

3    their money, to help them ease their way into retirement.

4          Among Seabrook's duties was making sure that whatever

5    he did with the union's money was in the best interests of the

6    people he represented.  That is not what he did.

7          Instead, as you'll learn, Seabrook invested that

8    money, money that was supposed to serve as a safety net for the

9    union and its members, with a hedge fund, a kind of business

10   that makes risky and aggressive investments with its clients'

11   money in order to try to make large profits.

12         Seabrook was willing to embrace that risk with the

13   retirement money of tens of thousands of correction officers

14   not because it was the right thing or the smart thing to do,

15   but because he was getting bribed to do it.  He sold out his

16   duties to the workers he represented once he saw an opportunity

17   to line his pockets.

18         The man who promised Seabrook those bribes, that was

19   Murray Huberfeld.  Murray Huberfeld had helped start a hedge

20   fund called Platinum Partners, and he still had a lot of money,

21   his money and his family's money, invested in it.

22         Around 2013 Huberfeld saw the funds needed new, big

23   investors like pension funds and unions, and Huberfeld, as it

24   turned out, was willing to bribe someone like Norman Seabrook

25   in order to secure an investor like the corrections officers

1    union.

2           Together these men agreed with each other, and then in

3    exchange for cash bribes or kickbacks from the hedge fund

4    potentially worth about a hundred thousand dollars every year,

5    Seabrook would steer millions of dollars of his union's money

6    into the hedge fund.  That is exactly what they did.

7           Over the course of 2014, Norman Seabrook directed

8    millions of dollars into the hedge fund not once, not twice,

9    but three times, 10 million, 5 million and then another 5

10   million.  All told, Seabrook steered about $20 million of the

11   union's money to the hedge fund, including millions of dollars

12   that were supposed to be for paying salaries and running the

13   day-to-day operations of the union.

14          At the end of that first year, Seabrook cashed in.  He

15   received his first kickback from Huberfeld, $60,000 in cash

16   stuffed in a fancy luxury handbag, his first cash reward for

17   betraying the union.

18          Folks, when you hear about bribery cases, it is easy

19   to imagine a scene out of the movies, someone handing off a

20   sackful of cash in some private place.  Ladies and gentlemen,

21   in this case it actually happened.  The bag, the bills, the

22   hand-off, they were all real.  You'll see that it actually

23   happened that way.

24          So that is why we're here today.  Norman Seabrook and

25   Murray Huberfeld, two powerful men motivated by pure greed,

1    entered into a corrupt scheme.  As a result, the hard working

2    men and women of the Correction Officers Benevolent Association

3    were left with a leader who acted for his own interests rather

4    than theirs and who used their hard earned retirement benefits

5    as nothing but a means to line his own pockets.

6            This is the government's opening statement.  This is

7    our opportunity, my opportunity to lay out a roadmap for you

8    and give you a sense of what the evidence presented during this

9    trial will show.  To do that, we'll do that in two simple

10   parts:

11           First, I am going to describe what the evidence at

12   this trial will show happened;

13           Second, I will give you a sense of just how we're

14   going to prove it.  Let's talk about what the evidence will

15   show and let's start with Seabrook.

16           For 20 years Seabrook was the president of COBA, the

17   corrections officers union.  He had responsibilities to those

18   10,000 active duty correction officers in New York City and

19   thousands more members who had already retired.  Seabrook was

20   unlike earlier COBA presidents.  He was outspoken, high profile

21   and brash.  That aggressive style helped him win gains for

22   correction officers, gains in dealing with city and state

23   lawmakers.  Within the unit, that same style made him feared

24   and gave him immense power.

25           Now, in theory most of the decisions facing the union,

1    including its financial decisions, were made by the union's

2    executive board, a group of correction officers that included

3    Seabrook.  In practice, however, Seabrook wielded immense power

4    over the board members' jobs and futures, including whether

5    they worked in COBA's Lower Manhattan offices or returned to

6    their regular jobs patrolling the city's jails.  So Seabrook

7    basically controlled the board, and with that control, he

8    controlled millions of dollars of the union's money as well.

9         All of this made Norman Seabrook very powerful, but it

10   didn't make him rich.  Each year he collected his regular

11   correction officer's salary and a stipend provided by the

12   union.  Seabrook wanted more money, and as you'll learn, he was

13   not above selling out the best interests of his union members

14   in order to get it.

15         Huberfeld, Murray Huberfeld, was wealthy and an

16   influential member of his community.  He had helped start the

17   hedge fund.  By 2013, although he no longer had an official

18   position at the fund, he continued to be associated with it.

19   Not only that, he still had his own money and his family's

20   money tied up in the fund.  So Huberfeld still had a lot

21   invested in that hedge fund.  Its performance mattered to him.

22         Huberfeld knew that the hedge fund's managers wanted

23   to ensure that more money was being put into the fund by

24   investors than being taken out of it, and he was told that that

25   wasn't happening.  Not good news.

1       So Huberfeld had an interest in attracting new

2   investors, but he wanted the kinds of clients who would not

3   only invest millions of dollars, but would be more likely to

4   leave those millions in the fund for long periods of time.

5       His best bet, the hedge fund's best bet was to move

6   away from wealthy individual clients and toward institutional

7   clients like pensions and unions.  Huberfeld, it turned out,

8   was not above paying someone a little extra on the side if it

9   meant getting these clients' business.

10      How did Seabrook and Huberfeld find each other?  They

11  were introduced by a man named Jona Rechnitz.  Jona Rechnitz

12  was a young up and coming real estate businessman.  He had

13  grown up in Los Angeles, a son of privilege.  His father had

14  been very successful in real estate, and Rechnitz moved to New

15  York and started his own career, hungry to make his own name.

16      Rechnitz felt the key to success in business was to

17  make as many connections with powerful people as possible,

18  movers and shakers in politics, law enforcement and real

19  estate.  That way he would become known as as the sort of guy

20  who knew how to make things happen.

21      So he spent thousands of dollars on vacations, fancy

22  lunches, sports tickets and expensive gifts for police

23  officials, and made hundreds of thousands of dollars in

24  political contributions, and in exchange he could and did call

25  for special help from his friends in high places.

1      One of those powerful friends Mr. Rechnitz had made in

2    the city was Norman Seabrook, a high profile leader of the

3    correction officers union.  You'll learn that Rechnitz was good

4    at making connections, putting people together who might be of

5    use to each other, and that is exactly what he did with

6    Seabrook and Huberfeld, who was an old family friend.

7      You'll hear that in late 2013, Huberfeld had told

8    Rechnitz his hedge fund was looking for large institutional

9    clients.  The lightbulb went off.  Rechnitz told Huberfeld he

10   might be able to reel-in Seabrook and his union as a client for

11   the fund.  Huberfeld's reaction was simple:  Great! get it

12   done!

13     By that time, Rechnitz had already begun shooting

14   Seabrook to an occasional weekend getaway.  One day in December

15   of 2013, Rechnitz took a small group of his friends in law

16   enforcement, including Seabrook, to the Dominican Republic on a

17   private jet.  Rechnitz hoped during that trip he could close

18   the deal.

19     That is exactly what happened.  While they were

20   together in the Dominican Republic, Rechnitz and Seabrook had a

21   private conversation at their hotel.  Seabrook complained that

22   his life had been hard, that he had bills to pay.  The

23   conversation turned to the union's investments, and Seabrook

24   complained there, too.  He told Rechnitz he wasn't particularly

25   happy with the investment advisor who helped the union decide

1    where to invest its money.

2            Rechnitz saw the opening.  Rechnitz told Seabrook

3    about the hedge fund and said he might be able to arrange for

4    that hedge fund to pay Seabrook kickbacks if Seabrook directed

5    union money to the fund.  Seabrook was immediately interested.

6            Hearing that maybe some of his financial problems

7    might be solved, he turned to Rechnitz, referred to himself in

8    the third person, and said it is time that Norman Seabrook got

9    paid.  When they got back to the United States, Seabrook and

10   Huberfeld reached a deal.  The deal was this:

11           If Seabrook got COBA to invest, Seabrook would get to

12   line his own pockets with a percentage of any profit that the

13   hedge fund made on COBA's money at the end of the year every

14   year for as long as the union's money stayed with the hedge

15   fund.  So the more COBA invested, the more Seabrook stood to

16   pocket.

17           If it all worked out and Seabrook could convince the

18   union to invest $20 million, Seabrook could personally make

19   about a hundred thousand dollars a year.  In the end, Seabrook

20   did deliver $20 million of the union's money.

21           So how did Seabrook do it?  He did it by directing

22   three different tranches, layers of money to the union's hedge

23   fund over the course the year 2014.  First, in January Seabrook

24   set the wheels in motion for an initial $10 million investment.

25   That money, Seabrook arranged to had the hedge fund make an

1    official presentation, a pitch to the union to invest money

2    that was held in trust for union members so that when they

3    retire, they would each get one big payout to ease their way

4    into retirement.

5           In theory, the union's investment decisions with

6    respect to that money were made by a committee of four people,

7    Seabrook and three other members of the union's executive

8    board.  In practice, however, Seabrook knew how to control the

9    executive board members who were all correction officers with

10   no independent financial expertise and who all depended on

11   Seabrook for their seats on the board.

12          So after the hedge fund made a presentation to the

13   committee, Seabrook had no trouble getting the board to invest

14   up to $10 million in the hedge fund.  Seabrook told the board

15   that, of course, they should only invest if the union's lawyers

16   and advisers vetted and approved of the fund.  That was just

17   lip service because when the union's lawyers sent the committee

18   a letter that listed a number of serious concerns they had

19   about the union investing in the hedge fund, Seabrook made sure

20   that no other member of the committee ever saw that letter.

21          The other committee members didn't know that their

22   lawyers had raised serious concerns about the investment before

23   they agreed with Seabrook to do it.  Of course, Seabrook never

24   disclosed to the board that he was being paid a kickback by Mr.

25   Huberfeld in order to get the union to invest.  So it is no

1    real surprise that within a few months of reaching his corrupt

2    deal with Huberfeld, Seabrook caused the union to invest $10

3    million with the hedge fund.

4              But a $10 million investment wasn't enough to get

5    Seabrook the amount of money he wanted in kickbacks.  Remember

6    the more the union invested, the more Seabrook stood to make

7    off the profits.  That led to a second payment, $5 million just

8    a few months after that first $10 million investment.  It

9    happened like this:

10             Seabrook knew that the union had more money than what

11   was in the account to pay out the retirement benefits.  He knew

12   it also had millions of dollars in the basic operating account.

13   This was the money the union used on a day-to-day basis, the

14   money that kept the lights on, money that came directly from

15   the dues paid by the union's members.

16             A large part of that operating account was considered

17   what is called the reserve, a pot of money on which the union

18   could survive in case of an emergency.  It wasn't money that

19   was supposed to be invested aggressively.  It was money that

20   was supposed to be there for a rainy day.

21             So in June of 2014, about three months after the

22   initial $10 million investment into the Platinum hedge fund,

23   Norman Seabrook did something extraordinary.  Without getting

24   anyone's permission, without even telling anyone else on the

25   executive board, Seabrook sent $5 million of the union's

1   operating account money to the hedge fund, a sum of money

2   representing most of that reserve.  Just like that, most of it

3   was plunged into a risky hedge fund investment secretly and

4   without proper authorization.

5           The only reason anyone else at the union found out was

6   because the union's bank called the union's treasurer the next

7   day asking for his signature on the wire transfer.  That is the

8   first two payments.

9           The third payment happened in June.  The board's

10  committee met again, and Seabrook worked his magic one more

11  time, convincing them to put a third collection of money,

12  another $5 million in the fund.  So 10 million in January, 5

13  million in June, and 5 million in July, $20 million in total.

14          He ignored the commitment of the union's money in a

15  hedge fund, much more than their investment advisor said made

16  any sense, but, of course, the decision hadn't been made

17  because it made sense for the union.  The only person who had

18  all the facts, Norman Seabrook made the investment happen

19  because he was promised a sizeable personal payday in order to

20  do it.  So that is how Seabrook got the union's money into the

21  hedge fund.

22          What happened when as the man himself put it, it was

23  time for Norman Seabrook to get paid?

24          What happens when he was supposed to get his first

25  annual bribe payment at the end of 2014?  Well, for obvious

1   reasons, the hedge fund couldn't just cut normal Seabrook a

2   check, so Huberfeld and Jona Rechnitz came up with a plan to

3   cover up the bribe payment to Seabrook.  Rechnitz had a share

4   of season ticket package for the New York Nicks.  These were

5   courtside seats, each worth thousands of dollars even though

6   the Nicks weren't very good.  Rechnitz and Huberfeld pretended

7   Rechnitz sold some of those courtside seats to the hedge fund

8   for $60,000 so he would use them with their clients.

9          Rechnitz would give 60 grand in cash to Seabrook, and

10  then the hedge fund would reimburse Rechnitz by paying him

11  $60,000 for the sham Nicks tickets.  Rechnitz even created a

12  fake invoice for Nicks tickets for $60,000 and sent it to

13  Huberfeld.

14         So with that plan in place, Rechnitz arranged to pay

15  off Seabrook on Huberfeld's behalf.  On December 11th, 2014,

16  Rechnitz was supposed to have dinner with Seabrook and some

17  other friends in law enforcement in midtown.  Rechnitz called

18  Seabrook and asked him to meet him outside the restaurant early

19  because he had something for him.

20         Rechnitz knew he was delivering the $60,000, but he

21  was also delivering bad news because Seabrook was expecting so

22  much more.  So he literally tried to dress it up.  He went to

23  the Salvatore Ferragamo store, a lucky store in Manhattan.  He

24  knew Ferragamo was Seabrook's favorite brand.  He bought

25  Seabrook fancy shoes from that store before.

1      So he went to that store and he purchased a small bag,

2   a satchel for about $800.00.  He then went back to this office

3   and stuffed $60,000 in cash from his business estate into that

4   bag.  When the time came, he met Seabrook just up a block from

5   the restaurant inside of Seabrook's car and made the hand-off.

6   Seabrook was disappointed, but not so disappointed that he

7   didn't take the money.

8      Over the next few months Huberfeld continued to try to

9   get more money from Seabrook and COBA, but Seabrook had to slow

10  down.  For once some of his board members were putting pressure

11  on him for what had happened with the operating account money,

12  and he felt increased scrutiny.  What's more, federal

13  investigators visited Rechnitz and asked him questions about

14  some of his financial dealings.  Everything stopped.  That was

15  as far as things got.

16     About a year later, Norman Seabrook was arrested by

17  the FBI, and they searched his house.  Guess what the FBI

18  found?  Right in Seabrook's den the FBI found the Ferragamo

19  satchel.  They also found over $23,000 in a safe elsewhere in

20  the house along with other stacks of thousands of dollars in

21  cash.  I'll say that again, ladies and gentlemen.  The FBI

22  found the Ferragamo bag that Rechnitz had stuffed with bribe

23  money and tens of thousands of dollars in cash in Norman

24  Seabrook's house.

25     That is what the evidence is going to show, ladies and

1    gentlemen.  Norman Seabrook agreed to betray his union for his

2    personal enrichment, and Murray Huberfeld arranged for Seabrook

3    to get paid for that betrayal to the tune of a bagful of cash,

4    $60,000.  So that is what happened.  That is what the evidence

5    at this trial will show.

6                How are we going to prove it to you?

7                You are going to see a lot of evidence evidence over

8    the course of the next couple of weeks and you're going to hear

9    a lot of testimony.  Right now I will give you a sense of the

10   most important types of evidence you can expect to see and hear

11   during this trial.

12               First, you are going to hear testimony from lots of

13   witnesses, including from members of the union about how

14   Seabrook manipulated the annuity, the fund committee approved

15   its investments into the hedge fund.  You will hear no one on

16   that committee had any idea Seabrook had a relationship with

17   the people in the hedge fund at that time, let alone that

18   Huberfeld was bribing.

19               You will also hear how Seabrook concealed important

20   information from his fellow members of the committee, like the

21   letter from the union's lawyers that raised concerns about

22   investing in the hedge fund.

23               Second, you are going to see evidence of the kickback,

24   the bagful of cash took a short but important journey on its

25   way so Seabrook's hands, purchased at the Ferragamo store,

1   brought back to Jona Rechnitz's office to be filled with cash

2   and brought back to the restaurant before Seabrook took it

3   home.

4          You'll see the evidence that allows you to track that

5   journey.  You will see the receipt from the luxury store

6   stamped just before Seabrook and Rechnitz were supposed to get

7   together.  You will see the surveillance video showing Rechnitz

8   going to his office after the purchase to load up the bag with

9   cash and you will see video of him leaving with the bag to meet

10  Norman Seabrook.

11         You will see police records showing that Seabrook

12  drove into Manhattan that evening.  You will see phone records

13  showing Rechnitz called Seabrook right around the time they met

14  in Manhattan -- sorry -- right around the time that they met in

15  Manhattan and Rechnitz talked to Huberfeld once the deed was

16  done.

17         You will see a picture of Seabrook and Rechnitz

18  together after the dinner that evening and, yes, you will even

19  see the bag, the Ferragamo bag that the FBI found in Seabrook's

20  den with the exact same serial number as the bag in the receipt

21  that Rechnitz got from the Ferragamo store.  You will also see

22  the thousands of dollars in cash that they found in Seabrook's

23  home safe.

24         The third category of evidence.  You will see evidence

25  of a coverup.  You will see the fake invoice for Nicks tickets

1   that Jona Rechnitz had his assistant drummed up right around

2   the time when Rechnitz and Seabrook met for the payoff.  You

3   will see and hear evidence showing that the reason for

4   reimbursement made no sense.  You will see the check Murray

5   Huberfeld and the hedge fund cut to Rechnitz again for Nicks

6   tickets just days after Seabrook got paid.

7          You will even see visual evidence, footage of

8   courtside at Madison Square Garden that shows those seats were

9   used by Jona Rechnitz and his friends, not by Murray Huberfeld.

10         Fourth, you will hear recorded conversations with a

11  judicially authorized wiretap on Rechnitz's phone.  These

12  recordings began in the weeks after Seabrook was paid, but

13  you'll hear now in early 2015 Huberfeld was still trying to get

14  more money out of COBA, and you will see phone records showing

15  how that regular phone contact between Rechnitz and Seabrook,

16  what had been many calls a month slowed significantly right

17  after Seabrook got paid and slowed even more once Rechnitz and

18  Seabrook found themselves under scrutiny by COBA's board and

19  from law enforcement.

20         (Continued on next page)

21

22

23

24

25

1            MR. BELL:  Finally, ladies and gentlemen, you'll hear

2     a detailed account of how all of this happened from Jona

3     Rechnitz himself.  Rechnitz will take the stand, and he'll tell

4     you about how he made the scheme happen, about how he brought

5     the defendants together for their mutual benefit and greed.

6     He'll tell you about how this was the culmination of years of

7     his paying and gifting his way up New York City's pathways of

8     power.

9            And he'll tell you about how, on December 11th, 2014,

10    he handed Norman Seabrook $60,000 in a bag, and how he received

11    a check for $60,000 from Murray Huberfeld shortly thereafter as

12    reimbursement.  Rechnitz will tell you that he did everything

13    he could to keep this a secret, at least for a while.  He

14    didn't tell the whole truth about any of this the first couple

15    of times he was approached by law enforcement.  He even started

16    deleting some of his e-mails, even tried to cover up his

17    crimes, Seabrook's crimes, Huberfeld's crimes, crimes of

18    various people in law enforcement and city government, whose

19    loyalty he bought.

20           But it's hard to stick to a lie for that long,

21    especially in Jona Rechnitz's case, when he had so much to keep

22    hidden and federal law enforcement had started closing in.

23    Eventually, law enforcement did close in and Rechnitz couldn't

24    keep his many secrets anymore.  He came clean.  He pled guilty

25    and admitted what he did, not only helping to arrange the bribe

1    between Seabrook and Huberfeld, but also admitting to buying

2    the loyalty of law enforcement and politicians for years.

3          Rechnitz will also tell you that he is now cooperating

4    with the government and testifying because he hopes to receive

5    leniency at sentencing.  I want to be clear about Jona

6    Rechnitz.  This is someone who committed serious crimes.

7    Rechnitz will tell you about the gifts to cops and city

8    officials and the favors he got and expected in return.  He'll

9    also tell you about some of the business practices he engaged

10   in, which even when they may not have been illegal, were often

11   shady or distasteful.  Given that he managed to arrange a

12   kickback scheme between a union leader and a hedge fund, that

13   shouldn't surprise you.

14         I expect that the defense counsel will ask you to

15   focus on and scrutinize Rechnitz, and you should.  He was a

16   wheeler and dealer, a wannabe big shot, and he broke the law in

17   multiple ways to get ahead.  You may not approve of the way he

18   sailed through his late 20s on a wave of entitlement.  You will

19   not approve that he was willing to flout the law and arrange

20   for payments to people like Norman Seabrook and the police to

21   get whatever he wanted, but the question isn't going to be

22   whether you approve of Jona Rechnitz or even whether you like

23   him.  It's whether you believe he's telling the truth.

24         So we ask you to listen very closely and carefully to

25   his testimony.  Compare that testimony with the other evidence

1    that you'll see and hear, and see if his testimony is supported

2    by that other evidence.  When you do that, you'll find that

3    Rechnitz's testimony is backed up by everything else you will

4    see and hear at this trial, the documents, the other witnesses,

5    the wiretap calls, the phone records, the pictures, the video

6    and the other evidence that you'll see.  All of the evidence

7    showing that Norman Seabrook sold the duties he owed to the

8    hardworking men and women of the union and their retirement

9    money for personal gain, and that Murray Huberfeld bought off

10   Seabrook to shore up the hedge fund that he had founded and was

11   invested in.

