HAPPSEA1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                          16 Cr. 467 ALC

5  NORMAN SEABROOK AND MURRAY HUBERFELD,

6          Defendants.

7  ------------------------------x

8

9

10                                     October 25, 2017
                                       9:04 a.m.
11

12

13  Before:

14              HON. ANDREW L. CARTER, JR.,

15                                     District Judge
                                        and a jury
16

17

18                     APPEARANCES

19  JOON H. KIM,
         United States Attorney for the
20       Southern District of New York
    KAN MIN NAWADAY,
21  MARTIN BELL,
    RUSSELL CAPONE,
22       Assistant United States Attorneys

23

24

25

HAPPSEA1

                              APPEARANCES (Continued)


BRACEWELL, LLP,
         Attorneys for defendant Seabrook
BY:  PAUL LEWIS SHECHTMAN, Esq.
         MARGARET EMMA LYNAUGH, Esq.
                    Of counsel


MAZUREK LIPTON, LLP
         Attorneys for defendant Huberfeld
BY:  HENRY EDWARD MAZUREK, Esq.
         EVAN LOREN LIPTON, Esq.
                    Of counsel


Also Present:
         BARD HUBBARD, Special Agent FBI
         YOLANDA BUSTILLO, Paralegal USAO
         AUGUSTA GRANQUIST, Paralegal

1     (Trial resumed; jury not present)

2     THE COURT:  Please be seated.  Okay.  We're waiting to

3 make sure that all the jurors are here.  I'm not sure if

4 they're all here yet.

5     Is there anything else we need to deal with today

6 before this witness gets back on the stand and is crossed

7 today?  I understand that counsel for Huberfeld has decided not

8 to file any request for any curative instructions.

9     Is there anything else we need to deal with today

10 before we start?

11     MR. SHECHTMAN:  Not before the witness.

12     MR. BELL:  I don't believe so.  I understand the

13 witness is in the security line, or maybe at the end of it

14 since that was some minutes ago, and should be up shortly.

15     THE COURT:  All right.  Remind me, after this witness,

16 who's up next?

17     MR. BELL:  Gilad Kalter, the witness from yesterday's

18 brief colloquy.

19     THE COURT:  Okay.  And give me a sense as to the

20 length of Mr. Kalter's direct examination, if you have a sense.

21     MR. CAPONE:  Between an hour and an hour and a half,

22 your Honor.

23     THE COURT:  And does defense counsel have a sense of

24 the cross-examination of that witness?

25     MR. MAZUREK:  About 45 minutes.

1          THE COURT:  Okay.

2          MR. SHECHTMAN:  Of this witness?

3          THE COURT:  Of Mr. Kalter.

4          MR. SHECHTMAN:  I think there may be none from us,

5    your Honor.

6          THE COURT:  All right.  Regarding Mr. Kalter, just to

7    make sure that the record is complete, I think it was pretty

8    obvious from yesterday, but I did find that his invocation of

9    the Fifth Amendment was reasonable and proper.  It's reasonable

10   for that witness to believe that if he disclosed the

11   information sought by the government here, that that

12   information could be used against him in a criminal proceeding,

13   whether in State Court or in Federal Court.

14          In particular, there was and is a pending case in the

15   Eastern District of New York, and there's substantial overlap

16   between the issues in disclosing this information here.  If he

17   were to disclose that, that information could be used directly

18   to incriminate him in that other proceeding.  In addition, that

19   information could be used to lead to other evidence that could

20   be used against him.  Anything else from counsel on that?

21          MR. SHECHTMAN:  Nothing, your Honor.

22          MR. CAPONE:  No, your Honor.  Thank you.

23          THE COURT:  Okay.  Let me just check in.  How are we

24   doing with jurors?

25          THE DEPUTY CLERK:  We're waiting for six more.

HAPPSEA1

1          THE COURT:  All right.  So we're waiting for six more

2     jurors.  Okay.  I'll check back in with counsel.

3          Are there any updates, in terms of defense counsel,

4     now that you've seen the direct, the length of your cross of

5     this witness?

6          MR. SHECHTMAN:  Maybe five or ten minutes longer.

7          THE COURT:  Okay.  And other defense counsel, anything

8     else?

9          MR. MAZUREK:  No, your Honor.

10         THE COURT:  All right.  I'll be back.

11         MR. SHECHTMAN:  Your Honor, can I make an unusual

12    request, which is, in some sense, I don't represent

13    Mr. Huberfeld but I've gotten to know him and his family, and

14    for the last couple of days, the family has occupied the second

15    row.  There are three young gentlemen in white shirts, who are

16    Jona Rechnitz's friends as I understand it, they're not members

17    of the Huberfeld family.

18         Now, I'm well aware that it's not a wedding; there's

19    not a bride side and a groom side.  I asked them, first

20    courteously, then not courteously, if they would move so the

21    family could sit together in that row.  They've declined.  I

22    take it that is evidence that they are, in fact, Jona's

23    friends.

24         If there's any way that the Court thinks -- has any

25    power to say could the family sit together in the second row.

HAPPSEA1

1   I know the Huberfeld family would appreciate it greatly.

2           THE COURT:  Okay.  Counsel for the government?

3           MR. BELL:  This, for a number of reasons, including

4   those given by the United States v. Gupta, United States v.

5   another Seabrook is probably territory into which the Court

6   should not wade.  With jurisprudence, obviously, we have open

7   courtrooms, and we don't believe we have reserved seats outside

8   of the ones that counsel and I are fortunate enough to occupy

9   here in the front.

10          I'm not sure that it would be wise for the Court to

11  step in here.  We appreciate Mr. Shechtman's remarks with

12  respect to courtesy, but I'm not sure that there is any sort of

13  appropriate relief to be obtained here.

14          MR. SHECHTMAN:  It's a public courtroom, but my sense,

15  I could be wrong on this, is that the third row is as public as

16  the second, and that's the reason for what I think is a modest

17  request.  If the Court doesn't want to do it, I understand, but

18  it is upsetting to people who are here to support somebody.

19          THE COURT:  Just so I understand the level of

20  consternation here, it's not an issue in terms of the family

21  members in the third row not being able to see or not being

22  able to hear.

23          MR. SHECHTMAN:  No.

24          THE COURT:  It's a question of them not being able to

25  sit together?

1    MR. SHECHTMAN:  Totally, your Honor.  And, look, if

2    you get reversed by the Second Circuit because three people are

3    sitting on the third row as opposed to the second, that circuit

4    is more difficult than I believe it to be.

5    THE COURT:  Well, I guess it doesn't seem that it's

6    necessarily appropriate for me to get into this.  It seems to

7    me that, again, this is a case that is litigated very adroitly

8    by both sides.  It seems to me that what jumps out as a

9    practical solution is if everyone can hear, why don't they all

10   just sit in the third row?  If they just want to sit with each

11   other, why can't they all just sit together in the third row or

12   the fourth row, the fifth row or whatever it is.  If it's just

13   a matter of them sitting together, it seems to me that that

14   would probably solve the problem if that's what the issue is.

15   MR. MAZUREK:  Judge, since this is my client's family,

16   as well, I just hope that everyone's going to maintain civility

17   in the gallery, and what I've heard from some of the family

18   members is that there have been rude speaking.

19   THE COURT:  There's been what?

20   MR. MAZUREK:  Rude, rude speaking about -- in that

21   second row from these three gentlemen about my client.  They've

22   been rude to his wife.  So I just am hoping that we all can get

23   along here, and that that's not going to be a problem, but I

24   have alerted the court security officer to watch the situation.

25   THE COURT:  Okay.  Anything else from Mr. Shechtman?

1     MR. SHECHTMAN:  Nothing, your Honor.

2     THE COURT:  Okay.  It doesn't seem, again, that it's

3  appropriate for me to get into this.  The main concern is

4  making sure that no one communicates anything to the jurors of

5  any sort, and to make sure that there are no disruptions in the

6  courtroom.  Counsel in this matter have been doing a very fine

7  job of remaining civil with each other, even though they are

8  hotly contesting this litigation, and lawyers are not

9  necessarily known for being the most peaceful folks, the most

10  non-confrontational folks on the planet.  But in this case,

11  counsel have been doing a great job of getting along with each

12  other.

13     It seems to me that it would be important for everyone

14  in the gallery to take counsel's lead and treat each other

15  civilly, and generally it's a good thing for people if you

16  don't have anything nice to say, to just not say anything.  But

17  again, I'm not going to weigh into this and start getting into

18  potentially trammeling on people's First Amendment rights.

19     It doesn't seem that it's helpful for folks in the

20  audience to be throwing shade at each other at all, no matter

21  who they're here to support or who they're here to show their

22  non-support of.  It doesn't seem that that's particularly

23  helpful.  So I hope that everyone in the audience will take the

24  lead from counsel, not only counsel but the parties themselves,

25  Mr. Seabrook, Mr. Huberfeld, and to the extent that there are

1    representatives from the government, they have all been acting

2    in a very fine manner in terms of treating each other with

3    respect.

4           Anything else, counsel?

5           MR. SHECHTMAN:  No.

6           MR. BELL:  No, your Honor.

7           MR. MAZUREK:  No, your Honor.

8           THE COURT:  Okay.  I'll be back when the jurors get

9    here.  See you soon.

10          (Recess)

11          THE COURT:  The jurors are here.  I'd like to be able

12    to go straight through to 11:30.  Why don't we do this now, if

13    any parties or counsel need to use the restroom, you can use

14    the robing room so we can go straight through to 11:30.  Is

15    that good?

16          MR. BELL:  Should we get the witness, your Honor?

17          THE COURT:  Sure, get the witness.

18          (Pause)

19          THE COURT:  Okay.  Let's bring the jury in.

20          (Jury present)

21          THE COURT:  Okay.  Please be seated.  Welcome back.  I

22    hope you had a pleasant evening.  Let's continue with the case

23    on trial.  Go ahead, counsel.

24          MR. SHECHTMAN:  May I proceed, your Honor?

25          THE COURT:  Yes.

1   ELIAS HUSAMUDEEN,

2         called as a witness by the Government,

3         having been previously duly sworn, testified as follows:

4   CROSS-EXAMINATION

5   BY MR. SHECHTMAN:

6   Q.  Mr. Husamudeen, good morning.

7   A.  Good morning.

8   Q.  My name is Paul Shechtman, and I represent Norman Seabrook.

9   A.  Yes.

10  Q.  Would I be correct, sir, that you have been on the board of

11  the Corrections Officers' Benevolent Association for more than

12  20 years?

13  A.  Yes.

14  Q.  Close to 22 years?

15  A.  Yes, sir.

16  Q.  And --

17        THE COURT:  Let me just ask the witness to make sure

18  you keep your voice up and lean into the microphone.  Can the

19  jurors hear everything?  Go ahead, counsel.

20  Q.  And you're comfortable if I call it COBA this morning?

21  A.  Yes, I am.

22  Q.  And you know my client Norman Seabrook quite well?

23  A.  I've known him for about 22 years.

24  Q.  And he first ran for president of COBA, would I be correct,

25  in 1995 and he beat out several, I think maybe as many as

1    seven, other groups that were running against him?

2    A.   Yes, we did.

3    Q.   And you ran with him as treasurer?

4    A.   Yes.

5    Q.   And you ran with him again -- elections are every four

6    years?

7    A.   Yes.

8    Q.   And you ran with him again in 1999?

9    A.   Yes.

10   Q.   2003?

11   A.   Yes.

12   Q.   2007?

13   A.   Yes.

14   Q.   2011?

15   A.   Yes.

16   Q.   And 2016, the last time, as the first vice president?

17   A.   Yes, sir.

18            THE COURT:  And, again, let me just ask the witness to

19   make sure you keep your voice up.  Go ahead, counsel.

20   Q.   And each time -- Mr. Seabrook and you and the slate of

21   candidates, each time you won?

22   A.   Yes.

23   Q.   And that is a secret ballot of the members?

24   A.   Yes, it is.

25   Q.   And you came to Mr. Seabrook's attention and to the

1    attention of other members of COBA because you wrote a widely

2    read newsletter, in some sense an underground newsletter, that

3    pointed out the inefficiencies and shortcomings of the

4    incumbent administration back in 1994, '95?

5    A.  Yes, sir.

6    Q.  And Mr. Seabrook came to you and asked you to run with him?

7    A.  Yes.

8    Q.  And you have remained a board member of COBA ever since

9    that time?

10   A.  Yes.

11   Q.  You were treasurer from 1995 to 2000 -- 2010, I'm sorry,

12   sir?

13   A.  Yes.

14   Q.  And fair to say you did a good job?

15   A.  Yes.

16   Q.  You don't have to toot your own horn.

17   A.  Okay.

18   Q.  But fair to say.  And you cared about the union members?

19   A.  Yes.

20   Q.  And you cared about keeping a watchful eye over COBA's

21   assets?

22   A.  Yes.

23   Q.  And you were a fiduciary, you had a duty to do that, and

24   you took it seriously?

25   A.  Yes.

1   Q.  And Mr. Seabrook was also a fiduciary?

2   A.  Yes.

3   Q.  Now, in 2010, Mr. Seabrook asked you to become the first

4   vice president?

5   A.  Yes.

6   Q.  And am I right that is because the fellow who was first

7   vice president at the time resigned or retired and so there was

8   an opening?

9   A.  Yes, he retired.

10  Q.  And it was the prerogative of the president to fill that

11  interim vacancy; it was his power to fill the vacancy?  Let me

12  put it differently.  He appointed you?

13  A.  Yes.

14  Q.  Okay.  In 2012, you ran with him -- he ran as president,

15  and you ran as first vice president?

16  A.  Yes.

17  Q.  And I repeat myself, but again, you won?

18  A.  Yes.

19  Q.  I'd also be correct that in 2016, Mr. Seabrook was required

20  to step aside; he was suspended because he was indicted in this

21  case?

22  A.  Yes.

23  Q.  And you became acting president, you filled the void?

24  A.  Yes.

25  Q.  I'd also be correct that a great deal has changed for the

1   membership of COBA since 1995, when Mr. Seabrook and you were

2   first elected?

3   A.  Yes.

4   Q.  And I think you testified yesterday a change for the

5   better?

6   A.  Absolutely.

7   Q.  As you sit here today, you are, I think also fair to say,

8   enormously proud of COBA's accomplishments in the past 22

9   years?

10  A.  Yes.

11  Q.  Significant increases in pay for the members?

12  A.  Yes.

13  Q.  Multiple pay increases over that period?

14  A.  Yes, sir.

15  Q.  Parity with cops and firefighters, police officers and

16  firefighters?

17  A.  Yes.

18  Q.  Mr. Seabrook and you and the other board members increased

19  life insurance benefits?

20  A.  Yes, we did.

21  Q.  Increased medical benefits?

22  A.  Yes.

23  Q.  Increased legal services?

24  A.  Yes.

25  Q.  And during that 20 years that you were together, I think

1    the term you used yesterday was Mr. Seabrook was the face and

2    voice of the union?

3    A.   Yes.

4    Q.   And it could be a loud voice?

5    A.   Yes.

6    Q.   And for lack of a better word, it could be a smooth voice,

7    it could be a charming voice?

8    A.   Yes.

9    Q.   And when he was the face and voice of this union, you were

10   right beside him?

11   A.   Yes.

12   Q.   And you said yesterday that we wanted to promote

13   corrections officers, that it was that simple, that's what you

14   were about?

15   A.   Yes.

16   Q.   And I think you also said you wanted to put them on the map

17   everywhere in the world?

18   A.   Yes.

19   Q.   And everywhere in the world would mean having correction

20   officers respond to the scene after 9/11?

21   A.   Yes.

22   Q.   Respond to Long Island after Hurricane Sandy?

23   A.   Yes, sir.

24   Q.   Respond to Puerto Rico, not in this hurricane, but in a

25   prior hurricane?

1   A.  Yes.

2   Q.  Probably in this hurricane.  Did they respond?

3   A.  They would be prepared to go out, yes.

4   Q.  And responded to New Orleans after Hurricane Katrina?

5   A.  Yes.

6   Q.  What that was about was to raise the profile of corrections

7   officers, to show how dedicated public servants they were and

8   to earn them respect?

9   A.  Yes.

10  Q.  You testified that Mr. Seabrook was driven, would that be

11  correct?

12  A.  Yes.

13  Q.  And you were driven?

14  A.  Yes, we were.

15  Q.  And by driven, I don't mean you had a chauffeur?

16  A.  No.

17  Q.  You, the two of you, devoted enormous amount of time to

18  making sure that corrections officers got a fair deal, both at

19  Rikers and in contract negotiations?

20  A.  Yes, along with other members of the executive board,

21  absolutely.

22  Q.  I'm sorry, I didn't hear the last part?

23  A.  Along with other members of the board, yes.

24  Q.  Along with other members of the board.  This was not a

25  one-man show?

1    A.  No, it was not.

2    Q.  During that period of time, there were numerous legislative

3    victories for COBA?

4    A.  Yes.

5    Q.  In some sense, things you wouldn't imagine when you started

6    in 1995?

7    A.  Yes.

8    Q.  Among them, there was a variable support bill that helped

9    fund and support retirees' pensions?

10   A.  Yes.

11   Q.  There was an anti-privatization bill?

12   A.  Yes.

13   Q.  And what that said was that the jails of New York City, the

14   officers there would be COBA officers, and we weren't going to

15   privatize and let private guards have the run of the place?

16   A.  Yes.

17   Q.  There was a three-quarters bill?

18   A.  Yes.

19   Q.  I take it that what that said was that if a corrections

20   officer was disabled, he could retire with 75 percent pension,

21   tax free?

22   A.  Yes.

23   Q.  And those are just some of the legislative accomplishments?

24   A.  Yes.

25   Q.  And, again, it was all about respect for corrections

1    officers?

2    A.   Yes.

3    Q.   And benefits for corrections officers?

4    A.   Yes, sir.

5    Q.   And equity, particularly equity with police officers and

6    firefighters?

7    A.   Yes.

8    Q.   That's because, in your view, and it's certainly a

9    reasonable view, this was probably the most dangerous job in

10   the City of New York?

11   A.   I still feel that way, yes.

12   Q.   Now, I think you said if you compared it to the prior

13   administration, the benefits that were won, there was no

14   comparison?

15   A.   No comparison.

16   Q.   It was night and day, day and night?

17   A.   If I must say so myself.

18   Q.   You can this morning.

19   A.   Yes.

20   Q.   And among the things you negotiated, the union negotiated

21   under Mr. Seabrook's leadership, was an annuity payout?

22   A.   Actually, it was negotiated in the 1968.

23   Q.   But added to greatly during the 22 years that you and

24   Mr. Seabrook were there?

25   A.   We continued, yes.

1    Q.  And the way that worked, if I understand it, is that the

2    city, New York City, contributed money to a fund, and they

3    contributed a certain amount of dollars for each day that a

4    correction officer worked on the job?

5    A.  Yes.

6    Q.  And that money was then invested in a portfolio selected by

7    the board of trustees of that annuity fund?

8    A.  Yes.

9    Q.  And when a corrections officer retired, that annuity

10   benefit could be paid out to him when he retired?

11   A.  Yes.

12   Q.  It could be paid in a lump sum?

13   A.  Yes.

14   Q.  But he had a series of other options, right?  He could

15   leave it in; he could put it in an IRS.  It was really his

16   choice, but it was his money?

17   A.  Yes, or her.

18   Q.  Pardon?

19   A.  Or her money.

20   Q.  I stand corrected.  Or her money.  And there was a board

21   for that annuity fund, and it was the president, the first vice

22   president, the treasurer and financial secretary?

23   A.  Yes.

24   Q.  A four-person board?

25   A.  Yes.

1    Q.  And Mr. Seabrook was on it as president from 1995 to 2016?

2    A.  Yes.

3    Q.  And you were on it until 2010 as treasurer, and then to

4    2016 as first vice president, and now as acting president?

5    A.  Yes.

6    Q.  In addition, there was an investment advisor named Thomas

7    Reynolds?

8    A.  Yes, sir.

9    Q.  He was an independent investment advisor in the sense that

10   he had his own company; he wasn't a COBA employee?

11   A.  Yes.

12   Q.  And there was a lawyer, Howard Wien, of the Koehler firm,

13   who advised the annuity, the four of you?

14   A.  Yes.  And at times, Richard Koehler.

15   Q.  And at times, Richard Koehler himself?

16   A.  Yes.

17   Q.  Who was the senior partner in the Koehler law firm?

18   A.  Yes.

19   Q.  And fair to say that the two of them, Mr. Reynolds and

20   Mr. Wien, were men of good judgment?

21   A.  I'm sorry, were what?

22   Q.  Men of good judgment?

23   A.  Can you ask that again?  I'm sorry.

24   Q.  Yesterday you used the words they were professionals.  You

25   agree with me, they were professionals?

1    A.  Yes.

2    Q.  And you have great respect for them?

3    A.  They were professionals, yes, I respect them.

4    Q.  And a key part of your job on the annuity board, really the

5    central part, was the investment of those funds the city

6    provided to the annuity fund?

7    A.  Yes.

8    Q.  And you didn't just put it in a checking account and let it

9    sit there idly; you tried to earn interest on it?

10   A.  Yes.

11   Q.  And if we go to 2013, you had that money in the annuity

12   fund, and that annuity fund is separate from the pensions that

13   the corrections officers get?

14   A.  Yes, sir.

15   Q.  So people refer to it sometimes as a pension fund, but it's

16   really a sort of supplemental fund?

17   A.  Correct.

18   Q.  And you had that money invested with several entities in

19   2013?

20   A.  Yes.

21   Q.  Wright Investor Services?

22   A.  Yes.

23   Q.  International Real Estate or Intercontinental Real Estate?

24   A.  Yes.

25   Q.  And Advent Capital?

1    A.  Yes.

2    Q.  And if we could, Ms. Granquist, would you put Government

3    Exhibit 309 up on the screen?

4            THE COURT:  Hold on a minute.  Make sure the jurors

5    have it.  Go ahead.

6            MR. SHECHTMAN:  Am I okay just showing this to the

7    jury?

8            MR. BELL:  Yes, no objection.

9            THE COURT:  Hold on.  We're having some problems.

10   It's not on the witness' screen.  Hold on.

11           Does counsel have an extra hard copy of it?

12           MR. MAZUREK:  I have it.

13           THE COURT:  Yes, go ahead.  Co-counsel is approaching

14   with a hard copy of it.  Do the jurors all have it in front of

15   you?

16           JURORS:  Yes.

17           MR. SHECHTMAN:  Judge, our device shows that it's on,

18   but it's obviously not on.

19           THE COURT:  We'll go analog for now.  We'll call IT

20   and get them to come up here, but he has a hard copy of it.

21   Unless, do you need him to mark anything on this?

22           MR. SHECHTMAN:  I don't.

23           THE COURT:  Okay.

24   BY MR. SHECHTMAN:

25   Q.  So, Mr. Husamudeen, would you look at what is Government

1   Exhibit 309 with me, and would I be correct that is the minutes

2   of the April 17th and 22nd board meeting in 2013?

3   A.  Yes.

4   Q.  And it shows present Mr. Seabrook, who was the president;

5   you, who at this time was first vice president; Michael

6   Maiello, who was the treasure; and Amelia Warner, who was the

7   financial secretary?

8   A.  Yes.

9   Q.  And also present are those two gentlemen you mentioned, the

10  two professionals, Mr. Wien and Mr. Reynolds?

11  A.  Yes.

12          THE COURT:  Counsel, sorry to interrupt.  Just as a

13  housekeeping matter, is 309 in evidence?

14          MR. BELL:  Yes, we had the stipulation yesterday, your

15  Honor.

16          THE COURT:  Okay.  Great.  Go ahead, continue.

17  Q.  And if you'll turn to the second page, Ms. Granquist.

18          There was an investment manager's report that's

19  principally a report, I take it, by Mr. Reynolds?

20          THE COURT:  I think he wants you to turn to the second

21  page.

22  A.  There isn't -- oh, I'm sorry.  It's on the back.  Okay.

23  Yes, okay.

24  Q.  Do you have it?

25  A.  Yes.

1    Q.  And if you look at that second page with me, you'll see

2    where it says investment managers' reports?

3    A.  Yes.

4    Q.  And those are the reports of the investment managers that

5    we mentioned before, the three funds that you had your money

6    with?

7    A.  Yes.

8    Q.  And I say "you" to mean the annuity fund?

9    A.  Yes.

10   Q.  And you'll see that two gentlemen made a report for Wright;

11   am I correct?

