1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                        16 Cr. 467 ALC

5  NORMAN SEABROOK AND MURRAY HUBERFELD,

6              Defendants.

7  ------------------------------x

8

9

10                                      October 26, 2017
                                        9:00 a.m.
11

12

13  Before:

14                  HON. ANDREW L. CARTER, JR.,

15                                      District Judge
                                          and a jury
16

17

18                          APPEARANCES

19  JOON H. KIM,
         United States Attorney for the
20         Southern District of New York
    KAN MIN NAWADAY,
21  MARTIN S. BELL,
    RUSSELL CAPONE,
22       Assistant United States Attorneys

23

24

25

1

2                         APPEARANCES (Continued)

3

4   BRACEWELL, LLP,
            Attorneys for defendant Seabrook
5   BY:  PAUL LEWIS SHECHTMAN, Esq.
            MARGARET EMMA LYNAUGH, Esq.
6                    Of counsel

7

8   MAZUREK LIPTON, LLP
            Attorneys for defendant Huberfeld
9   BY:  HENRY EDWARD MAZUREK, Esq.
            EVAN LOREN LIPTON, Esq.
10                   Of counsel

11

12  Also Present:
            BARD HUBBARD, Special Agent FBI
13          YOLANDA BUSTILLO, Paralegal USAO
            AUGUSTA GRANQUIST, Paralegal
14

15

16

17          (Trial resumes)

18          (In open court; jury not present)

19          THE COURT:  Please be seated.  Are all the parties

20  here?

21          MR. BELL:  We are, your Honor.  I don't see Mr.

22  Shechtman, but he is outside.

23          MS. LYNAUGH:  He is out in the hallway.

24          (Pause)

25          MR. BELL:  We are also looking for the witness, your

1    Honor.

2              THE COURT:  Okay.

3              MR. BELL:  Oh, the witness is here.

4              (Pause)

5              THE COURT:  So the witness is outside, I take it?

6              Let me just find out from counsel if there is anything

7    counsel need to address before this witness resumes the stand?

8              MR. SCHECHTMAN:  Not from us, your Honor.

9              MR. MAZUREK:  No, your Honor.

10             THE COURT:  Let me just find out in terms of

11   housekeeping and schedules for today.  I know counsel had

12   discussed yesterday the possibility of coming to some sort of

13   stipulation regarding the NYPD captain.  Where are we with

14   that?

15             MR. BELL:  We are going to call him, but he will be

16   brief.

17             THE COURT:  Okay.  When you say "brief," like how

18   brief is brief?

19             MR. BELL:  Briefer than the second witness yesterday.

20   He should be about 10 to 15 minutes on direct tops.

21             THE COURT:  How long is the anticipated cross of that

22   witness?

23             MR. SHECHTMAN:  There should be no further questions.

24             MR. MAZUREK:  I will not John Coltrane on the captain.

25             THE COURT:  So we'll wait for the jury to get here.

1  As soon as they're here, we will start.  I will be back when

2  the jury gets here.

3          (Recess)

4          THE COURT:  Okay.  They're here.  Let's bring the jury

5  in and have the witness retake the seat.

6          (Jury present)

7          THE COURT:  Please be seated.  Let's continue with the

8  case on trial.  Welcome back.  Go ahead, counsel.

9   GILAD KALTER, resumed.

10  DIRECT EXAMINATION (continued)

11  BY MR. CAPONE:

12  Q.  Good morning, Mr. Kalter.

13  A.  Good morning.

14  Q.  When we left off yesterday, we were talking about

15  Centurion, which I think you testified was a hedge fund started

16  by Mr. Huberfeld for which you started working full time around

17  2007?

18  A.  Correct.

19  Q.  I think you testified that that still was in the same

20  building as the other fund, the PPVA?

21  A.  Correct.

22  Q.  Can you remind us what Mr. Huberfeld's role and

23  responsibilities were at Centurion.

24  A.  Sure.  He was the general partner and I think his title was

25  the chairman and chief investment officer, and his

1  responsibilities were everything, to run the firm and make

2  major investment decisions and things like that.  We reported

3  to him.

4  Q.  Based on your experience there, are you aware of whether

5  he, either directly or indirectly, had money invested in

6  Centurion?

7  A.  Yes, he did.

8  Q.  We also started talking yesterday about management fees.

9  In fact, I think that is exactly where we broke.

10         If you don't mind explaining again what management

11 fees are and how they were structured in your experience at

12 Platinum.

13 A.  Sure.  A management fee is a fee that the investment

14 manager charges the investors in a hedge fund.  It is a

15 fixed -- it is typically a fixed percentage fee, and in the

16 Centurion case, it was a 2 percent fee, and it would be 2

17 percent of the value of the portfolio on a yearly basis, and it

18 would be paid monthly throughout the course of the year to the

19 management company.

20 Q.  So on a $10 million investment, would that be a $200,000

21 fee annually?

22 A.  Yes.

23 Q.  Are there also fees based on profits that are made on an

24 investor's investment?

25 A.  Yes.

1    Q.  Generally speaking, what were those fees, in your

2    experience, at both Centurion and Platinum?

3    A.  I believe what you're referring to is the performance fee

4    or the incentive allocation, and they were 20 percent was the

5    fee, and that would be in the event that the firm was

6    profitable, the investments were successful, and on an annual

7    basis at the end of the year you would look back how much you

8    made, how much profit was generated.  You would take that

9    amount of profit, and 20 percent of that amount would be paid

10   to one of the management entities.

11   Q.  And 80 percent to the investor?

12   A.  Correct.

13   Q.  In terms of Centurion, are you aware of who at Centurion

14   split the management fees?

15   A.  Yes.

16   Q.  Who was that?

17   A.  It was Mr. Huberfeld and myself and a trust of

18   Mr. Huberfeld's.

19   Q.  What was the breakdown, if you recall?

20   A.  It was 95 percent of the points in the company were between

21   Mr. Huberfeld and his trust, and 5 percent was to me.

22   Q.  So that is talking about the money coming in and the

23   profits.  How about what Centurion was investing that money in,

24   what types of assets or securities was Centurion investing in?

25   A.  The investment strategy at Centurion was asset-based

1   lending strategy which means that the private deals were being

2   done with the capital, loans mostly, and the investment idea

3   was that we would lend money against some sort of collateral

4   that the borrower was able to pledge to us.

5           In the event of a default, we would pursue the

6   collateral to recoup our investment and any profits owed to us,

7   and the remainder of that value of the collateral, once sold or

8   liquidated, would go back to the borrower.

9   Q.  If there was no default, how would Centurion be compensated

10  based on those loans?

11  A.  Typically by an interest piece.  Sometime there would be an

12  equity kicker, but generally by an interest-bearing loan.

13  Q.  Can you give us an example of a type of loan that Centurion

14  would make with investors' money?

15  A.  Sure.  In the early days one of the strategies was a real

16  estate lending strategy.  I think it is the simplest to

17  explain, and it was simply somebody had a borrower come with a

18  piece of collateral real estate, they would ask for a

19  short-term loan, the building would serve or the -- whatever it

20  was, whatever the real estate was would serve as collateral

21  that we would attach ourselves to, and they would pay some rate

22  of interest to us on a monthly, quarterly, annual, however the

23  loan was structured, basis similar to a mortgage you would get

24  at a bank, except the rate would be a little higher and the

25  term would be a little shorter.

1    Q.  Were there other types of loans in addition to real estate?

2    A.  Yes.

3    Q.  Was your role to identify the different loans to make?

4    A.  No.

5    Q.  Whose role was that principally?

6    A.  Mr. Huberfeld and others at the firm, other portfolio

7    managers.

8    Q.  I think you testified yesterday that your role was more on

9    the operations side?

10   A.  Correct.

11   Q.  Keeping the business running?

12   A.  Correct.

13   Q.  At some point while you were working in Centurion, did you

14   begin taking on any additional roles?

15   A.  Yes.  There was some deals, loans that I did work on and

16   assist portfolio managers, assist Mr. Huberfeld with, and in

17   addition to that, I started taking on a marketing role as it

18   related to the Centurion fund.

19   Q.  What is involved in marketing?

20   A.  The goal of a marketing department is to raise capital for

21   the hedge fund so that they have more capital to invest.  In

22   that role, I would meet with prospective investors, attend

23   industry conferences and talk to them about the fund.

24   Q.  When you met with prospective investors, is that something

25   you sometimes referred to as a pitch?

1   A.  Yes.

2   Q.  How did you start getting involved in pitches at Centurion?

3   A.  Mr. Huberfeld initially would do the pitch, and at some

4   point he asked me to start attending some of those meetings.  I

5   learned how to do the pitch.

6   Q.  Did pitches also involve written materials?

7   A.  It depends on who's pitching, but it could.

8   Q.  What type of or types of written materials are sometimes

9   used?

10  A.  So typically there could be a marketing presentation, there

11  could be a longer version, a shorter version, there could be

12  like a one-page document or, I don't know, 10-to-20 page

13  document, and those sometimes are used in meetings or just, you

14  know, for follow-up and whatnot.

15  Q.  Now, at the time that you were working at Centurion, what,

16  if you know, was your brother-in-law, Mr. Nordlicht doing?

17  A.  Any specific period?

18  Q.  Let me rephrase the question.  You testified earlier that

19  you moved on from the PPVA to Centurion over the course of 2005

20  to 2007.  For the next couple of years while you were at

21  Centurion was Mr. Nordlicht still running the PPVA?

22  A.  Yes.

23  Q.  Did there come a time when Centurion and the PPVA merged

24  under a single entity?

25  A.  Yes.

1    Q.  Around when was that?

2    A.  It was the beginning of 2011.

3    Q.  In what way did it merge, if you can describe that for us.

4    A.  So PPVA and PPCO were two totally separate funds.

5    Q.  You just said PPCO for the first time, if you can explain

6    that?

7    A.  I am sorry.  Centurion and PPVA were two separately managed

8    funds and businesses.  In 2011 Mr. Huberfeld stepped off as the

9    chairman and chief investment officer and general partner of

10   Centurion, and Mr. Nordlicht assumed that role, and the

11   Centurion fund was renamed PPCO, Platinum Partners Credit

12   Opportunities Fund, and it became part of the Platinum Partners

13   family of funds.

14   Q.  And Mr. Nordlicht was in charge of both at that point?

15   A.  Yes, he assumed Mr. Huberfeld's role; and, therefore, he

16   was in charge.

17   Q.  What happened that led to this, to the extent you're aware

18   that led to this change?

19   A.  I think synergistically it made sense to have the two back

20   offices start coming together and minimizing the need for

21   duplicative roles.  I think it brought Platinum to a larger

22   critical mass and size that would help it come to the next

23   level of AUM, assets under management, basically the size of

24   your hedge fund in dollars.

25          Those things led to the restructuring, I guess we can

1    call it, or the merger.

2    Q.  The different funds were now under a single company, for

3    lack of a better word, that was called Platinum Partners?

4    A.  Yeah.  I think the term Platinum Partners is not a legal

5    entity, so to speak.  I think it is a name that refers to all

6    the different funds such as PPVA, PPCO, et cetera, et cetera,

7    that were under this umbrella, so to speak.

8    Q.  Were there other funds in addition to PPVA and PPCO?

9    A.  Yes.

10   Q.  Were those two, nonetheless, two of the biggest funds

11   within Platinum?

12   A.  Can you repeat that.

13   Q.  Were PPVA and PPCO, nonethless, two of the biggest funds

14   within Platinum?

15   A.  Yes.

16   Q.  Did the company continue at that point, after the merger in

17   2011 to work out of the Carnegie Hall Tower?

18   A.  Yes.

19   Q.  Did you stay on after the merger?

20   A.  Yes.

21   Q.  What was your title and role at that point?

22   A.  The same as earlier, chief operating officer, and I was, in

23   addition to the responsibilities of the COO role, spending more

24   and more time on the marketing effort and slowly less and less

25   time on the operational side.

1    Q.  You testified a moment ago that after this merger, Mr.

2    Huberfeld stepped away from the general partner role of

3    Centurion or PPCO, and what role, if any, did he continue to

4    play after the entities merged?

5    A.  After the entities merged, at the very beginning Mr.

6    Huberfeld was needed for some legacy positions, and him and he

7    would help if asked by Mark Nordlicht, and he would also

8    continue to refer investors that might be interested in

9    Platinum to the marketing team or just to me to go like you

10   used the term before, pitch.

11   Q.  Did he continue to refer investors to you for pitches

12   throughout, say, 2014?

13   A.  Sometimes.  It didn't always come to me.

14   Q.  To Platinum?

15   A.  My belief, my understanding is yes.

16   Q.  Based on your position at Platinum after the merger, are

17   you aware of whether Mr. Huberfeld, again directly or

18   indirectly, had money invested in the funds?

19   A.  Yes, he did.

20   Q.  In what ways was the money invested in, personally or

21   through some other means?

22   A.  Mr. Huberfeld had some entities.  He had some accounts for

23   his children.  His father, may he rest in peace, had accounts,

24   some charitable accounts.  That is what I can recall.

25   Q.  Do you remember any of the family members' names whose

1    accounts were in the funds?

2    A.   Yes.

3    Q.   What were those?

4    A.   Okay.  There was White Star, which was an entity that Mr.

5    Huberfeld and some other people invested with.  His children

6    had accounts in their names.

7    Q.   What were those names that you remember?

8    A.   I may butcher this, but you had the Jessica Huberfeld

9    account, an Ariela, Rachel Huberfeld account, you had an

10   Alexander Huberfeld account, and Ariela Huberfeld account, and

11   I am not certain about any others.

12           Then there was Mr. Huberfeld's father's account, I

13   don't remember the name offhand, and there were two Huberfeld

14   foundations.  One was Mr. Huberfeld and one was Mr. Huberfeld,

15   Sr., I believe, and I think it was called the Huberfeld Family

16   Foundation.

17   Q.   A few moments ago we spoke about management fees.

18           Based on your position at Platinum, are you aware of

19   whether, after stepping off of the general partner role, Mr.

20   Huberfeld nonetheless in some way continued to share in

21   management fees from the funds?

22   A.   Yes, he did.

23   Q.   In what way did he share in the management fees?

24   A.   In a passive way.

25   Q.   Can you explain what you mean by that.

1   A.   Sure.  Mr. Nordlicht had a trust, and the trust had certain

2   beneficiaries.  An entity of Mr. Huberfeld's was one of those

3   beneficiaries.

4   Q.   Do you remember the name of the entity?

5   A.   Manor-something, might be Manor Associates, but I can't

6   fully remember, but it was Manor-something.

7   Q.   You testified that you did operations at the new -- first

8   of all, were you more involved in PPCO or PPVA going forward?

9   A.   In that time period at the merger, only PPCO.  After the

10  merger, only PPCO.  Pretty much my entire career there, only

11  PPCO.

12  Q.   Okay.  Were you involved in marketing with respect to PPCO?

13  A.   Yes.

14  Q.   Was there anyone else at Platinum after the merger

15  principally responsible for marketing either of the funds?

16  A.   Yes.

17  Q.   Who was that?

18  A.   I'm not sure exactly when he joined, but his name was Uri

19  Landesman.

20  Q.   Was he involved in both funds, PPCO and PPVA?

21  A.   Yes.  He was responsible for the marketing and investor

22  relations of all Platinum funds.

23  Q.   After the merger in 2011, how long did you continue to work

24  for Platinum?

25  A.   I left Platinum somewhere in the, either the middle or

1    beginning of the third quarter of 2015.

2    Q.  During that time, did the office space continue in the

3    Carnegie Hall Tower?

4    A.  Sometime in the latter part of 2014 the offices moved.

5    Q.  Where did they move?

6    A.  They moved to 55th Street, I believe it was 250 West 55th

7    Street.

8    Q.  Where within the building was the company?

9    A.  It was on the 14th floor.

10            MR. CAPONE:  Ms. Bustillo, if we can publish

11   Government Exhibit 659 for the witness and everyone.

12            THE COURT:  Again, counsel, for housekeeping, are you

13   moving this in evidence?

14            MR. CAPONE:  Yes.

15            MR. MAZUREK:  No objection.

16            THE COURT:  It is admitted without objection.

17            (Government Exhibit 659 received in evidence)

18   BY MR. CAPONE:

19   Q.  What is this, Mr. Kalter?

20   A.  This is a picture of 250 West 55th Street.

21            THE COURT:  Let me check in.  Do the jurors have that

22   in front of them?  Okay.  Go ahead.

23   BY MR. CAPONE:

24   Q.  All right.  So with that background on Platinum, I have a

25   few questions for you about hedge fund in general and I would

1    like to talk about COBA specifically.

2              When an investor invests money into a hedge fund, what

3    is that called typically?

4    A.   It's called an investment, but more typically a

5    subscription into your hedge fund.

6    Q.   Are there documents by which an individual subscribes?

7    A.   Yes.

8    Q.   What are those documents called?

9    A.   The subscription agreement.

10   Q.   When an investor takes some or all of their money out of

11   the fund, what is that called?

12   A.   That is called a redemption.

13   Q.   In the process of subscribing to a hedge fund, are you

14   aware of the term onshore and offshore investments?

15   A.   Yes.

16   Q.   What are those?

17   A.   Those would be the two different -- let's tackle them one

18   at a time.  An onshore fund is a fund that's domiciled in one

19   of the 50 states in the U.S. and it accepts subscriptions from

20   U.S. tax paying investors.

21             An offshore fund is a vehicle set up in a foreign

22   jurisdiction, let's just use Cayman Islands as the easiest

23   example, and that entity accepts investors that don't live in

24   the U.S.  They're domiciled somewhere outside of the U.S. or

25   they do live in the U.S. but they are not subject to taxation

1    such as a foundation or endowment.  Those would typically go

2    into an offshore vehicle.

3    Q.   In the case of Platinum's funds, did both the PPVA and PPCO

4    have onshore and offshore funds?

5    A.   Yes.

6    Q.   Did the onshore and offshore funds merge in any way?

7    A.   After 2007 at Centurion/PPCO, the onshore and offshore

8    funds, all of the capital invested would drop down into what we

9    call a master fund, and the master fund would hold everybody's

10   assets co-mingled together and make the investments.

11   Q.   Did the PPVA have a similar structure?

12   A.   It was different, but in respect to your last question,

13   yes, it was similar.

14   Q.   Speaking about both the PPCO and the PPVA -- are you aware

15   you worked more on the PPCO side -- are you aware generally of

16   what the difference is, principal differences between the two

17   funds are?

18   A.   Yes.  I want to clarify.  I worked entirely on PPCO side.

19   Q.   Got it.

20   A.   Okay.

21   Q.   Are you aware of what the principal differences between the

22   funds were?

23   A.   From a very high 50,000 foot level, yes.

24   Q.   What were they?

25   A.   The PPCO fund was, as we spoke about earlier, is a single

1    strategy type-fund of asset-based lending.  The PPVA fund was

2    structured as a multi-strategy fund which could invest in

3    almost anything, I believe.  The strategy was to find the

4    strongest risk adjusted returns for investors, be it a trading

5    strategy, a private investment strategy and anything in-between

6    those two types of investments.

7           Also the volatility in the returns were higher,

8    meaning in PPVA you could have a very big up month and a very

9    big down month over the historical looking-back period whereas

10   in PPCO, the returns were very steady and, you know, not as

11   volatile.

12   Q.  Okay.  So now I'd like to talk about the Correction

13   Officers Benevolent Association.  Are you aware of that entity?

14   A.  Yes.

15   Q.  How did you become familiar with it?

16   A.  At some point I was asked, told that there was going to be

17   a presentation to the Correction Officers Benevolent

18   Association, and I was asked to attend that pitch and deliver

19   the PPCO portion of the presentation.

20   Q.  Okay.  Did you attend that pitch?

21   A.  Yes.

22   Q.  Do you know how COBA became a potential client in the first

23   place?

24   A.  Yes.

25   Q.  How did that happen?

1    A.  It was referred by Mr. Huberfeld.

2    Q.  Are you aware of, based on your discussions with Mr.

3    Huberfeld and others, of who referred it to him?

4    A.  Yes.

5    Q.  Who is that?

6    A.  Jona Rechnitz.

7    Q.  At the time or around when was this?

8    A.  Sometime in 2014, I believe in the early part of 2014 was

9    the presentation.

10   Q.  At that time were you aware of who Jona Rechnitz was?

11   A.  Yes.

12   Q.  What did you know about him?

13   A.  I had met him, I believe the first time I had met him was

14   years, a couple of years earlier.  He was a real estate broker,

15   saw some apartments that he was showing, came across him over

16   the years on -- we lived in a similar neighborhood, attended

17   synagogues, there was overlap and would see him there, but that

18   is what I knew of him.

19   Q.  What, if you know, was his relationship with Mr. Huberfeld?

20   A.  Through his real estate business, Mr. Huberfeld had

21   purchased an apartment and they had become friendly.

22   Q.  Had you seen him at Platinum's offices before?

23   A.  Yes.

24        MR. CAPONE:  Ms. Bustillo, can you publish for the

25   witness Government Exhibit 713.  Your Honor I offer this in

1   evidence as well.

2             THE COURT:  Any objection?

3             MR. SHECHTMAN:  No, your Honor.

4             THE COURT:  It is in.

5             (Government Exhibit 713 received in evidence)

6             MR. CAPONE:  Can you publish that, please.

7   BY MR. CAPONE:

8   Q.  Mr. Kalter, do you recognize who this is?

9   A.  Yes.

10  Q.  Who is it?

11  A.  Jona Rechnitz.

12  Q.  Did either Mr. Huberfeld or Mr. Rechnitz go to the actual

13  pitch meeting?

14  A.  No.

15  Q.  Was this a meeting to present both the PPVA and the PPCO or

16  just one of them?

17  A.  Both.

18  Q.  I think you testified that you were there to present the

19  PPCO?

20  A.  Correct.

21  Q.  In advance of the meeting, did you personally send any

22  marketing materials to anyone at COBA?

23  A.  I don't think so.

24  Q.  Did you send any subscription materials to anyone at COBA?

25  A.  I don't think so.

1    Q.   Again what are subscription materials?

2    A.   Subscription materials would be the document we referred to

3    earlier, the subscription agreement, and it would also include

4    a document called a private placement memorandum or an offering

5    memorandum.  Those names are pretty much based on where the

6    entities are domiciled, but they're interchangeable.  Those

7    documents would typically be sent to a subscribing investor,

8    would have to be sent to a subscribing investor.

9              MR. CAPONE:  Ms. Bustillo can you publish Government

10   Exhibit 1016 which I believe is in evidence already.  Actually,

11   to be safe, I will move this into evidence.

12             THE COURT:  Any objection?

13             MR. MAZUREK:  No.

14             THE COURT:  That is in.

15             (Government Exhibit 1016 received in evidence)

16   BY MR. CAPONE:

17   Q.   Mr. Kalter, do you see this is an email from Joseph

18   Ritterman to Jona Rechnitz, CC Murray Huberfeld, on December

19   26, 2013?

20   A.   Yes, yes.  .

21   Q.   Who was Joseph Ritterman?

22   A.   An employee, at this time period a PPCO employee.

23             MR. CAPONE:  Ms. Bustillo if we can go to the text of

24   the email.

25   BY MR. CAPONE:

1   Q.  The email reads:  "Jona, please see the attached PPM and

2   subscription document for Platinum Partners credit Opportunity

3   Fund, LLC."

4           What is your understanding of what was being sent

5   here?

6   A.  The documents that I just described before, the private

7   placement memorandum and the subscription document.

8   Q.  For the PPCO or PPVA?

9   A.  PPCO.

10  Q.  Was this before or after the pitch meeting?

11  A.  Before.

12  Q.  In your experience, is it common to send subscription

13  paperwork to an investor before they're even pitched?

14  A.  It is not the norm, but it does happen sometimes if

15  requested by an investor prior to a pitch.

16          MR. CAPONE:  Ms. Bustillo, if we can put up Government

17  Exhibit 402 which is in evidence.

18  BY MR. CAPONE:

19  Q.  Do you see this is an email from Joe Mann to TSR at

20  Reynolds Consulting dot com, with a number of CCs?

21  A.  Yes.

22  Q.  What is the date on this email?

23  A.  This is January 6, 2014.

24  Q.  Do you know whose email TSR at Reynolds Consulting is?

25  A.  It was a consultant that was engaged by COBA.

1    Q.  Do you recall his name?

2    A.  I think it was Tom or Tommy.

3              MR. CAPONE:  Ms. Bustillo, if we can go to the body of

4    the emails.

5    BY MR. CAPONE:

6    Q.  If you can take a look at that, Mr. Kalter, what is being

7    conveyed in this email or what is being sent to COBA?

8    A.  The marketing materials for PPVA, PPCO, and another

9    Platinum fund.

10   Q.  This is about 10 days after the subscription materials were

11   sent for the PPCO only?

12   A.  I don't recall the exact date on the last email, but that

13   was in December and this is in January.

14   Q.  Is this still before the pitch meeting that you attended?

15   A.  I don't remember the date exactly of the pitch, but --

16             MR. SHECHTMAN:  We'll stipulate it was before.

17             THE COURT:  Okay.

18             MR. CAPONE:  All right.  Let's go to a couple of the

19   pages of the attachment.  Ms. Bustillo, can you turn to Page

20   43.

21   BY MR. CAPONE:

22   Q.  Mr. Kalter, do you recognize what this is?

23   A.  Yes.

24   Q.  What is it?

25   A.  This is one of the marketing material documents that was

1    referred to generally as the one-pager.

2    Q.   What is a one-pager?

3    A.   It's a short summary of key points that fits on one page --

4    actually, two pages because it is both sides of one page.  It

5    is easier to call it a one-pager instead of two-pager.

6    Q.   Is this for the PPCO?

7    A.   Yes.

8    Q.   Is it for the offshore or onshore part of the PPCO?

9    A.   This is for the offshore and tax exempt funds.

10             MR. CAPONE:  If we could, Ms. Bustillo, zoom in on a

11   chart at the bottom of the page.

12   BY MR. CAPONE:

13   Q.   What is this chart show, Mr. Kalter?

14   A.   This is a summary of the fund, the overall fund statistics,

15   and at the top it gives you some metrics that are very common

16   in the hedge fund and private equity fund space, and then

17   underneath that are the net monthly returns that were produced

18   by the offshore and tax exempt vehicles of PPCO.