12       I mentioned before that at closing of the case we'll

13   have the chance to talk to you again, but between now and then,

14   I'll ask you to do just three things.  First, I'll ask you to

15   pay careful attention to the evidence and the testimony as it

16   comes in.  Second, I'll ask that you follow Judge Carter's

17   instructions on the law.  And third, I'll just ask you to use

18   your common sense, the same common sense that's used through

19   your lives out there in the world.

20       Do those three things, the defendants will get a fair

21   trial, the government will get a fair trial, and I expect that

22   you'll reach the only verdict consistent with the evidence

23   you're about to see and hear, that the defendants, Norman

24   Seabrook and Murray Huberfeld, are guilty as charged.  Thank

25   you.

1          THE COURT:  Okay.  Who's going first for defense

2    counsel?

3          MR. SHECHTMAN:  I am, your Honor.

4          THE COURT:  Okay.

5          MR. SHECHTMAN:  May it please the Court, ladies and

6    gentlemen of the jury, good morning.  My name is Paul

7    Shechtman, and along with Maggie Lynaugh, I represent Norman

8    Seabrook, who you've already heard a great deal about.

9          Ms. Lynaugh, please stand.

10         And helping us in this trial will be Gussie Granquist,

11   a paralegal.  Gussie, will you stand.

12         For 20 years, until the indictment in this case and

13   Mr. Seabrook was suspended from duty, according to New York

14   City law, for 20 years Mr. Seabrook was the president and is

15   the president of the Correction Officers Benefits Association,

16   COBA, the union that represents the men and women who worked in

17   New York City jails, who have been rightly described this

18   morning as people who do a hard and dangerous job.  It is our

19   privilege to represent Mr. Seabrook, who, as you will learn,

20   has been one of the city's most effective labor leaders, one of

21   the most effective labor leaders, I would say, in the history

22   of this city.  Mr. Seabrook, would you stand.

23         This case is named United States v. Norman Seabrook

24   and Murray Huberfeld.  That's what was on the jury

25   questionnaires that you filled out.  That's what will be on the

1   transcript that the court reporter prepares every day, but in

2   many ways, that gets it wrong.  In reality, this case is Jona

3   Rechnitz v. Norman Seabrook and Murray Huberfeld.  For Jona

4   Rechnitz is the government's star witness.  He was mentioned

5   last in the opening, but he's first.

6         In many ways, as you will see, he's the government's

7   only real witness.  He's the only witness who says there was

8   cash, $60,000, in the Ferragamo bag that he gave to

9   Mr. Seabrook on December 11th, 2014.  He is the only witness

10  who says that Mr. Huberfeld bribed Mr. Seabrook.  At bottom,

11  this is a one-witness case, and the one witness is Jona

12  Rechnitz.  When this case is over, when you learn about Jona

13  Rechnitz, what you will know is that Jona Rechnitz is a liar,

14  serial liar, a pathological liar.  You'll learn that he lies

15  about the smallest things and about the biggest things.  Most

16  importantly, you'll learn that Jona is lying about Norman

17  Seabrook and Murray Huberfeld.

18        Let me give you a few examples of the lies that you'll

19  learn about.  Let me start with October of 2013, first example.

20  In October of 2013, Jona befriended Norman Seabrook --

21        THE COURT:  Just a second.  Just try to stay closer to

22  the microphone there, counsel.

23        MR. SHECHTMAN:  I'm going to move the microphone.

24        THE COURT:  Okay.

25        MR. SHECHTMAN:  First lie, first example.  In October

1   of 2013, Jona began to befriend Norman Seabrook to try to win

2   him over, to ingratiate himself with Mr. Seabrook, to buy him

3   gifts, to take him on trips.

4          And what you'll learn is that Jona soon learned that

5   Mr. Seabrook's office, the COBA's office, was at 75 Broad

6   Street, downtown.  And so Jona sent Mr. Seabrook an e-mail that

7   said the following -- let me make sure I get this right -- the

8   e-mail said:  I own 23 Wall Street and I used to own 25 Broad

9   Street.  I own 23 Wall Street and I used to own 25 Broad

10  Street.  And what you're going to learn is he didn't own either

11  building.  He never owned either building.

12         All right?  He owned those buildings as much as you

13  and I own those buildings.  No ownership interest at all.  Now,

14  he did manage 20 -- let's get this right.  He did manage 23

15  Wall Street?  His company did, but that management agreement

16  was terminated one week before he wrote that e-mail that said

17  he owned those buildings.  Okay?  And that is pure Jona

18  Rechnitz.  All right?  Take a tiny little piece of truth, I

19  managed those buildings, I managed them until last week when I

20  was fired, and turn it into a lie, I own those buildings.

21  That's the first example of the Jona Rechnitz, who's the

22  government's star witness.

23         Let me give you a second example.  This one is from

24  the summer of 2014, July of 2014, and by then Jona was

25  continuing to try to win over Mr. Seabrook, to try to befriend

1   him, to try to say, as Jona always said:  You're my best

2   friend; so happy I know you.

3         And so he said to Mr. Seabrook, come out, bring your

4   family, take a ride on my yacht.  It's docked over on the pier

5   on the west side.  Take a ride with your family on my yacht,

6   and Mr. Seabrook did.  He brought his family.  7:00 to 10:00

7   they rode on the yacht, except it wasn't Mr. Rechnitz's yacht.

8   He didn't own it.  He rented it for the evening, and here is

9   the direction that was given to the crew.  The directions said

10  this:  Very important to have no personal photos, items or

11  indications that the boat is rented.  Staff is to act as if

12  Jona Rechnitz owns the boat.

13        All right?  Don't let Mr. Seabrook know it's a rental.

14  Staff is to act as if Mr. Rechnitz owns the boat, just like he

15  owned the building that he didn't own.  And why?  That's the

16  second thing that's pure Jona.  I said the first thing was take

17  a kernel of truth and expand it, expand it into a bag of

18  popcorn, expand it into a complete lie.  The second thing about

19  him is lie to make yourself bigger than you are, lie to make

20  yourself more important than you are, lie to say that the boat

21  you're renting for the evening is the boat you own.

22        Third example.  Third example is in November 2014.  In

23  November 2014, Jona Rechnitz applied for a gun license.  He

24  wanted to own a handgun, and you'll see that application.

25  Every sentence in that application is false, but it begins with

1   the following, occupation.  All right?  Occupation, diamond

2   company manager.  False.  Not true.  Why?  Well, we'll ask him,

3   but I presume the answer is it's hard to get a license if you

4   say I'm in the real estate business.  It's easier to get a

5   license if you say I'm in the diamond business, I own diamonds,

6   I carry diamonds, I move diamonds.  So Jona lied.

7           You're going to see the form at the bottom of it that

8   says, false statements on this form are a crime.  So he lied.

9   And you're going to hear that he's got immunity for that lie,

10  as he does for so many other things because he's testifying in

11  this case.

12          Now, if you look at that license application again, if

13  you continue, there's a part of it that says this, there's a

14  part of it that says, if you apply for a license in the City of

15  New York, your application is a public record.  You and I and

16  the reporters should know who's applying for gun licenses in

17  this city.  But there's some exceptions; so check the box if

18  you fit any of the exceptions.  Check the box if you fit any of

19  the exemptions.  And Jona checked the box.

20          Why should his application be confidential?  Because

21  he was a chaplain in the Westchester County Police.  Okay?

22  Well, sort of.  You're going to hear that he paid tens of

23  thousands of dollars to the Westchester County executive to get

24  his chaplaincy.  You're going to hear that he never performed

25  any services, he never went to any meetings, he never counseled

1   any members.  He was truly a no-show spiritual advisor.

2          Why did he put chaplaincy on that form?  I suppose the

3   answer is, we'll ask him, it's easier to get a confidential

4   application through if you can say you're connected to law

5   enforcement, and so he did.  He was a phony chaplain, and it

6   is, through and through, a phony application.

7          Now, that, ladies and gentlemen, is the tip of a very

8   large iceberg.  Those are three examples, and you're going to

9   hear literally scores more.  Jona Rechnitz and the truth have

10  never been in the same room, and this will not be the first

11  room.  There's more that could give you a taste of Jona

12  Rechnitz.  Mr. Bell said he went through his 30s, I think his

13  expression was, it was an elegant expression, a wave of

14  entitlement.

15         You're going to hear that Jona Rechnitz went through

16  his 30s and 20s on a wave of lies and the biggest lie is the

17  one that he told that brings us to this courtroom.  So I urge

18  you, as you hear the evidence in this case, keep your eye on

19  the ball.  The government may well argue, Jona may well tell

20  you, that he has a history of lying but he's suddenly reformed.

21  He is now a truth teller because he signed an agreement with

22  the government to tell the truth.  He's changed his stripes.

23         But the evidence will show that in May 2016, when Jona

24  first approached the government with his story about

25  Mr. Seabrook and Mr. Huberfeld, when he first approached the

1    government, he was desperate.  And you're going to hear a

2    little piece of tape, or Jona will tell you about a little

3    piece of tape, where he says:  Desperate people do desperate

4    things, and that's what happened.

5           Jona's world was collapsing around him.  Jona knew

6    that the government was on to him.  He knew that he was likely

7    to be indicted for corrupting police officers, showering them

8    with gifts in return for benefits for himself and his friends,

9    benefits like, get this one, benefits like having a lane in the

10   Lincoln Tunnel shut down so that he and his friends could get

11   in the city faster from their private jets.

12          He knew that he was likely to be indicted for that,

13   and he knew that he was likely to be indicted for defrauding

14   investors for putting money into a Ponzi scheme, a Ponzi scheme

15   in which he made hundreds of thousands of dollars, if not more.

16   And the person he called his best friend, a person named Moshe

17   Weinberger lost millions.

18          Above all, Jona knew the government was on to him and

19   he was facing a lengthy prison sentence, and so Jona came to

20   the government with his lawyers and sought leniency.  If you

21   give me a sweetheart deal, I will give you two men, Norman

22   Seabrook, a powerful union leader; Murray Huberfeld, a powerful

23   and successful business leader.  And Jona made up a story about

24   them.  He got his sweetheart deal.  He got it by doing what he

25   does so well, what he's done for a living, he lied.

1           And as I said, it's Jona Rechnitz's false story, his

2     lie, his sweetheart deal that brings us together today.  So

3     keep your eye on the ball.  The government will argue that

4     Jona's story is corroborated.  You've already heard some of

5     that this morning, but the proof will show that the

6     corroboration doesn't actually corroborate anything that

7     matters.  At the end of the day, at the end of this case, this

8     is all about Jona's word.

9           When I was a young lawyer, a young trial lawyer, I was

10    told a story, and it was a story about what was called palm

11    tree corroboration.  As I heard the story, it went like this:

12    A man walked into a police station in Florida, in Miami, and he

13    says to the police officer, a terrible crime, the governor just

14    assaulted me under a palm tree.  And the police officer says,

15    sir, that's a very serious accusation, that's a very serious

16    charge.  Do you have anything to corroborate that?  Do you have

17    anything to support that?  And the man said, I do, I do.  Come

18    with me.  And he walked the police officer down the street and

19    he pointed up and he said, there's the palm tree.  That's what

20    supports it.  All right?  Which is to say nothing supported it.

21          The corroboration in this case, what backs up Jona's

22    word in this case is just that, it is pure palm tree

23    corroboration.  All right?  The Knicks tickets, the Ferragamo

24    bag, the photographs, the money found in Mr. Seabrook's house,

25    19 months after this alleged bribe.  It will all prove

1    irrelevant as corroboration when you look at it closely, when

2    you exercise your common sense.  It's all like the palm tree in

3    that old story, it proves nothing.

4         Let me be more specific with you.  You will hear that

5    on December 11th, 2014, Jona Rechnitz bought a Ferragamo bag

6    for Mr. Seabrook.  He bought it as a present for Mr. Seabrook,

7    whom he was working so hard to befriend, to cultivate.  You

8    will learn that Mr. Seabrook drove into Manhattan from his home

9    in the Bronx.  There were telephone calls between the two men.

10   You'll learn that Jona gave Mr. Seabrook the bag and that Jona

11   and Mr. Seabrook went, with Mr. Banks, Phillip Banks, a deputy

12   police commissioner, who they were close with, they went with

13   Mr. Banks to a synagogue for a service and to dinner at a

14   restaurant.

15        All of that is true.  None of it is disputed.  But the

16   prosecutors will show you a receipt for the bag.  They will

17   show you a video of Jona with the bag.  They will show you

18   photographs of Mr. Seabrook's car driving into the city through

19   a toll booth on the Triborough Bridge.  They will show you

20   photographs of Jona with Mr. Seabrook and Mr. Banks at the

21   synagogue.  They will even show you a picture of the

22   restaurant.  They will spend days proving what is not in

23   dispute.  They will spend days proving everything but what

24   matters.  What matters in this case is this, was there $60,000

25   in that bag?  And for that, there's only the word of Jona

1   Rechnitz.

2          Ladies and gentlemen, you'll also learn this, Norman

3   Seabrook was a powerful union leader in this city.  He ran COBA

4   with a strong hand.  He ran it for 20 years.  He won the

5   confidence of his members because he won them benefits.  He

6   could scream to get his way, and he could charm to get his way.

7   He could cajole to get his way.  His way was to improve the

8   lives of his members.  When he started in 1985 as a correction

9   officer, correction officers were second-class citizens in this

10  city.  Police and firemen earned far more.  Wins at the

11  bargaining table and at the legislature, wins that Mr. Seabrook

12  won gained correction officers respect and equality.

13  Correction officers grew in strength because Norman Seabrook

14  had their back.

15         Mr. Seabrook came to know Jona Rechnitz through

16  Phillip Banks, that very senior police official.  Norman

17  thought Jona was a billionaire.  Jona owned buildings, at least

18  he said he did; he owned a yacht, or at least he said he did;

19  he flew private jets; and he owned or he had a partial

20  ownership in a hedge fund, Platinum Partners, or at least he

21  said he did.

22         Mr. Seabrook was not happy with the performance of the

23  investments that his annuity fund was making, and you're going

24  to learn he was not happy for good reason.  He thought the

25  returns could be higher, and he asked the annuity fund, an

1   independent investment advisor, Thomas Reynolds, to check out

2   Platinum Partners.  You will hear from Mr. Reynolds during the

3   course of this trial.  He will tell you that Platinum Partners

4   checked out, that it was highly rated, that it consistently had

5   excellent returns, that its returns over a lengthy period

6   averaged 18 percent.

7           Your bank account, my bank account doesn't earn

8   18 percent, and so with Mr. Reynolds' blessing, the COBA

9   annuity fund invested in Platinum, first, $10 million in

10  March 2014 and then $5 million in August 2014.  Again, with

11  Mr. Reynolds' approval.  The investment was not made because

12  anyone was bribed.  The investment was made because Platinum

13  checked out, because its returns were excellent.

14          Jona had impressed Mr. Seabrook as a supposed

15  billionaire, and his fund or the fund he claimed to have an

16  ownership interest in, Platinum Partners, had impressed

17  Mr. Reynolds.  That is what this case is about.  That is what

18  the proof will show.

19          When this case is over, you would not buy a used car

20  from Jona Rechnitz.  Don't buy what he's selling in this

21  courtroom.  Don't buy his lies.  The proof will show that

22  Norman Seabrook is innocent of these charges.  The proof will

23  show that Murray Huberfeld is innocent of these charges.

24          When all the evidence is in, when this case comes to a

25  conclusion, maybe as early as next week, when all the evidence

1   is in, you're going to learn that in United States v. Norman

2   Seabrook and Murray Huberfeld, in what might be better

3   described as Jona Rechnitz v. Norman Seabrook and Murray

4   Huberfeld, in this case, Jona Rechnitz's word is worthless.  I

5   thank you.

6            THE COURT:  Okay.  Counsel?

7            MR. SHECHTMAN:  Judge, could we just have a one-minute

8   bathroom break?

9            THE COURT:  Sure.  Let's do this.  Let's go ahead and

10  just take a six-minute break, and we'll be right back.  Okay?

11  Again, don't discuss the case with anyone else.  Don't discuss

12  it amongst yourselves.

13           (Recess)

14           THE COURT:  Okay.  Are we ready?  Let's bring the jury

15  back in.

16           MR. BELL:  Judge?

17           THE COURT:  Yes.

18           MR. BELL:  Just to note, the microphone back there

19  still does not work for some reason, which will effect all of

20  our lives once we start with witnesses.

21           THE COURT:  Okay.  Wait, wait, wait.  We know it's not

22  working now?

23           MR. BELL:  This one is working, but that one is not

24  working.

25           THE COURT:   Instead of bringing the jury back in here

1    and bringing them back out, let me just tell Tara to hold off

2    on the jurors for a second.  Let's get IT up here.

3              MR. MAZUREK:  Like icing the kicker.

4              MR. SHECHTMAN:  Your Honor, can I --

5              THE COURT:  Yes?

6              MR. SHECHTMAN:  Are we still going to take an 11:30

7    morning break?

8              THE COURT:  I think we're going to need to take that

9    closer to noon, depending on when they get here; so probably

10   noon to 12:30.

11             MR. SHECHTMAN:  Okay.

12             THE COURT:  So, counsel, let me get a sense, how long

13   is your opening statement going to be?

14             MR. MAZUREK:  About 30 minutes.

15             THE COURT:  So what's going to happen is IT has

16   informed us before that once the opening statements -- due to

17   whatever technical glitches there are, once we're finished with

18   opening statements, that mic is going to die and they can make

19   that other mic come alive.  So we'll have them up here in 30

20   minutes; so that shouldn't be a problem.  There shouldn't be

21   any interruption of flow.  We'll have the witness start

22   testifying, we'll take a break at noon.  Let my deputy make

23   that call, and we'll get the jury out, and we'll go on with

24   defense counsel's opening statements.

25             MR. MAZUREK:  Thank you, Judge.

1     THE COURT:  The other thing, on the record, counsel,

2  something else I've just been informed of.  We can deal with

3  this later, after the break.  My deputy has just informed me

4  that juror No. 1, the juror who was late today, was late

5  because his mother was hit by a car yesterday, and he needs --

6     THE DEPUTY CLERK:  Judge, I'm sorry.

7     THE COURT:  Correction, not his mother.  The home

8  health aide that takes care of his mother was hit by a car

9  yesterday; so he needs to make some other arrangements.  We can

10  bring him out later and make an inquiry of him and the like.

11     Counsel, having talked about that now, I know you're

12  in the middle of making your opening statement.  We can deal

13  with that at the break.  At 12:00 we can talk about that.  But

14  the home health aide that takes care of his mother was hit by a

15  car, and he may need to make some other arrangements.  Okay?

16  Let's bring the jury in.

17     (Jury present)

18     THE COURT:  Okay.  Please be seated.  Go ahead,

19  counsel.

20     MR. MAZUREK:  Thank you, Judge.  Good morning, ladies

21  and gentlemen.  This is the last speech you'll have to hear for

22  the day and, hopefully, I read somewhere the last shall be

23  first; so we'll see how it goes.

24     Ladies and gentlemen, about an hour ago, Mr. Bell

25  walked this way, towards my client, pointed his finger at him.

1    He said, this man promised to bribe Norman Seabrook.  Now,

2    look, I get it.  This is a criminal trial.  We each have our

3    roles in this case, right?  The Judge presides over the matter.

4    The prosecutors, they point fingers, and the defense lawyers,

5    we're the voice of our clients.  But think about this, ladies

6    and gentlemen, is that the first impression that you would want

7    of someone who you cared about?  I dare say it wouldn't be.

8           Now, why is Mr. Huberfeld sitting in this courtroom

9    having his finger pointed at him?  Because he did business with

10   Jona Rechnitz.  What will the evidence show in this case?

11   That's what's important.  It's not important what I say, what

12   Mr. Bell says, or what Mr. Shechtman says, but what the

13   evidence will show.  And over the next two weeks or so, you're

14   going to have a chance to hear from different witnesses, look

15   at many documents and study the facts.

16          All we're here to do right now is to give you a

17   roadmap of things that you should expect to hear from that

18   witness stand in the far corner of this courtroom.  When

19   Mr. Bell stands up and says my client, Mr. Huberfeld, promised

20   to bribe, what will the evidence show?  What will the evidence

21   show who Mr. Huberfeld actually is?  You're going to hear from

22   his former partner, Gilad Kalter, maybe as early as today, who

23   was an officer at the hedge fund that my client worked.

24          And, yes, you're going to hear from Jona Rechnitz.

25   You've heard a lot of things about him.  I still have a few

1    more things to add before you get to see him later this week,

2    but what will the evidence show of Mr. Huberfeld?  Well, it

3    will show who he really is, a 57-year-old man, grew up in

4    Brooklyn, immigrant family.  You'll hear from Jona Rechnitz how

5    he got to know Mr. Huberfeld, because Jona Rechnitz's

6    grandfather and Mr. Huberfeld's father were from the same part

7    of Poland and survived the Holocaust.  They immigrated to

8    Brooklyn, and you will hear that they started small businesses,

9    were entrepreneurs right here in New York City.

10           You will hear that Mr. Huberfeld went to Brooklyn

11   College, but he always worked.  Here's the contrast I want you

12   to keep your eye on, ladies and gentlemen.  In this case, Jona

13   Rechnitz, son of a fancy real estate owner from Beverly Hills,

14   running around gambling, private jets, fancy trips, sitting

15   next to Spike Lee at the Madison Square Garden during Knicks

16   games and Murray Huberfeld.