12   A.  Yes.

13   Q.  And Wright was a fund that mostly invested in stocks and

14   bonds?

15   A.  Yes.

16   Q.  Stocks, sometimes people call equities?

17   A.  Yes, sir.

18   Q.  And am I correct that one of the things that was reported,

19   if you look at that paragraph, was that the returns that Wright

20   was getting on its investments did not meet their benchmark?

21   A.  Yes.

22   Q.  And what that meant was --

23        THE COURT:  Hold on.  You just have to speak audibly

24   into the microphone.

25   A.  Yes.

1   Q.  What that meant was they didn't do as well as they had

2   predicted, you had hoped, what was benchmarked for them?

3   A.  Yes.

4   Q.  And if you look at the bottom, you'll see there was also a

5   report from Mr. Weinstein from Intercontinental, at the very

6   bottom of that page?

7   A.  Yes.

8   Q.  And Intercontinental is a real estate investment fund?

9   A.  Yes, it is.

10  Q.  And it invests in real estate all around the country?

11  A.  Yes.

12  Q.  And I take it what happens is those real estate properties,

13  they may be a shopping center in South Carolina, but they show

14  up rent, and it's that rent that gives you your return?

15  A.  Yes.

16  Q.  And you'll see the report there was that they had earned

17  15 percent on an annualized basis during that year?

18  A.  Yes.

19  Q.  And fair to say that's a healthy return?

20  A.  Yes, it is.

21  Q.  If you look at the third page with me, it says at the very

22  top of that third page, that the trustees discussed liquidating

23  assets in other accounts to add to the Intercontinental

24  account?

25  A.  Yes, I see.

1    Q.  Indeed, there was a motion made to increase the fund's

2    investment in the Intercontinental Real Estate fund by $5

3    million?

4    A.  Yes.

5    Q.  And that passed unanimously?

6    A.  Yes.

7    Q.  That's because at 15 percent, it made more sense to have

8    more money there?

9    A.  Yes.

10              MR. SHECHTMAN:  Now, if you would put up,

11   Ms. Granquist, what is Government Exhibit 307.

12              And I believe that's also in evidence, Judge.

13              THE COURT:  Okay.  Can we bring a hard copy --

14              MR. BELL:  We have no objection it being in evidence.

15              THE COURT:  It's admitted into evidence without

16   objection.  Can we bring a hard copy for the witness also.

17              (Government's Exhibit 307 received in evidence)

18              THE COURT:  Why don't we just check with the jurors.

19   Do you all have it on your screen?

20              JURORS:  No.

21              THE COURT:  No?  Not yet?  Hold on a second.

22              MR. SHECHTMAN:  Have we got it?

23              THE COURT:  Do we have it now?

24              JURORS:  Yes.

25              THE COURT:  Okay.  Go ahead.

1    BY MR. SHECHTMAN:

2    Q.  If you'd look with me at 307, if you just can look at the

3    first page, that is a report by Mr. Reynolds to the fund?

4    A.  Yes.

5    Q.  And when I say "the fund," to the annuity fund?

6    A.  Yes.

7    Q.  And the only thing I want you to look at is the second page

8    of that, and if you see where it says "note" on that second

9    page, right before it says "manager's allocation" and I

10   apologize that we can't get it up on your screen.  Do you see

11   where it says "note" there?

12   A.  Yes.

13   Q.  And if you look down, you'll see -- Ms. Granquist, if

14   you'll highlight it -- 5 million was transferred to

15   Intercontinental from Wright on 9-3-13?

16   A.  Yes.

17   Q.  And that's what the board voted on and $5 million came out

18   of Wright because Wright, of all these three firms, was the one

19   that was performing the least well?

20   A.  Yes.

21   Q.  Now, Ms. Granquist, if you could put up Government

22   Exhibit 306.

23        THE COURT:  Okay.  And can we get a hard copy for the

24   witness?

25        MR. BELL:  Your Honor, I don't believe 306 is in, but

1   we're happy to --

2            THE COURT:  Is there any objection to 306?

3            MR. SHECHTMAN:  I move it in, your Honor.

4            THE COURT:  Okay.  306 is admitted without objection.

5            (Government's Exhibit 306 received in evidence)

6            MR. SHECHTMAN:  As soon as the jurors have it, if you

7   can just raise your hand when you have it.

8   Q.  Sir, if you look at the cover --

9            THE COURT:  Hold on a second.

10           MR. SHECHTMAN:  Do you have it, Judge?

11           THE COURT:  I have it.  I just want to make sure the

12  jurors do.

13           MR. SHECHTMAN:  I think they do.

14           THE COURT:  Do you all have it?

15           JURORS:  Yes.

16  BY MR. SHECHTMAN:

17  Q.  If you look at the cover of 306, this is -- again, it's a

18  report from Mr. Reynolds, and you can see Reynolds Consulting

19  Services down at the very bottom of that first page.

20  A.  Yes.

21  Q.  And it's a report to the Benevolent Association Annuity

22  Fund?

23  A.  Yes.

24  Q.  And it's a report as of December 31st, 2013; so it's

25  essentially the end of the year?

1    A.  Yes.

2    Q.  And if you'll turn over to the second page, and I'd be

3    correct that, at the end of the year, you had 66 percent --

4    66.04 percent, to be precise -- of your money in Wright, 17.27

5    in Intercontinental, and 16.69 in Advent?

6    A.  Yes.

7    Q.  And I think we talked about the fact that Wright is a

8    stocks and bonds fund, Intercontinental is a real estate fund,

9    and am I right that Advent is a private equity fund, it

10   actually buys and sells companies?

11   A.  Advent?

12   Q.  Yes.

13   A.  Invested in what is called convertible bonds.

14   Q.  It's a convertible bond company?  Okay.  I apologize.  In

15   any event, that was your allocation, 66 percent in Wright,

16   17 percent in the real estate fund and 16.6 percent in Advent?

17   A.  Yes.

18   Q.  And the change -- if you look at the prior column, right,

19   the change, you'll see that Intercontinental there is 6

20   million; am I correct, 6.6?

21   A.  Yes.

22   Q.  And by the end of the year, it's 12?

23   A.  Yes.

24   Q.  And that's not because -- I mean, the interest rate was

25   good, it was 15 percent, but that really reflects the fact that

1    you moved $5 million there?

2    A.  Yes.

3    Q.  And of the three, again, you moved it there because Wright

4    was the least successful?

5    A.  Yes.

6    Q.  Now, that report from Mr. Reynolds came to you shortly

7    before the January 2014 meeting of the annuity fund board?

8    A.  I don't recall if it came before.  Usually we got these

9    things at the meeting.

10   Q.  You got them at the meeting?

11   A.  Yes.

12   Q.  So although it's dated 12-31, it was actually handed out at

13   the meeting?

14   A.  Yes.

15   Q.  Okay.  And so let's take a look at that meeting.

16            And, Ms. Granquist, if you could put up 310,

17   Government Exhibit 310.

18            THE COURT:  Do the jurors have it?

19            JURORS:  Yes.

20            THE COURT:  Okay.  Go ahead.

21   Q.  Mr. Husamudeen, do you have it?

22   A.  Yes.

23   Q.  And these are the minutes of the January 13, 2014, Annuity

24   Fund Board, correct?

25   A.  Yes.

1   Q.  Held at the COBA's offices at 75 Broad Street?

2   A.  Yes.

3   Q.  And present are the board trustees, you, Mr. Seabrook,

4   Mr. Maiello and Ms. Warner?

5   A.  Yes.

6   Q.  And what I want you to do is turn over to the second page,

7   if you would, and again -- and I think I'm right in saying this

8   happened almost every meeting, the managers come in and talk

9   about how their funds are doing?

10  A.  Yes.

11  Q.  And if you look at the top of that page, you will see that

12  Wright came in and, again, what we learn is the returns for

13  Wright for 2013 did not meet the benchmarks that the trustees

14  had set?

15  A.  Yes.

16  Q.  So Wright was still lagging behind?

17  A.  Yes.

18  Q.  And then, if you look down at the bottom, there was new

19  business, and to read down the minutes, Mr. Landesman,

20  Mr. Kalter, Mr. Kaplan made a proposal for Platinum?

21  A.  Yes.

22  Q.  And do you recall that?

23  A.  Yes.

24  Q.  And they made, what in the vernacular is called, a pitch?

25  A.  Yes.

1   Q.  And they were a hedge fund?

2   A.  Yes.

3   Q.  Which was a somewhat new concept, certainly a new concept

4   for the annuity fund?

5   A.  Yes.

6   Q.  But not that complicated a concept.  They invested in a

7   variety of things.  They can invest in stocks or bonds or real

8   estate or commodities or companies; they were another

9   investment vehicle?

10  A.  Yes.

11          MR. SHECHTMAN:  And, Ms. Granquist, if you could put

12  up 402.

13          Question, are you comfortable if we put that in

14  evidence?

15          MR. CAPONE:  It's in.

16          MR. SHECHTMAN:  It's in.

17          THE COURT:  Okay.  Do the jurors have that in front of

18  them?

19          JURORS:  No.

20          THE COURT:  Okay.  All right.  Do the jurors have it

21  now?

22          JURORS:  No.

23          THE COURT:  You have it?  Okay.  Before you start,

24  counsel, we have someone from IT here.  Let's see if we can get

25  the witness' screen working.

1          (Pause)

2          MR. BELL:  Judge, just for the record, we're not

3    actually sure that Government Exhibit 402 was moved in, but we

4    don't object to it.

5          MR. SHECHTMAN:  That's fine.  I'll move it, just to be

6    safe.

7          THE COURT:  Okay.  402 is admitted without objection.

8          (Government's Exhibit 402 received in evidence)

9          THE COURT:  Okay.  Hold on just a second.

10          (Pause)

11          So counsel, IT has informed me -- I was hoping this

12    would be a two minute fix -- this may take a little longer.

13    Let's just keep going the way we've been doing it.  We'll give

14    the witness the documents in hard copy.  I think the jurors can

15    still see it, if it's all right with everyone.  I think the

16    witness already has 402, unless it comes back.

17          MR. SHECHTMAN:  Judge, if it's possible, part of the

18    remediation process seems to be that we've added red lines to

19    the screen.  I don't know if they can be removed or not, but

20    they're not part of the document.

21          THE COURT:  Okay.  Let's see if we can deal with that.

22    Are the red lines off of the screen?

23          MR. SHECHTMAN:  They are.

24          THE COURT:  All right.  Okay.

25          MR. SHECHTMAN:  Thank you.

1    BY MR. SHECHTMAN:

2    Q.   And Platinum made a pitch that day to COBA, and I think you

3    testified yesterday --

4              THE COURT:   Okay.   Hold on one second, counsel.

5              (Pause)

1          THE COURT:  The witness's monitor is still not

2     working, but the red lines are gone.

3     BY MR. SHECHTMAN:

4     Q.  I think you said yesterday that that pitch by Platinum

5     lasted about an hour?

6     A.  Yes, yes, sir.

7     Q.  Its purpose was to describe to you the fund, how it worked,

8     how successful it was and the like?

9     A.  Yes.

10    Q.  And if you look at 402 now in evidence, that is an email

11    from Mr. Mann at Platinum to Mr. Reynolds, who was your

12    investment adviser?

13    A.  Yes.

14    Q.  And it is is dated January 6th, which is about a week

15    before your annuity fund board meeting?

16    A.  Yes.

17    Q.  If you look with me at the second page, the third page of

18    it, really the page that begins fund overview?

19    A.  Yes, I have it.

20    Q.  And I just want you to look in the box in the center of

21    that page and you'll see it says that Platinum, PPVA fund, that

22    was one of the funds that Platinum had and that was the fund

23    you eventually invested in.  Am I correct?

24    A.  Yes.

25    Q.  It says that that fund had $1.28 billion invested across

1    five product?

2    A.  Yes.

3    Q.  And rate of return since its inception in 2003, if you look

4    at the top, you'll see it says launched in 2003, the rate of

5    return was 18.67 percent?  Do you see that first number in the

6    box?

7    A.  Yes.

8    Q.  And I take it that also is a healthy rate of return?

9    A.  Yes.

10   Q.  Were you told that in this pitch?  That wasn't something

11   that they hid from you?

12   A.  Excuse me?

13   Q.  They told you that the rate of return was over 18 percent?

14   A.  I recall them telling me, but I am sure they included,

15   might have included that.

16   Q.  It is not the kind of thing they want to hide from you?

17              MR. BELL:  Objection.

18              THE COURT:  Overruled.  I will allow it.  You can

19   answer.

20   A.  I agree.

21   BY MR. SHECHTMAN:

22   Q.  If you go with me further back, there is a section called

23   awards, industry awards and recognition, and you'll see that

24   they were voted best non-directional hedge fund in the top 20

25   from HSB bank, they were No. 5, Barclays had them No. 1 and

1   then No. 3 in terms of their annual ranking.  Was that

2   information shared with you?

3   A.  I don't recall.

4   Q.  Again not something you'd expect them to hide from you?

5          MR. BELL:  Objection.

6          THE COURT:  I'll allow it.

7   A.  No.

8   BY MR. SHECHTMAN:

9   Q.  I mean they were there to encourage you to invest?

10  A.  Yes.

11  Q.  Now, let's go back, if you would, to the minutes of that

12  board meeting.  That is 310, if you would.  If you look at the

13  second page of those minutes -- we are going to try to help

14  you.  Our apologies.  (Pause)

15         Do you have both pages of it?  If you look at the

16  second page with me, it says --

17         THE COURT:  Do the jurors have it in front of them?

18  Okay.  Go ahead.

19  BY MR. SHECHTMAN:

20  Q.  It says Mr. Reynolds and Mr. Wien were instructed to

21  perform due diligence and to report back to the chair with

22  their results.  Do you see that under the new business?

23  A.  Yes.

24  Q.  Mr. Reynolds being the investment advisor, Mr. Wien being

25  the lawyer?

1    A.   Yes.

2    Q.   And the chair being Mr. Seabrook?

3    A.   Yes.

4    Q.   And the next sentence says in the event the advisor --

5    (inaudible) -- the chair was authorized to invest up to $10

6    million to be taken from assets held by right with Platinum,

7    right?  That is what the minutes say.  Am I correct?

8    A.   Yes, that's what the minutes say.

9    Q.   In your experience at COBA, the minutes are approved at the

10   next meeting?

11   A.   Yes.

12   Q.   If they're inaccurate, somebody will speak up?

13   A.   If they catch it, if they read it, yes.

14   Q.   As far as you know, these minutes were approved?

15   A.   I wasn't at that meeting, but as far as I know, yes.

16   Q.   Now, that approval at that meeting was conditional on

17   Mr. Reynolds' due diligence and Mr. Wien's due diligence?

18   A.   Yes.

19   Q.   Due diligence means just that, you're supposed to -- those

20   professionals are supposed to review and be diligent in their

21   review?

22   A.   Yes.

23   Q.   I take it that I think you testified yesterday that you

24   hadn't heard of Platinum before that meeting?

25   A.   Yes.

1    Q.  You hadn't heard of Mr. Kalter or Andrew Kaplan, the

2    gentleman who came to that meeting?

3    A.  Yes.

4    Q.  And you hadn't heard of Murray Huberfeld?

5    A.  Yes.

6            THE COURT:  Again let me ask the witness to make sure

7    you continue to lean into the mike and keep your voice up.

8            Go ahead.

9    BY MR. SHECHTMAN:

10   Q.  Would I be correct that you first, the annuity fund first

11   invested in Intercontinental real estate in 2011?

12   A.  I don't recall, but --

13   Q.  Let's see if we can help.  If you can put 307 back up.

14           THE COURT:  Can someone help the witness with 307.

15           (Pause)

16           THE WITNESS:  Thank you.  I have it.

17   BY MR. SHECHTMAN:

18   Q.  Do you have it?

19   A.  Yes.

20   Q.  This is a little bit confusing, but do you see where it

21   says Intercontinental at the top, it says inception, September

22   3rd, 2013.  Do you see that in that chart there?

23   A.  Yes, I do.

24   Q.  If you go down further, and it says $12 million there?

25   A.  Yes.

1    Q.  Go down further, you'll see that it says in the second

2    line, 5.8 million was transferred to Intercontinental from

3    Wright on 5-10-11.  It is hard to think that the inception was

4    in 2013 if the first money went in there in 2011?

5    A.  Okay.

6    Q.  If you look down, we have seen this another $5 million

7    transferred to Intercontinental in September of 2013.  If you

8    add those up, that is about 10.8 million, you add the interest

9    to it and you get that 12 million.  On the basis of that, sir,

10   I say to you it looks like Intercontinental knocked on your

11   door in 2011?

12   A.  Okay.

13   Q.  By your "door," I mean the annuity fund board?

14   A.  Yes.

15   Q.  I take it you hadn't heard of Intercontinental in 2011 when

16   they made their pitch?

17   A.  No.

18   Q.  You hadn't heard of Bard Weinstein when he came to meet

19   you?

20   A.  No.

21   Q.  Peter Elabgian when he came to meet you in 2011?

22   A.  No.

23   Q.  Petro Palangian?

24   A.  No.

25   Q.  And that's not uncommon, the fact you hadn't heard of

1  Platinum, the fact you hadn't heard of Intercontinental, the

2  fact you hadn't heard of the Platinum people, the fact you

3  hadn't heard of the Intercontinental people?  You're not a

4  professional financial adviser?

5  A.  No, I am not.

6  Q.  You're a union leader?

7  A.  Yes.

8  Q.  Now, yesterday we spent a fair bit of time on Government

9  Exhibit 1072, and I just want to ask if you can put that back

10  up on the screen.  Do you have it, sir?

11  A.  Yes, I do.

12  Q.  I think you said yesterday you had never seen this letter,

13  certainly didn't see it at the time?

14  A.  Yes.

15  Q.  It is a letter, dated February 14th.  If you can go back to

16  the first page in the email, it is delivered from Mr. Wein to

17  Mr. Seabrook, copied to Mr. Koehler, the head of the firm,

18  copied to Tommy Reynolds, the investment adviser, and it is

19  dated, go to the second page, the letter itself is dated

20  February 14th, 2014.  What I want to do is just spend a few

21  minutes going through this.  If you go over to the second page

22  of the letter, and the paragraph that begins, "First."

23          I apologize for reading so much of this, but I am

24  going to just read it to you if you would and if you will

25  follow along with me.

1           It says First, being that other benefit funds

2      investments are relevant to a discussion of any proposed

3      investment, it is a concern that, to our knowledge, none of the

4      other supplemental benefit funds are invested in this type of

5      hedge fund.  Where other retirement funds have invested in

6      hedge funds, they have chosen to invest in"fund of funds.

7           That is a collection of hedge funds managed by an

8      investment manager.  By having several hedge funds, the fund of

9      funds diversifies the investment class minimizing the risk, but

10     also potentially reducing the returns.

11          So what looks like unions or at least other entities

12     that had supplemental benefit funds had done is not to pick one

13     hedge fund, but to pick a fund that managed several hedge

14     funds?

15               MR. BELL:  Objection.

16               THE COURT:  Basis?

17               MR. BELL:  Foundation.

18               THE COURT:  I'll allow it.  You may answer.

19     A.  I don't even understand the question.

20     BY MR. SHECHTMAN:

21     Q.  I said what that paragraph says, what other supplemental

22     benefit funds --

23     A.  Oh, yes.

24     Q.  They hadn't put it in one fund?

25     A.  Yes.

1    Q.  They put it in a fund of funds, which is to say a fund that

2    had several hedge funds as part of it?

3    A.  Yes.

4    Q.  And the advantage of that is you diversify, but you don't

5    have it in just one hedge fund, correct?

6    A.  Yes.

7    Q.  But the disadvantage is you reduce your potential return,

8    and that is what that says?

9    A.  Okay.

10   Q.  Diversity can minimize risk, but it can also reduce

11   returns?

12           MR. BELL:  Objection, your Honor.

13           THE COURT:  Do you understand that to be true?

14           THE WITNESS:  From reading this?

15           THE COURT:  Yes.

16           THE WITNESS:  Yes.

17           THE COURT:  Go ahead, counsel.

18   BY MR. SHECHTMAN:

19   Q.  That is -- you have been -- you're a union leader, but you

20   have been involved in investments for a long time.  That is a

21   pretty good rule in life, which is to say, if you want higher

22   returns, you take on a little more risk?

23   A.  You're asking me to speculate?

24   Q.  No.  I am asking whether that is true based on your

25   knowledge?

1    A.  Say that again.

2    Q.  If you want a little bit of higher returns, you often time

3    have to take on a little more risk?

4    A.  Agreed.

5    Q.  You keep it in a checking account, right, and you have no

6    risk, you're FDIC insured and you have no returns, correct?

7    A.  That's not this type of fund.

8    Q.  I understand.  I am just saying that's a simple example of

9    where you want to reduce risk, you can get your risk to zero,

10   but you get your risk to zero and you get your returns to zero?

11   A.  Okay.

12   Q.  Correct?

13   A.  Yes.

14   Q.  Now, the next paragraph says the fact that the proposed

15   investment is not a fund of funds, right, and that fund of

16   funds is a fund that invests in several hedge funds, is in our

17   opinion, mitigated, so it is reduced by the fact that this

18   office and the investment consultant -- that is Mr. Reynolds,

19   right?

20   A.  Where are you reading?

21   Q.  I am reading the second paragraph that says the fact

22   that --

23   A.  Okay.

24   Q.  Are you with me?

25   A.  Yes.

1   Q.  Do you have it highlighted?  There you go.  The jury?

2           MR. SHECHTMAN:  The jury has it.

3   Q.  The fact the proposed investment is not a fund of funds is,

4   in your our opinion, mitigated, it is reduced by the fact that

5   this office -- that means the lawyers and the investment

6   consultant -- I take it that means Mr. Reynolds?

7   A.  Yes.

8   Q.  Review of the actual investments made by this product,

9   which is to say, made by Platinum, reveal a traditional fund of

10  funds strategy, thus minimizing but of course not eliminating

11  the risk of large losses.

12          Would I be right what is being said there is if you

13  have a fund of funds, right, you're invested in several hedge

14  funds?

15          MR. BELL:  Objection.

16          THE COURT:  Please rephrase the question.

17  BY MR. SHECHTMAN:

18  Q.  Well, I take it what your lawyers are saying there is if

19  you're invested in a fund of funds, it invests and earns in

20  several hedge funds, but this is just one hedge fund, it is

21  Platinum, but the risk is minimized some because Platinum

22  itself is diversified?

23          MR. BELL:  Objection.  It needs more foundation.

24          THE COURT:  I will allow it.  You may answer.

25  A.  You are going to have to ask me again.  Basically what are

1    you doing, you're asking me to critique this letter?

2              THE COURT:  Hold on.  That is not -- you can answer

3    the question.  Please rephrase the question, counsel.

4              MR. SHECHTMAN:  I will withdraw the question.

5    BY MR. SHECHTMAN:

6    Q.  Look down at the bottom with me, if you would, and there

7    were questions asked of you yesterday about a series of

8    concerns, and I just want to go over them quickly with you.

9              If you see, there is a paragraph that begins in light

10   of the foregoing, right, and this paragraph, the concern is

11   that Platinum has not agreed to be fiduciaries.  That is the

12   concern?

13   A.  I see it.

14   Q.  And the next paragraph that begins, Third, the concern

15   there is that there were actual and potential conflicts of

16   interest that were possible.  Would I be correct?

17   A.  Yes.

18   Q.  And the next paragraph, the concern is that when you invest

19   in a risky vehicle like this, you could lose your whole

20   investment?

21   A.  Yes.

22   Q.  This fund had been around since 2002, but that was still a

23   risk?

24   A.  I am sorry.

25   Q.  I will withdraw the question.

1          Then if you go to the next page, it highlights one

2     particular concern?

3     A.   Yes, I see it.

4     Q.   The concern here is the hedge fund pays redemptions in cash

5     and in kind at the hedge fund's discretion.  What your lawyers

6     were concerned about is if you are redeeming, if you wanted

7     your money back, you guys wanted cash?  You didn't want an oil

8     well?

9          MR. BELL:  Objection.

10    A.   That is what the letter says.

11         THE COURT:  I will allow it.

12    A.   That is what the letter says, yes.

13    BY MR. SHECHTMAN:

14    Q.   That was another concern?  And that was a particular

15    concern?

16         MR. BELL:  Objection.

17    A.   This letter --

18         THE COURT:  Hold on.  Please rephrase the question,

19    counsel.

20    BY MR. SHECHTMAN:

21    Q.   That was another concern that is pointed out in this letter

22    that was shown to you yesterday?