19   Q.   Earlier you spoke about volatility.

20             What do we see in terms of volatility for the PPCO

21   offshore returns?

22   A.   We see that it is not that volatile.  It ranges in a small

23   bandwidth.

24   Q.   What is a bandwidth in terms of annually?

25   A.   Okay.  So you go from -- let's ignore the three months of

1    2007 because that is not a full year's performance -- it goes

2    anywhere from on a full year 8.47 percent -- that is not a full

3    year, either.  Sorry.

4              Let's just go with -- it goes as low as 9.9 for a full

5    year and it goes as high as 12.68 for the high year.

6    Q.  What about in terms of monthly returns, what is the range

7    that you've seen?

8    A.  I see anywhere a low month of 27.27, 27 basis points.  That

9    was the first month of operations.  So it probably wasn't a

10   full month, but it goes as high as -- I apologize.

11   Q.  That is okay.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  I guess you can look at the first month of 2009.

2    A.  2009?

3    Q.  Yes.

4    A.  There's a 2.25 percent return on that month.

5    Q.  All right.

6             THE COURT:  Hold on just a second, counsel.  Go ahead.

7             MR. CAPONE:  Thank you, your Honor.

8             Ms. Bustillo, if we could now go to Page 20.

9    Q.  What do we see here, Mr. Kalter?

10   A.  So this is the one-pager for the PPVA offshore fund.

11   Q.  Okay.  And, Ms. Bustillo, again if we could look at the

12   chart at the bottom.

13            What do we see in terms volatility here?

14   A.  Well, I mean, it's much wider.  You have -- on an

15   annualized basis, you have 53.25 percent in 2007, and then you

16   have, in 2008, a positive 4.37 percent year.

17   Q.  And how about on a monthly basis?

18   A.  That's going to take me a little bit of time.

19   Q.  Do you see a number of months with negative returns?

20   A.  I do.  Anything in parenthesis indicates a negative return

21   for the month.

22   Q.  Do you see as high, in 2007, a 5.44 percent positive

23   return?

24   A.  I see that, that's June of 2007, and I see 2008 September

25   has a negative 3.41.  I don't know if there's a larger than

1    that anywhere.

2    Q.  Okay.

3    A.  But those are the plus and minuses.

4    Q.  All right.

5              MR. CAPONE:  Ms. Bustillo, you can take that down, and

6    if you can now put up Government Exhibit 1022, which I would

7    also move into evidence.

8              THE COURT:  Any objection?

9              MR. MAZUREK:  No objection.

10             MR. SHECHTMAN:  No objection.

11             THE COURT:  Okay.  That's in.

12             (Government's Exhibit 1022 received in evidence)

13             THE COURT:  Hold on.  Make sure the jurors have it.

14   Okay.  Jury have it?

15             JURORS:  No.

16             (Pause)

17             THE COURT:  Okay.  Go ahead, counsel.

18   BY MR. CAPONE:

19   Q.  Mr. Kalter, do you recognize what this is?

20   A.  Yes.

21   Q.  And what is it?

22   A.  It's an e-mail.

23   Q.  Let's take a look at the bottom half, which it looks like

24   you were ultimately forwarded.  What is going on here?

25   A.  So this is an e-mail from Tommy Reynolds to Uri Landesman,

1    and it's January 9th, 2014, and it's talking about where, when

2    and what to bring to the COBA presentation.

3    Q.   Okay.  And then on the top you respond:  "Is this for the

4    Monday meeting?"

5    A.   Yes.

6    Q.   I think you're referring to, again, the COBA presentation?

7    A.   Yes.

8    Q.   And who is cc'd on this top e-mail?

9    A.   You have Murray, Jona and one of the executive assistants

10   at Platinum.

11   Q.   Did the meeting happen shortly after this January 9th

12   e-mail?

13   A.   I believe so.

14   Q.   And where was it?

15   A.   It was at COBA's offices at 75 Broad Street, Suite 810.

16   Q.   And who went to the meeting from Platinum?

17   A.   Uri Landesman, Andrew Kaplan and myself.

18   Q.   And what was each of their roles, Uri Landesman and Andrew

19   Kaplan?

20   A.   They were -- Uri was the president of Platinum Partners,

21   and Andrew was the chief marketing officer of Platinum

22   Partners.

23   Q.   Had you guys discussed how to split up this pitch meeting?

24   A.   Yes.

25   Q.   And how was that?

1   A.  They would do PPVA; I would do PPCO.

2           MR. CAPONE:  Ms. Bustillo, if we could publish for the

3   witness Government Exhibit 710 and 704, side by side, and I'd

4   also move these photographs into evidence.

5           MR. SHECHTMAN:  No objection, your Honor.

6           THE COURT:  Okay.

7           MR. MAZUREK:  Likewise.

8           THE COURT:  No objection to either.

9           MR. MAZUREK:  No.

10          THE COURT:  Okay.  Those are in.  You can publish them

11  to the jury.

12          (Government's Exhibit 710 and 704 received in

13  evidence)

14          THE COURT:  Does the jury have them yet?  Okay.  Go

15  ahead, counsel.

16  BY MR. CAPONE:

17  Q.  Mr. Kalter, do you recognize the men on the left and right?

18  A.  Yes.

19  Q.  And who is Government Exhibit 710?

20  A.  710 is Mr. Landesman.

21  Q.  And 704?

22  A.  Mr. Kaplan.

23  Q.  Okay.  It was you and these two men who went to the pitch

24  meeting?

25  A.  Yes.

1    Q.  When you arrived at 75 Broad Street, where did you go at

2    first?

3    A.  We waited in the reception area.

4    Q.  And was anyone else there?

5    A.  Yeah.  There were other managers that were waiting as well.

6    Q.  Okay.  So was it your understanding that they were there

7    for the same meeting?

8    A.  Same type of meeting, but not with us.

9    Q.  Okay.  And, Ms. Bustillo, if you could also publish

10   Government's Exhibit 652 and 656, which are already in

11   evidence, side by side.

12          Starting with the right, do you recognize Government

13   Exhibit 652?

14   A.  Yes.

15   Q.  And what is that?

16   A.  The reception area.

17   Q.  And is that where you were waiting?

18   A.  Yeah, but I wasn't sitting on that couch.  I was sitting on

19   the other couch.

20   Q.  And how about 656?

21   A.  Yes, that's the boardroom of the COBA.

22   Q.  Is that where the actual meeting took place?

23   A.  Yes.

24   Q.  Do you remember -- if you can take us through, as best as

25   you can remember, what happened when you and Mr. Landesman or

1    Mr. Kaplan went into the room?

2    A.   So we were called in.  We walked into the room.

3    Mr. Seabrook gave us a nice shalom.  There were a lot of people

4    on the COBA side, and it was the three of us.  We were sitting

5    on the side of the picture closer to us, and Mr. Seabrook was

6    at the other head of the table, under the Corrections Officers'

7    Benevolent Association signage.

8            And then around the table, up and down the sides, were

9    other members of the board.  The trustees?  I don't know what

10   they're referred to at COBA.  They were there.  And I believe

11   one or both, Mr. Reynolds and COBA's outside counsel might

12   have -- were there.  I remember for sure one.  I don't remember

13   which one.  Somebody from not the board is my recollection.

14   Q.   Okay.  And did you have an understanding at the time of

15   what Mr. Seabrook's role was at COBA?

16   A.   Mr. Seabrook was the president.

17   Q.   How did you know that?

18   A.   I don't remember how I knew that, but I knew that.

19   Q.   Okay.  What happened after you walked in and greeted each

20   other?

21   A.   We sat down and it seemed to be -- we did the pitch.  It

22   was an abridged version of the pitch because we were doing two

23   different funds, two different groups, but it was the overview,

24   the first meeting-style pitch for each of PPVA and PPCO.

25   Q.   And roughly how long did you each pitch for?

1   A.  Maybe 15 minutes each was the allotted time for the

2   meeting.

3   Q.  Did anyone from the COBA side have questions?

4   A.  Yes.

5   Q.  Do you recall what they were?

6   A.  Not particularly the specific questions, but there was

7   discussion about the general terms of each fund, the key

8   statistics of each fund -- not statistic, the key terms is I

9   think the right thing, such as fees, liquidity, and then what

10  the returns were like of each separate vehicle.

11  Q.  Did Mr. Seabrook speak during the meeting?

12  A.  Yes.

13  Q.  What was his demeanor like?

14  A.  He -- his presence was he was in charge.  His title was

15  true.  He was the president, and it was -- it seemed that he

16  was respectful of his peers.  He definitely was respectful to

17  us, gave everybody the opportunity to ask questions and, like I

18  said before, some did, and it felt to me like a standard first

19  meeting.

20  Q.  Did you have a sense at the end of the meeting whether they

21  were leaning -- COBA, that is, was leaning towards one fund or

22  the other or neither?

23  A.  I don't remember exactly when I got the sense, but it

24  wasn't a sense when I found out.  I was told, I believe by

25  Mr. Landesman and Mr. Kaplan, that COBA had chosen to go into

1   PPVA and not into PPCO.

2   Q.  Okay.  Did you know that at the meeting?

3   A.  I don't remember if it was at the meeting or sometime

4   shortly after the meeting.  I don't remember exactly when.

5   Q.  Okay.  Now, are you aware of how much COBA -- did they

6   ultimately invest?

7   A.  Yes.

8   Q.  And are you aware of how much they invested?

9   A.  Yes.

10  Q.  At first, how much was that?

11  A.  I think the first invest -- I think it was $10 million to

12  start.  I think that was their first investment.  Again, it's

13  PPVA, it's a little foreign.

14  Q.  Okay.  And based on your experience working at Platinum, do

15  you know what the phrase "institutional investor" means?

16  A.  Yes.

17  Q.  And what is that?

18  A.  Institutional investors is an investor who has set up shop

19  to be in.  The business of investing capital on behalf of

20  whoever they're representing, if it's a college endowment, it's

21  the college's endowment that sets up the investment committee,

22  et cetera.  If it's a pension fund, if it's a public fund, they

23  are set up, these investors, to do the diligence and homework

24  required on making an investment.

25  Q.  And what are the benefits, if any, of institutional

1   investors?

2   A.  I'm sorry, I didn't hear you.

3   Q.  What are the benefits, if any, of institutional investors?

4   A.  The institutional investors write larger checks than

5   individuals.  They have access to larger sums of capital, and

6   institutional investors, once they do their homework on you and

7   choose to move forward, very typically are what's known as

8   sticky capital, which is capital that likes to stay with the

9   manager as the manager's returning capital, meaning returning

10  positive performance on that capital.

11  Q.  And not take their money out?

12  A.  Correct.  I mean, they could, obviously, and they do, but

13  generally that's the reputation.

14  Q.  And was COBA an institutional investor?

15  A.  I believe so.

16  Q.  And after the meeting, and you found out that they were

17  going to invest 10 million, did you play any role with respect

18  to COBA's investments going forward?

19  A.  Yes.

20  Q.  And what?  If you can, give us an overview of what role or

21  roles you played, and then we can talk specifically.

22  A.  I just helped on the legal side, documentation.  I helped

23  get some documentation done.

24  Q.  Okay.  All right, well, let's start there and look at some

25  of that documentation.

1              MR. CAPONE:  Ms. Bustillo, if you can put up

2     Government Exhibit 403, which I believe is in evidence.

3              Does everybody have it?

4              THE COURT:  Yes.

5     Q.   Okay.  Mr. Kalter, do you see this is a letter to SS&C

6     Technologies?

7     A.   Yes.

8     Q.   And who is that?

9     A.   SS&C is a fund administrator that Platinum used.

10    Q.   And very basically, what do they do?

11    A.   The administrator provides, let's just zoom out and say,

12    two general services.  One is investor relation services; so it

13    will help you with -- they'll send out your monthly statements,

14    they'll help bring capital.  When somebody subscribes, they'll

15    do the anti-money laundering checking to make sure the capital

16    is not laundered capital or dirty capital and make sure that

17    they can release it to us to use, and they'll help with

18    collecting all the documentation and keeping the files for each

19    investor.

20             The other thing that they do is they help the finance

21    department keep parallel books and records and accounting so

22    that there's always a second set of books and records for the

23    company.

24    Q.   Do you see this letter is from a Howard Wien on behalf of

25    Koehler and Isaacs?

1    A.  Yes.

2    Q.  And who is that?

3    A.  COBA's outside counsel.

4    Q.  And in the body it says:  "Enclosed are a signed and

5    initialed subscription agreement, a signed side letter and a

6    form W9, by which my client, the Corrections Officers'

7    Benevolent Association annuity fund, applies to subscribe in

8    the PPVA International Limited."

9         We've already talked about what a subscription

10   agreement is.  Do you know what a side letter is?

11   A.  Yes.

12   Q.  And what is a side letter?

13   A.  So a side letter is a document that an investor may ask for

14   if the investor would like some terms in the way that the fund

15   is run that are listed in the private placement memorandum.  If

16   they'd like to deviate and have their investment governed by

17   different terms, they'll ask for a side letter that will

18   effectively amend the PPM as it relates to their investment and

19   their investment only.

20   Q.  I mean, is that something that, in your time at Platinum,

21   happened from time to time with investors?

22   A.  It happened from time to time with investors.

23   Q.  And it also references a form W9, and what's that?

24   A.  It's the tax form that the administrator keeps on hand so

25   that, at the end of the year, they have each investor's tax

1    information.

2    Q.  All right.  And, again, I just want to take a look at a

3    couple of provisions on these signed documents.  Well, first,

4    what is the actual entity investing here in February of 2014?

5    A.  It's the Corrections Officers' Benevolent Association

6    annuity fund, period.

7    Q.  Okay.  Ms. Bustillo, can we go to the third page.

8              And what is this, Mr. Kalter?

9    A.  This is the PPVA International Fund or, as we called it

10   earlier, the offshore fund.  Their subscription agreement.

11   Q.  Okay.  This is for -- at the top of this it says, for COBA?

12   A.  Yes.

13   Q.  So they were investing in the offshore fund?

14   A.  Yes.

15   Q.  Is it because they were a tax-exempt investor?

16   A.  I would assume that, but I don't know that for sure.

17   Q.  All right.  Ms. Bustillo, can we go to the seventh page.

18             Is this a page from the subscription agreement?

19   A.  It appears to be.

20   Q.  Can you please read section 5(a)?

21   A.  "Represents that the subscriber has adequate means of

22   providing for all its current needs and possible contingencies,

23   has the financial ability to bear the economic risk of losing

24   its entire investment in the fund, and has no need for

25   liquidity with respect to this investment beyond that provided

in the fund's charter documents."

Q.  All right.  Then, Ms. Bustillo, if we can now go to the 25th page.

Who is this subscription agreement signed by?

A.  Mr. Seabrook.

Q.  And what date was it signed?  I think you have to zoom out.

A.  The 20th of February, 2014.

Q.  And finally, Ms. Bustillo, if we can go to page 36.

Do you recognize what this is, Mr. Kalter?

A.  Yes, this is the side letter.

Q.  For that first investment?

A.  Can you zoom back out for me?  Yes.

Q.  All right.  If we could just focus on the first, the numbered paragraph one.  Can you read that to us and -- well, first, can you read that to us?

A.  Sure.  "1:  Distributions in kind.  PPVA agrees that, notwithstanding any provision in the fund documents permitting distributions in kind to the shareholders of PPVA, it will not make a distribution in kind to the investor.  Any distribution in kind that otherwise would be made to the investor will be held by PPVA for the benefit of the investor, and cash proceeds will be distributed to the investor promptly following the liquidation thereof."

Q.  And do you have an understanding as to what that provision means?

1    A.   Yes.

2    Q.   What is that?

3    A.   It means that in the fund documentation, it permitted that

4    in the event that there was an asset that needed a long time

5    for it to turn into cash or mature, that if PPVA went out of

6    business or closed, the manager of PPVA would have the right to

7    distribute the actual investments, not cash, to the investors,

8    and the investors would then have to figure it out and, you

9    know, collect their capital when it matured.

10        This provision says that PPVA will not do that with

11   respect to COBA.

12   Q.   Okay.  And you can zoom out, Ms. Bustillo.

13        On the first page of this letter, are there any other

14   substantive provisions that are negotiated?

15   A.   I don't see any.

16   Q.   Okay.  And if we can go to the second page.  Do you see any

17   others there?

18   A.   No.

19   Q.   All right.  We can take that down.

20        So we've just reviewed the paperwork for the initial

21   $10 million investment.  Did there come a time, if you know,

22   when more money was invested by COBA but from a different legal

23   entity?

24   A.   Yes.

25   Q.   And how much was invested the second time?

1    A.   Five million.

2    Q.   And let's publish Government Exhibit 405, Ms. Bustillo.

3    It's in evidence.

4              THE COURT:   The jurors should have that on the screen.

5    Okay.  Go ahead, counsel.

6    Q.   Do you recognize what this is, Mr. Kalter?

7    A.   Yes.

8    Q.   And what is it?

9    A.   So this is a similar letter like we saw earlier for the

10   first investment from COBA's outside counsel to SS&C

11   Technologies, Platinum's administrator, attaching the same

12   three documents as last time.  I think it was -- yeah, the

13   subscription agreement, the side letter and the tax W9 form.

14   Q.   And is this on behalf of a different entity, at least legal

15   entity?

16   A.   Yes.

17   Q.   And what is that?

18   A.   The Corrections Officers' Benevolent Association, Inc.

19   Q.   Okay.  And what's the date on which Mr. Wien sent the

20   signed materials?

21   A.   June 3rd, 2014.

22   Q.   And, by the way, you said earlier that you were involved in

23   helping with some of the documents.  Were the side letters

24   things that you helped work on?

25   A.   Yes.  I helped liaise with outside counsel to get it done.

1   Q.  Okay.  All right.  Again, Ms. Bustillo, if we can go to the

2   seventh page of this document.  One back.  If we could

3   highlight again provision 5(a).

4           Can you read that?

5   A.  Sure.  "Represents that the subscriber has adequate means

6   of providing for all its current needs and possible

7   contingencies, has the financial ability to bear the economic

8   risk of losing its entire investment in the fund and has no

9   need for liquidity with respect to this investment, beyond that

10  provided in the fund's charter documents."

11  Q.  And so did both legal entities make this representation?

12  A.  I believe so.

13  Q.  And again, Ms. Bustillo, Page 25.

14          And who signed this subscription agreement?

15  A.  Mr. Seabrook.

16  Q.  And, finally, Page 40, Ms. Bustillo.

17          Do you recognize what this is, Mr. Kalter?

18  A.  Yes, this is the side letter for that.  This is the side

19  letter that was referenced in the last exhibit.

20  Q.  Okay.  Does it have the same authorization in terms of the

21  distributions in kind?

22  A.  Yes.

23  Q.  And this one has a second paragraph titled Liquidity.  Can

24  you read that, please?

25  A.  Yes.  "Liquidity.  For so long as investor maintains a

1  balance of at least $5 million invested in PPVA, then upon

2  three days' notice, PPVA will allow investor to redeem up to

3  $1 million of its investment.  For the avoidance of doubt,

4  investor shall only be permitted to exercise this liquidity

5  right one time following its initial investment, provided,

6  however, that in the event that investor re-invests the

7  redeemed amount and the balance at such time exceeds $5

8  million, investor shall again be permitted to exercise this

9  liquidity right."

10  Q.  Do you have an understanding of what that provision meant?

11  A.  Yes.

12  Q.  And what is that?

13  A.  It means that as long as COBA has a balance of $5 million,

14  they can ask for a million dollars back and upon three days'

15  notice.  The --

16  Q.  Sorry, I interrupted you.

17  A.  And then it goes on to say that they could only do this

18  once, but they re-earn that right if their balance goes up

19  above $5 million again.

20  Q.  And is that if they reinvest the redeemed $5 million?

21  A.  Yes.

22  Q.  And does this apply to COBA, Inc. or to the entire COBA

23  investment?

24  A.  This is the side letter only for the second -- this one

25  applies to the second investment.

1    Q.  Okay.  And are you --was it, in your experience, common, or

2    at least did it happen from time to time, to negotiate

3    liquidity provisions in side letters?

4    A.  Yes.

5    Q.  All right.  So we can take that down.

6            MR. CAPONE:  And, your Honor, I'm going to move into

7    evidence a number of e-mails that we've conferred about; so I

8    don't have to do it ten times, and that's Government

9    Exhibits 1034, 1038, 1046, 1049, 1050, 1057, 1060, 1068, 1069,

10   1070 and 1080.

11           MR. MAZUREK:  No objection, your Honor.

12           MR. SHECHTMAN:  None, your Honor.

13           THE COURT:  All right.  They're all in.

14           (Government's Exhibits 1034, 1038, 1046, 1049, 1050,

15   1057, 1060, 1068, 1069, 1070 and 1080 received in evidence)

16           MR. CAPONE:  If we could start, Ms. Bustillo, with

17   1080.

18   BY MR. CAPONE:

19   Q.  All right.  And let's focus on the bottom e-mail at first.

20   This is from Howard Wien to Will Slota.  Who is Will Slota?

21   A.  Will Slota was -- worked in the operations department,

22   eventually becoming the chief operating officer of the PPVA

23   funds.

24   Q.  Okay.  And in the body it says -- the subject is Correction

25   Officer Benevolent Association.  The body says two items.  Can

1   you read the second item?

2   A.   Sure.   "Norman has instructed me to investigate investing

3   union, as opposed to annuity fund money.   He tells me he spoke

4   with Platinum officials about this.   Please forward any

5   appropriate documentation.   My understanding is that if the

6   investment is made, it will be with the same liquidity

7   protections as in the annuity fund side letter."

8   Q.   Okay.   So this e-mail, I think we saw the signed documents

9   for June 3rd in the previous exhibit we reviewed?

10   A.   I don't remember the date.

11   Q.   Okay.

12   A.   Sorry.

13   Q.   That's okay.   But according to this e-mail, as of May 15th,

14   was Platinum made aware that Norman Seabrook was considering

15   investing union money?

16   A.   It appears that way from this e-mail.

17   Q.   And I guess it looks like it was forwarded to you?

18   A.   I guess so.

19   Q.   You seem to not have known what he was talking about at

20   first?

21   A.   I have to read it first.

22   Q.   Yes.

23   A.   I see what you mean by I didn't know what he was talking

24   about.

25   Q.   All right.   So we can take this down.   Ms. Bustillo, if we

1    can go to Government Exhibit 1034.

2           Okay.  Let's start with the bottom e-mail, if the jury

3    has it.  Can you read the "from" and "to" and the text of this

4    e-mail?

5    A.   Sure.  It's from Mark Nordlicht, it's to Michael Kimelman.

6    Q.   And what's the date?

7    A.   It's dated Friday, May 30th, 2014.

8    Q.   Okay.  And what did he say?

9    A.   "What subs are in or expected for June 1?"

10   Q.   And by subs, do you have an understanding of what that's

11   referring to?

12   A.   Subscriptions.

13   Q.   If we could take that part down, and go to the next couple

14   of e-mails on the chain.

15          Okay.  So working from the bottom up, do you see

16   Mr. Kimelman list a bunch of numbers, the names are redacted,

17   but is it fair to say those are other investors?

18   A.   Yes.

19   Q.   And then you see expected, amounts unknown, COBA?

20   A.   I see that.

21   Q.   Okay.  And then I think we can go just right to the top of

22   the e-mail chain.  Do you see that's an e-mail from Michael

23   Kimelman to Mark Nordlicht?

24   A.   Yes.

25   Q.   CC'ing Bernie Fuchs and Murray Huberfeld?

1    A.  I see it.

2    Q.  And what did Mr. Kimelman say?

3    A.  He said:  "I got document to Norman on Wednesday."

4    Q.  Again, is this around the same time period as the

5    investment of COBA, Inc. money, or union money, we've been

6    referring to?

7    A.  Yes, the second.  I don't know that Inc. is union money.  I

8    just know that it's Inc.

9    Q.  It's the second?

10   A.  Yeah.

11   Q.  Okay.  And if we can go to 1038 now.  Can you read that

12   one?

13   A.  Yes.

14   Q.  The "from" and the "to"?

15   A.  This is an e-mail from Mark Nordlicht to Murray Huberfeld

16   dated June 2, 2014, and it -- would you like me to read?

17   Q.  Yes.

18   A.  It says:  "COBA in?"

19   Q.  All right.  So we can take that down, Ms. Bustillo.

20          Mr. Kalter, after these first two investments that

21   we've reviewed, were you involved in any way in any future

22   meetings with COBA?

23   A.  Yes.

24   Q.  And one meeting or multiple meetings?

25   A.  One.

1   Q.  And when did that happen?

2   A.  This date I actually remember because it was the day after

3   my son was born.  It was the 29th of July, and it was -- I was

4   asked to fill in for Mr. Landesman and Mr. Kaplan, who were

5   oversee seas in Asia, for an update meeting.

6   Q.  And do you recall how you were asked to fill in or when you

7   learned about it?

8   A.  I don't remember exactly when I learned about it.  It

9   wasn't that much time prior to the meeting, and as I said

10  earlier, I really didn't know much about the PPVA marketing

11  pitch and fund.  Mr. Landesman gave me some talking points and

12  told me to go and explain that they were overseas and I was,

13  you know, filling in and reading from a scripted piece of paper

14  some bullet points that Mr. Landesman had asked me to deliver.

15          And I told Mr. Seabrook and the entire board that

16  Mr. Landesman and Mr. Kaplan, who they liaised with, were

17  overseas and they'd be back, and if there was any follow-up

18  questions, don't waste your breath on me.  We'll set up, we'll

19  get you -- you know, they'll talk to you guys when they get

20  back.

21  Q.  All right.  So Ms. Bustillo, can we publish Government

22  Exhibit 1046 and go through the third and final page of that.

23  If we can highlight the e-mail.

24          So do you see this is an e-mail from Tommy Reynolds,

25  to Bart Weinstein, Janina Kreider, Andrew Kaplan and Gina

1  Laburdy?

2  A.  Yes.

3  Q.  Dated July 22nd?

4  A.  Yes.

5  Q.  Do you know anyone on the recipient end of that chain?

6  A.  Only Mr. Kaplan.

7  Q.  He's from Platinum?

8  A.  Yes.

9  Q.  And the body says:  "The next trustee meeting will be

10  Tuesday, the 29th, at 10:00 a.m.  I will send out the times to

11  you in a separate e-mail.  Please set the day aside."