17           What are you going to hear about Murray Huberfeld?

18   During college, he opened -- helped with his father to open a

19   kosher fast food chain.  It was called Kosher Delight in

20   Flatbush, Brooklyn, and, ladies and gentlemen, Jona Rechnitz

21   will tell you all about that.  That's how Murray Huberfeld got

22   his start.  He opened a fast food chain and was behind the

23   counter working, working.

24           And from there, yeah, guess what?  The evidence will

25   show Murray Huberfeld became a great success, a great success.

1    He built capital in his fast food chain, this Kosher Delight,

2    these small restaurants.  He got to know people in his

3    community, and he said, you know what, I think I have a knack

4    for investment, and he founded an investment fund with people

5    who helped his family build the capital to open these stores.

6         In about 2003, the evidence will show, Murray

7    Huberfeld and his partners founded a hedge fund, a hedge fund

8    called Platinum Partners.  That's what the evidence will show.

9    Now, let me say something about what a hedge fund is.  You're

10   going to hear evidence about it, but just so that you can

11   understand the way the story progresses here in this case.  A

12   hedge fund, ladies and gentlemen, is just a fancy way of saying

13   that a group of people or entities get together and agree to

14   allow other people, the managers of the fund, to find the best

15   investments for their money.

16        And that's what Murray Huberfeld did.  He was someone

17   who said, I'm going to go out, find the best investments, scour

18   the four corners of the earth and find the best places for

19   people to earn money on their investments.  Those investments

20   could be in anything, stocks, bonds, loans, commodities like

21   oil or gas, or investments in other companies.  A hedge fund,

22   don't be scared by the term and turned off by it, it's just a

23   place where people pool their money and have other people

24   manage it and make other investments.

25        Now, Murray Huberfeld and his partners, you will hear,

1    started with a modest set of investment money in 2003, pooled

2    it together, sought money from other people in their community,

3    and ten years later, ten years later, in 2013, around the time

4    when the events that the government are going to put in front

5    of you in this case, it was a gigantic fund.  Murray Huberfeld

6    was a success, is a success.

7            You're going to hear evidence, maybe even later today,

8    that that fund, Platinum Partners, was started on the shoulders

9    of Kosher Delight capital, has about -- had about a billion

10   dollars, that's with a B, in assets under management by the

11   time that Jona Rechnitz introduced Murray Huberfeld to Norman

12   Seabrook.  Now, to put that into perspective, ladies and

13   gentlemen, the amount that the government is saying are part of

14   the reason for the $60,000 bribe, which is the only issue in

15   this whole case, that COBA investment that Mr. Bell spoke about

16   earlier this morning, were $20 million.

17           Now, I will confess something to you, that throughout

18   this trial there's going to be a lot of numbers, and I

19   apologize in advance because I went to law school because I'm

20   not good at math.  But I can tell you that $20 million, the

21   amount of the COBA investment, which is the motivation that the

22   government claims is the reason that my client suddenly took to

23   a life of crime and committed a bribe, $20 million out of one

24   billion dollars, with a B.  That's a small percentage, a very

25   small percentage.

1          Now, you're going to hear about this fund and hear a

2    little bit about it from the other lawyers, but it's a

3    multi-strategy fund.  It had investments both in the credit

4    portion of the funds, with loans that it extended to people or

5    entities, mostly companies.  It invested in companies.  It had

6    an international base.  It was a very large investment fund,

7    ladies and gentlemen.  It was not something that, for the spur

8    of the moment, that Mr. Huberfeld suddenly needed $20 million

9    to make this fund something that it already had grown over the

10   ten years.  That didn't happen.

11         The evidence will show that Murray Huberfeld did not

12   promise to bribe Norman Seabrook to get this one investment ten

13   years into the creation of the fund that already succeeded.  It

14   makes no sense.

15         Now, let me tell you what else the evidence is going

16   to show you about my client, Murray.  Murray didn't take this

17   success that he achieved lightly.  As I said, it took him ten

18   years to build up this fund to where it was in 2013, and you

19   will hear that he is, and I know this for a fact, an incredibly

20   driven person who works 24/6.  I said 24/6 because

21   Mr. Huberfeld observes the Sabbath.  It's the one time that he

22   doesn't work.

23         He is a type A personality, who gives his all to every

24   project.  And how are you going to understand that in this

25   case?  Well, in this case, you're going to hear from Murray

1    Huberfeld because, as the government said, during the early

2    months of 2015, the government was thankfully investigating a

3    real criminal called Jona Rechnitz, and they had secret

4    wiretaps up on Jona Rechnitz's phone.  So when Mr. Huberfeld

5    called Jona Rechnitz to ask Mr. Rechnitz to do his brokerage

6    work or promotion of the fund, you get to hear from

7    Mr. Huberfeld.

8         And what are you going to hear?  You're not going to

9    hear, oh, Jona, pay cash to Norman Seabrook or, oh, Jona or

10   Jeremy, his partner, why didn't you pay Norman more money so we

11   can get more money into the Platinum fund, or hey, Jona, why

12   did you underpay Norman Seabrook because now he's angry and I'm

13   not putting more money into the fund.  That's what the

14   government claims, but you're not going to hear that.

15        What are you going to hear?  I'll tell you what you're

16   going to hear, a very pushy guy from Brooklyn screaming at a

17   broker, saying, get more gelt into my fund.  Gelt, you'll hear,

18   is a Yiddish term for money, and he's going to be pushy and

19   he's going to be, let's close the deal.  He's going to be,

20   what's going on?  Get an update.  I don't care that you're in

21   Los Angeles.  Get over here and get the deal done.  There's

22   more money to be done in COBA.

23        And the government wants you to believe that's a

24   crime.  They want you to believe that's bribery, but that's

25   Murray Huberfeld doing his job, the same job he had been doing

1    for ten years.  He wasn't saying stuff money in a bag.  He was

2    saying, Jona Rechnitz, do the things that you're supposed to

3    do.  You're the million dollar broker, get it done.

4         Ladies and gentlemen, the only reason that Murray

5    Huberfeld is sitting in this courtroom, you're going to hear

6    through the course of the evidence in this trial, is because of

7    Jona Rechnitz.  That's it.

8         You've heard a little bit about Jona Rechnitz, but

9    he's a broker.  That's what the evidence will show.  He's a

10   middleman, a matchmaker.  He's cupid for business people.  He

11   puts one person together with another.  Murray Huberfeld,

12   looking for investments, looking for investors, big, because

13   there's a billion dollar fund.  Jona Rechnitz, who is this guy?

14   It's really going to be hard for you to believe by the end of

15   this trial that this guy did the things he did.

16        He was, as Mr. Bell calls him, the man about town.

17   Jona Rechnitz, you're going to hear, came to New York City from

18   his flashy Beverly Hills neighborhood and came to New York and

19   said, you know what, I'm going to be a business tycoon.  I'm

20   going to be one of the most important people that everybody is

21   going to want to know in New York City.  Now, he had, you're

22   going to hear, a pretty wealthy daddy, and he had some charisma

23   because the things that he got to do were quite literally

24   spectacular.

25        He had some money as a base because of his father and

1   his father's real estate developments, but he got to know

2   people and he got to spend a lot of money.  Ladies and

3   gentlemen, you're going to hear that he spent more money on

4   Knicks tickets than he paid in taxes.  Ladies and gentlemen,

5   you're going to hear that he took private jets, spent hundreds

6   of thousands of dollars a year on private jets to Las Vegas,

7   Miami, Dominican Republic, London, Israel.

8           And who does he talk to?  He talks to -- let me ask

9   you this.  How many of us get the opportunity, get the

10  opportunity every time we want to leave our job and our office

11  in Manhattan, got to go home, some of us take the subway, some

12  of us Metro-North, some, unfortunately like myself, New Jersey

13  Transit, but Jona Rechnitz, he gets to call -- get this, you're

14  going to hear this in the testimony -- the New York City Chief

15  of Police, the highest uniformed officer in New York, a guy by

16  the name of Phil Banks.  And when he's ready to go home, hey,

17  Phil, come pick me up.  And he gets to be driven home with

18  lights and sirens in a police cruiser by the chief of police.

19          Guess who he calls on the cell phone when he has an

20  idea to run the city?  Hmm.  You know, you and me, maybe we

21  have some ideas that we talk about over coffee with our

22  friends, but Jona Rechnitz, you'll hear, he calls a fellow by

23  the name of Bill de Blasio on his personal cell phone, and he

24  gets an answer.  You'll hear Mayor de Blasio's personal e-mail

25  address that he flaunts around to his investor friends and

1    said, this is my bud, Bill.  This guy was barely 30 years old.

2    It's hard to believe, but you're going to hear it right from

3    that witness stand.

4         Now, this is the guy who presents it to my client,

5    Murray Huberfeld, and as I said, Huberfeld's family and the

6    Rechnitzes came from the same Orthodox Jewish community.  And

7    actually, Murray's parents were from the same part of Poland as

8    Jona's family originally; so they knew of each other.  They

9    were in the same type of circles.

10        So Mr. Huberfeld, you'll hear, heard about

11   Mr. Rechnitz and Jona's incredible rise to a big position here

12   in New York City, to somebody, as they say in that neighborhood

13   in the upper west side, a big macher or bigshot.  And what does

14   a broker, ladies and gentlemen, sell?  A broker sells

15   connections.

16        You heard Mr. Shechtman, Jona Rechnitz said, I own

17   this building, I own that building, I own a yacht.  He didn't

18   own any of that.  The only assets Jona Rechnitz had, ladies and

19   gentlemen, was that address book, that phone number of Mayor de

20   Blasio, the ability to take Chief of Police Banks around in a

21   cruiser, the ability, as Mr. Shechtman told you, again hard to

22   believe but you're here in this case, to close down a lane in

23   the Lincoln Tunnel for a business associate.

24        Now, I'm not a big fan of reality TV, but I know

25   there's a show on one of these channels called Million Dollar

1    Listing, and it's about a fancy broker who gets people tied up

2    to big fancy properties.  Jona Rechnitz was the real life

3    Million Dollar Broker.  If you owned an investment fund, ladies

4    and gentlemen, or a part owner, like Murray Huberfeld, and you

5    heard that this is the guy who's running around town, who has

6    the connections that are just too fantastic to believe,

7    wouldn't you hire him?

8         That's what Platinum Partners and Murray Huberfeld

9    did, said, Jona, I think we have an idea.  And you're going to

10   hear testimony that Jona said, I have a list, I have a list.

11   What broker doesn't have a list?  25 entities, unions, city,

12   state pension funds.  He's got the list, and he wants to sell

13   it to Murray Huberfeld and Platinum.  He can bring

14   institutional investors, and you're going to hear evidence that

15   institutional investors are important to a fund.  Of course

16   they are.  They have a lot of money, the pension fund or city

17   and state funds, or labor union funds.

18        And here's a guy, ladies and gentlemen, that the

19   evidence will show, was running around with the top labor and

20   City Hall officials in New York City.  That's what Jona

21   Rechnitz sold to Murray Huberfeld.  He didn't sell a bribe.  He

22   didn't come to Murray Huberfeld and say, oh, I'm, you know, a

23   rising star and I have all these connections, but I can't get

24   the deal done; so can you bribe Norman Seabrook.  No.

25        He's going to tell you that, but I'll tell you why

1    he's going to tell you why he's going to say that in a second,

2    because he's in a heap full of trouble.  All the evidence will

3    show, ladies and gentlemen, is that Murray Huberfeld knew of,

4    heard of and most people in the Orthodox Jewish community at

5    this time in 2013, knew who Jona Rechnitz was, because he was

6    this guy who was out there everywhere.

7         You're going to hear evidence that -- I hear there's

8    something called Page Six in the New York Post, and you're

9    going to hear evidence that Jona Rechnitz had a speed dial line

10   to that reporter on the New York Post on Page Six that every

11   time that he was on that floor of the Madison Square Garden

12   during a Knicks game, it could be reported.  Here is Jona

13   Rechnitz sitting next to Stewart Rahr, pharmaceutical

14   billionaire.  You will hear that they put a bet together on the

15   game for $100,000 to give to charity.  Jona Rechnitz was all

16   over, and that's what he sells and he sold to my client.

17        Now, unfortunately, the reality is you're going to

18   hear that Jona Rechnitz was no ordinary broker.  You heard that

19   already.  He wasn't.  I mean, it's crazy.  He spent hundreds of

20   thousands of dollars on entertainment, hundreds of thousands of

21   dollars.  His AmEx bill was a million dollars a year.  Now,

22   when he came to Murray Huberfeld and said, I can get you these

23   lists of people, that's all the evidence is going to show

24   happened.

25        I'm going to take you through what you expect to see

1    on the evidence that's not -- let's put Jona Rechnitz's

2    testimony aside.  What is the evidence that's going to be

3    presented to you?  You're going to hear evidence that Jona

4    Rechnitz wooed people like Norman Seabrook, that he gave Norman

5    Seabrook trips and invited him out.  And you know what, that's

6    not Mr. Seabrook's fault.  What's wrong with that?

7         Here is a guy saying, come on, I want to show you

8    around town and I have great connections.  And, you know what,

9    Mr. Seabrook, you're an important labor leader, and

10   Mr. Seabrook is an important labor leader, and it's good for

11   the labor union to sit with the Chief of Police Phil Banks.

12   What's wrong with that?  That's what the evidence is going to

13   show what Jona Rechnitz did.

14        Second, you're going to hear Jona Rechnitz promoted

15   Platinum Partners, the hedge fund.  Of course he did because

16   that's how he gets paid.  He gets paid on commissions.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1          Right?  And he also sells his credibility, so you know

2     what you get on this case?  The government says my client

3     promised to pay Norman Seabrook because he is a partner at

4     Platinum Partners.  You know what Jona Rechnitz is going to

5     testify he told Norman Seabrook?  He told him he was the

6     partner, he was the partner of Platinum Partners, he was part

7     owner of Platinum Partners.  He didn't even tell Murray

8     Huberfeld because Jona Rechnitz said hey, I'm the man.  I've

9     got this hedge fund, it's going great, 18 percent annual

10    returns.  He sold it to Norman Seabrook.  That is what you're

11    going to hear the evidence to be.  He will admit that.

12         Now, you're also going to hear that Jona Rechnitz then

13    told Murray Huberfeld that Norman Seabrook has an interest in

14    Platinum Partners, for COBA for the union, for the union money.

15    Would you be interested?

16         And Murray Huberfeld said great job, Jona, this is

17    exactly the kind of investor we are looking for.  So you're

18    going to hear that on January 13th, 2014, as a result of the

19    match that was made by Jona Rechnitz of Norman Seabrook to

20    Platinum Partners, that there was a board meeting, a board of

21    the Correction Officers Benevolent Association, a board meeting

22    on January 13, 2014, including a fellow by the name of Gilad

23    Kalter, who will testify today or tomorrow from Platinum

24    Partners, who was the chief operating officer at the time of

25    one of the Platinum funds along with two or three other

1   representatives of Platinum.

2           They did a presentation.  They showed financial

3   documents.  They showed a history of the fund, what kind of

4   investments they made, how liquid the fund is, what they can

5   offer to the COBA board, and it was a presentation of the

6   entire board, and they were not the only investing fund that

7   was presented to the board on that day.  There were others.

8           After that board meeting, you're going to hear that

9   the Platinum lawyers got in touch with the COBA lawyers and

10  you're going to hear that those lawyers negotiated terms for

11  potential investments of COBA into Platinum.  You're going to

12  hear COBA negotiated a side letter agreement which made the

13  terms better than the normal subscriber of Platinum.  It gave

14  special consideration to the fact that COBA was a pension fund,

15  so it gave them better deals than the normal investor that

16  Platinum had.

17          Then you'll hear the board voted, that the annuity

18  funds invested $15 million in the general fund, 5 million in

19  the way Mr. Bell told you, and you're going to hear that

20  Platinum Partners agreed to pay Jona Rechnitz a hundred

21  thousand dollars for connecting them to COBA, Platinum to COBA.

22          Murray Huberfeld at the request of Platinum, you will

23  hear Platinum issued the checks and they issued checks for

24  reimbursement of expenses that Jona had in doing his work for

25  the fund and he also, Jona asked for charity checks to be made

1    in his name because you're going to hear what is how Jona

2    operated.  He would throw around a lot of checks to charity,

3    four checks totaling about a hundred thousand dollars.

4            He got paid.  Jona Rechnitz got paid by Platinum

5    Partners, and that is what the evidence will show.  No other

6    evidence in this case other than the testimony of Jona Rechnitz

7    will say that oh, Murray Huberfeld directed a bribe, I was told

8    to bribe Norman Seabrook by Huberfeld.  Only Jona Rechnitz.

9    The objective, independent evidence in this case will show what

10   actually happened was Murray found and a successful broker,

11   million dollar broker, brought him to promote Platinum, and

12   Jona Rechnitz brought COBA as he was bringing or seeking to

13   bring other pension funds and savings funds into the

14   investment, into the investment fund.  That is all.

15           That is, ladies and gentlemen, what the non-Jona

16   Rechnitz will show in this case.  There was no $60,000 payment

17   that my client had anything to do with to Norman Seabrook.  It

18   just isn't there except in the lies of Jona Rechnitz.

19           Why is Jona Rechnitz coming in here and lying to you?

20   It is quite simple.  He committed a lot of crimes.  He

21   committed a lot of crimes in this torrid of facts-case

22   lifestyle of his late 20's.  You're going to hear he was

23   involved in two investment deals, two investment deals, one

24   with a liquor distributor in Harlem and one in a ticket broker

25   who resells various expensive sports tickets which Jona would

1    spend millions of dollars on.

2            He would find investors to invest in these two

3    businesses.  Joan Rechnitz will come in here and basically tell

4    you, ah, you know what?  I am the most unlucky person in the

5    world.  These two investment deals that I put together, the

6    liquor business, Peralta liquor business and Nissen ticket

7    business, they just so happened to be both complete frauds, I

8    didn't know.  I didn't know.  I brought all these investors in,

9    my good friend, best friend, Michael Weinberger, I had him put

10   millions of dollars in this.  I didn't know.

11           You will evaluate that testimony, how unlucky he was

12   to have two investment deals in this whole business and they

13   both end of being Ponzi schemes.  What are the chances of that?

14   That is Jona Rechnitz.  He had a slight problem talking about

15   millions of dollars of losses in both of those investment

16   deals, and you'll hear he was bad in paying taxes because

17   everything that he did was an expense and so he didn't have any

18   income.

19           You will hear he had those problems, too, and he had

20   the problems that, you know, with the Police Department that he

21   wanted a gun, of course, why wouldn't you want a gun to carry

22   around New York City.  So he had to bribe people to get a gun,

23   or he wanted to be chaplain in Westchester County, so he had to

24   bribe the Westchester County Executive to get that chaplain

25   seat.

1     He committed health care fraud because he had somebody

2     else pay for his health care.  The list goes on and on.  So

3     Jona Rechnitz went in 2015, you're going to hear he starts

4     being visited by police officers investigating him, he had a

5     problem.  He had to work out this problem because otherwise,

6     you're going to hear he was facing many years in prison, many

7     years in prison.  So what he did was he hired some fancy

8     lawyers, and they walked into the U.S. Attorney's Office and

9     they worked out a deal.  They worked out a deal.

10    You're going to hear about this deal.  It is a very

11    important piece of paper in Mr. Rechnitz's life, you're going

12    to hear, because that piece of paper has the possibility, the

13    difference between Joan Rechnitz going home to his five kids

14    every night or going home to a jail cell by himself for several

15    years.

16    Pretty powerful stuff, pretty tempting stuff.  You're

17    going to hear he has a cooperation agreement with the

18    government that if the government believes he completely and

19    truthfully discloses all information he knows about other

20    people that can advance a criminal investigation, then the

21    government will write a letter.  You will hear about that

22    letter in court.  It is called a 5K1 letter, and that letter is

23    the Joan Rechnitz get-out-of-jail-free card.  If the government

24    writes it, seeking leniency at Joan Rechnitz's sentencing, he

25    might go home.  Otherwise, he goes to prison.  Think of that,

1    ladies and gentlemen, what a powerful motivator to lie.

2         Now, the thing is, Joan Rechnitz, you will hear,

3    didn't need powerful motivators to lie to the government.  He

4    lies to everybody.  You are going to hear he lied to hedge fund

5    operators, to his best friend Michael Weinberger who lost

6    millions of dollars in two different Ponzi schemes.  He lied to

7    his own father-in-law, David Kahn, put him in a bad investment

8    deal just so he could get a commission.

9         He lied to our good mayor, Bill DiBlasio, about what

10   Jona would do for the mayor.  He lied to lenders, banks and

11   little people relying on Jona to tell the truth about financial

12   documents.  He lied to borrowers who trusted that he told them

13   the truth about his own investments.

14        He lied to Norman Seabrook, whom he told he was an

15   owner of Platinum Partners, and he lied to my client, Murray

16   Huberfeld, who he told that he legitimately promoted Platinum

17   Partners as a real broker.  Now in a few days he will lie to

18   you to convict my client of a felony crime.

19        Ladies and gentlemen, don't, don't be another victim

20   of Jona Rechnitz.  Thank you.

21        THE COURT:  Okay.

22        (Off-the-record discussion)

23        THE COURT:  Let's have the government call your first

24   witness.