23    A.   Yes.

24    Q.   That concern again is that the payment could be in kind,

25    which is to say, not cash?

1    A.  Yes.

2    Q.  As we go forward, I am going to refer to that as payment in

3    kind or PIK.  Is that okay?

4    A.  Yes.

5    Q.  Now, I want to see if we can go behind this letter.  This

6    letter is February 14th of 2014, and it is not signed, I think

7    was pointed out yesterday?

8    A.  Okay.

9    Q.  Correct?

10   A.  Yes.

11              MR. SHECHTMAN:  Now, Ms. Granquist, if you could put

12   up what is -- and not for the jurors until we get this into

13   evidence -- Defendant Exhibit A.

14              THE COURT:  Do you have a hard copy for the witness?

15              MR. SHECHTMAN:  The only way to do this is give the

16   computer screen.  We'll get it to him.

17              THE COURT:  Okay.  Hold on a second.

18              What we can do is, can you see that screen?

19              THE WITNESS:  If they enlarge it, yes.

20              THE COURT:  I think the witness, if you make what

21   you're showing large enough, I think the witness can see it

22   from the screen that is in front of the Court Reporter.

23              MR. SHECHTMAN:  That is great.

24              (Off-the-record discussion)

25              THE COURT:  Counsel, before you go any further,

1   Defendant's Exhibit A, is this something you're seeking to

2   introduce into evidence?

3           MR. SHECHTMAN:  It turns out my mistake, it actually

4   is Government Exhibit 1027.

5           (Off-the-record discussion)

6           MR. SHECHTMAN:  It is part of 1027 and we are all fine

7   with it being admitted.

8           THE COURT:  Okay.  You are moving it in evidence and

9   it is admitted without objection.

10          MR. SHECHTMAN:  I think that's correct.

11          (Government Exhibit 1027 received in evidence)

12          THE COURT:  This will be labeled as part of --

13          MR. SHECHTMAN:  Government Exhibit 1027, no need to

14  have duplicate markings.

15          MR. BELL:  It is already in, your Honor.

16          THE COURT:  That is in evidence without objection.

17          Make sure you make it large enough so that the witness

18  can see it.  Hold on, let's wait for the jurors to get it in

19  front of them.

20  BY MR. SHECHTMAN:

21  Q.   That is a letter to Mr. Landesman and Mr. Kaplan and Mr.

22  Kalter.  Those are the people we saw made the presentation for

23  Platinum, and it is a letter from the Koehler firm, and if we

24  go to the end of it, it is a letter from Mr. Wien, correct?

25  A.   From here it is not enlarged, but it looks like it is

1  signed by Mr. Wien.  Yes, it is from Mr. Wien.

2  Q.  Okay.  We'll do our best to enlarge.

3          And I take it like the document you saw yesterday, you

4  were shown yesterday, this is not a letter that you saw at the

5  time?

6  A.  No, I didn't see this letter or the other --

7  Q.  Let's just look together at the second page, I think, and

8  if you look on the second page, you'll see a sentence written

9  to Platinum by the fund's lawyer.  It says we have the

10 following concerns, and it is 1, 2, 3, 4, and one is they're

11 not fiduciaries.

12         THE COURT:  Hold on.  You have to enlarge it.

13         THE WITNESS:  Thank you.

14 BY MR. SHECHTMAN:

15 Q.  One is they're not fiduciaries.  Two is the conflict of

16 interest.  Three is you have the potential to lose everything,

17 and four is it needs liquidity, and you can't accept payments

18 in kind, what I called before PIK.

19 A.  Yes, I see it.

20 Q.  And this letter is February 5th.  It is written to Platinum

21 before that letter we saw which was February 14th?

22 A.  Okay.

23 Q.  But it is the same four concerns that are expressed in the

24 February 14th letter, fiduciaries, conflict of interest, large

25 losses, PIK?

1    A.  Okay, yes.

2            MR. SHECHTMAN:  Now, I am going to ask, Judge, if I

3    can just make this B and we'll worry about A later so I don't

4    have to remark.  I will offer defendant exhibit -- I am going

5    to ask we show Defendant Exhibit B.

6            THE COURT:  Do you wish to introduce Defendant's

7    Exhibit B into evidence?  Is there any objection to that?

8            (Off-the-record discussion)

9            MR. BELL:  No objection.

10           THE COURT:  Defendant's B is admitted without

11   objection.

12           (Defendant Exhibit B received in evidence)

13           MR. SHECHTMAN:  This --

14           THE COURT:  You have to make sure the witness has a

15   hard copy.

16           MR. SHECHTMAN:  I have to make sure the jury gets it

17   on the screen.

18           THE COURT:  Is this something you have a hard copy or

19   we need to make it larger on the Court Reporter's screen.

20           Do the jurors have it on their screen?  Okay.

21   BY MR. SHECHTMAN:

22   Q.  And this is dated February 18th of 2014, so this is after

23   that unsigned letter that you were shown yesterday?  Am I

24   correct on that?

25   A.  Yes.

1    Q.  And this is from Mr. Kalter, who we know is at Platinum, to

2    Mr. Landesman, Mr. Kaplan, Mr. Huberfeld, all Platinum people,

3    and the subject is COBA.  I take it you didn't see this at the

4    time, either?

5    A.  No.

6              MR. SHECHTMAN:  Ms. Granquist, if you go down.

7    BY MR. SHECHTMAN:

8    Q.  And it says the 10 million is set to come in -- that meant

9    to be to PPVA, the Platinum fund we talked about.  Russ is

10   working on a side letter addressing PIK.  They dropped the

11   first three points.  So it looks like on February 18th, those

12   first three of those four points we talked about have been

13   dropped?

14             MR. BELL:  Objection.

15   Q.  Were you aware of that?

16             MR. BELL:  Objection.

17             THE COURT:  Please rephrase the question, counsel.

18   BY MR. SHECHTMAN:

19   Q.  Well, the email says they dropped the first three points.

20   Were you aware of that at the time?

21   A.  I wasn't aware of the email, the letter, this.  I wasn't

22   aware of any of this stuff.

23   Q.  Understood completely.

24             Now, the next thing I want to show you is, and we'll

25   wait to show this to the jury, what is Defendant's Exhibit C,

1   and I will ask if you get that.

2           THE COURT:  Are you seeking to introduce Defendant's

3   C?

4           MR. SHECHTMAN:  I am, your Honor.

5           MR. BELL:  We object, your Honor.  A sidebar may be

6   necessary.

7           THE COURT:  Let's have a sidebar in the robing room.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Thank you.  Hold on a second.

3          (Pause)

4          MR. SHECHTMAN:  Judge, I asked Ms. Granquist to come

5    in, which is not usual.  She will figure out what she does

6    depending on what the court rules.  Is that a problem?

7          MR. BELL:  We don't object.

8          THE COURT:  No, that is fine.

9          (Pause)

10         THE COURT:  What is the government's objection?

11         MR. BELL:  A number of things, your Honor.

12         We saw this document for the first time this morning

13   despite the fact that the union had been under a subpoena for

14   two years, which leads us to believe that there actually isn't

15   a business record avenue for admission on account of it doesn't

16   appear that they maintained it given we didn't get that through

17   the subpoena.

18         I suppose there is some possibility of an attempt to

19   lay a foundation here through the witness, and I think they

20   should have to go jump through that series of hoops if it comes

21   in at all.

22         THE COURT:  So the objection is foundational, you

23   think it is not a business record because this wasn't turned

24   over previously?

25         MR. CAPONE:  It is hearsay if it is offered for the

1    truth unless a hearsay exception can be established.

2    Presumably the proffered exception would be it is a business

3    record.  It does not appear to be a document maintained by the

4    union, and they have not produced it to us.

5         Apparently we're told it was given to defense counsel

6    last night or this morning by the attorneys for the union who

7    we have not spoken to and have no -- it is a PDF, a scan, so we

8    have no basis to assess its authenticity or again whether it is

9    a business record.  They can try to lay the foundation through

10   this witness, but --

11        THE COURT:  Defense counsel?

12        MR. SHECHTMAN:  I am speechless.  This is a document,

13   right, that is signed by each member of the board, and this

14   witness will say that that is his signature.  I am a hundred

15   percent confident of that.

16        The reason I am confident of it, we got it last night,

17   and we went online, looked for the signature.  That is his

18   signature, Mr. Seabrook's signature.  We went online and looked

19   for Mr. Maiello's signature.  Mr. Maiello's signature, right?

20        It is a resolution.  Now, I don't know why it wasn't

21   turned over.  I called last night because when that -- the

22   fault is mine -- I didn't focus on that document.

23        THE COURT:  Let's do this in the short term.  We have

24   a jury waiting.  This will take a little bit more than two

25   minutes to resolve this.  I'll give the jurors a 10-minute

1  break while we look at this.

2            (Continued on next page)

1           (In open court)

2           THE COURT:  Here is what we are going to do.  We are

3    going to give you a 10-minute morning break so you can use the

4    restroom.  Don't discuss with counsel, don't discuss this case

5    amongst yourselves, don't do independent research, and I will

6    see you in 10 minutes.  Thank you.

7           (Jury excused).

8           THE COURT:  Please be seated.  Let me see the document

9    again.

10           MR. SHECHTMAN:  Judge, we'll put it up on your screen.

11    Is that on your screen?

12           THE COURT:  Hold on a second.  (Pause)

13           Can you show me the second page of this document.

14    (Pause)  Just so we're clear, the witness is out of the

15    courtroom.  Is that correct?

16           MR. BELL:  Yes, your Honor.

17           THE COURT:  Let he hear more from the government as to

18    the basis of your objection here.

19           MR. BELL:  It is indisputably a hearsay document.  So

20    it has to be an applicable exception.  Presumably although

21    perhaps we should check in with defense counsel at this point

22    to make sure we are on the same page, they looked to get this

23    in as a business record?

24           MR. SHECHTMAN:  Judge, I am happy to get this in not

25    for its truth.  What I want to get in is that this person

1    signed this document, right?  Which shows, which says these

2    things.  If you want to leave it at that, I am okay with that,

3    but this is a business record.  We are putting in emails in

4    this case between two people, right, who if they talked in the

5    hallway wouldn't be a business record.  This is hard to imagine

6    this isn't a business record.  It is signed by every one of

7    these people.

8            THE COURT:  Hold on.  While we keep going down this

9    line, I know that counsel are very experienced and tend to

10   reflexively when we talk about a document go straight to the

11   business records exception, and that is a ground by which many

12   documents are admitted.

13           Let me ask counsel to weigh in why some of these

14   statements contained within this document wouldn't fit under

15   hearsay exception 15, statements and documents that affect an

16   interest in property?

17           MR. SHECHTMAN:  Your Honor, I want to say the

18   following:  I think from Columbia Law School, I forgot that

19   hearsay exception.  That is exactly what they do.  If you talk

20   about a document that affects an interest in property, this is

21   it.  I apologize to the court for being a step behind.

22           THE COURT:  I know I am springing this on folks.  If

23   you need to look at my rules of evidence book, do that and let

24   me get your thoughts on it.  The same thing for defense

25   counsel.  Here, I have another.

1          MR. LIPTON:  We have one.

2          THE COURT:  Okay.

3          (Pause)

4          MR. SHECHTMAN:  Judge, that seems to fit and, indeed,

5     if you look at the whereas clause, right --

6          THE COURT:  Just hold on and let the government get a

7     chance to look at that and make sure everyone has had a chance

8     to read that exception first.

9          (Pause)

10         THE COURT:  Has the government had a chance to look at

11    Rule 803 (15)?  Let he hear what the government's view is on

12    this and let me hear from defense counsel on this.

13         Does the government have any objection to that

14    exception applying?

15         MR. CAPONE:  Perhaps, your Honor.  We don't have the

16    case law in front of us, but I think it may be that that rule

17    envisioned the admission of things, just deeds and other things

18    publicly recorded.

19         THE COURT:  I think that is 14.  I think that is 14,

20    talking more about things publicly recorded.  15 doesn't have

21    in the rule anything about any requirement that something be

22    filed publicly and the like.  I think you're talking about 14.

23    I am talking about 15.

24         MR. CAPONE:  14 is the documents themselves.  15 is

25    statements in those documents.  I understand the distinction

1    your Honor is drawing.  I would be more comfortable taking a

2    look at the case law.

3              THE COURT:  What about let me hear from defense

4    counsel on this.

5              MR. SHECHTMAN:  Judge, if you look at the advisory

6    committee note, and it says that thus, for example, a deed

7    purporting to have been executed by an attorney, in fact, may

8    recite the existence of the power of the attorney or may recite

9    the -- (inaudible) -- these recitals are exempt from the

10   hearsay rule.

11             The circumstances under which the dispositive

12   documents are executed and the requirement that the recital be

13   germane to the purpose of the document are believed to be

14   adequate guarantees of trustworthiness particularly in view of

15   the inapplicability of the rule if dealing with the property

16   has been inconsistent with the document.

17             So you say to yourself the following, right?  That

18   this is a recital here that is surely germane to the purpose of

19   the document.  It explains why it is that we are moving $10

20   million in this direction.

21             If you ask the question whether it is inapplicable

22   because the dealings with the property were inconsistent with

23   the document, just the opposite is true, the $10 million moves.

24   So it seems directly on point and again the bottom line here is

25   the following:

1       That all of these hearsay exceptions and advisory

2   committee shows as much are based on guarantees of

3   trustworthiness.  The notion is we have a document signed by

4   four trustees at the bottom of it in the left corner, and I

5   don't know whether we can bring this up, right, is the Koehler

6   & Isaac -- what does one call it?  File something or other,

7   right, which says Howard which, of course, is Howard Wien,

8   labor, document COBA, union, Platinum, WBD.  It says

9   resolution, right, which of course is what this is, it is the

10   resolution of this issue.

11       It is a copy, but God bless the Federal Rules of

12   Evidence, they don't require originals unless there is some

13   genuine issue about it not being authentic, it not being real.

14   There can't be a genuine issue here.  This is a copy like

15   hundreds of other copies that go into evidence in the

16   courtroom.

17       So you have a document that fits the hearsay

18   exception, thankfully the court has found for us that we missed

19   it fits the all, everything in the advisory committee note and

20   the fact that it is a copy in the Year 2017 doesn't keep it out

21   of any federal courtroom.

22       THE COURT:  Tell me, what is the date of this document

23   again?

24       MR. SHECHTMAN:  The best we can do is this, your

25   Honor.  At the top it says proposed 2-2014 after 5 weeks of due

1   diligence.  Five weeks would make sense because the meeting

2   itself was January 13th.

3           So it is not dated otherwise in that, but everyone is

4   signing this in order to dispose of the property.  This is a

5   witness yesterday who testified that he knew nothing about this

6   till November, right?  Are we really going to keep out a

7   document that he signed that shows that he knew it?

8           THE COURT:  Let me hear from the government again.

9           MR. BELL:  A number of things, your Honor.

10          Let's start out where Mr. Schechtman left off.  With

11  respect to the handwriting at the top, Mr. Schechtman says that

12  the timing would make sense.  Of course it would.  We think

13  that is there is some reasonable probability that is why, it

14  is, in fact, there.  We don't know when that handwriting was

15  put down relative to the rest of the stuff there.  The

16  handwriting presents its own hearsay problem.

17          THE COURT:  Why doesn't at some level -- why does that

18  matter?  It seems to me my recollection of this witness'

19  testimony from yesterday is that -- correct me if I am wrong --

20  that he wasn't aware of this situation.  Make sure I am not off

21  there because I thought the witness had said yesterday, and

22  especially when he is talking about the Puerto Rican Day Parade

23  and the like, that he had no knowledge of any of this.

24          MR. BELL:  Setting aside the Puerto Rican Day Parade,

25  which references its own tranche of money from different funds,

1    purported correspondence we have here, I think that that

2    testimony belies the fact this document was not produced by the

3    union goes to the very reliability issues that we're trying to

4    raise.

5              Mr. Schechtman, who --

6              THE COURT:  Before we get there, I guess what my

7    question is, isn't the existence of this document or this

8    purported signature of this witness on this document

9    inconsistent with the witness's testimony from yesterday?

10             If that is the case, then we are not talking about the

11   statements within the document being offered for the truth of

12   the matter asserted.  They're being offered as showing an

13   inconsistent prior statement or at least an inconsistencies.

14   They're not being offered for the truth.

15             Again what we are talking about here I think is we are

16   talking about the issue that comes up with documents all the

17   time of essentially double hearsay.  There is the first hearsay

18   layer that comes with the document itself which is what we have

19   been focusing on with respect to the business records exception

20   or statements that affect an interest in property.

21             Then there are the actual statements within the

22   document itself.  It seems to me the statements within the

23   document itself are relevant and not hearsay.  They go, I

24   believe -- and make sure I am not off here -- to show that this

25   witness is not entirely credible when the witness said that

1    this witness wasn't aware of the back-and-forth about this

2    investment.  I'll talk about the later hearsay problem first.

3    Is that correct?  Is that your understanding, counsel for the

4    government?

5              MR. BELL:  I think that is largely right, your Honor,

6    and it may be valid as impeachment use.  I don't think that

7    necessarily means it comes into evidence, but --

8              THE COURT:  That is what I am trying to get at.

9              It seems to me there is no dispute some of the

10   statements here and the fact that this witness allegedly signed

11   this document, there is no hearsay issue there.  That is going

12   toward the latter part of hearsay.  That is not being offered

13   for the truth of the matter asserted.

14             Perhaps with the document itself coming into evidence,

15   there are these issues.  I am not sure it is necessary for the

16   document itself to come in at this point.  It does seem the

17   document very well may come into evidence.  I am not sure if it

18   is necessary to have the document now, but I will hear from

19   counsel on this.

20             I don't want to delay the jury.  I don't want to delay

21   this trial needlessly.  It very well may be that counsel who is

22   quite able can go into the statements contained within the

23   document without introducing the document itself, and the fact

24   that this witness signed this document, then we can deal with

25   the evidentiary issues later in terms of the first level of

1    hearsay, whether or not the document itself comes into

2    evidence.

3              MR. BELL:  Substantially, your Honor that is right.

4              We are attempting to make contact with the union to

5    allay what concerns we have with respect to the documents.

6    Again we noted at the beginning of the sidebar in the robing

7    room the concern we have.  I think your Honor is right as to

8    the most, the most acute part of this.

9              THE COURT:  Let he hear from defense counsel on this.

10             MR. SHECHTMAN:  Judge, I think you got it right first,

11   right, which is to say, 14 says that the document showing an

12   interest in property is admissible as the hearsay exception.

13   15 says the recitals are admissible.  There is a hearsay

14   exception.

15             It is not limited to the use.  It is limited to

16   documents that affect an interest in property.  You couldn't

17   have a document that more affected an interest in property than

18   a document in which the five trustees say this money can be

19   moved from one entity to another, right?

20             So that means it is admissible under 14, the document,

21   and the recital, right, which comes before it are admissible

22   under 15.

23             THE COURT:  The issue is with 14, I think there is an

24   an issue because I don't think a foundation has been laid in

25   terms of it being kept in a public office.  That may be the

1    issue with 14.

2                MR. BELL:  I think, your Honor, with respect to -- now

3    I'm losing track, 15, it may also be necessary for counsel to

4    lay some foundation as to whether this action qualifies as

5    dispositive document.  We haven't heard anything at this point

6    the effect of the resolution is within the sort of language and

7    practices.  That is a relative minor note, but we note it

8    anyway.

9                In other words, there can be, depending on what the

10   witness would say about what these resolutions mean and what

11   their effect is, some difference between this and something

12   like a deed.

13               THE COURT:  It seems to me just to try to shortcut

14   because I don't want to have the jury not being productive now.

15   It also seems it is very likely, I know defense counsel may not

16   have been prepared to do this at this time, that a business

17   record exception can easily be laid with this witness, it does

18   seem to me.

19               MR. SHECHTMAN:  My guess is what this witness is going

20   to say is I don't remember this, right?  Because yesterday what

21   he said was that this investment was not made in the usual

22   fashion.  The board didn't sign onto this.

23               THE COURT:  What I am saying in terms of the business

24   record exception, if there is a foundation that is laid such

25   that you know as an executive board member that sometimes the

1    board passes resolutions, and you know that those resolutions

2    are written down, and those resolutions are kept by someone in

3    the ordinary course of business, et cetera, et cetera, et

4    cetera, till we get to the actual resolution, and then I think

5    again it seems to me this can probably easily be laid, the

6    foundation can easily be laid.

7            If not, we'll see where we are.

8            MR. SHECHTMAN:  I'll do it.  You're right on 15, but

9    on 14 -- so I will do it as a business record.  I thank the

10   court.

11           THE COURT:  Again, if the government has this other

12   concern, it seems again once this foundation is laid, that is

13   not an issue.  The fact you may have other issues that can be

14   brought up we can deal with later in the course of this trial

15   if you think the document is not authentic.  If this witness

16   lays the foundation for this document as a business record, and

17   I don't know if he needs to acknowledge his signature, but that

18   does it.

19           MR. BELL:  Understood.  We may have some voir dire for

20   the foundation being laid.

21           THE COURT:  Ready to bring the jury in, are we?  All

22   right.  Let's bring the jury back in.  Let's get the witness

23   back on the stand.

24           (Jury present)

25           THE COURT:  Please be seated.  Welcome back.  Let's

1   continue with the case on trial.  Go ahead, counsel.

2              MR. SHECHTMAN:  Judge, do you have the copy?  Can I

3   get it back?  (Inaudible).

4              (Pause)

5              THE COURT:  Go ahead.

6   BY MR. SHECHTMAN:

7   Q.  Mr. Husamudeen, on your screen is what has been marked as

8   Defendant's Exhibit C, and would I be correct that at the top

9   of that it has some language about a resolution?

10  A.  I can't read it.

11             THE COURT:  He is going to enlarge it for you.

12             THE WITNESS:  Yes, I see resolution of the trustees.

13  BY MR. SHECHTMAN:

14  Q.  Go to the very end of it.

15             MR. BELL:  Can we arrange for the witness to have a

16  hard copy of the document?

17             (Pause)

18             JUROR:  Is the jury supposed to see this?

19             THE COURT:  No, not yet.

20  BY MR. SHECHTMAN:

21  Q.  At the end of that document, if you go to the very end of

22  it with me, there is a paragraph that begins, "Now, therefore."

23             Am I correct?

24  A.  Yes.

25  Q.  And then it is followed by a covenant -- the jury can't see

1    it yet -- and then four signatures?

2    A.  Yes.

3    Q.  And that second signature I would be correct is yours?

4    A.  Yes.

5    Q.  And you recognize it as yours?

6    A.  Yes.

7    Q.  And the first signature is Mr. Seabrook's, whose signature

8    you have seen a lot?

9    A.  Yes.

10   Q.  And that is his?

11   A.  Yes.

12   Q.  And the third you recognize as Mr. Maiello's signature?

13   A.  Yes.

14   Q.  And you have seen that a lot?

15   A.  Yes.

16   Q.  I don't know if you know Ms. Warner, is the fourth hers?

17   A.  I don't really know, but it is there.

18   Q.  Those are the four members, trustees of the annuity fund?

19   A.  Yes.

20   Q.  And you've all signed this resolution?

21   A.  Yes.

22   Q.  Would I be correct that these resolutions are typically

23   prepared by your lawyers?

24   A.  Yes.

25   Q.  Would I be correct they're always prepared by your lawyers?

1    A.  Yeah, you would.

2    Q.  Yes?

3    A.  Yes.

4    Q.  And if you look at the very left-hand corner of this one,

5    and we may not be able to see this well.  Can you see it on the

6    screen?  Let's skip it because it will be too hard for you to

7    see it.  I did that last night.

8            THE COURT:  In the lower left?

9            THE WITNESS:  Yeah.

10   BY MR. SHECHTMAN:

11   Q.  It is a resolution signed by each of the board trustees?

12   A.  Yes, this resolution is signed.

13   Q.  And again --

14           MR. BELL:  Sorry.  I didn't hear that last answer.

15           THE COURT:  He said yes.

16           MR. BELL:  He said something after that.

17           THE WITNESS:  "Prepared by the lawyers."

18   BY MR. SHECHTMAN:

19   Q.  Prepared by the lawyers, right?

20   A.  Yeah.

21   Q.  It is the practice of the lawyers to maintain those

22   resolutions so that the union has a record of its resolutions?

23   A.  Yes.

24   Q.  And if you wanted a resolution, wanted to go back, you

25   would call your lawyers and say do you have that resolution?