12        Is Tuesday the 29th the meeting you attended?

13  A.  Yup.

14  Q.  All right.  If we could go to the second page of this

15  e-mail, I guess at first on the bottom half.  We can highlight

16  that.

17        Okay.  Again, an e-mail from Mr. Reynolds from Friday,

18  July 25th, 2014, to the same group of people, setting forth

19  some times.  Do you see that?

20  A.  Yes.

21  Q.  And Platinum is one of the presenters?

22  A.  Yes.

23  Q.  And then we can highlight the next two parts of the chain

24  at once, Ms. Bustillo.

25        Okay.  Do you see the next day, July 26th,

1    Mr. Kaplan's first response is: "Hi, Tommy. Uri and I are in

2    Asia, back 8-1. We left New York on 7-22, and I was never

3    informed earlier that there would be such a meeting for when

4    can we reschedule?" Do you see that?

5    A.  Yes.

6    Q.  And what was Mr. Reynolds' response to Mr. Kaplan?

7    A.  Would you like me to read it?

8    Q.  Sure.

9    A.  He responds: "I found out the same day as you. Try to

10   have someone there just for a quick review. Safe travels."

11   Q.  And what was Mr. Kaplan's further response, if you can read

12   it?

13   A.  Yeah. He writes: "Uri and I are the only ones who can do

14   it. We would call in from Asia and send the presentations, but

15   we will be on a flight from 8:00 to 3:00 p.m. Eastern, Tokyo to

16   Singapore."

17   Q.  Okay.

18   A.  "We can" --

19   Q.  Sorry to interrupt you.

20   A.  "We can call in on Monday at that time from Tokyo."

21   Q.  Okay. Although he said Uri and I are the only ones that

22   can do it, I take it you did go to this meeting?

23   A.  Yes.

24   Q.  Okay. And, finally, we can go to the first page. From

25   there up, if you can highlight, Ms. Bustillo, all the way to

1    the top.

2              Do you see that Mr. Landesman then forwarded that

3    chain to Mr. Huberfeld and said:  "Let's discuss this when I

4    return.  Hoping to be in on Wednesday"?

5    A.  I see that.

6    Q.  Okay.  And what was Mr. Huberfeld's response?

7    A.  "Call me."

8    Q.  What was Mr. Landesman's response?

9    A.  "Now, from Tokyo?"

10   Q.  And then Mr. Huberfeld appeared to send a phone number?

11   A.  Yes.

12   Q.  And Mr. Landesman:  "Having trouble reaching you"?

13   A.  Yes.

14   Q.  "Please call me" and then digits?

15   A.  Yes.

16   Q.  What time did Mr. Huberfeld send his phone number to

17   Mr. Landesman?

18   A.  At 10:08 p.m.

19   Q.  All right.  And this is July 27th?

20   A.  Yes.

21             MR. CAPONE:  Okay.  So we can pull that down and,

22   next, if we can publish to the witness alone Government

23   Exhibit 1079.

24             I will also move this into evidence.  I'm not sure if

25   there's an objection.

1      MR. MAZUREK:  No objection.

2      THE COURT:  Hold on.

3      MR. SHECHTMAN:  No objection.

4      THE COURT:  Okay.  That's in.

5      (Government's Exhibit 1079 received in evidence)

6      MR. CAPONE:  Okay.

7      THE COURT:  Hold on.  It may take a moment for the

8  jury to get it.  Okay.  Jurors have it now?  Okay.  Go ahead,

9  counsel.

10      MR. CAPONE:  Thank you, Judge.  If we can go to the

11  second page.

12  BY MR. CAPONE:

13  Q.  It looks like the bottom e-mail is cut off, but do you see

14  Mr. Landesman writes to you "Now"?

15  A.  I see that.

16  Q.  And then what was your response?

17  A.  "Can you call the U.S.?"

18  Q.  Okay.  And is this -- this is July 27th.  Is this the same

19  day as the e-mail we were just reviewing?

20  A.  Yes.

21  Q.  Okay.  And if we can go back to the first page, and,

22  Ms. Bustillo, if you can highlight the bottom e-mail from

23  Mr. Landesman.

24      And if you could read that, Mr. Kalter?

25  A.  Sure.  He writes:  "Better for you to call," and his phone

1   number.  "Have note-taking equipment, as I'll give you some

2   talking points.  I think they came in March 1st, so get

3   monthlies from Joe Mann.  I think you'll only get ten minutes.

4   Don't pitch for more.  Norman will handle that after you leave.

5   Sent from my iPad."

6   Q.  Okay.  You can take that down.

7          Just below that, what time had you written to

8   Mr. Landesman?

9   A.  It appears to be 10:39 p.m.

10  Q.  Okay.  Do you recall from the e-mail we just reviewed

11  previously, at around 10:08 p.m. Mr. Landesman was also

12  coordinating to speak to Mr. Huberfeld about this meeting?

13  A.  I think so, but I would love to see the past e-mail to

14  verify it was the exact same time, like you're saying, but it

15  sounds about close.

16  Q.  We can let it speak for itself, but thank you.

17         Okay.  And did you then speak to Mr. Landesman that

18  night?

19  A.  I don't remember if it was that night or the next morning,

20  but I did, at some point after this, speak to Mr. Landesman

21  with my note-taking equipment ready.

22  Q.  I think this phone call you already described, but is that

23  the call in which he gave you bullet points to provide to the

24  board?

25  A.  I believe so, yes.

1  Q.  And was it your understanding, based on that conversation,

2  that you were pitching for more money, or you were just giving

3  them an update?

4  A.  My understanding was it was an update.  I went in with the

5  bullet points.  I read them, and I basically left.

6  Q.  Did you ask for any more money into Platinum?

7  A.  I don't think so, but I don't recall all the specifics

8  about that meeting.  It was a while ago.

9  Q.  Okay.  Were you the only one from Platinum?

10  A.  Yes.

11  Q.  And who was there, if you recall, from COBA?

12  A.  Similar to the pitch meeting that I attended with

13  Mr. Landesman and Mr. Kaplan, it appeared to be Mr. Seabrook

14  and his fellow trustees.  I could be getting that term

15  incorrect, but it seemed to me a similar group.

16  Q.  Did you know at the time, not what you know now, did you

17  know at the time whether any more money was invested within a

18  few days after that meeting?

19  A.  I don't recall my state of mind then.

20  Q.  Okay.

21  A.  Sorry.

22  Q.  That's okay.

23        Ms. Bustillo, can we put up now Government

24  Exhibit 1049.

25        And do you see this is just a couple of days later

1    Mr. Nordlicht wrote:  "Did COBA send docs?"

2    A.  I see that.

3    Q.  And, who's Mr. Kimelman?

4    A.  Mr. Kimelman was an employee of the PPVA fund, in their

5    operations department.

6    Q.  And his response was:  "Not yet"?

7    A.  Say that again, I'm sorry.

8    Q.  His response was:  "Not yet"?

9    A.  Yes, his response is "not yet."

10   Q.  And who did Mr. Nordlicht forward that to?

11   A.  Mr. Huberfeld.

12   Q.  We can take that down and put up Government Exhibit 1050,

13   please.  Okay.

14        The bottom e-mail says it's from Howard Wien to Andrew

15   Kaplan on August 1st.  Is that three days after the update

16   meeting that you attended?

17   A.  Yes.

18   Q.  It just says:  "Per your request" and we'll look at the

19   attachment in a moment.  Who did Mr. Kaplan forward that to?

20   A.  Mr. Nordlicht and Mr. Huberfeld.

21   Q.  If you look at the middle e-mail --

22   A.  Oh, my bad.

23   Q.  That's okay.

24   A.  I'm sorry about that.  He, Mr. Kaplan, sent it to

25   Mr. Landesman and he cc'd Joe Mann.

1   Q.  Okay.  And then who did Mr. Landesman forward it to?

2   A.  Mr. Landesman forwarded it to Mr. Huberfeld and

3   Mr. Nordlicht.

4   Q.  Let's take a look at what was forwarded, if you can go to

5   the next page.  Do you recognize what this is?

6   A.  Yes.

7   Q.  And what is it?

8   A.  This is a form that is in the subscription package that

9   enables an investor, who had already invested in a prior

10  period, to add more money to their investment without having to

11  go through the process of completing a full subscription

12  package.  They can fill out this one-page form and attach it to

13  their existing forms.

14  Q.  Okay.  So they don't need to re-fill out everything?

15  A.  Yeah.  It's not the simplest of forms to get through.

16  Q.  And what was the entity here that was adding money?

17  A.  Oh, sorry.  The Corrections Officers' Benevolent

18  Association annuity fund.

19  Q.  And how much money was being added?

20  A.  $5 million.

21  Q.  Okay.  And what was the date this was signed up at the top?

22  A.  It's either August 1st or August 7th.  I can't tell, but I

23  think it's August 1st.

24  Q.  The e-mail forwarding this was August 1st.

25  A.  So then I would go with August 1.

1   Q.  And who signed it?

2   A.  It looks like Mr. Seabrook.

3   Q.  And again, this was a couple -- a few days after the update

4   meeting?

5   A.  Yes.

6   Q.  Okay.  All right.  So that takes us through August 2014.

7   Did anything happen with respect to your role or

8   responsibilities at Platinum later in 2014?

9   A.  Yes.

10  Q.  And what was that?

11  A.  At the end of 2014, we had mentioned that Platinum moved

12  offices.  In conjunction with that move, there was an effort to

13  restructure the operations.  Let's just call it the back office

14  of the two funds because there were some duplicative roles

15  still that hadn't been removed or combined from the 2011

16  restructuring.

17          I gave my chief operating officer title to somebody

18  else, and I focused solely on raising capital for PPCO with the

19  idea of trying to learn the marketing pitch and fund of PPVA,

20  but that never took hold.  I focused solely on PPCO and helped,

21  like I did here, with some legal stuff, if anything.

22  Q.  Okay.  Whose thought or idea was it for you to, in theory,

23  take on that expanded role?

24  A.  Mr. Nordlicht.  Mr. -- Mr. Nordlicht.

25  Q.  And why didn't it actually happen?

1    A.  Because Mr. Landesman never left.

2    Q.  And what happened further into 2015 with respect to your

3    job at Platinum?

4    A.  So I left.  I decided it was time for me to start my own

5    fund.  I took somebody who had been with us at Centurion for a

6    long time, from the very beginning, and we started the business

7    that we spoke about yesterday called Regia.

8    Q.  And around when was it that you actually sort of left

9    Platinum and started Regia?

10   A.  So it was -- it was somewhere summer or early third

11   quarter.  The dates are --

12   Q.  Of what year?

13   A.  Of '15.

14   Q.  Okay.

15   A.  That we left.

16   Q.  And prior to that time, in late 2014, early 2015, were you

17   both working at Platinum and planning this new fund?

18   A.  Can you -- one more time.  I'm sorry.

19   Q.  Yes, prior to that, in the months at the end of 2014 and

20   beginning of 2015, were you both working at Platinum and also

21   getting ready to start this new fund?

22   A.  Yes.

23   Q.  Okay.  And although you did not take on the role with

24   respect to marketing PPVA, did Mr. Nordlicht, nonetheless,

25   include you on some relevant e-mails with respect to marketing

1    issues?

2    A.  Yes.

3    Q.  I'm going to pull up a couple of those e-mails.  If we can

4    publish Government Exhibit 1057 in evidence.

5         In the bottom e-mail dated November 27th, 2014, from

6    Mr. Nordlicht to you reads:  "Any activity December 1?"

7         Can you read your response?

8    A.  Sure.  I responded at 8:34 p.m.  "There is definitely SK

9    money but not a lot.  Yossi, how much is the current total for

10   PPCO?"

11   Q.  And what did you mean by "definitely SK money"?

12   A.  SK was a consulting firm that advised, let's just call it,

13   institutional money, institutional capital.  They had invested

14   in a nice way into PPCO, and every month they would let us know

15   if they were putting some or none -- some or no capital into

16   our fund.  So I'm telling Mr. Nordlicht that there definitely

17   was some, but not a lot.

18   Q.  And what was Mr. Nordlicht's response?

19   A.  He responds:  "I really need PPVA.  I know Murray was

20   working on COBA.  On the horizon, we have 44 million dec 31

21   reds there."

22   Q.  And what do you understand him to have meant by "I really

23   need PPVA"?

24   A.  That he would like new investors to invest in PPVA.

25   Q.  And you had told them about PPCO?

1    A.   Correct.

2    Q.   And he said, "I know Murray was working on COBA," and

3    following that, "On the horizon, we have 44 million dec 31 reds

4    there."  Do you have an understanding of what that meant?

5    A.   Yes.

6    Q.   And what is it?

7    A.   It means that on the redemption date of December 31, the

8    calendar date, the date that the redemptions were actually

9    redemptions, he had to -- he had $44 million worth of investors

10   that were asking for a redemption on that date.

11   Q.   Okay.  All right.  Let's take that down and put up, if we

12   can, Ms. Bustillo, Government Exhibit 1060.

13          And by the way, you just talked about redemption.  Can

14   you remind us what redemption is?

15   A.   Sure.  Redemption is opposite of the subscription.  A

16   redemption is when they asked for their capital to be returned

17   to them.

18   Q.   Okay.  And this is an e-mail from the following day, from

19   Mark to Murray Huberfeld, and can you just read that?

20   A.   It reads:  "Any chance for COBA for" December, or "dec 1?

21   Hoping for a big -- hoping for big month in dec," December.

22   "Regards from Shalom, by the way.  Saw him at Kotel."

23   Q.   Do you recall -- we can take that down.

24          Do you recall, during the early part of 2015, being

25   asked to go or invited, I should say, to go to another meeting

1    with COBA to pitch for money?

2    A.   Yes.

3    Q.   Did you actually go to that?

4    A.   No.

5    Q.   Were you included on e-mails with respect to that meeting?

6    A.   I don't really remember.

7    Q.   Okay.  We'll pull a couple up.  Let's pull up Government

8    Exhibit 1068.  Okay.  So do you see April 1, 2015, Andrew

9    Kaplan writes for April 1, currently 30 million in new subs for

10   PPVA.  10 million of that received.  See attached spreadsheet

11   for names and details.  It appears to be a chain that you're

12   on.  Do you have an understanding as to what that meant?

13   A.   Yeah.

14   Q.   And what is that?

15   A.   He's in his marketing role.  He's explaining new investors

16   subscribing for two PPVA for this April 1st date, and he's

17   saying that of this $30 million, that he has, let's call it,

18   indications of ten million so far has been received in the

19   bank.

20   Q.   Okay.  And then do you see Mr. Nordlicht's response to

21   Mr. Kaplan, cc'ing you and others?

22   A.   Yes.

23   Q.   Can you read it?

24   A.   He writes:  "I don't think COBA has been confirmed.  Let's

25   bring in another five to ten so we won't feel sting if it

1    doesn't come in."

2    Q.  All right.  And what is your understanding of what that

3    meant?

4    A.  He's -- well, let's start at the beginning.  He doesn't

5    think COBA's been confirmed means he's not sure that COBA is

6    actually going to come in.  Let's bring another five to ten

7    means let's find other investors.  So we won't feel the sting

8    if it doesn't come in, so he won't have a shortfall or a need

9    to come up with capital from other means.

10   Q.  And to be clear, this is after the first three COBA

11   investments.  This isn't referring to any of those; is that

12   right?

13   A.  Yes, it appears to be after, which would mean it's

14   something new.

15   Q.  All right.  We can take that down, Ms. Bustillo, and put up

16   Government Exhibit 1069.

17         The bottom e-mail is from Mr. Nordlicht to Mr. Kaplan,

18   cc'ing you.  And can you read that e-mail?

19   A.  He writes:  "We lost COBA, unfortunately.  Any last-minute

20   people we should be contacting?  I think they have until the

21   end of next week."

22         (Continued on next page)

23

24

25

1   Q.  What was Mr. Kaplan's response?

2   A.  Andrew responds, "I'm trying.  Did anyone speak with

3   Norman?"

4   Q.  Do you recall if you spoke with Norman around that time?

5   A.  Me?

6   Q.  Yes.

7   A.  I don't think I did.

8           MR. CAPONE:  Finally, in terms of emails, Ms.

9   Bustillo, if we can publish Government Exhibit 1070.  Just

10  highlight the text.

11  BY MR. CAPONE:

12  Q.  The bottom is an email from Andrew Kaplan to Mark

13  Nordlicht, CC'g you and others.  Can you read it.

14  A.  Yes.  Andrew writes, "Meeting with COBA went great.  Norman

15  said he will send us more money shortly."

16  Q.  I think you testified earlier that you did not go to

17  another solicitation meeting?

18  A.  Yeah, I didn't.  I don't believe I went to anything

19  further.

20  Q.  What was Mr. Nordlicht's response?

21  A.  "What does shortly mean?"

22  Q.  What was Mr. Kaplan's response?

23  A.  "Couldn't press him in meeting in front of all."

24  Q.  What did you understand Mr. Kaplan to have meant?

25  A.  Now or then?

1    Q.  Now?

2    A.  That he felt it was inappropriate at a board meeting to

3    ask --

4            MR. MAZUREK:  Objection.  This calls for speculation.

5            THE COURT:  Sustained.  Please rephrase the question.

6            MR. CAPONE:  I'll just withdraw it.  Thank you.  We

7    can take that down.

8    BY MR. CAPONE:

9    Q.  All right, Mr. Kalter, I have a couple of concluding topics

10   before we wrap up.

11           First, do you recall Mr. Rechnitz being involved in

12   any other pitches that you were aware of?

13   A.  There was one other pitch that he had facilitated setting

14   up with the police, I don't know what the entity, I don't

15   remember what the entity was, but it was like the police.  That

16   is all I remember about Jona.

17   Q.  Were you at that pitch with the police?

18   A.  Yes.

19   Q.  Where did it take place?

20   A.  At the new Platinum offices.

21   Q.  What do you remember about it?

22   A.  I remember that we brought a bunch of people from Platinum

23   into the meeting.  I remember that we ordered a nice lunch, it

24   was lunchtime, and I remember not specifics about the pitch

25   itself, they're all a blur, there were so many of them, but I

1  remember it happening.  I remember them coming and I remember

2  them leaving, but, you know, it's a little bit of a blur.

3  Q.  Are you aware of whether that police entity, whatever it

4  was, ever invested in Platinum?

5  A.  To my knowledge, they did not.

6  Q.  Mr. Kalter, are you aware over the years of whether anyone

7  at Platinum bought batches of Nicks tickets?

8  A.  I am.

9  Q.  Did you play any role with that?

10  A.  I bought batches of Nicks tickets.

11  Q.  How did it work?

12  A.  Well, first I have my own season tickets, and then there

13  was a cousin of Mr. Nordlicht who had seats that a bunch of us

14  bought anywhere from 5 to 10 games, two to four seats.  He had

15  four seats, but we broke them up.  For I think two seasons a

16  whole bunch of us purchased a couple of games each from him.

17  Q.  Did that include the 2014 to 2015 season?

18  A.  Yes.

19  Q.  Where were the seats?

20  A.  The seats were in Section 107, Row 4.

21  Q.  Where is Section 107?

22  A.  Section 107 is the center court section.  It is not the

23  folding chairs like on the floor, but it's the fourth row up,

24  good seats.

25  Q.  What was your responsibility, if any, with respect to the

1    tickets?

2    A.   I divided them up with Mr. Nordlicht's cousin, picking

3    which games, and then I divided them up from all the people on

4    our side that said I want five, I want five, I want four,

5    whatever it was.  Then I distributed them.  I would arrange to

6    get Mr. Nordlicht's cousin paid for his tickets.

7    Q.   Approximately how many games would tickets be bought for?

8    A.   It is hard to give you that exact answer because what would

9    happen is let's say I wanted two tickets and somebody else

10   wanted two tickets, we might take four for one game and I would

11   go to and they would go to.

12         Definitely a personality issue of meshing who with

13   who.  I would guess that, you know, there were probably four to

14   six people each taking five games, some taking four seats, some

15   taking two seats.

16   Q.   Were the tickets used personally or for clients?

17   A.   I don't really remember.  I would err on the side of

18   caution and say both.  I don't remember.

19   Q.   Are you aware of any purchases by Platinum around the 2013

20   to 2015 time of batches of Nicks tickets from anyone from Jona

21   Rechnitz?

22   A.   I am not.

23   Q.   Or from anyone other than Mr. Levine who you mentioned

24   previously?

25   A.   No.

1          MR. CAPONE:  If I can have one moment, your Honor.

2          (Off-the-record discussion)

3          MR. CAPONE:  No further questions.

4          THE COURT:  Any cross-examination?

5          MR. MAZUREK:  Yes, sir.

6          THE COURT:  Okay, go ahead.

7     CROSS-EXAMINATION

8     BY MR. MAZUREK:

9     Q.  Good morning, Mr. Kalter.

10    A.  Good morning.

11    Q.  My name is Henry Mazurek, and I represent Murray Huberfeld.

12          You testified on direct examination about how you got

13    to know Mr. Huberfeld.  I am going to ask you questions related

14    to that.  Did you first meet Mr. Huberfeld at the Platinum

15    offices?

16    A.  Yes.

17    Q.  Did you know Mr. Huberfeld before then?

18    A.  Yes, but not personally.

19    Q.  How did you know him?

20    A.  That he had seeded my brother-in-law's fund.  They were

21    partners, so to speak, and he was a local resident of the area

22    I grew up in.

23    Q.  What area was that?

24    A.  The five towns, Long Island.  I grew up in Woodmere.  Mr.

25    Rechnitz lived in Lawrence.

1   Q.  Are you familiar with the restaurant chain Kosher Delight?

2   A.  Yes.

3   Q.  How do you know it?

4   A.  I have been a patron for many, many years.  Unfortunately,

5   it is no longer.

6   Q.  What were the set of restaurants?

7   A.  Mr. Huberfeld brought the concept of fast food to the

8   Kosher audience and marketplace.  We didn't have the Burger

9   King and McDonald's type hamburger until Mr. Huberfeld stepped

10  up.  Maybe it would be better for me if he never did from my

11  weight perspective, but, yeah, good food.

12  Q.  Where were these restaurants located?

13  A.  There was one right near Madison Square Garden on Broadway.

14  I used to go before every Nicks and Ranger game that I would go

15  to.  There were two in Brooklyn.  Those are the ones I know of,

16  but I don't know if there were more.

17  Q.  When you started at Platinum in 2005, were you immediately

18  assigned to work for Mr. Huberfeld?

19  A.  No.

20  Q.  So how did that process happen?

21  A.  I joined in either January or February of 2005.  Mr.

22  Huberfeld was around.  His family office operated out of our

23  offices.  We got along.  We liked each other.  We liked to eat,

24  two personalities.  We got along.

25  Q.  How would you describe his -- are you finished?

1   A.   Just to add to that question, at the end I -- summertime

2   Mr. Huberfeld had the idea of the asset-based lending strategy

3   in the hedge fund structure, it hadn't been done before that we

4   knew of in any material way, and he said to me I'm giving you a

5   shot, let's try to do this.  That's how it happened.

6   Q.   When you worked under him at Platinum and then Centurion

7   and then Platinum again, how would you describe his mental

8   state?

9   A.   To the point -- first of all, he works 24 hours a day other

10  than the Sabbath, so it is 24-6.  My phone could ring at 2:00

11  in the morning.  It could ring at 7:00 in the morning.  When he

12  traveled to other time zones, it was bananas, but he always

13  worked.  He was on top of everybody.  He was diligent.  He

14  pushed to do it now, not to procrastinate, and he was

15  effective.

16  Q.   When you worked under him as he created Centurion, you said

17  he was chief investment officer.  Is that right?

18  A.   Chairman and chief investment officer.

19  Q.   He was the boss, essentially?

20  A.   Yeah.

21  Q.   He was in charge of making decisions on the appropriate

22  investments for the fund, correct?

23  A.   Yes.

24  Q.   He was also in charge of running the people who were

25  working under him, correct?

1    A.  Correct.

2    Q.  He was responsible for making sure that people were going

3    out and marketing the new fund to get, to raise capital?

4    A.  Yes, but in the early years it was three of us, and Murray

5    carried that torch and did it well.

6    Q.  You had explained on direct examination how this fund

7    Centurion later was folded back into the Platinum Group,

8    correct?

9    A.  Not back into, but into.

10   Q.  Into?  I am sorry.

11         The Centurion fund that Murray started, Platinum was

12   already up and running at that time, correct?

13   A.  Yes.

14   Q.  And that was the fund that your brother-in-law, Mark

15   Nordlicht, was running?

16   A.  Correct.

17   Q.  And that is PPVA, correct?

18   A.  Correct.

19   Q.  So the Centurion fund, I believe you said, was a single

20   asset-based strategy fund.  Is that right?

21   A.  It was an asset-based lending strategy, and within -- so

22   like if I give you real estate example, it wasn't only real

23   estate loans, it was other types of loans so the collateral

24   could change, the structure could change, but the idea was to

25   be in the lending business with collateral.

Q.  This was really Murray's place in terms of what the

investment strategy that he came up with and that he ran,

right?

A.  Yup.

Q.  That was very different from PPVA, correct?

A.  Correct.

Q.  Now, during the period that you were working for him under

Centurion, you said you were chief operating officer, right?

A.  Correct.

Q.  And the funds grew from when it started when you first

started full time in 2007 until it eventually merged with

Platinum in 2010, correct?

A.  Yes.

Q.  And it grew into, by 2013, a fund that had almost $400

million in assets under management, correct?

A.  What year was that?

Q.  By 2013?

A.  It sounds right, but I would need to see something to

actually verify it.

Q.  Several hundred million dollars?

A.  Yeah, it was much larger than when we started.

Q.  During the course of when you started to do some more

marketing in addition to your role as chief operating officer,

you were able to bring in institutional advisory firms such as

Shepherd & Kaplan, I think you mentioned?