25        MR. BELL:  Your Honor, the government calls Elias

1    Husamudeen.

2              THE COURT:  Okay.

3     ELIAS HUSAMUDEEN,

4         called as a witness by the Government,

5         having been duly sworn, testified as follows:

6              THE COURT:  Before you start, give us a Testing 1, 2,

7    3, to make sure that mike is live.

8              MR. BELL:  Testing 1, 2, 3.

9              THE COURT:  Keep your voice up.

10             MR. BELL:  Very well, sir.

11             THE COURT:  Now again, counsel, keep your voice up.

12   For the witness, the acoustics aren't great.  Lean into the

13   microphone and give us a Testing 1, 2, 3.

14             THE WITNESS:  Testing 1, 2, 3.

15             THE COURT:  Are the jurors able to hear the witness

16   okay.

17             THE JURY:  Yes.

18             MR. BELL:  I have just been provided a microphone,

19   Testing 1, 2, 3.

20             (Pause)

21   DIRECT EXAMINATION

22   BY MR. BELL:

23   Q.  Good morning, Mr. Husamudeen.

24   A.  Good morning.

25   Q.  Where were you born, sir?

1    A.   Charleston, South Carolina.

2    Q.   Where do you live now?

3    A.   Staten Island, New York.

4    Q.   Are you testifying today pursuant to a subpoena?

5    A.   Yes, I am.

6    Q.   What job or jobs do you currently have?

7    A.   I am currently a New York City correction officer and I am

8    also the president of the correction officers union known as

9    COBA.

10   Q.   I want to ask you a few things about each of those jobs.

11         First of all, Mr. Husamudeen, what is a correction

12   officer?

13   A.   New York City correction officers are responsible, someone

14   who is hired and responsible for care, custody and control of

15   inmates and detainees in the New York City jail system.

16   Q.   Where generally do New York City's correction officers

17   work?

18   A.   We generally work in the 13 or 14 jails throughout New York

19   City.  At least 9 or 10 of them are located on Rikers Island.

20   Q.   What duties and responsibilities do corrections officers

21   have as part of the care, custody and control that you

22   mentioned a moment ago?

23   A.   Well, our duties are numerous, but we are responsible for

24   ensuring that inmates don't leave the custody of the New York

25   City jail system.  We are responsible for ensuring that they

1   get the services that they're entitled to as inmates, such as

2   whether it is mental health treatment, being able to receive

3   visits and things from their family, things of that nature.

4   Q.  Is it a challenging job?

5   A.  I think it is the most challenging job in the world.

6   Q.  Why is that?

7   A.  Well, basically we're responsible for working with people

8   that most people don't want to work with or don't want in the

9   community.

10  Q.  Is it a dangerous job?

11  A.  Yes, it is.

12  Q.  How so?

13  A.  Well, because again we're working with people who are

14  arrested for assaults, for murder, for rape, for violent

15  crimes, and for 24 hours a day seven days a week we are there

16  with them, working with them in the same vicinity with them.

17  Q.  You also mentioned that you're the president of the

18  Correction Officers Benevolent Association.  What is the

19  Correction Officers Benevolent Association?

20  A.  The Correction Officers Benevolent Association is the union

21  that represents correction officers, active and retired, in New

22  York City.

23  Q.  I believe you mentioned it is known as COBA, for short?

24  A.  Yes.

25  Q.  How long have you been the president of COBA?

1   A.  Approximately 15 months, 16 months.

2   Q.  Did you have other jobs with COBA prior to that?

3   A.  Yes.  Prior to holding this position, I held the position

4   as first vice president of the union, and I've held the

5   position as treasurer of the Correction Officers Benevolent

6   Association.

7   Q.  How long were you first first vice president?

8   A.  Approximately about five years.

9   Q.  How long were you treasurer before that?

10  A.  About 15 years.

11  Q.  What are your duties currently as president of the

12  Correction Officers Benevolent Association?

13  A.  As a president of the union, it is my duty basically --

14  basically the president of the union is like the CEO of a

15  company, responsible for the day-to-day operation and ensuring

16  that the Correction Officers Benevolent Association's rights,

17  the rights of -- protect the rights of the union, collective

18  bargaining and things we represent our members on.

19  Q.  What duties did you have as vice president for before that?

20  A.  As the vice president of the union, my duties were those

21  that were assigned to me by the president.

22  Q.  What did those include in your case?

23  A.  It included being responsible for dealing with the office

24  of the commissioner of the agency, dealing with the chief of

25  the department, working with the other board members to ensure

1   that the rights of correction officers were upheld and

2   protected and whatever else was assigned.

3   Q.  How about as treasurer before that, sir, what were your

4   duties and responsibilities as treasurer?

5   A.  As a treasurer, my duties and responsibilities pretty

6   spelled out in our Constitution and bylaws, but responsible for

7   ensuring, overseeing the funds, checks, writing checks, making

8   sure the bills are paid, making sure that our books were

9   balanced and basically the duties of chief financial officer.

10  Q.  I think you touched on this a little bit, but what is the

11  purpose of the union, of COBA?

12  A.  The purpose of the union is to represent the men and women

13  who are members of the union.  Part of our job is to negotiate

14  collective bargaining agreements.  Part of our job is to ensure

15  and get legislation that benefits correction officers, to

16  represent correction officers through everything, and every

17  aspect as far as their benefits are concerned.  We're

18  responsible for optical and dental and prescription and

19  negotiating with the city and negotiating with the Department

20  of Corrections.

21  Q.  How many members does COBA have?

22  A.  Currently COBA has 10,600 active members and about the same

23  amount of retired members.

24  Q.  Where does COBA rank among the largest unions of its type?

25  A.  We're considered the second largest law enforcement union

1    in the city.

2    Q.  What qualifies someone to be a member of the union?

3    A.  You have to take the test to become a New York City

4    correction officer.  If you pass the test, you meet all the

5    requirements, you enter the academy and you become a member of

6    the correction officers union, COBA.

7    Q.  Are all of New York City's or substantially all of New York

8    City's correction officers members of the union?

9    A.  They're all members.

10   Q.  Who was your predecessor as president of the union?

11   A.  My predecessor was Norman Seabrook.

12   Q.  How long was Norman Seabrook president of COBA?

13   A.  Approximately 20 years.

14   Q.  About how long ago did you meet Mr. Seabrook?

15   A.  I met Mr. Seabrook I believe in 1991-'92.

16        THE COURT:  Let me check with you with the jurors.

17   Are you able to hear the witness okay?  I remind the witness to

18   keep your voice up because the acoustics aren't great.

19   BY MR. BELL:

20   Q.  How was it you first came to meet Mr. Seabrook?

21   A.  I met Mr. Seabrook when he was a candidate running for

22   office, running to be the president of the union.

23   Q.  How was it that Candidate Seabrook came to get to know you?

24   A.  At the time that he was candidate for office, I was working

25   in one of the largest jails on the island, and I was writing

1    and producing a newsletter, and he found out that it was me,

2    that I was writing this newsletter, and he came to my jail and

3    asked me to come to a meeting and subsequently asked me to join

4    his group that was running for office.

5    Q.  Did you do that?

6    A.  Yes.

7    Q.  Was that electoral group or slate successful come election

8    time?

9    A.  Yes, we were.

10   Q.  Have you been a member of the executive board ever since?

11   A.  Yes, I have been.  I have been a member of the executive

12   board since 1995.

13   Q.  What gains, if any, was the union able to make once that

14   slate came into power?

15   A.  Well, once we were elected to office, we made substantial

16   gains.  We were able to get legislation for correction officers

17   such as things such as three quarter disability bill, a heart

18   bill.  We were able to get at least 30, 40 different pieces of

19   legislation passed for correction officers.

20        We were successful in negotiating at least more than

21   7, 8 contracts, getting corrections officers raises and a host

22   of other things that we were successful in doing.

23   Q.  How did that compare to the progress made under previous

24   boards or slates?

25   A.  I am sorry?  Say that again.  Can you ask that.

1    Q.  Sure thing.  I asked you about what gains, if any, the

2    union was able to make once your slate, Mr. Seabrook's slate,

3    came into power?

4          How did those gains compare with the progress that

5    previous boards were able to make?

6    A.  There was no comparison.

7    Q.  What do you mean, there was no comparison, sir?

8    A.  Where we were successful in taking corrections officers was

9    far, far beyond where the previous administration or the people

10   that we took over from was able to do.

11   Q.  What accounted for the difference with this administration?

12   Why was it more successful?

13   A.  Drive.

14   Q.  What do you mean by, "drive"?

15   A.  We wanted to do what we did for correction officers.  We

16   wanted to promote correction officers.  We ran to get elected

17   to do exactly what it was that we did, and that was to promote

18   correction officers, that was to put correction officers on the

19   map, that was to make sure that everybody in the City of New

20   York, the state or country or the world, knew that we were

21   correction officers and we were to be respected as every other

22   law enforcement agency was.

23   Q.  In what ways did Mr. Seabrook as president contribute to

24   that period and those gains?

25   A.  He was, Mr. Seabrook was the face and the voice of the

1   union.

2   Q.  How visible was he as the face or the voice of the union

3   during that period of time?

4   A.  He was probably more visible than most union leaders in the

5   city.  Anything that had anything to do with corrections, we

6   definitely were there.  Anything that had anything to do that

7   affected our members, we were there, he was there.  It didn't

8   matter whether it was dealing with Albany, dealing with City

9   Hall, City Council, whoever it was that we had to deal with he

10  was definitely visible.

11  Q.  Serving as the public face of the union and dealing with

12  those various entities outside of the union, how would you

13  characterize his style or behavior as the public face of the

14  union?

15  A.  I would characterize it as effective.

16  Q.  In what ways?

17  A.  Usually whatever we set out to accomplish is what we did,

18  it is what we accomplished.

19  Q.  How would you characterize the way or ways in which Mr.

20  Seabrook dealt with forces within the union?

21  A.  Pretty much in your face, I mean up close and personal.

22  Q.  What do you mean by in your face or up close and personal?

23  A.  Usually meaning that when you were dealing with Norman,

24  basically one thing that he always said was he said bring your

25  A game, so basically that was his personality.

1    Q.  What did you understand bring your A game to mean?

2    A.  Be able to back up, defend or protect whatever it is,

3    whatever the issue is that you're bringing to the table or that

4    you're promoting.

5    Q.  Are you familiar with something within COBA called the

6    executive board?

7    A.  Yes.

8    Q.  What is COBA's executive board?

9    A.  The C O B A, COBA's executive board consists of at this

10   time of 15 members who are part of being responsible for the

11   running of the union and the day-to-day operation of the union.

12   Q.  Did that group meet periodically under Mr. Seabrook?

13   A.  Yes.

14   Q.  How would you describe Mr. Seabrook, how Mr. Seabrook

15   interacted with members of the executive board below him?

16   A.  I don't understand.  What do you mean?

17   Q.  Well, for example, how did Mr. Seabrook go about

18   presiding -- how would you describe how Mr. Seabrook presided

19   over meetings of the executive board?

20   A.  Well, he definitely presided over it.  He definitely

21   conducted them.  He definitely ran the meeting as the president

22   of the union is supposed to or should.

23   Q.  What do you mean by that?

24   A.  Well, if you're basically in charge of the meeting, you

25   call the meeting.  If there is an agenda, you address the

1   agenda.  If there are issues, you basically go around the

2   table.  He would usually say what do you have?  What do you

3   have?  What do you have?  And basically that interaction

4   between him and whichever particular board member is what it

5   would be.

6   Q.  Were there instances in which Mr. Seabrook and the other

7   members of the executive board below him disagreed in those

8   settings?

9   A.  Yeah, like every other board, yes, we definitely had

10  disagreements.

11  Q.  How or in what ways did Mr. Seabrook handle those

12  disagreements?

13  A.  I mean there were times where there might have been yelling

14  and screaming.  There were times when maybe it wasn't, but it

15  pretty much depended on the situation or the issue at hand.

16  Q.  When you say there might have been yelling and screaming,

17  specifically do you mean on Mr. Seabrook's part?

18  A.  Yes, on his part and at times on part of other board

19  members, depending on who they were.

20  Q.  What sorts of powers did Mr. Seabrook have over fellow

21  members of the executive board?

22  A.  Well, basically as the president of the union, all of the

23  executive board members performed duties that are prescribed to

24  them or assigned to them by the president of the union, and in

25  addition to whatever other duties is defined in our

1   Constitution and bylaws.

2           THE COURT:  Let's do this.  We are going to take our

3   30-minute break now.  Don't discuss the case amongst ourselves

4   or with anyone else.  Don't do independent research regarding

5   issues or parties in this case.  See you at 12:30.

6           (Jury excused)

7           THE COURT:  You can sit down.

8           So, counsel, let's do this.  First things first.

9   Let's talk about how to handle the situation with Juror No. 1.

10  Let me tell you what I plan to do and then let me hear what

11  counsel's thoughts are.

12          It seems to me what makes sense is to after the break,

13  bring Juror No. 1 out here, let Juror No. 1 know we have been

14  informed that there was an issue in which his mother's home

15  health care aid was hit by a car, and he needed to make some

16  arrangements, and I will ask him whether or not he was able to

17  make those arrangements.

18          If he says he was not able to make those arrangements,

19  my plan would be to make my robing room available to him and he

20  can use the phone in there, and he can use the internet service

21  in there in case he needs to look up anything.  That would be

22  my recommendation.  Do counsel have any other thoughts or

23  anything else you want me to do in this regard?

24          MR. BELL:  That sounds fine, your Honor.

25          MR. SCHECHTMAN:  My only question is if we do it after

1      the break and he is using the internet in there, we can take a

2      half hour, 45 minutes, and I wonder whether it makes sense to

3      do it at 2:30?

4              THE COURT:  We can do that, too.  At 2:30 he is done.

5      He can use his cell phone or whatever the case may be.  We can

6      do that, too.  I was trying to see if there is a way to

7      expedite it.  I understand.

8              I want to make sure.  I am not sure what arrangements

9      he needs to make, and if it is something where it is simply the

10     home health care aid worked for some sort of agency, if it is a

11     matter of contacting the agency and getting someone to sub as

12     his home health care aid, it shouldn't take that much time.  If

13     we get too long and it may be too late in the day to get a

14     substitute.  Let me hear from counsel.

15             MR. MAZUREK:  Judge, I am happy to give the gentleman

16     whatever he needs in order to accomplish that at 12:30 that

17     makes sense.

18             MR. BELL:  We are, too.  I acknowledge the possibility

19     that Juror No. 1 is attending to that now.  Whatever he needs

20     by the time we get to the other side of the break, we will be

21     reasonable.

22             MR. MAZUREK:  I think it may be on his mind and

23     distracting him while he is listening to the testimony.

24             MR. SCHECHTMAN:  I withdraw my suggestion.

25             THE COURT:  Then let's deal with the other matter.  Is

1    Ms. Hendon here and her client?

2              MR. CAPONE:  She must be in the -- perhaps we can come

3    back five minutes early and deal with it then.

4              THE COURT:  Yes, we can do that.  I don't know if it

5    will take five minutes.  You believe Ms. Hendon is here in the

6    building and her client is in the building?

7              MR. CAPONE:  Yes.

8              THE COURT:  I don't want to keep the jury waiting.

9    Why don't we try to deal with this at 12:20 and counsel can get

10   a 15-minute break.  Does that sound good to everyone?  See you

11   at 12:20.

12             (Recess)

13             THE COURT:  Hold on.  Is Ms. Hendon here?  Okay.  Is

14   your client here?

15             MS. HENDON:  He is.

16             THE COURT:  Let's bring him up here to the witness

17   stand.

18             MS. HENDON:  Judge, could I approach with the other

19   counsel before my client takes the stand briefly?  You may know

20   what I am going to ask and you may already have a ruling.  I

21   want to make sure you do.

22             THE COURT:  I believe I understand what your request

23   will be.  That request was relayed to me by the government this

24   morning.  That request is denied.  Let's have the witness,

25   putative witness take the stand.  Stand.  Raise your right

1   hand.

2    GILAD KALTER,

3         called as a witness by the Government,

4         having been duly sworn, testified as follows:

5              THE COURT:  You may have a seat.

6              Before we get into this, let me get a sense from

7   counsel for Mr. Kalter as to whether or not you have advised

8   your client to assert the Fifth Amendment and give me a sense

9   as to why?

10             MR. CAPONE:  Mr. Seabrook is not here.

11             MR. SCHECHTMAN:  I am happy to proceed on this issue.

12  I waive his appearance.

13             MS. HENDON:  I have so advised my client, your Honor.

14             My advice is based on the existence of another matter,

15  not the matter that your Honor's jury is hearing, of the matter

16  of United States versus Huberfeld, et al.  My understanding is

17  my client is a witness in that matter, but there is another

18  related matter as to which there may be subject matter overlap.

19             THE COURT:  Okay.  Let me get a sense from the

20  government as to the subject areas that you would like to go

21  into in terms of your direct examination of this witness.

22             MR. CAPONE:  The subject matters, your Honor, include

23  this witness' history of Platinum Partners, Murray Huberfeld's

24  history of Platinum, work with Murray Huberfeld for quite some

25  time and Platinum Partners and the predecessor firm, the

1  solicitation of the Correction Officers Benevolent Association

2  as to which this witness played a role, some information

3  regarding redemptions at Platinum Partners and other general

4  background information.

5          THE COURT:  Okay.  So let's do this.  Let's have Ms.

6  Hendon, if you can stand next to your client, and let's have

7  the government ask one general question regarding those subject

8  areas.  Lets see what the answers are.

9  GILAD KALTER,

10  DIRECT EXAMINATION

11  BY MR. CAPONE:

12  Q.  Mr. Kalter, have you been subpoenaed to testify today?

13  A.  Yes.

14  Q.  I would like to ask you questions today about your time at

15  Platinum Partners as well as Mr. Huberfeld and soliciting

16  clients as well as the benevolent association.  Are you willing

17  to answer those questions?

18  A.  No.

19  Q.  Why is that?

20  A.  I decline to answers based on my constitutional rights.

21          THE COURT:  Which one in particular?

22          THE WITNESS:  The Fifth Amendment.

23          THE COURT:  Okay.

24          MR. CAPONE:  I think that is suffices to invoke the

25  order, your Honor, that we ask you to sign.

1     THE COURT:  All right.  Since this witness has refused

2     on the basis of his privilege against self-incrimination to

3     testify or provide other information in a proceeding before a

4     Court of the United States, I, as the person presiding over the

5     proceeding, communicate to this witness an order issued under

6     18 U.S. Code 6002, and the witness may not refuse to comply

7     with this order on the basis of your privilege against

8     self-incrimination.  Do you understand?

9     THE WITNESS:  Yes.

10    THE COURT:  Have you, in fact, seen a copy of that

11    order?

12    THE WITNESS:  Yes.

13    THE COURT:  Is there anything further, counsel for the

14    government?

15    MR. CAPONE:  No, your Honor.

16    THE COURT:  Anything further, Ms. Hendon?

17    MS. HENDON:  No, your Honor.

18    THE COURT:  Anything from counsel for Mr. Seabrook or

19    Huberfeld?

20    MR. MAZUREK:  No, your Honor.

21    MS. LYNAUGH:  No, your Honor.

22    THE COURT:  All right.  We are finished then.

23    (Witness excused)

24    MR. BELL:  Should we get the witness, Mr. Husamudeen?

25    THE COURT:  Not yet.  We need to deal with the issue

1    with the juror before we bring the witness back in.

2                I thought about something else that may make sense to

3    ask this juror.  Again I will ask this juror whether or not he

4    has had an opportunity to make the phone calls or make contact

5    in terms of getting another home health care aid for his

6    mother, and if he has, then that is fine.  If he hasn't, as I

7    mentioned, I will let him use the robing room and the phone in

8    there and the internet there.

9                If he has or when he has, I am wondering, and I want

10   counsels' input on this, if it makes sense to get a sense of,

11   without getting too much in his mother's health care situation,

12   what time the home health care aid normally arrives or

13   something just to make sure this juror can get here at 9:00

14   o'clock.

15               If the juror can't get here at 9:00, or if it would be

16   better for the juror to get here at 9:30, I am willing to

17   adjust the schedule for tomorrow and have the jurors get here

18   at 9:30.  My only concern is if there is a brand new home

19   health care aid, I don't know what his mother's medical

20   situation is, it might be frightening to her to see some brand

21   new person there if he is not sort of there to make the

22   introduction.  Those are just thoughts that come into my mind.

23   I will give counsel a chance to think about that and let me

24   know if you think we should go into that a little bit.

25               (Continued on next page)

1          MR. SHECHTMAN:  I think, from the defense's point of

2    view, they're good thoughts and you should go into it.

3          MR. CAPONE:  We agree, your Honor.

4          THE COURT:  Okay.  All right.  Anything else?  I'll

5    come back out in two minutes at 12:30.

6          MR. BELL:  No, your Honor.

7          (Recess)

8          (In open court; Juror No. 1 present)

9          THE COURT:  Okay.  Hi.

10         JUROR:  Hi.

11         THE COURT:  My deputy informed me that your mother's

12   home healthcare provider was hit by a car yesterday.

13         JUROR:  Yes, sir.

14         THE COURT:  And that you needed to make some

15   arrangements for a replacement.  Were you able to make those

16   arrangements yet?

17         JUROR:  No.  I mean, I came straight over here today.

18   I couldn't do that.

19         THE COURT:  Okay.  So does the home healthcare aide

20   who usually works with your mother, do they work for an agency?

21         JUROR:  Yes, worked for an agency.

22         THE COURT:  So what we can do to help in this regard,

23   I can let you use my robing room.  We have internet service in

24   there, in case you need to look up the name of the agency.  You

25   can use the phone in there to make calls to try to set up the

 1  replacement.  Is that something that you'd be willing to do?