1    A.  Yes.

2    Q.  Because they maintain it and they keep it and that's their

3    job?

4    A.  Yes.

5    Q.  They prepare it and they maintain it?

6    A.  Yes.

7            MR. SHECHTMAN:  I offer Defendant's Exhibit C into

8    evidence.

9            MR. BELL:  Brief voir dire?

10           THE COURT:  Sure.

11   VOIR DIRE EXAMINATION.

12   BY MR. BELL:

13   Q.  I want you to take a moment to look at the document as a

14   whole, Mr. Husamudeen.  Once you do, I have a couple of

15   questions for you, okay?

16   A.  Okay.

17   Q.  Take a look at the document at this point.

18   A.  (Pause)

19   Q.  Have you had a moment, Mr. Husamudeen?

20   A.  Yes.

21   Q.  I want to first direct your attention to the handwriting at

22   the top of the first page.  Do you see that?

23   A.  Yes.

24   Q.  Prior to your looking at this today, Mr. Husamudeen, were

25   you at all familiar with that handwriting on this document?

1    A.  No.

2    Q.  Are you familiar with -- now, Mr. Schechtman asked you a

3    moment ago a number of questions about the way in which

4    resolutions are prepared and who prepares them.  Do you recall

5    those questions?

6    A.  Yes.

7    Q.  Are you, prior to today, familiar with this specific

8    resolution?

9    A.  I am sorry.  Say that again.

10   Q.  Prior to seeing it today on the stand right now, do you

11   recall seeing this specific resolution before?

12              MR. SHECHTMAN:  This is voir dire?

13              THE COURT:  Is there an objection?

14              MR. SHECHTMAN:  Yes.

15              THE COURT:  Sustained.

16   BY MR. BELL:

17   Q.  Do you recall signing this, sir?

18   A.  Yes.

19              MR. BELL:  One moment, please.

20              (Off-the-record discussion)

21              MR. BELL:  Your Honor, we maintain our objection with

22   respect to the handwriting at the top of the document which the

23   witness --

24              THE COURT:  Hold on.

25              (Pause)

1          THE COURT:  Overruled.

2          MR. SHECHTMAN:  Your Honor, I offer Defendant's C into

3    evidence.

4          MR. BELL:  We object.

5          THE COURT:  That objection is overruled.  Defendant's

6    C is admitted.

7          (Defendant Exhibit C received in evidence)

8    CROSS-EXAMINATION (continued)

9    BY MR. SHECHTMAN:

10   Q.  So this is a resolution of the trustees of the Correction

11   Officers Benevolent Association.  Am I correct?

12   A.  The annuity fund trustees.

13   Q.  Of the annuity fund?  My apologies?

14   A.  Yes.

15   Q.  And signed by each of the board trustees?

16   A.  Yes.

17   Q.  And would I be correct that many of your resolutions are in

18   this form where they have whereas clauses that begin it?

19   A.  Yes.

20   Q.  That is the way lawyers often prepare resolutions?

21   A.  You would know better than I do but, yes.

22   Q.  So let's go back and just look at some of these whereas

23   clauses.  It says -- look at the second one whereas the

24   investments managed by right associates (a mix of fixed income

25   and equity products) did not meet the benchmark for calendar

1    year 2013.  That is a whereas clause we talked about, right,

2    had not met its benchmark.  I'm correct?

3    A.  Yes.

4    Q.  Let's continue, go back to the document itself.

5            Whereas, the next whereas clause, whereas, Platinum

6    management made a presentation to the trustees on the date set

7    forth above.  That was January 13th, 2014.  Pertaining to its

8    Platinum Partners value arbitrage fund, an investment product

9    in the hedge fund classification.  That whereas clause I take

10   it also is accurate in that Platinum had come in to that

11   January 13th meeting and made a presentation?

12           Am I correct?

13   A.  Yes.

14   Q.  Let's go to the next one.

15           Whereas, the trustees instructed the investment

16   consultant, Reynolds Consulting Services and its counsel,

17   Koehler & Isaccs, to perform the due diligence with respect to

18   the investment product and manager.  That we talked about, the

19   January 13th meeting directs both Tommy Reynolds and the

20   lawyers to do due diligence, correct?

21   A.  Yes.

22   Q.  Whereas, such due diligence was performed and both fund

23   counsel and the consultant advised that such investment would

24   be prudent.  Do you see that?

25   A.  I see it, yes.

1  Q.  And you signed this document, correct?

2  A.  Yes, I did.

3  Q.  And you have been doing this for a long time, and I take it

4  you read things before you sign them?

5  A.  Most times.

6  Q.  Let's go to the next one.

7          Whereas, the trustees have concluded that investing in

8  this hedge fund will provide a greater likelihood of higher

9  returns for the participants, and that is true, those returns

10  were 18 percent.  Am I correct?

11  A.  That's what is here, yes.

12  Q.  That is what was presented to you in that pitch, am I

13  correct?

14  A.  Yes, yes.

15  Q.  The next one.

16          Whereas, the historical performance of Wright warrants

17  continuing Wright as an investment manager for the type of

18  financial products in which it regularly invests regarding less

19  of its 2013 performance.

20          You weren't cutting off Wright?  You weren't taking

21  them to zero, right?  They still had a lot of money?

22  A.  No.  They still had money, yes.

23  Q.  And then it says now, therefore, the board resolved to

24  invest $10 million with Platinum management, the investment in

25  the Platinum Partners value arbitrage fund.  In order to

 1    accommodate this, the board instructed Reynolds and Koehler &

 2    Isaccs to take all necessary steps so that the $10 million in

 3    assets held by Wright would be liquidated and the proceeds

 4    transferred to Platinum for investment.

 5              Do you see that?

 6    A.  Yes, I see it.

 7    Q.  If we go to the very top of the first page, you'll see a

 8    notation that says prepared February 20th, 14, after five weeks

 9    due diligence.  That February 20th would be about a week after

10    the document that was shown to you yesterday, that February

11    14th letter?

12    A.  I am not sure of the date I signed this resolution because

13    it is the date we signed it is not on here, but, yeah, I see

14    the proposed 2/20, but again it doesn't really matter because I

15    still never saw this front page of --

16    Q.  (Multiple voices)

17              THE COURT:  Hold on.  Don't talk over each other.  Go

18    ahead.

19    BY MR. SHECHTMAN:

20    Q.  You signed it and every member of that four-person board

21    signed it?

22    A.  Yes, I signed it.

23    Q.  Do you recall when you signed it?

24    A.  No, I don't recall when it was signed.

25    Q.  Your testimony yesterday was that you didn't even know

1    about this, this investment had been made until November.  Does

2    that refresh your recollection?

3    A.  Say that again.

4    Q.  Does this refresh your recollection that you knew about

5    this well before November?

6    A.  I was in the January meeting where we agreed to have the

7    attorneys vet these people and find out about them before we

8    invested.  So, of course, I knew it from the January meeting as

9    a board of trustee, that we agreed that we would invest if they

10   checked out.  So I am a little --

11   Q.  You are not surprised by this?  You are not surprised that

12   you signed this?

13   A.  No, I am not surprised.

14   Q.  I take it that to the extent your testimony yesterday could

15   be interpreted this investment was unusual, right, because Mr.

16   Seabrook did it without all of the board members signing, all

17   board members signed, correct?  All the board members signed

18   off on this?

19   A.  Yes.

20   Q.  That is the way things were usually done?

21   A.  We usually signed resolutions after we made certain

22   decisions, yes.

23   Q.  You signed this resolution after you made this decision to

24   send $10 million to Platinum?

25   A.  In January of 2014, yes.

1    Q.  Now, I want to show you what is Defendant's Exhibit D, and

2    if you could put it up without the jury seeing it at first.

3              THE COURT:  Is this something that you're going to

4    seek to introduce into evidence?

5              MR. SHECHTMAN:  I think it is a government exhibit.

6    It may turn out it is easier to do it that way, but I want the

7    government to see it first.

8              THE COURT:  Okay.  Do you have a hard copy for the

9    witness?

10             MR. SHECHTMAN:  We're going to try.

11             MR. BELL:  We have no objection.

12             MR. SHECHTMAN:  Do you want to do it as a government

13   exhibit?

14             MR. BELL:  Yeah.

15             MR. SHECHTMAN:  Your Honor, we are going to --

16             MR. BELL:  There is a difference insofar as our

17   version doesn't have the first page.

18             (Off-the-record discussion)

19             MR. SHECHTMAN:  We are going to do this as Government

20   Exhibit 317, and I take --

21             THE COURT:  Without objection?

22             MR. SHECHTMAN:  Admitted without objection.

23             THE COURT:  Okay.

24             (Government Exhibit 317 received in evidence)

25             THE COURT:  Do the jurors have that yet?

1          MR. SHECHTMAN:  No, but we are getting it.

2          (Pause)

3          THE COURT:  While the hard copy is handed to the

4    witness, let me check with the jurors, do you have it on your

5    screens yet?  Okay, great.

6          (Pause).

7    BY MR. SHECHTMAN:

8    Q.  Mr. Husamudeen, this is also dated February 14th.  It is

9    from your lawyer to Mr. Seabrook and copies Mr. Koehler, the

10   head of that law firm, and Tommy Reynolds, your consultant.

11         What I want to ask you is, did you see this document

12   at the time?

13   A.  No, sir.

14   Q.  You're looking at the second page of it?

15   A.  Yes.

16   Q.  Did you see that at the time?

17   A.  No, I didn't.

18   Q.  So look at it with me, if you would.  That is a letter,

19   dated February 14th, from Tommy Reynolds, who is the consultant

20   we talked about, correct?

21   A.  Yes.

22   Q.  The professional?

23         And he says that -- the second paragraph -- -- let's

24   do the third paragraph -- our due diligence, we reviewed the

25   Morningstar analysis of Platinum Partners Value Arbitrage Fund,

 1  and that is the fund I take it the money was invested in, as

 2  well as reached out to other hedge fund analysts in the

 3  industry for their views on Platinum Partners.

 4          Do you see that?

 5  A.  Yes.

 6  Q.  And that is what due diligence is, you're trying to learn

 7  about something, correct?

 8  A.  Yes.

 9  Q.  According to Morningstar, the value average arbitrage fund

10  has a five star rating with 268 million in assets.  The value

11  of the fund beating the multistrategy category in 2010, 11, 12,

12  13 by various percentages.  I'll skip a little bit.

13          The Value Arbitrage Fund has also a strong Alpha

14  contribution in the 3 and 5 year time frames.  You would agree

15  with me that neither of us know what that sentence means?

16  A.  Yes.

17  Q.  It goes down to say the fees are in line with others in the

18  industry, the fund administrator is a good firm, and the

19  auditor is BDO Seidman, which is a large financial firm.

20          Did you see this at the time?

21  A.  No.  .

22  Q.  It is not the kind of thing, would you agree with me,

23  someone would intentionally keep from you, but it is all

24  positive about --

25          MR. BELL:  Objection?

1          THE COURT:  Rephrase that.

2     BY MR. SHECHTMAN:

3     Q.  If you saw it at the time, would you conclude this was a

4     pretty good investment?

5          MR. BELL:  Objection.

6          THE COURT:  I will allow it.

7     A.  This is addressed to the Board of Trustees.  I am a member

8     of the Board of Trustees.  I never got this.  I never saw this

9     at all.

10    BY MR. SHECHTMAN:

11    Q.  I --

12    A.  So I never saw this letter.  It was never provided to me.

13    Q.  You would agree with me it is a positive assessment?

14    A.  Yeah, it is a positive-looking letter.

15         MR. SHECHTMAN:  I want to show you what is defendant's

16    exhibit -- I will make it E, Judge, and fill in blanks because

17    some of these have turned out to be government exhibits.

18         (Off-the-record discussion)

19         MR. SHECHTMAN:  Judge, it may be that when we go

20    forward here, we are going to substitute a government exhibit

21    for this so that the jury doesn't have two of things, but at

22    the moment we would offer this without objection as Defendant

23    Exhibit E.

24         THE COURT:  We can do that probably taking a break in

25    like five minutes.  If you think this is a good time to take a

1   break, we can do that now.

2           MR. SHECHTMAN:  A few more minutes?

3           THE COURT:  What is the document going to be?

4           MR. SHECHTMAN:  Defendant Exhibit E and coming in

5   without objection.

6           THE COURT:  That is in.

7           (Defendant Exhibit E received in evidence)

8           THE COURT:  Do the jurors have it on their screen?

9   Get it on the jurors' screens.  Does the witness have a hard

10  copy of it?

11          (Pause)

12  BY MR. SHECHTMAN:

13  Q.  I will ask you whether you saw this at the time?  It is

14  dated March 1st, 2014?

15  A.  I don't recall ever seeing this.

16  Q.  So this is after that February 14th letter, unsigned letter

17  that the government talked to you about yesterday, correct?

18  A.  Yes.

19  Q.  This is an agreement between the COBA Officers Benevolent

20  Association and Platinum, and it says we're pleased that the

21  Correction Officers Benevolent Association Annuity Fund has

22  committed to subscribe to the PPVA.  That is the Platinum

23  investment, correct?

24  A.  Yes.

25  Q.  And then if you go down to the distribution in kind, and it

1   says PPVA agrees that, notwithstanding any provision in the

2   fund documents permitting distributions in kind to the

3   shareholders of PPVA, it will not make a distribution in kind

4   to the investor.  Do you see that?

5   A.  Yes.

6   Q.  So that is the issue that you and I have called the PIK

7   issue, the payment in kind?

8   A.  Okay.

9   Q.  Correct?

10          And this is a letter agreement between, worked out

11  between your counsel and the fund that you're not going to get

12  distributions in kind, you're going to get --

13          MR. BELL:  Objection.

14          THE COURT:  Basis?

15          MR. BELL:  Foundation.

16          THE COURT:  Overruled.  You may answer.

17          THE WITNESS:  Can you repeat that.

18  BY MR. SHECHTMAN:

19  Q.  This is a letter that says you're not going to get

20  distributions in kind, correct?

21  A.  That's what it says.

22  Q.  And that was a concern of the lawyers that we saw back on

23  February 14th?

24  A.  Yes.

25  Q.  The PIK problem?  And this resolves that issue?

1    A.  Okay.

2    Q.  So I'd also be correct that two days after this, after the

3    PIK issue had been resolved, the $10 million went from COBA to

4    Platinum?

5    A.  Okay.

6    Q.  Agreed?

7            MR. SHECHTMAN:  Let's take a look and see if we can

8    show you that and then we'll stop, Judge.

9            If you put up 307 again, Ms. Granquist, and go to that

10   second page, this is that Tommy Reynolds document, and if you

11   look at --

12           THE COURT:  Hold on just a second.  Hold on.

13           (Pause)

14           THE WITNESS:  I am sorry?

15           THE COURT:  Do the jurors have in front of them?

16   BY MR. SHECHTMAN:

17   Q.  Look at the last line on those notes, and it says $10

18   million transferred to Platinum Partners from Wright on

19   3-13-14.  Do you see that?

20   A.  Yes.

21   Q.  And that is two days after the side letter that solved the

22   PIK problem?

23           MR. BELL:  Objection.

24           THE COURT:  I'll allow it.  You may answer.

25   A.  That is what it says in the letter.

1          MR. SHECHTMAN:  Judge, it's a good time for a break.

2          THE COURT:  Let's do this, we're going to take our

3    break now, our 30-minute break -- make it a 35-minute break.

4    Come back at 12:05.  In the interim, don't discuss this case

5    with anyone else.  Don't let anyone discuss it with you.  Don't

6    do any of the independent research regarding any of the issues

7    or parties.  See you at 12:05.

8          (Jury not present)

9          THE COURT:  Okay.  Hold on a second.  Let's do this.

10   Because of the concerns that the jurors expressed yesterday

11   about just bumping into people unnecessarily, let's give the

12   jurors a five-minute head start.  That's why I wanted them to

13   come back at 12:05 instead of 12:00, and I'll ask counsel to

14   get back here and the parties to get here at 12:00 so we can

15   avoid any unnecessary bumping into the jurors.  Just, if you

16   can, have a five-minute delay before you head out.

17          Anything else before we resume?

18          MR. BELL:  No, your Honor.

19          MR. SHECHTMAN:  No, your Honor.

20          (Luncheon recess)

21

22

23

24

25

1    A F T E R N O O N   S E S S I O N

2    12:04 P.M.

3    (Trial resumed; jury not present)

4    THE COURT:  All right.  Go ahead, counsel.

5    MR. CAPONE:  Your Honor, I just wanted to note briefly

6    that we're going to change the order slightly.  After this

7    witness, we'll call Matt Balemian, that's because he's a pretty

8    brief witness and he's from out of town; so we'll get him on

9    and off.

10    THE COURT:  Okay.  Hopefully, the jurors will be here

11    soon, and if the counsel and parties need to use the restroom,

12    we'll go straight through until 2:30.

13    (Pause)

14    THE COURT:  While we're waiting, can counsel just put

15    something on the screen and make sure the witness' monitor is

16    working.  Let's just try it out to make sure that it works.

17    MR. SHECHTMAN:  Is that on there?

18    THE COURT:  It's not on my screen either yet.

19    MR. SHECHTMAN:  Is yours working?

20    THE COURT:  Mine is working.  Counsel, it's working

21    now.  We'll try it again.  Wait, it just faded out.  Try it

22    again.  It's there.  The witness is good, I'm good.  Jurors

23    here?

24    THE DEPUTY CLERK:  Yes, Judge.

25    THE COURT:  Bring them in.  Let's go.

1          (Jurors present)

2          THE COURT:  Okay.  Please be seated.  Welcome back.

3     Let's continue with the case on trial.  Go ahead, counsel.

4          MR. SHECHTMAN:  Ms. Granquist, if you could put back

5     up Government Exhibit 307.

6          THE COURT:  Okay.  It was working, but it's not

7     working.  Can you hand him a copy again.

8          MS. LYNAUGH:  Yes.

9          MR. SHECHTMAN:  And the jurors can see this?

10         JURORS:  Yes.

11         MR. SHECHTMAN:  You can.  So Ms. Granquist, if you

12    turn to the second page.

13    BY MR. SHECHTMAN:

14    Q.  And this is, again, Mr. Reynolds' report.  Go back to the

15    first page.  I apologize.  This is Mr. Reynolds report of

16    June 30th, 2014.  And so, Mr. Husamudeen, if you'd look at it

17    with me very quickly.  In June of 2014, the annuity fund has a

18    little more than 50 percent of its money in Wright; 13.7 in

19    Platinum, that's the hedge fund; 17.76 in Intercontinental Real

20    Estate, that's the real estate firm; and 16.81 in Advent.  Does

21    that make sense?

22    A.  Yes.

23    Q.  And that comes after moving that $10 million from Platinum

24    Partners to Wright in the beginning of March 2014, correct?

25    A.  Yes.

1        MR. SHECHTMAN:  Okay.  Now, Ms. Granquist, if you'd

2   next put up Government Exhibit 311.

3        And I'm not sure this is in evidence but I know it can

4   come in without objection.

5        THE COURT:  Okay.  Any objection to 311?

6        MR. BELL:  No objection.

7        THE COURT:  Okay.  It's in.

8        (Government's Exhibit 311 received in evidence)

9   BY MR. SHECHTMAN:

10  Q.  And if you look at 311 with me --

11       THE COURT:  Hold on.  Let him get a copy of it first.

12  Q.  This is the minutes of the July 29th, 2014, board meeting,

13  correct?

14  A.  Yes.

15  Q.  And this is a meeting that you were not at?

16  A.  Yes.

17  Q.  You were on vacation?

18  A.  Yes.

19  Q.  Right?  But Mr. Seabrook, Mr. Maiello and Ms. Warner were

20  there, which is a quorum, correct?

21  A.  Yes.

22  Q.  And if you look at the bottom of the first page, you'll see

23  a sentence that says the consultant reported instructing Wright

24  to do so, but noted that they had not maximized their full

25  equity potential.  And that consultant would be Mr. Reynolds,

1    correct?

2    A.   Where is that?

3    Q.   Right at the bottom of the first page, the sentence that

4    says:   The consultant reported instructing Wright to do so.

5    A.   Yes, that's in the record.

6    Q.   But they had not maximized the full equity potential, and

7    what he instructed him, apparently, if you look at the sentence

8    before, is to increase their equity potential, less bonds, more

9    stocks less bonds?

10   A.   Okay.

11   Q.   But they hadn't done that?

12   A.   Yes.

13   Q.   Right?  Now, if you go over to the next page, you'll see

14   that the various options were considered.  Look at the middle

15   of the next page, where there's a one?

16   A.   Yes, I see it.

17   Q.   The options were to completely remove the equity

18   investments from Wright.  It says Wright would no longer be

19   authorized to invest in stocks, to permit Wright to increase

20   its equity position and, if you continue, you will see that it

21   says, as a result of these concerns -- the last sentence before

22   it was indented there -- the trustees chose to phase Wright out

23   of equity over time and to table the discussion of what was to

24   be done with any remaining funds managed by Wright.

25           And then there is a resolution, and it says it was,

1  therefore, unanimously resolved that $10 million would be taken

2  from the equity portion of the assets managed by Wright, with 5

3  million transferred to Advent convertible securities, and five

4  million transferred to Platinum Partners, the hedge fund.  So

5  that is a unanimous vote of the board in your absence, to take

6  $10 million more away from Wright, which was performing poorly,

7  and to give five to Advent and five to Platinum Partners,

8  correct?

9  A.  That's what it say, yes.

10 Q.  And which is to say, to split it between the two, not to

11 give all to Advent, not to give all to Platinum Partners,

12 correct?

13 A.  Yes, that's what it -- yes, that's what it says.

14 Q.  Okay.  So when you returned from vacation, did you ask what

15 happened at that annuity board meeting?

16 A.  No.

17 Q.  And so you didn't learn until November that another $5

18 million had gone to Platinum Partners?

19 A.  As far as I recall.

20 Q.  Did you say to them, did you do anything at that meeting?

21 A.  It would usually be discussed at the next trustee's

22 meeting.

23 Q.  So you were absent in that --

24 A.  July.

25 Q.  -- July meeting and you waited to talk about it until

1    November?

2    A.  At the next meeting.

3    Q.  Now, there are two separate entities, am I right,

4    Mr. Husamudeen; there is the annuity fund and that is the fund

5    that the city puts its money in there --

6         THE COURT:  Just hold on just a second.  We'll see if

7    we can get this monitor fixed quickly.

8         (Pause)

9         Thank you.  It's working now.

10   BY MR. SHECHTMAN:

11   Q.  Two separate entities, there is the annuity fund and that

12   is where the city puts its money, and when an officer retires,

13   that money is available to him or her, if they want it?

14   A.  Yes.

15   Q.  And it's not -- as you said, it's not a pension.  It's a

16   supplement to a pension?

17   A.  Yes.

18   Q.  And then the second entity is COBA itself, correct?

19   A.  Yes.

20   Q.  And that is the union?

21   A.  Yes.

22   Q.  And the union also has money because it collects dues from

23   its members?

24   A.  Yes.

25   Q.  Now, you learned, you said, in June of 2014 at the Puerto

1    Rican Day Parade that $5 million of COBA's money had been

2    removed to Platinum Partners; is that right?

3    A.  Yes.

4    Q.  And that Puerto Rican Day Parade is an annual June event?

5    A.  Yes.

6    Q.  Now, I want to talk a little bit about COBA for a second.

7              MR. SHECHTMAN:  And I'd ask Ms. Granquist to bring

8    Government Exhibit 110 up, and this is a government exhibit.

9              Again, your Honor, I think there's no objection to my

10   offering it into evidence.

11             MR. BELL:  None.

12             THE COURT:  Okay.  110 is in.

13             (Government's Exhibit 110 received in evidence)

14             THE COURT:  Do the jurors have it in front of them?

15             JURORS:  No.

16             THE COURT:  Okay.

17             MR. SHECHTMAN:  Mr. Husamudeen, can you see that?

18             THE COURT:  Hold on.  Make sure the jurors have it.

19             THE WITNESS:  Yes.

20             MR. SHECHTMAN:  I'm sorry.

21             THE COURT:  The jurors have it, the witness has it.

22   Go ahead, counsel.

23   BY MR. SHECHTMAN:

24   Q.  This is an exhibit prepared by the government, and it shows

25   two COBA accounts, an 8301 account and a 3241 account.  Do you

1   see those two accounts?

2   A.  Yes.

3   Q.  And when you were treasurer, when you were vice president,

4   there were two accounts, there was a checking account and there

5   was a second account?