1    A.  Yes.

2    Q.  And so there were retirement funds who invested in

3    Centurion which later became PPCO?

4    A.  I believe there were retirement, but it could have been

5    other types of endowments, foundations, et cetera, so I don't

6    want to say it was only that type.

7    Q.  But --

8    A.  Institutional is what you're looking for, yes.

9    Q.  You knew that some of these institutional investors, for

10   example, were the San Diego Union Tribune Retirement Plan?

11   A.  It sounds familiar.

12   Q.  The San Rico Retirement Plan?

13   A.  I think so.  That sounds right.

14   Q.  These were all institutional investors who invested during

15   the time that you were at PPCO?

16   A.  Correct, correct.

17   Q.  Just to be clear, you talked a little bit on direct

18   examination about what a hedge fund is.  But institutional

19   investors like pension plans do sometimes include hedge funds

20   within their investment mix.  Is that correct?

21   A.  To my knowledge, yeah.

22   Q.  And that was consistent with what you personally saw at

23   PPCO?

24   A.  Yeah.

25   Q.  That makes sense because hedge funds were returning large

1   rates of return during the period that you worked at PPCO?

2   A.  Some were, some weren't.  It is hard to generalize that.

3   Q.  But PPCO was --

4   A.  PPCO --

5   Q.  Returns were averaging between 8 and 12 percent in the

6   bandwidth you talked about on direct examination?

7   A.  Correct.

8   Q.  So when you were -- just to complete this thought -- when

9   you were asked to pitch COBA for PPCO in the early 2014, there

10  was nothing unusual about the fact that you were being asked to

11  pitch an Annuity Fund to a labor union?

12  A.  Agree.

13  Q.  You had mentioned on direct examination that at the end of

14  2010, Murray Huberfeld's role at Centurion/PPCO changed,

15  correct?

16  A.  Yes.

17  Q.  And that was because or as part of the fact that Centurion

18  was merging into the Platinum Group of Funds, correct?

19  A.  Correct.

20  Q.  And Mark Nordlicht, your brother-in-law, took over at the

21  beginning of 2011 as chief investment officer of PPCO, correct?

22  A.  Correct.

23  Q.  Murray at that point did not have the day-to-day

24  responsibilities for making investment decisions going forward

25  at PPCO?

1    A.  Yes, he did not.

2    Q.  Just to be clear, for the purposes of PPVA, Mr. Huberfeld

3    never had that position, correct?

4    A.  Correct.

5    Q.  You had talked about then that he had an ongoing role for

6    managing what you called legacy positions.  Is that right?

7    A.  Yes.

8    Q.  This is correct, a legacy position means an investment

9    strategy Mr. Huberfeld had brought into PPCO that was still

10   ongoing, and so he still had relationships and would work to

11   help complete the investment signature?

12   A.  Yes, but in addition to that, it wasn't just the

13   relationships, it is the knowledge base of Mr. Huberfeld having

14   with a portfolio manager or himself, having made that

15   investment, his knowledge was invaluable to help benefit the

16   investors by getting the best possible result on each

17   investment.

18   Q.  In addition to that, he would also continue to go out and

19   promote the fund to potential new investors?

20   A.  Well, I don't know if he himself would go and promote it

21   and do the pitch, but he would refer people typically earlier

22   on to Mr. Landesman and Mr. Kaplan, or whoever was the

23   marketing team, and then later on if it was PPCO, he would, I

24   think, mostly send it to me.  It could be I just don't know of

25   others.

1  Q.  It was basically just a referral position?  He was not

2  actively attending these meetings any more as an officer of the

3  management group?

4  A.  To the best of my knowledge, as it happened with me, he

5  didn't attend.  I don't want to say he never attended, but he

6  generally didn't attend, just because I don't remember every

7  meeting that I had from 2011 until today.

8  Q.  That was no longer his role within the fund?

9  A.  Right, right, he wasn't doing the pitches actively.  He

10  wasn't out there saying this is me running it.  It wasn't like

11  that.

12  Q.  After 2011 is it fair to say he had a more informal role

13  within the Platinum fund group?

14  A.  Yes.

15  Q.  You also talked about different investments that he and his

16  family and charitable foundations continued to have, correct?

17  A.  I spoke about that, but in the time periods of my

18  knowledge, not today.

19  A.  I don't know if there is today.

20  Q.  I understand.  Back at the time you talked about the

21  different accounts that you remembered Mr. Huberfeld and his

22  family associated with, right?

23  A.  Correct.

24  Q.  And you also had said that at the time of Centurion, that

25  he had a substantial ownership interest in the management of

1    the firm.  Is that right?

2    A.  Can you repeat that.  I am sorry.  I lost you.

3    Q.  That when Centurion was created and you were working with

4    him, he had a substantial interest in the management of the

5    firm, in the management fees for the firm?

6    A.  Meaning percentage of the operating, percentage of the

7    entities?

8    Q.  That's correct.

9    A.  Yes.

10   Q.  When Centurion folded into, became PPCO in the Platinum

11   Group, do you know whether he continued to have that interest?

12   A.  I believe he had the same or similar interests, except it

13   was no longer an active interest where he had control and power

14   and the rights to affect company business.  It turned into a

15   passive, a passive piece of equity that didn't give him any

16   power or control of the company.

17   Q.  If I could analogize, as a shareholder in a company, you

18   would have a certain percentage interest and receive a certain

19   percentage of profits, but not be able to affect the day-to-day

20   operations?

21   A.  Similar, yes, similar.

22   Q.  And some of the entities that you talked about on direct

23   examination that were part of the Huberfeld group of investors,

24   they were both invested in PPCO, some of them, correct?

25   A.  Yes.

1    Q.   And some in PPVA?

2    A.   I can't help you with that.  I don't know.

3    Q.   You don't know?

4         So the accounts that you talked about on direct

5    examination were accounts that you understood were accounts

6    related to PPCO?

7    A.   Yes.

8    Q.   You mentioned a number of his children's names and his

9    father's account and also you said two Huberfeld foundations.

10        Do you know what those were?

11   A.   I think that one was Mr. Huberfeld, Senior's charitable

12   foundation, and I believe Mr. Huberfeld had one, but I believe,

13   so I could be wrong.  I don't know.  I don't remember exactly.

14   I think he also had a charitable foundation.

15   Q.   Just to be clear, a charitable foundation investing in a

16   hedge fund means that the money that could be used for

17   donations or the purposes of the foundation were invested would

18   increase the endowment of that foundation for charitable use?

19   A.   Correct, if somebody is not allocating their charitable

20   funds today, they can choose to invest that capital for growth

21   purposes so that they have more charity to give.  It is almost

22   like you're doing it on behalf of the charities you haven't

23   given the money to yet.

24   Q.   When the PPCO and PPVA funds merged in the beginning of

25   2011, the combined entity at that point had assets under

1   management of approximately $1 billion.

2           Is that your memory?

3   A.  I don't remember the exact number.  I think it might have

4   been a little short of a billion, but it got closer to a

5   billion by putting them together.  I don't remember the exact

6   numbers at that date.

7   Q.  But we looked at the 2014 pitch materials to COBA, and if I

8   told you that on that sheet, what you called the one-pager, it

9   showed the firm assets under management at that point in 2014

10  was 1.3 billion, that would be accurate?

11  A.  That sounds accurate, especially if you're stipulating

12  you're reading it from the one-pagers, I will go with you.  You

13  were just asking me about 2011, which is a time period I don't

14  have a recollection of.

15  Q.  It certainly eclipsed 1 billion into the 2014 time period?

16  A.  Yes.  The funds definitely hurdled over that 1 billion

17  dollar number at some point.  I don't know.

18  Q.  I want to ask you some questions about Jona Rechnitz.  You

19  were asked about his involvement with respect to the COBA

20  investment.  Do you recall that?

21  A.  Meaning on direct?

22  Q.  Yes.

23  A.  Sure, yes.

24  Q.  You said you knew Mr. Rechnitz from the neighborhood,

25  right?

1    A.   Yes.

2    Q.   And also that he was a real estate broker, correct?

3    A.   Correct.

4    Q.   Now, you know generally that Platinum, in addition to

5    having an internal marketing department which sometime used

6    brokers or sometimes you referred to as placement agents for

7    the purpose of finding new investors, right?

8    A.   Yes.

9    Q.   And brokers have a role in connecting the two sides?

10        If you have a fund and are looking for investors, and

11   the broker knows people, high net worth individuals or

12   institutional investors, they act as the middleman, right?

13   A.   Yes.

14   Q.   And sometimes these middlemen or match-makers, if you will,

15   would be given the promotional materials of Platinum or would

16   have the ability to know the subscription information of the

17   fund in order to talk it up to potential new investors, right?

18   A.   Yes.

19   Q.   Did you know at this time, in the beginning of 2014 when

20   you were told about the pitch to COBA, whether Mr. Rechnitz

21   acted this way in terms of introducing COBA to Mr. Huberfeld?

22   A.   You would you just repeat the first part of the question.

23   Was I what?

24   Q.   Were you aware that Mr. Rechnitz was the person who acted

25   to introduce Mr. Huberfeld to the possibility of a COBA

1   investment?

2   A.  Just he was as a placement agent?

3   Q.  No.  I am just saying --

4   A.  Yes, I was aware that he introduced.

5   Q.  You knew that because he was included in a number of email

6   correspondence between Platinum and COBA with respect to the

7   pitch meeting and other subscription information?

8   A.  Sure, amongst other -- it wasn't like -- yes, we knew from

9   that and just water cooler talk.

10  Q.  I am sorry?

11  A.  Water cooler talk in the office.

12  Q.  In other words, it was transparent that Mr. Rechnitz had a

13  role with COBA in terms of this particular investment?

14  A.  I wouldn't go that far and say a role with COBA.  He made

15  an introduction.

16  Q.  He made an introduction?  He was known to be the person to

17  have made that introduction?

18  A.  Yes.

19  Q.  It wasn't hidden, it wasn't anyone trying to hide Jona

20  Rechnitz had anything to do with the COBA introduction?

21  A.  Not as I recollect.

22  Q.  In fact, it was something that was talked about in the

23  office as water cooler talk?

24  A.  I figure it was more in marketing water cooler.  We had our

25  little water cooler.

1    Q.  Fair enough.

2            In fact, you testified that not only with respect to

3    COBA, but there were other potential investors that Jona

4    Rechnitz introduced to the Platinum fund; for example, the

5    COBA?

6    A.  Correct.

7    Q.  Now, do you know whether Mr. Rechnitz had any kind of

8    formal arrangement with Platinum with respect to being a

9    placement agent?

10   A.  I don't know of any.

11   Q.  As a lawyer, you're familiar, sir, with the fact that

12   placement agents or brokers in the regulated financial industry

13   have to have certain licenses.  Is that correct?

14   A.  That sounds correct.

15   Q.  Do you know whether Mr. Rechnitz had that license?

16   A.  No idea.

17   Q.  Following along with that, if he didn't have that license,

18   would he be able to be paid directly as a finder or commission

19   on any particular transaction?

20   A.  He would not be able to receive incentive-based

21   compensation from the fees generated by the management company.

22   Q.  So, in other words, the management company of Platinum

23   couldn't pay Jona Rechnitz directly based on a commission for

24   bringing in a certain client or investor?

25   A.  If you take out the word "directly" from your statement,

1  I'll agree with it.  They couldn't pay him.

2  Q.   Based on a transaction or incentive for that transaction?

3  A.   Correct.

4  Q.   Now I am going to ask you some questions about the

5  particular pitch to COBA that you did in I think you said early

6  2014, January 2014.  Is that correct?

7  A.   Yes, the initial pitch you're talking about.

8            MR. SHECHTMAN:  Might this be a good time to break?

9            THE COURT:  We are going to take a break for five

10  minutes.  Is this a good time for break or do you want to go a

11  little bit longer?

12            MR. MAZUREK:  Fine, your Honor.

13            THE COURT:  Let's go ahead and take our break now.  I

14  will give you 35 minutes.  Again so come back at 12:00 o'clock.

15  In the meantime, don't discuss this case amongst yourselves or

16  with anyone else.  Don't do any independent research regarding

17  any of the issues of this case.  See you at 12:00 o'clock.

18            (Jury excused)

19            THE COURT:  Again let's give the jury a three and a

20  half minute head start so they can gather their belongings and

21  get moving, and we'll excuse the witness and talk to counsel.

22  Let's give the jurors a three and a half minute head start and

23  then I'll address the issues that counsel and the parties have

24  to raise.  We may use the robing room.  You can all sit down.

25            (Pause)

1          THE COURT:  Everyone in the audience, you're free to

2     go now.  The witness is excused.  Any reason I shouldn't excuse

3     the witness, counsel?  No, hearing none, the witness is

4     excused.

5          (The witness left the courtroom)

6          THE COURT:  Counsel all present?  Counsel, all here?

7     The parties are here? one quick thing.  Please be quiet in the

8     audience.

9          One thing to just, I want to talk to the parties about

10    briefly.  Let's talk about my final instructions to the jury

11    today.  Hopefully after this break we can go straight till

12    2:30, and then I will let them go.  I plan to give them the

13    usual instructions unless there is something else that counsel

14    wish me to add.  It may make sense at this point to sort of

15    gently remind the jurors it is important for them to get here

16    at 9:00 o'clock, but let me hear from counsel on that.

17    Anything else from counsel?  Let me hear from the government

18    and defense counsel.

19          MR. CAPONE:  Two things, your Honor:

20          First, we agree that a reminder is appropriate;

21          Second, I think the defense has a request to stop a

22    little early tomorrow.

23          THE COURT:  Let me hear.

24          MR. MAZUREK:  I have no problem with your suggestion

25    for admonition.  For tomorrow, your Honor, because my client is

an observer of the Sabbath and the sun sets around 5:00, and he

has to get out and prepare to his home in Long Island, whether

we could adjourn for the day 1:30 until 2:30.

THE COURT:  I looked on time and date dot com, and

according to that website, sunset tomorrow is at 5:58 pm.  So

it seems that I think 2:30 should still work, but let me hear

more from counsel as to why -- I am certainly willing to make

appropriate accommodations, but even if we leave -- I am not

sure why he wouldn't be able to make it to Long Island in that

period of time by 5:00.  Sunset it is supposed to be at 5:58

tomorrow.

MR. MAZUREK:  I am informed that Sabbath begins 18 or

20 minutes before that.  That aside, Mr. Huberfeld told me it

took him almost two and a half hours to get home last Friday

from the city.  I leave it up your Honor.

THE COURT:  We can stop a little early.  If it did

take two and a half hours, as long as he is out of here by

3:00, it should be fine.  I am willing to to stop a little

early.  We can stop at 2:00 if that makes it easier.

MR. MAZUREK:  Sure, that is fine.

THE COURT:  We can do that.  We'll stop at 2:00

tomorrow.  I will let the jury know that.  Remind me.  I will

let the jury know that.  Let me find out what counsel feel?

Should I let the jury know that today?  I don't think

they'll complaint if we break at 2:00 o'clock instead of 2:30

1   tomorrow.  It might not be necessary to let them know.

2              MR. MAZUREK:  Maybe for their own planning purposes?

3              THE COURT:  I will tell them 2:00 o'clock tomorrow.  I

4   will remind them they should try to get here at 9:00 o'clock or

5   by 9:00 o'clock.  Is there anything else counsel need to raise?

6              MR. MAZUREK:  No.

7              THE COURT:  Try to get here, counsel, by 11:57.  The

8   witness is gone.  From defense counsel, how much longer do you

9   have with this witness?

10             MR. MAZUREK:  Maybe like 45 minutes.

11             THE COURT:  All right.

12             MR. MAZUREK:  I will try to be brief, I know.

13             THE COURT:  All right.

14             (Luncheon recess)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            A F T E R N O O N   S E S S I O N

2                        12:04 P.M.

3            (Trial resumed; jury not present)

4            THE COURT:  Okay.  Let's go ahead and have the witness

5      on the stand so as soon as the jurors are ready, we can start.

6            MR. SHECHTMAN:  Your Honor?

7            THE COURT:  Yes.

8            MR. SHECHTMAN:  I will have cross-examination.  I

9      promise it won't be more than two or three minutes, very short.

10           THE COURT:  Okay.  Counsel, while we're waiting, are

11     there any exhibits that you're going to want to introduce into

12     evidence that are not currently in evidence?

13           MR. MAZUREK:  No.

14           THE COURT:  Okay.  Co-counsel, are there any exhibits

15     that you're going to want to introduce in evidence that aren't

16     currently in evidence?

17           MR. SHECHTMAN:  There's a government exhibit.  It will

18     come in.  I just want to alert Mr. Capone.

19           THE COURT:  Can you just confirm that there's no

20     objection to it so we can put it on the screen immediately.

21           MR. SHECHTMAN:  Yes.  We're okay.

22           THE COURT:  All right.

23           MR. SHECHTMAN:  We won't slow it down.

24           THE COURT:  All right.  Okay.  Are they all here?

25           THE DEPUTY CLERK:  Yes.

1           THE COURT:  Okay.  Let's go.

2           (Jury present)

3           THE COURT:  Okay.  Please be seated.  Welcome back.

4    Let's continue with the case on trial.  Go ahead, counsel.

5           MR. MAZUREK:  Thank you, Judge.

6    BY MR. MAZUREK:

7    Q.  Good afternoon, Mr. Kalter.

8    A.  Good afternoon.

9    Q.  Let me start off, after the break, with questions relating

10   to the fee structure for the management that you were talking

11   about on direct examination and called it the two and 20; do

12   you remember that?

13   A.  Yes.

14   Q.  And you were speaking about your understanding at PPCO at

15   the time, correct?

16   A.  Yes, but I believe the question was also about -- I don't

17   remember exactly, but I believe both were two and 20, for the

18   most part.

19   Q.  When you say both --

20   A.  PPVA.

21   Q.  -- you mean PPVO and PPCO?

22   A.  Yes.

23   Q.  Just so I understand it correctly, the two percent that you

24   talked about, which is a flat percentage of the amount of the

25   investment holdings on an annualized basis; is that right?

A.  Yes, payable monthly.  So it's one-twelfth of two percent

per month based on that month's value of the assets under

management.

Q.  Based on your experience at PPCO, do you understand that

that portion of the fee that is used by the hedge fund, goes to

things such as to the operations of -- paying for the

operations of the fund; is that fair?

A.  Yes.

Q.  Okay.  And then the 20 percent of the fee structure, which

is on profit returns, really is the profit center for the

management, correct?

A.  Yes, but in theory it works like that.  I'm addressing the

last two questions.  There could be leftover of the two percent

that would then get distributed to the partners.  There could

be a year where the two percent has a shortfall, and the 20 is

used for the operations as well.

Q.  Understood.  But in either of those scenarios, still the

majority of a manager's compensation structure comes from that

20 percent?

A.  Yes.

Q.  Okay.  Now, were you familiar in 2014 and '15, especially

when you started to move over to PPVA, what the ownership

structure was at PPVA, in terms of the partners?

A.  Not fully.  Not fully.

Q.  Can you explain what your understanding was?

1   A.  Yes.  I can't remember all the players and what their

2   breakdown was in the PPVA side.  I want to clarify your

3   question.  I never officially moved over to the PPVA side; so

4   my knowledge is just, you know --

5   Q.  Do you know who the general partner or the managing partner

6   was?

7   A.  Absolutely, Mark Nordlicht.

8   Q.  Did he have a substantial ownership interest in PPVA?

9   A.  Could you define substantial?

10  Q.  More than 50 percent?

11  A.  I don't believe so.

12  Q.  Okay.  Less than?  Do you have an understanding of how

13  much?

14  A.  Him and his trust, together, were probably more than

15  50 percent.

16  Q.  Okay.

17  A.  But because of the fact that his trust had other

18  beneficiaries --

19  Q.  Okay.

20  A.  -- I say he's less -- I think he was less than 50 percent,

21  but again, I think.  I don't know.

22  Q.  Understood.  When you say him and his trust, meaning

23  Mr. Nordlicht personally and the trust, which also had a number

24  of Nordlicht-related beneficiaries?

25  A.  Had a number of beneficiaries, not Nordlicht related.

1    Q.  You don't know?

2    A.  I don't believe they were Nordlicht related.

3    Q.  Okay.  And there were other partners other than

4    Mr. Nordlicht and his trust?

5    A.  Yes.

6    Q.  And do you know who they were?

7    A.  Mr. Landesman.  I don't know about Mr. Levy.  I don't know

8    if they ever put me down as an equity owner of PPVA because I

9    never assumed that role.  I don't know where they went in flux

10   as I was leaving.  I don't know what happened with those

11   documents and percentages.

12   Q.  Do you know whether or not Mr. Huberfeld had any kind of

13   interest?

14   A.  Via the trust.

15   Q.  Via the trust that you mentioned with Nordlicht?

16   A.  Correct.

17   Q.  Okay.  He was one of the beneficiaries?

18   A.  An entity of Mr. Huberfeld's, unless that was changed and I

19   didn't know about it.

20   Q.  Do you have any idea what percentage that entity had in the

21   trust?

22   A.  I don't.

23   Q.  Do you know how many beneficiaries of the trust there were?

24   A.  I believe there were three.

25   Q.  Three.  Okay.  So in addition to Mr. Nordlicht, the trust,

1  which had multiple beneficiaries, Mr. Landesman, Mr. Levy, were

2  there any other significant partners in PPVA?  Do you know

3  whether Mr. Bodner was a partner?

4  A.  Via the trust.

5  Q.  Anyone else?

6  A.  Are you referring to any specific time period?  I think you

7  said '15 and '14?

8  Q.  Yes.

9  A.  I think that's it, but again, it's a fuzzy recollection.

10  Q.  There may be others?

11  A.  There may be, yeah.

12  Q.  Okay.  And so I understand, in this kind of partnership --

13  A.  Yes, I thought of one other.  There definitely is one

14  other, Mr. Fuchs.

15  Q.  Mr. Fuchs, okay.  And do you have any sense of the

16  percentage share of the other partners that you've mentioned

17  combined, Landesman, Levy and Fuchs, approximately?

18  A.  I think Mr. Fuchs was ten percent, and I do not know how

19  Landesman and Levy broke down at the end.

20  Q.  So I have a better understanding of this, can you explain

21  then, with respect to the management fee structure and we'll

22  talk about the performance fee part, which I think you've

23  testified to as sort of the profit center, the 20 percent, how

24  that would then be divided among the different partners?

25  A.  Via the percentages that I wasn't able to provide to you?

1   Q.  Okay.  So if there are, as you said, four or five -- let's

2   say five different people or entities that are within the

3   ownership structure, the profits that the management team would

4   make would then be divided by those five people according to

5   their shares?

6   A.  Yes, but it would really be divided in two layers, right?

7   It would be divided not by those five people.  It would first

8   be divided by the trust, Mr. Nordlicht and the other people,

9   and then the trust would distribute.  So it wasn't one big

10  division, like everybody sat in the room and divided it up.

11  Q.  Right.  So let's take the trust, for example, just saying

12  that the trust would get whatever percentage the trust had, and

13  then under the trust there are multiple beneficiaries, where

14  the trust amount would then have to be divided by the multiple

15  beneficiaries?

16  A.  Yes.  And I don't believe that at the PPCO side, that PPCO

17  people administer the trust.  They could have, but I don't

18  recall them doing that.  I think it was run by other people.

19  Q.  Okay.  So if I can put this into a specific example, if,

20  for example, in a given year there is a $20 million

21  contribution, which is the amount that COBA invested into PPVA

22  for 2014, and for simplicity's sake, if there is a ten percent

23  return at the end of the year, that would be $2 million that

24  would go into the performance part of the management fee,

25  correct?

1    A.  Sounds right.

2    Q.  Okay.  Of that $2 million, 80 percent, or $1.6 million goes

3    to COBA, correct?

4    A.  Correct.

5    Q.  The investor?

6    A.  Yes.

7    Q.  And then $400,000 is the profit that's left over for the

8    PPVA managers, correct?

9    A.  Yes.

10   Q.  Now, if, in the course of that year, the two percent

11   doesn't cover overhead and the operations of the fund, then

12   some of that $400,000 would have to be used for that, correct?

13   A.  Correct.

14   Q.  If, however, the two percent does cover, then the 400,000

15   then may be distributed to all of the ownership or management

16   groups of the PPVA, correct?

17   A.  Yes.

18   Q.  And if there are -- even if they're divided equally among

19   five different entities, that $400,000 is 80,000 for each of

20   the five different entities, in my hypothetical?

21   A.  Yeah, rough math, sounds -- if everybody is equal.  I

22   assume you just took 400 and divided by five.

23   Q.  Yes.  If that wasn't the case, there were actual

24   percentages for each of the partners?

25   A.  Yes.

1    Q.  And that would be how, roughly, the amounts are distributed

2    for management fees on any particular -- or by investor?

3    A.  One more time, I'm sorry.  I didn't understand the

4    question.

5    Q.  That would very generally be how fees are -- would be, once

6    they come into the fund, how they may be distributed down the

7    line, according to the percentage --

8    A.  Yeah.

9    Q.  -- interest of --

10   A.  Right.

11   Q.  -- every particular owner?

12   A.  Yes, yes.

13   Q.  And if an owner is a trust, then again, it has to be

14   divided by multiple times, according to the number of

15   beneficiaries within that trust?

16   A.  Not by the number of beneficiaries, by the percentage --

17   Q.  Yes.

18   A.  -- of their ownership of the trust.

19   Q.  Right.  Again, because each -- whoever the beneficiary is,

20   they would be designated as certain percentage ownership of the

21   trust?

22   A.  Correct.  And, therefore, that ownership would convert into

23   the income of the trust being divided by that ownership

24   percentage.

25   Q.  That just highlights that there are very many multiple

 1   layers in terms of how the profits, the fees, the $400,000,

 2   trickled down to the ultimate recipients of the income of the

 3   company, correct?

 4   A.  Can you say the question again?  I'm sorry.  I didn't

 5   understand.  It sounded like a statement, not a question.

 6   Q.  The hypothetical we went through, and your explanation,

 7   just shows that there are multiple levels that the management

 8   fee distribution would have to take before it gets to its

 9   ultimate recipients?

10   A.  Fair.

11   Q.  Fair enough?  Okay.  I'm going to ask you now specifically

12   about the COBA pitch at the end of 2013, beginning of '14.