 2             JUROR:  I mean, I can wait until I get home because I

 3  have to figure out what's going on with her, if she probably

 4  already got somebody or they're already making arrangements.  I

 5  don't know, yet.  So I just know what happened yesterday.  I

 6  know they kind of lack on sending people.  Sometimes it can

 7  take a week or it could be three days, depending if they find

 8  somebody.

 9             THE COURT:  All right.  So if you want to make the

10  calls now, you can do that.  Would you want to do that now?

11             JUROR:  No.

12             THE COURT:  You want to wait until the end of the day?

13             JUROR:  Yes.

14             THE COURT:  Okay.  Let me get a sense, when the home

15  healthcare aide normally comes to see your mother, is there

16  someone else usually there besides the home healthcare aide and

17  your mother when the home healthcare aide arrives?

18             JUROR:  No.

19             THE COURT:  Okay.  But does your mother understand

20  what's happening?  I just want to make sure there's not a

21  situation where your mother is alarmed by a new person coming

22  in.  Does your mother understand what's happening?

23             JUROR:  Yeah, yeah.

24             THE COURT:  Okay.  So you're fine with making these

25  calls later?

1          JUROR:  Yes, definitely.

2          THE COURT:  So I just want to also make sure that none

3     of this is weighing on your mind so heavily that it's difficult

4     for you to --

5          JUROR:  I appreciate that.

6          THE COURT:  Are you still able to concentrate on

7     what's happening here?

8          JUROR:  Yes, definitely.

9          THE COURT:  All right.  Just hand the microphone to my

10    deputy for a second, step back to the jury room.  Don't discuss

11    with the other jurors what we've discussed out here.  Okay?

12         JUROR:  All right.

13         (Juror not present)

14         THE COURT:  Any further questions that counsel want?

15    I think we may be good here.

16         MR. BELL:  We are.

17         THE COURT:  And defense counsel?

18         MS. LYNAUGH:  We're fine, also, your Honor.

19         THE COURT:  Anything else anyone one wants me to do?

20         MR. BELL:  No, your Honor.

21         THE COURT:  So I guess what we should do -- well, what

22    my thinking now is trying to figure out whether or not it makes

23    sense to bring this juror out here just to say thank you for

24    telling us that, and then let him go in and then bring

25    everybody out, or if you think it makes sense, we can just

 1    bring all the jurors out at this point.

 2            He seems to be fine.  I don't think there's any need

 3    to have any further communication with him, but I just wanted

 4    to find out what counsel's view is.

 5            MR. BELL:  I think he's fine, your Honor.

 6            MS. LYNAUGH:  We agree, your Honor.

 7            MR. MAZUREK:  Bring in the full jury.

 8            THE COURT:  Let's get the witness on the stand and

 9    bring in the jury, and also, hold on.  It seems, again, my

10    other concern is it doesn't seem that there's any need to start

11    late.  It seems like we can start at 9:00.  Does counsel agree

12    with that?

13            MR. CAPONE:  Yes.

14            MS. LYNAUGH:  Yes.

15            THE COURT:  All right.  Let's bring the jury in.

16            (Jury present)

17            THE COURT:  Okay.  Please be seated.  Welcome back.

18    Let's continue with the case on trial.  Let's do another quick

19    audibility check on the mic.

20            MR. BELL:  Check one, two; check one, two.

21            THE COURT:  Can you give us a testing one, two, three?

22            THE WITNESS:  Testing one, two, three.

23            THE COURT:  Okay.  Again, any members of the jury, if

24    you have difficulty hearing at any point, just raise your hand,

25    let me know, and we'll make the necessary adjustments.

1          Another thing you should know.  This is a beautiful

2     building, it's an old building; so occasionally when it's very

3     windy outside, these windows are going to shake a little bit

4     and they're going to rattle a little bit, but they are secure

5     and you are safe.  Okay?

6          Go ahead, counsel.

7          MR. BELL:  Thank you, your Honor.

8     BY MR. BELL:

9     Q.  Good afternoon, Mr. Husamudeen.

10    A.  Good afternoon.

11    Q.  When we broke, you were discussing the way in which the

12    president can give members of the executive board some

13    assignments?

14    A.  Yes.

15    Q.  What are examples of some of those assignments?

16    A.  Some of those assignments can be, you can be assigned to

17    work with the -- let's just say chief of security.  You can be

18    assigned to work -- be responsible for a particular facility.

19    You can be responsible for dealing with the delegates, handling

20    whatever it is that the president assigns to you besides

21    whatever your duties are.

22    Q.  Are some of those assignments more demanding than others?

23    A.  I would say yes.

24    Q.  And in your experience, are some of those assignments more

25    widely desired than others?

1  A.  I would think that some are more desirable than others,

2  yes.

3  Q.  Who controls which executive board members get which

4  assignments?

5  A.  It's pretty much whatever is assigned to you, whatever your

6  duties are in the constitution and bylaws, and whatever is

7  assigned to you by the president.  So it would be the

8  president.

9  Q.  Are you familiar with something called release time?

10  A.  Yes.

11  Q.  And what, in the context of the executive board, does

12  release time refer to?

13  A.  Release time refers to executive board members who are

14  fully released from their duties of a correction officer, and

15  they're released to the union to perform whatever the duties

16  are assigned to them by the president or the executive board or

17  the constitution and bylaws.

18  Q.  Are you on release time as president of the Corrections

19  Officers Benevolent Association?

20  A.  Yes, I am.

21  Q.  Currently, are all of the members of the executive board on

22  release time?

23  A.  Yes, they are.

24  Q.  Was this also true with the executive board around the

25  2013, 2014 time frame?

1   A.  Yes, I -- yes.

2   Q.  Now, under release time, the executive board, how do the

3   executive board members get paid?

4   A.  The executive board members are paid a stipend by the

5   Correction Officer Union, and they're paid their regular salary

6   as a correction officer.

7   Q.  And who controls whether a given executive board member is

8   on release time or not?

9   A.  That comes from the office of the president.

10  Q.  And prior to your ascent to the role of president, would

11  that have been Mr. Seabrook who controlled that?

12  A.  Yes.

13  Q.  Now, when a correction officer, a member of the executive

14  board, is on release time, do they have to work at the jails

15  themselves?

16  A.  No.

17  Q.  Where do they work?

18  A.  They work out of the correction officers -- out of the

19  union office, and they're assigned field duties working out in

20  the field.

21  Q.  So I want to show you, and I think that we're just going to

22  put this on your screen to save me a bit of a journey.  What

23  are Government Exhibits 652 and 656?  Do you see those, sir?

24  A.  Yes.

25  Q.  Are you familiar with what's depicted in those pictures?

1   A.  Yes, I am.

2   Q.  And what's depicted there?

3   A.  One is a picture of the reception area in our main office

4   at 75 Broad, and the other is a picture of the conference room

5   at 75 Broad.

6   Q.  You mentioned 75 Broad.  Is that the location of COBA's

7   offices?

8   A.  Yes, the main office is located at 75 Broad Street in

9   Manhattan.

10  Q.  Is there an additional office?

11  A.  We have a satellite office in Queens, near Rikers Island.

12  Q.  Do Government Exhibits 652 and 656 fairly and accurately

13  depict their respective parts of COBA's offices?

14  A.  I'm sorry?

15          MR. SHECHTMAN:  I have no problem admitting these and

16  showing them to the jury.

17          THE COURT:  Okay.  They're in evidence.

18          (Government's Exhibits 652 and 656 received in

19  evidence)

20          MR. BELL:  Can we go ahead and publish 652 and 656.

21  And --

22          THE COURT:  Hold on a second.  For the jurors, do you

23  have that on your screens yet?

24          JURORS:  No.

25          MR. BELL:  It may take a moment, your Honor.

1    THE COURT:  You have it now?  Go ahead, counsel.

2    MR. BELL:  Thank you, your Honor.

3  BY MR. BELL:

4  Q.  And so I think you mentioned that the one on the left was

5  the reception area?

6  A.  Yes.

7  Q.  And what's that on the right, 656?

8  A.  On the right is the conference room.

9  Q.  Can we also show just to Mr. Husamudeen for the moment 657

10  and 658.

11    MR. SHECHTMAN:  Same thing, no problem showing these

12  and admitting them to the jury and showing.

13    THE COURT:  Okay.  Those are admitted.  Are you moving

14  to admit those in evidence?

15    MR. BELL:  We are, your Honor.

16    THE COURT:  Okay.  They're admitted without objection.

17    (Government's Exhibits 657 and 658 received in

18  evidence)

19    MR. BELL:  Can we publish 657 and 658 to the jury as

20  well?

21  Q.  Mr. Husamudeen --

22    THE COURT:  Hold on.  There's a little bit of a delay.

23  All right.  Do the jurors have it now?  Okay.  Go ahead.

24  BY MR. BELL:

25  Q.  Mr. Husamudeen, are you familiar with what's depicted here?

1   A.  Yes, I am.

2   Q.  And what do we see in 657 and 658?

3   A.  It's the office of the president at 75 Broad Street.

4   Q.  Thank you, Ms. Bustillo.  We can take those down.  Are you

5   familiar, within the language used by COBA and its executive

6   board, with the term "being sent back"?

7   A.  Yes.

8   Q.  And what does being sent back refer to?

9   A.  Well, that's a term that's used -- being sent back means

10  that your release time will be taken away, and you'll be sent

11  back to whatever your facility is or wherever it was you worked

12  before you were on release time.

13  Q.  And who has the power to send a member of the executive

14  board back to the jails the way you've described?

15  A.  The president.

16  Q.  Does the -- does being a member of the executive board come

17  with other perks or benefits that correction officers

18  ordinarily would not get?

19  A.  Yes.

20  Q.  What are some examples of these?

21  A.  You're provided a vehicle, a car, E-ZPass, gas card, things

22  of that nature.

23  Q.  And who controls whether an executive board member gets

24  access to those things?

25  A.  Well, ultimately, everything is controlled -- comes through

1  the office of the president, but those are things that pretty

2  much have come with the position.

3  Q.  Now, are you familiar with an individual named William

4  Valentin?

5  A.  Yes.

6  Q.  And how are you familiar with Mr. Valentin?

7  A.  He's a former board member.

8  Q.  Approximately when did he become a board member and when

9  did he stop?

10  A.  I believe he became a board member in 2010, 2010, 2012.

11  Q.  And when did he cease to be a board member?

12  A.  I believe around, if my memory is serving me correct, 2013,

13  2014.

14  Q.  Generally speaking, Mr. Husamudeen, how did Mr. Valentin

15  come to not be a member of the board anymore?

16  A.  He was -- he was brought up on charges, found guilty and

17  removed.

18  Q.  Without going into the substance of those charges, who

19  initiated charges against Mr. Valentin?

20  A.  If I recall, as a matter of fact, I believe it was the

21  president, but I'm not sure.

22  Q.  Was there a time when a vote was taken as to whether

23  Mr. Valentin should continue to receive his stipend?

24  A.  Yes.

25  Q.  Who initiated that vote?

1    A.   I believe it was the president, if my memory is serving me

2    correct.

3    Q.   Was that Mr. Seabrook at the time?

4    A.   Yes.

5    Q.   And are there rules that govern the activities of the

6    executive board and the union as a whole?

7    A.   Yes.

8    Q.   What are those rules?

9    A.   We are bound by the constitution and by laws of the COBA,

10   of the Corrections Officers' Benevolent Association.

11             MR. BELL:  And so, your Honor, at this time, I'd like

12   to read a stipulation.  It's Government Exhibit 1501.  It's

13   stipulated between the parties that, and then it references

14   several exhibits.  I'll note some of these now, but move for

15   the stipulation of the relevant exhibits to be admitted.  We

16   may refer back to the rest later.

17             It's agreed between the parties that Government

18   Exhibit 301 contains audited financial statements for the

19   Corrections Officers' Benevolent Association annuity fund,

20   fiscal year 2013, prepared by Buchbinder, Tunick and Company,

21   LLP.

22             Government Exhibits 303, 304 and 305 contain the

23   audited financial statements for the Corrections Officers'

24   Benevolent Association for fiscal years 2012 to 2013, 2013 to

25   2014, 2014 to 2015, respectively, prepared by the same entity.

1          Government Exhibits 309, 3312 are true and accurate

2     minutes of meetings of the Corrections Officers' Benevolent

3     Association annuity fund board of the trustees that occurred on

4     the dates set forth in the minutes prepared by counsel.

5          Government Exhibit 313 is a true and accurate copy of

6     an agreement of declaration of trust between COBA and the

7     trustees of the Corrections Officers' Benevolent Association

8     dated April 16th, 1998.

9          Government 314 contains the constitution and bylaws of

10    the Corrections Officers' Benevolent Association as of

11    January 2013, which has been in effect during the years 2013

12    through the present.

13         Government 401 is a true and accurate copy of a

14    private offering memorandum for Platinum Partners Value

15    Arbitrage Fund International Limited dated November of 2012.

16         Government 403 contains a true and accurate copy of a

17    subscription agreement signed side letter, form W9, which the

18    Corrections Officers' Benevolent Association annuity funds

19    subscribed to the Platinum Partners Value Arbitrage Fund

20    International Limited.

21         Government Exhibits 405 and 406 contain true and

22    accurate copies of a subscription agreement, signed side

23    letter, form W9, which by the Corrections Officers' Benevolent

24    Association, Inc. subscribe to the Platinum Partners Value

25    Arbitrage Fund International Limited.

1        Finally, Government 408 contains a true and accurate

2    copy of a subscription for additional interests by which the

3    Corrections Officers' Benevolent Association annuity fund made

4    an additional subscription to the Platinum Partners Value

5    Arbitrage Fund International Limited.

6        Stipulated and agreed that this stipulation,

7    Government 1501, and Government Exhibits 301, 303 through 305,

8    309, 3312, 401, 403, 405, 406 and 408 may be received in

9    evidence as government exhibits at trial, and it's signed by

10   the parties and dated October 23rd.

11       Your Honor, the government offers 1501 and the

12   referenced Exhibits 301, 303, 304, 305, 309, 3312, 401, 403,

13   405, 406 and 408.

14       THE COURT:  Okay.  So admitted.

15       (Government's Exhibits 1501, 301, 303, 304, 305, 309,

16   3312, 401, 403, 405, 406 and 408 received in evidence)

17       MR. BELL:  Thank you.  I'd ask Ms. Bustillo to publish

18   Government Exhibit 314.

19   BY MR. BELL:

20   Q.  And as we publish that, Mr. Husamudeen, I'm holding a hard

21   copy, just so you can get a sense of the thickness of the

22   document.  Hold on.

23       MR. BELL:  Do the jurors have it?

24       JUROR:  Yes.

25       THE COURT:  Go ahead.

1          MR. BELL:  Thank you, your Honor.

2     Q.  Are you familiar with Government Exhibit 314?

3     A.  Yes.

4     Q.  And how are you familiar with 314?

5     A.  This is the constitution and bylaws of the Corrections

6     Officers' Benevolent Association.

7     Q.  So, Ms. Bustillo, I'd ask if you could to take us to Page 3

8     of that document.

9          Which states:  Executive Board.  I'm going to ask you

10    about a number of the folks referenced here.  First of all, do

11    you recognize Mr. Seabrook at the top of the list?

12    A.  Yes.

13    Q.  And immediately below that, is that you, sir?

14    A.  Yes, it is.

15    Q.  I direct your attention to five persons down, there's an

16    individual listed next to Michael Maiello; do you see that?

17    A.  Yes.

18    Q.  And who is Mr. Maiello?

19    A.  He's the treasurer for the union.

20    Q.  And was he the treasure around the 2013, 2014 time frame?

21    A.  Yes.

22    Q.  Immediately below Mr. Maiello there is another individual,

23    Amelia Warner.  Do you recognize Ms. Warner?

24    A.  Yes.

25    Q.  Who is Ms. Warner?

1    A.  She's the financial secretary for the correction officer's

2    union.

3    Q.  I'd also like to direct your attention to the third from

4    the bottom, where it says William Valentin; do you see

5    Mr. Valentin?

6    A.  Yes.

7    Q.  Are you familiar with him?

8    A.  Yes.

9    Q.  Who is Mr. Valentin?

10   A.  He was -- he's a former board member, former corresponding

11   secretary for the union.

12   Q.  We will come back here in just a moment, but while we're

13   here, I'd ask that we publish first to Mr. Husamudeen,

14   Government Exhibits -- maybe we could do a four-way here,

15   Ms. Bustillo -- 711, 706, 707, and 703.

16          Are you familiar with the folks depicted here,

17   Mr. Husamudeen?

18          MR. SHECHTMAN:  No reason for those not to be

19   submitted to the record.

20          MR. BELL:  We offer them all.

21          THE COURT:  Okay.  They're admitted and for the

22   record.

23          (Government's Exhibits 711, 706, 707, and 703 received

24   in evidence)

25          MR. BELL:  Can you publish them?

1    Q.  And who is that?

2            THE COURT:  Just hold on a second.  Okay.  Go ahead,

3    counsel.

4            MR. BELL:  Thank you, your Honor.

5    Q.  Mr. Husamudeen, who is that in the upper left, in 711?

6    A.  That's Norman Seabrook.

7    Q.  In the upper right?

8    A.  Michael Maiello.

9    Q.  And the lower left?

10   A.  Amelia Warner.

11   Q.  And who is that in the lower right?

12   A.  Elias Husamudeen.

13   Q.  And that's you?

14   A.  Yes, sir.

15   Q.  Can we go back to 314, Ms. Bustillo, and back to that

16   executive board page.

17           Now, Mr. Husamudeen, was this always the composition

18   of the executive board?

19   A.  No, sir.

20   Q.  Was there a time when it changed?

21   A.  Yes.

22   Q.  How did the board's composition change?

23   A.  We went from ten board members to 15 board members.

24   Q.  And what were the circumstances under which that expansion

25   took place?

1  A.  We -- it was put out to a vote of the members of the union

2  to expand the executive board.  It was voted and approved, and

3  the executive board went from ten board members to 15 board

4  members.

5  Q.  And did that come with any costs to the union?

6  A.  Yes, it did.

7  Q.  What was the nature of the costs?

8  A.  Well, when it happened, at that time, we didn't have what's

9  called release time for the five additional members; so there

10  was a cost involved that we had to pay the city for that

11  release time.

12  Q.  And were the new board members all on release time once

13  their positions came into existence?

14  A.  Yes.

15  Q.  I want to direct your attention now --

16         MR. SHECHTMAN:  Judge, could we just get a date on

17  when that happened?

18         THE COURT:  Sure.

19  Q.  When did that change take place, Mr. Husamudeen,

20  approximately?

21  A.  I believe it was -- actually, I don't even -- I believe it

22  was 2013 -- When the five additional people came on?

23  Q.  Yes, sir.

24  A.  I believe it was around about 2010, I believe 2010.

25  Q.  When that --

1   A.  I could be wrong.

2   Q.  When that happened, was there a change to the union's

3   constitution?

4   A.  Yes.

5   Q.  All right.  We may come back to that in a moment.  For the

6   moment, let me direct your attention to Page 6 of this

7   document, Ms. Bustillo, and let's focus in on the article two.

8           I'm going to read portions of this to you,

9   Mr. Husamudeen.  It says:  The objectives and purposes of the

10  association shall be to organization and represent all persons

11  performing the duties of correction officer under the

12  jurisdiction of New York City Department of Correction; to

13  assist its members in obtaining due recognition and appropriate

14  compensation for their professional work as correction officers

15  and in improving the conditions under which they work; to

16  promote the social welfare of its members; and to foster the

17  advancement of the professional skills of its members as

18  correction officers.

19          Let's pause there.  What sorts of things did the union

20  do to advance the professional skills of its members,

21  Mr. Husamudeen?

22  A.  To foster the advancement of professional skills of its

23  members.  Well, one of the things that we do and did is involve

24  ourselves with training and recommending the different types of

25  training that we feel that our members would have benefited

1    from, such as example, additional mental health training in

2    dealing with mentally ill inmates, and just training in

3    whatever we felt would actually enhance or help us in our --

4    perform our duties as corrections officers.

5    Q.  I want to now direct your attention to Page 13 of the same

6    document.  Ms. Bustillo, Article VI.  That's the I if I

7    remember right from school.  It concerns the executive board.

8    We're going to do the same thing here.

9            Section 1, labeled Powers reads:  The executive board

10   of the association shall be composed of the elected officers of

11   the association.  It shall be the governing body of the

12   association, except when meetings of the association are in

13   session.  All matters affecting the policies, aims and means of

14   accomplishing the purposes of the association shall be decided

15   by the executive board unless this constitution provides

16   otherwise.

17           Section II concerns meetings.  The executive board

18   shall meet on the third Wednesday of each month, except that

19   the president may change the date of any meeting on sufficient

20   notice.

21           Was there a time, Mr. Husamudeen, at around that 2013,

22   2014 window, where the frequency of meetings changed?

23   A.  We had weekly meetings.  We had monthly meetings.  We met

24   Mondays, Fridays.  I mean, we had meetings; so the frequency

25   would have changed.

1    Q.   And who generally called meetings, Mr. Husamudeen?

2    A.   The president.

3    Q.   It goes on.   The president may call other meetings of the

4    executive board whenever, in his or her judgment, the interests

5    of the association demanded it, upon notice which states the

6    purpose of the meeting.   A quorum shall consist of nine

7    members.