6   A.  When I was treasurer?  Yes, we had checking accounts.

7   Q.  And you had a money market account?

8   A.  Money market, yes.  We had money market certificate of

9   deposit accounts, yes.

10  Q.  So am I right that 8301 is the checking account?

11  A.  I haven't been in the treasurer's office for like five

12  years; so if you say it is, then I guess it is.

13  Q.  Probably shouldn't do it that way, but I think it is.

14          Let's look at 3241 for a second.

15          MR. SHECHTMAN:  And, Ms. Granquist, if you'd put up on

16  the screen what is a page out of that account.

17          And, Judge, again, this is from Government

18  Exhibit 102.

19          MR. BELL:  No objection.

20          THE COURT:  Okay.  102 is in.

21          (Government's Exhibit 102 received in evidence)

22  BY MR. SHECHTMAN:

23  Q.  So if you'd look at that account with me?

24          THE COURT:  Hold on.  Do the jurors have it?

25          JURORS:  Yes.

1        THE COURT:  Okay.  Go ahead.

2    BY MR. SHECHTMAN:

3    Q.  And this is the second of those accounts.  This is the 3241

4    account, and you will see that it has a daily balance summary.

5    It shows right down towards the bottom, Ms. Granquist, it shows

6    $6.8 million, and then it has interest paid this year $70,000;

7    do you see that?

8    A.  Yes.

9    Q.  Now, let's go back briefly to that chart on 110, and if you

10   look at that account, that money market account that draws

11   interest, you'll see that for most of 2012, 2013 COBA had about

12   $6 million in that money market account.  Do you see that?

13   A.  Yes.

14   Q.  And that $6 million was earning -- let's see.  If we take

15   $6 million, and if we took one percent of it, let's take $6.7

16   million, that is what is in there at the end of 2013, right?

17   In November of 2013, 6.7, $6.8 million, and you took one

18   percent, the interest rate you would earn would be 67, $68,000.

19   That would be one percent.  Are you with me?

20   A.  I'm with you.

21   Q.  Okay.  And that makes sense.  So, Ms. Granquist, would you

22   go back to 102.  Right.

23        You had $6.8 million in there, and you earned 70,000;

24   so the interest rate on that money market account was about one

25   percent; would that be fair?

1  A.  That would be fair.

2  Q.  Now, if the interest rate were ten percent, do the math

3  together, it's pretty easy.  If it was ten percent, it would be

4  $670,000?

5  A.  Okay.

6  Q.  Five percent would be half of that, $335,000, correct?

7  A.  Okay.

8  Q.  So by having $6 million in that account at one percent, you

9  weren't taking very much risk, but you were leaving a lot of

10  money on the table, that interest rate was low?

11         MR. BELL:  Objection.

12         THE COURT:  Overruled.

13  A.  Okay.

14  Q.  And that was money that was there in 2011, '12, '13 and

15  '14; that was in that money market account, correct?

16  A.  Correct.

17  Q.  At one percent?

18  A.  Okay.

19  Q.  And I take it that that -- the checking account was used to

20  write checks out of?

21  A.  Yes.

22  Q.  For daily business, daily activity?

23  A.  Yes.

24  Q.  And the money market account was, in effect, a rainy day

25  account?  You were saving it for a rainy day?  Saving it for

1   when you needed it?

2   A.  Okay.  It's called a reserve, but okay, a rainy day

3   account.

4   Q.  And it would be fair to say, if you look down that column

5   on that exhibit -- Ms. Granquist, could you put 110 back up --

6   it hadn't rained in a while, which is to say, you left a lot of

7   money just sitting there, correct, in the reserve account?

8   A.  Okay.

9   Q.  Now, you were asked yesterday about there coming a time

10  when COBA added five additional trustees; do you remember that?

11  A.  Yes.

12  Q.  And I think you said you weren't sure, but you thought it

13  might be 2010?

14  A.  Yes, I believe that's what I said, 2010 or 2013 or

15  something.

16          MR. SHECHTMAN:  There is a stipulation -- I think

17  that's probably right.  There's a stipulation with the

18  government that those five trustees became effective in

19  January 2013.

20          MR. BELL:  So stipulated, your Honor.

21          THE COURT:  Okay.

22  BY MR. SHECHTMAN:

23  Q.  So in January of 2013, the constitution was amended and

24  five additional trustees were added, correct?

25  A.  Yes.

1   Q.   And they were borough trustees?

2   A.   Yeah, they're called borough trustees, yes.

3   Q.   So there wasn't really one for each borough.  You combined

4   Staten Island and Brooklyn, and you had a citywide trustee?

5   A.   Yes.

6   Q.   So that's four plus one is five?

7   A.   Yes.

8   Q.   And those borough trustees were members of the executive

9   board?

10  A.   Yes, they are members of the executive board.

11  Q.   And they were available 24/7 for the members?

12  A.   Yes, just like the other board members.

13  Q.   Just like the other board members.  Now, would it be fair

14  to say that nothing in life is free, those five additional

15  trustees actually cost COBA money?

16  A.   Yes.

17  Q.   Because what you had to do was pay the city to release them

18  from their Rikers Island duties, or whatever jail they were

19  working at?

20  A.   Yes.

21  Q.   And those costs were not trivial because you're basically

22  paying the city for their salary?

23  A.   Yes.

24  Q.   And you also had a car for each of them; so that they

25  really could be available 24/7?

1  A.  Yes.

2  Q.  And so that money, that additional cost in 2013, five

3  trustees, could be as much as $500,000, $400,000; it was a

4  significant sum?

5  A.  Yes.

6  Q.  And I think I'm right, at the same time, you added four

7  rapid response delegates?

8  A.  Yes.

9  Q.  And they cost -- I assume they had cars as well?

10  A.  The rapid response delegates, and there were maybe, at the

11  time, two or three cars that they shared when they were on

12  call.

13  Q.  And they had a modest compensation, 500 to $1,000 extra a

14  month?

15  A.  Very modest.

16  Q.  But that also came out of COBA's money?

17  A.  Yes.

18  Q.  So 2013 you took on considerably new expenses that you

19  hadn't had before for the five borough trustees?

20  A.  The rapid response delegates, I'm sorry, they existed

21  before trustees even were appointed.

22  Q.  But did you have --

23  A.  They were there before.  They weren't new.  They didn't

24  come on with the trustees.  They were already there.  We were

25  already using --

1   Q.  Were you already paying them?

2   A.  Yes, they were being paid.

3   Q.  Okay.  So the only real expense was for the five new

4   trustees?

5   A.  Pretty much.

6   Q.  Okay.  It was close to a half million dollars?

7   A.  For the new trustees?

8   Q.  Yes.  You had to pay their salary, they had a car?

9   A.  Yes, pretty much.

10  Q.  Now, I think it's your testimony that Mr. Seabrook took

11  $5 million out of that money-market fund, where it was getting

12  one percent, and without a vote of the board, he transferred it

13  to Platinum Partners, correct?

14  A.  Yes.

15  Q.  Now, Mr. Maiello did sign off on it because he had to?

16  A.  Yes.

17  Q.  And I don't mean he had to in the sense that anybody forced

18  him to, but you couldn't have a check from COBA without two

19  signatures?

20  A.  Yes.

21  Q.  And so he knew about it, he knew what it was for and he

22  signed it?

23          MR. BELL:  Objection.

24          THE COURT:  What's the objection?

25  Q.  He signed it?

1    A.  As far as I know, he signed it, yes.

2    Q.  Now, it came time, at the Puerto Rican Day Parade, that you

3    learned about it, and you were upset because you thought that

4    the board should have approved it?

5    A.  Yes.

6    Q.  Now, in the past, I take it that you and Mr. Seabrook had

7    moved money between the checking account and the money market

8    account without the board approval when you needed it?

9    A.  It's a big difference --

10   Q.  Just yes or no.

11            THE COURT:  If you can answer the question yes or no.

12   A.  Yes.

13   Q.  But it's a big difference, in your view, between moving it

14   between the checking account and the money market account and

15   taking $5 million and putting it in a hedge fund?

16   A.  Yes.

17   Q.  And so you confronted Mr. Seabrook, and you said, what the

18   F is your problem?

19   A.  Pretty much.

20   Q.  You weren't afraid to confront him?

21   A.  Say that again?

22   Q.  You weren't afraid to confront him?

23   A.  I'm sorry?

24   Q.  You weren't afraid to confront him?

25   A.  No.

1   Q.  I mean, you'd known each other for at least 22 years, and

2   if he F'd up, you'd tell him, and if you F'd up, he'd tell you?

3   A.  Yes.

4   Q.  And you told him, and his response was, it's making money?

5   A.  Yes.

6   Q.  And it was making money because it had gone from that one

7   percent account to Platinum Partners, which was bringing in

8   about ten percent?

9           MR. BELL:  Objection.

10          THE COURT:  Overruled.

11  A.  I can't say whether it was making money or not.  At the

12  time, he said it was making money.  That was it.

13  Q.  Well, look, that was in May or June, right?

14  A.  June.

15  Q.  In August, you put $5 million more in the Platinum

16  Partners.  You wouldn't have done that if it wasn't making

17  money --

18  A.  I wasn't --

19          MR. BELL:  Objection.

20          THE COURT:  Overruled.

21  A.  I wasn't in that meeting to put in an additional five

22  million, but if I -- the investment was -- the five million was

23  supposedly moved in June.  So if the Puerto Rican Day Parade is

24  in June, and we just -- and he just moved the five million, how

25  is it making money when it didn't have enough time to land?  So

1   I can't say that it was making money.  He said it was making

2   money.

3   Q.  And you haven't seen the July -- you didn't see the July

4   minutes until November?

5   A.  On the annuity side.

6   Q.  On the annuity side?

7   A.  Yes.

8   Q.  Same Platinum Partners, though?

9   A.  Yes.

10  Q.  Now, did you -- you barked at him, so to speak, at the

11  Puerto Rican Day Parade.  Was there a vote of the board to move

12  the money back?

13  A.  No.

14  Q.  Now, that board is not made up of weaklings, would I be

15  right about that?

16          MR. BELL:  Objection.

17          THE COURT:  Overruled.  Is the board made up of

18  weaklings?

19          THE WITNESS:  The board is made up of men and women

20  who signed on and took an election to do a job; so weak link,

21  that's suggestive --

22  Q.  All of whom, like you, had worked in the corrections

23  system; these are strong people?

24  A.  Yes.

25  Q.  Joe Brasco, Karen Bellfield, Al Frain, Danny Bosco, all of

1  those were men and women who could speak their mind?

2  A.  Yes.

3  Q.  And none of them spoke their mind at the next meeting and

4  said, bring this money back?

5  A.  No.

6  Q.  Now, one of your concerns, I take it, was you were taking

7  $5 million out of a money market firm, which is highly liquid,

8  and it was being transferred to a hedge fund, which was less

9  liquid?

10  A.  Okay.

11  Q.  And this was a rainy day fund, and it hadn't rained in the

12  past, but it could rain, and so you'd like to have liquidity;

13  would I be correct?

14  A.  Any monies not used goes into a reserve.

15  Q.  Well, that's right, but the question is, what interest rate

16  are you getting?  And you were getting one percent and now

17  you're getting more, right?  So but you had a concern that it

18  wasn't as liquid?

19  A.  I had a concern that he didn't consult with the board on

20  such a large investment or use of the union money.

21  Q.  And at the next --

22  A.  That was my concern.

23  Q.  And at the next meeting, with a group of strong,

24  independent people who could speak their mind, nobody said

25  we've got to reverse this?

1    A.  I expressed my concern to Mr. Seabrook, which is what I

2    wanted to do, which is what I needed to do, which is what I

3    did.

4    Q.  But now answer my question.  At the next meeting, nobody

5    said reverse it?

6    A.  Not that I recall.

7    Q.  Now, let me show you what is Government Exhibit 316, if you

8    would?

9          MR. SHECHTMAN:  And, Judge, again, I think there's

10   agreement to admit this as a government exhibit.

11         MR. BELL:  There is, your Honor.

12         THE COURT:  Okay.  316 is in.

13         (Government's Exhibit 316 received in evidence)

14         THE COURT:  Do the jurors have it in front of them?

15   Wait a second.

16   BY MR. SHECHTMAN:

17   Q.  And so this is --

18         THE COURT:  Wait, wait, wait, wait.  Hold on.

19         MR. SHECHTMAN:  I'm sorry.  Totally my apologies, your

20   Honor.

21         THE COURT:  Make sure the jurors have it.  Go ahead,

22   counsel.

23         MR. SHECHTMAN:  We're going to back up, and what I

24   want to put up on the screen is Defendant's Exhibit G.  My

25   apologies, Judge.

1          THE COURT:  Is that already in evidence?

2          MR. SHECHTMAN:  No.

3          THE COURT:  Okay.

4          MR. SHECHTMAN:  And so we won't show it to the jury

5   until we do.  And this is also, I think, is part of the

6   government exhibit, but --

7          THE COURT:  Is there any objection to Defendant's G?

8          MR. BELL:  There isn't.

9          MR. SHECHTMAN:  Okay.

10         THE COURT:  Defendant's G is in evidence.  Go ahead

11  and publish it.  Hold on a second.  Make sure the jurors have

12  it.

13         (Defendant's Exhibit G received in evidence)

14  BY MR. SHECHTMAN:

15  Q.  So this --

16         THE COURT:  Hold on.  Do the jurors have it?

17         JURORS:  Yes.

18         THE COURT:  Now we have it.  Go ahead, counsel.

19  BY MR. SHECHTMAN:

20  Q.  So this is June 2nd, 2014, that is shortly before the

21  Puerto Rican Day Parade; would I be correct?

22  A.  Yes, sir.

23  Q.  And this is a letter between COBA, not the annuity fund,

24  but COBA and Platinum Partners, the PPVA fund?

25  A.  I've never seen it.  It wasn't given to me, but I assume

1    that it is, yes.

2    Q.  And if you look at the first paragraph, No. 1, this is

3    another one of these side letters that says, no distributions

4    in kind.  This is a PIK issue.  We don't want oil wells; we

5    want cash?

6    A.  Okay.

7    Q.  That your lawyers negotiated?

8    A.  Yes.

9    Q.  And then if you look at the second bullet point, this says,

10   for as long as investor maintains a balance of at least five

11   million -- and that's what had been invested -- then upon three

12   days' notice, you can redeem up to a million dollars.  Do you

13   see that?

14   A.  Yes.

15   Q.  So it's a one-time, you can pull one million dollars on one

16   three days.  And this also was negotiated by your lawyers?

17   A.  Okay.

18   Q.  So that if there's a concern about liquidity, you can pull

19   a million dollars on three days' notice, correct, under this

20   agreement?

21   A.  Okay.

22   Q.  Now, if you look at the back, this is signed by

23   Mr. Seabrook, and would I be correct in saying it was an

24   agreement prepared for Mr. Seabrook's signature, it was

25   prepared by the Koehler firm?

1           MR. BELL:  Objection.

2           THE COURT:  Overruled.  I'll allow it.

3    A.   Okay.  I mean, it does -- the document looked like it was

4    prepared by someone, I don't know.

5    Q.   Those were your lawyers for all purposes?

6    A.   I don't see their name anywhere on this document, but I

7    have to go with you, yes.

8    Q.   And so that is a side letter with a liquidity provision,

9    correct?

10          And now let me just sort of switch gears for a second.

11   The fact that the $5 million was taken out of the money-market

12   fund, which had the one percent interest, put into Platinum

13   Partners was not hidden from the members?

14   A.   No, I'm sure I'm not the only one Mike Maiello told about

15   it.

16   Q.   Now, let's look at Government Exhibit 304.

17          MR. SHECHTMAN:  Ms. Granquist, if you will.

18          And again, your Honor, I think there's no objection to

19   this coming in.

20          MR. BELL:  None.

21          THE COURT:  It's in.  Publish it.  Hold on for a

22   second.

23          (Government's Exhibit 304 received in evidence)

24   Q.   And this is the --

25          THE COURT:  Hold on.  Let's just make sure the jurors

1  have it.  Do you have it?  Okay.  Go ahead, counsel.

2  BY MR. SHECHTMAN:

3  Q.  This is the COBA financial statements for 2014, 2013.

4         And, Ms. Granquist, if you could turn to Page 7, I

5  believe.

6         And if you look at Page 7, it's a list of assets, and

7  you'll see it says, hedge fund, 5,047,000; so that's 5 million

8  plus the interest it's getting on?

9  A.  Yes.

10 Q.  Now, there was some discussion about the power Mr. Seabrook

11 had to send people back to Rikers Island or send people back to

12 a city jail?

13 A.  Mmm, hmm.

14 Q.  That comes with being president, correct?

15 A.  Yes, it does.

16 Q.  You have that power?

17 A.  Yes.

18 Q.  And there was mention of a Mr. Valentin who was brought up

19 on charges; do you recall that?

20 A.  Yes.

21 Q.  I don't know if he was sent back, or he was removed from

22 the board, but disciplinary action was taken against him?

23 A.  Yes.

24 Q.  And that wasn't just Mr. Seabrook acting on his own, the

25 board voted unanimously to approve that?

1    A.  Yes.

2    Q.  And two last questions or -- never trust a lawyer who says

3    two last questions, but I'll try to be quick.  You are paid by

4    the city?

5    A.  Yes.

6    Q.  And you also collect a second check from the union?

7    A.  Yes.

8    Q.  And together, that means for being the acting president,

9    all in, it's about, what, $250,000?

10   A.  Last year the union paid me $140,000.

11   Q.  And the city?

12   A.  About 95.

13   Q.  So 230?

14   A.  Roughly.

15   Q.  And that's the same that Mr. Seabrook received when he was

16   president?

17   A.  Well, he made a little bit more than I did.

18   Q.  He was president, and you're acting president?

19   A.  Well, when I became acting president, I decided to take a

20   pay cut.

21   Q.  Okay.  But a modest one?

22   A.  37 percent.

23   Q.  So he was making 37 percent more than you?

24   A.  Yes.

25   Q.  From the union?

1    A.  Yes.

2    Q.  Okay.  And so you took a pay cut to bring it down?

3    A.  Yes.

4    Q.  And his salary was approved by the union?

5    A.  Yes.

6    Q.  And yours was, and people were pleased that you took the

7    pay cut?

8    A.  I assume they are.  I didn't make it public.

9    Q.  Okay.  And when you talked about Mr. Seabrook, what you

10   said was -- I think you were asked a question something like,

11   is there one word that captures him, or how would you capture

12   him, and you said "effective"?

13   A.  Yes, I did.

14   Q.  And he was?

15   A.  Yes, he was.

16   Q.  And the Seabrook team.  And that is, Mr. Seabrook and you

17   for 20 years, and others, were among the most effective, if not

18   the most effective, labor leaders in this city?

19   A.  It was said.

20   Q.  Now, you were asked yesterday if had you known that Norman

21   Seabrook took a bribe to put money into Platinum Partners,

22   would you have approved it, and you said no, correct?

23   A.  Yes.

24   Q.  And that's because you have a fiduciary duty to make sure

25   that money is invested properly because it's the members'

1  money?

2  A.  Yes.

3  Q.  And as you sit here today, I'd also be correct that you

4  have no knowledge, no opinion one way or the other, as to

5  whether Mr. Seabrook took a bribe?

6  A.  No.

7  Q.  And the reason we're here in this courtroom is that that's

8  for this jury to decide?

9          MR. BELL:  Objection.

10          THE COURT:  Sustained.

11          MR. SHECHTMAN:  No further questions.

12          THE COURT:  Okay.

13          MR. BELL:  Redirect?

14          THE COURT:  Any questions from co-counsel?

15          MR. MAZUREK:  No, your Honor.

16          THE COURT:  Okay.  Any redirect?

17          MR. BELL:  Yes, your Honor.

18          THE COURT:  Okay.

19          MR. BELL:  Thank you, your Honor.

20          MR. SHECHTMAN:  Judge, Mr. Bell has given me a minute

21  and a half to let me get seated and organized.

22          THE COURT:  To do what?

23          MR. SHECHTMAN:  To just sit down and get organized.

24          MR. BELL:  I'm ready to go when everyone is.  I just

25  want to make sure Mr. Shechtman is fine.

1          MR. SHECHTMAN:  Just one minute, your Honor.

2          MR. BELL:  May I proceed, your Honor?

3          THE COURT:  Yes.

4     REDIRECT EXAMINATION

5     BY MR. BELL:

6     Q.  Good afternoon, Mr. Husamudeen.

7     A.  Good afternoon.

8     Q.  Ms. Bustillo, would it be possible for you to put up

9     Government Exhibit 110 once more.

10         Mr. Husamudeen, a few minutes ago you were asked a

11    number of questions by Mr. Shechtman about this chart.  Do you

12    recall seeing this chart a few minutes ago?

13    A.  Yes.

14    Q.  And this chart tracks a couple of the union's accounts from

15    2011 to 2015; is that fair to say?

16    A.  Yes.

17    Q.  And so what I'll ask you to do -- Ms. Bustillo, these

18    numbers are incredibly tiny, if you can try to focus in

19    beginning on the line for April 30th, 2014, it's about

20    two-thirds of the way down.  Can you take that about -- can you

21    do about eight lines, as close to the fourth and starting at

22    that point.  Thank you very much.

23         And so what you see here -- I want to focus your

24    attention, Mr. Husamudeen, on the line beginning May 31st,

25    2014, the line immediately below it June 30th, 2014; do you see

1   that?

2   A.  Yes.

3   Q.  And we've highlighted it for you.

4           And can we highlight the same two rows in the third

5   column.  Thank you, Ms. Bustillo.

6           And so there's a change from May 31st to June 30th of

7   about $5.3 million to about .3 million dollars, right?

8   A.  Yes.

9   Q.  And that reflects the movement of about $5 million of that

10  account into Platinum Partners, to your understanding, and out

11  of that COBA account, doesn't it?

12  A.  Yes.

13  Q.  And that's the same money movement that was discussed at

14  the Puerto Rican Day Parade; do you recall that?

15  A.  Yes.

16  Q.  Now, Mr. Shechtman asked you a number of questions about

17  the reserve, and he -- I think you observed that there had not

18  been a rainy day in a while, meaning that there had not been a

19  reason to draw from the rainy day fund for the reserve; do you

20  recall that?

21  A.  Yes.

22  Q.  Now, does the importance of the reserve depend on whether

23  you used it lately?

24  A.  No, it doesn't.

25  Q.  Why is that?

1   A.  There are months when the monies, the dues, the monies

2   that's coming in, is less than the monies that's going out, and

3   when that happens, we have to draw from the reserves.

4   Q.  What sorts of reasons could lead to a situation like that?

5   A.  Unexpected expenses, unexpected legal fees, a lot of

6   different reasons, you know, that would involve having to have

7   to take from the reserves.

8   Q.  Is it fair to say that some of these reasons are reasons

9   outside of the union's immediate control?

10  A.  Yes.

11  Q.  That's the reason why it's called a rainy day fund, isn't

12  it, because you can't control the rain?

13          MR. SHECHTMAN:  Judge, I don't know that your Honor

14  does this, allow leading questions on redirect?

15          THE COURT:  I'll allow some of this, yes.  That's

16  overruled.  You may answer.

17  A.  I'm sorry.

18          MR. BELL:  You know what, I'll withdraw the question.

19          Why don't we take that down, Ms. Bustillo, and what I

20  will try to do, with an adventurous spirit and your help, is

21  switch over to the ELMO here.

22  Q.  All right.  Now, you were shown this exhibit earlier as

23  Defense Exhibit MH301.  You were shown that by Mr. Shechtman,

24  weren't you?

25  A.  Yes.

1   Q.  This is a letter from an individual named Gilad -- an

2   e-mail, rather, from an individual named Gilad Kalter to Mark

3   Nordlicht, David Ottonsasser, Uri Landesman, Andrew Kaplan and

4   Murray Huberfeld, along with some other folks who are copied,

5   from February 18th, 2014, subject line, COBA, correct?

6   A.  Yes.

7   Q.  Now, you weren't the recipient of this e-mail, were you?

8   A.  No.

9   Q.  Now, the e-mail says the ten million is set to come in top

10  of PPVA.  Russ working on a side letter addressing PIK.  They

11  dropped the first three points.

12          Do you recall being asked a number of questions about

13  the first three points being the concerns that had been raised

14  in the letter on your screen earlier?

15  A.  Yes.

16  Q.  Now, around February of 2014, you did not know -- or

17  withdrawn.

18          Around February of 2014, did you know that COBA had

19  dropped three of its concerns?