13             MR. MAZUREK:  And if we could publish, your Honor, to

14   the jury what's already admitted into evidence as Government

15   Exhibit 1016, the first page, please.

16             THE COURT:  Okay.  Do the jurors have it?

17             JURORS:  No.

18             (Pause)

19             THE COURT:  Okay.  Go ahead, counsel.

20   BY MR. MAZUREK:

21   Q.  Ready?  Okay.  On your screen is, I think, an exhibit that

22   you reviewed on direct examination, an e-mail from Joseph

23   Ritterman; do you see that?

24   A.  Yes.

25   Q.  And this e-mail is sent to Jona Rechnitz, copying Murray

Huberfeld, subject:  Platinum materials, correct?

A.  Yes.

Q.  And Mr. Ritterman writes Jona directly saying:  Jona,

please see the attached PPM and subscription document for

Platinum Partners Credit Opportunities Fund, LLC.  If you have

any questions or require further information, please do not

hesitate to contact me, correct?

A.  Yes.

Q.  Now, Mr. Ritterman is sending what's called a PPM to

Mr. Rechnitz.  PPM, that's a private placement memorandum; is

that right?

A.  Yes.

Q.  And that is sort of the memorandum that describes the

investment fund and the possibility to subscribe to the terms

under which --

A.  Plus much more, but yes.

Q.  Okay.  What's the much more?

A.  It talks about not only subscribing to the company, but it

talks about the terms of your subscription in the most robust

place you'll find it.  The one-pager doesn't give you the

information the PPM gives you.  It talks about the risks of

investing.  It talks about the conflicts of interest that the

manager may have amongst tons of different conflicts.  It talks

about how taxes are treated, how ERISA is treated.  It talks

about tons and tons of things that I am not going to nail

1    everything in this --

2    Q.   That's quite all right.

3    A.   -- right here, but it's a very large, robust legal

4    document.

5    Q.   Okay.  And it's being sent to Mr. Rechnitz in this

6    instance.  Do you have an understanding why it would be?

7    A.   No idea.

8    Q.   Okay.  And in your experience at PPCO, sometimes would you

9    be aware if there is a placement agent or a person who's

10   introducing a prospective investor, they would get copies of

11   the private placement memorandum or subscription documents

12   relating to that investor?

13   A.   I'm sorry to do this to you.  Could you repeat the first

14   part of the question?  I don't know what I'm answering.

15   Q.   In your experience at PPCO, would it be common for the

16   private placement memorandum and subscription documents for a

17   potential investor to be sent to the placement manager?

18   A.   I didn't deal directly with many placement agents; so I

19   don't know if it's common, but I suppose, as I mentioned on

20   direct, that it wouldn't be weird if somebody wanted to see the

21   PPM before a meeting.  That definitely has happened in the

22   past.

23   Q.   The person who might be introducing a potential investor

24   and acting as an agent in some respects or broker or middleman,

25   it wouldn't be weird for them to get a copy of these materials,

1   correct?

2   A.  It would not be weird, correct.

3   Q.  Okay.  And I think you said on direct, or even in cross,

4   that your understanding was Mr. Rechnitz is the one who made

5   the introduction of COBA to Platinum, or you had heard that?

6   A.  Yes.  He made the introduction to Platinum, yes.

7   Q.  Okay.  Now, the private placement memoranda and

8   subscription documents that are attached to this e-mail are for

9   the PPCO fund, correct?

10  A.  Yes.

11  Q.  And only the PPCO fund, correct?

12  A.  That's what it looks like.

13  Q.  Okay.  And that is the fund that you were working for at

14  the time, correct?

15  A.  Correct.

16  Q.  In fact, the chief operating officer, right?

17  A.  Correct.

18  Q.  And this was also the fund that originally was founded at

19  Centurion by Mr. Huberfeld?

20  A.  Yes.

21  Q.  It was the fund that he had -- the only part of the fund

22  that he actually had investment responsibilities and was the

23  chief investment officer for, correct?

24  A.  The only part of what?

25  Q.  Platinum.

1    A.  So the question is, the only part of Platinum that he had

2    responsibility for?

3    Q.  That he had investment responsibilities for at Platinum?

4    A.  I'm going to say I believe so because I don't want to be

5    overly inclusive, but I think so.

6    Q.  But there was the credit fund that he was the chief

7    investment officer of?

8    A.  Yes.

9    Q.  Now, in this e-mail in Government Exhibit 1016, PPVA is not

10   being provided, correct?

11   A.  It doesn't appear so.

12   Q.  Were you aware, when you were asked to pitch to COBA,

13   whether there was a decision to include all of the funds or the

14   major funds, PPCO and PPVA, in the pitch to COBA?

15   A.  Yeah, because the meeting was designed that Uri and Andrew

16   would do PPVA, and I would do PPCO; so therefore, I knew those

17   two funds were being presented.

18   Q.  Were you involved in any meetings or discussions leading up

19   to the pitch talking about what strategy, marketing strategy

20   you would take in terms of which of the two funds you would

21   push for COBA?

22   A.  I don't recall anything happening, any meeting happening

23   about that.

24   Q.  Okay.  The next thing you remember is attending that

25   meeting on January 13th, around that time in 2014, correct?

1    A.  Correct.

2    Q.  And Murray Huberfeld did not attend any COBA pitch meeting,

3    correct?

4    A.  He did not.

5    Q.  You were asked on direct examination about a particular

6    term in the subscription agreements for both COBA, the annuity

7    fund and the general fund, which indicated an acknowledgment by

8    the investor that they would have to bear the economic risk of

9    a potential total loss of the investment; do you remember that?

10   A.  Yes.

11   Q.  That provision in the subscription agreement for Platinum

12   was the standard term?

13   A.  Yes.

14   Q.  And it was the standard term, as you understand it, within

15   the hedge fund industry generally, correct?

16   A.  Yes.

17   Q.  Okay.  We can take the exhibit down now.

18           In the meeting on January 13th, 2014, before the COBA

19   board of trustees, I think your testimony was both sides -- you

20   pitched PPCO, Mr. Landesman pitched PPVA, both funds were

21   pitched, right?

22   A.  Yes.

23   Q.  You don't remember exactly when the decision was made to

24   select PPVA over PPCO?

25   A.  Correct.

1    Q.  But it was sometime shortly thereafter?

2    A.  I believe so.  I believe it was shortly after.

3    Q.  Now, you talked about, again, a little bit about the

4    differences between the two funds, and is it fair to say that

5    PPVA could be described as the more liquid of the two funds?

6    A.  I don't know how to answer that question.

7    Q.  Well, let me put it this way, then, to make a more specific

8    question.  Both PPVA and PPCO had notice period requirements

9    before you could take out your investment, correct?

10   A.  Yes.

11   Q.  And what that means is that if you want to withdraw money

12   or make a redemption request, you had to do it certain days in

13   advance, and at the end of that notice period, then you would

14   get your money, correct?

15   A.  Correct.

16   Q.  And for PPVA, that standard notice period, when you'd have

17   to tell them, you know, you want your money and before you got

18   your money, was 90 days, correct?

19   A.  Sounds right.

20   Q.  And for the PPCO, during that same time period, it was six

21   months?

22   A.  Correct.

23   Q.  So if you're interested in getting your money sooner, the

24   better of the two funds would be PPVA, correct?

25   A.  Correct.

1  Q.  Now, in this particular instance when COBA picked PPVA as

2  its investment choice, you talked about side letters that were

3  negotiated between the two sides, right?

4  A.  Yes.  We saw them.

5  Q.  We saw them.  There was one in March and one in June?

6  A.  Sounds right.

7  Q.  And the one in June, for example, had a provision where

8  that notice period, the 90-day notice period, could be reduced

9  to three days, at least for $1 million of the investment,

10  correct?

11  A.  Yes.

12  Q.  And both of the side letters included provisions which said

13  if I'm going to withdraw money, I want cash back and not some

14  share in some kind of other asset, correct?

15  A.  Yes.  No payment in kind.

16  Q.  No payment in kind.  And side letters, you said, were

17  something that Platinum would do on occasion on behalf of

18  investors, correct?

19  A.  Yeah, there were a number of them.

20  Q.  And they were something that were negotiated between the

21  two sides, the lawyers on the investor's side and the lawyers

22  for the fund, correct?

23  A.  It didn't have to be the lawyers.  It could have been the

24  marketing people or Mark.  The lawyers might have documented

25  it, but it doesn't mean they negotiated it.

1    Q.   Okay.  But Platinum would not offer concessions of their

2    standard terms.  They would have to be presented by the

3    investor and say we want some changes here, and what the

4    ultimate side letter represents is going to be the result of

5    that kind of negotiation?

6    A.   I can't tell you what other people did.  I can only tell

7    you that I wouldn't offer anything until somebody came and

8    said, we're going to write you a check for X but...  Okay?

9    Once that "but" comes, that's when the negotiations start.  But

10   I don't know what other people did.

11   Q.   Were you involved in the negotiations with respect to the

12   COBA investment?

13   A.   I don't remember.  I know I spoke to Mr. Wien, lawyer to

14   lawyer, but I don't remember -- I don't remember if I

15   negotiated, or I was just doing what others negotiated to help

16   get the side letter done.

17   Q.   But you know there was a negotiation because the side

18   letter -- there were side letters for these two different

19   investments?

20   A.   There was some sort of either negotiation or line in the

21   sand.  I don't know where it went.  I don't know how it

22   happened, but it happened.

23   Q.   And at times, does Platinum draw that sand in the line and

24   say, look, we would love to have you come aboard in this

25   investment, but these are things that we can't concede?

1  A.  Yeah.  If somebody asks you to work for free, you're

2  probably going to say no.  I don't know where that line is

3  drawn.  It's a tough line to say, but yes, there certainly is a

4  line.

5  Q.  And that line is determined by the chief management, Mark

6  Nordlicht and them?

7  A.  Yes.

8  Q.  The whole process that you were involved in with the pitch

9  meeting in January 2014, up to the time when COBA made its

10 initial subscription in June of 2014 -- or March of 2014, would

11 it be fair to say that, for you, that was a fairly standard

12 process?

13 A.  I wasn't involved after that pitch; so I don't know what

14 transpired, but if you're asking me on a timeline perspective,

15 sure.  Some people move quickly.  Some people take a year.  It

16 just depends on everybody's style.  There's no industry

17 standard.  You have to do diligence for X, that doesn't exist.

18 Q.  The pitch itself, I think you already testified on direct,

19 was fairly standard in terms of your experience, the first

20 pitch made?

21 A.  Yes, slightly short because of the fact that we were

22 splitting the time, but that made sense in totality.

23 Q.  And you said the board of trustees were engaged with

24 questions from the other side and potentially also from the

25 financial advisor who was present?

A.   Potentially from the financial advisor, but definitely a

bunch of questions; so that it has to be at least some trustees

because they weren't all from one person.

Q.   One other question on -- you were asked some questions

regarding redemptions and what redemptions mean.  That's the

withdrawals from the fund, correct?

A.   Yes.

Q.   The process by which an investor would have to undertake to

withdraw its money, if there is a notice period.  They would

have to give notice, whatever that period is.  With PPVA, you

said it was 90 days, correct?

A.   I believe it's 90 days from the one pager, yes.

Q.   And that would mean on the 90th day, the payment would be

forwarded by Platinum to the investor?

A.   No.  The way that it would work is the redemption date

would be 90 days after -- let's start over again.

            An investor gives 90 days' notice before any calendar

quarter.  That's the redemption process.  So if an investor

wants their money out by December 31 as the redemption date,

that's the date they strike them as not in the fund.  They

might not get their money -- they would have to give notice 90

days prior to December 31.  Okay?  But I believe the fund had

the right to not send the cash out for 30 more days.  So they

had from December 31 to January 31 or January 30, whatever 30

days is, to wire the capital.

1    Q.  Okay.  And if a redemption request is made, let's do it

2    under your example, September 30th and then it comes to

3    December 31st, the investor would always have the opportunity

4    to recant or withdraw that redemption request, correct?

5    A.  Yes.

6    Q.  And that means their investment would stay put, correct?

7    A.  Yes, unless the manager wanted them out.  The manager, in

8    PPCO for sure, I believe PPVA had the same right, the manager

9    can force an investor out if they don't want them anymore.

10   Q.  Okay.  So you were asked to look at a number of e-mails on

11   direct examination from Mark Nordlicht talking about reds

12   versus subs; do you remember those?

13   A.  I remember reds.  Oh, yeah, I don't remember -- yeah, sure.

14   Q.  And reds is short for redemptions, correct?

15   A.  Yes.

16   Q.  And subs is short for subscriptions?

17   A.  Yes.

18   Q.  Okay.  And if an investor is making a request in September,

19   the end of the third quarter, for a December or end-of-December

20   or January payment, according to the terms of the agreement,

21   there may be requests made, millions of dollars of requests

22   made that are never actually paid because the investor might

23   withdraw or recant that redemption request before the end of

24   the period?

25   A.  Yes.

1  Q.  And that sometimes happened in your experience?

2  A.  I believe so.  I can't cite a specific instance, but I

3  believe so.

4  Q.  And Mr. Nordlicht's role at PPVA, as the general manager,

5  was it fair to say that he was always the sort of guy who would

6  push, especially the marketing team, to bring in new money?

7  A.  Yes.

8  Q.  And would you describe his style in terms of how he would

9  motivate his people to go out and get new subscriptions, that

10  it was lighting a fire under them in a sort of panicky way, in

11  a way that he was very -- he didn't have a light touch; is that

12  fair to say?

13  A.  I can't answer that because I wasn't really part of the

14  marketing team.  Okay?  So I didn't get those rah-rah speeches,

15  but so for me, I wasn't raising money for PPVA, and I was doing

16  a pretty good job at PPCO; so, you know, I don't know.  I don't

17  know.

18  Q.  Okay.  Fair enough.  Fair enough.  But he, Mr. Nordlicht,

19  was also your brother-in-law, in addition to being the head of

20  the PPVA?

21  A.  He still is.

22  Q.  He still is.  And how would you describe Mr. Nordlicht?

23  A.  He's not -- I don't think he's the head -- I answered your

24  question.  Can we break that down?  I'm sorry.  I don't know

25  what I answered there.

1   Q.  Mr. Nordlicht is still your brother-in-law?

2   A.  Yes.

3   Q.  And back in 2014 and '15 he was the head of the PPVA,

4   correct?

5   A.  Yes.

6   Q.  And in your experience, while you were working at Platinum,

7   how would you describe his management style?

8   A.  Intense, exciting, kind of like at the edge of your seat

9   always.

10  Q.  Yes.

11  A.  Always something happening, always something, you know --

12  always working on something, be it, you know, I'm talking about

13  portfolio related, investments.  There was always a new this,

14  that he was always excited about, and he had a pretty good

15  foresight in these investments; so that's his style, I guess.

16  Q.  Okay.  And was he always excessively worried about

17  redemptions in the fund and making sure that new capital was

18  coming in?

19  A.  Again, not my area of expertise on the PPVA side.  So I

20  can't -- I have no comparative knowledge of all periods; so I

21  can't tell you always.  I don't know.

22  Q.  Well, let me ask you this.  In the period of 2014 to 2015,

23  do you have any memory that there was any increased worry about

24  redemptions during that point in time?

25  A.  Again, I can't answer if there was an increased worry.  I

1    don't know how it ran before that. You're asking me to compare

2    to things that I don't have knowledge of.

3    Q. No, I'll just ask you not to compare, but do you have any

4    memory in that time period, 2014, '15, about a worry about

5    redemptions?

6    A. I don't know if I would use the word "worry." There were

7    redemptions, but it sounded to me like the Mark Nordlicht that

8    I just described, who, you know, he had a plan, he had a way to

9    meet those redemptions, and it wasn't something I focused on at

10   all.

11   Q. Was there any focus on it at Platinum at that period of

12   time, that you remember?

13   A. There was -- there were redemptions and they were working

14   on how to meet those redemptions, but that's all I really know.

15   Q. Okay. Redemptions are just an ordinary part of running a

16   hedge fund, correct?

17   A. Yes.

18   Q. Especially when you're running a hedge fund where a lot of

19   the investors are individuals or family investors, correct?

20   A. Yeah, but I think that at all levels of hedge funds you

21   have to be mindful of redemptions.

22   Q. That's just one of the normal things that you have to do if

23   you're a manager of a hedge fund, is to be able to deal with

24   the volatility of redemptions, correct?

25   A. Unless you don't have a provision for redemptions until the

1    end of a certain time period, then you don't have to worry

2    about redemptions.

3    Q.   Right.  But in the normal course, when you do have

4    redemption, or that the subscription agreements allow

5    redemptions, that's just something that you have to deal with

6    in an day-to-day operations?

7    A.   Here's how I'll say it.  In an open-ended hedge fund, which

8    means it's open, it's open for new investors and it's open for

9    investors to leave, you have to be mindful of redemptions.

10   Q.   And there are different ways that you can deal with

11   redemptions, correct, within the fund?

12   A.   Yes.

13   Q.   By raising new money, that's one of the ways to deal with

14   it, correct?

15   A.   Correct.

16   Q.   You can liquidate existing positions that the fund has in

17   order to deal with redemptions?

18   A.   Correct.

19   Q.   You can take out loans in order to deal with short-term

20   shortfalls when you need to make redemptions during the period?

21   A.   I don't know about that.

22   Q.   You're not familiar with that?

23   A.   Yeah, I -- yeah, I don't -- I don't know about taking out

24   loans to -- I guess you could, but in my mind, I hadn't come up

25   with that one.

1    Q.  Okay.  But there are different financing techniques or

2    vehicles that would be available in order for a hedge fund

3    manager to plan and respond to redemption activity?

4    A.  Yeah, I think the ones that you just mentioned.

5    Q.  Now, on some of the e-mails that you were asked about on

6    direct examination relating to COBA, we saw that Mr. Huberfeld,

7    were either forwarded e-mails on occasion or sometimes copied,

8    correct?

9    A.  Yes, we saw that.

10   Q.  And that's not something that was unusual for you to see in

11   this particular instance with respect to COBA investments,

12   right?

13   A.  It doesn't seem unusual.

14   Q.  And the reason for that is you understood that

15   Mr. Huberfeld was responsible for generating this particular

16   investor, correct?

17   A.  For making the referral.

18   Q.  For making the referral?

19   A.  To Platinum, the Platinum market.

20   Q.  I see.  So the referral partner would be the one who may be

21   kept in the loop as to what was going on with that particular

22   investor?

23   A.  It depends on who's the one keeping in the loop and their

24   style.

25   Q.  In this instance, it was Mr. Nordlicht?

1    A.  I think we also saw Mr. Landesman, too, but that was the

2    way they handled it.

3    Q.  Okay.  Again, that would not be anything unusual if the

4    referral partner was associated somehow with that investor?

5    A.  I don't think so.  I could be wrong, but I don't think so.

6    Q.  It didn't strike you as unusual?

7    A.  I wasn't really on those e-mails.  I didn't see them until

8    prep; so I can't give you my state of mind back then because I

9    wasn't on them.

10   Q.  No, I'm just saying today there's nothing unusual about, in

11   your experience as --

12   A.  If there was anything, if there was anything that seemed

13   unusual, the explanation that you just gave seems reasonable.

14   Q.  Okay.

15           MR. MAZUREK:  Just one moment, your Honor.

16           (Pause)

17   Q.  You indicated that as of October 2014, the Platinum fund

18   moved offices; is that right?

19   A.  I don't think I gave an exact month, but it was the end of

20   '14.

21   Q.  End of '14.  And they --

22   A.  Like, not the very end, but like near.  You know, October

23   would be in that range.  I just don't know if it was October.

24   Q.  Okay.  And at that point, the Platinum moved from 57th

25   Street to 55th Street, I think was your testimony?

1   A.  Correct.

2   Q.  And you moved over with them, right?

3   A.  Correct.

4   Q.  Mr. Huberfeld did not, he did not take up an office on 55th

5   Street?

6   A.  I don't believe he had an office on 55th Street.

7           MR. MAZUREK:  I have no further questions, your Honor.

8           MR. SHECHTMAN:  Very brief.

9           THE COURT:  Do you have cross-examination?  Okay.

10  CROSS-EXAMINATION

11  BY MR. SHECHTMAN:

12  Q.  Mr. Kalter, I promise you I will be very brief.

13  A.  Take as much time as you need.  Or don't.

14          THE COURT:  I'll be the judge of that.  Go ahead,

15  counsel.

16          THE WITNESS:  Sorry, your Honor.

17          MR. SHECHTMAN:  Can we just take one second to get

18  caught up here?

19          Ms. Granquist, can you put up Government Exhibit 402.

20  It might be easier, if the government has it, just put it up,

21  402, and I think we're going to -- yes, that's the -- is that

22  up?  Go to Page 20.

23  BY MR. SHECHTMAN:

24  Q.  You were shown this earlier, and if you look down at the

25  bottom -- yes, make that a little bigger for the jury.  I think

1  you were shown this, and you were asked whether this fund,

2  which is the Platinum Partners Value Arbitrage Fund, which is

3  the fund that COBA invested in, whether the returns were more

4  variable than the other fund, and I think your answer is yes;

5  am I correct about that?

6  A.  Yes, I think the numbers don't lie.

7  Q.  I think the numbers don't lie.  And you particularly

8  pointed to the number 4.37 as one of the yearly returns?

9  A.  Yes, that's 2008.

10  Q.  Right.  And I'd be correct that 2008 was what some people

11  would call the great recession?

12  A.  I don't know if I've heard it called the "great recession,"

13  but it was a very, very, very bad part of the cycle.

14  Q.  And the stock market dropped dramatically?

15  A.  Yeah.

16  Q.  So that if you were invested just in stocks, you would have

17  lost a lot of money that year?

18  A.  Sounds right.  Or maybe not.  Some people could have gone

19  the right way on the market.

20  Q.  If they short?

21  A.  Short.

22  Q.  But if you were just invested in stocks, you would have

23  lost money, and that firm earned 4.73 percent, right?

24  A.  If you invested long in stocks, you likely --

25  Q.  If you invested long in stocks, you would have lost a lot

1   of money.  The firm earned 4.73 percent during that recession

2   year?

3   A.  Yeah.

4   Q.  Okay.  And the year before that, they earned 53 percent?

5   A.  I see that.

6   Q.  So that if you had invested 20 million at the beginning of

7   the year, you would have had 30 at the end?

8   A.  Yes.

9   Q.  Okay.  Ms. Granquist, could you put up Government

10  Exhibit -- I'm going to ask some questions as you get ready --

11  1047.

12          You attended that July 29th, 2014, board meeting?

13  A.  Yes.

14  Q.  By yourself?

15  A.  Yes.

16  Q.  For the Platinum side?

17  A.  Yes.

18  Q.  And you were a last-minute pinch hitter?

19  A.  I would call myself a last minute hologram reading other

20  people's words in that meeting.

21  Q.  Nervous when you started?

22  A.  Nervous when I started what?

23  Q.  When you went there?

24  A.  I don't really have stage fright.

25  Q.  Let's put up 1047.  Okay?  Would you look at that?  That's

1  an e-mail from Tommy Reynolds.  That's the consultant, right?

2  A.  I see it.

3  Q.  And it says:  "Gil did a great job"?

4  A.  I see it.

5  Q.  I just wanted you to know that.

6  A.  Thank you.  It's the first time I'm hearing that.  I read

7  those bullet points well.

8         MR. SHECHTMAN:  I have no further questions.

9         THE COURT:  Okay.  Any redirect?

10        MR. CAPONE:  Briefly, your Honor.

11        THE COURT:  Okay.

12  REDIRECT EXAMINATION

13  BY MR. CAPONE:

14  Q.  Mr. Kalter, do you recall being asked questions on

15  cross-examination about whether retirement funds sometimes

16  invest in hedge funds like Platinum?

17  A.  Can you remind me what the questions were?

18  Q.  Well, I'll just ask it this way.  Are you aware of the

19  investor composition of the PPVA?

20  A.  Not really.

21  Q.  Are you aware of whether there were retirement funds

22  invested in the PPVA, other than COBA?

23  A.  I don't believe there were, but I can't recall for sure.

24  Like -- because it's the same thing over.  I don't -- I don't

25  remember having access or seeing their investor roster.

1    Q.  Okay.

2    A.  So I don't really know.

3    Q.  Okay.  And you were asked questions about -- a few

4    questions about brokers or placement agents; do you recall

5    that?

6    A.  Yes.

7    Q.  Was it your testimony that it's your understanding that

8    such a person needs to be licensed to receive commission-based

9    payment from a fund?

10   A.  Yeah, they need to be licensed to receive incentive-based

11   compensation, I think is the term, but I could be butchering

12   that also.  But the idea is the linked income to the management

13   company needs to be some sort of license.

14   Q.  During your time at Platinum, were there times where

15   individuals who weren't licensed asked you for a commission

16   for -- to be able to receive a commission to refer business to

17   you?

18   A.  Yes.

19   Q.  What did you respond in those circumstances?

20   A.  I told them that I didn't know of a way that we can do

21   that.  If they were insistent, I'd offer them to speak to

22   either outside counsel or internal counsel and try to hash it

23   out with them, who was more familiar with the rules.  But in my

24   experience, anybody who asked me, we weren't able to come up

25   with a structure without them sitting for an exam.

1   Q.  Are you aware of an individual named Ned Siegel?

2   A.  Yes.

3   Q.  And who is that?

4   A.  He was on some sort of advisory board that Platinum had set

5   up, and he was a former Ambassador to, I think, the Bahamas.

6   Q.  Did there come a time where he, to your knowledge, wished

7   to refer investors to Platinum?

8   A.  Yes.

9   Q.  What, if you know, what happened with that?

10  A.  I put him in touch -- or I put his counsel in touch with

11  our counsel.  I believe it was somebody internal, and he

12  liaised with external counsel.  And before I left, I had told

13  Ambassador Siegel that I don't have a structure, and we left it

14  to the lawyers to figure it out, and I never heard more about

15  it.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1    Q.  Do you recall in your experience at Platinum any time where

2    you or anyone else you knew of devised any plan to pay

3    unlicensed brokers in violation of any legal rules?