8         I want to skip down to section 4.   The executive board

9    shall receive from the president, in advance of each fiscal

10   year, a proposed budget for the coming year.   Such proposed

11   budget shall be subject to revision and approval by two-thirds

12   vote of the executive board at a regular or special meeting

13   thereof is modified from time to time.

14        During the time that Mr. Seabrook was president, who

15   would introduce the budget?

16   A.   The president.

17   Q.   Let's switch out from the executive board section,

18   Ms. Bustillo, and move back to Page 10.

19        Article V says:   Duties of executive officers, and

20   reads:   Section one, the president.   The president shall be the

21   chief executive and administrative officer of the association

22   and shall conduct the affairs of the association in accordance

23   with this constitution and with the decisions of the membership

24   and the executive board.   He shall preside at all meetings of

25   the association and the executive board.

1          He or she shall, with the approval of the executive

2     board, maintain suitable offices for the transaction of

3     association business.  He or she shall, under policies adopted

4     by the executive board, employ, terminate, fix the compensation

5     and expenses and direct the activities of such office and field

6     staff as are required to effectively carry out the functions of

7     his or her office.

8          And Section D says:  He shall sign or countersign, as

9     the case may be, all checks, authorization for expenditures,

10    contracts and other official documents of the association.

11         Under Mr. Seabrook, Mr. Husamudeen, how did you

12    understand the countersigning process of checks to work?

13    A.  Well, our system out, we have a two-signature check.  It

14    requires the signature of the president, and it requires the

15    signature of the treasurer; so the countersign is that

16    signature.

17    Q.  And would that have been Mr. Maiello?

18    A.  Yes.

19    Q.  Now, I want to direct your attention to Page 11 of the same

20    document.  This concerns the treasurer.  If we could look at

21    just the first.  Thank you.  It says:  The treasurer shall keep

22    regular books of the account of the association, which books

23    shall be subject to inspection by any member of the executive

24    board upon reasonable notice.  His or her accounts shall, at

25    all times, be subject to the examination and audit by the

1    president or his or her designee.

2            I want to skip now, Mr. Husamudeen, down to section c,

3    which says:  He or she shall maintain the following separate

4    accounts.

5            Reference is made immediately underneath to the

6    general fund.  Are you familiar with the general fund,

7    Mr. Husamudeen?

8    A.  Yes.

9    Q.  And what was the general fund?

10   A.  The general fund is the dues account.

11   Q.  And when you say the dues account, what do you mean?

12   A.  The general fund, when we collect dues from our members,

13   the dues that are collected goes into what's called a general

14   fund.

15   Q.  Is the general fund also known as the COBA, Inc. account?

16   A.  Yes.

17   Q.  And did it -- where did those dues ultimately go?  What was

18   the purpose of the dues?

19   A.  The general fund, the dues account is for the operation of

20   the union.  It's for the day-to-day operations, for paying the

21   rent, it's for paying the telephone bill, it's for paying for

22   the cars, it's for paying for legal services.  It pays for the

23   day-to-day operation of the union.

24   Q.  Are you familiar, in the context of that operating account,

25   with something called the reserve?

1    A.   Yes.

2    Q.   What was the reserve?

3    A.   Well, in each one of the accounts -- well, in the general

4    fund, in particular, what we have is a reserve fund, and that's

5    actually any monies that are not used.  It ends up -- we call

6    it a reserve.  It's in the account, but it ends up in the

7    reserve fund.

8    Q.   What's --

9    A.   Meaning it's there for whatever else we have to do, as far

10   as the union is concerned.

11   Q.   What are some circumstances under which the union might

12   have to draw upon the reserve?

13   A.   Well, if the -- if the amount of money or dues that we take

14   in for the month isn't enough to cover the amount of the

15   expenditures, then we would reach into the reserves to cover

16   that.

17   Q.   Who made decisions with respect to the money in the

18   operating account or general fund account?

19   A.   Ultimately, the president does.

20   Q.   Did the operating account have trustees?

21   A.   The members of the executive board, in this particular

22   case, are the trustees of the general fund.

23   Q.   And the president, you mentioned, of course, submitted a

24   budget.  Did that budget pertain to the operating account?

25   A.   Yes, it does.

1    Q.  Now, in the years prior to 2014, was the money in that

2    operating account money that was invested for growth purposes?

3    A.  In the years prior to that, no.  Well, they were invested,

4    but they were only invested in things such as a money market

5    account or certificate of deposit, that type of stuff, but not

6    invested.  It's not a fund for investment.  It's a fund for the

7    operation of the union.

8    Q.  And the things that the fund was invested in that you

9    mentioned, money marketing accounts, things of that sort, were

10   those generally conservative investments --

11   A.  Yes.

12   Q.  -- or aggressive investments?

13   A.  Yes.

14   Q.  What was the purpose of those modest investments?

15   A.  The purpose of having the money market or a CD or

16   certificate of deposit was just not to have that amount of

17   money sitting in a checking account, such as a

18   non-interest-bearing checking account, things of that nature.

19   Q.  Prior to 2014, was that money, to your knowledge, ever put

20   in a hedge fund?

21   A.  No.

22   Q.  Prior to 2014, was that money ever put in any sort of

23   aggressive investment vehicle or instrument?

24   A.  No.

25   Q.  Was there a reason why not?

1   A.   It's for the operation of the union.  It's not for -- the

2   dues account, the general fund is not for investment.  It's for

3   the operation of the day-to-day, the business of the union.

4   Q.   I want to direct your attention back to the screen and two

5   slots under general fund reference is made to the annuity fund;

6   do you see that, sir?

7   A.   Yes, I do.

8   Q.   What is the annuity fund?

9   A.   The annuity fund is a benefit that was negotiated by the

10  union on behalf of correction officers, and the city makes

11  contributions to the union on behalf of each member and the

12  annuity fund.  The trustees of the annuity fund is responsible

13  for investing this money, and correction officers, when they

14  retire or get promoted or leave the job, they get this money.

15  It's sort of like a pension supplement.

16  Q.   So what would happen with respect to the annuity fund when

17  an individual correction officer retired?

18  A.   When an individual correction officer retired, he or she

19  would receive whatever their share of the annuity fund is and a

20  check.

21  Q.   And what was the purpose of that payout?

22  A.   That was a benefit that was negotiated for our members.  It

23  acts as a pension supplement.

24  Q.   Where did the money in the annuity fund come from?

25  A.   It came from the contributions from the City of New York.

1    Q.  Now, I think you mentioned the board of trustees a moment

2    ago.  Who made decisions with respect to the annuity fund?

3    A.  Decisions were made by the annuity fund board of trustees.

4    Q.  And who were the members of the annuity fund board of

5    trustees, position-wise?

6    A.  The member -- the board of trustees on the annuity fund was

7    the president of the union, the first vice president, the

8    secretary and the treasurer.

9    Q.  And so I want to direct your attention now to that same

10   window, 2013, 2014.  Do you recall who the members of the

11   annuity fund board of trustees were at that time?

12   A.  The same four people.  Norman Seabrook, Elias Husamudeen,

13   Michael Maiello and Amelia Warner.

14   Q.  Now, did the board of trustees for the annuity fund have

15   assistance in making its decisions as to what to do with the

16   money?

17   A.  Yes.

18   Q.  From whom?

19   A.  I don't understand.

20   Q.  Sure thing.  You mentioned a moment ago that the members of

21   the board of trustees for the annuity fund had assistance in

22   making decisions.  Who provided that assistance?  Who helps the

23   members of the annuity fund board of trustees make their

24   decision?

25   A.  Oh, we, the annuity fund, hired, you know, professionals to

1   assist us in doing that.  We had a fund attorney that assists

2   us.  In addition to that, we have a consultant, an investment

3   consultant that assisted us in making decisions about

4   investments.

5   Q.  And so let me ask about each of those.  You mentioned that

6   there was an attorney for the fund.  Who was the --

7   A.  Yes.

8   Q.  -- attorney for the fund?

9   A.  The attorney for the fund was Koehler & Isaacs, Howard

10  Wien.

11  Q.  I'm sorry, you mentioned Howard Wien?

12  A.  On behalf of Koehler & Isaacs, yes, Attorney Howard Wien,

13  and Richard Koehler.

14  Q.  And is Koehler & Isaacs a law firm?

15  A.  Yes, it is.

16  Q.  You also mentioned that there would be a consultant or

17  advisor.  Around 2013 and 2014, who was that?

18  A.  That was Reynolds Consulting Company or Corporation, Thomas

19  Reynolds.

20  Q.  And who was Mr. Reynolds?

21  A.  He is, I believe, the owner of Reynolds Consulting.

22  Q.  And was he the point person at the Reynolds Company?

23  A.  Yes.

24  Q.  Now, how long had you been on the annuity fund board by the

25  time 2014 came around?

1   A.  I've been a member of the board of trustee on the annuity

2   fund since 1995.

3   Q.  How had annuity fund money been invested prior to 2014?

4   A.  We invest in stocks, bonds, convertibles, real estate,

5   things of that nature.

6   Q.  In your experience from 1995 up until 2014, had the annuity

7   fund board of trustees ever invested in a hedge fund?

8   A.  No, we didn't.

9   Q.  Now, you mentioned that it was invested in stocks and bonds

10  and the like.  Were there outside entities with whom -- who

11  managed the annuity fund board's money?

12  A.  Yes.

13  Q.  Who were those outside entities prior to 2014?

14  A.  Prior to 2013?

15  Q.  Prior to 2014.  So up until 2014?

16  A.  We had --

17  Q.  I'll ask specifically about like in 2013 or so, what

18  outside managers managed the annuity fund's money?

19  A.  At that time, we had, I believe, three money managers.  One

20  company was called Wright Investors, another company was Advent

21  Capital, and the third company was real estate,

22  Intercontinental Real Estate Investment Company.

23  Q.  Were there rules that governed the annuity fund's

24  activities?

25  A.  Yes.

1   Q.  I'm going to now direct your attention to Government

2   Exhibit 313, which is in via the stipulation that I read

3   earlier.  Are you familiar with Government's Exhibit 313, sir?

4   A.  Yes.

5   Q.  How are you familiar with 313?

6   A.  This is the trust agreement between the City of New York

7   and the correction officers union.

8   Q.  And what did this -- what was the importance of this

9   document, as a trustee for the annuity fund?

10  A.  Well, this document pretty much explained the roles of the

11  trustees and the powers of the trustees and what the trustees

12  are responsible for, not responsible for.

13  Q.  So I'd like for you, Ms. Bustillo, if you could, to first

14  direct us to Page 3 of that document.

15          How are we doing, jury, can you see?

16          JUROR:  Yes.

17          MR. BELL:  Thank you very much.

18  Q.  I want to direct your attention to where it says section 1.

19  Ms. Bustillo, can we highlight the first two full sentences.

20          Section 1:  In accordance with the collective

21  bargaining agreements between the City of New York and COBA, as

22  the representative of all correction officers employed by the

23  City of New York, a trust fund is hereby established, which

24  shall be known as the annuity fund of COBA of the City of

25  New York, herein called the fund.

1          The purpose of the fund shall be to receive monies

2     paid to it by the City of New York, as well as such other

3     property as may be transferred to the fund as authorized

4     herein, and to use the same to provide annuity fund benefits

5     for eligible correction officers and their beneficiaries, all

6     in accordance with the terms of this agreement, and of such

7     agreements between the COBA and the City of New York as may

8     from time to time govern the use of monies provided by the city

9     for the fund.

10         I now want to direct your to the next page, section 2,

11    trustees.  Thank you, Ms. Bustillo.  The first couple of

12    sentences of this section read:  The fund shall be administered

13    in accordance with the provisions of this agreement by four

14    trustees, who shall be persons holding office as the president,

15    first vice president, treasurer, and financial secretary of the

16    COBA, for as long as they each shall hold office, provided that

17    any trustee may refuse to serve or may resign at any time by

18    mailing or delivering written notice of such refusal or

19    resignation to the COBA.  Any vacancy among the trustees

20    resulting from a vacancy in the office of the president, first

21    vice president, treasurer or financial secretary of COBA, or

22    resulting from a refusal or resignation by any such officer of

23    the COBA to serve as trustee, may be filled by designation of

24    the president of the COBA or if the office of the president

25    shall be vacant, then by designation of the first vice

1    president of the COBA.

2           During the time when Mr. Seabrook was president of the

3    union, was he a member of the annuity fund board of trustees

4    continuously?

5    A.  Yes.

6    Q.  Now, I want to direct your attention to Page 10 of that

7    document.  One moment.  And just section, yes, Page 10 -- thank

8    you, Ms. Bustillo, and can you highlight section 7(a).  The

9    trustees shall meet regularly at any semiannual or more

10   frequent intervals as they may determine; or at the call of any

11   two trustees, on at least two days' notice to all of the

12   trustees, delivered personally or by certified or registered

13   mail, or at any time, by the consent in writing of all of the

14   trustees.

15          As a general matter, Mr. Husamudeen, who called the

16   meetings of the annuity fund board of trustees?

17   A.  The chairman, which is the president of the union.

18   Q.  And was that Mr. Seabrook?

19   A.  Yes.

20   Q.  And, finally, here, with respect to meetings, as a general

21   matter, who attended these meetings?

22   A.  The meetings were attended by the trustees, the fund

23   attorneys and the investment consultant and, at times, we would

24   bring in the managers, the money managers.

25   Q.  Were there times when you would hear from prospective new

1   money managers at these meetings?

2   A.   Yes.

3   Q.   And generally what would happen at those meetings?

4   A.   Generally, at those meetings, they would come in with their

5   PowerPoint, make a presentation to the trustees, explaining to

6   us or detailing to us about their companies, about the assets

7   and how well they've done for other clients or how well their

8   fund, or whatever it is they're investing, that they're

9   selling.

10  Q.   What did you understand the purpose of those presentations

11  to be?

12  A.   The purpose of those presentations is to get the trustees

13  to invest monies and have them manage the monies.

14  Q.   Now I want to direct your attention to one more part of

15  this document.  On Page 19, section D, it says here:  The

16  trustees of the fund shall be responsible in a fiduciary

17  capacity for all money, property, or other assets received,

18  managed or disbursed by them or under their authority on behalf

19  of such fund.

20       Mr. Husamudeen, what did you understand it to mean

21  that you were serving as a fiduciary?

22  A.   Basically what it just said, that we are responsible for

23  investing the money and ensuring that the money is safe, and

24  pretty much that's it.

25  Q.   Did you understand the other members of the board of

1    trustees to also be fiduciaries?

2    A.  Yes.

3    Q.  Did that include Mr. Seabrook when he served on the board?

4    A.  Yes.

5    Q.  Now, let's take that down.  Thank you, Ms. Bustillo.

6         Did there come a time when you came to hear of a hedge

7    fund called Platinum Partners?

8    A.  Yes.

9    Q.  In what context, Mr. Husamudeen, did you first hear of

10   Platinum Partners?

11   A.  They came and made a presentation to the board of trustees.

12   Q.  Had you arranged that presentation?

13   A.  No.

14   Q.  I want to focus your attention on that meeting.

15   Approximately when did it take place?

16   A.  January 2014.

17   Q.  And had you -- and prior to that meeting, had you ever

18   heard of the Platinum Partners hedge fund?

19   A.  No.

20   Q.  Prior to that meeting, were you aware of any plans that the

21   annuity fund board had to invest in a hedge fund?

22   A.  No.

23   Q.  Prior to that meeting, had you heard of a person named

24   Murray Huberfeld?

25   A.  No.

1   Q.  Mark Nordlicht?

2   A.  No.

3   Q.  Gilad Kalter?

4   A.  No.

5   Q.  Andrew Kaplan?

6   A.  No, sir.

7   Q.  Uri Landesman?

8   A.  No.

9   Q.  Who was present for the presentation?

10  A.  Three -- three gentlemen from Platinum.  I can't recall

11  their names, but they came to make the presentation.

12  Q.  And about how long would you say the presentation was?

13  A.  I don't know.  Roughly no more than an hour.

14  Q.  What sorts of things did the people from Platinum say --

15  before we get there, where did this presentation take place?

16  A.  At the COBA headquarters.

17  Q.  What kinds of things did the Platinum folks say during that

18  presentation?

19  A.  Pretty much the same thing that everybody else says, this

20  is our company, this is what we do, this is what we invest in,

21  this is how we perform from this time to this time, or how

22  we've performed over the years, and pretty much promising to do

23  the exact same thing for us, if we agree to hire them.

24  Q.  Did anyone from the board of trustees itself, do you

25  recall, ask questions during that presentation?

1    A.  I don't recall.

2    Q.  Now, after the Platinum people were finished with their

3    presentations, where did they go?

4    A.  They left.

5    Q.  After they leave -- after they left, was there a discussion

6    about what you had just heard in the presentation?

7    A.  Yes.

8    Q.  Who was present for that discussion?

9    A.  The fund attorney, the investment consultant and the

10   trustees.

11   Q.  And what, if anything, did the board determine during that

12   discussion?

13   A.  If I recall, we made a determination that once they're

14   vetted by the fund attorney and the investment consultant, if

15   they check out, that we would invest money with them.

16   Q.  Now, who among the board members had proposed that specific

17   course of action during that discussion?

18   A.  The president.

19   Q.  Mr. Seabrook?

20   A.  Yes.

21   Q.  Was there a discussion of how much they might invest?

22   A.  I believe we -- it was determined to be up to 10 million or

23   $10 million, a 10-million-dollar investment.

24   Q.  And do you recall who among the board members first

25   broached that amount?

1    A.  The president.

2    Q.  Mr. Seabrook?

3    A.  Yes.

4    Q.  Did anyone disagree with him?

5    A.  No.

6    Q.  And so at the conclusion of that conversation, what

7    happened, what was decided?

8    A.  At the conclusion, it became the responsibility of the fund

9    attorneys to vet the company to ensure that they actually

10   exist, along with the investment consultant, to ensure that

11   they -- that they actually are within the rules, as far as the

12   SEC and all the other things, and that was the duty of the fund

13   attorney and the consultant.

14   Q.  At the conclusion of that meeting, did you expect that once

15   the lawyers and advisors checked out Platinum Partners, that

16   you would hear from them one way or the other?

17   A.  That's usually how it was done.

18   Q.  Was it your expectation that that's how it would be done

19   that time?

20   A.  The way we -- the way it was normally done, they would vet

21   the company, check the company out, and they would come back

22   and we would have discussion, and then we would make a

23   determination as to whether we're going to invest or not.

24   Q.  Is that what happened this time, to your knowledge?

25   A.  No.

1    Q.  Now, at the time of -- what did happen, sir?  Did there

2    come a time -- withdrawn.

3           At the time of this meeting, did you have any reason

4    to believe that Mr. Seabrook was profiting personally in any

5    way from COBA's potential investments in Platinum Partners?

6    A.  No, no.

7    Q.  What knowledge, if any, did you have of any agreement

8    between Seabrook and anyone affiliated with Platinum Partners?

9    A.  None.

10   Q.  Now, does the annuity fund board of trustees regularly keep

11   minutes?

12   A.  Yes, we kept minutes.

13   Q.  Who prepared those minutes?

14   A.  Those minutes were prepared by the fund attorney.

15   Q.  And as a general matter, were you able to review those

16   minutes?

17   A.  I'm sorry?

18   Q.  Were you able to review those board meeting minutes?

19   A.  Yes, those minutes are usually reviewed at the next

20   meeting.

21   Q.  So I want to direct your attention to Government

22   Exhibit 310, which was admitted via stipulation.  These are

23   further stipulation minutes from the board meeting held on

24   January 13th, 2014.  Does that match with your understanding of

25   when that presentation took place?

1    A.   Yes.

2    Q.   So I want to direct your attention first to where it says

3    at the top the trustees present, and which trustees were

4    present?

5    A.   Norman Seabrook, the chair, myself, Elias Husamudeen,

6    Michael Maiello and Amelia Warner.

7    Q.   Thank you.  Take that part down.

8             Now can we go to the next page and can we focus in on

9    the section Roman VI, new business:  I'll read a portion of it.

10   Uri Landesman Gilad Kalter and Andrew Kaplan made a proposal

11   for Platinum Partners.  Platinum offered hedge fund financial

12   products, one of which the value arbitrage fund was being

13   offered to the annuity fund.  Although Platinum was not a fund

14   of funds, nor did they have any labor union clients, the

15   trustees felt the record of returns and reputation of the firm

16   warranted further investigation.

17            So far, Mr. Husamudeen, does that comport with your

18   memory of what happened?

19   A.   As far as I can recall, yes.

20   Q.   I'll continue to read.

21            Mr. Reynolds and Mr. Wien were instructed to perform

22   due diligence and to report back to the chair with their

23   results.  Do you see that part, sir?

24   A.   Yes, I do.

25   Q.   As a general matter, when due diligence was instructed,

1    were the lawyers and investment advisers told to report back to

2    the chair?

3    A.   Like I said earlier, usually they would report back to the

4    board.  We would have a meeting to discuss their findings and

5    then we would make a determination as to how we were going to

6    proceed.

7    Q.   Do you recall Mr. Reynolds and Mr. Wien being instructed to

8    report back to specifically to the chair as opposed to the

9    board at that meeting?

10   A.   No, honestly I don't recall.  Usually, like I said, the

11   process is they report back to us.

12   Q.   It then continues.  In the event the advisers find the

13   investment be prudent, the chair was authorized to invest up to

14   $10 million, to be taken from assets held by Wright with

15   Platinum.

16        Again does that comport with the chair being

17   authorized to invest in accord with your recollection of what

18   happened?