20  A.  No.

21  Q.  Did you know what the three concerns were?

22  A.  No.

23  Q.  Reference is made here to PIK, did you know what PIK was?

24  A.  No.

25  Q.  With respect to the concerns I mentioned a moment ago, was

1   there ever a vote, that you were aware of, among the trustees

2   to drop certain concerns?

3   A.  No.

4           MR. BELL:  Why don't we take that down, and I'll

5   switch back to regular screen, Ms. Bustillo.  Thank you.

6           While we're adjusting, your Honor, just to sort of

7   belts and suspenders the situation here, to the extent that

8   they're not in already in, the government offers Government

9   302, 308, and 313 through 317 into evidence.

10          THE COURT:  Any objection to those?

11          MR. SHECHTMAN:  None, your Honor.

12          THE COURT:  Okay.  Those are all in.

13          MR. MAZUREK:  No, not from me either, your Honor.

14          (Government's Exhibits 302, 308, 313 through 317

15   received in evidence)

16          MR. BELL:  Thank you, your Honor.

17   BY MR. BELL:

18   Q.  And so the concerns that were mentioned were --

19   Ms. Bustillo, can we post Government Exhibit 1027, please.  Can

20   we actually go to -- well, let's pause for just a moment.

21          Mr. Shechtman asked you a number of questions about a

22   letter attached to this e-mail, a February 5th, 2014, e-mail

23   between some of those same people.  Why don't we go to the next

24   page, which is the start of the letter?

25          THE COURT:  Let me just check.  Do the jurors have

1   that in front of them?

2            JURORS:  Yes.

3            THE COURT:  Okay.  Go ahead.

4            MR. BELL:  Thank you, your Honor.

5   Q.  Do you recall being asked a number of questions about this

6   letter earlier in your testimony?

7   A.  Yes.

8   Q.  And so Mr. Shechtman asked you a number of questions

9   concerning the issues that were discussed in this letter.  To

10  be clear, what familiarity, if any, did you have with this

11  letter prior to -- rather, at the time that the investment was

12  being discussed?

13  A.  None.

14  Q.  What familiarity did you have with the -- I want to make

15  sure I ask this correctly.  What familiarity did you have with

16  the issues discussed in this letter prior to -- or, rather, at

17  the time that the investment was being considered?

18  A.  None.

19  Q.  So let's go to Page 2.  So you were asked a number of

20  questions about the four concerns on this letter, which I think

21  Mr. Shechtman appropriately summarized as the investment

22  manager advising that it's a fiduciary, conflicts of interest,

23  the request that the fund acknowledge that it can bear the risk

24  of losing the whole investment, and liquidity concerns.  Do you

25  recall being shown that during your cross?

1    A.  Yes.

2    Q.  And so were you aware of any of those concerns at the time,

3    during February of 2014, at all?

4    A.  No.

5    Q.  Now, I would like for us to put up, although I realize I

6    may have to rely on the ELMO again, what's in from earlier as

7    Defense Exhibit C.  I actually may have a copy of that.

8             So, Mr. Husamudeen, you were shown this resolution

9    earlier today.  I believe that the copy you were shown was

10   marked as Defense Exhibit C.  Do you remember seeing this

11   resolution?

12   A.  Yes.

13   Q.  And I believe that you testified earlier that that was your

14   signature on the second page?

15   A.  Yes.

16   Q.  Now, do you recall actually signing this resolution?

17   A.  Yes.

18   Q.  Do you recall when you signed the resolution?

19   A.  No.

20   Q.  Do you recall whether it was -- do you recall where it was

21   in the sequence of events that we have been describing

22   regarding the investments in Platinum Partners?

23   A.  It would have had to have been after the trustees' meeting

24   on January 13th.  We usually -- when we make decisions, we sign

25   resolutions afterwards; so it would have had to have been after

1    the January 13th meeting.

2    Q.  And so sometime after January 13th, 2014?

3    A.  Yes.

4    Q.  But you're not sure when after January 13th, 2014?

5    A.  No.

6    Q.  Now, ordinarily, Mr. Husamudeen, are these resolutions

7    dated, in your experience?

8    A.  You know what, no, they're usually just like this.

9    Q.  Which is to say a handwritten date at the top?

10   A.  No, no, there's no handwritten.  Where it says, at 1100

11   hours, January 13th, it basically -- most of the resolutions

12   have the date that we made the resolution or the decision.  But

13   looking at it, this pretty much resembles the resolutions that

14   we normally sign.

15   Q.  So let me ask you specifically, sir, is there usually

16   handwriting at the top containing a date and an account where

17   this fit in the timetable?

18   A.  There's never handwriting at the top.

19   Q.  So you said that the resolution -- you testified moments

20   ago that this would have had to have been after the

21   presentation from Platinum Partners?

22   A.  Yes.

23   Q.  Is it possible that this was signed during this meeting or

24   sometime after that day?

25   A.  No, it would have had to have been after that day.

1  Q.  And why is that?

2  A.  It usually is.  Actually, usually the resolutions come in

3  at the next trustees' meeting, or there are times when the

4  attorneys would send them over shortly after we've had a

5  meeting and after we've made different resolutions or

6  declarations.

7  Q.  And you testified that the next trustees' meeting was in

8  July of 2014.  Was that your testimony from before?

9  A.  Yes, it was July 29th or something like that.

10  Q.  And so would you have signed this at the July --

11          MR. SHECHTMAN:  Judge?

12          THE COURT:  Hold on.

13          MR. SHECHTMAN:  Objection.

14          THE COURT:  Let him finish the question.  Go ahead.

15  Q.  Would you have signed this at the July 2014 trustees'

16  meeting?

17  A.  If not before then, yes.

18          THE COURT:  Hold on, hold on.

19          MR. SHECHTMAN:  I'll withdraw the objection.  He can

20  answer.

21          THE COURT:  Hold on.  Please rephrase the question.

22          MR. SHECHTMAN:  I withdraw the objection.

23          THE COURT:  Well, I think we were talking over each

24  other.  Just restate the question, please; so we can get a

25  clear answer from the question.  Go ahead.

1    Q.  I'll ask a different question, in any event.  Were you at

2    the July 2014 trustees' meeting?

3    A.  No, sir.

4    Q.  Now, you mentioned that although you do -- although you

5    don't recall when you signed this, you do recall signing it?

6    A.  Yes.

7    Q.  At the time that you signed this resolution, were you aware

8    of the letter that I showed you just a moment ago, Government

9    Exhibit 1027, the one that listed the four objections or the

10   four concerns?

11   A.  As I said over and over, I wasn't aware of any of those

12   e-mails, letters.  I wasn't even aware of the attorneys'

13   concerns concerning the investment.  No, I wasn't aware.

14            MR. BELL:  One moment, please.  Just one moment.

15            (Pause)

16   Q.  And specifically, Mr. Husamudeen, did Mr. Seabrook ever

17   share those concerns with you?

18   A.  No.

19   Q.  Did Mr. Seabrook ever share any of those documents with

20   you?

21   A.  No.

22   Q.  Let's put up -- let's not.  We'll come back to those

23   documents very briefly in a bit.  I want to touch on this.

24   Mr. Husamudeen, you were asked a number of questions about what

25   we'll call the middle $5 million, that is the $5 million that

1   you learned about at the Puerto Rican Day Parade, and you were

2   asked about whether you raised this at a subsequent board

3   meeting; do you recall that?

4   A.  Yes.

5   Q.  Do you recall anyone raising the issue of the $5 million at

6   subsequent board meetings?

7   A.  Yes.

8   Q.  Who did?

9   A.  Former board member William Valentin.

10  Q.  And what was the nature of what Mr. Valentin raised about

11  the $5 million?

12  A.  I don't recall exactly what it was.  I do recall that we --

13  it wasn't addressed because at that time, I believe

14  Mr. Valentin had already filed a lawsuit; so we had no

15  discussion on the investment, but it was brought up by him.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

HAPPSEA3                    Husamudeen - Redirect

HAPJSEA4                    Husamudeen - redirect

Q.  Just to be clear, Mr. Valentin was present for a board

meeting at which he raised the issue of $5 million?

A.  I am not sure whether he was present or whether it was

submitted in writing, but I do recall him bringing it up.

Q.  So in some form -- I want to make sure I understanding your

testimony correctly -- in some form Mr. Valentin raised the $5

million before the board, but you're not sure in what form.  Is

that a fair characterization?

A.  Yes.

Q.  I want to go back to 10-27 once again.  Let's go to the

first page -- sorry -- the second page.  The first page is the

actual letter portion.  I want to go to the very next page,

actually.  Can you highlight the first full sentence which says

the annuity fund, however, is not adverse to being a

trendsetter.  Can we just highlight it on the regular pages.

        Can we highlight the last two lines of Paragraph 1

where it says this is not acceptable to the annuity fund, as

each of these entities and individuals must acknowledge their

fiduciary obligations to the annuity fund.

        Can we also highlight the first sentence of Section 2,

where it says the 0M is quite blunt about conflicts of

interest.

        Can we also highlight Section 3 beginning with the

annuity fund cannot acknowledge as required by the SA that it

1   has the financial ability to bear the economic risk of losing

2   its entire investment.

3           Now, Mr. Husamudeen, when was the very first time that

4   you saw this letter?

5   A.  I believe just recently.  I didn't see it when it was

6   written.  I am not sure.

7   Q.  When you say "just recently," are we talking about this

8   year?  Are you talking about this month?

9   A.  I am talking about this year.  I am not sure whether it was

10  with my attorney, with your office, but I never saw it prior.

11  Maybe I have seen it within the last couple of months of being

12  subpoenaed.

13  Q.  What was your reaction when you saw this letter for the

14  very first time?

15  A.  My reaction for this letter is the same as it is for the

16  other emails and the other letters.  I never saw it.  I am a

17  trustee.  No one ever said to me that they had these concerns.

18          These concerns were never expressed to me, so I get a

19  little agitated when I see this letter and any of the other

20  letters because --

21  Q.  We were going in the same direction.  Why were you

22  agitated?

23  A.  Because if I had been exposed to these letters and these

24  emails, I would never have voted to invest a dime of the

25  union's money in Platinum Partners.

1              MR. BELL:  No further questions.

2    RECROSS EXAMINATION

3    BY MR. SHECHTMAN:

4    Q.  Ms. Granquist, would you put up 110 back up on the screen.

5    (Pause)  This is 110.

6              THE COURT:  Do the jurors have that?

7    BY MR. SHECHTMAN:

8    Q.  This is Government Exhibit 110.  You have looked at it

9    before.  It is the two funds, right?  Not up there?

10   A.  No.

11             (Pause)

12             THE COURT:  It is on the screen now.

13   BY MR. SHECHTMAN:

14   Q.  Do you have it?  It is back on the screen now?

15   A.  Yes.

16   Q.  We looked at this before and you were asked about this on

17   redirect.  These are the two funds, and I would be correct that

18   for most of 2012 and 2013, you had between 6.8 and $5.3 million

19   in that money market?  Would I be correct?

20   A.  Yes.

21   Q.  And that was not needed to make up for a shortfall on dues

22   in any particular month?

23   A.  I can't really say that.

24   Q.  You can't really say it?  Did you keep 5.3 to $6.8 million

25   to make up for a shortfall in dues?

1    A.  We might not need $5.8 million, but the reserves is there

2    so if we need it.

3    Q.  I am sorry.  We are having months where no one is paying

4    dues?

5    A.  There is a possibility.  Anything could happen.

6    Q.  So we let $6.7 million there on the possibility that no one

7    would pay dues in a month?

8    A.  Yes.

9    Q.  And that is the way you ran this union?

10   A.  Very conservative.  The dues money of the members is to

11   operate the union.

12   Q.  And so?

13   A.  It is not a profit-making corporation.

14   Q.  The $6 million sat there making 1 percent and your costs

15   went up in 2014 more than a half million dollars.  That is your

16   testimony?

17   A.  I wasn't president when all of that was going on or

18   treasurer.

19   Q.  Mr. Seabrook was?

20   A.  Yeah, exactly.

21   Q.  And Mr. Seabrook made the decision that leaving $6.8

22   million of 1 percent was not in the union's interest?

23   A.  And I would have to say he made the decision to leave it

24   there for two or three years and sat there doing nothing.

25   So --

1    Q.  Probably --

2            THE COURT:  Hold on.

3            (Multiple voices)

4            THE COURT:  Finish the answer.

5            THE WITNESS:  I am done.

6    BY MR. SHECHTMAN:

7    Q.  Your testimony is probably a mistake, he should have pulled

8    it out sooner?

9    A.  That is not what that fund is for.  The annuity fund is for

10   investment.  The general fund, the operating fund is for the

11   operation of the union.

12   Q.  Now, the way this was set up, and I think we saw this, in

13   order to ensure liquidity, you could pull money out on three

14   days' notice.  Is that correct?

15   A.  What do you mean?  I don't know.

16   Q.  The money that went to Platinum out of COBA, that could be

17   pulled out on three days' notice?

18           MR. BELL:  Objection; scope.

19           THE COURT:  Let's have a brief sidebar.

20           MR. SHECHTMAN:  I would be very quick.  One document I

21   didn't get in before that I think is important here.  It will

22   take me two seconds.

23           THE COURT:  Let's have a quick sidebar.

24           (Continued on next page)

25

1              (At the sidebar)

2              THE COURT:  I am concerned about the time for this.

3    The witness said he wasn't aware of these documents.  The

4    documents are in evidence.

5              MR. SHECHTMAN:  It is not.  It will take 30 seconds.

6              THE COURT:  You read the certain portions in front of

7    the jury.  They're in evidence.  You are trying to get this

8    witness to agree with you about what this means.  At this point

9    you may be taking us down a road that will have you wind this

10   up even more.  Give me a sense of where we are going.

11             MR. SHECHTMAN:  The shortest reason.  I want to show

12   him money was pulled out on three days' notice in August.

13             THE COURT:  We have been through that.  You pulled

14   that out in cross-examination in three days.

15             MR. BELL:  I didn't address it.

16             MR. SHECHTMAN:  I wanted to pull out it was --

17             THE COURT:  You got him so say that on your cross.

18             MR. SHECHTMAN:  He said could be.  I want to find to

19   for sure if it was.

20             THE COURT:  And what else?

21             MR. SHECHTMAN:  I am done.

22             THE COURT:  I will let you do that.  Let's go.

23             MR. SHECHTMAN:  Five minutes at the most.

24             THE COURT:  That is more than one question.

25             MR. SHECHTMAN:  I have a sense it is one more

1    question.

2             THE COURT:  Move this along.  The witness was a lot

3    longer than 45 minutes.

4             MR. SHECHTMAN:  The witness said he never --

5             (Multiple voices)

6             MR. SHECHTMAN:  I will ask him three questions about

7    that and I am done, five minutes.

8             THE COURT:  Reality?  Let's go.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           MR. SHECHTMAN:  Ms. Granquist, would you put

3    Government Exhibit 316 up on the screen.  We're okay admitting

4    this?

5           MR. BELL:  Yes, we are.

6    BY MR. SHECHTMAN:

7    Q.  Just to look at this briefly, Mr. Husamudeen, you testified

8    there was that side letter that --

9           THE COURT:  Hold on.  Now the jurors have it.

10   BY MR. SHECHTMAN:

11   Q.  -- you testified there was a side letter that allowed the

12   money to be moved out on three days' notice.  Would you look at

13   Government Exhibit 316.

14   A.  I testified that -- you said I testified that there was a

15   three day?  Or you showed me a document stating that there was.

16   Q.  I showed you a document.  Do you see this document?

17   A.  Yes.

18   Q.  And that is a request to redeem the money on three days'

19   notice.  Am I correct?

20   A.  Yes, sir.

21   Q.  Dated in August of 2013?

22   A.  Yes.

23   Q.  There was a series of questions about concerns that your

24   lawyer had.  Do you remember those questions?

25   A.  Yes.

1   Q.  I take it that it is your testimony that nobody told you

2   about those concerns?

3   A.  Yes, that is my testimony.

4   Q.  If those concerns had been addressed and resolved by the

5   lawyers with Platinum's lawyers, weren't your lawyers supposed

6   to tell you we have concerns but they were addressed?

7   A.  They are my lawyers.  I am a trustee, so if you share it

8   with the chairman who is also a trustee, why wouldn't you share

9   it with me?  I am a trustee as well.

10  Q.  My question is, your lawyers were tasked with doing due

11  diligence, right, after the January meeting?

12  A.  Yes.

13  Q.  And if they had concerns and if those concerns were

14  addressed, though they no longer had concerns, were they

15  failing you if they didn't tell you?

16  A.  In my opinion, yes.

17  Q.  So it is your view that they should have said to you there

18  was a PIK issue but we resolved it?

19  A.  The annuity fund consisted --

20  Q.  My question --

21  A.  Consisted of --

22          (Multiple voices)

23  A.  I am one of them and they should just inform the chairman,

24  which I am right now for this fund, I should have been informed

25  about this and so should the other trustees of this fund.

1  Q.  Even though those concerns were resolved to the lawyers'

2  satisfaction, right, with a side letter, they still should have

3  told you?

4            MR. BELL:  Objection.

5            THE COURT:  I will allow it.

6  A.  The letter, all of these letters and emails are addressed

7  to who?  The Board of Trustees.  So, yes, yes, I should have

8  known about the concerns whether they were resolved or not.  I

9  am a trustee.  I should have been informed.

10 Q.  I take it the following:  One of these letters was

11 addressed to the Board of Trustees.  The rest of them were

12 addressed to Platinum.  Would I be correct?

13 A.  I saw my name or I saw Board of Trustees on quite a few of

14 these letters.

15 Q.  On one letter, sir?  Am I correct?

16 A.  I am not sure.

17           MR. SHECHTMAN:  No further questions.

18           MR. BELL:  We have nothing else.

19           THE COURT:  The witness is excused.

20           (Witness excused)

21           THE COURT:  Let's have the government call its next

22 witness.

23           MR. CAPONE:  The government calls Matthew Balemian.

24  MATTHEW BALEMIAN,

25     called as a witness by the Government,

1      having been duly sworn, testified as follows:

2           THE COURT:  Now the acoustics here aren't great, so if

3  you can lean into the microphone and give us a Testing 1, 2, 3.

4           THE WITNESS:  Testing 1, 23.

5  DIRECT EXAMINATION

6  BY MR. CAPONE:

7  Q.  Good afternoon, sir.

8  A.  Good afternoon.

9  Q.  Where do you work?

10  A.  SS&C Technologies.

11  Q.  How long have you worked for SS&C Technologies?

12  A.  I have been at SS&C for 19 years.

13  Q.  How far did you go in school?

14  A.  Degree in accounting, bachelors degree in accounting.

15  Q.  What is SS&C technology?

16  A.  We're a software company.  We provide investment and

17  financial software-enabled services such as fund administration

18  to hedge fund clients and private equity clients.

19  Q.  Can you explain to us as simply as possible what it means

20  to provide fund administration services to hedge fund clients.

21  A.  Sure.  As a third-party administrator, we are maintaining

22  the books and records independently for our clients' funds on a

23  monthly basis, calculating the value of those funds and

24  reporting that information to investors.

25  Q.  What is your title?

1    A.  I am a managing director in investor services.

2    Q.  What does the Investor Services Department do?

3    A.  Investor services is responsible for onboarding new

4    investors into the funds.  We will capture and collect their

5    subscription information when they're investing money into the

6    particular fund.  We'll maintain a share registry of those

7    investors' information.  We'll also provide reporting back to

8    them inclusive of the account value of their statements on a

9    monthly basis.

10   Q.  Is there also an accounting department at SS&C?

11   A.  There is.

12   Q.  What is that department do?

13   A.  The accounting department maintains the books and records

14   so they're capturing from the funds' portfolio transactions,

15   they're recording that into the general ledger, reconcile those

16   transactions back to custodians and prime brokers.  They're

17   also calculating the net asset value on a monthly basis for

18   those funds.

19   Q.  You mentioned a moment ago you used the term subscription.

20   What is that?

21   A.  Subscription is a way that a client invests into a fund, so

22   with an offering document for a particular fund there is a

23   particular document that an investor has to complete in order

24   to invest money into the fund itself.

25   Q.  So for SS&C's clients, does SS&C keep track of when new

1    investors subscribe to that client's fund?

2    A.   Yes, we do.

3    Q.   As well as when existing investors add money to the fund?

4    A.   Correct, yes.

5    Q.   How does SS&C keep track of that information?

6    A.   We have internal proprietary systems and software, so as we

7    capture those transactions, we're processing them and recording

8    them into our systems directly.

9    Q.   Are you aware of an entity called Platinum Partners?

10   A.   Yes.

11   Q.   What is it?

12   A.   It is a hedge fund client of SS&C.

13   Q.   Does SS&C provide both investor services and accounting

14   services for Platinum Partners?

15   A.   Yes, we do.

16   Q.   Are you aware of whether Platinum Partners had one fund or

17   multiple funds?

18   A.   They had multiple funds.

19   Q.   What are the funds of which you're aware?

20   A.   They had value arbitrage funds, liquid opportunity funds

21   and credit funds as well.

22   Q.   Does SS&C prepare reports for its clients including

23   Platinum Partners regarding the investors in the funds?

24   A.   Yes, we do.

25   Q.   If you can look on the ledge there right next to the stack

1    of documents.

2    A.   Yes.

3    Q.   Would you take a quick look through them and let me know if

4    you recognize them?

5    A.   I do recognize them.

6    Q.   And they are for the record Government Exhibits 1113, 1114,

7    1115, 1118, 1119 and 1120.

8              MR. CAPONE:  I will offer them now if there is no

9    objection?

10             THE COURT:  Any objection by either defense counsel?

11             MR. MAZUREK:  No, your Honor.

12             MR. SHECHTMAN:  No, your Honor.

13             THE COURT:  Those are in.

14             (Government Exhibits 1113, 1114, 1115, 1118, 1119 and

15   1120 received in evidence)

16   BY MR. CAPONE:

17   Q.   What are those?

18   A.   These represent investor capital detailed partnership

19   reports for both Platinum Value Arbitrage U.S. fund and

20   international fund.

21   Q.   Do they pertain to a particular time period?

22   A.   They pertain to years 2013, 2014 and 2015.

23   Q.   What are they?  What does an investor capital detailed

24   report show?

25   A.   It's depicting the value of each investor's holding within

1    the fund.

2    Q.  These are for the U.S. and the international funds?

3    A.  Correct.

4    Q.  For the Platinum Partners Value Arbitrage Fund?

5    A.  Correct.

6    Q.  Do you know what the difference is between the U.S. and the

7    international fund?

8    A.  Yes.

9    Q.  What is it?

10   A.  A U.S. fund is based more for U.S. investors.  A non-U.S.

11   fund is for tax exempt U.S. investors or foreign investors.

12   Q.  In the case of Platinum Partners, are you aware of whether

13   the Platinum Partners Value Arbitrage Fund International and

14   U.S. funds link up in any way?

15   Q.  They are considered feeder funds, which means they do

16   invest into another trading entity called the master fund, so

17   the Value Arbitrage International U.S. funds do invest in a

18   Value Arbitrage Master Fund for trading purposes.

19   Q.  Let's take a look at a few of these documents and we can

20   put them on the screen starting with Exhibit 1113.

21          If we can highlight, Ms. Bustillo, the row at the top

22   which describes each of the columns.  Mr. Balemian, can you

23   take us through each of these columns and explain what a report

24   like this shows.

25   A.  Sure.  The investor description and parent investor is the

1    legal name of that investor who is invested into this fund.

2    The investor type code represents the class that they've

3    invested into based on the offering documents and their

4    subscription documents.  Beginning capital would represent in

5    this case it's a January 13 monthly cycle.  That would be the

6    beginning capital balance as of that period.  Contributions,

7    withdrawals, assignments would be any capital activity that was

8    processed for those particular investors.  That would then give

9    you revised beginning capital.  The income allocation is how

10   much did the fund earn or lose in that particular monthly

11   cycle.  That is allocated to each investor.

12            Management incentive fees are religious fees related

13   to -- fees that are calculated against the investor based on

14   the class of series that they've invested with the fund.

15   Q.  How about withdrawals and ending net capital?

16   A.  Ending withdrawals would be again any withdrawal payments

17   made to the investor base on their requests at the end of the

18   period and ending net capital would represent what the value is

19   of their fund at that time period.

20   Q.  Are you able to tell in a report such as this what the

21   value of any individual investor's investment is in that fund

22   at the end of the month?