4    A.  I do not.

5    Q.  Even any conversations about it?

6    A.  Not that I recall, but again we are talking about a lota, a

7    lota years and a lota, lota conversations.

8    Q.  Do you recall any conversations in connection with the COBA

9    investment about Jona Rechnitz serving as a placement agent or

10   broker?

11   A.  I do not.

12   Q.  You were also asked questions about redemptions in the

13   PPVA?

14   A.  Yeah, I believe so.

15   Q.  To be clear, do you have a significant recollection or

16   knowledge base with respect to the level of redemptions in the

17   PPVA in the 2014-2015 time period?

18   A.  I can tell you what we read on email today.

19   Q.  Independent of that?

20   A.  Can you ask me the question one more time.

21   Q.  Yes.  Do you have an independent recollection of the

22   significance or lack thereof of redemptions in the PPVA in that

23   time period?

24   A.  I remember there were redemptions, but I don't know, I

25   don't know how significant or not those were based on the size

1   of the funds and Mr. Nordlicht's ability, like we went through

2   on cross, the ways to come up with cash.

3   Q.  And you were also asked about when the Platinum office

4   moved, whether Mr. Huberfeld took office space in the new

5   office on 55th Street?

6   A.  Yes, I recall that.

7   Q.  You said he didn't?

8   A.  I don't think he had an office in the new office.

9   Q.  Do you know where he worked at that point?

10  A.  Yes, he moved to another investment that Mr. Huberfeld had

11  been part of putting together.  He moved in with that company.

12  Q.  What was that called?

13  A.  It was called Beechwood.

14  Q.  Finally, you were asked questions about the legal

15  negotiations of side letters and you were also refocused on

16  something that I had highlighted to you which is a provision

17  about investors being able to bear the economic risk of loss of

18  their entire investment?

19  A.  Yes.

20  Q.  Do you recall that?

21  A.  I recall that.

22  Q.  Is that, in your experience, a provision that Platinum ever

23  agreed to waive?

24  A.  I don't know of any instances where it was agreed to waive,

25  but I don't know --

HAQJSEA5

1          MR. MAZUREK:  That calls for speculation.

2          THE COURT:  Overruled.

3   A.  -- I don't know of any instances where that provision was

4   waived.  I certainly would never waive that provision.

5   Q.  Why not?

6   A.  Because that provision is something that as the fund

7   manager, you want to make sure that people not only recognize

8   that they can lose money, but you don't want to lose somebody's

9   last dollar.  If you're losing the last dollar, they shouldn't

10  be invested in hedge funds.

11         MR. CAPONE:  Nothing further.

12         MR. MAZUREK:  Nothing further.

13         THE COURT:  The witness is excused.

14         (Witness excused)

15         MR. CAPONE:  Before calling our next witness, I have a

16  few exhibits I want to move into evidence and publish that are

17  independent of any given witness.

18         THE COURT:  All right.  Have you given the defense

19  notice of them and is there any objection to them?

20         MR. CAPONE:  These are the emails that have been the

21  subject of prior --

22         THE COURT:  I want to make you sure we have the

23  numbers together so we can have the record complete.

24         (Off-the-record discussion)

25         MR. CAPONE:  At this point the government moves into

1  evidence Government Exhibits 1002, 1003, 1006, 1007 and 1041.

2            THE COURT:  Is there any objection to them?

3            MR. MAZUREK:  No, your Honor.

4            THE COURT:  Any objections?

5            MR. SHECHTMAN:  None.

6            THE COURT:  Those are in.

7            (Government Exhibits 1002, 1003, 1106, 1007 and 1041

8  received in evidence)

9            MR. CAPONE:  I want to publish those and read from

10 them.  It is Government Exhibit 1002.  It is an email from Mark

11 Nordlicht to Huberfeld at Gmail dot com, dated August 2, 2013,

12 the body of which reads:  Please note subs versus reds.  Need

13 for new direction is clear.

14           We can take that down and put up briefly Government

15 Exhibit 1003, which is a multipage attachment that we don't

16 have to go through today, but it is now in the record.

17           Ms. Bustillo, if we can put up Government Exhibit

18 1006.  This is an email at the bottom of which is from Michael

19 Kimelman from Mark Nordlicht, Uri Landesman, SanFilippa and

20 Will Slota at 2013 redemptions dot X L S X.  The body reads:

21 estimated year end redemptions attached.  PPVA U.S. approximate

22 17 million.  PPVA International, approximate 35 million.

23           I won't read the remainder of that bottom email.

24           The top email is a forward of this from Mark Nordlicht

25 to Murray Huberfeld, dated November 5th, 2013 at 7:35 pm.

1   Subject forward 2013 redemptions, X.  The body reads 50 million

2   and reds for Dec 31.

3           The attachment is Government Exhibit 1007, briefly put

4   that up.

5           MR. MAZUREK:  May we have the whole email read?  He is

6   only reading portions.

7           MR. CAPONE:  I can read the whole email.

8           THE COURT:  Let's have a quick sidebar.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At the sidebar)

2              THE COURT:  I would like to move this along.  Is there

3     a particular email you want read?  I don't know if that is

4     necessary.

5              MR. MAZUREK:  If it is in evidence.  My only concern I

6     don't think it is fair he highlights certain portions.  He has

7     opportunities to do that in argument.  Let's move them in,

8     they're in and argue about them.

9              MR. CAPONE:  I will happy to read the whole email.

10             THE COURT:  I am not happy to read the whole email.  I

11    would like to try to get the live witnesses.

12             MR. MAZUREK:  I agree it.  It is not fair if they only

13    reading portions.

14             THE COURT:  Is there a particular portion?

15             What we can do, they're in evidence.  He can read the

16    portions he wants to read.  You can get up and read anything

17    else you want to read and let's get the witness on.  Does that

18    work?  Do you actually need to have the entire emails for all

19    of these documents read in?

20             MR. CAPONE:  There is no more email after this.

21             THE COURT:  So we can do that if there is something in

22    particular you want to read, they're in evidence.  I will give

23    you a chance to get up and read a portion if you want to read.

24             Does that satisfy your concern?

25             THE COURT:  Many of these emails he sifted through

1    quickly.  I don't think the jury is looking at some of them.

2              MR. MAZUREK:  Let's just finish.  I don't need to read

3    it.  There is no other email?

4              MR. CAPONE:  Just one more.

5              THE COURT:  You withdraw that objection?

6              MR. MAZUREK:  I withdraw.

7              THE COURT:  So you are going to read this email.  The

8    next witness will be about 10 minutes on direct?

9              MR. BELL:  I think so, your Honor.

10             THE COURT:  Yes?

11             MR. MAZUREK:  Can I just confer?

12             THE COURT:  Make it quick, though.

13             (Off-the-record discussion)

14             THE COURT:  Do you want him to read the entire portion

15   of one particular email?

16             MR. MAZUREK:  Yes.

17             THE COURT:  Do that.

18             (Continued on next page)

19

20

21

22

23

24

25

```
 1          (In open court)

 2          THE COURT:  Go ahead, counsel.

 3          MR. CAPONE:  Ms. Bustillo, can we put 1003 back up --

 4  excuse me -- 1006.  Sorry about that.  I will read the rest of

 5  the bottom email.  I had read through PPVA International 35

 6  million.  The rest reads this includes Venus 20 million Ray

 7  Brenner 3.7 and Adam Brenner 8, which are likely to recant or

 8  move to PPCO.  Amir Shaked is also in for 1 million and likely

 9  to recant.

10          CITGO, 190030, like Crescendo has a large redemption

11  in for approximate 6.1 million.

12          JUROR:  We are not seeing this.

13          THE COURT:  It is not on the juror's screens.  Hold on

14  a second.

15          (Pause)

16          THE COURT:  They have it.

17          MR. CAPONE:  This includes venus 20 million, Ray

18  Brenner, 3.7, and Adam Brenner, 8 which are likely to recant or

19  move to PPCO.  Amir Shaked is also in for 1 mil and likely to

20  recant.  CITGO 190030 likely crescendo has a large redemption

21  in for approximate 6.1 mil.  Please look at tab 123113 on

22  attached Excel sheet for details.

23          The attached Excel is Government Exhibit 1007, which I

24  will not read, but there it is.

25          Finally, if we can publish Government Exhibit 1041.  I
```

1    will read this email into evidence, the bottom of which is from

2    June 16th, 2014 at 4:16 pm from Uri Landesman.

3           He writes in PPVA, Sloan Well is supposedly money good

4    for 5 mil.  We have another 1 to 2 mil prospect for July 1, and

5    about 500,000 of other likely August 1 doesn't have much

6    visibility yet in that fund.  PPCO is all over the map, partly

7    because Shepard Kaplan is sort of fighting with one of their

8    clients as to the client investing in us through them or on

9    their own.  We are not sure if SK's estimates that they are

10   giving us include or exclude that client.  We have another 20

11   million prospect looking good for either July 1 or August 1.

12   Ergo, PPCO could be as much as 60 mil over the next two

13   closings.  Zero is not out of the question, either.

14          The response is also Monday, June 16th, 2014, at 4:43

15   pm.  It is from Uri Landesman -- sorry -- from Mark Nordlicht

16   to Uri Landesman, line copy to Murray Huberfeld, re prospects.

17          It reads okay, Schwebel already accounted to make up

18   for at least for some past issues.  Let's talk in a little bit.

19   I think we need to revamp the strategy on PPVA and figure out

20   what to do.  It can't go on like this or practically, we will

21   need to wind down.  This is not a rhetoric thing, it is just

22   not possible to manage net outflows of this magnitude.  I think

23   we can overcome this, but this is code red, we can't go on with

24   status quo.  We need to be very aggressive if we can't to stay

25   open.  We can't pay out 25 million in reds per quarter and have

1   come in.  It just becomes almost impossible to manage asset

2   allocation among the different strategies.  I really feel that

3   while we are still overloaded in energy, we are now diversified

4   in four different companies within energy which should make us

5   a bit more attractive hopefully.  It feels like in PPCO we are

6   in decent shape because of SK, although clearly we want to

7   diversify there too.

8               We can take that down.  Thank you, your Honor.

9               THE COURT:  Call your next witness.

10              MR. BELL:  The calls Captain Michael Joy.

11  MICHAEL JOY,

12       called as a witness by the Government,

13       having been duly sworn, testified as follows:

14  DIRECT EXAMINATION

15  BY MR. BELL:

16  Q.  Good afternoon, Captain Joy.  Where do you work?

17  A.  I am work for New York City Police Department Strategy

18  Technology Division.

19  Q.  I may have just spoiled this.  What is your rank?

20  A.  Captain.

21  Q.  How long have you worked for the NYPD?

22  A.  15 years.

23  Q.  Do you work for a particular part of the NYPD?

24  A.  Yes, I am the executive officer for the Strategic

25  Technology Division.

1    Q.   What is the Strategic Technology Division?

2    A.   We are responsible for all major technology projects for

3    the New York City Police Department.

4    Q.   What are your duties as executive officer of that division?

5    A.   I supervise all personnel and I manage most of the projects

6    including our license plate recognition system, our mobility

7    initiatives, our body camera deployment projects as well as

8    most of our applications.

9    Q.   You mentioned something a moment ago called a license plate

10   recognition system.  Is that sometimes called LPR?

11   A.   Yes.

12   Q.   What is LPR?

13   A.   LPR is a system that captures license plates as vehicles

14   move across their field of vision.

15   Q.   How are you personally familiar with the LPR system?

16   A.   I began that project as assigned to the counterterrorism

17   division probably close to 10 years ago in 2007.  I oversee

18   that project generally on its day-to-day activities, ensure its

19   maintenance and I coordinate all new deployments and new

20   builds.

21   Q.   What is a license plate recognition system?

22   A.   An LPR is a series of cameras, so each unit consists of two

23   cameras that take photographs of every vehicle that crosses its

24   path.

25   Q.   What information does it gather?

1   A.  We capture the date, time and location as well as two

2   individual photographs of each vehicle.

3   Q.  You mentioned two individual photographs.  How many cameras

4   are there in each unit?

5   A.  Two.

6   Q.  How do they differ?  Why two cameras?

7   A.  One camera is an infrared camera.  That camera is used to

8   detect if there is a license plate in its field of view.  It

9   has a high contrast ratio and is able to identify characters

10  and text in what appears to be a plate.

11          The other camera is a standard color camera that gives

12  you a scene view so you can visually determine make, model,

13  color, direction of travel.

14  Q.  On what occasions or with what events is data captured by

15  the LPR system?

16  A.  Any time that it detects what it believes is a license

17  plate crossing its field.

18  Q.  These LPR units, are they at fixed locations, at mobile

19  locations, or both?

20  A.  Both.

21  Q.  What can you tell me about where the fixed locations are

22  based?

23  A.  We cover every vehicular crossing, exiting or entering into

24  the Island of Manhattan as well as line across Canal Street on

25  the financial district.  We also cover make Verrazano Bridge,

1   Long Island Expressway and other major vehicular travels and we

2   have some sporadically placed within the financial district.

3   Q.  And the mobile locations?

4   A.  Mobile are affixed to the rear of police vehicles usually

5   scattered throughout the city.

6   Q.  You mentioned the fixed locations a moment ago.  You

7   mentioned crossings into Manhattan.  Are those bridges and

8   tunnels?

9   A.  Yes.

10  Q.  Just to be clear, what information is located, is recorded

11  along with the photographs when two photographs are taken?

12  A.  We take those photographs, we also append the date, the

13  time and the location and the what we call the asset, which is

14  the specific reader that took that photograph.  We keep all of

15  that together.

16  Q.  Does the LPR system capture every single vehicle that comes

17  into its path?

18  A.  As long as it can identify or see a license plate.

19  Q.  Under what circumstances might it not be able to see a

20  license plate?

21  A.  If the license plate is obscured in some way, if it is

22  covered in ice or snow or a very dark tinted plate cover.

23  Q.  On days when it is not actually snowing, is it very common

24  that LPR would miss one?

25          MR. SHECHTMAN:  I object to the relevancy of this.

1              THE COURT:  Overruled.  Go ahead.

2              THE WITNESS:  Repeat the question, please.

3    BY MR. BELL:

4    Q.  Absent snow or ice, is it likely that LPR would miss one?

5    A.  No.

6    Q.  For how long does the NYPD retain the data recorded by LPR?

7    A.  Five years.

8    Q.  How are you, Captain Joy, able to access that data?

9    A.  We use a system that we call the Domain Awareness System

10   that has access to all the former records.

11   Q.  Have you accessed or have you run any particular queries on

12   that system that are the subject of your testimony today?

13   A.  Yes.

14   Q.  How many different vehicles did you run?

15   A.  One.

16   Q.  Was it for a particular time?

17   A.  Yes, but I don't remember off the top of my head.

18             MR. BELL:  We would like to at this point offer with

19   no objection Government Exhibits 1301 through 1306.

20             MR. SHECHTMAN:  No objection.

21             MR. MAZUREK:  No objection.

22             THE COURT:  They're in.

23             (Government Exhibits 1301 through 1306 received in

24   evidence)

25             MR. BELL:  Can we publish 1301, please.

1   BY MR. BELL:

2   Q.   What is it that we are looking at right now, Captain Joy?

3   A.   You're looking at a report from our Domain Awareness System

4   regarding a read from our license plate recognition system.

5   Q.   What can you tell us about the date or time at which this

6   recording was done?

7   A.   This photo was taken on December 11th, 2014, at 10:41 am.

8   Q.   You mentioned the asset being a particular unit or

9   recorder.  Where was this located?

10  A.   This is located on the inbound lanes of the Third Avenue

11  Bridge.

12  Q.   Are you familiar with that area?

13  A.   Yes.

14  Q.   What does inbound refer to?

15  A.   Inbound refers to entering Manhattan.

16  Q.   Reference is made to a specific vehicle here.  What is the

17  license plate?

18  A.   The license plate is GJC 7849.

19  Q.   Referencing also made to a make and model, where does that

20  information come from?

21  A.   That information comes from associated DMV registrations.

22           MR. BELL:  Can we look at the bottom part of that

23  page, please, Ms. Bustillo.  The bottom two boxes.  Thank you.

24  BY MR. BELL:

25  Q.   So the information that we are looking at right now,

 1   Captain Joy, where does that come from?

 2   A.   This information comes from New York State DMV

 3   registration.

 4   Q.   What is the registered owner of the automobile in question?

 5   A.   The Correction Officers Benevolent Association.

 6           MR. BELL:   There are other details there that I think

 7   we needn't go through.   Ms. Bustillo, if you can focus again on

 8   the top half.

 9   BY MR. BELL:

10   Q.   Just briefly and in summary, what does this information

11   tell us happened involving this car?

12   A.   It identifies the vehicle as GJC 7849 entered Manhattan via

13   the Third Avenue Bridge on December 11th, 2014 at 10:41 am.

14   Q.   I want to direct your attention to the second page of the

15   exhibit.   What do we have here, Captain Joy?

16   A.   This is a map view of where that LPR is physically located.

17   Q.   Is that what is indicated by the red marker?

18   A.   Yes.

19   Q.   Go to 1302.   So is this another example of the same record?

20   A.   Yes.

21   Q.   Does it correspond with the same vehicle?

22   A.   Yes.

23   Q.   The same sort of summary question, Captain Joy.   What does

24   this tell us happened regarding this vehicle?

25   A.   It identifies the vehicle bearing license plays GJC 7849

went southbound on FDR Drive, which this reader is physically

located near the Brooklyn Bridge on December 11th, 2014 at

11:06 a.m.

MR. BELL:  And there is a second page to this one.

Can we look at that Ms. Bustillo.

BY MR. BELL:

Q.  First of all, are you familiar with the area depicted in

the map?

A.  Yes.

Q.  Where is that?

A.  This is not far from this building, just on the southbound

lanes of the FDR Drive just before the Brooklyn Bridge.

Q.  Does this correspond with your understanding of where that

fixed asset is?

A.  Yes.

MR. BELL:  So Ms. Bustillo, can we dispute up 1303,

please.

BY MR. BELL:

Q.  The same set of questions, Captain Joy.  What does this

record tell us happened involving this vehicle?

A.  This record identifies vehicle bearing plate GJC 7849 going

northbound on the FDR Drive at the same area near the Brooklyn

Bridge on December 11, 2014 at 1:43 pm.

Q.  You mentioned 1:43 pm.  It says 1343 pm.  What is that

about?

1    A.  1343 is the military time.

2    Q.  Can we go to the second page, Ms. Bustillo.

3    Q.  It looks to be about the same area.  Does this correspond

4    with your area of where that as set is?

5    A.  Yes.

6            MR. BELL:  Why don't we pull up 1304, please.

7    BY MR. BELL:

8    Q.  The same set of questions, Captain Joy.  What does this

9    record tell us happened with this vehicle.

10   A.  This identifies vehicle bearing plate GJC 7849 leaving

11   Manhattan via the Triboro Bridge on December 11th, 2014, at

12   3:30 pm.

13   Q.  The Triboro Bridge outbound is referenced in the asset

14   field.  What does that mean?

15   A.  It means it was captured leaving Manhattan.

16           MR. BELL:  Ms. Bustillo has put up the second page.

17   BY MR. BELL:

18   Q.  Are you familiar with this area?

19   A.  Yes.

20   Q.  Where, generally, is it?

21   A.  This is across 125th Street of Manhattan right above the

22   Randall's Island area on the Triboro Bridge.

23   Q.  Does that correspond with your understanding as an

24   executive officer where that asset is located?

25   A.  Yes.

1              MR. BELL:  Ms. Bustillo, put up 1305.

2    BY MR. BELL:

3    Q.   Now, Captain Joy, what time is referenced in this record?

4    A.   1809 or 6:09 pm.

5    Q.   Does it refer to the same vehicle?

6    A.   Yes.

7    Q.   What does this record tell us that vehicle was doing on

8    December 11th, 2014 at 6:09:59 seconds pm?

9    A.   That this vehicle reentered Manhattan via RFK Triboro

10   Bridge.

11             MR. BELL:  Can we take a look at the second page, Ms.

12   Bustillo.

13   BY MR. BELL:

14   Q.   So is it your understanding from this information that the

15   vehicle would have reentered Manhattan via the Robert F.

16   Kennedy Bridge at that time?

17   A.   Yes.

18             MR. BELL:  Let me direct your attention now to 1306.

19   Now, 1306, can you highlight the date and time field, Ms.

20   Bustillo.  That is December the 11th, 2014 at 11:30:26 seconds

21   pm.

22   BY MR. BELL:

23   Q.   What does the license plate reader system indicate happened

24   at that time?

25   A.   That this vehicle bearing plate GJC 7849 exited Manhattan

1   via the RFK Triboro Bridge.

2   Q.  Is that roughly at the same location you spotted it before?

3   A.  Yes.

4   Q.  Can we just go to once again that is the RFK Kennedy

5   bridge?

6   A.  Yes.

7   Q.  Now, in putting together these exhibits, did you run a

8   query for that day or was there some broader period of time?

9   A.  No.  I ran the query for that day.

10  Q.  Are those the data points that came up as a result of that

11  query?

12  A.  Yes.

13  Q.  Were there any others, to your knowledge?

14  A.  No.

15         MR. BELL:  One moment, please.  No further questions

16  for Captain Joy.

17         THE COURT:  Any cross-examination?

18         MR. SHECHTMAN:  Very briefly, your Honor.

19  CROSS-EXAMINATION

20  BY MR. SHECHTMAN:

21  Q.  Captain Joy, just so we're clear, if someone lived in the

22  northeast section of the Bronx and they drove into Manhattan

23  over the Whitestone and Triboro, which I guess is now the RFK

24  or any other bridge, and they drove in and out of Manhattan

25  over those bridges, it wasn't snowing, the license plate wasn't

1  obscured, your equipment was working, you should have pictures

2  for every other day just like the ones you showed in court

3  today?

4  A.  Generally, yes.

5  Q.  I think what you said was the only day you were asked about

6  was December 11th?

7  A.  That is correct.

8  Q.  So if Mr. Seabrook drove in and out every other day, you

9  would have pictures just like this?

10  A.  Yes.

11         MR. SHECHTMAN:  No other questions.

12         THE COURT:  Any other cross-examination?

13         MR. MAZUREK:  No, your Honor.

14         THE COURT:  Any redirect?

15         MR. BELL:  No, your Honor.

16         THE COURT:  The witness is excused.

17         (Witness excused)

18         THE COURT:  Government may call its next witness.

19         MR. BELL:  Your Honor before we call our next witness,

20  there is a stipulation we would like to read into the record.

21         THE COURT:  Okay.

22         MR. CAPONE:  I am reading from what is marked as

23  Government Exhibit 1502.  It reads:

24         It is hereby stipulated and agreed by and among the

25  parties that if called to testify, custodians of records from

1   the reference below would testify that

2       1. Government Exhibit 202 contains true and accurate

3   copies of records of the airlines reporting corporation.

4       2.  Government Exhibit 203 contains true and accurate

5   copies of records of Executive Travel Exchange Ltd. depicting

6   trips booked by Jona Rechnitz through Executive Travel

7   Exchange, Ltd. on the dates, airlines and routes indicated in

8   the exhibit and for the costs indicated in the exhibit.

9       3.  Government Exhibit 204 contains a true and

10  accurate invoice from the national event company.

11      4.  Government Exhibit 205 contains true and accurate

12  copies of records of Southwest Airlines.

13      5.  Government Exhibits 206 and 206 A contain true and

14  accurate copies of records of jet select aviation.

15      6.  Government Exhibit 207 contains true and accurate

16  copies of records of Delta Airlines.

17      7.  Government Exhibit 209 contains true and accurate

18  copies of records of Virgin Atlantic Airlines.

19      Government Exhibit 210 contains true and accurate

20  copies of records of Great Seats, Ltd.

21      It is further stipulated and agreed that this

22  stipulation, which is Government Exhibit 1502, as well as

23  Government Exhibits 202 through 207, 209 and 210 may be

24  received in evidence as government exhibits at trial.  Your

25  Honor, the government moves this stipulation, 1502, as well as

 1  Government Exhibits 202 through 207, 209 and 210 into evidence.

 2        THE COURT:  That is in.

 3        (Government Exhibits 1502, 202 through 207, 209 and

 4  210 received in evidence)

 5        MR. BELL:  Your Honor, the government calls Jona

 6  Rechnitz.

 7   JONA SOLOMON RECHNITZ,

 8        called as a witness by the Government,

 9        having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY MR. BELL:

12  Q.  Good afternoon, Mr. Rechnitz.

13  A.  Good afternoon.

14  Q.  Where were you born?

15  A.  Los Angeles, California.

16  Q.  Where do you live now?

17  A.  Los Angeles, California.

18        THE COURT:  Let me ask the witness to lean into the

19  microphone so we can hear you.  Can the jury hear okay?  Keep

20  your voice up.

21  BY MR. BELL:

22  Q.  I will try to lead by example, Mr. Rechnitz.

23        How old are you now?

24  A.  I'm 34 years' old.

25  Q.  Are you married?

1    A.   I am.

2    Q.   Do you have children?

3    A.   Yes.

4    Q.   How many children do you have?

5    A.   Five children.

6    Q.   How would you describe your childhood, sir?

7    A.   Happy childhood, I was blessed with two sets of

8    grandparents, great grandmother who was very involved with my

9    life growing up, good friends, nice family.

10   Q.   And your parents?

11   A.   My parents, yes, I was very close to my parents growing up

12   and still am.

13   Q.   How would you describe the circumstances of your

14   upbringing?

15   A.   Thank God I had a privileged childhood.  I was able to

16   attend private school and went to summer camps, never had to

17   work to help out at home.  Vacationed.

18   Q.   What did your father do for a living?

19   A.   Real estate, real estate developer.

20   Q.   And your mother?

21   A.   Interior decorator.

22   Q.   What was the nature of your father's real estate business?

23   A.   He did mixed used developments, residential and commercial

24   properties for the most part.

25   Q.   Did you understand that business to be successful?

1   A.   Yes.

2   Q.   By what measures was it successful?

3   A.   People would seek his advice often.  We were involved in

4   the community.  I saw my family name in a lot of places of

5   importance.

6   Q.   What did you understand your father's status within the

7   community to be?

8   A.   Prominent.

9   Q.   By what measures?

10  A.   Again he would donate to a lot of causes.  He was involved

11  with many organizations.  He was involved in the community.