19   A.   Again, the process was usually you report back to the Board

20   of Trustees, we make a review, we look at it and we make a

21   determination and we proceed from there.

22        This particular, I don't really recall, to be honest

23   with you, as far as this is concerned.

24        MR. BELL:  At this time I would like to read another

25   stipulation.  It is labeled Government Exhibit 1513.  I will

1    read portions of it now and look to admit the relevant

2    documents.

3         It is agreed between the parties that:  On or about

4    October the 30th, 2015, a search warrant was issued by United

5    States Magistrate Judge for the email account Jona, J 0 N A, at

6    JRS cap dot com hosted by Intermedia.  Government exhibits --

7    and there is a list of them -- are true and correct copies of

8    emails, attachments to those emails, contact entries and

9    calendar entries from e-mail account Jona as JRS cap dot com,

10   provided by Intermedia, in response to the third part.

11        There is another list of exhibits that says those are

12   true and correct copies of emails and attachments to those

13   emails sent to and/or from employees of Platinum Partners as

14   indicated in the emails that were provided to the government

15   pursuant to subpoenas served on Platinum Partners.

16        There is another smaller set of emails that says these

17   government exhibits are true and correct copies of emails and

18   attachments to those emails sent to and/or from employees of

19   Platinum Partners as indicated in the emails that were obtained

20   from servers at Platinum Partners.

21        Then there is another set of true and correct copies

22   of emails and attachments to those emails sent to and/or from

23   employees or officers of the Correction Officers Benevolent

24   Association as indicated in the emails that were provided to

25   the government pursuant to subpoena served on the Correction

1   Officers Benevolent Association.

2           Finally, Government Exhibit 1071 is a true and correct

3   copy of an email sent to Thomas Reynolds that was provided to

4   the government pursuant to a subpoena served on Mr. Reynolds.

5           It is further stipulated and agreed that this

6   stipulation, which is Government Exhibit 1503, may be received

7   into evidence as a government exhibit at trial.  It is signed

8   by the parties and dated October 23rd.

9           Your Honor, the government offers the stipulation

10  itself which is 1503.

11          THE COURT:  Okay.  Before you go, counsel, let me give

12  the jurors another instruction.  We provided you with notepads

13  and pens for you to take notes.  Let me give you an instruction

14  on note-taking.

15          Please keep your notes to yourself until you and your

16  fellow jurors go into the jury room to decide the case and

17  don't let your note-taking distract you such that you don't

18  hear the answers by witnesses.  When you leave at night, leave

19  the notes in the jury room.  No one is going to look into the

20  notebooks.  They're going to be left there.

21          My Deputy will gather the notebooks and they will be

22  safeguarded.  If you choose not to take notes, remember you

23  should rely on your own memory of what has been said and do not

24  be influenced by notes of other jurors.  Some people remember

25  better when they don't take notes and not everyone is a good

1    note-taker.  That doesn't mean those notes are a better

2    reflection of what happened in court than your memory is, and

3    again at the end of the case if there is any dispute about what

4    happened here in court, we have some very hard working and

5    talented Court Reporters who are taking everything down.

6              Go ahead, counsel.

7              MR. BELL:  Would this also be a good time for your

8    standard instruction of what stipulations are?

9              THE COURT:  Sure.  Let me just give you, a stipulation

10   is an agreement by the parties.  So items that are stipulated

11   to means the lawyers have agreed that those items should come

12   into evidence and those stipulations count as evidence.  So

13   basically I will give you a more detailed definition of

14   stipulations later, but stipulations is basically just fancy

15   legal talk for an agreement between the parties.  Okay?

16             Go ahead, counsel.

17             (Government Exhibit 1503 received in evidence)

18             MR. BELL:  Ms. Bustillo, I ask for you to put on

19   Mr. Husamudeen's screen Government Exhibit 1027.  Government

20   1027 was one of the exhibits in the stipulation mentioned as

21   having been to or from employees of Platinum Partners that were

22   provided to the government via subpoena.

23   BY MR. BELL:

24   Q.  Mr. Husamudeen, you're not a party to this email, are you?

25   A.  No.

1    Q.  I want to direct your attention --

2              THE COURT:  Make sure you use the microphone.

3              THE WITNESS:  Sorry.

4              MR. BELL:  Thank your Honor.

5              MR. SCHECHTMAN:  Judge, we are fine with the jury

6    seeing this to make it easier.

7              THE COURT:  Thank you.  Are you moving this into

8    evidence?

9              MR. BELL:  The government offers 1027.

10             THE COURT:  Any objection?

11             MR. MAZUREK:  No objection.

12             THE COURT:  It is in.

13             (Government Exhibit 1027 received in evidence)

14   BY MR. BELL:

15   Q.  And so this is an email from individuals named David

16   Ottensoser to Gilad Kalter.  Mr. Kalter was one of the folks

17   mentioned empty minute meeting?

18             THE COURT:  Do the jurors have that?

19             MR. BELL:  Sorry, your Honor.

20   BY MR. BELL:

21   Q.  My update is a little better on the screen than the jury

22   does.  My apologies.  This is an email from David Ottensoser to

23   Gilad Kalter.  Mr. Kalter was mentioned in the board meetings

24   and it is dated February 5, 2014.  The subject is Platinum

25   Partners value arbitrage fund and Correction Officers

1    Benevolent Association annuity fund.

2              I want to direct your attention to the bottom field

3    where it is from Howard Wien and Koehler & Issacs email

4    address.  Who is Mr. Wien?

5    A.  He is an attorney for Koehler & Issacs, a fund, one of our

6    fund attorneys.

7    Q.  It is copied to Norman Seabrook, Richard Koehler and Tommy

8    Reynolds.  Do you see that?

9    A.  Yes.

10   Q.  Once again, who is Mr. Koehler?

11   A.  Richard Koehler is the partner in Koehler & Isaccs.

12   Q.  And Mr. Reynolds?

13   A.  Reynolds is Tommy Reynolds from Reynolds Consulting.

14   Q.  Are you a recipient on that email?

15   A.  No.

16   Q.  Are any other of the trustees other than Mr. Seabrook?

17   A.  No.

18   Q.  The field then reads:  Attached are comments and requests

19   for individual information with respect to your proposal to the

20   COBA Annuity Fund.  Renew and contact me at your earliest

21   convenience to discuss further.  Thank you.  At which point Mr.

22   Landesman forwards it further and says let's get this turned

23   around ASAP.

24             I want to direct your attention to the attachment.  Go

25   to Page 2 of that document.  This is a letter, dated February

1    5, 2014.  Can we highlight the date, please.  It is from

2    Koehler & Isaccs law firm to Uri Landesman, Andrew Kaplan and

3    Gilad Kalter at Platinum Partners Value Arbitrage Fund.  Do you

4    see that?

5    A.  Yes.

6    Q.  If we can very briefly take a look at the next page, and

7    the next page.  It is signed, as you can see, by Howard Wien

8    with copies to Mr. Seabrook, Mr. Koehler and Mr. Reynolds.

9              Mr. Husamudeen, in or around February of 2014, do you

10   recall receiving this letter?

11   A.  No.

12   Q.  Did you ever see this letter while in consideration of

13   investing in Platinum Partners was being undertaken by the

14   board?

15   A.  No.

16   Q.  Let's go back two pages if we can.  The letter says I am

17   writing on behalf of my client, the Correction Officers

18   Benevolent Association, in response to your recent

19   presentation.  The annuity fund is an employee fringe benefit

20   fund.

21             Can we go down to the final paragraph on that page.

22   It continues the fiduciary obligations in these documents are

23   similar to those existing for fringe benefit funds for

24   regulated by the employment retirement income security act,

25   ERISA, although the annuity funds is not covered by ERISA.  It

1  is for this reason the annuity fund carefully monitors proposed

2  investments keeping in my the ERISA standard of a prudent man

3  in acting in like capacity and the ERISA, a duty to minimize

4  the risk of large losses.

5          To our knowledge -- highlight the first paragraph --

6  none of the prudent men in like capacity, that is, similar New

7  York City supplemental retirement funds, have invested in the

8  type of investment you propose.  The annuity fund, however, is

9  not adverse to being a trendsetter.  If it is to be such,

10 however, there needs to be enhanced protection for the

11 participants.

12         At the time when the Platinum investment was discussed

13 after that presentation, do you recall there being any

14 conversation about whether any entities like COBA invested in

15 this sort of fund?

16 A.  No, I don't recall.

17 Q.  So I want to direct your attention to the, there is a list

18 of numbered items that begins thus, it is necessary to express

19 the following concerns.  Why don't we focus on the first two,

20 Ms. Bustillo.

21         Under No. 1 it says the annuity fund has requested

22 that its investment advisers and managers acknowledge they are

23 fiduciaries, not only as a general matter, but as specifically

24 described in ERISA Section 3 (21)(A), although the offering

25 memorandum and subscription agreement take pains to shield the

1    fund, the investment manager, the partner and directors from

2    liability to the annuity fund, this is not acceptable to the

3    annuity fund, as each of these entities and individuals must

4    acknowledge their fiduciary obligations to the annuity fund.

5           Mr. Husamudeen, at the time that the investment was

6    being considered, do you recall having any conversations

7    regarding the concern expressed in Section 1 here?

8    A.  No.

9    Q.  Directing your attention to No. 2, the letter continues.

10          The 0M is quite blunt about conflicts of interest.

11   The annuity fund, however, require fiduciaries to act with the

12   exclusive purpose of providing benefits.  Permitting the

13   conflicts of interest present in the 0M and SA would, offering

14   memorandum and subscription agreement, would sacrifice this

15   obligation.

16          Mr. Husamudeen, do you recall at the time of the

17   investment was being considered anyone discussing with you that

18   particular concern?

19   A.  No.

20   Q.  Let's direct your attention now to the remaining two

21   concerns, three and four.

22          No. 3.  In light of the annuity fund's obligation to

23   avoid large losses and to act with the exclusive purpose of

24   providing benefits, the annuity fund cannot acknowledge, as

25   required by the SA, that it has the financial ability to bear

1    the economic risk of losing its entire investment in the fund

2    and has no need for liquidity.

3            Mr. Husamudeen, was that a concern that was discussed

4    at all in your presence during the time of the investment being

5    considered?

6    A.  No.

7    Q.  Do you recall any conversation whatsoever about whether the

8    board had the financial ability to bear the risk of losing its

9    entire investment?

10   A.  No, sir.

11   Q.  Directing your attention to concern No. 4.  It says as the

12   annuity fund does not need liquidity to pay benefits, any

13   amounts redeemed must be in cash.  The annuity fund cannot

14   accept the in kind payments required under the offering

15   memorandum and subscription agreement.

16           Do you recall any conversations taking place while the

17   investment was being considered involving that concern?

18   A.  No.

19   Q.  Can we zoom out and slightly more and go to the, "It is

20   hoped" subparagraph.

21           It is hoped that the foregoing do not present

22   insurmountable obstacles.  Please direct me to a proposal as to

23   how you believe these issues may be addressed.  In addition,

24   please provide the following information so as to further the

25   annuity fund's due diligence.

1          Now, were you ever made aware, Mr. Husamudeen, of a

2     proposal as to how those concerns might be addressed?

3     A.  No.

4     Q.  Why don't we take that exhibit down.

5          I now want to direct your attention to what is marked

6     as Government Exhibit 1072 for identification.  We can put that

7     up on the screen for Mr. Husamudeen as well.

8               MR. BELL:  I can offer it if there are no objections?

9               MR. MAZUREK:  No objection.

10              MR. SCHECHTMAN:  No objection.

11              MR. BELL:  Your Honor, I government offers 1072.

12              THE COURT:  It is admitted without objection.

13              (Government Exhibit 1072 received in evidence)

14    BY MR. BELL:

15    Q.  I want you to take a look at this email, Mr. Husamudeen.

16    This is an he mail from Howard Wien to Norman Seabrook, dated

17    February 14, 2014.

18              THE COURT:  Hold on.  Do the jurors have it yet?  Now

19    they do.

20              MR. BELL:  Sorry about that, folks.

21    BY MR. BELL:

22    Q.  Now that all of us can see an email, Government Exhibit

23    1072, from Mr. Wien to Mr. Seabrook, Mr. Koehler and

24    Mr. Reynolds on February 14th, 2014.  Do you see that, sir?

25    A.  Yes.

1   Q.  The subject line is Platinum Partners and it says please

2   see the attached per our discussion earlier today.  Why don't

3   we go ahead and take a look at the attachment.  Ms. Bustillo,

4   can we turn to the next page.

5           So this is a letter, dated February 14th, addressed to

6   Board of Trustees, Correction Officers Benevolent Association

7   Annuity Fund, 75 Broad Street, and so on.

8           You were a member of that Board of Trustees, weren't

9   you, Mr. Husamudeen?

10  A.  Yes.

11  Q.  During the time that the investment was being considered,

12  did you ever see this letter?

13  A.  No.

14  Q.  I want to direct your attention to the first couple lines.

15  It says dear trustees.  We have been asked to review the

16  proposal to invest in the above referenced financial product.

17          It goes on, that product is a hedge fund.

18  Essentially, a hedge fund invests in investments that are of

19  higher risk than traditional equity investments.

20          Can we zoom out from there, Ms. Bustillo.

21          Let's go to to the last full paragraph on the page.

22  It says hedge funds are also an unusual investment for

23  retirement funds.  To be sure, they are a valid asset class

24  when operated properly and for private investors, are a

25  reasonable part of an investment portfolio.  Retirement funds,

1    however, are held to a particularly high standard of care as

2    they invest for the benefit of others.

3         New York City's supplemental retirement funds,

4    although managed by the various labor unions, are governed by

5    the Comptroller's Office and by a supplemental agreement with

6    the city.  Both echo the standard of care required for

7    retirement funds generally and require retirement fund trustees

8    to operate with the prudence of like individuals.  The annuity

9    fund must also invest plan assets in a manner that minimizes

10   the risk of large losses.

11        Mr. Husamudeen, in or around the time of the

12   investment being considered, whether it is in this letter or

13   anywhere else, do you recall being involved in conversations

14   about the risks of this type of instrument for retirement

15   funds?

16   A.  No.

17   Q.  Let's go to the next page.  It then says you should be

18   aware of the following before you decide on whether or not to

19   invest in this product.  One moment, please.

20        (Pause)  Let's start with the next paragraph.

21        First, being that other benefit fund's investments are

22   relevant to a discussion of any proposed investment, it is a

23   concern that, to our knowledge, none of the other supplemental

24   benefit funds are invested in this type of hedge fund.

25        Do you recall that coming up in any discussions of the

1   Board of Trustees at the time the investment was being

2   considered?

3   A.  I don't recall, no.

4   Q.  Let's zoom out of that paragraph and let's go to the

5   second.  Second, it says the structure of this hedge fund makes

6   it difficult to recover in the event of fraud or other

7   misconduct because the hedge fund is the only entity we can go

8   after as the other parties, specifically, the related hedge

9   funds, the investment manager and the limited and general

10  partners are all protected by corporate shield theories,

11  limitation of liability clauses and indemnification clauses.

12  Additionally, the Annuity Fund must agree to a broad hold

13  harmless clause.

14          Mr. Husamudeen, at the time that the investment was

15  being considered, were you party to any discussion about how

16  the Annuity Fund might recover in the event of fraud or other

17  misconduct?

18  A.  No.

19  Q.  Do you recall ever discussing what a hold harmless clause

20  was?

21  A.  Excuse me?

22  Q.  Do you recall any discussion of what a hold harmless clause

23  was?

24  A.  There was never any discussion.  This document was never

25  provided to me.  I never saw this until --

1    Q.  Even without seeing this document, do you recall any

2    discussion of what the document has discussed so far?

3    A.  No.

4    Q.  Including from Mr. Seabrook?

5    A.  No.

6    Q.  Directing your attention to then where it says third,

7    third, the hedge fund's offering plan is very blunt about

8    actual and potential conflicts of interest and all the involved

9    partners and players can invest in products that benefit

10   themselves or other entities even if those investments are at

11   the expense of the Annuity Fund.  Although we have requested a

12   proposal from the hedge fund to address these conflicts, we

13   were told that the language would not be altered.

14            Do you recall any discussion of conflicts of interest

15   or potential conflicts of interest involving Platinum Partners

16   at the time that the investment was being considered?

17   A.  No.

18   Q.  Do you recall any mention of a request for something to

19   address conflicts of interest being rejected?

20   A.  No.

21   Q.  Finally, to direct your attention to the fourth paragraph,

22   the beginning of it, fourth, the offering plan is similarly

23   blunt that the investor should be prepared and accepts the risk

24   of losing its entire investment.  Was that something that was

25   ever discussed that you were aware of at the time the

1   investment was being considered?

2   A.  No.

3   Q.  I want to direct your attention to the next page.  The

4   letter is unsigned.  Did you ever see a signed version of this

5   letter?

6   A.  No, sir.

7   Q.  Did you ever see an unsigned version of this letter?

8   A.  No.

9           MR. BELL:  Why don't we take it down.  Thank you, Ms.

10  Bustillo.

11          MR. SCHECHTMAN:  One second, your Honor.

12          (Pause)

13          MR. BELL:  Actually, why don't we put that back up.

14  Why don't we go to that page it goes on.

15          Can we just go to the end of the previous page first.

16  I will start reading so we can conclude that sentence.

17  BY MR. BELL:

18  Q.  4th, the offering plan is blunt that the investor should

19  then accepts the risk of losing its entire investment and to be

20  permitted to invest, the annuity fund must represent that it

21  can withstand the loss of the entire investment and does not

22  need its -- continue on the next page -- not need its

23  investment to be liquid.  As both of these factors are

24  inconsistent with the needs of the annuity fund, it should not

25  make this representation.  In discussion with the hedge fund's

1    attorney, however, we have been told that this representation

2    must be made.

3            Do you recall being privy to any discussion of these

4    issues at the time that the investment was being considered?

5    A.  No.

6            MR. BELL:  Let's go now fully to that last page, the

7    third page, Ms. Bustillo.

8    BY MR. BELL:

9    Q.  Let's go to the final small paragraph that begins as you

10   consider.  As you consider this investment, please also keep in

11   mind that the amount invested should reflect the heightened

12   risk inherent in hedge funds and that the annuity fund's

13   initial investment with Intercontinental was 5 million and with

14   Advent was 10 million.

15           I believe you mentioned Advent, Mr. Husamudeen.  Do

16   you recall what Intercontinental was?

17   A.  Intercontinental was a real estate investment company.

18   Q.  Do you recall seeing any discussion or hearing any

19   discussion of a comparison between those investments and this

20   investment while this investment was being considered?

21   A.  No, sir.

22   Q.  Now let's take this down.  Thank you, Ms. Bustillo.

23           Did there come a time -- well, withdrawn.

24           After the January 2014 Annuity Fund Board of Trustees

25   meeting, when was the next meeting of the Annuity Fund Board of

1    Trustees?

2    A.   The next meeting took place in July.

3    Q.   Were you present for that meeting?

4    A.   No, sir.

5    Q.   Why not?

6    A.   I was on vacation.

7    Q.   Did you later review the board minutes from that July

8    meeting?

9    A.   Yes.

10   Q.   So I'd like for us to publish Government Exhibit 311.

11            Are these the --

12            THE COURT:  Hold on.

13            (Pause)

14   BY MR. BELL:

15   Q.   Are these the minutes you reviewed from the meeting you

16   missed?

17   A.   Yes.

18   Q.   It lists July 29th, 2014.  Does that comport with when you

19   missed that meeting?

20   A.   Yes. .

21   Q.   Can we go to the second page, please.  There is a section

22   called investment manager's reports.  I think you mentioned

23   this, sir, but generally what were the investment manager's

24   reports?

25   A.   They were generally put in the minutes of the meeting,

1    reminding what was discussed in the prior meeting as far as

2    what the managers brought to the table when they would have to

3    come to quarterly meetings to tell us how the funds are doing,

4    how our money is doing, how much money they've made us or lost.

5    Q.  I want to direct your attention to the very bottom of that

6    page.  It says Gilad Kalter made Platinum Partners'

7    presentation.  The hedge fund returned 3.09 percent since -- go

8    onto the next page -- its inception during March, 2014.

9    Platinum projected a 2014 return of 8 percent for 2014 but up

10   to 14 percent if certain transactions occur as planned.

11          Prior to reviewing these minutes, Mr. Husamudeen, had

12   you been notified that the annuity fund board invested money

13   into Platinum Partners?

14   A.  No.

15   Q.  Was this the first that you knew?

16   A.  Well, from the January meeting and the decisions made there

17   -- I didn't appear at the meeting until November.  I believe,

18   as a matter of fact, November which was when I saw these

19   particular meet minutes.

20          MR. MAZUREK:  I had trouble --

21          THE COURT:  Would you repeat that answer into the

22   microphone again.

23          THE WITNESS:  Prior to these minutes here we are

24   looking at now are from the July meeting.  I would not have

25   seen these minutes until the following trustees meeting which I

1    believe was in November.

2    BY MR. BELL:

3    Q.  Prior to reviewing those meeting minutes, did anyone else

4    tell you that the due diligence had cleared and that the fund

5    had, in fact, invested in Platinum Platinum?

6              MR. SCHECHTMAN:  I apologize.  There was an answer

7    that began from the January meeting.

8              THE COURT:  Let's get the Court Reporter to read the

9    question and answer before the last questions and answer.