23   A.  Yes, we are.

24   Q.  Can we go, Ms. Bustillo to Page 56 of this document.

25            Again what fund does this pertain to?

1  A.  This is the Platinum Value Arbitrage USA Fund.

2  Q.  Does this particular portion of the document show the value

3  of investors' investments at the year end 2013?

4  A.  Yes, would represent the end of the year value for 2013.

5  Q.  I want to highlight a few of these for you to read.  Ms.

6  Bustillo, starting with the third entry, Alexander Huberfeld.

7          What is the value of that individual's investment at

8  year end 2013?

9  A.  $172,073.65.

10  Q.  Just a little bit lower, Ms. Bustillo.  Ariella Huberfeld,

11  what is the value of that investor's investment?

12  A.  $114,715.75.

13  Q.  And lower in on the page, the Huberfelds, Jessica.  What is

14  the value of that investor's --

15  A.  $172,073.65.

16  Q.  And below that Philip and Rae Huberfeld?

17  A.  Ending balance $205,176.74.

18  Q.  Finally, a little bit below or just below Rachel Huberfeld,

19  how about the value of that?

20  A.  The value was $172,073.65.

21  Q.  If we can take this exhibit down and please put up

22  Government Exhibit 1118.  Mr. Balemian, what fund does this

23  document pertain to?

24  A.  The pertains to the Platinum Value Arbitrage Fund

25  International.

HAPJSEA4                    Balemian - Direct

1    Q.  For the same PPVA, but now the international fund?

2    A.  Correct.

3    Q.  Can we go to Page 55.  What time period are we looking at

4    here?

5    A.  We're looking at the final month of 2013, December.

6    Q.  And again I want to highlight a couple of the entries a

7    little bit down that first page, the Huberfeld Family

8    Foundation.

9          What is the value of the Huberfeld Family Foundation's

10   investment in the fund at year end 2013?

11   A.  The value was $10,247,993.88.

12   Q.  Lower down on the page there is another Huberfeld Family

13   Foundation investment.  Would you highlight that.  What is the

14   value of this second Huberfeld Family Foundation investment at

15   year end 2013?

16   A.  The value there was $2,160,853.16.

17   Q.  That is about 12.4 million total, if you add those two up?

18   A.  Correct.

19   Q.  Let's now review the report for 2013, and I want to review

20   2014 before we wrap up.  Ms. Bustillo, if we can put up

21   Government Exhibit 1114.  Thank you.

22          What is this?

23   A.  This is a 2014 investor capital statement for the Platinum

24   Value Arbitrage Fund USA.

25   Q.  Ms. Bustillo, can we go to Page 51, please.  Excuse me.

1    56.  You were right the first time.  What time period does this

2    page show?

3    A.  This shows the final month in 2014 for December.

4    Q.  Again if we can highlight the Huberfeld related entities

5    starting with Alexander Huberfeld, what is the value of that

6    investment at year end 2014?

7    A.  The value was $146,892.53.

8    Q.  And Ariella Huberfeld just below it?

9    A.  $107,286.96.

10   Q.  Ms. Bustillo, a little lower.  Jessica Huberfeld, what is

11   the value of that investment?

12   A.  $146,892.53.

13   Q.  Philip and Rae Huberfeld?

14   A.  $128,193.52.

15   Q.  And finally on this document Rachel?

16   A.  $146,892.53.

17   Q.  And this is all year end on the U.S. fund?

18   A.  Correct.

19   Q.  So let's take a look at one more, Exhibit 1119.  What fund

20   does this pertain to?

21   A.  This pertains to the PPVA, Platinum Value Arbitrage Fund

22   International Limited.

23   Q.  Page 51, please.  Again if we can take a look at what time

24   period is this?

25   A.  This is for the final month of the year 2014, December.

1    Q.  Ms. Bustillo, the first Huberfeld Family Foundation entry.

2           What is the value of the Huberfeld Family Foundation

3    first investment at year end 2014?

4    A.  $10,977,310.53.

5    Q.  How about the second Huberfeld Family Foundation?

6    A.  $2,314,629.38.

7    Q.  That is about 13.3 million?

8    A.  Correct.

9    Q.  Have you reviewed this particular exhibit, Government

10   Exhibit 1119, prior to testifying today?

11   A.  Yes.

12   Q.  Did you also see entries for the Correction Officers

13   Benevolent Association?

14   A.  I have.

15   Q.  Let's take a look at a couple of those.  Page 52, Ms.

16   Bustillo.

17          Two-thirds of the way down the page do you see a

18   Corrections Officers Benevolent Association annuity fund?  What

19   is the value of that investment at year end 2014?

20   A.  The value is $10,540,158.05.

21   Q.  Is this second entry in a different legal name?

22   A.  It is.

23   Q.  What is it?

24   A.  The Correction Officers Benevolent Association, Inc.

25   Q.  What is the value of that investment at year end 2014?

1    A.  $5,126,430.59.

2    Q.  One more page, Ms. Bustillo.

3         Do you see a third Correction Officers' Benevolent

4    Association investment?

5    A.  I do.

6    Q.  What is the value of that investment?

7    A.  The value is $5,054,235.59.

8    Q.  In total, do the three investment we have just reviewed

9    exceed $20 million?

10   A.  They do.

11   Q.  Were you able to tell where the Correction Officers

12   Benevolent Association ranked compared to other investors at

13   the year end 2014 in this fund in terms of the overall capital

14   in the fund?

15   A.  We were.

16        MR. MAZUREK:  Objection.  Vague as to rank.

17   BY MR. CAPONE:

18   Q.  In terms of dollar value?

19        THE COURT:  Overruled.  Go ahead.  You may answer.

20   A.  The dollar value was the fourth largest investment in the

21   fund.

22   Q.  How many investors, roughly, were in the fund as of this

23   month?

24   A.  Approximately 175.

25   Q.  How about the Huberfeld Family Foundation, where did that

1   entity rank in terms of dollar value of the investments in the

2   fund at year end 2014?

3   A.   That ranked around 10th at the fund.

4   Q.   Again roughly out of 175?

5   A.   Out of 175, approximately.

6   Q.   You spoke earlier about SS&C tracking all of the

7   subscriptions to the fund on an annual basis?

8   A.   Yes.

9   Q.   Were you able to review the information concerning

10  subscriptions to the fund, the international fund, in 2014?

11  A.   Yes.

12  Q.   What was the single biggest subscriber to the international

13  fund in 2014?

14  A.   COBA was the largest, Correction Officers Benevolent

15  Association was the largest subscriber for that year.

16          MR. CAPONE:  No further questions.

17          THE COURT:  Any cross-examination?

18          MR. MAZUREK:  Briefly, your Honor.

19          THE COURT:  Okay.

20  CROSS-EXAMINATION

21  BY MR. MAZUREK:

22  Q.   Good afternoon.

23  A.   Good afternoon.

24  Q.   My name is Henry Mazurek.  I represent Mr. Huberfeld, and

25  we have never met before or talked before, correct?

1    A.  Correct.

2    Q.  You were just asked about some questions regarding your

3    work as a fund administrator at SS&C for the Platinum Group of

4    Funds, correct?

5    A.  Correct.

6    Q.  I just want to understand, you had mentioned that there

7    were a number of funds that were part of the Platinum Group,

8    correct?

9    A.  Correct.

10   Q.  You were just asked questions by Mr. Capone related to a

11   subset of those funds, correct?

12   A.  Correct.

13   Q.  Specifically, the last set of questions regarding rankings

14   of different investments, he asked you specifically only with

15   respect to a certain subset of the funds called the PPVA

16   International Fund, correct?

17   A.  That's correct.

18   Q.  On direct examination you indicated that that fund is only

19   one of a couple of feeder funds into a master trading account,

20   correct?

21   A.  Correct.

22   Q.  What that means is that there were at least two funds, the

23   PPVA International and the PPVA USA, whose assets dropped down

24   into another fund where the trading and investment activity

25   actually took place?

1    A.  Correct.

2    Q.  Correct?

3    A.  Correct.

4    Q.  So there is no distinction whatsoever between the money

5    that comes in either on the PPVA International side versus the

6    PPVA USA side, correct?

7    A.  That's correct.

8    Q.  It is just a matter of what tax entity is making the

9    particular investment?

10   A.  Correct.

11   Q.  So if you're actually going to rank a listing of

12   subscribers or investors who is actually investing within the

13   master account, you wouldn't just include the PPVA

14   International side, you would also want to add the USA side,

15   correct?

16   A.  You could do so, correct.

17   Q.  I am sure you could do so.

18         If you were trying to make a fair and accurate

19   representation of the money available to be traded or invested,

20   you would combine those two funds, correct?

21   A.  Correct.

22   Q.  But you were not asked to do that?

23         You were asked only to look at the PPVA International

24   side, correct?

25   A.  Correct.

1    Q.  An important part of evaluating percentages or rankings of

2    investments would be to understand the total assets under

3    management.  Would that be fair to say?

4    A.  Correct.

5    Q.  Assets under management, just so we're working under the

6    same understanding, are the total number of investments that

7    are available to the fund managers to invest, correct?

8    A.  Correct.

9    Q.  As the fund administrator, you are aware of the total

10   assets under management for the entire PPVA fund during the

11   course of the time you guys were administering the fund?

12   A.  Yes.

13   Q.  That would be one of the things that you would keep track

14   of, correct?

15   A.  Correct.

16   Q.  So I am going to ask you take a look at a couple of

17   documents.  First of all, the investor capital information that

18   you were asked to look at by the government did not include the

19   assets under management totals?

20   A.  We looked at both the U.S. and the international funds.

21   Q.  I am asking whether those big spreadsheets that were

22   printed out and admitted into evidence, did they include the

23   assets under management for those funds for those years?

24   A.  Yes.

25   Q.  So can you look in that stack of documents to your left and

1   tell me two things:  First, what the assets under management

2   were for the PPVA International Fund at December 31, 2014, and

3   the assets under management for the PPVA USA fund for the end

4   of 2014?

5   A.  Yes.

6            MR. MAZUREK:  And then, Judge, I am going --

7            THE COURT:  Hold on.

8            MR. MAZUREK:  I am not asking the witness.  I am

9   asking the court's indulgence to allow me once I get the

10  answers to put them, write them on the screen as a

11  demonstrative aid for the jury.

12           THE COURT:  Okay.  Does the government have any

13  position on that?

14           MR. CAPONE:  No objection.

15           THE COURT:  Okay.

16           MR. MAZUREK:  Can we publish the electric white board,

17  please.

18           THE COURT:  Has the witness had a chance to review

19  that?

20           THE WITNESS:  Yes, I do have them.

21           THE COURT:  Does the witness have an answer to the

22  question yet?

23           THE WITNESS:  Yes, for Platinum Arbitrage Fund

24  International for the end of 2014, the value of the fund was

25  $491,656,504.26.

1   BY MR. MAZUREK:

2   Q.  That was for the international fund?

3   A.  That was for the international fund.

4   Q.  And for the PPVA USA fund?

5   A.  And for the PPVA at the end of 2014 U.S. fund, the value

6   was $267,356,881.51.

7           MR. MAZUREK:  If I my just write those numbers down on

8   the white board for the jury?

9           THE COURT:  Go ahead.

10          MR. MAZUREK:  So we have -- is it working -- sorry for

11  the chicken scratch here.  I N T L is for international, okay?

12  Q.  And you said at that time was 491 million?

13  A.  Yes.

14  Q.  That is 491 million, correct?

15  A.  Correct.

16  Q.  For the end of 2014, correct?

17  A.  Correct.

18  Q.  And then there was a second fund which you had called the

19  feeder fund, right, PPVA USA fund, right?

20  A.  Correct.

21  Q.  And you said at the end of 2014, that was approximately 267

22  million?

23  A.  Yes.

24  Q.  491 plus 267, correct?

25  A.  Yes.

1    Q.  I am going to let you do the math if you might to tell me

2    what the total assets under management, I'll designate that as

3    AUM for assets under management, right?  Okay?

4    A.  Okay.

5    Q.  And can you do the math for me?

6    A.  I can't write on there?

7    Q.  What is that?  I don't think you can write on there.

8    A.  758.

9    Q.  I am sorry?  758, right?

10   A.  Did I do my math right?

11   Q.  Hold on.  758, okay.  $758 million, right?

12   A.  Yes.

13   Q.  That is the amount that the SS&C reported as fund

14   administrator was valuable for the Platinum managers to invest

15   by the end of 2014, correct?

16   A.  That was the ending value in the fund for that time period,

17   yes.

18   Q.  You were asked questions about a particular investor in

19   2014, and that was I'll call the Correction Officers Benevolent

20   Association, right?

21   A.  Yes.

22   Q.  And you totaled that I believe in your direct testimony in

23   2014, approximately $20 million, $20 million exactly was

24   subscribed to the PPVA International side, right?

25   A.  Yes.

HAPJSEA4                    Balemian - cross

1   Q.  And that would be part of the $491 million you see on the

2   screen, correct?

3   A.  Yes.

4   Q.  And the only reason that -- I'll use the shorthand COBA for

5   the correction officers' investment, okay -- the only reason

6   COBA invested on that top line, that top line of the

7   international was because it is a tax exempt organization,

8   correct?

9   A.  Correct.

10  Q.  And there is no distinction between the people who invested

11  or at least -- strike that.

12          There is no difference between the people who invest

13  in international versus USA in terms of the types of

14  investments the subscriber is going to get in that fund,

15  correct?

16  A.  Correct.

17  Q.  So the total number of actual subscriptions that come into

18  PPVA should include both the international and USA for the

19  purposes of measuring investment capital available to the fund,

20  right?

21  A.  Correct.

22  Q.  And the $10 million or $20 million number you looked at,

23  first of all, you were asked questions about the difference

24  from the initial amount invested in 2014 up until the amounts

25  that were reported at the end of 2014, correct?

1    A.  Yes.

2    Q.  I believe I wrote down the numbers correctly.

3            There was, you testified there was a gain in the COBA

4    account by the end of the year, correct, from the original

5    investment?

6    A.  By a "gain," you mean --

7    Q.  More money, there was more money in the account on December

8    31st, 2014 than was actually invested?

9    A.  Well, there was money that was invested that year in 2014.

10   Q.  Correct.  We said that was $20 million, right?

11   A.  Yes.

12   Q.  And at the end of 2014 there was more than $20 million in

13   the COBA accounts?

14   A.  Yes.

15   Q.  The numbers you reported were about 5.054 million for one

16   account at the end of December 31st, 2014, right?

17   A.  Correct.

18   Q.  And then there was approximately 10.5 million in another

19   account by the end of 2014?

20   A.  Correct.

21   Q.  And approximately 5.126 million in a third account,

22   correct?

23   A.  Correct.

24   Q.  I know you're trusting me on this, but if I add those three

25   numbers up, that is approximately $20,670,000.  Does that sound

1    about right?

2    A.   That sounds about right.

3    Q.   So in one year's investment, COBA made $670,000?

4    A.   That would sound correct.

5    Q.   That $20 million that was invested in 2014 by COBA, if that

6    represented a percentage, if that were represented as a

7    percentage of the total assets under management that were

8    available to the hedge fund managers to invest, tell me if I am

9    correct in my math, what I would do is I would divide 20

10   million by the total assets under management of 758 million.

11        Is that right?

12   A.   Yes.

13   Q.   So the COBA investment in 2014 as a percentage of all of

14   the investments in the PPVA fund is approximately 2.6 percent,

15   correct?

16   A.   Without doing the math, that sounds about right.

17   Q.   You know that this fund was around since approximately

18   2003.  Is that right?

19   A.   I don't recall.  I am not sure.

20   Q.   SS&C has been the fund administrator for the entire

21   duration of the fund?

22   A.   No.

23   Q.   Of its existence?

24   A.   No.

25   Q.   When did they start, do you remember?

1    A.  I believe when the investors side, it was 2007.  I don't

2    recall on the accounting side.

3    Q.  So SS&C has been the fund administrator for the Platinum

4    Group of Funds at least by 2014 for seven years?

5    A.  I would say yes, correct.

6    Q.  And you were only asked about PPVA, but you are also aware

7    the Platinum Group of Funds has other funds other than PPVA,

8    correct?

9    A.  Correct.

10   Q.  I think you alluded to some of that in your direct

11   examination, that it also include the PPCO, correct?

12   A.  Yes.

13   Q.  That is the Platinum Partners Credit Opportunity Fund,

14   correct?

15   A.  Correct.

16   Q.  That was a largely a debt-based investment strategy fund,

17   correct?

18   A.  I'm not sure.

19   Q.  You're not familiar with the investment strategy?

20   A.  No, I am not, not with that fund, no.

21   Q.  That was a fund that also SS&C acted as fund administrator

22   for, correct?

23   A.  Correct, we do.

24   Q.  I am going to ask you to take a look at a document I am

25   marking for examination as --

1          THE COURT:  Before you do that, let's go ahead and

2     take a 10-minute break, all right?  We'll be right back, okay?

3     Don't discuss the case with anyone else, don't discuss it

4     amongst yourselves.  See you soon.

5          (Jury excused)

6          THE COURT:  My Deputy handed me a note indicating one

7     or some of the jurors indicated they needed to take a restroom

8     break.  Let's excuse the witness now for the time being and ask

9     counsel something real quick.  Let me ask the witness to step

10    outside.

11          (The witness left the courtroom)

12          THE COURT:  Is the witness out of the courtroom now?

13          MR. MAZUREK:  Yes.

14          THE COURT:  Let me get a sense from defense counsel,

15    how much longer do you have with this witness?

16          MR. MAZUREK:  I have probably another set of numbers

17    to do and that should be it.

18          THE COURT:  I am starting to get concerned about the

19    pace here.  We need to move these things along a little bit.

20          MR. MAZUREK:  I haven't done anything wrong.

21          THE COURT:  The documents are in evidence.  We don't

22    need to just read all of the documents that are in evidence.

23          MR. MAZUREK:  I won't do that.

24          THE COURT:  The witness seems to be agreeing with your

25    math.  You don't need to be carrying the 1 here on the screen

1   here.  Let's just try to keep things moving because I am

2   worried about the pace we have got here.  You have got seven

3   more numbers, you said.  How long do you think this will take?

4              MR. MAZUREK:  I'll finish before 2:30.

5              THE COURT:  Can you give me just a quick offer of

6   proof?  What are these numbers about?  I want to move things.

7   I know that counsel, you want to litigate this all to the hilt,

8   but what are we talking about in terms of the numbers?

9              MR. MAZUREK:  I want to put into evidence the PPCO

10  numbers that are also part of the fund that have not been

11  admitted because they're relevant.  The government has

12  introduced only a part --

13             THE COURT:  Before you go further, does the government

14  have any objection to this coming in?

15             MR. CAPONE:  One second, your Honor.

16             (Off-the-record discussion)

17             MR. CAPONE:  The PPCO is not the fund that was

18  invested in.

19             THE COURT:  I got that.  Do you have any objection to

20  this coming in?

21             MR. MAZUREK:  I can offer --

22             MR. CAPONE:  If I can hear what the relevance is.

23             THE COURT:  What is the relevance?

24             MR. MAZUREK:  They put in information, only partial

25  information of the Huberfeld investments into the fund and

1    PPCO.  There are additional investments that were made, so it

2    is an impartial picture of the Huberfeld investments.

3              MR. CAPONE:  No objection, your Honor.

4              THE COURT:  No objection.  So you can just -- that is

5    in evidence.  Tell me what the number is later.  Put that on

6    the screen.  Move.  What else do you need to do with these

7    documents, with these numbers?  Where are you going with this

8    witness?

9              MR. MAZUREK:  That would be it, your Honor.

10             THE COURT:  I think the point has been made.  The

11   point is what was presented by the government was sort of an

12   inflated picture of the percentage of the COBA and Huberfeld

13   investment in terms of the assets under management.  I think

14   that has been established.  If you want to --

15             MR. MAZUREK:  I won't beat a dead horse.

16             THE COURT:  You can't do that, but let's try to move

17   this along.

18             MR. MAZUREK:  I will do that.  This is the first time

19   I stood up the whole case.

20             THE COURT:  I understand.  So then with this

21   understanding, there won't be objection to this evidence coming

22   in, how long do you think it will take to do this bit with the

23   witness?

24             MR. MAZUREK:  Me?

25             THE COURT:  Yes.

1          MR. MAZUREK:  It shouldn't take long, 10 minutes.  I

2     will go as quickly as I can.

3          THE COURT:  Okay.  Who is next on tap?

4          MR. CAPONE:  Gilad Kalter, your Honor.

5          THE COURT:  All right.  Counsel may go ahead and use

6     the restroom if you need to, but keep things moving along here.

7          MR. MAZUREK:  I promise.

8          (Recess)

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Is the witness here?  Go ahead and bring

2     the witness in.  Okay.  Are we ready?  All right.  Let's bring

3     the jury in.

4          (Jury present)

5          THE COURT:  Okay.  Please be seated.  Let's continue.

6     Go ahead, counsel.

7          MR. MAZUREK:  Thank you, Judge.

8     CROSS-EXAMINATION (Resumed)

9     BY MR. MAZUREK:

10    Q.  Mr. Balemian, I just want to go back to clarify one point

11    that you just made before the break, and I think this was my

12    error.  We were talking about the total COBA investments by the

13    end of December 31st, 2014, correct?  Do you remember that?

14    A.  Yes.

15    Q.  And we did some math and figured that it was about a

16    $700,000 gain on the investment by the end of the year,

17    correct?

18    A.  Yes.

19    Q.  But that $700,000 gain was not on a full year's investment

20    opportunity, correct?

21    A.  Based upon the time they invested throughout the year, it

22    could have been a partial year.

23    Q.  That's right.  So if there were three investments made in

24    March, June and August by COBA, so that $700,000 was actually

25    made on much less than one year of investment opportunities for

1   that money, correct?

2   A.  That's correct.

3   Q.  Okay.  Now, we were also talking about PPCO, which is the

4   credit opportunity part of Platinum Partners, correct?

5   A.  Correct.

6   Q.  And that is another one of the family of funds of Platinum,

7   correct?

8   A.  It is.

9   Q.  And it's run by the same managers, the same investment

10  managers, correct?

11  A.  Yes.

12  Q.  And I put in front of you two documents which have been

13  marked as MH103 and 104.

14          MR. MAZUREK:  These are not in evidence, your Honor.

15  I've also provided copies to the government.

16          THE COURT:  Are these the documents that you seek to

17  move into evidence for which there is no objection?

18          MR. MAZUREK:  Yes.

19          MR. CAPONE:  Yes, your Honor.

20          THE COURT:  So move them in.  They're in.  What

21  numbers are they?

22          MR. MAZUREK:  Defense Exhibits MH103 and MH104.

23          THE COURT:  Okay.  They're in.

24          (Defendant's Exhibits MH103 and MH104 received in

25  evidence)

1          THE COURT:  Go ahead and publish them.

2          MR. MAZUREK:  If we can take the December 2013

3    document.

4          THE COURT:  Do the jurors have it?  Not yet?  Okay.

5    Do the jurors have it now?

6          MR. MAZUREK:  No.

7          THE COURT:  Okay.  Go ahead, counsel.

8    BY MR. MAZUREK:

9    Q.  Great.  So on your screen you see a Platinum Partners

10   monthly letter dated December '13; is that right, sir?

11   A.  It appears as so, yes.

12   Q.  Okay.  And do you see about two-thirds down the screen, if

13   we can enlarge the section called funds statistic?

14   A.  Okay, I see that.

15   Q.  And do you see in the last column, farthest to the right,

16   it says "firm AUM;" do you see that?

17   A.  Yes.

18   Q.  AUM, we've used that abbreviation before to mean assets

19   under management, correct?

20   A.  Correct.

21   Q.  And it says 1.28 billion for the end of '13, correct?

22   A.  It does.

23   Q.  Okay.  And underneath there it says PPCO master fund assets

24   under management, 331 million, correct?

25   A.  Correct.

1  Q.  That $331 million figure is in addition to the PPVA assets

2  under management, correct?

3  A.  This is for the credit opportunities fund; so that would be

4  separate, yes.

5  Q.  So the number that is right above it, at 1.28 billion, that

6  reflects the entire amount of assets under management by

7  Platinum for the PPVA and the PPCO and the PPLO funds, correct?

8  A.  I am not certain of that.

9  Q.  That's what's reported here on the statistics being

10  reported by Platinum Partners for the end of December of 2013,

11  correct?

12  A.  Again, I'm not familiar with this document.  I've not seen

13  this document.

14  Q.  Okay.  You're familiar with the reporting by SS and C of

15  the PPCO fund, correct?