12  People would call him all the time for favors and help.

13  Q.   How far did you get in school, Mr. Rechnitz?

14  A.   Masters of science in business marketing through college.

15  Q.   Where did get that degree?

16  A.   Yeshiva University.

17  Q.   Roughly when?

18  A.   2005 or 6.

19  Q.   What did you do after you got that describe from Yeshiva

20  University?

21  A.   I went on to the New York University School of Continuing &

22  Professional Studies, for a graduate certificate in real

23  estate.

24  Q.   Did you finish that certificate?

25  A.   No, I did not.

1    Q.   Did you do anything else at the same time that you were

2    pursuing that certificate?

3    A.   Yes, I was working at Marcus and Millichap as broker's

4    assistant.

5    Q.   What was Marcus and Millichap?

6    A.   A real estate investment firm, a brokerage firm.  I

7    represented buyers and sellers of real estate sales.

8    Q.   What were your job responsibilities while you were a

9    broker's assistant?

10   A.   Anything from pouring coffee to helping draft setups of

11   properties and cold-calling, just calling various landlords and

12   trying to get their business to sell their real estate.

13   Q.   You mentioned setups before.  What are those?

14   A.   They're basically sheets that were sent out on a property

15   giving the description of the property with the for sale

16   information on it.

17   Q.   How long did you have that job with Marcus and Millichap?

18   A.   About a year.

19   Q.   What did you do after that?

20   A.   After that, I went on to work in an existing company Broad

21   Realty.  I opened a Commercial Division called Broad

22   Properties.

23   Q.   What was Broad Properties?

24   A.   Broad Properties was the Commercial Division, the same

25   thing sort of Marcus and Millichap on a much smaller scale.  I

1   tried to start a new group within an existing company.

2   Q.  What were your tasks as you tried to start that new group?

3   A.  I had to build a team.  I had to deal with some HR issues,

4   hire personnel, again cold call and try and get listings,

5   meaning try to get people to sell their real estate and

6   represent them so we can make commissions.

7   Q.  How long did you have that job with Broad Properties?

8   A.  About a year, I think.

9   Q.  Mr. Rechnitz, how would you characterize your lifestyle at

10  that point in your career?

11  A.  I was a newly-married couple.  We were being supported by

12  my father and father-in-law.  I had to submit a budget to them

13  basically showing all my expenses.  They could figure out what

14  my experiences were.  It was like a newly-married couple being

15  supported by parents.

16  Q.  Did there come a time you left Broad Properties?

17  A.  Yes.

18  Q.  Approximately when?

19  A.  I believe it was 2007.

20  Q.  What did you leave Broad Properties to do?

21  A.  I started working for a company called Africa Israel.

22  Q.  What was Africa Israel?

23  A.  Africa Israel was a publicly-traded company on the Tel Aviv

24  Stock Exchange which had a U.S. subsidiary called Africa Israel

25  USA, which was a real estate company.

1    Q.  Is it the subsidiary the entity you worked for?

2    A.  Yes.

3    Q.  What was the business of the subsidiary Africa Israel USA?

4    A.  They were primarily residential luxury developers.  They

5    also got a little bit into the commercial office business, but

6    they would by trophy properties, very expensive properties

7    across New York.

8         They had a couple of investments in South Carolina and

9    Florida, but other than that, primarily in New York and a

10   little in California.

11   Q.  From roughly when to roughly when did you work for Africa

12   Israel USA?

13   A.  2007 until the end of -- until 2011.

14   Q.  What was your first job with Africa Israel USA?

15   A.  I was assistant to the CEO.

16   Q.  Who was the CEO?

17   A.  Rotem Rosen.

18   Q.  What were your responsibilities when you started out

19   working for Mr. Rosen?

20   A.  So it was a very small office at the time.  There were only

21   three or four of us, so we kind of did a little bit of

22   everything.  I attended all the meetings or many important

23   meetings with the CE0.  I would do anything from pour his

24   coffee, get his dry cleaning, to sitting with large developers

25   and negotiating deals and working on a lot of the paperwork

1   that was necessary for deals.

2   Q.  Was there a lot of copy work to do generally in New York

3   real estate?

4   A.  I think so.

5   Q.  Did you advance within that organization?

6   A.  I did.

7   Q.  What was your ultimate job, your final job with Africa

8   Israel USA?

9   A.  I ended up being the director of acquisitions and

10  dispositions for the company.

11  Q.  About when did you become director of acquisitions and

12  dispositions?

13  A.  I think it was in 2009.

14  Q.  What did that work involve?

15  A.  I had the responsibility of selling the company's portfolio

16  as they were starting to liquidate a bit.  The market had

17  crashed and they had paid high prices for the properties which

18  they've owned, and I was in charge of kind of selling the

19  properties and still looking for new opportunities, though most

20  of my efforts were focused on selling for the company.

21  Q.  What sorts of connections did you make during your time at

22  Africa Israel USA?

23  A.  Some very significant connections.  We were a company that

24  had just spent several billion dollars in New York real estate.

25  I was the guy selling that product for less than our cost.

1    There were a lot of people who sought after these properties,

2    and I was the guy they had to deal through, so I made some

3    significant relationships in who's who in real estate.

4    Q.  Did there come a time when you left Africa Israel USA?

5    A.  Yes.

6    Q.  Approximately when?

7    A.  2011.

8    Q.  Why did you leave?

9    A.  Well, we were liquidating, we weren't buying, so I saw the

10   writing on the wall, I felt it was a good time for me to

11   establish my own firm and try and make my own success at that

12   point.

13   Q.  Did you do that?

14   A.  Yes.

15   Q.  What was the firm that you started?

16   A.  It is called JSR Capital.

17   Q.  What did the JSR stand for?

18   A.  The first initial of my name, J for Jona, S for Solomon, R

19   for Rechnitz.

20   Q.  What was JSR Capital's primary day-to-day business?

21   A.  Real estate development, investment, development and

22   management firm.

23   Q.  What sort of real estate properties was JSR Capital

24   involved in in the first few years?

25   A.  We bought a property in the Bronx, medical office building,

1    small asset.  I was very involved in a building called the

2    Apthorp, A P T H O R P, Condominium, it was a residential

3    luxury condo.

4                THE COURT:  You have got to speak up.  We have to make

5    sure the jury can hear.  Lean into the microphone a little bit

6    more.

7                THE WITNESS:  Better?

8                THE COURT:  Yes.

9    A.  Residential luxury condominium, which I was actively

10   involved in buying and selling apartments and syndicating deals

11   in that property.

12               I bought a property in East Village, two townhouses

13   which we turned into 33 rental units, bought a building on

14   Madison Avenue, later on bought a building in Brooklyn, had

15   some other assets.

16   Q.  You have mentioned a number of locations, Mr. Rechnitz,

17   within New York City.  Is it fair so say you were focused on

18   the New York market at that time?

19   A.  Yes, at that point in my career.

20   Q.  Why were you focused on the New York market at that point

21   as opposed to Los Angeles where you had grown up?

22   A.  I was living here.  That was the market I wanted to make my

23   own mark in and I wanted to try to do things on my own rather

24   than just move back and work for my family.

25   Q.  What sort of volume of real estate did you do in your first

1   three or four years at JSR?

2   A.   Pretty significant.  I believe I purchased over a hundred

3   million dollars worth of property.

4   Q.   Can you give us a sense of some of the more prominent

5   properties JSR was involved in.  You mentioned Apthorp?

6   A.   The Apthorp property called 238 Madison, which is a mix use

7   property which has retail tenants on bottom, some restaurants

8   and has residential apartments on top.  We purchased it

9   primarily as a development site for condos.

10          Also the East Village property was a nice deal.  We

11  knocked down again two townhouses, built up a 33 rental,

12  residential rental property building.  In Brooklyn we bought a

13  very prominent property in the heart of Borough Park, which is

14  pretty famous for that neighborhood.

15  Q.   How were you able to obtain the capital to purchase those

16  properties?

17  A.   I worked with investors.  I syndicate my deals.

18  Q.   When you say you syndicate your deals, Mr. Rechnitz, what

19  does that mean?

20  A.   I usually put a little of my own money in, if any, and I

21  raise the rest from friends and family or outside investors.

22  Q.   How involved was your father in that business in the early

23  years of JSR, if at all?

24  A.   He was not, only if I called him for some advice.

25  Q.   Why wasn't he more involved in that?

1    A.   Again I wanted to try to establish myself independently

2    from my father.

3    Q.   Over the first four years or so of JSR Capital, would you

4    say the business was successful?

5    A.   Yes.

6    Q.   By what measures?

7    A.   Whenever I'd get a new deal, it wasn't so hard for me to

8    raise the money from investors.  That was a big indication for

9    me.  I had been written up more positively than recently, but I

10   was written up when I purchased properties, would appear in the

11   real estate publications.  I would be able to call many big

12   players in town, and they'd answer the call, so I measured the

13   success that way.

14   Q.   So you mentioned you measured the success of these in part

15   in terms of positive press, in terms of being written up.  Why

16   was that important?

17   A.   Because that's the way I believed at the time that the

18   world works, if you see your name in press and see it in print,

19   you must be doing well.  If it he says he bought this building

20   and that building, people like to bet on a winner.  If I go to

21   a meeting and show an article I was just written up, it says a

22   lot.

23   Q.   Just to be clear, why was being a winner sort, bet on a

24   winner thing, why was being received as a winner important for

25   business?

1    A.  At the time it was very important to me to grow.  I figured

2    it would take me to the next level.  The more you buy, the more

3    money you make.  If you have good investors and syndicate

4    deals, the more profit split you've got.

5    Q.  What sort of charitable involvement did you have at this

6    point?

7    A.  I had been involved in many charities in my local community

8    and abroad.  I was very young when I was a honored by an

9    organization on a major platform, received an award with

10   Governor Cuomo was there.  In hindsight, I was too young for

11   that, but that is something I did again which I felt advanced

12   my career.

13   Q.  How at all did this sort of specter of charity advance your

14   career?

15   A.  There were a lot of people at dinner, a lot of

16   advertisements in the paper that showed my picture, had a nice

17   bio about me and a movie.  I had fancy offices at the time that

18   were videoed for the dinner.  Again marketing.

19   Q.  How important were the connections you had made at African

20   Israel at this stage of your career?

21   A.  They were significant.

22   Q.  How were they significant?

23   A.  First of all, some of the connections I made ended up

24   investing with me.  There are attorneys I met through that that

25   worked there.  I definitely knew a lot of more brokers in the

1   marketplace that took me very seriously because I was the guy

2   who was at Africa Israel dealing with them.  They felt I dealt

3   with them.  It was some beneficial to my business.

4   Q.  Now, are you familiar with an individual named Jeremy

5   Reichberg?

6   A.  I am.

7   Q.  Who was Jeremy Reichberg?

8   A.  Jeremy was a friend of mine who I met as he was a police

9   liaison.

10          MR. BELL:  I would like to publish perhaps just for

11  the witness --

12          MR. MAZUREK:  No objection.

13          MR. SHECHTMAN:  No objection.

14          (Multiple voices)

15          THE COURT:  It is in.

16          (Government Exhibit 714 received in evidence)

17  BY MR. BELL:

18  Q.  Mr. Rechnitz, your screen is working, right?

19  A.  Yes.

20  Q.  Can you see the individual depicted in what is in as

21  Government Exhibit 714?

22  A.  I do.

23  Q.  Who is that, sir?

24  A.  Jeremy Reichberg.

25  Q.  When did you first meet Jeremy Reichberg?

1    A.  I think I met Jeremy in around 2008 or 2007.

2              THE COURT:  Continue to lean into the microphone.

3              THE WITNESS:  2008 or maybe 2007.

4    BY MR. BELL:

5    Q.  Volume-wise that is perfect.  Thank you.

6              How was it that you came to meet Mr. Reichberg?

7    A.  A mutual friend introduced us.

8    Q.  What were the circumstances of the introduction?

9    A.  So this friend of mine who I was dealing with in Africa

10   Israel had a special license plate on his car that said,

11   "Sheriff."

12             When he came to meet me, he would park wherever he

13   wanted, and that is something I thought was pretty cool.  It is

14   annoying to park in the city.  I said I kind of want one of

15   those, and he told me well, actually, there is a guy I want to

16   introduce you to.  There is a dinner taking place soon at a

17   restaurant with the NYPD football team.  A lot of the

18   higher-ups in the Police Department will be at that dinner, and

19   if you contribute to their cause, they'll recognize you and

20   you'll get to know them and it would mean a lot for you.

21             So I arranged a donation, I think I gave $5,000.00,

22   which is a significant amount of money, something I wanted

23   badly, and I went to the dinner and they presented me with a

24   plaque that said NYPD football team, had my name on it and I

25   started to get to know these guys a little bit and Jeremy.

1  Q.  Did you, in fact, meet Jeremy at that event?

2  A.  Yes.

3  Q.  Tell me about that meeting, what you remember of it.

4  A.  He was very happy with the donation I gave.  It made him

5  look good, made me look good, and we started to become friends

6  after that point.

7  Q.  At that time what did you understand about Mr. Reichberg,

8  about who he was?

9  A.  The liaison for NYPD.

10  Q.  What did you that to mean?

11  A.  I understood at the time he had an official position with

12  the New York Police Department as a liaison, go-between between

13  the Jewish community and the Police Department.

14  Q.  Where did you understand Mr. Reichberg to live?

15  A.  In Brooklyn, Borough Park.

16  Q.  Did you develop a relationship with Mr. Reichberg?

17  A.  I did.

18  Q.  What was the appeal of getting to know Mr. Reichberg

19  better?

20  A.  He had all these connections to police.  At that point,

21  that was something that was very important to me.  I didn't

22  know many people that had connections with police, growing up

23  in Los Angeles, and I thought this would be an awesome tool for

24  me personally and for my business.

25  Q.  What were the reasons that you thought that getting to know

1    somebody who knew the police would be useful to you?

2    A.  Because people like access to things that they don't

3    normally get.  I figured everybody always has an issue with

4    police, it could be a parking ticket, getting pulled over, it

5    could be needing security for something, and if I was the guide

6    they have to go through, that built a certain status and power

7    for me.

8    Q.  Now, at the time that you met Mr. Reichberg, where were you

9    along the career path that we talked about before?  Where were

10   you working?

11   A.  I was rising, I was working for Africa Israel, one of the

12   more senior people there.

13   Q.  Were there aspects of your job at Africa Israel that made

14   getting to know the police appealing?

15   A.  Yes.

16   Q.  What were those?

17   A.  The chairman of the company of Africa Israel was privately

18   in the diamond business, and he had a store on Madison Avenue

19   that had a lot of protestors over the holidays, Valentine's Day

20   and other holidays, that would stand outside of his store and

21   disrupt customers from going inside.

22        This was a big headache for him, and the CEO of Africa

23   Israel wrote him and asked me if there is anything I can do

24   through the police.  He felt they shouldn't be allowed to

25   protest outside of the business.

1          So I brought it to the attention of Jeremy, and he

2     said, you know, there is definitely something we can do.  Why

3     don't you get from the jewelry store a further donation for the

4     NYPD football team.  I did.  I think it was $25,000, a huge

5     amount of money, and he said that he would make sure the

6     problem went away.

7     Q.   Did anything come of that?

8     A.   No.

9     Q.   Now, did this relationship, this early relationship with

10    Mr. Reichberg turn into a lasting connection?

11    A.   It did.

12    Q.   Would you describe your relationship with Mr. Reichberg

13    over the first year or two.

14    A.   Yeah, the relationship improved quickly.  We would speak

15    often.  We would check in probably daily or every other day,

16    and just issues always came up and he was always the guy to get

17    it done.

18    Q.   Over that early period, what did you come to learn of the

19    relationships that Mr. Reichberg had with the NYPD officers?

20    A.   He had very strong relationships.  Even before I came into

21    the picture, I would say anybody who worked in his precinct

22    where he lives or Brooklyn South area was very tight with him.

23    He would call off and went to dinners together every so often.

24    He was on first-name basis with some of these guys.

25    Q.   What sorts of things was Mr. Reichberg able to do with his

1  police connections that you either witnessed or became aware

2  of?

3  A.  First of all, he was able to arrange police escorts if we

4  ever wanted to get a ride in a cop car and beat traffic.

5        One time the chairman of Africa Israel was visiting

6  from Israel, and he landed on his private plane in Teterboro

7  Airport during rush hour.  I called Jeremy and I said what can

8  we do because it would be good for me to impress this guy.  And

9  Jeremy arranged for a private escort.  We got to the Lincoln

10  Tunnel and one of the lanes completely blocked, and just the

11  chairman went to go through the lane by himself.  He got to his

12  hotel in very short time period.

13  Q.  Were you there at the time at the time this happened?

14  A.  I was.

15  Q.  Where were you within in the group that traveled through

16  the Lincoln Tunnel?

17  A.  I rode in one of the cars.  There were a couple of cars in

18  the entourage.

19  Q.  What were you thinking, Mr. Rechnitz, as you rode through

20  the Lincoln tunnel unimpeded?

21  A.  This is good, this will earn me a lot of points.

22  Q.  Did you develop and understanding of how, of what sort of

23  mobilization of police efforts it took in order to shut down

24  that lane of the Lincoln Tunnel?

25  A.  I realized it wasn't just going through one simple

1   procedure because I remembered that the Port Authority which

2   controlled the area until the tunnel which is a shared police

3   responsibility between New York and New Jersey had taken us

4   until the tunnel and waived us off and a NYPD cop car met us

5   right when we left the tunnel.  So it was a couple of different

6   hoops to go through.

7   Q.  Now, what effects, if any, did your relationship with Mr.

8   Reichberg have on JSR Capital's real estate business as it

9   grew?

10  A.  Well, again, there is a lot of people that I introduced him

11  to that I did business with that he helped out, so it was good

12  for me.

13  Q.  What sort of help was Mr. Reichberg able to provide?  Give

14  us an example or two.

15  A.  If somebody had jury duty, he was able to somehow get them

16  off of that.  If somebody got pulled over for a moving

17  violation, somehow he was able to handle that for them so that

18  they wouldn't get points on their license.

19        There were other small procedures, you know?  A few

20  times friends of mine who had funerals, he arranged a police

21  escort to the cemetery and back, things of that nature.

22  Q.  So what I want to do, Mr. Rechnitz, I want to direct your

23  attention now to about the middle of the year, early in the

24  year 2013.  How had your relationship with Jeremy evolved

25  between that early point until 2013?

1   A.  We became very close.  I even gave him space in my office

2   to conduct his business just to give him a place to go to every

3   day.

4   Q.  By that time, Mr. Rechnitz, what did you understand that

5   business to be?

6   A.  He had some expediting work he was doing for some of his

7   clients and people I referred him to.  He was helping people

8   with some of the police stuff.  Before meeting him, I

9   understood that he was somehow related to the diamond business,

10  but once I met him, the only business I saw was expediting and

11  police-related businesses.

12  Q.  Mr. Rechnitz, you mentioned a couple of times there the

13  term expediting.  For the uninitiated here, what did you

14  understand "expediting" to mean?

15  A.  Basically when you want to build or you want to do some

16  construction to property in New York, you need to get the

17  proper permits in place, and some city agencies work very

18  slowly.  So he claimed to know the commissioner and charge fees

19  to clients and got them approved on a much quicker basis than

20  it would have taken in the normal course without the

21  connections.

22  Q.  Now, how did your relationship with the police evolve over

23  that same period of time?

24  A.  Also we became one group.  Jeremy, I would take him out for

25  dinner all the time and we would hang out often and we also

1    became very friendly.

2    Q.  When you say became very friendly with the police, what are

3    we talking about in terms of number of people, ranks?

4    A.  The higher-ups in the Police Department, mostly chiefs and

5    inspectors and captains.

6    Q.  What specific role, if any, did you have as compared to

7    Jeremy Reichberg when it came to dealing with the police?

8    A.  Jeremy would deal with more of the details, if something

9    needed to be done, and I would be the guy to basically pay for

10   it.  For example, if we wanted to go out for dinner, Jeremy

11   would make the arrangement, we would go, and I would pay.

12        If there were details to deal with in getting specific

13   tickets or whatever he needed to get rid of them, I would put

14   him in touch sometimes with people, and if money needed to be

15   paid, I would pay.

16   Q.  What were the sorts of things you paid for for these police

17   at that point?

18   A.  Dinners, meals, holiday gifts, things of that nature.

19   Q.  Now, during the time that you -- you testified a moment ago

20   that you were able to put people in touch with Jeremy.

21        Did you understand that there were services that

22   Jeremy provided via the police or via the city that you weren't

23   involved in?

24   A.  Can you please repeat the question.

25   Q.  Sure.  You testified a few minutes ago, Mr. Rechnitz, that

1    you were able to get associates of yours, business associates

2    in some cases, favors via Mr. Reichberg.  Were there

3    interactions of that sort that Mr. Reichberg had involving

4    people you didn't have -- business that didn't involve you?

5    A.  Yes.

6    Q.  Give me some examples of that.

7    A.  He had people in and out of the office all the time that I

8    didn't recognize.  He was carrying plans after meetings with

9    expediting, people who he told me he was working on cases for

10   them.

11           I didn't really get into the specifics of things that

12   didn't have to do with me, but he was constantly busy on the

13   phone with all different types of people.

14   Q.  You mentioned meals and sporting events and the like with

15   police officials.  Who did you and Mr. Reichberg get closest to

16   among the NYPD's friends?

17   A.  James Grant was a very close friend, Eric Rodriguez, Jimmy

18   McCarthy, at one point Phil Banks, Michael Harrington, Andrew

19   Capool.  David Colon was I think most of the people we became

20   friendliest with.

21   Q.  Let me ask you about a number of those folks beginning with

22   I think you mentioned a Phil Banks.  Who was he?

23   A.  He was the chief of the NYPD.

24   Q.  What did you understand that to mean?

25   A.  He was the highest ranking uniformed officer in the New

1  York Police Department.

2  Q.  Did you come to develop an understanding of where his

3  offices were?

4  A.  Yes.

5  Q.  Where were his offices?

6  A.  At 1 Police Plaza.

7  Q.  There was also I think you made mention of someone named

8  James Grant?

9  A.  Yes.

10  Q.  Who was James Grant?

11  A.  James Grant again was a friend who ended up becoming an

12  inspector in the Police Department.  He had worked in Brooklyn

13  and now works -- well, worked in the Upper East Side.

14  Q.  You also mentioned an individual named Michael Harrington.

15  Who was Mr. Harrington?

16  A.  Yes, Mr. Harrington also was a friend who was the

17  right-hand man to Philip Banks.

18  Q.  Did you have an understanding of what ranks or offices he

19  held?

20  A.  He was a chief.

21  Q.  You mentioned an individual named Eric Rodriguez.  Who was

22  that?

23  A.  Yes, I believe he also was a chief.  He had worked in

24  Brooklyn, also just a friend.

25  Q.  You mentioned, I believe, a McCarthy.  Who was that?

1    A.  He was also a chief.  He had worked in Queens and also was

2    a friend.

3    Q.  You mentioned a Capool, I believe?  Who was that?

4    A.  Andrew Capool, I believe he was a chief.  He was an

5    inspector when I met him.  He also worked in Upper Manhattan,

6    was a friend as well.

7    Q.  I believe that you also mentioned a David Colon.  Who was

8    David Colon?

9    A.  David Colon was a chief as well.  He had worked in

10   Community Affairs with Phil Banks and in the Housing Division,

11   and he was a friend at that time.

12   Q.  Did there come a time when you and Mr. Reichberg became

13   politically involved together?

14   A.  Yes.

15   Q.  How did that first happen?

16   A.  So when Bill Thompson was running for mayor, we were

17   introduced to him through a friend named Fernando Mateo.

18   Q.  Who was Fernando Mateo?

19   A.  Fernando was a part owner of La Marina, which is a

20   restaurant on Dyckman in the Bronx, and he was a spokesperson

21   for the Hispanic Federation of Taxi & Limousine Drivers.

22          He was introduced to us by Chief Colon, and we met

23   with him.  He was a mover and a shaker, and we decided to get

24   into the political game.  We had the police going for us and

25   now it was time to get into politics.

Q.  When you say get into the political game, what were your

and Mr. Reichberg's goals at that point politically?

A.  We'll fell into the whole concept of having power and

connections, and that was very important to me at that time.

Q.  So I think you testified a moment ago that you met

Mr. Mateo when Bill Thompson was running for mayor?

A.  Yes.

Q.  What happened then?

A.  I ended up donating the maximum that we were allowed to,

which was $4,950.00 for me and for my wife as well, and then I

ended up bundling money for Mr. Thompson.  We met him, which

means I reached out to friends and family to support his causes

as well, and we ended up raising a significant amount of money

for his campaign.

                    (Continued on next page)

1    Q.   And you mentioned that you bundled money, I think you've

2    actually just explained that, but just to be clear, what's

3    bundling?

4    A.   Again, bundling is where I get the credit for bringing a

5    big amount, a big chunk of money to the candidate, but I would

6    have to go out and raise that money from family and friends.

7    Q.   What involvement, if any, did Mr. Mateo have with the

8    bundling and donating that you did?

9    A.   So he was supposed to do it on his own, as well, but he was

10   also part of our group, and we were -- we had made it that we

11   would be one powerful group together, between him and us.

12   Q.   So what happened after you donated to and bundled for

13   Mr. Thompson?

14   A.   Unfortunately, he lost the primary.

15   Q.   What happened after Mr. Thompson lost?

16   A.   The winner, who was Bill de Blasio, was the new winning

17   horse, and Fernando came back to us and said:  Guys, we've got

18   to continue.  We built something strong here.  I have an in

19   with Bill de Blasio.  We're going to have respect.  We're going

20   to have attention.  Trust me, I've got the right guy.  I'm

21   going to make a meeting.  Let's get in.

22   Q.   Now, to be clear, at this point, was the mayoral election

23   cycle still going on?

24   A.   Yes.

25   Q.   This was the 2016 cycle?

1    A.   Yes.

2    Q.   And what happened after Mr. Mateo talked up Mr. de Blasio

3    to you and Jeremy?

4    A.   He arranged a meeting in my office with the head fund

5    raiser for Mayor de Blasio, named Ross Offinger.