10             (Record read)

11   BY MR. BELL:

12   Q.  Prior to reviewing those minutes, had anyone formally

13   notified you that the annuity fund had, in fact, put money into

14   Platinum Platinum?

15   A.  No.

16   Q.  I want to shift gears for just a moment.

17             Did there come a time you learned from money from

18   COBA's general fund had been invested in Platinum Partners?

19   A.  Yes.

20   Q.  When did you learn that?

21   A.  I learned that in June of -- I learned that in June of

22   2014.

23   Q.  Where were you when you learned that?

24   A.  I was at the Puerto Rican Day Parade, the union was

25   marching in the Puerto Rican Day Parade, and at the end of the

1   parade the COBA treasurer brought that to my attention.

2              MR. SCHECHTMAN:  Can we object.  I don't think there

3   is any reason for us to leave the courtroom, but could Mr.

4   Seabrook have one minute bathroom break.

5              THE COURT:  Let's do this.  Let's go ahead and take a

6   10-minute break, and then we will have a little bit more

7   testimony and dismiss you for the day, all right?  Don't

8   discuss this case with anyone else.  Don't discuss it amongst

9   yourselves, okay?  See you soon.

10              (Jury excused)

11              THE COURT:  May I have counsel and the parties hang

12   here for a second.

13              (Pause)

14              THE COURT:  You can sit down.  Let's discuss a couple

15   of things while the jury is on its break.  Before he does that,

16   Mr. Seabrook can use my robing room.  You can use the restroom

17   in my robing room.

18              DEFENDANT SEABROOK:  Thank you, Judge.

19              (Pause)

20              THE COURT:  So let's wait for Mr. Seabrook to come

21   back and discuss a few things.

22              (Pause)

23              THE COURT:  Are counsel all here?  Mr. Seabrook here?

24              DEFENDANT SEABROOK:  Thank you so much.

25              THE COURT:  Let's discuss a few things real quick.

1      One thing that we need to discuss is my Deputy has

2   informed me that several of the jurors have expressed some

3   concern.  They have been bumping into -- you can sit down --

4   they have been running into the parties and counsel and people

5   who they perceive to be family members of the parties in the

6   halls, in the elevators and things and the like.  Nothing

7   inappropriate has been expressed to them, but they are somewhat

8   disquieted by that.

9      So we want to make sure the jurors are as comfortable

10   as possible.  I don't want to do anything extreme at this point

11   like trying to clear the hallways or any of that stuff.  It may

12   be helpful if the counsel and parties can wait 10 minutes

13   before you leave once the jury is dismissed so they can get

14   their belongings.  It is primarily during the breaks so we

15   don't have any misunderstandings.  Counsel want to be heard on

16   that or have any thoughts on that?

17      MR. BELL:  That is fine, your Honor.  I think that

18   here it is tough because there are only so many ways out.

19   There is kind of a narrow rabbit run.  That makes sense and we

20   are happy to stick around for as long as it takes.

21      MR. MAZUREK:  We are fine with that.  The other

22   concern is during breaks, if the breaks are only 10 or 15

23   minutes --

24      THE COURT:  I hope the only break we are going to have

25   was 30-minute break.  We weren't going to have any other

1    breaks.  I understand.  Anything else from defense counsel on

2    this?  The other thing we should discuss because we want to get

3    some more testimony for this jury before we let them out at

4    2:30 is screen angles.

5              So it hasn't been an issue yet because everything that

6    the government has sought to introduce has come into evidence.

7    To the extent that there may be some disagreements later on,

8    the jurors can see your screens from where they are, so to the

9    extent -- at least some of the jurors can -- to the extent you

10   are trying to show something only to the witness counsel for

11   the government and maybe the defense table may be okay, but if

12   you angle your screens a little bit, that would be helpful.

13             The other thing I am noticing some of the jurors are

14   adjusting their glasses and the like trying to read the items

15   on the screens when they're published, and it has been helpful

16   the government has enlarged them somewhat.  Keep in mind the

17   jurors' angle to their screens is different than the angle that

18   counsel have at their tables and different than the angle that

19   I have, and many of the other jurors like me have certainly

20   crossed the Rubicon into middle age and their vision is such it

21   may help to have it a little bit larger.

22             The other thing I want to talk to counsel about is my

23   closing instructions to the jury today.  I plan to just tell

24   the jury, as I told them before, don't do any independent

25   research related to this case or the parties in this case.

1    Don't discuss this with anyone else and ask them to get here at

2    9:00 o'clock.  Sound good to counsel?

3              MR. BELL:  It does.

4              MR. SCHECHTMAN:  If you just add don't read anything.

5              THE COURT:  And don't read anything.  Make sure I

6    remember to say that, too.

7              The other thing is we had previously talked before we

8    knew about Juror No. 1's mother's home health aid situation.

9    We talked about trying to say something extra to the jurors

10   about getting here on time.  Now that we have that information,

11   there is no need to show any shade at the jurors regarding

12   that.  We just ask them to get here at 9:00 o'clock.  Sound

13   good?  I let counsel get a quick two-minute break and bring the

14   jury in and finish up for the day.  You can use the robing

15   room, too.

16             (Recess)

17             THE COURT:  Let's get the witness here and let's go.

18   Let's bring the jurors in and have the witness take the stand

19   again.

20             A VOICE:  I don't think Mr. Huberfeld is here.

21             THE COURT:  Hold on.

22             MR. MAZUREK:  We're here.

23             THE COURT:  Let's go.

24             (Jury present)

25             THE COURT:  Let's be seated.  Let's continue.  Go

1    ahead, counsel.

2    BY MR. BELL:

3    Q.  Good afternoon once again, Mr. Husamudeen.

4         I believe that we left off a point where I asked you

5    whether there was a time when you learned that operating

6    accounts, general fund money, had been invested in Platinum

7    Partners, and you mentioned June of 2014 at the Puerto Rican

8    Day Parade.  What were you doing at the Puerto Rican Day

9    Parade?

10   A.  The union marches in all of the parades, and we were

11   marching in the Puerto Rican Day Parade.

12   Q.  Who generally was there on behalf of the union?

13   A.  Usually the entire executive board.

14   Q.  What was it that you learned and how?

15   A.  At the end of the parade, I was approached by COBA treasure

16   Michael Maiello, who informed me and was complaining that the

17   president invested $5 million of the general fund money without

18   speaking to the board, addressing the board or talking to the

19   board about it.

20   Q.  Was that the first you heard of this?

21   A.  Yes.

22   Q.  What was your reaction?

23   A.  Well, my reaction was one of concern.

24   Q.  Why were you concerned?

25   A.  I was concerned because that's something I felt -- I felt

1    that is something that should have been discussed with the

2    board.

3    Q.   Why?

4    A.   Because we are on the board, and as far as the general fund

5    as we discussed, we're all trustees on that fund, and if you're

6    going to invest $5 million of the general fund money, then it

7    just to me made sense that you would discuss it with the board.

8    Q.   To your recollection, prior to that point had $5 million

9    from the operating account been brought to the attention of the

10   general executive board?

11   A.   I'm not sure who else might Mike spoke to at that time.

12   Q.   Had it been raised at a meeting?

13   A.   Not that I recall.

14   Q.   Had Mr. Seabrook ever broached the possibility of that sort

15   of investment from the operating account?

16   A.   To the board?

17   Q.   To the board?

18   A.   Not that I recall.

19   Q.   What was your understanding at the time as to how big a

20   deal $5 million was?

21   A.   For me, the bigger deal was just discussing it with the

22   board.

23   Q.   Now, had you ever known the union to invest operating

24   account money in a hedge fund?

25   A.   No.

1   Q.  When you learned this at the end of the Puerto Rican Day

2   Parade, what did you do?

3   A.  I spoke with Norman.

4   Q.  Where did you speak with Mr. Seabrook?

5   A.  Somewhere at the end of the parade.  I am not sure.

6   Q.  Was anyone else present?

7   A.  No.

8   Q.  What, as closely as you can remember, did you say to Mr.

9   Seabrook and what did he say to you?

10  A.  I told him basically the conversation that was had with the

11  treasurer and that the gist of the conversation is he should

12  have addressed the board, he should have said something to the

13  board about that, and at that time my opinion was you can't do

14  that without talking to the trustees.

15  Q.  What was the tenor of what you told Mr. Seabrook?

16  A.  I don't understand.

17  Q.  What was your mood, your demeanor, the mood at the time you

18  told Mr. Seabrook this?

19  A.  Pissed off.

20  Q.  Were you loud?

21  A.  I guess I wasn't yelling, but, yes.

22  Q.  What specifically, as best as you can remember, that you

23  told Mr. Seabrook?

24  A.  Pretty much, you know, like what the fuck is your problem?

25  You can't do that, you know?

1   Q.  What, if anything, did Mr. Seabrook say to you?

2   A.  "It's making money."

3   Q.  Did he, did Mr. Seabrook provide any other reason why he

4   had done this without notifying the rest of the board?

5   A.  No, not that I recall, no.

6   Q.  Did the conversation end there or was there more to it?

7   A.  I think it pretty much ended there.

8   Q.  I want to show you what has been marked for -- I'll just

9   put this on your screen for the moment -- Government Exhibit

10  1035.  It was mentioned in the email stipulation among the

11  emails that came in from Platinum.

12          MR. BELL:  Again depending on how defense counsel

13  feels about this, we can admit it or work around?

14          MR. MAZUREK:  No objection.

15          MR. BELL:  The government offers 1035.

16          THE COURT:  It is in without objection.

17          (Government Exhibit 1035 received in evidence)

18          MR. BELL:  Can we publish that to everyone, please.

19  Would the jury just signal when you have it.

20  BY MR. BELL:

21  Q.  This is an email, dated May 20, 2014, from a person named

22  Uri Landesman to Andrew Kaplan, someone named Michael Kimelman

23  and someone named Joe Mann.  The subject line, COBA.

24          At the time, Mr. Husamudeen, did you know any of these

25  people?

1    A.   No.

2    Q.   It says, "Norman allegedly coming in here to sign papers

3    next week.  No calls to anyone there, please."

4              Now, you worked at COBA's offices at the time, right,

5    Mr. Husamudeen?

6    A.   Yes.

7    Q.   Do you recall there being any communication or any calls

8    coming in from Platinum Partners to COBA at around that time,

9    at around May 20th?

10   A.   No, no.

11   Q.   Let's take that down.

12             Now, Mr. Husamudeen, did there come a time when you

13   learned that the annuity fund board invested still more money

14   into Platinum, not the $10 million that we've discussed, but

15   another set of money?

16   A.   Yes.

17   Q.   Approximately when was that?

18   A.   I believe that was at the November Board of Trustees

19   meeting.

20   Q.   What did you learn at that meeting?

21   A.   Well, from the minutes, that we invested another 5 million.

22   Q.   What was your understanding of when that had happened?

23   A.   From the minutes at the last meeting where I wasn't, at the

24   July meeting.

25   Q.   The one that you missed?

1    A.  Yes.

2    Q.  Now, Mr. Husamudeen, at any point over this entire

3    timeline, 2014, were you aware of any possibility that Mr.

4    Seabrook was receiving kickbacks in exchange for the union's

5    investment in Platinum?

6    A.  No.

7    Q.  Were you aware of any relationship between Mr. Seabrook and

8    the hedge fund prior to that January 2014 meeting?

9    A.  No.

10   Q.  Or at any point over the course of 2014?

11   A.  No.

12   Q.  I want to direct your attention back to that first meeting,

13   the 2014 meeting where Platinum presented.

14           How would the knowledge of something like that, a

15   payment relationship between Mr. Seabrook and people affiliated

16   with Platinum Partners, have affected your approach to the

17   decision to invest union money in Platinum?

18           MR. SCHECHTMAN:  Can we make clear this is what we

19   what we call a hypothetical question.

20           THE COURT:  Objection?

21           MR. SCHECHTMAN:  Objection.

22           THE COURT:  Please rephrase the question, please,

23   counsel.

24           MR. BELL:  Sure.

25   BY MR. BELL:

1    Q.  Mr. Husamudeen, I am about to ask you a question about how

2    you would have valued something had you known it.

3           Had you known of a payment relationship between Mr.

4    Seabrook and people affiliated with Platinum Partners, how

5    would that have affected your decision as a trustee to invest

6    in Platinum?

7           MR. SCHECHTMAN:  The same objection.

8           THE COURT:  Overruled.  You may answer.

9    A.  How would it have affected my decision?

10   Q.  Yes, sir?

11   A.  Is that the question?

12   Q.  It is.

13   A.  They would have never got an interview.

14   Q.  What do you mean by that?

15   A.  If you're saying if I knew about a relationship between Mr.

16   Seabrook and the members of Platinum Partners, how would it

17   have affected my decision?

18   Q.  Yes, sir.

19   A.  What I am saying to you is that if I knew that, first of

20   all, I know there would be a conflict.  Second of all, they

21   would have never gotten a meeting because I would never have

22   been a part of that.

23          MR. BELL:  One moment, please.

24          (Off-the-record discussion)

25          MR. BELL:  I have no further questions for

1    Mr. Husamudeen.

2              THE COURT:  It seems to me that we're at 2:24.  It is

3    probably a good time to break for the day, so we're going to

4    break for the day.  I will give you the instruction I have

5    given you before.

6              Do not read anything about this case, don't listen to

7    anything about this case, don't do any research regarding any

8    of the issues or the parties in this case.  Don't talk to

9    anyone about this case.  Don't allow anyone to talk to you, and

10   I will see you at 9:00 am tomorrow.  Have a wonderful evening.

11             (Jury excused)

12             THE COURT:  Please be seated.

13             So it seems to me that we can excuse the witness now.

14   Is there any objection to that by the government or the

15   defense?

16             MR. BELL:  No, your Honor.

17             MR. MAZUREK:  No, your Honor.

18             THE COURT:  Just right before the break, the witness

19   inquired and saw my mints and asked for mints.  I will give him

20   some.  I want to let you know there is no ex-parte discussion.

21             Let's have the witness hold on here for a minute so

22   the jurors can get out of here.  Is there anything else --

23   we'll wait.  I don't think there is anything else we need to

24   discuss today or is there?

25             MR. BELL:  We don't think so.

1          THE COURT:  Counsel?

2          MR. SCHECHTMAN:  My guess is we will get through maybe

3   more -- we'll talk about that afterwards.

4          MR. MAZUREK:  I have one issue that I can raise from

5   an evidentiary point of view.

6          THE COURT:  Does it have anything to do with this

7   witness?

8          MR. MAZUREK:  Yes.

9          THE COURT:  Just wait a couple of minutes and let the

10  witness get out of here and we will take up your other issues.

11          (Pause)

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Okay.  All right.  On the record.  The

2    witness is excused.  Thank you.

3          (Witness temporarily excused)

4          Okay, counsel.

5          MR. MAZUREK:  Judge, at the end of this witness'

6    direct examination there was some hearsay testimony elicited or

7    testimony of out-of-court declarations by the witness and

8    Mr. Seabrook.  I understand that they're being admitted, I

9    expect, under 801(d)(1) with respect to the comments that

10   Mr. Seabrook had made to this witness.

11         Though I understand that that conversation has little

12   to do with Mr. Huberfeld, since it's only a discussion relating

13   to that witness and Mr. Seabrook, it would not otherwise be

14   admitted against Mr. Huberfeld in a separate trial.  So I just

15   wanted to alert the Court.  I haven't decided yet whether to

16   ask for a limiting instruction, but I wanted to raise that

17   issue and would, if I think one is appropriate.  I'll alert the

18   Court in the morning with the proposal.

19         THE COURT:  Okay.  Government?

20         MR. BELL:  I recognize that the request hasn't come

21   yet, but should one come, we will oppose it.  This seems about

22   as garden variety as the co-conspirator statements as it gets.

23         We actually would not concede Mr. Mazurek's argument

24   that this is stuff that would not get in, were Mr. Huberfeld to

25   be tried on his own.  We'll see where his research takes him,

1      but if there is a request, this seems about as textbook as

2      co-conspirator statements get.  That's not something that's

3      lost even if people have different domains of the conspiracy or

4      even areas that they helped further.  So we would oppose any

5      such request for a limiting instruction.

6              THE COURT:  Okay.  I'll have to look at it when and if

7      it's going to be submitted.  I don't get the sense, again, that

8      defense counsel is seeking to exclude the information, but is

9      seeking some sort of potentially curative instruction so that

10     the jury understands the value of this testimony.  I'm not sure

11     if defense counsel is indicating at this point -- well, I don't

12     know what defense counsel's position is in terms of the

13     relevance of this information to Mr. Huberfeld.

14              I'm not sure if your position is that it would be

15     wholly irrelevant or only for certain uses in terms of the

16     overall conspiracy because we are talking about the conspiracy

17     charge here.

18              MR. MAZUREK:  Yes.

19              THE COURT:  Well, do you have a sense of where you're

20     going with this right now?  Tell me more about where you're

21     going with this.  Obviously, you haven't submitted this, but

22     tell me what sort of curative instruction would you be looking

23     for.

24              MR. MAZUREK:  A curative instruction that the

25     testimony that was elicited from this witness with respect to

1    the state of mind of Mr. Seabrook is not -- has limited

2    relevance with respect to Mr. Huberfeld.

3         THE COURT:  Let me just make sure I understand what

4    you're talking about.  Which statements are you talking about

5    in terms of the state of mind of Mr. Seabrook?  Because I'm not

6    sure there was a whole lot of that directly coming from this

7    witness.  This witness is talking about his state of mind, but

8    give me a sense of what you're talking about.

9         MR. MAZUREK:  It's a conversation that he replayed

10   from the Puerto Rican Day Parade between Mr. Seabrook and him

11   with respect to why Mr. Seabrook went ahead and invested money,

12   or that he invested money from the general fund.

13        THE COURT:  And you're talking about the statement,

14   it's making money?  Is that what you're talking about?  You're

15   talking about the conversation that came out on direct where

16   this witness said, you know, something to the effect of, you

17   know, What the French toast are you doing?  Why are you

18   investing this?  And Seabrook responds with:  It's making

19   money, is that what you're talking about or what specifically

20   are you talking about?

21        MR. MAZUREK:  That was part of the conversation, as I

22   remember it.  I want to look over the transcript again this

23   evening, if I might, because I think there's a little bit more

24   to it.

25        MR. SHECHTMAN:  Can we just talk among ourselves

1    tonight, and if there is something, we'll write the Court a

2    letter.  I don't want to make more of this than I think may be

3    useful.

4              THE COURT:  All right.  Is there anything else that we

5    need to deal with today?

6              MR. BELL:  Not from us, your Honor.

7              MR. SHECHTMAN:  Not from us, your Honor.

8              MR. MAZUREK:  No, your Honor.

9              THE COURT:  All right.  So let's get defense counsel

10   to go ahead and get me your letter by -- well, I guess, have

11   you decided whether or not you're submitting --

12             MR. MAZUREK:  I haven't decided.  I just wanted to

13   alert the Court.  It was maybe precipitous, but I wanted to

14   alert that it may come.

15             THE COURT:  Why don't we do this, if you are not going

16   to be submitting anything, can you let us know that by 4:30

17   today?

18             MR. MAZUREK:  So long as I have the transcript.

19             THE COURT:  Okay.  Fine.  Then make your submission by

20   6:00 this evening.  I will give the government until 10:00 to

21   respond, and there won't be any reply, and we'll see where we

22   are.  Anyway, does that schedule work for everyone?

23             MR. MAZUREK:  Yes, your Honor.

24             MR. BELL:  Sure, your Honor.

25             THE COURT:  Okay.  Anything else we need to deal with

HAOPSEA6

1 | today from either side?

2 |        MR. BELL:  No, your Honor.

3 |        MR. SHECHTMAN:  No, your Honor.

4 |        THE COURT:  Once again, let's try to get counsel here

5 | ten minutes before 9:00 to avoid any unnecessary bumping into

6 | jurors and get the parties here at ten minutes before 9:00 as

7 | well.

8 |        What do we have on tap for tomorrow in terms of

9 | witnesses?

10 |        MR. BELL:  Your Honor, I would expect, obviously,

11 | Mr. Husamudeen's cross, however long that is.  Mr. Kalter, as

12 | we mentioned before, will testify.  Assuming we get through

13 | with that, there are two very brief witnesses.  I think

14 | somebody from the NYPD with respect to license plate reader

15 | data, somebody else to get in some auditing documents.  Those

16 | should both be very quick.  Should we get through all of that,

17 | and I hope and anticipate that we would.  I think the great

18 | likelihood is that we would call Mr. Rechnitz.

19 |        THE COURT:  All right.  Anything else?

20 |        MR. SHECHTMAN:  No, your Honor.

21 |        MR. MAZUREK:  No.

22 |        THE COURT:  All right.  See you tomorrow.

23 |        (Adjourned until 9:00 a.m. on October 25, 2017)

24 |

25 |

1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    ELIAS HUSAMUDEEN

4    Direct By Mr. Bell . . . . . . . . . . . . . 115

5    GILAD KALTER

6    Direct By Mr. Capone . . . . . . . . . . . . 130

7                    GOVERNMENT EXHIBITS

8    Exhibit No.                          Received

9     652 and 656   . . . . . . . . . . . . . . . 140

10    657 and 658   . . . . . . . . . . . . . . . 141

11    1501, 301, 303, 304, 305, 309, 3312,  . . . . 146

12            401, 403, 405, 406 and 408

13    711, 706, 707, and 703 . . . . . . . . . . 148

14    1503    . . . . . . . . . . . . . . . . . . 175

15    1027    . . . . . . . . . . . . . . . . . . 176

16    1072    . . . . . . . . . . . . . . . . . . 182

17    1035    . . . . . . . . . . . . . . . . . . 199

18

19

20

21

22

23

24

25