16  A.  I'm not closely familiar with that fund, no.

17  Q.  But is it fair to say that your understanding is that the

18  combined Platinum Partners assets under management that you

19  were aware of, in the seven years that SS and C was the fund

20  administrator, by the end of '13 to '14, was over a billion

21  dollars?

22  A.  Again, I cannot speak to that.

23  Q.  Okay.  We can take that off the screen.

24       You were only asked to look at the PPVA numbers before

25  your testimony today here by the government, correct?

1   A.  Correct.

2   Q.  You were also asked to identify on direct examination

3   certain investor funds that had the Huberfeld name associated

4   with it?

5   A.  Correct.

6   Q.  Okay.  Do you know, sir, as you testify here today, whether

7   the accounts that you identified on Government Exhibits 113

8   through 120 represent all of the Huberfeld family related

9   investments in the Platinum Partners group?

10  A.  I do not.

11  Q.  Were you asked to look at the PPCO investments by the

12  Huberfeld family group?

13  A.  No.

14  Q.  So the testimony that you provided was limited only to PPVA

15  international with respect to the Huberfeld entities?

16  A.  Yes.

17  Q.  And one of the entities that you identified on direct

18  examination was the Huberfeld Family Foundation, which I think

19  you testified had approximately $13 million invested in PPVA

20  international, correct?

21  A.  Correct.

22  Q.  And PPVA international is one for tax exempt organizations

23  investors, correct?

24  A.  Correct.

25  Q.  And are you familiar that the Huberfeld Family Foundation

1   is one of the charities run by Murray Huberfeld's family?

2   A.  I was not aware of that, but no.

3   Q.  I'm sorry?

4   A.  I was not aware, no.

5   Q.  And, again, are you aware that the total subscriptions by

6   the PPCO fund in 2014 were over $110 million?

7   A.  Could you repeat the question?

8   Q.  Were you aware that the PPCO subscriptions in 2014 were

9   over a hundred million dollars?

10  A.  No, I was not.

11  Q.  I'm sorry?

12  A.  I was not aware, no.

13  Q.  So when you were asked to calculate total contributions or

14  ranks of percentages by COBA in 2014, that number of

15  subscriptions by the PPCO part of the Platinum funds was not

16  part of your calculation in creating that ranking?

17  A.  No, it was not.

18          MR. MAZUREK:  I have nothing further, your Honor.

19          THE COURT:  Any redirect?

20          MR. CAPONE:  Very briefly, your Honor.

21  REDIRECT EXAMINATION

22  BY MR. CAPONE:

23  Q.  Mr. Balemian, you were just asked some questions about the

24  PPCO fund?

25  A.  Yes.

1  Q.  The PPCO fund is a completely different fund than the PPVA

2  fund; is that right?

3  A.  Correct.

4  Q.  And they don't link up like the PPVA international and

5  U.S., do they?

6  A.  No.

7  Q.  And are you aware of whether COBA ever invested a dime in

8  the PPCO?

9  A.  I am not.

10  Q.  You were also asked about whether you looked at -- whether

11  I asked you about subscriptions to the PPVA U.S. fund?

12  A.  Yes.

13  Q.  Do you recall that?  On direct, I think you testified that

14  COBA invested $20 million or so in 2014 into the international

15  fund; is that right?

16  A.  Correct.

17  Q.  And you also testified that that was the highest

18  subscription, in terms of dollar value, to the international

19  fund in 2014?

20  A.  That is correct.

21  Q.  Did you also look at subscriptions to the international

22  fund prior to testifying today -- sorry.  Did you also look,

23  prior to testifying today, at subscriptions to the U.S. fund in

24  2014?

25  A.  Yes.

1    Q.  And were there any investors who subscribed more than $20

2    million to the U.S. fund in 2014?

3    A.  No.

4    Q.  And so was COBA the highest subscriber, in terms of dollar

5    value, to either fund in 2014?

6    A.  Yes.

7              MR. CAPONE:  No further questions.

8              MR. MAZUREK:  Briefly, your Honor.  Limited recross.

9    RECROSS EXAMINATION

10   BY MR. MAZUREK:

11   Q.  You were asked questions about the link between PPCO and

12   PPVA on redirect just moments ago, correct?

13   A.  Yes.

14   Q.  They are managed -- PPCO and PPVA are managed by the very

15   same hedge fund managers at Platinum Partners, correct?

16   A.  Correct.

17   Q.  And you were asked questions about the size of the

18   investments in 2014.  You are aware, based on your calculations

19   and the reviews that you did in preparation for your testimony

20   today, that in 2014, PPVA for both U.S.A. and international,

21   had about $84 million in investments that year, correct?

22   A.  Correct.

23   Q.  And all $84 million that went into PPVA whether it was in

24   the U.S.A. or international, were available to the very same

25   asset managers at Platinum Partners who managed the PPVA and

1    the PPCO, correct?

2    A.   Correct.

3    Q.   And if you were a hedge fund manager at Platinum, it

4    wouldn't matter which one of these accounts that you think the

5    money came in from because they're all assets that you are

6    responsible for, correct?

7              MR. CAPONE:  Objection, your Honor.

8              THE COURT:  Please rephrase the question.

9    Q.   Yes.  The hedge fund managers at Platinum Partners are

10   responsible for managing the funds whether it came in in PPCO,

11   PPVA U.S.A., PPVA international, correct?

12   A.   The trading strategies would be different and the offering

13   documents that were provided to the investors would alert them

14   to what they're investing into.  So I would say from a master

15   perspective, it's a different trading strategy.

16   Q.   But it is the same managers who have to manage all of those

17   funds, correct?

18             MR. CAPONE:  Objection.

19   A.   Same managers.

20   Q.   Whether they invest in one type of trading strategy or

21   another, correct?

22   A.   Same managers, but they would not commingle investments

23   from funds if they're investing in specific trading strategy

24   within that fund.

25   Q.   I understand.  My question is, if you were the hedge fund

1   manager, you're responsible for all $1.2 billion of those

2   assets that come into your hands, correct?

3   A.  That's correct.

4           MR. MAZUREK:  Nothing further.

5           THE COURT:  Okay.  The witness is excused.

6           (Witness excused)

7           THE COURT:  Government, you may call your next

8   witness.

9           MR. CAPONE:  The government calls Gilad Kalter.

10  GILAD KALTER,

11      called as a witness by the Government,

12      having affirmed, testified as follows:

13          THE DEPUTY CLERK:  Please state your first and last

14  name and spell it for the record.

15          THE WITNESS:  Gilad Kalter, G-i-l-a-d, K-a-l-t-e-r.

16          THE DEPUTY CLERK:  Please have a seat, Mr. Kalter.

17          THE WITNESS:  Thanks.

18          THE COURT:  Okay.  Now, the acoustics here aren't

19  great; so if you can, just try to lean into the microphone and

20  give us a quick testing one, two, three.

21          THE WITNESS:  Testing one, two, three.

22          THE COURT:  Okay.  Go ahead, counsel.

23          MR. CAPONE:  Thank you, Judge.

24  DIRECT EXAMINATION

25  BY MR. CAPONE:

1    Q.  Good afternoon, sir.

2    A.  Good afternoon.

3    Q.  Where were you born?

4    A.  New York.

5    Q.  And how far did you go in school?

6    A.  Through law school.

7    Q.  Are you currently employed?

8    A.  No.

9    Q.  What was your last job?

10   A.  Regia Capital Management.

11   Q.  And what was that?

12   A.  It was a small private equity fund, private equity style

13   fund in New York.

14   Q.  Is that a fund that you had tried to start up?

15   A.  Yes.

16   Q.  And prior to that, where did you work?

17   A.  At Platinum Partners.

18   Q.  And did you work for Platinum as a lawyer or in some other

19   capacity?

20   A.  A little bit -- a little bit of both, a little bit of law

21   and a lot of chief operating officer.

22   Q.  And from when to when had you worked at Platinum?

23   A.  I started in at the beginning of 2005, near the beginning

24   of 2005, and I left in 2015.

25   Q.  And do you recognize anyone in the courtroom with whom you

1   worked while at Platinum?

2   A.  Yes.

3   Q.  And who is that?

4   A.  Mr. Huberfeld.

5   Q.  And do you also recognize anyone in the courtroom

6   associated with any investors in Platinum?

7   A.  Yes.

8   Q.  And who is that?

9   A.  Mr. Seabrook.

10  Q.  And can you please identify each of those gentlemen by

11  where they're sitting and something that they're wearing?

12  A.  Sure.  Mr. Huberfeld is wearing a blue tie with light --

13          MR. MAZUREK:  I'll stipulate, your Honor, Mr. Kalter

14  can identify Mr. Huberfeld.

15          THE COURT:  Okay.

16  Q.  Mr. Seabrook?

17  A.  Mr. Seabrook is wearing a red tie, white shirt, pocket

18  square.

19          MR. SHECHTMAN:  Stipulate to the pocket square.

20          THE COURT:  Okay.

21  BY MR. CAPONE:

22  Q.  Thank you.  Was Platinum Partners a hedge fund?

23  A.  It was a group of hedge funds.

24  Q.  And can you explain to us what a hedge fund is?

25  A.  A hedge fund is an investment company that raises capital

1    from investors, and the hedge fund manager then invests that

2    capital on behalf of the investors, seeking to return a profit

3    to investors.

4    Q.  And when you started working at Platinum Partners in 2005,

5    at that time, was there multiple funds or one fund?

6    A.  There was one fund.

7    Q.  And what was the fund at that time?

8    A.  It was called the Platinum Partners Value Arbitrage Fund.

9    Q.  Can we call that PPVA going forward?

10   A.  Sure.

11   Q.  Before you were working at the PPVA, what were you doing?

12   A.  I was a lawyer, practicing corporate law in New York.

13   Q.  And how did you come to leave that job and work for

14   Platinum?

15   A.  I begged a family member at Platinum for a job.

16   Q.  And who was that family member?

17   A.  My brother-in-law.

18   Q.  And what is your brother-in-law's name?

19   A.  His name is Mark Nordlicht.

20   Q.  And at the time, in 2005, what was Mr. Nordlicht's role at

21   Platinum, or the PPVA?

22   A.  He was the general partner of the fund.  At some point, he

23   had the title of chairman and chief investment officer, but I'm

24   not sure if it dated back to 2005.

25   Q.  And how old were you when you started at Platinum in 2005?

1    A.  I think I was 27.

2    Q.  And had you had any experience with hedge funds to that

3    point?

4    A.  No.

5    Q.  What was your -- well, how many people worked for Platinum

6    at the time you started, roughly?

7    A.  I would say approximately eight to ten.

8    Q.  And what was your job when you started?

9    A.  I did a lot of different things at the beginning.  I helped

10   out with the operations team.  I helped out the marketing team.

11   I helped the -- some private investment folks with, I remember,

12   their stock loan book, a lot of little tasks.

13   Q.  But not one, focused responsibility at first?

14   A.  Correct.

15   Q.  And how about, you identified earlier Mr. Huberfeld.  What

16   role, if any, did he play at that time in Platinum?

17   A.  Mr. Huberfeld was an investor who provided the -- provided

18   some of the, what we call, seed capital for Platinum, but he

19   had no role at PPVA.

20   Q.  And when you say seed capital, what do you mean?

21   A.  When a hedge fund is in its infancy, a seed capital partner

22   will be a partner who invests a large sum or enough of a sum to

23   get started and start investing, and typically that seed

24   partner will almost always have some equity in the business.

25   Q.  And so was Mr. Huberfeld one of the individuals then that

1    started Platinum, the PPVA, with the seed capital?

2    A.  Yes.

3           MR. CAPONE:  Ms. Bustillo, can you publish three

4    photos to the witness 708, 709 and 712, and I can offer them if

5    there's no objection.

6           MR. SHECHTMAN:  No objection.

7           MR. MAZUREK:  No objection.

8           THE COURT:  Okay.  They're in.

9           (Government's Exhibits 708, 709 and 712 received in

10   evidence)

11          MR. CAPONE:  Can we publish those to the jury as well,

12   Ms. Bustillo.

13          THE COURT:  Okay.  Do the jurors have it yet?  Okay.

14   Go ahead, counsel.

15   BY MR. CAPONE:

16   Q.  If you can, starting with the top left, identify who's in

17   Government 708?

18   A.  It looks like me.

19   Q.  And who's in 709, at the top right?

20   A.  Mr. Nordlicht.

21   Q.  That's your brother-in-law?

22   A.  Yes.

23   Q.  And who is at the bottom, 712?

24   A.  Mr. Huberfeld.

25   Q.  You can take that down, Ms. Bustillo.

1          When you started in 2005, where were the offices?

2     A.  The offices were on 57th Street, on the 54th floor.

3     Q.  And where on 57th Street?

4     A.  Oh, it was Carnegie Hall Tower, which 152 West 57th.

5     Q.  And on the 54th floor, are you aware of whose office space

6     it was at the time?

7     A.  Yeah, it was the prior offices of Mr. Huberfeld's

8     predecessor firm that Platinum had taken over from him.

9     Q.  And what was the name of that firm?

10    A.  Broad Capital.

11    Q.  And did Mr. Huberfeld, in 2005, when you started, have an

12    office in that space?

13    A.  Yes.

14    Q.  After you started at Platinum in 2005 and did miscellaneous

15    responsibilities, as you've described, did there come a time

16    when you took on a new role?

17    A.  Yes.

18    Q.  And what was that?

19    A.  Sometime in the middle -- summertime of 2005, Mr. Huberfeld

20    had an idea for a new hedge fund that he sought to manage, and

21    he had asked me to come join him and help him build that new

22    fund.

23    Q.  And what was the new fund called?

24    A.  The new fund was called Centurion Credit Group.

25    Q.  And do you have -- what had been your interactions with him

1   to date when he asked you to start?

2   A.   Just seeing each other around the office, generally forming

3   a good relationship, and I think he thought I had a good skill

4   set to help him build that fund.

5   Q.   And so did there come a time where you were formally

6   working for that new fund instead of Platinum?

7   A.   Yeah, yeah.

8   Q.   And what was -- you may have said this already, but what

9   was it called, the new fund?

10  A.   It was Centurion Credit Group.

11  Q.   And when were you officially working for Centurion, as

12  opposed to the Value Arbitrage Fund?

13  A.   For some time I worked for both, and I would say

14  approximately 2007 I was solely focused on Centurion.

15  Q.   And at that point, what happened to the office space at the

16  Carnegie Hall Tower?

17  A.   Eventually Platinum took over the entire floor on 54, and

18  some point later took on the fourth floor, as well, and we

19  occupied both the 54th and fourth floors.

20  Q.   Okay.  So both entities were still in that building?

21  A.   Both entities were still in that building.

22  Q.   What was your official role at Centurion when you started

23  in 2007?

24  A.   My role was the chief operating officer role.  For a very

25  brief period of time I had the title of president of Centurion,

1   but that wasn't the appropriate title, and chief operating

2   offer is what I assumed quickly thereafter.

3   Q.  What did you do as chief operating officer?

4   A.  I helped make sure the business itself ran, that the

5   employees were paid, that the lights stayed on, that, you know,

6   general recurring bills were paid.  I helped with legal work,

7   formation of the vehicles.  Those two roles pretty much

8   occupied what I did, and every now and again I would help work

9   on a transaction.

10  Q.  What was Murray Huberfeld's title?

11  A.  Murray was the Chairman and Chief Investment Officer of

12  Centurion.

13  Q.  And what did that mean in terms of his day-to-day role?

14  A.  He was the boss.  We reported directly to him, and any

15  major decisions that had to be made were, for the most part,

16  his to make.

17  Q.  Are you aware of the term management fees?

18  A.  Yes.

19  Q.  And what are management fees?

20  A.  Management fees are one of the fees that the hedge fund

21  manager will charge the hedge fund investors, and the way a

22  management fee works is it is a fixed percentage fee that is

23  charged on the value of the holdings of the hedge fund on an

24  annual basis.  So if, for example, the management fee was a two

25  percent fee, then they would charge two percent of the value of

1   the hedge fund's portfolio on a monthly basis, one-twelfth of

2   two percent on a calendar year.

3   Q.  And that's --

4           THE COURT:  Hold on, counsel.  We're getting close to

5   the time to dismiss the jury.  Let me just see counsel briefly

6   in the robing room.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  I just wanted to find out if there's any

3   special instructions you want me to give them.  I'll just give

4   them the typical instructions I've been giving them, unless

5   there's something else?

6          MR. BELL:  No, your Honor.

7          MR. CAPONE:  No.

8          MR. MAZUREK:  Just one thing.

9          THE COURT:  Yes.

10          MR. MAZUREK:  Obviously, there were articles today; so

11   just to alert them to how important it is for the jury not to

12   be -- if they come across something when their web browser

13   shows up, or something, that they should turn away from it.

14          THE COURT:  Okay.  All right.  Anything else?

15          MR. CAPONE:  No, your Honor.

16          MR. MAZUREK:  No, your Honor.  Thank you.

17          THE COURT:  Okay.  Sounds good.

18          (Continued on next page)

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Okay.  So members of the jury, we're going

3     to let you go home for the day.  Again, I will instruct you, as

4     always, do not read anything in the press or on the Internet

5     about this case.  If you should see something, do not continue

6     reading anything.  Don't listen to anything about this case,

7     don't let anyone talk to you about this case, don't talk to

8     anyone about this case, don't do any independent research

9     regarding any of the issues or the parties in this case and

10    have a wonderful evening.  We'll see you bright and early at

11    9:00 a.m.

12         (Jury not present)

13         THE COURT:  So please be seated.  Let's do this,

14    please be seated, and we'll give the jurors, again, a

15    five-minute head start, and then we'll go ahead and excuse the

16    witness, and then just a couple of things I want to talk to

17    counsel about, and then I'll let people get on about their

18    business.  Okay?  Just hang out here for five minutes.

19         (Pause)

20         Okay.  We can excuse the witness now.  Folks in the

21    audience, if you want to takeoff, go ahead and takeoff.  I just

22    have a couple of things I want to address with counsel and the

23    parties.  Let's wait for the witness to leave first.

24         (Witness temporarily excused)

25         Okay.  Is the witness out of the courtroom?

1          Okay.  Again, I expressed a concern, especially with

2     the witness before this one, just in terms of pace.  I just

3     want to make sure that we keep things moving.  Obviously, I'm

4     going to give counsel plenty of scope on direct and

5     cross-examination with these witnesses, and there are some

6     witnesses who it's obvious to me that counsel are going to want

7     a lot more time with, and I'm fine with that.

8          But the witness before this one, Mr. Balemian, it

9     seemed to me that he's not a crucial, crucial, crucial witness,

10    and it seems that we should be able to dispose of his testimony

11    pretty quickly.  So I know that lawyers have different styles

12    and some may be more -- when it comes to examining witnesses,

13    some may be more like John Coltrane, some like be Miles Davis,

14    where you understand it's the notes that you don't play and the

15    questions you don't ask.

16          I don't care about the styles, except when I get too

17    much Coltrane, and it's going to take too much time and start

18    sucking up the jurors' time.  I want to make sure that we make

19    the most of the jurors' time, make the most of the jurors'

20    attention span.  We want to keep the jurors actively engaged,

21    and we want to move this case along.

22          So if there are quick witnesses that we can dispose of

23    quickly, let's try to do that.  There are documents in evidence

24    that sort of speak for themselves.  Let's just try to move this

25    examination along quickly.

1          If counsel know ahead of time that you want to

2    introduce something, unless you feel that you need to have the

3    element of surprise for a particular document, show it to

4    opposing counsel.  If there's no objection, I'm letting it in.

5    All right?  So let's just see if we can move things along that

6    way because, again, I know that some witnesses are going to

7    take a long time, and that's fine, but for the witnesses who

8    shouldn't take that long, let's try to move that along.

9          Anything else we need to deal today from the

10   government or the defense?

11         MR. BELL:  No, your Honor.

12         THE COURT:  From the defense?

13         MR. MAZUREK:  No, your Honor.

14         MR. SHECHTMAN:  No, your Honor.

15         THE COURT:  Let me get a preview of where we're headed

16   tomorrow in terms of witnesses.  So we have one witness on the

17   stand.  Who's next after him?

18         MR. CAPONE:  After this witness, it will be NYPD

19   captain who's direct will be very brief, maybe 20 minutes.

20   After that, Jona Rechnitz.

21         THE COURT:  Okay.  So the NYPD captain, can I get an

22   offer of proof on this witness?  What is this witness expected

23   to testify about?

24         MR. CAPONE:  This witness is expected to testify about

25   license plate reader data showing Mr. Seabrook's travel

1    throughout the city on December 11th, 2014.

2              MR. SHECHTMAN:  Judge?

3              THE COURT:  Okay.

4              MR. SHECHTMAN:  The cross will be, I think, one

5    question, but we would stipulate to that testimony.

6              THE COURT:  Okay.  When you say you stipulate to that

7    testimony, let me make sure I understand what you're saying.

8              MR. SHECHTMAN:  That Mr. Seabrook's car came in, that

9    it crossed the bridge at a certain time, that it went home at a

10   certain time.  We're fine.

11             MR. BELL:  We'll confer with counsel.  If there's a

12   way to save some time, great.  If not Captain Joy will be

13   brief.

14             THE COURT:  Okay.  That will be great.  If counsel can

15   reach a stipulation on that, that's fine.

16             Does counsel for Huberfeld expect much

17   cross-examination on this witness, if this witness were to be

18   testifying live?

19             MR. MAZUREK:  Captain Joy?

20             THE COURT:  Yes.

21             MR. MAZUREK:  None.

22             THE COURT:  Okay.

23             MR. MAZUREK:  But, Judge, I am going to be

24   cross-examining Gilad Kalter.

25             THE COURT:  I understand, and my sense is that --

1          MR. MAZUREK:  More significant.

2          THE COURT:  -- this strikes me as a more significant

3     witness, and that's fine.  And I'm not sure how much

4     examination Seabrook's counsel will have on this witness.

5          MR. SHECHTMAN:  Probably have something, your Honor.

6          THE COURT:  Again, that's fine.  I have no problem

7     with giving counsel plenty of scope on the more significant

8     witnesses, but witnesses like this NYPD captain, if counsel can

9     reach a stipulation, that would be great.  If not, let's just

10    keep it moving so that we can get to the witnesses that are

11    going to take a little bit more time.

12         All right.  Anything else we need to deal with today?

13         MR. CAPONE:  Not from the government.

14         THE COURT:  From the defense?

15         MR. MAZUREK:  No, your Honor.

16         THE COURT:  All right.  Okay.  See everyone tomorrow.

17    Let's, again, have everyone try to get here at ten minutes to

18    9:00 to avoid unnecessary bumping into jurors.  Have a good

19    evening.

20         (Adjourned to 9:00 a.m. on October 26, 2017)

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

ELIAS HUSAMUDEEN

Cross By Mr. Shechtman . . . . . . . . . . . 220

Redirect By Mr. Bell . . . . . . . . . . . . 322

Recross By Mr. Shechtman . . . . . . . . . . 335

MATTHEW BALEMIAN

Direct By Mr. Capone . . . . . . . . . . . . 343

Cross By Mr. Mazurek . . . . . . . . . . . . 354

Redirect By Mr. Capone . . . . . . . . . . . 374

Recross By Mr. Mazurek . . . . . . . . . . . 376

GILAD KALTER

Direct By Mr. Capone . . . . . . . . . . . . 378

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

307  . . . . . . . . . . . . . . . . . . . 236

306  . . . . . . . . . . . . . . . . . . . 238

402  . . . . . . . . . . . . . . . . . . . 243

1027 . . . . . . . . . . . . . . . . . . . 259

317  . . . . . . . . . . . . . . . . . . . 288

311  . . . . . . . . . . . . . . . . . . . 298

110  . . . . . . . . . . . . . . . . . . . 302

102  . . . . . . . . . . . . . . . . . . . 303

316  . . . . . . . . . . . . . . . . . . . 314

304  . . . . . . . . . . . . . . . . . . . 317

302, 308, 313 through 317  . . . . . . . . . 326

1113, 1114, 1115, 1118, 1119 and 1120  . . . 346

708, 709 and 712 . . . . . . . . . . . . . 383

                          DEFENDANT EXHIBITS

Exhibit No.                                    Received

B  . . . . . . . . . . . . . . . . . . . 261

C  . . . . . . . . . . . . . . . . . . . 283

E  . . . . . . . . . . . . . . . . . . . 292

G  . . . . . . . . . . . . . . . . . . . 315

MH103 and MH104  . . . . . . . . . . . . 370