6    Q.   And what happened during that meeting with Ross Offinger?

7    A.   Fernando, Jeremy and I met with Ross and said, we're one

8    group and we expect a lot of access and influence in the

9    office.  We're going to become significant contributors, but we

10   want access.  And when we call, we want answers.  When we reach

11   out for things, we want them to get done.  It was very

12   important and specifically stated at that meeting.

13   Q.   After that was specifically stated in that meeting, what

14   was Mr. Offinger's response?

15   A.   Okay.  How much do you think you guys can get together?

16   And I had committed at that point, I think I said about 50 to

17   $100,000.

18   Q.   And did Mr. Reichberg and Mr. Mateo make commitments, as

19   well, or was that the group commitment?  What else came out of

20   it?

21   A.   That was my commitment with Jeremy, and Fernando had other

22   obligations and commitments to him, but Fernando was bringing

23   us to the table and sharing the credit of bringing us to the

24   table to Ross.

25   Q.   Now, you mentioned that you wanted access.  When were you

1   expecting to be able to cash in on that deal for access?

2   A.  Could you please repeat the question?

3   Q.  Sure.  You said that you told Mr. Offinger, or that the

4   three of you told Mr. Offinger that you wanted access.  Just to

5   be clear, when were you expecting that access to kick in?

6   A.  From that moment until the mayor won and after the mayor

7   won.

8   Q.  And so what sorts of benefits did you think that you would

9   be able to secure if and when Mr. De Blasio got elected?

10  A.  My mind was limitless.  Jeremy had told me in the days of

11  Giuliani, people made a fortune.  I was focused on making

12  money, getting my name out there, becoming a big player in

13  town.  So I figured maybe I'll buy an office building, and I'll

14  get the City as a tenant.  Maybe I'll need to get special

15  permits to make residential developments.  These types of

16  things occurred in my mind.

17  Q.  What sorts of things, if there were any specific things,

18  did Mr. Reichberg speak to you about being able to do after the

19  election?

20  A.  He told me that we would get on committees, we would get

21  prestige, people would have to go through him to get to the

22  mayor, and there's a lot of money to make doing that.

23  Q.  What did you understand committees to refer to, sir?

24  A.  The inauguration committee, the transition committee, and

25  there were other boards in New York that are prestigious

1  positions.

2  Q.  Were those things appealing to you personally, as well?

3  A.  Pardon?

4  Q.  Were those things appealing to you personally, as well?

5  A.  Yeah.

6  Q.  Why?

7  A.  Because.  I'm in my late 20s or early 30s, and I'm going to

8  be on a board appointed by the mayor of New York.  I thought

9  that was something to be proud of.

10  Q.  Now, did Mr. Reichberg also discuss specific benefits that

11  you may be able to get in the future through your connections

12  with the NYPD?

13  A.  Yes.

14  Q.  What sorts of benefits were discussed?

15  A.  Police chaplaincy.

16  Q.  What did you understand a police chaplaincy to be?

17  A.  That would be basically --

18           THE COURT:  Again, just keep your voice up.

19  A.  That's something which would give me a parking placard so I

20  could park where I wanted.  You get a badge, if you get pulled

21  over.  Things like that.

22  Q.  Now, aside from the benefits that you've just articulated,

23  what did you understand a police chaplain to actually be?

24  A.  A rabbi, a priest.

25  Q.  And were you a rabbi or a priest?

1    A.   No.

2    Q.   To your knowledge, was Mr. Reichberg?

3    A.   No.

4    Q.   What was the reason why you and Mr. Reichberg were

5    discussing chaplaincy, despite your lack of a religious title?

6    A.   Because it's something that we wanted.

7    Q.   Now, did there come a time over that electoral cycle where

8    you developed a relationship with -- well, withdrawn.

9         What fund-raising did you actually do for the

10   de Blasio campaign over the remainder of 2013?

11   A.   I think that we raised Mayor de Blasio the hundred thousand

12   that was promised.

13   Q.   And how did you go about doing that?

14   A.   Again, I gave the maximum of 4,950, my wife did, and then

15   we went to bundle the rest of the money.

16   Q.   In the same way that you had for Mr. Thompson?

17   A.   Yes.

18   Q.   Did there come a time where you developed a relationship

19   with Candidate de Blasio himself?

20   A.   Yes.

21   Q.   Tell us about how that came to be.

22   A.   Soon after I met Ross at the meeting, Bill de Blasio came

23   to my office, spent some nice time with me, gave me his

24   personal cell phone number on the back of his business card,

25   gave me his personal e-mail address, told me to call if there's

1    anything I need, always be in touch, and he really appreciated

2    my support and friendship.

3    Q.  Did you, in the months that ensued, in fact, keep in touch

4    with Mr. de Blasio?

5    A.  Yes.

6    Q.  In what ways and to what degree?

7    A.  I called his cell phone often.

8    Q.  About how often would you say over the course of the

9    campaign?

10   A.  At least once a week, if I have to guess.

11   Q.  What would you talk about?

12   A.  Different issues in the city.  If he Winns, who he should

13   be appointing for certain positions, just talking and getting

14   to know one another.  I e-mailed him on his personal e-mail.

15   We would chat.  I'd go to events of his.  He invited me to

16   events and put me in very good-seated areas.

17   Q.  Would he pick up the phone?

18   A.  Yes.

19   Q.  Return calls?

20   A.  Yes.

21   Q.  Return e-mails?

22   A.  Yes.

23   Q.  During the campaign itself, did you ask Mr. de Blasio for

24   things going forward?

25   A.  Yes.

1  Q.  What sorts of things did you ask for before the campaign

2  was concluded?

3  A.  I asked to be on a committee when he would win mayor, the

4  transition committee, and he said he would get back to me or

5  Ross would get back to me.  Sorry, was your question before he

6  was mayor?

7  Q.  Yes.  Yes, it was.

8  A.  So that was the only thing before he was mayor.

9  Q.  I imagine that the election happened at one point,

10  Mr. Rechnitz.  How did the election work itself out?

11  A.  He won.  He's the mayor of New York.

12  Q.  Were you, in fact, able to get on those committees?

13  A.  He put me on his inauguration committee.

14  Q.  What is it do you understand that to mean?

15  A.  Just a prestigious title.  We had one meeting at the

16  offices of Kramer Levin, where they spoke to us about the

17  inauguration and what it would be about.

18  Q.  Did you do much of anything on that committee?

19  A.  No.

20  Q.  Did you have to?

21  A.  No.

22  Q.  In the weeks after Mr. de Blasio's electoral victory, what

23  sort of a relationship did you have with Mr. Offinger?

24  A.  He would call whenever they needed money, or I would call

25  him whenever we had an issue.

1   Q.  Let's take those one at a time.  When he called, what was

2   the nature of your response?

3   A.  I was the yes man.  I always gave money, as long as I was

4   seeing him produce results.

5   Q.  And what happened when you would call Mr. de Blasio in the

6   weeks when he was mayor elect?

7   A.  He took my calls.  I mean, we were friends.

8   Q.  You mentioned that you got appointed to the inauguration

9   committee.  What, if anything, happened with Mr. Reichberg

10  after the election?

11  A.  He was appointed as well.  I wanted to be on the transition

12  committee, but they didn't want to put Jeremy on; so I said,

13  then I'm not going to go on.

14  Q.  Did you develop an understanding of why they didn't want to

15  put Jeremy in the transition committee?

16  A.  They said that he was a name that was getting published in

17  the papers, and they wanted diverse criteria of individuals on

18  it, and that he didn't meet the criteria.

19          MR. BELL:  Now, I want to publish and perhaps simply

20  offer Government Exhibit 702.

21          THE COURT:  So are you offering it?

22          MR. BELL:  One moment.

23          MR. SHECHTMAN:  No objection, your Honor.

24          MR. MAZUREK:  No objection, your Honor.

25          MR. BELL:  I kind of figured.  In that case, your

1    Honor, we offer 702.

2                THE COURT:  Okay.  It's in.  You may publish that.

3                MR. BELL:  Can we publish that?

4                THE COURT:  Yes.

5                (Government's Exhibit 702 received in evidence)

6                THE COURT:  Hold on.  Does the jury have it?

7                MR. BELL:  I think the speed is getting faster.

8    BY MR. BELL:

9    Q.  Mr. Rechnitz, what are we looking here, at Government

10   Exhibit 702?

11   A.  This was a photo that was taken at one of Bill de Blasio's

12   events.

13   Q.  Can you walk us through who we see?

14   A.  Fernando Mateo, Jeremy Reichberg, Mayor de Blasio and me.

15   Q.  Now, after the election took place, to your knowledge, what

16   became of Mr. Offinger?

17   A.  He was the head fund raiser for Mayor de Blasio.

18   Q.  And did he, in fact, have the sort of pull within City Hall

19   that you hoped for?

20   A.  Yes.

21   Q.  How did you come to realize that?

22   A.  Whenever we would call him for access or for a favor, we

23   were getting the response that we expected and the results we

24   were expecting.

25   Q.  What sorts of things did you call for for Mr. de Blasio

1    just in the weeks after the election?

2    A.   Over time, after he won.

3    Q.   After he won, then going into 2014, what sorts of things

4    did you call Mr. Offinger for?

5    A.   Many things.  There was a property in Ocean Parkway, which

6    a friend of mine owned, and he called me to tell me that they

7    tried to sell the building previously, but there was a local

8    police precinct that had previously identified that property as

9    a desirable property for the new precinct they were building.

10           And there's some law in this city that if a police

11   precinct designates your property, they kind of get a shot to

12   match whatever offer you have from a potential purchaser.  And

13   they were in deep negotiations to sell that property and wanted

14   to make sure that -- they heard rumors that the Police

15   Department was interested in that property.

16           So I called Ross, and I told him to find out and to

17   get an immediate answer if this is a property that was on the

18   agenda of the Police Department.

19           My wife's cousin had a school in the east side, which

20   she was closing up at the end of the school year, and after

21   many years of occupying that property, she received a notice

22   that she had to close a month earlier due to some code

23   deficiency.  And I had Jeremy deal with the details with Ross,

24   but it was very important to get them to delay the closing of

25   her school by a month.

1          I asked him to put a friend of mine on a committee for

2   the City of New York.

3   Q.   What did you understand that to be, Mr. Rechnitz?

4   A.   I don't understand your question.

5   Q.   What did you understand the committee for the City of

6   New York, the entity you mentioned a moment ago, to be?

7   A.   Some committee where he's a representative for the City of

8   New York.

9   Q.   Okay.

10  A.   A friend of mine had an issue with some water bill on a

11  property.  Jeremy spoke to Ross about fixing that issue.

12          Important to me was, on one of my properties on

13  Madison Avenue, I had an issue.  I was getting a lot of

14  violations from the city in reference to Airbnb.  Airbnb is

15  basically when a landlord or a tenant rent out their apartment

16  on a nightly basis.  So contractually, I had rented an

17  apartment to a tenant of mine.  He was then renting it out on a

18  nightly basis and earning income.

19          The problem with that is if it's being operated as a

20  hotel, and I'm an apartment building, my building is not up to

21  code, for example not enough sprinklers, as if it was a hotel

22  use.  And I was getting violations in the thousands of dollars,

23  and I didn't think that was fair.  So I called Ross, and I told

24  him I wanted him to get me in front of the people who make

25  these decisions so that I don't have to keep paying these

1    expensive violations.

2    Q.  Now, I want to direct your attention back to 2013 just for

3    a moment.  Did you and Jeremy form similar relationships with

4    local politicians, other local politicians, with respect to

5    bundling and such?

6    A.  Yes.

7    Q.  Who else did you fund raise for?

8    A.  We fund raised for --

9           THE COURT:  Again, lean into that microphone.

10   A.  We gave or -- well, we gave to Senatore Espaillat, some

11   local counsel people, and Rob Astorino.

12   Q.  Who was Rob Astorino?

13   A.  He was the county executive of Westchester County.

14   Q.  And did you get to know him personally?

15   A.  Yes.

16   Q.  How were you introduced?

17   A.  Fernando Mateo.

18   Q.  Where did you first meet him?

19   A.  In my office.

20   Q.  And what happened during that meeting?

21   A.  We met with Rob.  Fernando lived in his district and

22   introduced us, told him that we're movers and shakers, and we

23   have the ability to financially back him.  He had some talks at

24   that time that maybe he was one day going to run for Governor

25   and that it was a good guy to know.

1          And we met with him and Jeremy, or I told him of our

2   desire.  We thought this was a good opportunity, that he could

3   appointment us maybe, or get us our chaplainship that we

4   desired, to become police chaplains for Westchester County.

5   Q.  Now, to be clear, Mr. Rechnitz, where did you live at that

6   time?

7   A.  Manhattan.

8   Q.  Did you have anything to do with Westchester County?

9   A.  No.

10  Q.  To your knowledge, did Mr. Reichberg?

11  A.  No.

12  Q.  Was it your expectation that you'd be able to get

13  chaplaincies, notwithstanding that fact?

14  A.  Yes.

15  Q.  So what did Mr. Astorino say to you?

16  A.  He said that he will talk to George Longworth, who is the

17  commissioner of the Police Department of Westchester County,

18  and that he would be in touch with us.

19  Q.  What was your extent -- what was the extent of your

20  involvement in Mr. Astorino's fund-raising?

21  A.  I raised some money for him, and I donated to him as well,

22  I think $15,000, which is significant for a county executive

23  race.

24  Q.  And did you, in fact, apply to become chaplain?

25  A.  What do you mean apply?

1    Q.  Well, did you become chaplain?

2    A.  Yes.

3    Q.  And what did that mean to you, becoming a chaplain?

4    A.  It meant that I got my parking placard.

5    Q.  Let me ask a better question.  What did becoming chaplains

6    involve?

7    A.  I didn't have to do anything.

8    Q.  Now, other than fund raising, did you do other favors for

9    Mr. Astorino?

10   A.  I did.

11   Q.  Can you tell me about that?

12   A.  Yes.  He came to my office one day.  He had known that my

13   office was on 47th Street, which is the heart of the Diamond

14   District and watches, and he brought me a picture of a watch

15   and asked me if I can find that watch for him, that he wanted

16   to buy it.  It was a Rolex, and I told him I'm happy to give it

17   to him; he doesn't have to buy it.

18              And I called down to the -- to one of the stores that

19   I dealt with and asked them if they had the watch in stock and

20   how much it was.  They said that they did, and I told him I

21   want to buy it for him, and he told me that he couldn't take it

22   as a gift.  He had to pay something because that wouldn't be

23   allowed.  It was a 7 to $10,000 watch, if I remember correctly.

24   And I said:  How much do you want to pay?  And he said -- it

25   came out, either I told him or he told me, he paid one to

1   $2,000, and I covered the rest of the watch.

2   Q.  Now, during the time that you fund raised -- that you,

3   rather, Mr. Reichberg and Mr. Mateo fund raised for de Blasio

4   and Astorino, did you take any action to circumvent the

5   campaign contribution limits at that time?

6   A.  I did.

7   Q.  What did you do?

8   A.  I worked with what's called straw donors.

9   Q.  What did you do with straw donors?

10  A.  A couple of people in my office, I had them write checks,

11  because I wasn't allowed to give more than 4950, and I

12  reimbursed them for those donations.

13  Q.  How many times did you do that?

14  A.  A handful.

15  Q.  Did you get bundling credit for those donations?

16  A.  I did.

17  Q.  Was there a reason that you did that, other than the

18  bundling credit?

19  A.  I did it for the credit.  When I told Ross I'm going to

20  raise him a certain amount, I had a lot of pressure from him to

21  bring that amount in.  So many times when he was even in my

22  office, I would tell them hold on.  I would go and get a few

23  checks from people and then bring them in.

24          MR. BELL:  Your Honor, I have about five minutes left

25  and I think we'll reach a logical break for the day.  Is that

1    okay?

2              THE COURT:  Yes.  Go ahead.

3              MR. BELL:  Thank you, your Honor.

4    BY MR. BELL:

5    Q.  Mr. Rechnitz, I want to very briefly switch gears before we

6    conclude for the day.  Are you testifying today pursuant to an

7    agreement with the government?

8    A.  Yes.

9    Q.  Pursuant to that agreement, have you pled guilty to any

10   crimes?

11   A.  I have.

12   Q.  What have you pled guilty?

13   A.  To conspiracy to commit honest services fraud.

14   Q.  At the time that you pled guilty to conspiracy to commit

15   honest services fraud, did you admit to certain conduct?

16   A.  I did.

17   Q.  And what kinds of conduct did you admit to?

18   A.  Three buckets of conduct I admitted to.

19   Q.  Tell us about the three buckets of conduct.

20   A.  The first is buying gifts and giving gifts to public

21   officials and police in exchange for favors.  The second one

22   was giving money to the mayor of New York in exchange for

23   favors.  And the third was participating in a bribe scheme

24   between hedge funds and Norman Seabrook.

25   Q.  And when you say participate in a bribe scheme, maybe it

 1   makes sense to start with that bucket.  What was it that you

 2   actually did?

 3   A.   I introduced Norman to the hedge fund.  I negotiated the

 4   terms of the amount of money that Norman would be paid for

 5   investing in that fund, and I physically paid him for that

 6   investment.

 7   Q.   And when you say Norman, who are you referring to?

 8   A.   Norman Seabrook.

 9   Q.   Is Mr. Seabrook in the courtroom today?

10   A.   He is.

11   Q.   And can you identify him perhaps by location and an item of

12   clothing?

13   A.   He is sitting in the second table in a gray suit.

14        MR. BELL:  Your Honor, recognizing the defendant,

15   Mr. Seabrook.

16        THE COURT:  Okay.

17   Q.   Who else, other than you and Mr. Seabrook, was involved in

18   what you describe as that bribe scheme?

19   A.   Murray Huberfeld.

20   Q.   Who was he?

21   A.   He was a friend of mine who was the head of the hedge fund.

22   Q.   I'll just ask you to speak up, sir.

23   A.   A friend of mine who was the head of the hedge fund.

24   Q.   And what was Mr. Huberfeld's involvement in this scheme?

25   A.   He was the one I negotiated with, and he is the one who

 1    reimbursed me for the payment I made to Norman.

 2    Q.  Is Mr. Huberfeld in the courtroom today?

 3    A.  He is.

 4    Q.  And can you identify him by location and what he's wearing?

 5    A.  He's at the same table as Norman, in a navy suit.

 6         MR. MAZUREK:  So is mine.

 7    Q.  There are a number of navy suits there.  Could you be a

 8    little more specific there?

 9    A.  A striped navy, striped tie, white lines.

10         MR. BELL:  Your Honor, identifying Mr. Huberfeld.

11         THE COURT:  Okay.

12    Q.  Now, with respect to that kickback conspiracy, can you tell

13    us what you specifically did in order to facilitate that bribe

14    scheme?

15    A.  I made a cash payment of $60,000 to Norman, and I was

16    reimbursed for laying out that money by Platinum with a fake

17    Knicks tickets invoice for $60,000.

18    Q.  How was the agreement behind the scheme reached?

19    A.  Pardon?

20    Q.  Was there an agreement in order for that payment to happen?

21    A.  Yes.

22    Q.  Who was the agreement between?

23    A.  I was the middleman, go-between between Murray Huberfeld

24    and Norman Seabrook.

25    Q.  And when you say you were the middleman, what do you mean

1    by that?

2    A.  I'm the one who introduced them.  I'm the one who

3    negotiated the amount that Norman would be paid from Murray,

4    and I'm the one who dealt with that aspect of their dealings

5    until investments were made.

6                MR. BELL:  One moment, your Honor.

7    Q.  You mentioned an entity called Platinum, what was that?

8    A.  Hedge fund.

9    Q.  And what did you understand Mr. Huberfeld's relationship to

10   the hedge fund to be?

11   A.  The head of the fund, one of the partners.

12   Q.  And, finally, Mr. Rechnitz, you mentioned that you and

13   Mr. Huberfeld had been friends.  How far back did you know him?

14   A.  Well, when I was a child, we often vacationed over the

15   holidays in similar places, but I really got to know him when I

16   was living in New York.

17               MR. BELL:  Your Honor, that may be a logical place to

18   break for the day.

19               THE COURT:  Okay.  Members of the jury, we're going to

20   break for the day.  Let me give you the usual instruction.

21   Again, do not read anything about this case.  If you see

22   anything about this case in writing, stop reading it.  Do not

23   listen to anything about this case.  If you are to hear

24   anything over the radio or television or internet about this

25   case, stop listening.

1          Do not do any independent research regarding any of

2     the issues or people involved in this case.  Do not talk to

3     anyone about this case.  Don't allow anyone to talk to you.

4          The other thing is for tomorrow, in terms of

5     scheduling, we're going to go a little bit shorter tomorrow.

6     We're going to break at 2:00 tomorrow.  So it is very important

7     that you get here at 9:00 a.m.  Not only for tomorrow but going

8     forward it's important to get here at 9:00 so that we can start

9     on time.  Okay?  So please get here at 9:00 a.m.  No one is

10    going to be upset if you get here at 8:45.  That's fine, too.

11    Let's try to get here at 9:00 and no later than 2:00 tomorrow.

12    Have a wonderful evening, and we'll see you tomorrow.

13          (Jury not present)

14          THE COURT:  Okay.  You can be seated again.  Let's

15    give the jurors a three-and-a-half minute head start.

16          (Pause)

17          MR. BELL:  Your Honor?

18          THE COURT:  Hold on.  I mean, we have a witness here.

19    The witness is here.  I don't know if we should discuss this in

20    front of the witness.

21          MR. BELL:  Can we discuss something very quickly in

22    the robing room then?  It's a little unusual, given that the

23    jury is not here, but I think it's important, and it's time

24    sensitive.

25          THE COURT:  Okay.

1          (At the side bar)

2          THE COURT:  Okay.

3          MR. CAPONE:  Your Honor, obviously, there are a number

4     of sensitivities, given the different families and everything

5     involved.  There's a report that I got from Mr. Kalter's

6     counsel that he was sort of accosted outside earlier by

7     somebody, not physically, but verbally.  I just ask, before the

8     audience leaves, that the Court let the witness leave and get

9     out of here.

10         MR. BELL:  He's been subject to some number -- some

11    amount of contact from folks, known and unknown, over the last

12    few weeks that I think is further animated by what Mr. Capone

13    just related; so we'd really appreciate it.

14         THE COURT:  Defense have any thoughts on that?

15         MR. SHECHTMAN:  Perfectly happy to let him go, Judge.

16    I have to say, I don't think the reports are true, but I'm

17    perfectly happy to let him go.

18         THE COURT:  To the extent that you can disclose it, is

19    the witness being escorted out by anyone or anything like that?

20         MR. BELL:  Yes, your Honor.

21         THE COURT:  Okay.  So I mean, the witness can leave

22    out through this back door, if that's easier.

23         MR. BELL:  Let's do that.

24         THE COURT:  I'll let the witness go a little earlier.

25         MR. SHECHTMAN:  That's fine.

1          THE COURT:  In fact, we'll let the witness go first

2     out this back way.

3          MR. BELL:  Great.  Thank you, your Honor.

4          THE COURT:  I guess while we're back here, is there

5     anything else we need to discuss?

6          MR. BELL:  I don't think so, your Honor.

7          MR. SHECHTMAN:  Nothing, your Honor.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Okay.  So we're back on the record.  So

3    the witness can be excused.  You can go out that way, and

4    everyone can sit down.  Everyone can sit down.

5          In terms of scheduling for tomorrow, obviously, this

6    witness is on the stand.  Do we have a sense of how long it's

7    going to take?  The direct of this witness may very well take

8    all day tomorrow, but where are we in terms of the government's

9    estimate for the rest of the direct?

10          MR. BELL:  I think there's a fair chance that it takes

11   us through the rest of the day tomorrow, and I've got a pretty

12   good sense that even if it does not, the cross-examination

13   will.  So I expect Mr. Rechnitz to be the sole witness that

14   takes us through the rest of -- well, the week is tomorrow, so

15   the rest of the week.

16          THE COURT:  Okay.  Just so I'm aware of where we are

17   scheduling-wise, who's next after Rechnitz?  How much is left?

18          MR. BELL:  As one might expect, after Mr. Rechnitz,

19   the witnesses come a little faster.  There are a number of FBI

20   agent witnesses who are short.  There are a small handful of

21   other representatives of the union, who are of modest length,

22   certainly compared to Mr. Rechnitz.  But this is, I think, the

23   part where things start to snowball some and pick up in pace.

24          THE COURT:  Okay.  Anything else from the defense on

25   any of this?

1          MR. SHECHTMAN:  No.

2          MR. MAZUREK:  No.

3          THE COURT:  All right.  I'll see counsel here

4     tomorrow.  Let's get counsel here at 8:50, just to avoid any

5     unnecessary bumping into jurors.  All right.  I'll see you.

6          (Adjourned until October 27, 2017, at 9:00 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

GILAD KALTER

Direct By Mr. Capone . . . . . . . . . . . . 399

Cross By Mr. Mazurek . . . . . . . . . . . . 461

Cross By Mr. Shechtman . . . . . . . . . . 507

Redirect By Mr. Capone . . . . . . . . . . . 510

MICHAEL JOY

Direct By Mr. Bell . . . . . . . . . . . . . 522

Cross By Mr. Shechtman . . . . . . . . . . 532

JONA SOLOMON RECHNITZ

Direct By Mr. Bell . . . . . . . . . . . . . 535

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

659   . . . . . . . . . . . . . . . . . . . 410

713   . . . . . . . . . . . . . . . . . . . 415

1016   . . . . . . . . . . . . . . . . . . 416

1022   . . . . . . . . . . . . . . . . . . 422

710 and 704   . . . . . . . . . . . . . . . 424

1034, 1038, 1046, 1049, 1050, 1057, . . . . . 438

        1060, 1068, 1069, 1070 and

        1080

1079   . . . . . . . . . . . . . . . . . . 446

1002, 1003, 1106, 1007 and 1041   . . . . . . 516

1301 through 1306   . . . . . . . . . . . . 526

1    1502, 202 through 207, 209 and 210    . . . . 535

2    714    . . . . . . . . . . . . . . . . . 547

3    702    . . . . . . . . . . . . . . . . . 568

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25