HARPSEA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                              16 Cr. 467 ALC

5   NORMAN SEABROOK AND MURRAY HUBERFELD,

6            Defendants.

7   ------------------------------x

8

9

10                                          October 27, 2017
                                            9:00 a.m.
11

12

13  Before:

14                HON. ANDREW L. CARTER, JR.,

15                                          District Judge
                                              and a jury
16

17

18                          APPEARANCES

19  JOON H. KIM,
         United States Attorney for the
20       Southern District of New York
    KAN MIN NAWADAY,
21  MARTIN BELL,
    RUSSELL CAPONE,
22       Assistant United States Attorneys

23

24

25

HARPSEA1

APPEARANCES (Continued)


BRACEWELL, LLP,
        Attorneys for defendant Seabrook
BY:  PAUL LEWIS SHECHTMAN, Esq.
        MARGARET EMMA LYNAUGH, Esq.
                Of counsel


MAZUREK LIPTON, LLP
        Attorneys for defendant Huberfeld
BY:  HENRY EDWARD MAZUREK, Esq.
        EVAN LOREN LIPTON, Esq.
                Of counsel


Also Present:
        BARD HUBBARD, Special Agent FBI
        YOLANDA BUSTILLO, Paralegal USAO
        AUGUSTA GRANQUIST, Paralegal




        (Trial resumed; jury not present)

        THE COURT:  Okay.  Please be seated.  We're just

waiting for the jury to get here.  Hopefully, they'll all be

here soon.  I just want to check with counsel.  Anything we

need to deal with this morning?

        MR. BELL:  No, your Honor.  We have, in an effort to

help the sound situation, propped a copy of the Federal Rules

of Criminal Procedure beneath the witness' microphone to raise

it up a couple of inches.  I don't think he'll learn much

1   within it while he's up there, but hopefully it will help.

2             THE COURT:  Anything else?

3             MR. SHECHTMAN:  No.

4             THE COURT:  Okay.  We'll wait for the jury to get

5   here.

6             MR. MAZUREK:  Okay.  Judge, we're just going to do the

7   same today, 11:30 to 12:00 break?

8             THE COURT:  Yes.  That's the plan.  We'll try to go to

9   11:30, but if there's a different place to stop before then, we

10  need to go to at least 11:00.  The plan is to go to 11:30, then

11  stop, take a 30-minute break, 35-minute break.

12            MR. MAZUREK:  And then 12:00 to 2:00?

13            THE COURT:  Yes.

14            MR. MAZUREK:  Okay.

15            (Recess)

16            THE COURT:  Okay.  Let's get the witness in.  The jury

17  is all here.

18            (Jury present)

19            THE COURT:  Okay.  Please be seated.  Welcome back.  I

20  hope you had a pleasant evening.  Let's continue with the case

21  on trial.  Go ahead, counsel.

22            MR. BELL:  Thank you very much, your Honor.  Before we

23  get started with Mr. Rechnitz, I want to read a stipulation for

24  the record.  The stipulation has been marked as Government

25  Exhibit 1504 for identification.

1          It is hereby stipulated and agreed between the parties

2     that:

3          1.  Bank records.  If called to testify, custodians of

4     records of the following banks would testify that the following

5     are true and accurate records of those banks during the time

6     periods referenced in the records.

7          Government Exhibits 101 and 102 contain records,

8     respectively, of:

9          One.  Hudson Valley Bank, account number 1700468301,

10    in the name Corrections Officers' Benevolent Association, Inc;

11         Two.  Hudson Valley Bank, account number 1700933241,

12    in the name of Corrections Officers' Benevolent Association,

13    Inc.;

14         Three.  Government Exhibits 103 and 104 contain

15    records, respectively, of, one, Sterling National Bank, account

16    number 0370610447, in the name Platinum Management New York

17    LLC; and, two, Sterling National Bank, account numbers

18    0370610463 and 370610519 in the name Platinum Partners Value

19    Fund (International) Limited, during the time periods

20    referenced in the records.

21         Government's Exhibit 104A contains records of wire

22    transfers relating to Sterling National Bank, account No.

23    370610519.

24         Four.  Government Exhibit 105 contains records of

25    Citibank, account number 4986185504, in the name JSR Capital

1      LLC.

2              Five.  Government Exhibits 106, 107 and 108 contain

3      records, respectively, of:  1.  JP Morgan Chase Bank, account

4      number 935161794, in the name JSR Capital, LLC; 2. JP Morgan

5      Chase Bank, account number 6301277006, in the name Norman

6      Seabrook; and 3. JP Morgan Chase Bank, account number

7      6302298716, in the names Susan Seabrook and Norman Seabrook.

8              Six.  Government Exhibit 109 contains records of TD

9      Bank, account number 3452397661, in the names Susan Seabrook

10     and Norman Seabrook.

11             Interstate wires.  Seven.  If called to testify, an

12     employee of the New York Federal Reserve Bank would testify

13     that:

14             Eight.  On March 3rd, 2014, a wire transfer of

15     $10 million was made through the Federal Reserve wire system

16     from the bank account of the Corrections Officers' Benevolent

17     Association at M&T Bank, account No. 1040571, to the bank

18     account of Platinum Partners Value Fund International, Limited,

19     at Sterling National Bank, account No. 370610519.

20             This wire transfer funds traveled interstate through

21     the Federal Reserve wire system through Federal Reserve

22     facilities in both Texas and New Jersey.

23             Nine.  On June 5th, 2014, a wire transfer of

24     $5 million was made through the Federal Reserve wire system

25     from the bank account of the Corrections Officers' Benevolent

1  Association at Hudson Valley Bank, account No. 1700933241, to

2  the bank account of Platinum Partners Value Fund International

3  Limited at Sterling National Bank, account No. 370610519.  This

4  wire transfer funds traveled interstate through the Federal

5  Reserve wire system through Federal Reserve facilities in both

6  Texas and New Jersey.

7              Ten.  On August 7th, 2014, a wire transfer of

8  $5 million was made through the Federal Reserve wire system

9  from the bank account of the Corrections Officers' Benevolent

10  Association at M&T Bank, account No. 1040571, to the bank

11  account of Platinum Partners Value Fund International Limited

12  at Sterling National Bank, account No. 370610519.  This wire

13  transfer fund traveled interstate through the Federal Reserve

14  wire system, through Federal Reserve facilities in both Texas

15  and New Jersey.

16              It is further stipulated and agreed that the

17  stipulation, which is Government Exhibit 1504, as well as

18  Government Exhibits 101 through 109, may be received in

19  evidence as Government Exhibits at trial.

20              It is signed and dated by the parties -- signed by the

21  parties and dated October 23rd.  Your Honor, at this time, the

22  government offers the stipulation, 1504, as well as 101 through

23  109.

24              THE COURT:  Okay.  They're in.  Go ahead.

25              (Government's Exhibits 1504, 101 through 109 received

1    in evidence)

2    JONA SOLOMON RECHNITZ,

3         called as a witness by the Government,

4         having been previously duly sworn, testified as follows:

5    DIRECT EXAMINATION (Resumed)

6    BY MR. BELL:

7    Q.  Good morning, Mr. Rechnitz.

8    A.  Good morning.

9    Q.  We left off yesterday with some conversation about conduct

10   that you admitted to at the time that you pled guilty to honest

11   services fraud conspiracy; do you remember that?

12   A.  Yes.

13   Q.  At that time, you mentioned what it was that you did in

14   order to facilitate the kickback between Mr. Seabrook and

15   Mr. Huberfeld.  Do you recall that testimony?

16   A.  Yes.

17   Q.  At the time, I believe you mentioned among the things that

18   you did, was that you helped to negotiate the kickback.  Do you

19   recall that?

20   A.  Yes.

21   Q.  Mr. Rechnitz, what did you mean by negotiate?

22   A.  I acted as the middleman.  I introduced Norman to Murray.

23   I was a messenger between the two of them to discuss the

24   payment terms of the kickback, and I physically made the cash

25   payment on behalf of Murray to Norman.

1    Q.  I believe that around about that same time you discussed

2    the relationships that you had with -- that you and Jeremy

3    Reichberg had with a number of NYPD officers and officials; do

4    you recall that?

5    A.  Yes.

6    Q.  I believe, at the time, you also described the

7    relationships as friendships.  Do you recall that?

8    A.  Yes.

9    Q.  For what purpose did you cultivate these friendships?

10   A.  As I think I explained, it was to gain power, to gain a

11   reputation, and to build that aspect of my career.

12   Q.  As part of that, did you expect certain things from these

13   partners in friendship in return?

14   A.  Yes.

15   Q.  We'll talk about that a bit more later.  The precise point

16   where we left off was in talking about the circumstances under

17   which you pled and your agreement with the government.

18           What I'd like to do now, Ms. Bustillo, if we can, is

19   publish to you what has been marked for identification as

20   Government Exhibit 1601.

21           MR. BELL:  Actually, I might like to offer this if

22   there's no objection.

23           THE COURT:  Is there any objection?

24           MR. SHECHTMAN:  None, Judge.

25           MR. MAZUREK:  No, your Honor.

1          THE COURT:  Okay, that's in.

2          (Government's Exhibit 1601 received in evidence)

3          MR. BELL:  Can we publish it to the jury then?  Thank

4    you.

5          If the jury could just indicate if they see it.  I

6    know it's the first one of the day.  It may take a while.

7    Thank you.

8    BY MR. BELL:

9    Q.  Now, Mr. Rechnitz, do you recognize that document?

10   A.  I do.

11   Q.  What is it?

12   A.  This is the cooperation agreement that I signed with the

13   U.S. Department of Justice.

14   Q.  Ms. Bustillo, can we turn to the last page of that

15   document?  Why don't we actually just flip through a page at a

16   time very briefly, second page, third page, fourth page and

17   fifth page.

18          Mr. Rechnitz, do you see signatures on that last page?

19   A.  I do.

20   Q.  And are you familiar with whose they are?

21   A.  Yes.

22   Q.  Whose are those?

23   A.  I signed it, my attorneys Allen Levine and Laura Birger,

24   the chief of the criminal division for the U.S. Attorney's

25   Office, Daniel Stein, and Russell Capone on behalf of Martin

1   Bell, Russell Capone and Kan Nawaday.

2   Q.  Okay.  Thank you.  You can take that down, Ms. Bustillo.

3         Now, what is your understanding of what you're

4   supposed to do pursuant to your agreement with the United

5   States government?

6   A.  I'm supposed to tell the truth and not commit any further

7   crimes and testify when called upon by the government.

8   Q.  And did you also plead guilty as part of that same

9   agreement?

10  A.  I did.

11  Q.  And when you say that you're supposed to testify truthfully

12  as called upon, does that include today?

13  A.  Yes.

14  Q.  Do you expect to testify at further proceedings after this

15  as of right now?

16  A.  Yes.

17  Q.  And what further proceedings do you expect to testify in?

18  A.  The United States v. --

19        MR. SHECHTMAN:  Judge, this one, I think, calls for an

20  objection.

21        THE COURT:  Sustained.

22        MR. BELL:  May I raise this -- you know, I may raise

23  this at a later point and come back to it for sidebar, but for

24  purposes of time, I think I'll move on from it for the moment.

25  BY MR. BELL:

1    Q.   Now, what is your understanding of what the government

2    would do for you, if you meet those conditions of the

3    cooperation agreements?

4    A.   They'll provide what's called a 5K letter.

5    Q.   What's a 5K letter?

6    A.   To my sentencing judge at my sentencing, which is a letter

7    describing all of the crimes I've committed, all of my conduct

8    and all of my cooperation from the date I signed the agreement,

9    and all of my conduct from that time as well.

10   Q.   And what would the purpose of that 5K letter be?

11   A.   It would be in the hopes of leniency for me at sentencing.

12   Q.   Now, have you been sentenced yet in connection with your

13   honest services fraud conspiracy plea?

14   A.   No.

15   Q.   Do you have an understanding of the maximum possible

16   penalty you face as a result of what you pled guilty on?

17   A.   Yes, I'm facing 20 years of imprisonment.

18   Q.   Now, who is it that decides what sentence you're going to

19   get?

20   A.   The sentencing judge.

21   Q.   To your knowledge, is the government going to recommend a

22   particular sentence in this 5K, if you get one?

23   A.   No.

24   Q.   What sentence do you hope to get as a result of your

25   cooperation?

1    A.  I hope a no-jail sentence.

2    Q.  To your understanding, does the actual outcome of this

3    trial have any impact on what sentence you get?

4    A.  No.

5    Q.  What does impact whether or not the government will write

6    that 5K letter, to your understanding?

7    A.  If I comply with the terms and I tell the truth and do not

8    commit any further crimes.

9    Q.  Mr. Rechnitz, what, to your knowledge, happens if you are

10   found to be untruthful in your testimony?

11              MR. MAZUREK:  Your Honor, object to lack of foundation

12   for this witness.

13              THE COURT:  Overruled.  Go ahead.  You may answer.

14   A.  Can you repeat the question, please?

15   Q.  Sure.  Mr. Rechnitz, to your understanding, what happens if

16   you are found to be untruthful in your testimony today?

17   A.  Then the government would rip up my agreement, and the 5K

18   would say that I lied and did not follow the rules and I did

19   not comply with the cooperation agreement that I signed.

20   Q.  In that case, what situation do you face without the letter

21   actually detailing your cooperation?

22   A.  In addition to the crime that I pled to, I think

23   obstruction of justice.

24   Q.  What's your understanding of what you would face at that

25   point with respect to the honest services fraud conspiracy?

1    A.  Additional charges besides the 20 years that I would be

2    facing.

3    Q.  Now, we left off at a place yesterday, Mr. Rechnitz, where

4    I think you had characterized them as buckets, three buckets of

5    conduct that you admitted to at the time of your plea.  Do you

6    remember that?

7    A.  Yes.

8    Q.  So I want to return to those now.  You testified about

9    facilitating a kickback between Murray Huberfeld and Norman

10   Seabrook.  Who was Murray Huberfeld?

11   A.  He was a friend of mine, and he was the head of the hedge

12   fund.

13   Q.  How did you first get to know Mr. Huberfeld?

14   A.  As I said, we used to travel to similar destinations for

15   vacations for the holidays, but I was reintroduced to him when

16   I was living in New York at a later part of my life.

17   Q.  And you mentioned that Mr. Huberfeld was associated with a

18   hedge fund.  What hedge fund did you understand Mr. Huberfeld

19   to be associated with?

20   A.  Platinum Partners.

21   Q.  Did you ever understand Platinum Partners to be known by

22   any other name?

23   A.  Yes.

24   Q.  What was that?

25   A.  Centurion.

1  Q.  And what was your understanding of the relationship between

2  Centurion and Platinum?

3  A.  I think Centurion later on became Platinum.

4  Q.  Now, what is your understanding of what it was that

5  Platinum Partners business actually was, what products or

6  services did they actually offer?

7  A.  They were in the hedge fund business.  I understood them to

8  offer two products, a credit fund and a value arbitrage fund.

9  Q.  What, if anything, did you understand the difference

10  between those two products to be?

11  A.  That the credit fund was a more conservative fund, focused

12  more on hard money loans with better collateral.  Whereas, the

13  value arbitrage fund was riskier than the credit fund.

14  Q.  Now, who was Norman Seabrook?

15  A.  Norman was also a friend introduced to me, I think in 2013,

16  by Phillip Banks.

17  Q.  At the time that you facilitated the kickback, what was the

18  nature of your relationship with Mr. Seabrook?

19  A.  We had met earlier on that year, and we developed a pretty

20  close relationship to that point in time.

21  Q.  So we'll come back to Mr. Huberfeld and Mr. Seabrook

22  momentarily.  Let's address one of the other buckets.  You

23  testified that you bestowed -- withdrawn.

24       You testified that you admitted at the time of the

25  plea to bestowing gifts on certain law enforcement officers

1   with the understanding that they would do things for you in

2   their official capacity.  Do you recall that?

3   A.   Yes.

4   Q.   Who were these law enforcement officials?

5   A.   Philip Banks, James Grant and Michael Harrington.

6   Q.   So it makes sense, perhaps, to touch on each of those.  I

7   think you started on this yesterday, but who is Philip Banks?

8   A.   Philip Banks was the chief of the NYPD.

9   Q.   How did you come to know him?

10  A.   Jeremy Reichberg introduced me to him, and we were

11  introduced to him through Michael Harrington.

12  Q.   And what was it that you did for Chief Banks as part of the

13  conduct that you described earlier?

14  A.   I gave him gifts, I took him and paid for meals, took him

15  on several trips, domestic and international, and paid for them

16  as well.

17  Q.   What can you tell us about the meals, how frequent they

18  were, the nature of the meals?

19  A.   They were either weekly or biweekly for an extended period

20  of time.

21  Q.   What can you tell us about sort of all of your costs of the

22  meals?

23  A.   We went to the finest kosher establishments in New York.

24  Q.   You also, I think, mentioned gifts.  What sort of gifts did

25  you get for Chief Banks?

1    A.  I gave him a championship ring that belonged to Muhammad

2    Ali that I had purchased because he was a big fan.  I gave him

3    a beautiful backgammon table that I had bought him.

4    Q.  Why backgammon?

5    A.  It's a game that he enjoyed and I enjoyed.

6    Q.  Did you ever play him in backgammon?

7    A.  Yes.

8    Q.  Where?

9    A.  In his office and in my office.

10   Q.  Now, what favors or benefits did Mr. Banks provide for you

11   in his capacity as chief of the department, or as an NYPD

12   Chief, perhaps I should say?

13   A.  First of all, I had access.  I'd meet him in his office on

14   a regular basis.  He let me park in his private spot in the

15   garage.  I spoke to him about promoting a specific officer,

16   which he ended up promoting, and he allowed me to call the

17   officer to give him the good news.

18   Q.  Who was that officer?

19   A.  James Grant.

20   Q.  We'll get back to that in a moment, but I didn't want to

21   interrupt your answer.  Were there other favors or benefits

22   that Chief Banks provided in his Chief capacity?

23   A.  I mean, having the relationship with him was very

24   beneficial for me within the Police Department.  I was known as

25   one of his close guys in his inner circle, and it opened doors

1   for me.

2   Q.  What sorts of doors did it open?

3   A.  If there was any cop that Jeremy or I would call, they

4   understood that we carry weight, and they were very helpful.

5   Q.  You also mentioned a moment ago an individual named James

6   Grant.  How is it that you got to know James Grant?

7   A.  Jeremy had been friends with him for a while, for a couple

8   of years before I entered the picture and introduced me to

9   James Grant.

10  Q.  And who did you understand grant to be at the time?

11  A.  A captain with the NYPD.

12  Q.  Over the course of the time that you knew him, did he

13  ascend in rank?

14  A.  Yes.

15  Q.  What did you understand there?

16  A.  Jeremy and I really spoke to Phil Banks on a regular basis

17  about promoting him and transferring him to a better police

18  precinct, which indeed did happen.  He became an inspector.

19  Q.  Did you have reason to believe that you and Jeremy were

20  responsible for that?

21  A.  Yes.

22  Q.  And what reason?

23  A.  Phil allowed us to tell him the good news, and he said:  I

24  took care of your boy.

25  Q.  Now, what was it that you did for James Grant as part of

1    the conduct that you described earlier, the conduct that you

2    admitted at the time that you pled?

3    A.   When James went on a family trip, I think with his wife and

4    kids, to Italy, I paid for his hotel stay.  I gave -- Jeremy

5    and I gave his family gifts on the holidays, and also took

6    James to some meals, and I flew him and treated him to a trip

7    to Las Vegas and, as well, to Florida.

8    Q.   Now, let me ask a couple of questions about each of those.

9    A.   I -- actually, I think I misspoke.  I don't think I took

10   him to Florida.

11   Q.   Okay.  With respect to the trip to Rome, just to be clear,

12   did you attend that trip?

13   A.   No.

14   Q.   How was it that you went about making arrangements?

15   A.   I went through a hotel service that prepays for the stay.

16   Q.   What did you understand about the quality of the

17   accommodations that you got for Mr. Grant?

18   A.   I believe that it was a five-star hotel.

19   Q.   You also mentioned gifts for Mr. Grant and his family, I

20   believe.  Can you give us some examples of those?

21   A.   Yeah.  We bought some video games and like Nintendo or Xbox

22   for the kids.  His wife, Jeremy had given his wife -- he had a

23   collection of some jewelry that he gave.  He gave a piece to

24   his wife.  I think that was on two occasions.

25   Q.   You also mentioned some meals.  Can you tell us about the

1    nature of the meals?

2    A.   Yeah.  Again, we went to some kosher restaurants together

3    every once in awhile.

4    Q.   You also mentioned a trip to Las Vegas.  Approximately when

5    did that take place?

6    A.   I believe it was in 2013 or '14.

7    Q.   What were the circumstances of the trip?

8    A.   I was going to Las Vegas to watch the Super Bowl with my

9    friends from Los Angeles, as I had done in the past, and Jeremy

10   asked me if he could come along with James and some other

11   people.  I explained to him if he does, I'm not going to be

12   watching the game with them or hang out with them, but I'm

13   happy to give them a ride there because I chartered a private

14   plane, which I paid for.

15   Q.   About how much did the plane trip cost you?

16   A.   I think round trip was around $50,000.

17   Q.   Did Mr. Reichberg indeed join you on the trip?

18   A.   He did.

19   Q.   Who did he bring with him?

20   A.   He brought James Grant, Michael Melici, and a prostitute.

21   I don't remember her name.

22   Q.   To the best of your knowledge, who arranged for the

23   prostitute?

24   A.   Jeremy.

25   Q.   To the best of your knowledge, who paid for her services?

1    A.  Either Jeremy or my friends who was with us, Marco.

2    Q.  And who was Marco?

3    A.  Marco was a friend.  His name is Marco Franco.  He was a

4    friend of mine and Jeremy's, and as I understand, Jeremy and

5    him coordinated together.

6    Q.  So did that constitute the traveling party and the flight

7    to Las Vegas?

8    A.  Yes.

9    Q.  What happened on the flight to Las Vegas?

10   A.  I had not been feeling well that day.  I think I had the

11   flu, and I was already kind of annoyed Jeremy was coming along

12   with the cops because I didn't want to insult them by not being

13   with them on the trip.  So they came on the flight, and I was

14   sitting across from Marco.  Jeremy was next to me.  The cops

15   kind of switched off, and the prostitute was sitting on the

16   couch.

17        And at one point in the flight, when I had woken up, I

18   had saw that the cops were not fully clothed on the back of the

19   plane with the prostitute, and I didn't want them to be

20   embarrassed in front of me; so I just closed my eyes and tried

21   not to watch the whole situation.  I did not see anything

22   specific going on besides that.

23   Q.  Now, once you got to Las Vegas, what happened for the

24   remainder of the weekend?  Did you spend time with the other

25   individuals you had flown out with?

1    A.  No.

2    Q.  What was the lodging situation?

3    A.  So I was at the MGM and I had a -- what's called the sky

4    loft, which is a two-floor room.  There were two rooms on the

5    top and one or two rooms on the bottom.  Marco had another room

6    in the hotel that he shared with the woman who came along

7    and -- well, it was Marco or one of the cops, I don't remember.

8    I just know Marco wasn't in my room, and I slept upstairs in

9    one room.  Jeremy was in another room upstairs, and the cops

10   stayed downstairs.

11   Q.  How much did you see of Jeremy and the cops for the

12   remainder of the weekend?

13   A.  I barely saw them.  I watched the Super Bowl with my

14   friends from Los Angeles, and I made them arrangements to

15   watch, in a totally separate hotel and area that I was in.

16   Q.  When you say made arrangements, did you pay for that?

17   A.  Yes.

18   Q.  Why did you make and pay for separate arrangements?

19   A.  Jeremy asked me to arrange a viewing for them for the Super

20   Bowl.

21   Q.  Do you recall what accommodations you came up with for

22   them?

23   A.  Yeah.  There was a private suite in one of the sports

24   books, I think it was in MGM, where they got tickets to watch

25   the Super Bowl.

1    Q.  Did there come a point in the weekend where you returned?

2    A.  Yes.

3    Q.  Did you return on the private jet?

4    A.  Yes.

5    Q.  Do you recall who came with you?

6    A.  I think it was the same group.

7    Q.  Did anything of note happen on the flight back?

8    A.  No.  Everybody seemed to be exhausted.

9    Q.  What happened when you returned to the East Coast, if

10   anything?

11   A.  I got in my car and I went home.  Everybody went their

12   separate ways.

13   Q.  Now --

14   A.  I want to clarify.  I don't know if it was my car or a car

15   service or if I got a ride with one of the people there.

16   Q.  Okay.  Now, this all, of course, came up in the context of

17   your describing favors and benefits that you provided to

18   Mr. Grant.  During the period of time where you were providing

19   him with these favors and benefits, what favors and benefits

20   did he provide in his capacity as a police official?

21   A.  First of all, he gave me rides on several occasions to the

22   airplane in his official car, with lights and sirens, to beat

23   traffic.

24          There were incidents where there were some private

25   disputes that friends of mine had, and he intervened to help,

1    such as, at one time in the diamond business, someone had not

2    returned a stone to a partner of mine, or a friend of mine; so

3    I called Jeremy and James Grant helped rectify the situation.

4          He gave me special access sometimes at parades that he

5    was working at, to kind of park where I wanted and enter the

6    parade like a VIP, as if I was one of the cops.  Stuff like

7    that.

8    Q.  Now, are these favors or benefits you would have expected

9    to receive had you not been supplying Mr. Grant with gifts

10   during that same period of time?

11   A.  No.

12   Q.  The same question as to Mr. Banks, are the favors and

13   benefits that you got from him favors or benefits that you

14   would have expected to receive had you not been supplying him

15   with gifts during that same period of time?

16   A.  No.

17   Q.  You also, sir, mentioned Michael Harrington.  Who was

18   Mr. Harrington?

19   A.  I had met Michael Harrington before he became the

20   right-hand man to Chief Banks, also through Jeremy.  He ended

21   up a chief in the department.

22   Q.  What sort of relationship did you have with Mr. Harrington?

23   A.  Also close.  He was one of our, I'd say, closest contacts

24   in the Police Department.  Jeremy would speak to him, I think,

25   on a daily basis.  I would try and speak to him two or three

 1   times a week, as well.  We'd check in with each other, see

 2   what's going on.

 3   Q.  What was it that you did for Chief Harrington as part of

 4   the conduct that you admitted to when you pled guilty?

 5   A.  He went to Chicago, with I think family members of his, and

 6   I footed the bill for his hotel stay.  And we also, on the

 7   holidays, brought similar-type gifts to him and his family.

 8   Q.  During that same period of time --

 9   A.  I'd just like to correct.

10   Q.  Oh, sure.

11   A.  I don't think we gave him a gift, just his family members.

12   Q.  All right.  Can you tell us -- I believe, were there meals

13   in there?  Did you mention meals?

14   A.  We went out weekly to the fine kosher restaurant

15   establishments.  We had meals all the time.

16   Q.  Who paid for those meals?

17   A.  I did.  We also went to cigar lounges, which I was a member

18   of, with Chief Banks as well.  It was me, Jeremy, Mike and

19   Phil, and many times Norman was there as well.

20   Q.  Who paid for whatever there was to be paid for at the cigar

21   establishments?

22   A.  I did.

23   Q.  Now, during that same period of time, what favors or

24   benefits did Mr. Harrington provide in his capacity as the

25   police official?

A.  He also gave us access to parades and VIP access to events

in Times Square.  For the new year, he let us drive as close as

we could, got us in to special areas, things like that.

Q.  Are these favors or benefits you would have expected to

receive had you not been supplying Mr. Harrington with gifts

during that same period of time?

A.  No.

Q.  You mentioned, I believe yesterday, an individual among the

police officials you knew named Dave Colon.  Do you recall that

testimony?

A.  Yes.

Q.  Who was Mr. Colon?

A.  He was a chief in the Police Department.  I believe he

worked in community affairs with Philip Banks, and ended up in

housing.

Q.  What was the nature of your relationship with Mr. Colon?

A.  He was one of the relationships that Jeremy had introduced

me to.  Dave Colon, also, I believe I paid for a hotel for his

daughter's birthday.  He called me once for her sweet 16, and

Dave introduced me to a fellow named Hamlet Peralta.

Q.  And who is Mr. Peralta?

A.  Hamlet Peralta was an individual who presented himself to

me as a liquor distributor, wholesale distributor.

Q.  So we'll get back to Mr. Peralta in just a little bit.

Now, you'd mentioned, I think in the initial part of your -- of

1  an earlier question, a trip to Florida that you testified you

2  did not bring Mr. Grant to.  Was this a trip to Florida

3  involving police officials?

4  A.  Yes.

5  Q.  When did that trip to Florida take place, approximately?

6  A.  It was for the BCS Championship, which is the NCAA

7  equivalent of the football Super Bowl.  I believe it was in

8  2013.

9  Q.  Just so we can officially peg a time stamp on that, do you

10  remember who played?

11  A.  Notre Dame.

12  Q.  Do you remember how it went for Notre Dame?

13  A.  I believe they lost.

14  Q.  And who did you bring on that trip?

15  A.  So Jeremy came with me, Steve McAlister, Betty Gardner,

16  Andrew Capul, his son, and one of the ways on the trip, Jimmy

17  McCarthy.

18  Q.  And just as a general matter, I don't know that we need to

19  go up and down the roster there, but who were these folks,

20  other than Mr. Reichberg?

21  A.  Jim McCarthy was a Chief in the Police Department.  Andrew

22  Capul was an inspector and Eddy was retired from the Police

23  Department and Steve was no longer with the Police Department.

24  Q.  Did you pay for travel to Florida?

25  A.  I did.

1   Q.  Did you pay for accommodations?

2   A.  I did.

3   Q.  What else, if anything, did you pay for, as far as the BCS

4   trip?

5   A.  A suite to watch the game, to the food, everything from A

6   to Z on that trip.

7   Q.  Did you also pay for entertainment in any way?

8   A.  Yes.

9   Q.  For whom?

10  A.  For the cops.

11  Q.  And what was the nature of the entertainment?

12  A.  Prostitutes.

13  Q.  Was that on one evening or more?

14  A.  No, only one evening.

15  Q.  Okay.  Now, stepping away from that bucket of conduct for

16  the moment, you also testified in a third bucket that you gave

17  campaign donations to, and I believe that you characterized it

18  as to Bill de Blasio, with the understanding that you'd be able

19  to influence matters in city government.  Do you recall

20  testifying about that bucket?

21  A.  Yes.

22  Q.  Now, at whose specific behest, at whose specific ask did

23  you make these donations?

24  A.  For the most part, Ross, but the mayor himself called me on

25  one occasion.

1  Q.  Okay.  And when you say Ross, who are you referring to

2  there?

3  A.  Ross Offinger, the fund raiser for the mayor.

4  Q.  Just once again, how was it that you came to know

5  Mr. Offinger?

6  A.  He was introduced to me through Fernando Mateo.

7  Q.  So getting specific here, Mr. Rechnitz, what donations did

8  you make at the behest of Mr. Offinger and/or Mr. de Blasio at

9  this time?

10  A.  I bundled money, as we discussed yesterday.  I donated and

11  my wife donated the maximum that we were allowed to personally.

12  I gave him a $50,000 check for the CONY, which was the Campaign

13  for One New York, which I understood at the time was for the

14  united pre-K program, and then I gave him $102,000 for the --

15  to keep the Senate democrats in control at the request of the

16  mayor himself.

17  Q.  So can you tell us about the circumstances of that last

18  donation?  First of all, when did it take place, roughly?

19  A.  Again, I think it was 2013 or 2014.

20  Q.  Was Mr. de Blasio the mayor yet?

21  A.  He was.

22  Q.  About how long would you say he had been the mayor at that

23  point?

24  A.  Probably within the year.

25  Q.  Up until the point of the donation for the Senate

1    democrats, how would you characterize your relationship with

2    Mr. Offinger and the administration?

3    A.   I was known.  We were in constant contact.

4    Q.   How did the donation to the Senate democrats first come up?

5    A.   Ross asked me to participate, and if I can participate in a

6    significant way.  I told him no.  I'm out on this one.  I

7    believe I even e-mailed him that, besides telling him in

8    person.  I had been frustrated that we had a lot of requests

9    and issues on the table that we had called about that weren't

10   being attended to in a timely fashion.  And then I said, you

11   know, I have not even heard from the mayor in a while.  All you

12   do is you come here when you need money.

13   Q.   What were the -- can you give me some of the examples of

14   some of the items that had frustrated you to that point leading

15   to that response?

16   A.   Sure.  Primarily, the Airbnb issue that I talked about,

17   about the building that I owned 238 Madison.  The city agencies

18   move very slow.  I had asked Ross for a long time to get me in

19   touch with the right people so I can have the right forum to

20   discuss why the rule is wrong.  I paid all my violations, and I

21   was getting sick and tired of it.  And I wasn't get the proper

22   forum or attention that I wanted.

23        There were some other matters that we discussed

24   yesterday that were also moving slowly.  For example, getting

25   in touch with DCAS, one of the departments in the city for the

1   Ocean Parkway property.  I wasn't getting the right contact and

2   it wasn't moving quick enough for my liking.

3   Q.  Once you raised this to Mr. Offinger, what response did you

4   get from him?

5   A.  He said, well, you know, you can always call the mayor.

6   I'm happy to get the mayor on the phone with you.  This is

7   really important to him.  Then, in fact, the mayor and I spoke,

8   and the mayor told me that it would mean a great deal to him.

9   It would be very significant to him if I could help out in this

10  campaign; so I did.

11          Once the mayor called me, I felt it's a personal favor

12  for him, and I'm going to come through.  And if he asks me to

13  do what I can, I asked him what's the maximum I'm allowed to

14  donate to you, Mr. Mayor.  He said, you can talk to Ross.  I

15  think it's 102,000, and that's exactly what I did.

16  Q.  How did you go about making that donation, like what were

17  the mechanics of it?

18  A.  I spoke to some partners of mine on the property that we

19  own, and I cut that check and I gave it to Ross.

20  Q.  Was the check from you personally?

21  A.  No.

22  Q.  Who was the check from?

23  A.  It was from an entity, JSTD Madison, LLC.

24  Q.  And what is that entity?

25  A.  It stands for Jona Siance Tally Diamonds, LLC, which is an

1  entity that we have, which owns the building located at 238

2  Madison Avenue.

3  Q.  What happened after you made that donation?

4  A.  Ross got a lot of the issues that I brought up to him

5  attended to.  He made me specific meetings with the city to

6  discuss the Airbnb issue, and he got me answers in terms of the

7  Ocean Parkway property.

8  Q.  Now, you've mentioned with respect to these various buckets

9  of conduct your relationships with political figures and with

10 the police, and I believe that you testified yesterday that you

11 participated in these schemes with Mr. Reichberg?

12 A.  Correct.

13 Q.  Were there favors or benefits that Mr. Reichberg got as a

14 result of these relationships that did not involve you

15 specifically?

16 A.  I believe so.

17 Q.  What of those were you aware of?

18 A.  He was dealing with all sorts of different people and

19 issues on his own.  I remember seeing him carrying plans about

20 some developments in Brooklyn and other such issues that he was

21 dealing with.  I was not so much involved in his own personal

22 dealings with other people.

23 Q.  How about with respect to the police officers?

24 A.  Same thing.

25 Q.  You mentioned earlier, by the way, your having been

1  involved with the diamond business.  Yesterday you testified, I

2  believe, that JSR Capital's primary day-to-day business was in

3  real estate development and resale.  What involvement did you

4  have with diamonds at this time?

5  A.  A lot of my investors are from the diamond business.  My

6  former employer was a very substantial diamond dealer, and my

7  office was located on 47th Street, which is the diamond

8  district; so I dabbled a lot in jewelry and diamonds.  I would

9  buy and sell.  I would, for my friends, once in awhile get them

10  what they wanted, and it was one of my sources of income.

11  Q.  How significant a source was it compared to JSR's other

12  businesses?

13  A.  Not too significant.

14  Q.  And so setting aside the diamonds and setting aside JSR

15  Capital's primary business in real estate, was JSR Capital

16  involved in other businesses?

17  A.  Yes.

18  Q.  What other types of business?

19  A.  Hard-money lending.

20  Q.  Mr. Rechnitz, what is hard-money lending?

21  A.  It's making loans to entities or individuals at higher

22  than -- higher interest rates than a normal bank would be

23  offering.  For example, if somebody wanted to borrow on their

24  home and paying a mortgage, they'd be paying anywhere from

25  three to five percent on their money.  We were charging two to

1   four percent per month.

2   Q.  What sort of a timeline, if any, tends to distinguish

3   hard-money lending?

4   A.  Pardon?

5   Q.  What sort of timeline were these loans generally; were they

6   short-term, long-term, or was there no real --

7   A.  They were short term, but they were continuous.

8   Q.  And what do you mean by that?

9   A.  I entered this type of business with two individuals and it

10  was over a couple-year course period.  They were short-term

11  loans, but I kept relending them and bringing them new loans

12  month after month.

13  Q.  What kinds of hard-money lending enterprises did you become

14  involved in?

15  A.  I was involved in securing loans for Hamlet Peralta, who we

16  spoke about, who ran a -- at the time, which I thought was a

17  wholesale liquor distribution, and also brought funding and

18  investments and loans to a company called The National Event

19  Company, which was a wholesale secondhand broker ticket company

20  for sporting and concerts.

21  Q.  So I want to ask you about each of those.  We might as well

22  begin with the wholesale liquor business.  You mentioned that

23  you came to know an individual named Hamlet Peralta.  How did

24  you meet Mr. Peralta?

25  A.  Chief David Colon, who we spoke about earlier, introduced

1    Jeremy and I to him.  He vouched for him.  He had told us that

2    he had invested with him and that he was good people.

3    Q.  Who did you understand Mr. Peralta to be, professionally?

4    A.  I understood him to be the owner of a restaurant called The

5    Hudson River Cafe in Harlem, the owner of a retail liquor store

6    on 125th Street, and the owner of liquor warehouses in Long

7    Island and in Harlem, and he told me that he was able to

8    purchase --

9              MR. MAZUREK:  Objection, hearsay.

10             THE COURT:  Overruled.  Go ahead.

11   A.  And he told me that he was able to purchase liquor at

12   heavily discounted prices, at wholesale pricing, and resell

13   them to the marketplace at somewhere in between wholesale and

14   retail for tremendous markups.

15   Q.  Was there a point where you became involved in Hamlet

16   Peralta's liquor business?

17   A.  Yes.

18   Q.  About when would you say that happened?

19   A.  I think it was in 2013.

20   Q.  How did you happen to get involved in that wholesale liquor

21   business?

22   A.  So after Dave Colon introduced us and vouched for us, we

23   had met with Hamlet in my office with Dave, Hamlet, Jeremy and

24   I was there.  And I told Hamlet I would give him a shot, let's

25   see how this thing works, and I asked him how much money he was

1    looking for.  He said $250,000.

2                So what I did was I went to one of my partners in the

3    diamond business.  I told him about the opportunity, that

4    Mr. Peralta had requested a loan for six weeks, was the

5    turnaround time for him to purchase the liquor and resell it

6    and that he would be paying six to eight percent return just

7    for that six weeks, and let's start off that way.  And if it's

8    successful, we'd go into another deal.  That is what we did.

9    Q.  Who was your friend?

10   A.  I believe that deal was Martin Klein.

11   Q.  And how much money do you recall -- well, sorry.  Do you

12   recall those being the terms upon which Mr. Klein got in?

13   A.  Yes.

14   Q.  At the time, did you invest any of your own money?

15   A.  No.

16   Q.  What happened with respect to that first investment?

17   A.  He paid that like clockwork at the six-week period to

18   Martin, and he also gave Jeremy and I a fee for raising the

19   capital, which Jeremy and I split as well.

20   Q.  Do you recall how much the fee was?

21   A.  I believe it was also six to eight percent.

22                (Continued on next page)

23

24

25

1    Q.  Was Mr. Klein, to your knowledge, aware of that fee?

2    A.  Yes.

3    Q.  How do you know he was aware?

4    A.  I told him.

5    Q.  What happened after that first loan went through to

6    success?

7    A.  Then I went to another partner who is part of the same

8    circle as Martin and I, who was also another partner of ours

9    named Yaro Turgemon from Taly Diamonds, and he did a loan as

10   well for $250,000, six weeks, the same deal, and the same thing

11   happened.  It was paid back like clockwork.  He got his fee and

12   I got my cut with Jeremy that we split.

13   Q.  Was Mr. Turgemon aware you were getting a cut?

14   A.  I think he was, but I am not sure.

15   Q.  What happened after that second lending arrangement came

16   through?

17   A.  We were starting to feel pretty comfortable with Hamlet.

18   He had kept his word in regards to half a million dollars of

19   payments, so we continued forward and the numbers grew.

20   Q.  In what way did you continue forward and how did the

21   numbers change?

22   A.  We entered many more deals.  It ended up I think at a

23   million dollars a deal or half a million dollars a deal.  We

24   continued for another year.

25   Q.  Who were the folks investing in Mr. Peralta's liquor

1   business over that period of time?

2   A.  Friends of mine, partners of mine, family.

3   Q.  Did you yourself invest in Mr. Peralta's liquor business?

4   A.  Yes.

5   Q.  How much did you invest?

6   A.  I put in $150,000.

7   Q.  What was your hope with respect to the $150,000 that you

8   invested?

9   A.  That I would be repaid like everyone else.

10  Q.  You mentioned I think that these were personal contacts

11  that you brought in as part of the investment.  Can you give me

12  a sense of who these people were?

13  A.  Very close friends.

14  Q.  Was there family as well?

15  A.  Yes.

16  Q.  What was your hope with respect to their investments?

17  A.  That they would also receive their money back like

18  clockwork, with profit and everybody would be able to make

19  money.

20  Q.  How did these investments work out over the course of those

21  next few months?

22  A.  They worked out until it didn't.

23  Q.  When did they not?

24  A.  I believe it came to the summertime or the fall of 2014.

25  Q.  What happened in the summer or fall of 2014?

A.  Mr. Peralta stopped paying us.  He was giving excuses.  I

believe he bounced a check a couple of times.  Then he had been

arrested for assault and some tax violations, and we were

starting to get very nervous.

Q.  Why were you starting to get nervous?

A.  Because it is one thing not to pay back on time with a good

excuse, but the excuses didn't stop, and then I saw he was

behaving reckless.

Q.  What, if anything, did you do at that point in order to try

to secure repayment from Mr. Peralta?

A.  First of all, I referred him to an attorney to handle his

assault charges.

Q.  Why did you do that?

A.  Because he had promised to pay me that week, and he was in

a holding cell at that point, and I needed him out because I

had commitments back to the people who loaned him based on his

commitment to me.

        I gave him access to one of my attorneys to try and

help him settle a civil dispute he was having over my

collateral which was Hudson River Cafe which I found out there

was a lawsuit going on.

Q.  What was your understanding of the lawsuit involving the

cafe?

A.  That someone claimed that that was their restaurant, not

really his, as he had told me and as he had signed the

1   collateral to me.  I purchased a life insurance policy on him

2   which is known as a key man policy.

3   Q.  What is a key man policy?

4   A.  A key man policy, which I believe is a standard practice,

5   is a policy that investors take on the person they're investing

6   with when it is a one-man show, one-man business, in the event,

7   God forbid, something happens to him, he has a health disaster,

8   that at least though we are not going to get profit, at least

9   our investment is covered since the whole business relies on

10  him.

11  Q.  Why did you purchase key man insurance as to Mr. Peralta at

12  this point?

13  A.  I was nervous he was reckless.  Once he got arrested for

14  assault, I didn't know that side of him and I was nervous what

15  if somebody does something to him, what if he gets in a fight,

16  what if he gets killed, what if he has a heart attack from the

17  pressure.  I didn't know what was going on.  I wanted to be

18  more secure in my investments.

19  Q.  I think you mentioned a moment ago the key man policy was

20  when businesses depended on one person.  Was it your

21  understanding Mr. Peralta was, in fact, a key man in his own

22  business?

23  A.  Yes.

24  Q.  Did you understand there to be anyone else involved in the

25  business that you, your friends and your family had invested

1    in?

2    A.  No.  The only person I understood to be involved, he told

3    me his sister had worked for him in the liquor store where he

4    sold some of the merchandise.

5    Q.  Did you understand that to be a prominent role within the

6    business that you had invested in?

7    A.  Not at all.

8    Q.  Why?

9    A.  He told me she was an employee running the store for him.

10   Q.  Was that the only time that you purchased key man insurance

11   with respect to one of your business interests?

12   A.  No.

13   Q.  On how many other occasions do you recall purchasing key

14   man insurance?

15   A.  I remember attempting to purchase it on another hard money

16   loan that we did, and there was a business I was involved with

17   where someone tried to purchase it on me.

18   Q.  Can you tell us a little bit about the process of getting

19   that key man insurance with respect to Mr. Peralta.

20   A.  Yes.  First of all, Mr. Peralta had to agree to it because

21   that is one of the requirements of the insurance company.

22   Second of all, he has to go through a medical exam and they

23   have to establish his health at the time.  Then he has to

24   assign the policy to me.  He was the one who was involved with

25   dealing with the actual details of the policy.

1   Q.  Were all of those conditions met?

2   A.  Yes.

3   Q.  How did you go about convincing Mr. Peralta to sign onto

4   the policy?

5   A.  I asked him.  I told him I'm not comfortable, and he said

6   okay.

7   Q.  Now, ultimately, Mr. Rechnitz, what happened with the

8   liquor investment?

9   A.  Unfortunately, we got duped, and he was charged with

10  running a Ponzi scheme, and he was convicted in court and --

11  Q.  When you say "we got duped," what was your understanding of

12  the relationship between the Ponzi scheme and the business you

13  had invested in?

14  A.  We then understood the business we invested in wasn't

15  really purchasing liquor with our money or the amounts of

16  liquor, rather they were or or Hamlet was using our money to

17  pay other investors.

18          MR. MAZUREK:  May I ask for a time-frame when this was

19  discovered?

20          THE COURT:  Sure.  The time-frame?  When did this take

21  place?

22          THE WITNESS:  I read about him becoming a Ponzi --

23  BY MR. BELL:

24  Q.  Do you recall when you read about Mr. Peralta being a

25  Ponzi?

1   A.  I think it was 2015.

2   Q.  Now, did you personally lose money as a result of the

3   investment in Mr. Peralta's business?

4   A.  Yes.

5   Q.  How much did you lose?

6   A.  I lost I think it was $500,000.

7   Q.  Was that all money that you yourself had invested directly?

8   A.  No.  I had invested 150,000, and I decided to give back

9   some money to some family and friends.

10  Q.  Why did you dot you do that?

11  A.  I felt responsible.  They knew nothing about the investment

12  or liquor business.  I was just trying to do them a favor.

13  Q.  Now, were you aware at the time that you recruited these

14  friends and family that there was reason for a Ponzi-like

15  concern?

16  A.  No.

17  Q.  When you did recruit investors to Mr. Peralta, were you

18  ever less than honest with them?

19  A.  No.  Pardon?  Repeat that.

20  Q.  Sure.  At the time, going back now to the time you

21  recruited investors to Mr. Peralta, were you ever less than

22  honest with any of them?

23  A.  Yes.

24  Q.  With who specifically?

25  A.  My friend Michael who invested a great deal of money into

1    the liquor business.

2    Q.  What was Michael's full name?

3    A.  Michael Weinberger.

4    Q.  How much did he, to your understanding, did he invest in

5    Mr. Peralta as a result of your introducing him?

6    A.  I believe he ended up losing just over $2 million.

7    Q.  In what respect or respects were you dishonest with Mr.

8    Weinberger in recruiting him?

9    A.  I had told him I had put the same amount of money into the

10   liquor investments as he had, which wasn't true.

11   Q.  Let's pause there for a moment.  Why did you do that?

12   A.  To get him to invest.  I thought that is what would make

13   him comfortable.

14   Q.  In what other respects were you less than truthful with Mr.

15   Weinberger?

16   A.  I also did not tell him that Jeremy and I were splitting a

17   fee for bringing his money to the table.

18   Q.  Why didn't you tell him that?

19   A.  Maybe he would have wanted more return for his money.  It

20   is not something I'm proud of and I regret.

21             MR. SHECHTMAN:  I couldn't hear you.

22             THE COURT:  Could you repeat that answer, please

23   louder.

24             THE WITNESS:  I don't remember the question.

25             (Record read)

1    BY MR. BELL:

2    Q.  Now, at the time that you were making these

3    misrepresentations to Mr. Weinberger, did you actually believe

4    this was a good investment?

5    A.  Yes.

6    Q.  Why?

7    A.  Because there was no reason not to.  He was paying

8    everything back like clockwork.  He was referred to me by a

9    chief in the Police Department, so I felt that gave me a great

10   level of comfort, and Jeremy Reichberg told me he was

11   constantly checking in on the inventory in the Long Island

12   warehouse and he was on top of Hamlet.

13   Q.  How, if at all, had you personally acted on your belief

14   that these were good investments?

15   A.  Pardon?

16   Q.  How, if at all, had you acted on your belief these were

17   good investments?

18   A.  I personally put in money and I brought in friends and

19   family.

20   Q.  You also mentioned among your hard money lending

21   enterprises a ticket business?

22   A.  Yes.

23   Q.  Who did you come to know in the ticket resale business,

24   Mr. Rechnitz?

25   A.  A fellow by the name of Jason Nissen.

Q.  How did you come to know Mr. Nissen?

A.  I purchased tickets on Stub Hub to a Nicks game, and Jason

came up to me and introduced himself that I purchased his

tickets and told me in the future if I ever want to buy them

for cheaper, I should call him directly and gave me his contact

information.

Q.  Approximately when did you first meet with Nissen?

A.  It was either 2011 or maybe 2012.

Q.  When you met Mr. Nissen, did you develop an understanding

of what his business was?

A.  Yes.

Q.  First of all, what was his business called?

A.  The National Event Company.

Q.  Was there a nickname for that entity?

A.  Neco.

Q.  What did you come to understand about how Neco worked?

A.  That he had access to tickets, to all types of concerts and

sporting events across the nation at very favorable pricing and

that there were a great margins and sales when he resold the

tickets to specific premium events.

Q.  What was your understanding about how he would go about

reselling those tickets?

A.  He had -- first of all, I had seen his office -- he had

many employees in his office.  He would sell them online.  He

would sell them through concierges at hotels, he would sell

1   them through credit card companies, he had corporate sponsors

2   he had dealt with that had a lot of private clientele.  He had

3   a very big network.

4   Q.  What was your understanding of how Mr. Nissen's business

5   got money in order to purchase the tickets in the first place?

6   A.  He told me that he had constantly had cash flow issues

7   which, of course, was the opportunity for us and that he worked

8   with private investors and that he had a credit line with I

9   believe it was Bank Leumi and another bank.

10  Q.  You said a moment ago that Mr. Nissen's cash flow issues

11  represented an opportunity for us.  First of all, who is the

12  "us"?

13  A.  For me and my group of investors I brought in.

14  Q.  In what way did Mr. Nissen's cash flow issues represent an

15  opportunity for you?

16  A.  Because he needed loans.  He was sloppy.  He was also kind

17  of a one-man show.  Even though he had a lot of people and

18  agents selling for him and buying for him, he was really the

19  guy who controlled everything from the top.

20  Q.  Did there come a point when you became involved in Mr.

21  Nissen's ticket business?

22  A.  Yes.

23  Q.  How did you become involved?

24  A.  Kind of the same thing as the liquor business, I brought

25  investors.  We were investing in specific events.

1          For example, if he was buying tickets to the Super

2     Bowl, so he needed to raise call it $2 million or $5 million

3     for that event, I would bring him the money.  The investors

4     would get a contract from him for the purchase of those tickets

5     to the Super Bowl.  He would resell them and then between 30 to

6     60 days later he was to pay back the investors with their

7     principal and profit, and I got my fee for bringing them into

8     his company to invest.

9     Q.   How was your fee worked out?

10    A.   It was worked out that I would either, depending on the

11    deal, sometimes I get 5 percent or up to 10 percent of the

12    investment.

13    Q.   Just to be clear, did investors invest in the business as a

14    whole or on an event-by-event basis or in some other way?

15    A.   Event-by-event basis.

16    Q.   Now, at the time that you first became involved in Neco,

17    did you understand it to be a legitimate business?

18    A.   Yes.

19    Q.   Based on what information?

20    A.   Well, I checked out their website, I checked out their

21    office.  A friend of mine at the time, Guy Tanne, who was --

22    Q.   Can you spell that name?

23    A.   G U Y, T A N N E, he was the CFO for some partners of mine,

24    had looked over on several occasions some of the financial

25    records of Jason.  Jason supplied me with his tax returns.  He

1   supplied me with his financials.  He showed me the sales that

2   he made on an annual basis ranging from 40 to $100 million of

3   sales a year.

4        I went to a couple events he was working where he told

5   me he sold such as the NFL All Star game in New Orleans, and he

6   had a line of people waiting to pick up tickets for him.  I

7   went to Brazil for the World Cup.  He was there.  He brought

8   down four or five of his employees.  They were also working the

9   World Cup.  So I had a very good feeling that this was a very

10  real business.

11  Q.  Did you yourself invest in Neco?

12  A.  No, I did not.

13  Q.  Did you recruit others to?

14  A.  I want to correct that answer.  I did a little bit, but not

15  close to any scale of anyone else.

16  Q.  On what order of magnitude are we talking about for your

17  personal investment?

18  A.  Several hundred thousand dollars.

19  Q.  Did you recruit others to invest in Neco?

20  A.  I did.

21  Q.  What kinds of people?

22  A.  Friends and family, the same type of group as I did with

23  the liquor business.

24  Q.  What sorts of things did you tell these folks, if anything,

25  in order to encourage them to invest?

1    A.   Just like in the liquor business, I told them about the

2    opportunity.  I told them that the event they were investing

3    in, how much money they would be putting up, and I once again

4    told them that certain individuals from that group that I was

5    putting in the same amount as them when I was not, and I did

6    not tell all of them that I was making a fee, only some of

7    them.

8    Q.   Now, did you, in fact, receive fees for the investments

9    that you brought to Neco?

10   A.   I did.

11   Q.   Over what period of time would you say you brought

12   investments into Neco?

13   A.   I think it was from 2011 until 2016.

14   Q.   How much would you say you received in commissions over

15   that period of time?

16   A.   I would estimate it to be about $5 million.

17   Q.   How did you get paid for -- rather how did you get paid

18   those commissions?

19   A.   Jason would either give me a check, send me a wire.  He

20   deducted a running balance I had for my next courtside seats or

21   he would just pay my credit card bill.

22   Q.   You mentioned a number of methods of payment a moment ago.

23        Did the way in which Mr. Nissen and his company pay

24   you change over time?

25   A.   Yes.  Towards the later years he wanted to just pay down my

1    credit card bill.

2              MR. MAZUREK:  May I have more specific time-frame?

3    What part later, please?

4              MR. BELL:  I am --

5              THE COURT:  If the witness can answer that.  When you

6    say toward the later years, can you be more specific?

7              THE WITNESS:  It wasn't in the beginning of our

8    relationship.  It was I think towards the end of 2013, if I

9    have to guess, and 2014 and 2015, 2016.

10   BY MR. BELL:

11   Q.  You did say the magic word "guess" there.  Just so we know

12   how confident are you in the timing of that?

13   A.  I am not.  I am just guessing.

14   Q.  Now, why was it, to your understanding, that Mr. Nissen for

15   a time paid you by way of paying down your credit card bill as

16   opposed to a more conventional way of payment?

17   A.  Because it would buy him more time.  He was always strapped

18   for cash, so if he was supposed to pay me money on the first of

19   the month, he knew my credit card bill wasn't due until the

20   third week of the month, for example, that would buy him a

21   couple weeks.

22   Q.  Did there come a point you became aware Mr. Nissen might

23   sell Neco?

24   A.  Yes.

25   Q.  Approximately when did you become aware of that?

1    A.    In 2013.

2    Q.    How did you become aware?

3    A.    He told me that thanks to the investors I brought to the

4    table, his sales had doubled and tripled and he was in a good

5    position to see a sale within the next year for a very

6    substantial number.

7    Q.    Did there come other signs that that sale might actually

8    happen?

9    A.    Yes.  It was very exciting.  He brought in a hedge fund

10   after, as he described to me, a proctology exam in a thorough

11   venting of his financials and his entire business by a company

12   called Falcon, which provided him a credit line for I believe

13   it was $40 million at much less interest rates than he had been

14   borrowing from us until then.

15   Q.    What was your reaction to news that Mr. Nissen might sell

16   his company?

17   A.    First of all, I was very excited, but I told him look I got

18   you to this stage, I would like a piece of that, and we had

19   agreed he would give me 10 percent of any money that he

20   personally made from the sale.

21   Q.    Was there an arrangement reached in advance of that sale?

22   A.    There was.  He told me it would be sold probably within the

23   year, and I asked him if he could advance me a million dollars

24   against the sale.

25   Q.    Why did you do that?

1    A.  Well, I wanted the money.  The way we worked it out was

2    monies he would have had to pay me anyways totaled more than a

3    million that year, so up to the million dollars for that year

4    we treated as a loan, which is to be repaid back I think it is

5    actually due next year since the sale is not happening, and

6    this way I was able to save it on part of my taxes as income,

7    and if he would sell the company, it would come off of that

8    sale.  I was able to defer that tax payment.

9    Q.  I think you testified to this, but I want to ask you

10   directly, Mr. Rechnitz, what were the terms of the loan

11   arrangements that you and Mr. Nissen reached?

12   A.  It was a five-year loan in the event that the sale was not

13   made of the company.  I think it was minimal interest rate,

14   just what we had to put in, if any, and I think that answers

15   the question.

16   Q.  What did you understand the tax consequences of receiving

17   that million dollars as a loan to be?

18   A.  I'd have a deferred tax payment.  I would be able to wait

19   until the company sells and pay the tax, I'd have to wait upon

20   the sale or I'd pay the tax five years from then at a later

21   date.

22   Q.  Now, without going into the advice you may have received

23   from attorneys specifically, what informed your sense of the

24   tax consequences?

25   A.  Pardon?

HARJSEA2                    Rechnitz - direct

1    Q.  Without going into any advice that you may have received

2    from attorneys specifically, what informed your sense of what

3    the tax consequences were?

4    A.  I discussed this with my accountant.

5    Q.  Now, for tax returns that you filed over the course of your

6    relationship with Mr. Nissen, did you pay taxes on the fees

7    that you received directly from him?

8    A.  Yes.

9    Q.  Are there tax returns for that period of time,

10   Mr. Rechnitz, that you have not yet filed?

11   A.  Yes.

12   Q.  To your knowledge, which tax years have you not yet filed?

13   A.  2015, 2016.

14   Q.  Why haven't you filed those tax years yet?

15   A.  Because I am missing pertinent information to file them

16   properly.

17   Q.  What is the nature of the information you're missing?

18   A.  Pardon?

19   Q.  What is the nature of the information you're missing?

20   A.  I am missing the credit card payments that Jason made for

21   me which would be treated as income.

22   Q.  What other information, if any, are you missing?

23   A.  I am also missing some other factors relating to the

24   ongoing case against Neco in terms of some other numbers to see

25   if monies that I've made, and I was waiting to see how the

1    Hamlet-Peralta trial would conclude.

2    Q.  What was your understanding of how Hamlet Peralta's

3    situation might affect your tax circumstances?

4    A.  Well, I wanted to see if there would be any retribution

5    paid, if I would be taking a loss on the monies that I've paid

6    out versus the cash that I received.

7    Q.  I should ask perhaps now about the Nissen situation.

8            Did you ever have, over the time that you were working

9    with him, occasion to work about Mr. Nissen's business?

10   A.  Yes.

11   Q.  What gave you cause to worry?

12   A.  Well, he bounced checks a lot.  I thought I caught him in

13   some lies.  He was late on payments.  He sometimes asked me to

14   get an investor not to request their money back at a specific

15   date, rather continue rolling it into the next event so he it

16   wouldn't have to come out of pocket, that cash.

17           There were times when an event was up and he owed

18   money to an investor and he asked me to -- he told me he had

19   used the money he was supposed to give back to that investor

20   for future tickets for a future event.  I would bring him a new

21   investor for the new event, knowing that money would pay back

22   the previous investor for the couple of days he was short, it

23   took for Stub Hub or whoever owed him the money to clear that

24   check for that specific event.

25   Q.  So I understand, you testified earlier that the investing

1   was done on an event-by-event basis.

2             Was there time on which money from one event was used

3   to cover another event?

4   A.  Yes.

5   Q.  There were times when money from one investor was used to

6   cover another investor?

7   A.  Yes.

8   Q.  When did this sort of thing happen?  First of all,

9   approximately how many times did that sort of thing happen?

10  A.  I'd say a dozen.

11            (Off-the-record discussion)

12  BY MR. BELL:

13  Q.  Over the course of how long were you involved?

14  A.  Again it was my guess.  It could be more, it could be less.

15  Q.  And that is over the course of how long you were involved

16  with Mr. Nissen's business?

17  A.  The years I dealt with him, I'd say five to six years.

18  Q.  When you had these concerns, what, if anything, did you do

19  to act on them?

20  A.  Oh, I had a concern, I'd call into my office, I'd say you

21  know, Jason, prove to me you used the money.  He had to pay

22  back -- let's say the U.S. Open event, and he had pressure of

23  the time of the U.S. Open investment and the new Super Bowl

24  investment would interfere with one another.

25            So I said prove to me you actually used this

1    investor's money for tickets, I think you're lying, and he

2    would come right over and gave me a whole pile of checks he

3    wrote out to different NFL teams and proved to me every time we

4    had a doubt that he was telling the truth.

5           Sometimes he would say no.  Wire's coming tomorrow and

6    I would say Jason, I don't believe.  He said there was a bank

7    error and get the banker on the forward with me and forward

8    email from the bank.  He always came through and always proved

9    his conduct.

10   Q.  Prior to 2017, was there an occasion in which Mr. Nissen

11   did not come through either with proof or money?

12   A.  Can you repeat the question.

13   Q.  Prior to 2017, in other words, through 2016, was there ever

14   a time Mr. Nissen didn't come through either with proof for

15   your purposes or with money ultimately?

16   A.  No.

17   Q.  Did there come a time when you came to realize that Neco

18   was not, in fact, a legitimate business?

19   A.  Yes.

20   Q.  Approximately when?

21   A.  In 2017.

22   Q.  How did you learn that Neco was not a legitimate business?

23   A.  Unfortunately, I read that he got charged by the government

24   for running a Ponzi scheme.

25   Q.  When that happened, did you lose money in the National

1    Event Company?

2    A.  No.

3    Q.  To your knowledge, did the investments that you personally

4    brought in lose money?

5    A.  Only one investor, I believe.

6    Q.  How much did that investor lose?

7    A.  I'm not sure because I think it was mostly profit.  I am

8    not sure.  It was definitely in the millions of dollars.

9    Q.  When you say it was mostly profit, what do you mean by

10   that?

11   A.  Over the year's profit he would have earned from investing

12   in the company, his events.

13   Q.  What happened with the $1 million loan with Mr. Nissen?

14   A.  I have to pay it back next year.

15   Q.  Now, we mentioned a moment ago or you mentioned a moment

16   ago, I believe, you haven't filed taxes for 2015 and 2016.  Why

17   haven't you filed?

18   A.  Again, I am missing the proper information to file my taxes

19   properly.

20   Q.  What would happen if you filed taxes without that

21   information?

22              MR. MAZUREK:  Objection; lack of foundation.

23              MR. SHECHTMAN:  I don't want to object, but I would

24   love to hear this.

25              THE COURT:  Let's have a quick sidebar.

1          (At the sidebar)

2          THE COURT:  What is the basis of the objection?

3          MR. MAZUREK:  Judge, he is asking what tax

4     consequences, legal consequences could result if he files taxes

5     without having certain information.  I just don't know what his

6     basis of that knowledge would be.

7          THE COURT:  Why does it matter?

8          MR. MAZUREK:  Why does it matter?

9          THE COURT:  He is not giving a legal opinion.  He is

10    saying what he believes what happened to him.  It doesn't

11    matter if it is right or wrong.  Why does it matter whether his

12    basis for saying this is what he thinking will happen, whether

13    it turns out to be right or wrong, why can't he say that?

14         MR. MAZUREK:  You can always say whatever you think or

15    believe.

16         THE COURT:  That is what he was asked.

17         MR. MAZUREK:  Then we are stuck with the answer.

18         THE COURT:  Isn't that what he is asked?

19         MR. MAZUREK:  He was asked what he personal belief is?

20         MR. BELL:  Yes.

21         THE COURT:  That is all he can answer.

22         MR. BELL:  I will be clearer if you like, Henry, but I

23    think that is right.  It goes to his understanding.  It is

24    clearly admissible.  More than that, my only concern is Paul's

25    happiness.

1           MR. MAZUREK:  The only question would be how he

2      obtained that personal belief.

3           MR. BELL:  I can ask that, too.

4           MR. SHECHTMAN:  No, don't ask that one.  Just leave

5      it.

6           THE COURT:  I guess he wants to ask that.  You can

7      cross on that.  He is not being offered as any sort of legal

8      expert or tax expert in the same way he answered questions

9      about what his beliefs are about what happens if he were to not

10     tell the truth here, that is what is in his mind and that is

11     what is leading him to not file taxes, according to him.

12     Whether you agree he is telling the truth or not, that will be

13     explored on cross-examination.

14          MR. MAZUREK:  I will cross on it.

15          THE COURT:  While we are back here, let me get a sense

16     because I believe I know what counsel's objections to was

17     earlier in terms of referring to this witness, this witness'

18     potential testimony in other cases, and I sustained that

19     objection.  There has been reference to other indictments

20     loosely regarding Nissen and potential trial with Peralta.

21          Let me get a sense from the government where you're

22     going?

23          MR. BELL:  I can tell you what I believe the answer to

24     be.  I believe the answer to be that Mr. Rechnitz expects to

25     testify at a trial here before Judge Woods in the spring of

1  Reichberg, Harrington and Grant.

2          The reason why I believe that to be admissible is that

3  the argument that I believe my friends on the other side opened

4  with is that Jona Rechnitz was in some really bad trouble, and

5  so he had to offer up Norman Seabrook and Murry Huberfeld in

6  order to get out of this.  That is an argument that begins to

7  lose some real force if he has already offered or also offered

8  the cops and Jeremy Reichberg and recognizes that he has to

9  testify against them.

10         In other words, the marginal benefit that you get from

11 tacking on Murray Huberfeld of all people when you've got some

12 of the highest level people in the PD is minimal.  It goes to a

13 point they themselves will open the door to.

14         THE COURT:  The importance of that is the defense is

15 going that way because he found himself in the soup, so he had

16 to offer up these folks on trial here.  Maybe he felt he needed

17 to give up other people as well.  I didn't sustain -- I don't

18 think there was an objection -- I didn't sustain the objection

19 to bringing out the fact that he expects to testify in other

20 proceedings, which is fine.  I don't know why it is necessary

21 to get into who those proceedings are about and who has been

22 indicted in those proceedings.

23         MR. BELL:  Mr. Nawaday wants to jump in, and I want to

24 let him.

25         MR. NAWADAY:  I was supposed to read stipulations.  I

1    thought the objection was the fact that reference was made to

2    charges being brought against these other people.  I think

3    we're fine not saying there are these pending charges against

4    these other people.  I think if Mr. Bell agrees, we can just

5    ask the questions as did you tell the government about other

6    people who you committed crimes with and have to testify about

7    with.  That goes to his understanding of the cooperation

8    agreement and also deals with not having to put forth before

9    the jury that there are other charges pending against other

10   people.

11            MR. SHECHTMAN:  That is fine.  The question is if

12   you're qualifying him to testify against other people and you

13   have to do it, that is fine.

14            THE COURT:  Good.  Ready?

15            MR. BELL:  I'll go one step further and say at this

16   time do you expect to have to do that?

17            (Multiple voices)

18            THE COURT:  He was asked if he was going to have to

19   testify about people.  If you want to go into those other

20   things, there is no objection to that.

21            (Continued on next page)

22

23

24

25

1          (In open court)

2          THE COURT:  That objection is overruled.  Do you want

3     to restate the question, counsel?

4          MR. BELL:  May we have it read back, your Honor?

5          THE COURT:  Sure.

6          (Record read)

7     A.   Then I would knowingly be filing a fraudulent tax return,

8     so after discussing with my accountant, I decided to file them

9     late and accurately even though I am going to have very

10    expensive penalties owed for filing late.

11    BY MR. BELL:

12    Q.   Is it your intention to file accurate tax returns?

13    A.   Yes.

14    Q.   Is it your intention to pay those late penalties?

15    A.   Yes.

16         MR. BELL:  One moment, please.

17         (Pause)

18    BY MR. BELL:

19    Q.   With respect to learning that Mr. Nissen was running a

20    Ponzi scheme -- withdrawn.  We have gone through everything I

21    want to go through there.

22         You mentioned your involvement in diamonds or jewelry

23    or the like.  You mentioned also I think a person named

24    Turgemon at one point, one of your investors?

25    A.   Yes.

1    Q.  Who was Mr. Turgemon?

2    A.  He had been partners with my former employer, and he ran a

3    wholesale diamond business called Taly Diamonds.

4    Q.  Where was that business located physically?

5    A.  580 5th Avenue, where my offices were.

6    Q.  In what proximity, if any, are the business and Mr.

7    Turgemon's business?

8    A.  We used to be on different floors, and we ended up sharing

9    an office.

10   Q.  What was Taly Diamonds?  What did you understand Mr.

11   Turgemon's business to be?

12   A.  He was in the diamond business.  He would manufacture and

13   sell wholesale diamonds.

14   Q.  Did you work for Mr. Turgemon?

15   A.  I did not.

16   Q.  Did there come a time where you, nevertheless, found

17   yourself on Mr. Turgemon's payroll?

18   A.  Yes.

19   Q.  Approximately when was that?

20   A.  It was I think for about two or three years.

21   Q.  Under what circumstances did you find yourself on Mr.

22   Turgemon's payroll?

23   A.  I wanted to be added to his health insurance plan which is

24   something that he had a broker dealer for his entire staff and

25   employees for, and I asked him if I could join their health

1   insurance plan to avoid the headache of having to just set it

2   up on my own.  He said okay, and his controller, Beatrice, told

3   me in order to do so, I needed to be added to they payroll, so

4   they would pay me a minimum salary as required and I would just

5   reimburse them for my health insurance and the payroll in order

6   to get the health insurance.

7   Q.  What was your understanding of what it would take for you

8   to get JSR Capital its own health insurance?

9   A.  Phone calls and hassle and details I didn't want to deal

10  with.

11  Q.  So did there come a time when you became an on-paper

12  employee of Taly Diamonds?

13  A.  Yes.

14  Q.  About how much did you get from Taly Diamonds as part of

15  that arrangement?

16  A.  I think it was $2,200 a month.

17  Q.  How much did you reimburse him?

18  A.  $2,200 a month.

19  Q.  Did you, in fact, get on Mr. Turgemon's business' payroll?

20  A.  Yes.

21  Q.  Did you, in fact, get on their health insurance plan?

22  A.  Yes.

23  Q.  For how long were you on Mr. Turgemon's payroll?

24  A.  Again I think it was two to three years.

25  Q.  For how long did you get health insurance by way of Mr.

1    Turgemon's business?

2    A.  Also two to three years.  Actually, I think the payroll was

3    only for a year or two, but the health insurance continued

4    after that.

5    Q.  How did that work?

6    A.  He switched the company.  The company I was reimbursing

7    that was paying me and had the health insurance plan was called

8    LTR Trading, and he switched the health insurance plan to Taly

9    Diamonds.  When he made that switchover, I was off his salary

10   and I was just getting reimbursement bills for the health

11   insurance.

12   Q.  Did you have to verify or certify anything else in order to

13   maintain the health insurance during that switch, to your

14   recollection?

15   A.  No.

16   Q.  Now, did you understand at the time you were procuring

17   health insurance in this way to be potentially illegal?

18   A.  No.

19   Q.  Why not?

20   A.  I didn't think it was illegal.  I didn't think of it that

21   way.  I figured he has a person who is negotiated a plan.  He

22   has a good health care plan.  I'll get on it and I'll pay him

23   every dollar that it costs him.

24   Q.  Do you have a different understanding now?

25   A.  I do.

1    Q.  What is your current understanding?

2    A.  That it is fraud.

3    Q.  How far did Mr. Turgemon's health insurance take you, like

4    into what period of time?

5    A.  Until June 2017.

6             MR. SHECHTMAN:  I missed that question and answer.

7             MR. BELL:  June 2017.

8             MR. SHECHTMAN:  Judge, I missed the question.

9             THE COURT:  Let's have the questioned read back.

10            (Record read)

11   BY MR. BELL:

12   Q.  Did there come a time prior to that when you endeavored to

13   remedy the situation?

14   A.  Yes.

15   Q.  When was that?

16   A.  After I learnt that it was not legal, and that is after I

17   began cooperating with the government.

18   Q.  How did you nevertheless find yourself still on the same

19   health insurance plan past that point?

20   A.  I began cooperating after the 1st of June, and the policy

21   was renewed June 2016 until June 2017, so I had already been

22   locked in for a year.

23   Q.  What did you do come June 2017?

24   A.  I switched out of the plan into my own health insurance

25   plan, which ended up costing I think a few hundred dollars more

1    a month.

2    Q.  Now, were there other purposes for your being on Mr.

3    Turgemon's payroll?

4    A.  Yes.

5    Q.  What other purposes were you on Mr. Turgemon's payroll?

6    A.  Jeremy told me that if we were on the payroll, we would be

7    able to apply for a pistol permit because they tend to be

8    approved for people who have a reason to carry a pistol, and

9    the reason being that I'm carrying expensive diamonds on me, so

10   in case somebody would come attack us, we can have

11   self-defense.

12   Q.  What was your understanding of who authorizes pistol

13   permits within New York City?

14   A.  The NYPD.

15   Q.  Is there a particular part of the NYPD in charge of such

16   things?

17   A.  There is a Pistol Division.

18   Q.  Now, did you, in fact, work for Mr. Turgemon transporting

19   diamonds?

20   A.  No.

21   Q.  For what reason did you want the firearm?

22   A.  I didn't know.  Something I just wanted.

23   Q.  Now, how did you go about attempting to obtain a firearm?

24   A.  So after we were added to Mr. Turgemon's payroll, there was

25   an online form that Jeremy came to the office and helped me

1    fill out, and he had an appointment at 1 Police Plaza downtown

2    on the first floor at the Pistol Division, and he told me that

3    James Grant had a friend there and that it had already been

4    taken care of.

5         So we went to the Pistol Division and I met with the

6    head of the office in the back-right corner where he had

7    somebody fill out my application with me, process it and

8    granted me the -- told me I would be granted a permit.

9    Q.  Now, were you the only person getting a pistol permit at

10   this time?

11   A.  No.

12   Q.  To your knowledge, who else was getting a pistol permit at

13   the time?

14   A.  Jeremy.

15   Q.  What, if anything, did you understand the circumstances

16   under which Mr. Reichberg was getting a pistol?

17   A.  His has an unconcealed permit and mine was more restricted,

18   just for the weekends.

19   Q.  What did you understand the difference between an

20   unconcealed permit versus a restricted permit to be?

21   A.  I didn't really understand.  I think it meant you can have

22   it at certain dates and times, not at other dates and times, or

23   it can be shown or not shown.  I didn't really get the whole

24   thing.

25   Q.  How did you come to understand that you were getting a

1    restricted permit?

2    A.   The head of the office who we had met with said that to me

3    in front of Jeremy, and I said to Jeremy why is yours different

4    than mine, and he says that is the way it has to be for right

5    now.

6    Q.   What did you understand Mr. Reichberg was saying that is

7    the way it has to be for right now?

8    A.   That he told me after a while it would be changed to the

9    same status as his, but it had to start that way.

10   Q.   Did you eventually get a firearm?

11   A.   No.

12   Q.   Did you eventually get a firearm permit?

13   A.   I found out afterwards I had one, but I never went to pick

14   it up and didn't know that it was granted.

15   Q.   How did you eventually find out that you had one and one

16   had been granted?

17   A.   A private investigator told me that.

18   Q.   Now, in filling out that online form, did you fill it out

19   by yourself or with others?

20   A.   Jeremy filled it out for me.

21   Q.   Did Jeremy, to your knowledge, fill out that firearm permit

22   form online honestly?

23   A.   I don't know.

24   Q.   Did you pay much attention to when Jeremy filled it out for

25   you?

1   A.  No.

2          MR. BELL:  Your Honor, I know that in the past prior

3   to the big break you sometimes had a little break, a bathroom

4   variety.  We are about to change subjects here.  This may or

5   may not be a good time.

6          THE COURT:  Let me just check with the jurors.  Do the

7   jurors need a bathroom break or are we okay?  All right.

8          Counsel, okay, let's keep going.

9   BY MR. BELL:

10  Q.  So, Mr. Rechnitz, I now want to direct your attention

11  specifically to the year 2013.  At around this time,

12  Mr. Rechnitz, what was your relationship with Murray Huberfeld?

13  A.  We were very close friends.

14  Q.  How often did you speak?

15  A.  Many times during the week.

16  Q.  Did you have, in addition to just being friends, a business

17  relationship?

18  A.  Yes, we had done some business together.  I had sold Murray

19  some apartments in a building I was involved with.  He had me

20  handle the construction for that apartment.  He always offered

21  to help me in any way he can.

22  Q.  What was the building that you and Mr. Huberfeld got

23  involved in together?

24  A.  The Apthorp Condominium.

25  Q.  How important was Mr. Huberfeld to your life and career

1   prospects at that point?

2   A.   I think it was significant.

3   Q.   Why was he significant?

4   A.   He is very reputable, wealthy, carried a certain stature in

5   our community, and being associated with him would only be good

6   for me.

7   Q.   When you say "our community," what do you mean?

8   A.   The Jewish Orthodox Community.

9   Q.   What benefits did you expect to be able to get as a result

10  of your association with someone of Mr. Huberfeld's status?

11  A.   Other people in similar positions as him would treat me on

12  a higher caliber and do business with me.

13  Q.   Was it important at that time for you to keep Mr. Huberfeld

14  happy?

15  A.   Yes.

16  Q.   What sorts of things did you do to keep him happy at the

17  time?

18  A.   Well, I tried to handle his project the best I could in

19  Apthorp, as we discussed.  We had gone to some sports games

20  together and I tried to bring him investors for his fund.

21  Q.   Now, are you familiar with something called the Simon

22  Wiesenthal Center?

23  A.   Yes, I am.

24  Q.   What is the Simon Wiesenthal Center?

25  A.   Simon is named after Simon Wiesenthal, a famous Nazi hunter

1   who they have the museum in Los Angeles Museum of Tolerance,

2   and in New York that preaches tolerance, they have a police

3   training program and anti-bullying seminar.

4          THE COURT:  Let me remind the witness to make sure you

5   speak into the mike and keep your voice up.

6   BY MR. BELL:

7   Q.  Maybe I ought to say if there is the uninitiated, what is a

8   Nazi?

9   A.  In the Holocaust, the Jews were persecuted by Nazis, so the

10   ones that were found were charged with war crimes, so there is

11   a man named Simon Siesenthal who devoted his life to finding

12   Nazis to bring them to trial.

13   Q.  You mentioned something called the Museum of Tolerance.

14   What is that?

15   A.  That is part of the Simon Wiesenthal Center, museums that

16   they have which public school kids visit, private individuals,

17   they have, as I said, a police training program.

18   Q.  Where is the Museum of Tolerance located?

19   A.  One is in Los Angeles on Pico Boulevard, and the center for

20   New York was on 42nd Street until I think a year ago when their

21   lease expired.

22   Q.  Did you understand Mr. Huberfeld to have a connection with

23   the Simon Wiesenthal Center, his museum?

24   A.  Yes, he was one of the board members, a trustee.

25   Q.  At that time did you have a relationship with the

1    Wiesenthal Center for the museum?

2    A.  I did independently.

3    Q.  What was the nature of your relationship?

4    A.  I was very active in helping them in New York try to build

5    New York.  I helped premier some of their important films.  I

6    brought different groups and tried to bring the city members

7    through the museum, tried to bring several police officers

8    through the museum, tried to help raise them funding.

9    Q.  You mentioned that you had an independent relationship with

10   the Wiesenthal Center.  Did you try to further your

11   relationship with the Wiesenthal Center at that point?

12   A.  I did.

13   Q.  What were you hoping to ultimately accomplish with the

14   Wiesenthal Center?

15   A.  First of all, I thought it was good work and I felt

16   passionate about what I was doing.  It was also a who's who on

17   the Board of Trustees and there was a certain status to be on

18   that board, and my hopes were to join that board and become a

19   big player in that sense.

20   Q.  For what reason?

21   A.  Again?

22   Q.  For what reasons specifically did you want to join the

23   board and become a big player there?

24   A.  I thought it would lead to more connections, more of my

25   growth, my reputation, my business, things that mattered to me

1   then.

2   Q.  You mentioned the board or something of a who's who.  Were

3   those among those you included Mr. Huberfeld?

4   A.  Yes.

5   Q.  Now, did Mr. Huberfeld and Mr. Reichberg have a

6   relationship at this point in 2013?

7   A.  I don't think so.

8   Q.  Did there come a time when they were introduced, to your

9   knowledge?

10  A.  Yes.

11  Q.  Who introduced them?

12  A.  I did.

13  Q.  What involvement did they have with each other thereafter

14  that you were aware of?

15  A.  They became friends.  They, I think, would hang out.

16  Jeremy would hang out at Murray's office often, they would eat

17  lunch together.  If there was a problem or someone needed help

18  in the community, Murray reached out to Jeremy.

19  Q.  Focusing on that same 2013 period, you testified earlier

20  Huberfeld was associated with a hedge fund called Platinum

21  Partners.  From speaking to Murray, what did you understand his

22  relationship with Platinum to be?

23  A.  To be one of the owners, one of the partners.

24  Q.  Did you develop an understanding of what Platinum's

25  business needs were at the time?

1    A.  Yes, Murray had told me that he was frustrated and sick of

2    dealing with private investors from the community, that they

3    would complain too much, they didn't have appreciation of when

4    he made money for them, and that he wanted to start working on

5    more institutional-type investors and such as unions.

6              He told me they were trying to get together with one

7    of the comptroller's to make a pitch for the city or the state

8    to invest in the fund.

9    Q.  What, if anything, did Mr. Huberfeld tell you with respect

10   to the ways in which private investors versus institutional

11   investors would treat their money differently with the fund?

12   A.  Like I was saying, the private investors, they make money,

13   they'd pull it out.  Then institutional were better clientele

14   to deal with.  They would be more long term.

15   Q.  Did you become familiar with the actual Platinum offices?

16   A.  Yes.

17   Q.  Where, approximately, were they located?

18   A.  In the Carnegie tower on 57th Street.

19   Q.  Were you ever there?

20   A.  Yes.

21   Q.  About how often were you there?

22   A.  I'd say about a dozen times.

23   Q.  What was it that brought you there when you went?

24   A.  I would go to see Murray.

25   Q.  Did you become familiar with the folks who worked at

1    Platinum's offices?

2    A.   Yes.

3    Q.   Who specifically do you recall becoming familiar with?

4    A.   Murray, his assistant, Angela, Gilad Kalter, David Bodner

5    and the people who worked in the back room.

6    Q.   Who was Gilad Kalter?

7    A.   I believe he was the COO and brother-in-law of Mark

8    Nordlicht, one of the partners of the fund, the head of the

9    fund.

10   Q.   I think you mentioned David Bodner.  Who was that?

11   A.   Murray's partner.

12   Q.   Did there come a time when you and Mr. Huberfeld discussed

13   the possibility of specific institutional clients that you

14   knew?

15   A.   Yes.

16   Q.   What were the nature of the conversations that you had

17   about that?

18   A.   He was telling me that Jeremy had all these connections and

19   we should try to think of who we can bring from an

20   institutional level from the city or police relationships we

21   had.  We had discussions.  I told him that I knew Norman

22   Seabrook, who was head of prison guards union, and I knew the

23   head of certain police unions and maybe I can get the city to

24   invest.  I was close to Bill DiBlasio, and we had those sorts

25   of conversations.

1    Q.  Mr. Rechnitz, did you actually know the heads of police

2    unions proper?

3    A.  Not at that point.

4    Q.  What connections did you understand yourself to have with

5    respect to police unions?

6    A.  I knew the higher-ups in the Police Department, so I

7    figured it would be very easy to get in touch.

8    Q.  So let's take a step back, sir.

9            How did you first meet Norman Seabrook?

10   A.  Phil Banks introduced us in his office in 2013.

11   Q.  That is at 1 Police Plaza?

12   A.  Yes.

13   Q.  Where did you meet him?

14   A.  In Phil's office.

15   Q.  At the time that you met Mr. Seabrook, what was your and

16   Mr. Reichberg's relationship with Mr. Banks like?

17   A.  We were part of his inner circle.  He had a very tight-knit

18   circle, as we were frequently reminded by Mike Harrington, who

19   got us into that circle, and it was basically me, Mike, Jeremy

20   and Phil.

21   Q.  How often did you see Phil Banks?

22   A.  I think weekly or every other week, often.

23   Q.  What sorts of things did you, banks and Mr. Reichberg do

24   together at that time?

25   A.  We hung out a lot in his office, smoked cigars with him,

1   we -- again a lot of cigars and cigar clubs -- we went for

2   meals that I paid for, stuff of that nature.

3   Q.  So what I'd like to do, Mr. Rechnitz, is show you a disc

4   that Ms. Bustillo has.  Save me the walk of bringing that to

5   you.  Thank you, Ms. Bustillo.  Fell free to take it out of the

6   disc.  It helps if you can see through, that is fine, too.

7           I believe the disc is labeled GX 1602.  Is that right?

8   A.  Yes.

9   Q.  Are you familiar with the disc itself?

10  A.  I am.

11  Q.  How do you recognize that disc?

12  A.  I initialed it and signed it.

13  Q.  Did you initial it at a point you were familiar with its

14  contents?

15  A.  Yes.

16  Q.  What do you understand to be on the disc?

17  A.  Three videos.

18  Q.  Broadly speaking, I don't want you to describe any single

19  one of them, but what sorts of videos are these?

20  A.  Videos of me in Mr. Bank's office, videos that includes

21  Phil, Norman, Jeremy and I together.

22          MR. BELL:  I would like to at this time offer 1602.

23  There are videos on it labeled 1401, 1402, and I'd like to

24  offer them as --

25          MR. SHECHTMAN:  No objection.

1          MR. MAZUREK:  No objection.

2          THE COURT:  That is in.

3          (Government's Exhibits 1602, 1401 and 1402 received in

4     evidence)

5          MR. BELL:  Ms. Bustillo, can you reclaim that from

6     Mr. Rechnitz.  What I would ask that we do, Ms. Bustillo, is

7     can you play Government Exhibit 1402, which is one of the

8     videos that is also on the disc.

9          THE COURT:  Hold on.  Let's make sure the jurors have

10    it.  Do you have it in front of you?  Go ahead.

11         MR. BELL:  Go ahead and play that, Ms. Bustillo.

12    BY MR. BELL:

13    Q.  Before we play it, since we have got it right here, who are

14    we looking at right here.

15    A.  Jeremy Reichberg.

16    Q.  And are you familiar with where Mr. Reichberg is?

17    A.  Yes.

18    Q.  Where is that?

19    A.  He is sitting in a conference table in Phil Banks' personal

20    office.

21    Q.  Notice, by the way, a little poster or picture in the back.

22    Are you familiar with that picture?

23    A.  Yes.

24    Q.  What is that?

25    A.  That is Muhammed Ali.

1          MR. BELL:  Why don't we go ahead and hit "play."

2          (Exhibit 1402 was played)

3   BY MR. BELL:

4   Q.  You're familiar with the video itself?

5   A.  Yes.

6   Q.  How are you familiar with the video?

7   A.  I took it.

8   Q.  What did you use to tape it?

9   A.  My iPhone.

10  Q.  We'll run it again because it went by very quickly.  Can

11  you tell us who it is that we actually saw within that short

12  clip.

13  A.  Yes, Jeremy Reichberg.  The next person we saw in the video

14  was Chief David Colon sitting in the chair.  The next person we

15  saw was Michael Harrington standing, and the next person we saw

16  was Philip Banks sitting at his desk, and then you saw my hand

17  as I was filming.

18  Q.  How did you happen to film this clip?

19  A.  Pardon?

20  Q.  Do you recall how you happened to film this quick clip?

21  A.  Jeremy and I were excited, we were in there smoking cigars.

22  We used to film these types of things for our own use.

23          MR. BELL:  Ms. Bustillo, can you play it one more

24  time.

25          (Government Exhibit 1402 was played)

 1            MR. BELL:  Take that down, Ms. Bustillo.

 2   BY MR. BELL:

 3   Q.  How important was the relationship with Chief Banks to you

 4   and Jeremy at the time?

 5   A.  Very.

 6   Q.  Why?

 7   A.  Because if you're in his inner circle, you can have

 8   influence, there is a certain power within the Police

 9   Department, everybody knows we have his ear, so they would

10   reach out to Jeremy a lot or even to me to put in a good word

11   for them.  We were treated very well because of it.

12   Q.  What sorts of things did you do to keep Chief Banks happy

13   at this point?

14   A.  We smoked cigars, we went to meals, we vacationed together.

15   Q.  What, if anything, did you do with respect to Phil Banks'

16   money?

17   A.  I invested his money for him, giving him a return that he

18   was pleased with.

19   Q.  What was the nature of that investment?

20   A.  I kind of did it as a favor.  I put money into my company

21   and paid him back the money after a year with profit.

22   Q.  Returning to Seabrook, do you recall specifically when Mr.

23   Seabrook was introduced to you?

24   A.  I think that it was in the fall of 2013.

25   Q.  Where were you at the time?

HARJSEA2                    Rechnitz - direct

1   A.  I was in Phil Banks' office.

2   Q.  Can you tell us what, if anything, you recall of who was

3   there and what conversations took place.

4   A.  Jeremy, Phil, Mike, Norman and me.  I remember Mike telling

5   us that he is going to be introduced to us.  He is very close

6   to Phil and part of the inner circle.

7   Q.  Did that, in fact, happen?

8   A.  Yes.

9   Q.  Tell me about the first conversation you had with Mr.

10  Seabrook.

11  A.  We got to know each other.  We spoke about what we each do.

12  It was a brief introduction.

13  Q.  What was Mr. Seabrook's demeanor during that brief

14  introduction?

15  A.  Norman is a -- you feel his power when you're in the room.

16  He carries a confidence and a charm that I felt.

17  Q.  How important was this introduction to you at the time it

18  was made?

19  A.  Very important.

20  Q.  Why was meeting Norman Seabrook very important?

21  A.  Because if he is that close to Phil, then I am going to be

22  that close to him.  This was yet another chapter in my life and

23  another thing that I felt no one else had access to.  I didn't

24  know anybody who was close to the head of the union for prison

25  guards.

1   Q.  Did you discuss the prospect of becoming friends with Mr.

2   Seabrook with Mr. Reichberg?

3   A.  Yes.

4   Q.  What did you understand Mr. Reichberg to tell you about

5   being friends with Mr. Seabrook to be?

6   A.  It would be very possible to become chaplains for the

7   prisons and it would be a great relationship to have as well.

8   Q.  In addition to the possibility of -- first of all, what was

9   the big deal about becoming jail chaplains?

10  A.  At the time it was the same thing as Westchester, in my

11  mind.  It is called the (Non-English word) an important person.

12  It is silly.

13  Q.  What did you understand the nature of Mr. Seabrook's

14  influence in the city to be at the time?

15  A.  Well, Phil introduced me and told me he is a mover and

16  shaker.  Norman had told me he was very close friends with Ray

17  Kelly.

18              (Continued on next page)

19

20

21

22

23

24

25

1   Q.  Who was Ray Kelly?

2   A.  He was the former -- well, he was the Commissioner of the

3   Police Department and that he was a very powerful man.

4   Q.  Now, at the time that you met Mr. Seabrook, did you

5   exchange contact information?

6   A.  We did.

7   Q.  Did you follow up with Mr. Seabrook using that contact

8   information?

9   A.  I did.

10  Q.  So I'd like to put on your screen, unless there's an

11  objection, Government's Exhibit 1004.

12            MR. SHECHTMAN:  No objection.

13            MR. BELL:  So why don't --

14            THE COURT:  Hold on.  Co-counsel for the defense?

15            MR. MAZUREK:  No objection.

16            THE COURT:  Okay.

17            MR. BELL:  Government offers 1004.

18            THE COURT:  It's in.

19            (Government's Exhibit 1004 received in evidence)

20            MR. BELL:  Can we publish for the jury.  If the jury

21  could sort of signal how we're doing on screens.  Great, thank

22  you.

23  BY MR. BELL:

24  Q.  Mr. Rechnitz, are you familiar with this e-mail?

25  A.  I am.

1    Q.  And who sent it to who?

2    A.  I sent it to Norman Seabrook.

3    Q.  The body of e-mail reads:  "Dear Norman.  It was very nice

4    meeting you last night.  Please let know today if you will

5    attend.  Looking forward."  And there was an attachment.

6         First of all, when, relative to meeting Mr. Seabrook,

7    did you send this e-mail?

8    A.  The day after we met.

9    Q.  Subject says:  "Invite attached."  What was the invite for?

10   A.  Jeremy and I were hosting a police appreciation day, which

11   was an event at the MetLife Stadium.  I had rented a suite to

12   watch the Jets play the Patriots, and we were going to be

13   giving out plaques and awards to all of the police that we knew

14   that we were friends with and had relationships with.

15   Q.  By the way, what is Mr. Seabrook's e-mail address here?

16   A.  NormanSeabrook@me.com.

17   Q.  Did you come to know other e-mail addresses for

18   Mr. Seabrook?

19   A.  Yes.

20   Q.  Do you recall the nature of the other e-mail addresses?

21   A.  There was the COBA one.

22   Q.  What do you mean by "the COBA one"?

23   A.  He had another e-mail address for his work.

24   Q.  So can we take a look at the attachment, Ms. Bustillo,

25   which would be the second page of the document.

1          Okay.  I believe the jury should be getting it

2    momentarily.  Great.

3          So do you see what's there on the screen, sir?

4    A.  Yes.

5    Q.  And was that the invitation that you sent?

6    A.  Yes.

7    Q.  The date was October 20th, it appears.  Who played that

8    day?

9    A.  The New York Jets and the New England Patriots.

10   Q.  Was that game a big ticket at that time?

11   A.  Yes.

12         MR. BELL:  Okay.  Why don't we take that down.  Thank

13   you, Ms. Bustillo.  One moment, please.

14         (Pause)

15         Okay.  Will you now put Government Exhibit 1005 on the

16   screen.  And I'd be happy to offer it now, if there's no

17   objection.

18         MR. MAZUREK:  No, no objection.

19         MR. SHECHTMAN:  No objection, Judge.

20         THE COURT:  Thank you, it's in.

21         MR. BELL:  The government offers 1005.

22         (Government's Exhibit 1005 received in evidence)

23   BY MR. BELL:

24   Q.  Can we go down to the very bottom of this e-mail,

25   Ms. Bustillo, and work our way up.  I think there's a second

 1    page.  Why don't we work our way up.  Oh, no, you know what,

 2    Ms. Bustillo, let's work from 10-18-13 at 10:52 down.  Thank

 3    you, Ms. Bustillo.

 4         So in response to the invitation here, Mr. Seabrook

 5    replies "Thank you so much for the invite.  I will be happy to

 6    attend with (my new found brother) is there any other

 7    information that I need for this event, please advise."

 8         In between the time that you met Mr. Seabrook and the

 9    time that this e-mail was sent, Mr. Rechnitz, what had Mr. --

10    what had you and Mr. Seabrook done to qualify for brotherhood?

11    A.  Nothing.

12    Q.  Let's go a little bit further up in that e-mail exchange.

13    Yes, that part.  Thank you, Ms. Bustillo.

14         "Hi, Norman.  Where can I have your ticket and parking

15    pass delivered today?  Also, our event starts at 12."

16         Did you have, ultimately, the ticket and parking pass

17    delivered?

18    A.  Yes.

19    Q.  Did Mr. Seabrook attend?

20    A.  Yes.

21    Q.  Did Mr. Seabrook pay for himself?

22    A.  No.

23    Q.  All right.  Let's go a little bit further up.  Yes, let's

24    do that.  Until further down right there.  Thank you,

25    Ms. Bustillo.

1        Mr. Seabrook replies, "75 Broad Street, New York, 8th

2   floor.  Amanda is my secretary."  And then you respond "I own

3   23 Wall Street/15 Broad and used to own 25 Broad.  Small

4   world."

5        Mr. Rechnitz, at the time that you told Mr. Seabrook

6   that, was it true?

7   A.  No.  The company that I worked for owned it, and I managed

8   it.

9   Q.  Why did you tell Mr. Seabrook that you, in fact, owned 23

10  Wall Street/15 Broad and used to own 25 Broad?

11  A.  To impress him.

12  Q.  Mr. Seabrook then replied.  "Like I said, my 'new

13  brother'."  New brother in quotes.

14        MR. BELL:  You can take that down, Ms. Bustillo, but I

15  ask that we put up Government Exhibit 1012 just for the witness

16  for the moment.

17        Defense counsel, I'm intending to offer this.  Is

18  there any objection?

19        MR. SHECHTMAN:  Just scroll down and see.  Oh, again,

20  no objection.

21        MR. MAZUREK:  No objection.

22        THE COURT:  Okay.  It's in.

23        (Government's Exhibit 1012 received in evidence)

24        MR. BELL:  Thank you, your Honor.  Can we publish the

25  second page of this exhibit to the jury, just the second, and I

1    don't know whether -- the jury can see it.

2    BY MR. BELL:

3    Q.  Mr. Rechnitz, what are we looking at here?

4    A.  This is at the event that we invited Norman to.  It's the

5    football game, and it's a picture of me, Jeremy and Norman

6    after we gave him one of the awards.

7    Q.  Thank you.  Let's take that down.  So, Mr. Rechnitz, after

8    that introduction, what sort of relationship did you have with

9    Mr. Seabrook over the next few weeks?

10   A.  We started to become much more in touch and, again, we had

11   just met him.  He was part of the circle; so we would be in

12   touch with him on a regular basis.

13   Q.  What sorts of things did you do together?

14   A.  Had meals, lots of cigars in my office, in Phil's office.

15   Eventually we took some trips together.

16   Q.  And during this period of time, how did you and

17   Mr. Reichberg treat Mr. Seabrook?

18   A.  I believe well.

19   Q.  And how did he treat you?

20   A.  Well.

21          MR. BELL:  Can you put up, Ms. Bustillo, for the

22   witness, Government 1010.

23          My intention is to offer it.  I'll allow the defense a

24   moment to take a look.

25          MR. SHECHTMAN:  Yes, no objection.

1              MR. MAZUREK:  No objection, your Honor.

2              MR. BELL:  The government offers 1010.

3              THE COURT:  It's in.

4              (Government's Exhibit 1010 received in evidence)

5              MR. BELL:  Can we publish to the jury?  This is

6    dated --

7              THE COURT:  Hold on.  Hold on.

8              MR. BELL:  Sure.

9              THE COURT:  Okay.  Go ahead.

10   BY MR. BELL:

11   Q.  This is dated November the 6th of 2013.  Mr. Seabrook

12   writes from his Gmail address, "Brother, I just wanted to reach

13   out and say thank you for all your friendship and trust.

14   Brother, it's friends like you that I'm proud to have and call

15   my friend.  You may often hear me say life is a gift.  It's

16   what you do with that gift that makes all the difference.  Be

17   well and God bless.  Your friend for life."  It's

18   Mr. Seabrook's signature line.

19             Was this fairly typical of how you and Mr. Seabrook

20   would communicate at that point?

21   A.  Yes.

22   Q.  At the top, you say, "To my new friend.  Thank you.  You're

23   a class act."

24             At some point in the first few months of knowing

25   Mr. Seabrook, did you take Mr. Seabrook out on a boat trip?

1    A.  I did.

2    Q.  What were the circumstances of the boat trip?

3    A.  I rented a boat in Manhattan.  We got onto the boat in

4    lower Manhattan and went out for a few hours.

5    Q.  What, if anything, did you tell Mr. Seabrook by way of

6    inviting him?

7    A.  That it was my boat.

8    Q.  Was it, in fact, your boat?

9    A.  No.

10   Q.  Why did you tell Mr. Seabrook that?

11   A.  To impress him.

12   Q.  Did you, in fact, take Mr. Seabrook out on the boat?

13   A.  Yes.

14   Q.  Were there other folks there as well?

15   A.  Yes.

16   Q.  Who was there?

17   A.  Phil Banks and Jeremy Reichberg.

18           MR. BELL:  So why don't we put up Government

19   Exhibit 1009, just for the witness for the moment.

20           It's our intention to offer this, counsel.

21           MR. MAZUREK:  No objection.

22           MR. SHECHTMAN:  No objection.  I'm sorry.

23           MR. BELL:  The government offers 1009 without

24   objection.

25           THE COURT:  Okay.  It's in.

1          (Government's Exhibit 1009 received in evidence)

2          MR. BELL:  I'll just wait for it to pop up for the

3    jury.  Thank you.

4    BY MR. BELL:

5    Q.  This is a memo from Ari Schwebel, at the JSRcap.com domain

6    to you on November 7th.  "Subject: Jeremy.  Jeremy is in your

7    office with this guy Norman.  You want them in your office??"

8    Do you recall the circumstances of this e-mail that was sent?

9    A.  I do.

10   Q.  What do you remember?

11   A.  I remember that Jeremy and Norman were in my office.  Ari

12   knew that I didn't like people waiting in my office when I

13   wasn't there.  But I told him it was okay.  I didn't want to

14   insult Norman and have him wait in a waiting area, especially

15   given his status in my life at that point; so I told Ari it was

16   okay.

17         MR. BELL:  You can take that down, Ms. Bustillo.

18   Thank you.

19   Q.  You mentioned there came a point where members of the inner

20   circle, as you called it, traveled together.  Did there come a

21   point where the inner circle, including Norman, began to travel

22   together?

23   A.  Yes.

24   Q.  Where was the first place that you -- well, when you did

25   travel together, who made arrangements for the travel?

1   A.  I did.

2   Q.  Who paid for it?

3   A.  I did.

4   Q.  And by your reckoning, Mr. Rechnitz, what was the purpose

5   of this travel?

6   A.  So get away.  First off, Phil Banks was overworked; so we

7   were always looking for an opportunity to get him away a

8   little.  Even his assistant, Marilyn, would always tell us he's

9   burnt out, take him away.  He's come into the office at

10  5:00 a.m., leaving at midnight.  So it was a way for us to

11  further our relationship on a personal level and go with the

12  chief of police and Norman.

13  Q.  And so do you recall the -- well, let's take a step back.

14          MR. BELL:  By virtue of the stipulation I read or,

15  rather, that we read yesterday, I believe that Government

16  Exhibit 203 is already in.  Before we do that, however,

17  Ms. Bustillo, can you put up Government Exhibit 1008 for the

18  witness.  And if counsel has no objection, the government would

19  like to offer it straight away.

20          MR. SHECHTMAN:  No objection, judge.

21          MR. MAZUREK:  No objection.

22          MR. BELL:  The government offers 1008.

23          THE COURT:  It's in.

24          (Government's Exhibit 1008 received in evidence)

25          MR. BELL:  Can we publish that to for the jury?  It's

1   up?  Great.

2   BY MR. BELL:

3   Q.  Now, Mr. Rechnitz, are you familiar with this e-mail?

4   A.  Could they zoom it in?  It's hard to see.

5   Q.  Sure.  Why don't we start with the bottom half.

6   A.  Okay.

7   Q.  Oh, perfect.  Whoops, I see what you're doing.  Why don't

8   we just do the bottom-half zoom for now.  Then we can zoom back

9   out.

10          So, Mr. Rechnitz, are you familiar with this e-mail?

11  A.  I am.

12  Q.  And what is it?

13  A.  This is an e-mail from the travel agent to me in

14  November 2013, November 5th, with a confirmed booking receipt

15  for a flight from Newark to London and London back to JFK.

16  Q.  Who are the passengers, according to the travel

17  arrangements here?

18  A.  Norman Seabrook, Jeremy Reichberg and me.

19  Q.  Now, do you recall making travel arrangements to London at

20  about this time?

21  A.  I do.

22  Q.  Just tell me about the circumstances of the planned trip?

23  A.  I was going for a purpose, I think to see a property, and I

24  invited Jeremy, as I did often, to come along, and we had the

25  idea to bring Norman as well, to kind of treat him.

1    Q.   And while --

2    A.   On a nice trip with a first class seat.

3    Q.   Why did you want to treat Norman?

4    A.   Again, same idea, to build a relationship and look like a

5    very important person to him.

6    Q.   Did you, in fact, wind up taking that trip to London with

7    Mr. Seabrook?

8    A.   No.

9    Q.   Why not?

10   A.   On the way there, I got cold feet.  I didn't really want to

11   go; so I told Jeremy, I don't want to go.

12   Q.   Did you tell Mr. Seabrook as well?

13   A.   We did.  We called him, and we actually met up with him on

14   the way to the airport on the side of the highway.

15   Q.   What happened during that exchange?

16   A.   I explained to Norman, if he wants, he and Jeremy can still

17   go, and he said, no, I'm not that kind of guy.  I was going to

18   spend time with you, and if you're not going, I'm not going.

19   Q.   Can we take down the blowup window, Ms. Bustillo.

20            So this is when -- just to look at the top here,

21   that's when you had originally forwarded those arrangements to

22   Mr. Seabrook, is it?

23   A.   Yes.

24   Q.   Let's take that down, Ms. Bustillo.  Let's put up

25   Government Exhibit 203, which came in via stipulation.  Can we

1    just focus in on the text?  Thank you.

2            So did there come a time, Mr. Rechnitz, when you did,

3    in fact, travel with Mr. Seabrook?

4    A.  Yes.

5    Q.  Are you familiar with this document here?

6    A.  Can you zoom it in, please?

7    Q.  Sure.  Just focus on the -- a little further down.  Let's

8    blow that up for now.

9            Does that help, Mr. Rechnitz?

10   A.  No, that's the wrong section.

11   Q.  Okay.  By the way, is your screen right next to you not

12   working?

13   A.  It is, but it's tiny.  Okay.

14   Q.  Can you see that?

15   A.  Yes.

16   Q.  Are you familiar with this document, now looking at the

17   bottom half of it?

18   A.  Yes, I am.

19   Q.  And what is this?

20   A.  This is the itinerary for a trip that Norman, Jeremy, Phil

21   and I took to the Dominican Republic.  Phil had been in Tampa

22   visiting family and Norman, Jeremy and I were in New York at

23   the time, and we all flew there and met there.

24   Q.  Was this commercial or private?

25   A.  Commercial, Delta Airlines and American Airlines.

1    Q.  What was the purpose of this trip?

2    A.  Again, Phil had a break in his schedule, and it was to go

3    away in an intimate setting of the four of us.

4    Q.  Did you, in fact, take that trip?

5    A.  I did.

6    Q.  Who paid for the accommodations?

7    A.  I paid.

8    Q.  For the flight?

9    A.  I paid.

10   Q.  For the food?

11   A.  I paid.

12   Q.  And what did you do during the trip?

13   A.  We played golf.  We relaxed.  We smoked cigars.  We ate

14   nice.  We relaxed.

15   Q.  Why don't we take that down.

16          Do you recall where in the Dominican Republic you

17   stayed?

18   A.  Yes.

19   Q.  Where?

20   A.  Punta Cana.

21   Q.  Why Punta Cana?

22   A.  That's where I had been previously, and that was a place

23   that was beautiful.

24   Q.  Now, did there come a time when you took another trip to

25   the Dominican Republic with some subset of these folks?

1    A.  Yes.

2    Q.  I want to publish Government Exhibit 206, which is in via

3    stipulation.

4            MR. SHECHTMAN:  No objection.

5            THE COURT:  I think it's already in.

6    Q.  If we can just focus in on the top half, Ms. Bustillo.

7    Thank you.  And if you can, for me, highlight first the date

8    December 17th, 2003 --

9    A.  2013.

10   Q.  Sorry, 2013.  Thank you, Mr. Rechnitz.  Departure from

11   Teterboro, New Jersey, to Punta Cana.  And can you now get out

12   of that blowup window and go to the next page.  Can you enlarge

13   the matrixes at the bottom, and can you highlight the passenger

14   names, Ms. Bustillo.  Philip Banks, Hamlet Peralta, Jona

15   Rechnitz, Jeremiah Reichberg and Norman Seabrook.  Can you take

16   that down.

17           Now, can you take the document as a whole down.  Can

18   you put up 206A, Ms. Bustillo.  Can you highlight M2Jets in the

19   invoice box at the top.

20           Do you recall a second trip to the Dominican Republic

21   in December of 2013?

22   A.  Yes.

23   Q.  Did you arrange that trip?

24   A.  I did.

25   Q.  Did you pay for that trip?

1    A.  I did.

2    Q.  First of all, who attended that trip to the Dominican

3    Republic?

4    A.  Phil Banks, Norman Seabrook, Jeremy Reichberg and Hamlet

5    Peralta and me.

6    Q.  Had Mr. Peralta been present for the earlier trip?

7    A.  No.

8    Q.  How did Mr. Peralta come to join this trip?

9    A.  I asked him to come along.  He was somebody who had a

10   brother who lived there.  He knew driving services, or whatever

11   that we would need when we were there, so I brought him along

12   to come and I also wanted to get him excited and hook him up,

13   since we were doing business with him.

14   Q.  Did you understand Mr. Peralta to already know everyone in

15   the party?

16   A.  I believe we had introduced him to Norman to that point and

17   potentially Phil as well.

18   Q.  How did the travel from the New York area to the Dominican

19   Republic work this time?

20   A.  I chartered a private jet.

21        MR. BELL:  Your Honor, we're going to get into this

22   trip in some detail, and this may be a logical place to take

23   the 11:30 break, even though we're a couple minutes early.

24        THE COURT:  Okay.  Let's go ahead and take the break

25   now.  Let's have you come back, again, in 35 minutes.  So let's

1    have you get back here at 11:58.  In the meantime, don't

2    discuss the case with anyone else, don't allow anyone to

3    discuss it with you.  Don't do any independent research on the

4    case, and we'll see you soon.

5              (Jury excused)

6              THE COURT:  Okay.  You may be seated.  Let's give the

7    jurors a three-minute, three-and-a-half-minute head start and

8    everyone can go.  Let's get counsel and the parties back here

9    at 11:55.  Is there anything else we need to address, counsel?

10             MR. SHECHTMAN:  Nothing, Judge.

11             THE COURT:  Okay.

12             MR. BELL:  Oh, there is one thing that I think

13   Mr. Mazurek has.

14             THE COURT:  Everyone can be seated.

15             MR. BELL:  Your Honor, I realize that we applied this

16   issue.  I know that Mr. Mazurek is about to raise an

17   evidentiary issue.  We may actually be able to confer and not

18   offer that.  So perhaps a moment for us to resolve that on our

19   own.

20             THE COURT:  All right.  Sounds good.

21             (Pause)

22             Counsel, resolved it?

23             MR. BELL:  We are hopeful that we will.

24             MR. CAPONE:  I think it would be best probably to just

25   address this as soon as we come back, so we can just talk

1    amongst ourselves.

2              THE COURT:  All right, fine.

3              MR. BELL:  Your Honor, you know that we had the

4    witness in the witness room, which I think he can get to

5    without running into the jurors here.  Can we excuse the

6    witness?

7              THE COURT:  That's fine with me.  Counsel?

8              MR. SHECHTMAN:  No objection.

9              MR. MAZUREK:  That's fine.

10             THE COURT:  Okay.  See everyone at 11:55.

11             (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2                        12:00 P.M.

3              THE COURT:  Okay.  So, counsel, have you worked out

4    this disagreement that you had before?

5              MR. MAZUREK:  Yes, your Honor.

6              THE COURT:  Okay.  And I'll give the jury the same

7    instruction that I've given them yesterday, fine with everyone?

8              MR. MAZUREK:  Yes.

9              MR. BELL:  Yes.

10             THE COURT:  So when the jurors are all here, we'll

11   start.  Let's go ahead.  Was there something else, counsel?

12             MR. MAZUREK:  Your Honor, may we put the draft

13   transcripts of some calls that may be coming in on their chairs

14   or underneath their chairs, or do you want us to wait?

15             MR. SHECHTMAN:  We have no objection to doing that.

16             MR. MAZUREK:  No objection.

17             THE COURT:  Okay.  Let's do that.

18             MR. NAWADAY:  Your Honor, we noticed that during the

19   break, during lunch, the door to the jurors' room was held open

20   during that time, and I'm just fearful that, with all the

21   people milling in the elevator area, you can hear what the

22   jurors are discussing over lunch.  I don't know if it's

23   possible to keep that door closed.  I'm sure it was open for

24   the jurors' comfort.  I wanted to raise that.

25             THE COURT:  Okay.  We'll see if we can keep that door

1    closed.  Obviously, the jurors shouldn't be discussing the case

2    anyway, but yes.

3             MR. MAZUREK:  Also, I would ask that the Court give

4    the standard instructions on the use of transcripts if they are

5    not in evidence.

6             THE COURT:  Okay.  When are the transcripts going to

7    be used?

8             MR. BELL:  Towards the back end of the direct, your

9    Honor.  I think we may get to them today, but there's also a

10   real possibility that we don't.  It may be worth waiting.  It

11   probably is worth waiting, just to give that instruction,

12   because it may not be today.

13            MR. MAZUREK:  No, just before you do it.

14            MR. BELL:  Yes, just before we do it.

15            THE COURT:  Okay.  Are all the jurors here, Tara?

16            THE DEPUTY CLERK:  Yes, Judge.  We're ready.

17            THE COURT:  Okay.  I guess counsel mentioned something

18   about the jury room being open during the break.  Is there any

19   way we can keep that door closed during the break?

20            THE DEPUTY CLERK:  They're allowed to keep the door

21   open, but they have to go back and forth.  I can arrange, if

22   that door is open, that they just have to pull it.

23            THE COURT:  Okay.  Let's get the witness on the stand.

24   Anything else before we start?

25            MR. CAPONE:  No.

1           MR. BELL:  No, your Honor.

2           MR. SHECHTMAN:  No, your Honor.

3           THE COURT:  Are there any other exhibits that the

4    counsel for the government wants to introduce into evidence,

5    and if so, do you want to go ahead and clear those with counsel

6    now?

7           MR. BELL:  I'm sorry, your Honor?

8           THE COURT:  Any other that you plan to introduce, do

9    you want to clear those with counsel right now so we can move

10   things along?

11          MR. SHECHTMAN:  Can Mr. Seabrook use the bathroom very

12   quickly?

13          THE COURT:  Yes.

14          MR. MAZUREK:  Judge, I think we're fine on exhibits

15   that Mr. Bell is going to introduce.

16          MR. SHECHTMAN:  Other than what we said, we've reached

17   agreement.

18          THE COURT:  Okay.  Are we ready?  All right.  Let's

19   bring the jury in.

20          (Jury present)

21          THE COURT:  Okay.  Please be seated.  Welcome back.

22   Let's continue.  Go ahead, counsel.

23          MR. BELL:  Thank you, your Honor.

24   BY MR. BELL:

25   Q.  Good afternoon, Mr. Rechnitz.

1    A.  Good afternoon.

2    Q.  Just wait for everybody to get settled here.

3              THE COURT:  Okay, counsel.  Go ahead.

4              MR. BELL:  Thank you, your Honor.

5    BY MR. BELL:

6    Q.  Mr. Rechnitz, I think before we broke I had started to ask

7    you some questions about a second trip that you took to the

8    Dominican Republic with Jeremy Reichberg, Hamlet Peralta,

9    Philip Banks and Norman Seabrook.  Do you recall that?

10   A.  Yes.

11   Q.  At the time that you took that trip, had you discussed

12   Mr. Seabrook with Mr. Huberfeld?

13   A.  Yes.

14   Q.  What was the nature of the discussion that you had had

15   about Norman Seabrook with Murray Huberfeld?

16   A.  As I was saying before, Murray had asked me to introduce

17   him to more institutional level or unions or any of those types

18   of connections that he knew I had for him, as investors of

19   Platinum hedge fund.

20   Q.  When you had mentioned Mr. Seabrook, what, if anything, did

21   Mr. Huberfeld say?

22   A.  He told me that would be great.  I should go, try to raise

23   as much as I could from him.

24   Q.  Did you have any particular goal in mind in this vein when

25   you took the December trip to the Dominican Republic?

1    A.  I planned on bringing it up at some point.  I was waiting

2    for the right time.

3    Q.  Now, during that trip to Punta Cana, did you have occasion

4    to speak with Mr. Seabrook privately?

5    A.  I did.

6    Q.  At what point in the trip?

7    A.  Late at night.

8    Q.  Where did you speak to Mr. Seabrook?

9    A.  In his hotel room.

10   Q.  How did that conversation start?

11   A.  Norman -- we had some drinks.  Norman had drank a lot.  He

12   was highly emotional that evening.  He was telling me, you

13   know, he saw this whole luxurious trip, we had chartered a

14   private plane, cigars, golfing, beautiful villa, and he was

15   emotional thanking me.

16        And it was hard for him how everything that he has he

17   had to earn on his own and, unfortunately, he only grew up

18   basically just with his mother, a single mom, and it was very

19   hard, and how it's hard for a black man nowadays to make a

20   living, and that he had a terrible situation with his home

21   mortgage, and he wishes he was able to afford these types of

22   things.

23        He was emotional that a dog of his passed away.  He

24   showed me a tattoo of his dog on his chest, and we were talking

25   about that sort of thing.

1    Q.  Where did the conversation go from there?

2    A.  I felt that was my opening to talk to him about potentially

3    investing in the hedge fund so he can make some extra income.

4    So I told him -- I asked him, where does the union invest, what

5    type of investments, and he was explaining that they're

6    invested in bonds and, I guess, other funds, or they have other

7    investments out there.

8           And I asked him what the process is, and he said that

9    there's a consultant that they pay, and that that consultant

10   directs the investments or vets it for the funds.  I asked

11   him -- I indicated to him, oh, that guy probably makes money

12   and invests it where his friends want, where he has friends.

13   And Norman says, oh, he makes, everybody makes, but Norman

14   Seabrook doesn't make.

15          So I said, yeah, you should be making money.  He said,

16   yes, it's time Norman Seabrook got paid.  So I started talking

17   to him about the hedge fund.  I said that I have a friend named

18   Murray Huberfeld who's a partner.  He has a hedge fund called

19   Platinum.  I'm actually a partner in the company, I told him,

20   to get him comfortable, which wasn't true.

21          And I told him, I would love to introduce you.  I

22   think it would be a great place for the fund to invest, and

23   you'll make money personally, if you make that investment.  He

24   said, what kind of money would I make?  And I said, you know,

25   let's set up the meeting with Murray.  I'll talk to Murray when

 1  we get back to town, and I'll get back to you.

 2  Q.  Now, at the time that you had this conversation in

 3  Mr. Seabrook's bedroom, was there any discussion concerning the

 4  amount of money that the union might be able to invest in the

 5  hedge fund?

 6  A.  Yes.  So I asked him if he controls the money, and how it

 7  works.  When he told me there's a consultant, and he said maybe

 8  if it's good, we'll start with five to seven million.  I had

 9  asked him about if it's something easy for him to do, can you

10  pull it off?  He said, yeah, well, we have a special pocket of

11  money in our annuity fund, and that's something that I control.

12  Q.  Did Mr. Seabrook say anything about how he controlled the

13  annuity fund?

14  A.  No.  I mean, he told me that there were some executive

15  members involved, that he was in charge, he had control over

16  that.

17  Q.  Now, up until this point, Mr. Rechnitz, what, if anything,

18  had Mr. Seabrook told you about the control that he wielded

19  within the union and his executive board?

20  A.  He told me that there are always people trying to hurt him

21  and take him down within the union, and that he's been long

22  lasting and that he was in a good position to get things done.

23  Q.  Had Mr. Seabrook related to you any particular instances of

24  someone challenging his control?

25  A.  At one point, he told me about something I read, a guy

1  Valentine who had some beef with him, that wanted him out or

2  wanted his position, and Norman even forwarded me, at one

3  point, or told me to look at some article concerning it, which

4  I think I then forwarded on to a few friends, including Murray,

5  and that he would prevail.  It wasn't an issue.

6  Q.  What, if anything, did Mr. Seabrook say about the union's

7  investment strategy up until that point?

8  A.  That they -- again, they have this consultant they go

9  through, and the union has all sorts of investments and pockets

10 of money, but that the annuity fund was one that he controlled.

11 Q.  When Mr. Seabrook -- I'm sorry, were you finished?  Okay.

12 I heard a sound.  I thought it was you.

13          When Mr. Seabrook said it's time for Norman Seabrook

14 to get paid, what was your reaction?

15 A.  I was cool with it.  That was my understanding as well,

16 that he'll invest the money and that he's going to be rewarded

17 for that investment monetarily.

18 Q.  Now, one moment, please.  Now, up until this point, had you

19 and Mr. Reichberg both been involved with your dealings with

20 Mr. Seabrook?

21 A.  No.

22 Q.  And what do you mean?

23 A.  I'm sorry.  Dealings, meaning just hanging out and stuff?

24 Yes.

25 Q.  Hanging out?

1   A.  Absolutely, everything was together.

2   Q.  During the meeting in Mr. Seabrook's bedroom in Punta Cana,

3   what, if anything, did Mr. Seabrook say with respect to who

4   should and who should not know about what you were discussing?

5   A.  He told me he didn't want Jeremy to know about it, and that

6   this would be between us, and that he didn't trust Jeremy.

7   Q.  What was your reaction to that, Mr. Rechnitz?

8   A.  I said okay.

9   Q.  Did there come a point where you left Mr. Seabrook's room?

10  A.  Yes.

11  Q.  What was your understanding at that time of what would

12  happen next?

13  A.  I would reach out to Murray, tell Murray, good news, I

14  think we're going to be able to secure five to seven million to

15  start from Norman, and I'd make that introduction, and that I'd

16  need to see Murray when I came back to town.

17  Q.  So when you did come back to town, did there come a time

18  when you contacted Mr. Huberfeld?

19  A.  Yes.

20  Q.  Approximately how long after you got back to the New York

21  area?

22  A.  Shortly after.

23  Q.  During that conversation, what did you say to Murray

24  Huberfeld and what did he say to you?

25  A.  I told him that I had a good conversation with Norman, and

1  that I need to see him to discuss specific details, but I think

2  he's good to go for five to seven million.

3  Q.  What was Mr. Huberfeld's reaction?

4  A.  He was happy.

5  Q.  What, if anything, did you tell Mr. Huberfeld with respect

6  to Mr. Seabrook's desire to get paid?

7  A.  That was an in-person conversation afterwards.

8  Q.  What did you say at that time?

9  A.  I met him, and I explained that I spoke to Norman and that

10  Norman wanted to be paid.  Murray first said, you know what,

11  I'll figure out a calculation, which we went through, that will

12  be for the pot for you, Jeremy, Norman, whoever, it's for the

13  whole group.  You worry with it.  I'll figure out the number

14  and you worry about it.

15       I said, on this one, I don't need to be paid.  I'm

16  happy to help.  We need to have a specific understanding of

17  what Norman's getting because I want to go back to him, and

18  then Murray said okay and went through the calculation with me.

19  Q.  Why was it that you felt that you didn't need to be paid

20  for this one, Mr. Rechnitz?

21  A.  This was particularly important from a request from Murray.

22  I like to give an image sometimes in a bigger than I am.  It

23  was just 60 grand at that time, or whatever it was.  I'm sorry,

24  I take back the 60 grand.  It was just going to be a fee that I

25  was going to pay tens of thousands of dollars, which involved a

1  lot of money, and I felt it would have more value to me, if

2  Murray kind of owed me one, was thankful to me for procuring

3  this.

4  Q.  What, if anything, at that time, had you and Mr. Huberfeld

5  discussed with respect to the possible amount of the

6  investment?

7  A.  I had told him it would be five to seven million dollars.

8  Q.  Now, did you have further conversations with Mr. Seabrook

9  and Mr. Huberfeld over the next few days?

10  A.  Yes.

11  Q.  What was the nature of your conversations with each of

12  these men?

13          MR. MAZUREK:  Can I have a more specific time frame,

14  if that's possible?

15          MR. BELL:  That seems to be something that --

16          THE COURT:  Please rephrase the question.  Go ahead.

17          MR. BELL:  Well, I can follow up, your Honor.

18  BY MR. BELL:

19  Q.  First, I think that question, did you have further

20  conversations with Mr. Seabrook and Mr. Huberfeld after that?

21  A.  I did.

22  Q.  Approximately when did these conversations take place?

23  A.  Soon after the trip.

24  Q.  So what month and year are we talking about?

25  A.  Same month, in December 2013.

1    Q.   Over those next few days and weeks in December of 2013,

2    describe the conversations that you had with Mr. Huberfeld?

3    A.   So, first, we wanted to establish with Murray -- I wanted

4    to establish what Norman's cut would be, if he made this

5    investment.  So Murray had explained to me that his funds

6    charges what's called two and 20.  Two, is two percent of the

7    amount of money that's invested by an individual or an entity

8    or the union.  That, Platinum keeps.  That's to pay their

9    payroll, keep the lights on, that sort of thing.

10          And 20 percent of the profit that the union would make

11   would go to Platinum, and from that 20 percent profit, he would

12   give 10 percent of those earnings to Norman.

13   Q.   And did you make, or did Mr. -- withdrawn.

14          Did either you or Mr. Huberfeld make specific

15   hypothetical calculations as to what that could mean for

16   Mr. Seabrook?

17   A.   Yes.

18   Q.   And what did you discuss in that vein?

19   A.   So he said, for example, if eventually he has $20 million

20   invested and the money makes 50 percent for the year, which

21   means there's a $10 million profit, from the 10 million profit,

22   20 percent would go to the union and so on and so forth.  It

23   came out to whatever the calculation at the time was, that the

24   expectation to Norman would be around $100,000 if all went

25   well.

Q.  And how frequently would Mr. Seabrook be paid?

A.  At the end of the year, once the funds performed and the

numbers came in because it was based on the performance of the

fund for that year.

Q.  Would that end-of-the-year payment happen once or more than

once?

A.  Once a year.

Q.  Now, when you got that set of calculations from

Mr. Huberfeld, what did you do with them?

A.  I went back to Norman, and I told Norman that I had thought

that he could be making a hundred to $150,000 a year.  I had

spoken to him about how the meeting went with Murray and that I

think, if you're happy, we can make an introduction and

properly make this thing happen.

Q.  Now, did you and Mr. Seabrook speak in detail about the

formula that Mr. Huberfeld had come up with?

A.  We did and Norman, you know, didn't really have the

patience to understand or go through the formula.  He just

wanted to know, bottom line, what do you think I'm making.  I

said, it all depends on what you invest and what it earns, but

it should be between a hundred and 150,000.  I wanted to make

Norman a little more excited than the 100,000 number.

Q.  And did that work?

A.  Yes.

Q.  What was Mr. Seabrook's reaction?

1    A.  He was happy.  He told me I should set up an introduction

2    via e-mail and that he would meet Murray.

3    Q.  At this point, Mr. Rechnitz, what understanding did you

4    have of Platinum Partners' financial health?

5    A.  I understood Platinum to be a strong company that had a lot

6    of well-known investors.  Many times Murray had shown me a

7    chart showing the returns of Platinum on an annual basis,

8    showing positive numbers.  In one or two cases, some down

9    years, which he portrayed as healthy for a fund.

10   Q.  Now, let me put up on the screen Government Exhibit 659,

11   and I think that you've admitted this already.  Are you

12   familiar with this location, Mr. Rechnitz?

13   A.  I believe so.

14   Q.  And how are you familiar with it?

15   A.  I think -- I don't think that's Platinum's offices.  I

16   think that's Beechwood.

17   Q.  And what was Beechwood?

18   A.  Beechwood was another company that Murray told me they had

19   started, which is a reinsurance company, which, as I understood

20   it, insurance companies give Beechwood money of theirs to

21   invest for a minimal interest rate, which has to be repaid, and

22   anything in excess of those interest rates, the company keeps.

23   Q.  What was your understanding of Mr. Huberfeld's relationship

24   with Beechwood reinsurance?

25   A.  I understood it to be a partner in the company.

1   Q.  And did you understand Mr. Huberfeld to have offices at

2   Beechwood?

3   A.  Yes.

4   Q.  Did you understand Mr. Huberfeld to have offices at

5   Platinum?

6   A.  Yes.

7   Q.  At around this time, did you meet him in both places?

8   A.  I had met him at Platinum, and I had met him at Beechwood.

9   I can't tell you the timing of each.

10  Q.  Okay.  Let's take this down, Ms. Bustillo.

11          Now, did there come a time when you introduced

12  Mr. Seabrook and Mr. Huberfeld in person?

13  A.  Yes.

14  Q.  Did you have one meeting with the two of them or multiple

15  meetings?

16  A.  Multiple meetings.

17  Q.  What were the multiple meetings that you had?

18  A.  I remember meeting once in their office, in the Platinum

19  offices, and one time at the Prime Grill Restaurant.

20  Q.  I'm going to ask you first about the Prime Grill, but

21  before I do, did Mr. Huberfeld express to you a desire to have

22  the union invest by any particular time?

23  A.  Yeah, I mean, a few times by e-mail.  I think February 1st

24  was the date he was pushing for.

25  Q.  And did he offer a reason for February?

1   A.  No.  He had told me -- I don't remember if it was February

2   or the second time they invested, but he specifically wanted

3   them in for that month because they were going to have a very

4   big month.  He didn't want him to miss out on the huge month of

5   profit.

6   Q.  Okay.  So I want to direct your attention to the meeting

7   with Mr. Huberfeld and Mr. Seabrook, not the Prime Grill one,

8   the other one at Platinum's offices.  How did that come

9   together; do you recall?

10  A.  Yeah, I put the meeting together.  We met in the board

11  room.

12          MR. MAZUREK:  Your Honor, can we have a time frame for

13  that meeting?

14          THE COURT:  No.  That's overruled.  Go ahead.

15  Continue your answer.

16  A.  We had a meeting in the Platinum offices, in the board

17  room, and this was a kind of a get-to-know-another meeting.

18  Norman to talk about his life, his career and the union.

19  Murray to talk about his life, his career, the background of

20  the funds.

21          Murray started to explain the two products.  We

22  discussed earlier before that the fund had offered, and I told

23  Murray, as I often did, no, no, no.  He would only be

24  interested in the credit fund.  It's less risk, and this is

25  better for Norman.  The numbers of the credit fund alone,

Norman had told me he thought were already better than the

small amounts of money that the union was getting on their

previous investments.

Q.  Why did you personally, Mr. Rechnitz, want to steer things

toward the credit fund?

A.  Because I wanted it to work well, meaning if there was a

down year, which is possible, they would lose less money than

if they were in the value arbitrage fund.  It was a higher risk

fund.

Q.  At the point in the meeting with Mr. Huberfeld and

Mr. Seabrook, where you attempted to steer things toward the

credit fund, what was Mr. Huberfeld's response?

A.  He said okay.

Q.  And did you leave that meeting thinking that the union was

likely to invest in one or the other fund?

A.  Yeah.  I felt that Norman had taken my advice, and Murray

did as well.

         MR. SHECHTMAN:  I didn't hear the last part.

Q.  Can you repeat that, Mr. Rechnitz?

A.  Yes.  I felt that Norman had taken my advice and Murray had

as well.

Q.  One moment, please.  Now, at around this time, back in

December of 2013, did you have any conversations with

Mr. Huberfeld about how payments might actually work?

A.  No.

1   Q.  At the time that you spoke to Mr. Huberfeld, did you have

2   any initial discussions about whether or not you might be

3   compensated for this?

4   A.  Yes.

5   Q.  What did you say to Mr. Huberfeld, and what did he say to

6   you?

7   A.  Same thing.  I said, this one, I don't need to make, and

8   Murray said, okay, we'll figure it out afterwards.

9   Q.  What did you understand his saying "we'll figure it out

10  afterwards" to mean, despite the fact that you said you weren't

11  interested?

12  A.  That separate from the calculation we specified Norman

13  would make, that he'll figure it out.  He'll do something for

14  me.  He wasn't just going to leave me with making nothing.

15  Q.  How did you feel that the meeting, the in-person meeting at

16  Platinum with Mr. Seabrook and Mr. Huberfeld, had gone?

17  A.  Excellent.

18  Q.  What made you think that?

19  A.  Murray was happy.  Norman was happy.  I was happy.

20  Q.  So did there -- one moment, please.  So I want to direct

21  your attention to what's marked as Government Exhibit 1013.

22          Ms. Bustillo, can we put that up.

23          MR. BELL:  And I'll offer it.

24          MR. SHECHTMAN:  No objection.

25          MR. MAZUREK:  No objection.

1          THE COURT:  Okay.  It's in.

2              (Government's Exhibit 1013 received in evidence)

3          MR. BELL:  Can we publish that for the jury, please.

4   BY MR. BELL:

5   Q.  Mr. Rechnitz, this is an e-mail -- oh, sorry.  All good?

6   Mr. Rechnitz, this is an e-mail from Noemi Morales at the

7   Platinum LP domain to you dated December 23th, 2013.  Who did

8   you understand Noemi Morales to be?

9   A.  One of the assistants in the office.

10  Q.  The subject line is:  "Please call Murray at the office."

11  What means did you have to contact Mr. Huberfeld generally at

12  that time?

13  A.  I would call his cell phone or his office directly.

14  Q.  Let's take that down, and can we go to Government 1014,

15  which I'd like to offer.

16         MR. MAZUREK:  No objection.

17         THE COURT:  Any objection from co-counsel?

18         MR. SHECHTMAN:  I apologize.  None at all.

19         THE COURT:  Okay.  It's in.

20             (Government's Exhibit 1014 received in evidence)

21         MR. BELL:  So let's publish that to the jury as well.

22  BY MR. BELL:

23  Q.  This came in via stipulation as a calendar entry within

24  your e-mail.  How did you use calendar entries, Mr. Rechnitz?

25  A.  If I had a meeting, I would write, just usually, the first

1    name of the person I was meeting.  I usually knew the location.

2    Q.  So what meeting does this represent?

3    A.  This represents the meeting between Murray, Norman and me

4    at Platinum that we just spoke about.

5    Q.  What's the date of the meeting here?

6    A.  December 24th, 2013.

7    Q.  And what time?

8    A.  12:30 p.m.

9    Q.  Thank you, Ms. Bustillo.  Can we take that down and put up

10   Government Exhibit 1015.

11   A.  I just want to clarify.  I said that's the meeting we spoke

12   about.  I believe that's the meeting we spoke about.

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. BELL:  And so I will go ahead and offer 1015.

2              MR. SHECHTMAN:  No objection.

3              MR. BELL:  1015.

4              THE COURT:  It is in.

5              (Government Exhibit 1015 received in evidence)

6              THE COURT:  While we are here, counsel, are there

7     other exhibits you plan to introduce?  Why don't you show those

8     to counsel. (Pause)

9              The next few exhibits there is no objection to?

10             (off-the-record discussion)

11             MR. SHECHTMAN:  We are fine, Judge.

12             THE COURT:  The never ones should come in and they'll

13    show up for the jury immediately.

14    BY MR. BELL:

15    Q.  Here we have 1015, an email from Murray Huberfeld.  Were

16    you familiar with Mr. Huberfeld's Gmail account?

17    A.  Yes.

18    Q.  Was that a work email, a personal email, or some other

19    email?

20    A.  I think both, his personal and work.

21    Q.  It is dated December 24, 2013, at 4:06 pm.  It is addressed

22    to you.  There is no subject and it says, "Great job today.  24

23    names to go."

24             Do you recall this email, Mr. Rechnitz?

25    A.  Yes.

1    Q.  What do you understand "great job today" to refer to?

2    A.  As putting Norman together with him and bringing Norman to

3    the table.

4    Q.  What did you understand "24 names to go" to refer to?

5    A.  In one of my conversations with Murray, he said get a list

6    of 25 names of people you think you can target to come invest

7    in the fund, so 24 names to go is the 25 minus Norman.

8    Q.  Had you, in fact, put together other names for Mr.

9    Huberfeld?

10   A.  I did, to make sure that it is not people he had already

11   been dealing with.

12   Q.  What sorts of people -- not asking for specific here, but

13   what sorts of people or entities have been among the other 24?

14   A.  I think it was relationships that I had with private

15   individuals.  Potentially there may have been some unions on

16   there as well.  I don't really remember.

17          MR. BELL:  Let's take this down.  I am going to go

18   ahead and offer 1016.

19          THE COURT:  It is in.

20          (Government Exhibit 1016 received in evidence)

21          MR. BELL:  Can we publish that to the jury.

22   BY MR. BELL:

23   Q.  Are you familiar with this email, Mr. Rechnitz?

24   A.  Give me a moment, please.  (Pause)

25   Q.  I am sorry?

1   A.  I just need a moment.

2   Q.  Oh, sure.

3   A.  Yes.

4   Q.  The email is from Joseph Ritterman at Platinum to you,

5   copying Murray Huberfeld at his Platinum LP dot com account.

6   It is on Thursday, December 26th, 2013.  The subject line is

7   Platinum materials.

8           What was your understanding of this email,

9   Mr. Rechnitz?

10  A.  After the meet I had with Murray Huberfeld, Murray and

11  Norman, Murray Huberfeld told me to get materials sent over.  I

12  made that request to Murray.  I thought he meant like at the

13  company, and I was a little surprised he had sent subscription

14  documents for the credit fund as discussed and that I was then

15  to forward to Norman.

16  Q.  What did you understand "subscription documents" to mean,

17  Mr. Rechnitz?

18  A.  Investment documents.

19  Q.  Why were you expecting something other than actual

20  investment documents at that point?

21  A.  The way I understood it, he would just be sending materials

22  on the fund itself.

23  Q.  What kinds of materials were you expecting that would just

24  concern the fund itself rather than --

25  A.  What fund invests, performance record, who the principals

1    are, due diligence information.

2    Q.  What of the Platinum Partners products did you understand

3    these subscription documents were for?

4    A.  The credit fund we had discussed in the office.

5              MR. BELL:  Can we now take that down -- sorry.  The

6    pull up window.  Just flip through the next three or four

7    pages, one at a time for a couple of seconds.

8              (Pause)

9    Q.  Let's stop there.  It says at the top for the exclusive use

10   of Jona Rechnitz.  It says Platinum Partners Credit

11   Opportunities Fund.  Again was this, to your understanding, the

12   more conservative fund or riskier fund?

13   A.  The more conservative fund.

14             MR. BELL:  You can take the blowup down and go through

15   the next couple of pages or so, five seconds at a time.  The

16   next one and one after that.  Why don't we take that down.

17   BY MR. BELL:

18   Q.  Now, at this point, before the subscription documents had

19   been sent over, had there, to your knowledge, been an actual

20   pitch by Platinum to the union?

21   A.  No.

22   Q.  You also mentioned a meeting at a restaurant called Prime

23   Grill?

24   A.  Yes.

25   Q.  What kind of restaurant was Prime Grill?

1   A.  Yes, it was a Kosher steakhouse.

2   Q.  How often had you been there before?

3   A.  Many times.

4   Q.  Had you been there with Murray?

5   A.  Yes.

6   Q.  Had you been there with Norman?

7   A.  Yes.

8   Q.  About how far away from your offices at the time was Prime

9   Grill?

10  A.  A few blocks.

11  Q.  About how far away from Mr. Huberfeld's offices at

12  Platinum?

13  A.  A couple of blocks.

14  Q.  Where was Prime Grill located, do you recall?

15  A.  On 56th Street, between 5th and 6th.

16  Q.  Where within Prime Grill did you dine with Mr. Huberfeld

17  and Mr. Seabrook?

18  A.  In the owner's booth.  The owner Joey has a table, a booth

19  close to the bathroom in the corner.

20          MR. BELL:  So the government will offer 665.

21          THE COURT:  It is in.

22          (Government Exhibit 665 received in evidence)

23  BY MR. BELL:

24  Q.  What are we looking at here, Mr. Rechnitz?

25  A.  Prime Grill.

HARJSEA4                    Rechnitz - direct

1   Q.  Now, at the time that you had the meal at Prime Grill with

2   Mr. Seabrook and Mr. Huberfeld, what did you discuss?

3   A.  We discussed Norman potentially running for mayor and

4   Murray said he would be a great mayor and he would support him

5   and we were just having a nice time talking about different

6   city events occurring and politics.

7   Q.  During that meeting, did you get into the nitty-gritty of

8   the business arrangement at all?

9   A.  No.

10          MR. BELL:  You can take that down Ms. Bustillo.  Thank

11  you.

12  BY MR. BELL:

13  Q.  Now, in what ways that you're aware of did Mr. Seabrook and

14  the folks from Platinum Partners keep in contact from that

15  point on?

16  A.  So I sent an email -- I was asked to send an intro email by

17  Norman to him and Murray.  We were discussing how to move

18  forward, and I sent an introductory email between the two of

19  them so they could start dealing directly on moving forward

20  with the investment.

21  Q.  Did you remain on some of those emails even after that

22  introduction?

23  A.  Yes.

24  Q.  What was your understanding of why you were still on the

25  emails at that point?

1    A.   Just coordination on -- Norman was sometimes telling me who

2    should or shouldn't be on the email and just to make sure

3    things flowed so that the investment would actually occur.

4    Q.   At this time, Mr. Rechnitz, to the best of your

5    understanding, did Mr. Reichberg, Jeremy Reichberg, have any

6    knowledge of the arrangements between Mr. Seabrook and Mr.

7    Huberfeld?

8    A.   From me, yes.

9    Q.   Why had you told him?

10   A.   Because we were partners in everything we were doing to

11   that point.  I didn't want to do it behind his back and I felt

12   he should know, and he should know that he was to pretend he

13   didn't know because.  That was Norman's request that he

14   wouldn't know.

15   Q.   Now, you mentioned that you had put Mr. Seabrook in contact

16   with Platinum via email.  Did you come to learn of any

17   preferences that Mr. Seabrook had about how he be kept in touch

18   about this matter?

19   A.   Yes.

20   Q.   What was your understanding of that?

21   A.   He and I think his assistant at one point called me and

22   said use his private email address, not the COBA email.

23              MR. BELL:  This may be a good time.  Can we, Ms.

24   Bustillo, put up Government Exhibit 1001.  It should come in

25   without objection.

1          (Government Exhibit 1001 received in evidence)

2          THE COURT:  Do the jurors have that?

3          Yes, it is in.

4     BY MR. BELL:

5     Q.  So this, pursuant to the earlier stipulation, is a contact

6     from your email.  What is the business phone number listed for

7     Mr. Seabrook?

8     A.  212-226-6175.

9     Q.  What is the mobile listed?

10    A.  646-302-5418.

11    Q.  What is the email displayed there?

12    A.  Norman Seabrook COBA at Gmail dot com.

13         MR. BELL:  Thank you, Ms. Bustillo.  We can take that

14    down.

15    BY MR. BELL:

16    Q.  Did there come a time during this period when you became

17    aware of another preference that Mr. Seabrook had as to who was

18    kept in the loop specifically with respect to email?

19    A.  I don't follow the question.

20    Q.  Sure.  Let me ask you another question.  Withdrawn.

21         Did there come a time, Mr. Rechnitz, where you learned

22    who the COBA investment advisor was?

23    A.  Yes.

24    Q.  Who was that?

25    A.  Someone Norman said, Tommy Reynolds.

1   Q.   Have you ever met Tommy Reynolds?

2   A.   No.

3   Q.   Do you have any other knowledge of Tommy Reynolds aside

4   from what Mr. Seabrook had told you?

5   A.   No.

6   Q.   Did there come a time when Mr. Reynolds appeared on email

7   communications that you were aware of?

8   A.   Yes.

9   Q.   Did there come a time when that stopped?

10  A.   Yes.

11  Q.   What were the circumstances under which that stopped?

12  A.   Norman was very upset that Platinum had copied Tom Reynolds

13  on emails.  He specifically called me to say he shouldn't be

14  copied on any more emails.  This was not the first time Norman

15  had told me that.

16          Someone at Platinum had messed up, so I called Murray

17  up and told him he is making a big problem, he needs to figure

18  this out.  Murray, while he had me on other line on speaker

19  phone, called Andrew Kaplan who I believe was the one who had

20  sent that email, and said nothing else goes to anybody before

21  checking with Jona, you're going to mess us up.  Nothing goes

22  to Tommy Reynolds.  Check with Jona before you send any email.

23          MR. BELL:  At this time, your Honor, I would like to

24  post and offer Government Exhibit 1017, which I don't believe

25  there is objection to.

1          THE COURT:  That is in.

2          (Government Exhibit 1017 received in evidence)

3          MR. BELL:  I'll just note this is another contact, via

4    the stipulation.  Can you just highlight where it says

5    subject -- not yet.  Okay.  There we go.

6          Can you just highlight where it says accepted 3:00 pm

7    meeting Jona Rechnitz and Murray Huberfeld.  Highlight where it

8    says Platinum credit management conference Room 1.  The start

9    time, December 30th, 13, and end time, and required attendees.

10          Let's take that down.

11   BY MR. BELL:

12   Q.  Mr. Rechnitz, at the time were you, in fact, working to get

13   other names on the list taken care of for Mr. Huberfeld?

14   A.  I sent Murray a list of names I thought of in that time

15   period.  I felt very motivated after Norman.

16   Q.  Were you at this time and stage as advanced as you were the

17   correction officers' union and Mr. Seabrook?

18   A.  No.

19   Q.  Did there come a time where you became aware of a

20   presentation that Platinum was going to make at the union

21   itself?

22   A.  Yes.

23   Q.  How did you first become aware of that?

24   A.  I believe that Murray forwarded me an email, if I remember

25   correctly, that Norman was having his team -- actually, Norman

1   had emailed me to find out who would be making the pitch.  He

2   told me he wanted a presentation in his offices at 75 Broad

3   Street, and I asked Murray who from his office would be making

4   that pitch.  Murray sent me I think three names, and then there

5   was an email confirming that meeting.

6           I was the middleman again between the coordination of

7   that meeting.

8           MR. BELL:  So I would like to offer Government Exhibit

9   1018.

10          THE COURT:  It is in.

11          (Government Exhibit 1018 received in evidence)

12          (Pause)

13          MR. BELL:  Can we first look at the bottom part.

14  BY MR. BELL:

15  Q.  The ultimate email was sent to you from an individual named

16  Joe Mann.  Who did you understand Joe Mann to work for?

17  A.  Platinum.

18  Q.  At the bottom email it says hi Jona, Uri has asked me to

19  send our latest materials to TSR Reynolds Consulting.  Do you

20  happen to know the name of the contact at Reynolds Consulting

21  that I am addressing?  Thanks, Joe Mann.

22          Do you understand this email to have been sent before

23  or after Mr. Seabrook got angry about the Reynolds email?

24  A.  I think it was before.

25  Q.  Later on you say I don't, in response.

1          MR. BELL:  Would you highlight the date, Ms. Bustillo.

2     Thank you.  Would you take that down.  Can we put up just for

3     the witness for the moment Government Exhibit 1019.  I will

4     offer 1019.

5          THE COURT:  Any objection?

6          MR. MAZUREK:  No.

7          THE COURT:  It is in.

8          (Government Exhibit 1019 received in evidence)

9          MR. BELL:  Can you put it up for everybody.

10    Q.  This is an email from you --

11         THE COURT:  Hold on.  Do the jurors have it?

12         MR. BELL:  Sorry.

13         (Pause)

14    BY MR. BELL:

15    Q.  This is e-mail from you to Mr. Huberfeld, January 6th, 2014

16    at 9:55 am.  Subject meeting.  Both copied, both copied here

17    for meeting coordination.  What was the purpose of this email?

18    A.  To set up the meeting we were just speaking about, the

19    pitch to Norman's members.

20         MR. BELL:  Ms. Bustillo, please take that down.  The

21    government offers 1020 and 1021.

22         THE COURT:  Any objection?

23         MR. MAZUREK:  No.

24         THE COURT:  Those are in.

25         (Government Exhibits 1020 and 1021 received in

1  evidence)

2          MR. BELL:  Put up 1020, Ms. Bustillo.

3  BY MR. BELL:

4  Q.  This is an email from you to Norman Seabrook, subject line

5  call Uri Landesman for Monday, January 6th.  Who did you

6  understand Mr. Landesman to be?

7  A.  The president of Platinum.

8          MR. BELL:  Let's take that down.  Let's look at 1021.

9  Can we start from the second page.  This is the same email we

10  saw before.  This email contains responses.  Can we go to the

11  next response, moving upward, Ms. Bustillo.

12          So January 6th, 2014, Mr. Seabrook writes please send

13  me the name and number of contact to set up meeting for Monday

14  at 11:00 am.  Take that down and go to the next part.

15          In this email you write Murray, please advise see

16  below for next Monday.  We go back to the first page, Ms.

17  Bustillo.  That last one was an email to both Mr. Seabrook and

18  Mr. Huberfeld.  Shortly after Mr. Huberfeld writes Uri

19  Landesman, Gilad Kalter and Naftali Monela.

20          MR. BELL:

21  Q.  Who did you understand those people to be?

22  A.  The three people from Platinum to attend the meeting in

23  Norman's office.

24          MR. BELL:  Take that down.  The next two, January 6th,

25  at 10:11.  You write, Norman, see below.  On January 6th, 2014

1    at 4:08 Mr. Seabrook says done Monday 11:00 am.

2    BY MR. BELL:

3    Q.  What was your understanding of what was going to happen

4    Monday at 11:00 am?

5    A.  That they set the meeting we have been discussing on the

6    pitch of the fund.

7    Q.  Take that bullet part down.  Your response to Mr. Seabrook

8    is awesome.  What was the big picture, Mr. Rechnitz, you

9    understood was happening at this time?

10   A.  This was the formality to make the investment happen.

11              MR. BELL:  Let's take that down.  The government

12   offers Government Exhibit 1022 without objection.

13              THE COURT:  It is in.

14              (Government Exhibit 1022 received in evidence)

15              MR. BELL:  Can we publish that to everyone, Ms.

16   Bustillo.  This is an email that was forwarded to you.  The

17   forwarded message is from Tommy Reynolds, January 9th, 10:44 to

18   Uri Landesman, subject COBA.  That email says Uri, the meeting

19   is at 12:00 at the Correction Officers Benevolent Association

20   office located at 75 Broad Street, Suite 810.  You will need 10

21   handouts and have 30 minutes for the presentation.  Look

22   forward to meeting you.  Tom Reynolds.

23              There is a forward from Gilad Kalter that goes to you

24   via carbon copy and to Uri Landesman, Murray Huberfeld and to

25   Noemi Morales, who says is this for the Monday meeting.

1    BY MR. BELL:

2    Q.  Did there come a time, Mr. Rechnitz, you learned the

3    meeting had, in fact, happened?

4    A.  Yes.

5    Q.  Who did you learn that from?

6    A.  Murray and Norman.

7    Q.  Were you yourself present for the meeting?

8    A.  No.

9    Q.  Did you expect to be present for the meeting?

10   A.  No.

11   Q.  When you heard from Murray and Norman, did you hear from

12   them separately or together?

13   A.  Separately.

14   Q.  What did you hear from each of them?

15   A.  That the meeting went well.

16   Q.  That is true for both of them?

17   A.  Yes.

18   Q.  Did there come a point when you learned that COBA did, in

19   fact, decide to invest in Platinum Partners?

20   A.  Yes.

21          MR. BELL:  The government offers Government Exhibit

22   1024.

23          THE COURT:  Any objection?

24          MR. MAZUREK:  No.

25          THE COURT:  It is in.

1           (Government Exhibit 1024 received in evidence)

2           MR. BELL:  Can we publish that, Ms. Bustillo.

3           I want to direct your attention to the bottom of this

4    e-mail.  Email from Andrew Kaplan, January 17th, 3:44 pm.  It

5    says just got off the phone with Tommy.  Issuing docs for COBA.

6    (Correction Officers Benevolent Association) pension for PPVA.

7           Can you highlight PPVA.  Indication of 7 to 10 million

8    to start.  Trying for February 1, but may be March 1.  Depends

9    on how quickly their lawyers turn the docs.

10   BY MR. BELL:

11   Q.  Did you see that email as part of this forward?

12   A.  Yes.

13   Q.  What was your reaction to the indication of 7 to $10

14   million to start?

15   A.  I was very happy because I was thinking 5 to 7.

16   Q.  I want to get your attention back down to that bottom part

17   of the email.  At the time did you happen to observe in the

18   previous sentence, the one before 7 to 10 million to start,

19   that it noted the PPVA?

20   A.  I did not.

21   Q.  What had been your understanding as to which product the

22   union might invest in?

23   A.  The credit fund.

24   Q.  Did you have any indication that the union might invest in

25   the PPVA up to that point?

HARJSEA4                    Rechnitz - direct

1    A.   No.

2    Q.   What investment had you encouraged Murray to extend to the

3    union?

4    A.   The credit fund.

5    Q.   Which one did you, at the conclusion of the previous

6    meetings, think they were going to invest in?

7    A.   The credit fund.

8    Q.   Do you have an understanding, Mr. Rechnitz, of why you

9    didn't take notice of the PPVA email at the time?

10   A.   I was very excited with the number I was bringing to the

11   table.  It was more than I had anticipated and it looked like

12   this thing was actually happening, not just talk.

13              MR. BELL:  Let's take that down.  A can we look at the

14   middle two beginning with from Murray Huberfeld down.  Thank

15   you.

16   BY MR. BELL:

17   Q.   So Uri Landesman sends that email Friday, January 14th, at

18   2050 military time, 8:50 pm regular time, to Andrew Kaplan and

19   Mark Nordlicht saying Mazel Tov.  In New York we are pretty

20   good on that.  What did Mazel Tov mean?

21   A.   Congratulations.

22   Q.   That email is then forwarded to by Mr. Huberfeld to you.

23   Subject line forward COBA.  Can we go to the top email.  The

24   top email, you forward this at Friday, January 17th, 2014, at

25   3:55 to Jeremy Reichberg.  Was that Mr. Reichberg's email

1    address, sir?

2    A.  One of them.

3    Q.  One of them.  Subject line COBA.  You say something on the

4    order of Rojeeee R O J E E E E.  Can you explain what Rojeeee

5    means?

6    A.  It is a slang we had for yippe, great.

7    Q.  Let's take that down.

8         Now, at the time that email, was the relationship with

9    Mr. Seabrook still important to you?

10   A.  Yes.

11   Q.  Why?

12   A.  The same reasons as before, and now there was an additional

13   reason.  He made a big investment and this is a man of action,

14   a man who gets things done.

15   Q.  What, if anything, were you going to look to do with Mr.

16   Seabrook from that point forward?

17   A.  To get him to introduce the fund to the comptroller who he

18   said he knew and I think Tom Di Napoli was the name and he had

19   told Murray and I he knew him and he would set up a meeting.

20   Q.  To your knowledge, did he ever actually succeed in setting

21   up the meeting?

22   A.  I don't think so.

23   Q.  What, if anything, after the Rojeeee email did Mr.

24   Huberfeld say to you with respect to things going forward with

25   Mr. Seabrook?

1    A.  He said it was a good start and now I should raise a

2    hundred million dollars, I am on the right start.

3    Q.  Was he saying that with respect to the union specifically?

4    A.  No.  He meant in general.

5    Q.  What, if anything, did Mr. Huberfeld say with respect to

6    the union specifically going forward?

7    A.  Great.  How do we get more.

8              MR. BELL:  I want to put up Government Exhibit 1029

9    and offer that.  I don't think there is objection.

10             THE COURT:  It is in.

11             (Government Exhibit 1029 received in evidence)

12             MR. BELL:  Can we publish that.  Let's look first to

13   the top half or so of this email.  This is a February 19, 2014,

14   email, 8:47 am from you to Norman Seabrook.  The subject line

15   references incoming wire posted and an amount.  Would you not

16   highlight the whole subject line, but just the amount part way

17   through, Ms. Bustillo.

18   BY MR. BELL:

19   Q.  The amount is listed $364,158,929.45, an email that you

20   forwarded to Mr. Seabrook that you had earlier received from

21   Huberfeld.  Do you recall this email?

22   A.  I do.

23   Q.  What were the circumstances under which you received this

24   email and what did you understand this to mean?

25   A.  This was exciting for Murray and for me.  I had never seen

1    a wire of this magnitude or this size, and Murray was showing

2    me this is a wire that just came into Beechwood on one wire and

3    told me show Norman and he'll see we are serious people here.

4    Q.  How did you expect this wire to announce to Mr. Seabrook

5    you were serious people?

6    A.  It is a very large number, and I told him that this is a

7    wire that the company had received.

8    Q.  What response, if anything, did you get to this from Mr.

9    Seabrook?

10   A.  He played it up as he had no doubts.  This is what he

11   expected.

12           MR. BELL:  Let's take that down and also put up

13   Government Exhibit 1025.  We offer it.  I don't think there is

14   an objection.

15           THE COURT:  It is in.

16           (Government Exhibit 1025 received in evidence)

17           MR. BELL:  Can we focus in -- go to the second page.

18   Let's go to the very end of this email, Ms. Bustillo.  So I

19   want to direct your attention to this email.  Can we blow it

20   up.  The message from Mr. Rechnitz to you, Mr. Huberfeld,

21   subject:  Norman.  January 17, 2014, 10 million by February 1

22   done.  What did the 10 million refer to?

23   A.  $10 million investment from COBA to Platinum.

24   Q.  Now let's go to the previous page.  Go to the very bottom,

25   January 18, 2014 at 4:01 pm, Mr. Huberfeld writes great and Thx

1    u.   What did you understand Thx u mean?

2    A.   Thank you.

3    Q.   What did you understand Mr. Huberfeld to be thanking you

4    for?

5    A.   For bringing the $10 million in.

6    Q.   Let's take that down.

7          There is the next email from Mr. Rechnitz, you to Mr.

8    Huberfeld, you say Y W.  What did that mean?

9    A.   You're welcome.

10   Q.   Let's take that down.  Let's do the rest of the page.

11   There is a back-and-forth here.  Mr. Huberfeld says how was

12   Shabos.  Good.  I heard you going to LV for the Super Bowl.

13   You respond.  What is LV?

14   A.   Las Vegas.

15   Q.   Mr. Huberfeld says nope.  Go to the previous page now, Ms.

16   Bustillo.

17         Let's go to the -- blow up the bottom two parts of

18   that email from -- thank you.  There is more back-and-forth.

19   You write that's what Mendy Friedman told Marvin.  You say

20   staying home and making a party or going to the game with you.

21   Let's take that down.

22         And let's do from where it says January 18, 2014, at

23   6:34 pm to Mr. Huberfeld, about a quarter of the way down the

24   page.

25   BY MR. BELL:

1    Q.  Mr. Huberfeld writes you broke through with Norman.  Now

2    let's really get going.  What did you understand that to mean,

3    Mr. Rechnitz?

4    A.  The hundred million, got permission for him to bring me --

5              MR. SHECHTMAN:  I can't hear a word.

6              THE COURT:  Please repeat your answer.

7              THE WITNESS:  I don't know if repeat it exactly.

8              THE COURT:  Hold on.  I'll have it read back.

9              (Record read)

10             THE COURT:  Continue on the answer.

11             THE WITNESS:  The hundred million dollars he wanted me

12   to bring to him.  He had big aspirations.

13   BY MR. BELL:

14   Q.  Is that what you said?

15   A.  He had big aspirations.

16   Q.  I will ask you to speak up just a little bit.

17   A.  Thank you.

18   Q.  Perfect.  Take that down.

19             Let's go to the next email, the one at the very top.

20   You write to Mr. Huberfeld, yup getting him at 10 instead of 7

21   and February instead of March wasn't too tough.

22             What did this mean, Mr. Rechnitz?

23   A.  Getting Norman to invest 10 million instead of 7 million,

24   getting him to February as Murray wanted instead of March

25   wasn't too tough, meaning I think I will be successful at this.

1   Q.  When you said getting hit at 10 instead of 7, who had done

2   the getting here, as referenced in this email?

3   A.  Me.

4   Q.  Let's take that down.  Let's go to the previous page.

5           Let's go to the two emails at the bottom, beginning

6   with that.  Mr. Huberfeld responds let's raise 100 M.  What did

7   you understand that to mean?

8   A.  A hundred million dollars.

9   Q.  You responded I'm happy at 50 by April.  What did you mean

10  when you said I'm happy at 50 by April?

11  A.  I would be very proud of myself if I was able to bring him

12  50 million by April.

13  Q.  Why did you say that, Mr. Rechnitz?

14  A.  Because I thought a hundred was very unrealistic and I

15  wanted to be able to deliver for him and impress him.

16  Q.  Meet all the expectations?

17  A.  Yes.

18  Q.  Let's take that down and let's go to the rest of the page.

19  Mr. Huberfeld responds okay, and then Mr. Rechnitz, you respond

20  I am meeting Tommy Di Napoli January 29.  Who was Mr. Di

21  Napoli?

22  A.  The comptroller for the State of New York.

23  Q.  Did you at that time believe that you were going to be able

24  to meet Mr. Di Napoli?

25  A.  Norman had told me he would set up that meeting, yes.

1    Q.  Did that, in fact, come through?

2    A.  No.

3    Q.  What happened, do you recall?

4    A.  It didn't happen.  I don't remember.

5    Q.  Let's take that down.

6            At around this time, Mr. Rechnitz, had you bought Mr.

7    Seabrook anything by way of gifts?

8    A.  At what point?

9    Q.  So we're talking at around this time in 2014, really all

10   the points before?

11   A.  Yes, I did.  Other than the trips we spoke about?

12   Q.  Yes.

13   A.  I took Norman on a trip to Israel.  I bought him very

14   expensive shoes, cigars, things of that nature.

15   Q.  What do you recall about the shoes that you bought Mr.

16   Seabrook?

17   A.  I think it was in the fall if I remember correctly.

18   Q.  Okay.

19   A.  I took him to Salvatore Ferragamo, which he told me was his

20   favorite brand of clothing, and I bought him a pair of, I

21   believe, they were crocodile dress shoes.  They were very

22   expensive.

23   Q.  What had led to the conversation which Mr. Seabrook told

24   you that his favorite brand was Salvatore Ferragamo?

25   A.  When we were away, he had these burgundy suede pair of

1   Ferragamos, and he had other pairs of shoes he wore, and he

2   would always say they're Ferragamo.  I put two and two

3   together.

4   Q.  What did you purchase from the Ferragamo store for Mr.

5   Seabrook?

6   A.  A pair of dress shoes.

7   Q.  Was he with you at the time?

8   A.  Yes.

9   Q.  Who chose the shoes?

10  A.  Norman.

11  Q.  And where did the shoes fit on the price scale of Ferragamo

12  from what you were able to observe?

13  A.  They were expensive.  They were several thousand dollars.

14          MR. BELL:  Now, I want to put up Government Exhibit

15  667, I believe without objection.  We offer that.

16          THE COURT:  It is in.

17          (Government Exhibit 667 received in evidence)

18          MR. BELL:  Let's put up 667.

19  BY MR. BELL:

20  Q.  Do you remember what is depicted in 667?

21  A.  The store where I purchased the shoes for Norman.

22  Q.  Let's take that down.  You mentioned that there was a trip

23  to Israel.  Around what time did that happen?

24  A.  I think it was March of 2014.

25  Q.  Who traveled with you to Israel?

1    A.  Jeremy, Norman, me, Phil Banks.

2    Q.  Who arranged the trip?

3    A.  I did.

4    Q.  Who paid for the trip?

5    A.  I paid.

6    Q.  What was the purpose of the trip, from your standpoint?

7    A.  I really wanted Phil Banks to go to Israel and see Israel.

8    I don't think he had the right view on Israel from not being

9    there, he just watched the news, and Norman had said it was a

10   great place, he had been there twice in the past, and we

11   decided that we would do a trip to Israel all together.

12            MR. BELL:  So I want to put up and offer, I believe

13   without objection, Government Exhibit 1030.

14            THE COURT:  It is in.

15            (Government Exhibit 1030 received in evidence)

16            MR. BELL:  Can we publish that to the jury, Ms.

17   Bustillo.

18   BY MR. BELL:

19   Q.  Do you recall this email, Mr. Rechnitz?

20   A.  Yes.

21   Q.  What is happening here?

22   A.  I sent an email to Phil Banks, Norman Seabrook and Jeremy

23   Reichberg, asking for their passport numbers, and I said I

24   needed them immediately with expiration dates in order to book

25   tickets for the travel.

HARJSEA4                    Rechnitz - direct

1              MR. BELL:  Let's take that down.

2      BY MR. BELL:

3      Q.  How long were you in Israel with this party, Mr. Rechnitz?

4      A.  Less than a week, I think it was four nights or five

5      nights.

6      Q.  While you were there, were pictures taken?

7      A.  Yes.

8      Q.  By whom?

9      A.  We had a professional photographer and we also took some

10     photos on our own.

11     Q.  Who paid for the professional photographer?

12     A.  I did.

13             MR. BELL:  The government offers Government Exhibit

14     1401, which is another video I believe without objection.

15             THE COURT:  It is in.

16             (Government Exhibit 1401 received in evidence)

17             MR. BELL:  Ms. Bustillo, assuming our AV is working

18     before we actually play that video.  Leave it right there.

19     BY MR. BELL:

20     Q.  Once you got to Israel, what did the four of you do?

21     A.  We went to Jerusalem.  We went to view the Temple Mount in

22     Old City.  We just had a ceremony where we had a piece of bread

23     and a jug of wine, and that night we went to dinner.  I believe

24     this is Angelica Restaurant in Jerusalem.

25             MR. BELL:  Let's play that video.

1          (Exhibit 1402 was played)

2     BY MR. BELL:

3     Q.  Now, when Mr. Seabrook said -- first of all, who took that

4     video?

5     A.  I did.

6     Q.  Who was that we are looking at right now?

7     A.  Norman.

8     Q.  Who was directly across from you?

9     A.  Jeremy.

10    Q.  And who was slumbering slightly over there at the other

11    end?

12    A.  Phil Banks.

13    Q.  When Mr. Seabrook, holding his glass there, said being

14    there with friends and family meant more than he could ever

15    express, what did you understand that to mean?

16    A.  He was talking about me, Jeremy and Phil.

17          MR. BELL:  Let's take that down.

18    BY MR. BELL:

19    Q.  Now, after the trip, Mr. Rechnitz, did you do anything in

20    particular with the photographs that were taken?

21    A.  Yes.

22    Q.  What did you do with the photographs?

23    A.  I made a photo book and I gave it as a gift to Jeremy, Phil

24    and Norman.

25    Q.  How did you go about making the photo book?

1    A.  Using Apple as a photo shop program.

2    Q.  Was there eventually a hard copy photo book made?

3    A.  Yes.

4    Q.  Did you get multiple copies of it?

5    A.  I did.

6    Q.  Who did you distribute those copies to?

7    A.  Phil, Norman and Jeremy.

8              MR. BELL:  I would ask, Ms. Bustillo, for you to bring

9    Mr. Rechnitz -- save me a fantastic voyage -- what has been

10   labeled as Government Exhibit 701 for identification.

11   BY MR. BELL:

12   Q.  Are you familiar with this item, Mr. Rechnitz?

13   A.  Yes.

14   Q.  What is that?

15   A.  This is the photo book.

16             MR. BELL:  The government offers Government Exhibit

17   701.

18             THE COURT:  Any objection?

19             MR. SHECHTMAN:  No.

20             MR. MAZUREK:  No.

21             THE COURT:  It is in.

22             (Government Exhibit 701 received in evidence)

23             MR. BELL:  We are not going to go through every one of

24   the vacation memories.  I do want to ask you about a number of

25   items.  Ms. Bustillo, can you put up Page 3, please.

1    BY MR. BELL:

2    Q.   What do we see here, Mr. Rechnitz?

3    A.   This is when we arrive at the airport, and as I said, we

4    went to the top of Jerusalem.  These photos reflect that

5    moment.

6    Q.   Page 7, please.  What is happening here, Mr. Rechnitz?

7    A.   We're on our way to the Western Wall and we stopped the

8    local police and Phil Banks gave them a souvenir he had brought

9    from New York which was an NYPD shield with the blessing in

10   Hebrew.

11            MR. BELL:  Page 12, please, Ms. Bustillo.

12   BY MR. BELL:

13   Q.   What is happening here?

14   A.   Norman and Phil are praying in a church in Jerusalem.

15   Q.   Page 18, please.  What is happening here?

16   A.   We are at the Western Wall, and we're all praying at the

17   Wall.

18   Q.   Page 45, please.  What is happening here?

19   A.   I was not there that day.  I believe that is photos of

20   Phil.  Indeed, that is it.

21   Q.   Page 56, please.  What is happening here, Mr. Rechnitz?

22   A.   We went to an F-16 airbase, and there was a training

23   seminar, and we got to go on the F-16 and try on some of the

24   outfits, so Norman was the representative from our group who

25   did that.

1      MR. BELL:  Take that down for a moment.  One moment,

2  please, your Honor.

3           (Off-the-record discussion)

4      MR. BELL:  Ms. Bustillo can you recall the exhibit and

5  put up Page 8, please.

6  BY MR. BELL:

7  Q.  Where is everyone here?

8  A.  This is in the Arab Shuk, the Arab marketplace, and I asked

9  Phil to choose a backgammon set he liked that I wanted to

10  purchase for him.

11  Q.  Why backgammon?

12  A.  This is the game we enjoyed to play.

13      MR. BELL:  Let's take that down.  Thank you.  I would

14  like to offer Government Exhibits 1073, 1074 and 1075.

15      THE COURT:  Any objection?

16      MR. SHECHTMAN:  None.

17      THE COURT:  They're in.

18           (Government Exhibits 1073, 1074 and 1075 received in

19  evidence)

20      MR. BELL:  Before we put anything up, Ms. Bustillo.

21  BY MR. BELL:

22  Q.  At this point were you still trying to get Mr. Seabrook to

23  invest more in Platinum Partners?

24  A.  Yes.

25  Q.  At this point was Mr. Huberfeld still talking to you about

1    the same?

2    A.   Yes.

3    Q.   So I'll ask you to put up Government Exhibit 1073.  It is

4    dated May 1st, in which you write Norman, 20 more coming maybe

5    talk later.

6           What was your understanding at this time,

7    Mr. Rechnitz?

8    A.   Murray was asking for more money from Norman.  I had spoken

9    to Norman and had the impression after speaking with him that

10   he could potentially invest another 20 million.

11   Q.   You then say to Murray -- Murray says to you been trying to

12   reach Jeremy for a week.  What did you understand that to refer

13   to?

14   A.   Jeremy had told me he was annoyed with Murray.  He was kind

15   of ignoring his calls because he had performed some sort of

16   work for Murray and hadn't been paid in full, to that point so

17   he was a little bit frustrated with him.

18           MR. BELL:  Ms. Bustillo, can you go ahead and put up

19   1074.

20   BY MR. BELL:

21   Q.   At around this time did you get Mr. Seabrook involved in

22   the Simon Wiesenthal Center, Museum of Tolerance?

23   A.   Until this point, I had not other than I had chaired a

24   premier for a movie that they put out and he had spoken.  I

25   don't remember if it was before this point or afterwards.

1   Q.  What happens here at the time of this email was sent?

2   A.  I had taken Norman through the center and I told him about

3   a program that the museum offered called Tools for Tolerance,

4   which was a training program for officers to deal with, and

5   there was a lot going on in the city at the time with the stop

6   and frisk issue, and it was an important issue in the city, and

7   Norman had told me that he had a bucket of money from the state

8   that he was able to direct the funds for the purpose of

9   training his officers and that he was going to be directing

10  $200,000 of that money to do the training inside the Simon

11  Wiesenthal Center.

12  Q.  Who are the individuals that you're sending the email to?

13  I see Rabbi Hier here and Rabbi Burg and --

14  A.  They're the directors of the museum.

15  Q.  Do you understand those directors to know Mr. Huberfeld?

16  A.  Yes.

17  Q.  What was your reaction to learning what Mr. Seabrook would

18  have his relationship with the museum?

19  A.  I was very happy.

20  Q.  Why?

21  A.  It is something I pushed for.  I solicited it and this is

22  something that I was very involved with, this museum.

23  Q.  Did it, in fact, wind up involving $200,000?

24  A.  I am not sure of the amount.  I had thought it was more.

25          MR. BELL:  Let's take that down.  Let's direct your

1    attention now to 1075.  Ms. Bustillo, can you publish.  This

2    email is dated May 22, 2014.  It is from you to Bill DiBlasio

3    at DiBlasio at ATT dot BlackBerry dot net.  Does the jury have

4    it?  Great.  The subject line is Norman under control.

5    BY MR. BELL:

6    Q.  Are you familiar with this email, Mr. Rechnitz?

7    A.  I am.

8    Q.  Can you explain the background to this email.

9    A.  Yes.  Norman had been outspoken that the new head of

10   Corrections was a man by the name of Ponti, that Joe Ponti was

11   the wrong choice to lead the Corrections Department, and he had

12   been outspoken.  Since Bill and I spoke often, he also knew

13   that I was friends with Norman, and he was frustrated with

14   Norman for not giving Ponti a chance.

15           I told Bill as a favor to him, I would speak to Norman

16   and get Norman to meet with Bill and be nicer to Ponti, which

17   this is after a conversation I had with Norman, I got back to

18   Bill to let him know that Norman was under control and would be

19   kinder and give a better shot to Ponti.

20   Q.  To your knowledge, Mr. Rechnitz, did that, in fact, happen?

21   A.  Yes.

22   Q.  Based on what?

23   A.  Norman told me and he wasn't as outspoken in the papers for

24   a while.

25   Q.  Let's take that down.  Did there come a point where

1    conversations about another union investment in Platinum picked

2    up?

3    A.   Pardon?

4    Q.   Did there come a point where conversations about another

5    investment of the union's money in Platinum Partners picked up,

6    was surfaced?

7    A.   Yes.

8            MR. BELL:  We are going to offer Government Exhibits

9    1037 and 1043 and 1044.

10           THE COURT:  Any objection?

11           MR. MAZUREK:  No.

12           (Government Exhibits 1037, 1043 and 1044 received in

13   evidence)

14           MR. BELL:  Can we publish 1037.  Go to the second page

15   for a moment.  Just highlight Michael Kimelman, Platinum

16   management at the bottom.  Highlight Platinum Partners Value

17   Arbitrage Fund, Ms. Bustillo.

18   BY MR. BELL:

19   Q.   Again, Mr. Rechnitz, did you understand that Platinum

20   Partners Value Arbitrage Fund to be the riskier of the products

21   or the more conservative of the products?

22   A.   The one with more risk.

23           MR. BELL:  Let's go back to the first page, Ms.

24   Bustillo.  So there is an email forwarded to you.  Go back and

25   start with the bottom, Ms. Bustillo, from Michael Kimelman at

1    Platinum to Mr. Huberfeld, PPVA International sub dot.

2            It says Murray, attached please find the pages of the

3    subscription document that need to be initialed, signed or

4    require banking coordinates, and then there are wire

5    instructions.  Let's take that down.

6            Mr. Huberfeld then forwards that e-mail to you, and

7    that appears to do it again.  There is an attachment.  Ms.

8    Bustillo, can we go to the first page of that attachment.  Can

9    you highlight where it says -- and the next page -- and the

10   next page.  Let's take that -- go back to the first page, Ms.

11   Bustillo.

12   BY MR. BELL:

13   Q.  So around the time that this email was sent, may the 27th,

14   2014, what did you understand was happening, Mr. Rechnitz?

15   A.  The union was investing another $5 million into Platinum.

16   Q.  How did you have that understanding?

17   A.  Murray had told me and Norman had told me.

18   Q.  Let's now put up Government Exhibit 1043.  Let's go to the

19   second page, an email from Tommy Reynolds dated July 9th.  Can

20   you highlight where it says I need this as soon as possible.

21   The numbers can be unaudited and signed.

22            Let's take that and jump back out to the box and go to

23   the first page, and there is an email -- go from there to the

24   bottom.  Thank you -- there is an email from from Andrew Kaplan

25   on July 10th that says received this request from Tommy.  Would

 1    you like me to handle it or do you prefer that someone else

 2    take care of it?  And then you ask this is for the 10 million,

 3    correct?

 4              Do you see that?

 5    A.  Yes.

 6    Q.  Do you have a recollection of what that referred to?

 7    A.  Yes.

 8    Q.  What was it?

 9    A.  I had called Norman after receiving the email that was

10    forwarded to me from Andrew and asked him what to respond, and

11    he told me to respond that he is talking about the $10 million

12    in email below and just make sure that is what he was referring

13    to.

14    Q.  Let's take that down.  Let's go to 1044.  The bottom seems

15    to be the same Jona received this request from Tommy.  Would

16    you like me to handle it or do you prefer that someone else

17    take care of it?

18              And at the very top, you forward that email to Mr.

19    Seabrook saying please advise.  Let's jump out of that box.

20    Let's take that down.

21              All told, Mr. Rechnitz, how many investments of the

22    union's money into Platinum Partners are you personally aware

23    of?

24    A.  $15 million.

25    Q.  Break that down for me.

1    A.   The first 10 million that we spoke about earlier and this 5

2    million that we are speaking about now.

3    Q.   Did you ever have knowledge of any other set of money,

4    personal knowledge, that was sent over to Platinum Partners

5    from COBA?

6    A.   No.

7    Q.   Now, did there come a point around this time when Mr.

8    Seabrook asked you to make a payment to someone other than

9    himself?

10   A.   No.

11   Q.   Did Mr. Seabrook ever involve you in any charity events

12   that he was involved in?

13   A.   Okay.  Yes, he asked --

14           MR. SHECHTMAN:  Objection.  (Inaudible)

15           THE COURT:  Sustained.

16   A.   I think the question --

17           THE COURT:  Hold on.  That is not before you.

18   BY MR. BELL:

19   Q.   Were there other occasions in which during the course of

20   the year 2014 -- withdrawn.

21           During the year 2014, did you ever make payments to

22   anyone at the direction of Mr. Seabrook?

23           MR. SHECHTMAN:  We have already gotten the answer.

24           THE COURT:  Let's have a quick sidebar.

25           MR. SHECHTMAN:  I withdraw it.  He knows the answer

1    and he knows the answer.

2             THE COURT:  Go ahead.

3             THE COURT:  Objection is withdrawn.  You may answer.

4    BY MR. BELL:

5    Q.  I will ask the question again.

6             At points during 2014, did you make payments to anyone

7    at Mr. Seabrook's direction?

8    A.  Yes.

9    Q.  What do you recall of that?

10   A.  Two organizations come to mind.  One is the Widows &

11   Childrens Fund that Norman raised money for, for the widows and

12   children of officers, prison guard officers who were no longer

13   here.

14            And there was an event involving Jason Williams, the

15   basketball player, where he wanted me to get money from Murray

16   for that event and donations from me as well.

17   Q.  Did you make those donations?

18   A.  For the widows and children, I did.  I don't remember if I

19   made it for the other event, and there was another occasion

20   where Norman was being honored somewhere, and I submitted an

21   add-on on his behalf.

22   Q.  Did you try to arrange for other meetings with other

23   potential investors on Mr. Huberfeld's behalf?

24   A.  Yes.

25   Q.  What other meetings?

1    A.  I tried to arrange a meeting between Roy Richter, which was

2    the head of one of the police unions.  I think it was CEA, the

3    Captain's Endowment Association, after meeting him in Phil

4    Banks' office.

5    Q.  What conversations did you have with Mr. Huberfeld about

6    this?

7    A.  I told him that I had met Roy and how should I get this

8    going by email, and he told me to put him in touch with Gilad

9    Kalter.

10            MR. BELL:  The government offers 1055.

11            THE COURT:  Any objection?

12            MR. MAZUREK:  No.

13            THE COURT:  It is in.

14            (Government Exhibit 1055 received in evidence)

15   BY MR. BELL:

16   Q.  Are you familiar with this email chain, Mr. Rechnitz?

17   A.  I am waiting for it to zoom in.

18   Q.  Why don't we zoom in on the bottom.  This is an email from

19   you, November 4, 2014, that says Dear Roy.  It was nice meeting

20   you last week in Chief Banks office.  I would like to get

21   together when time permits to introduce you to a fund as an

22   investment for some of your pension money.  The fund has other

23   NYC union investors as well.  The name of the fund is called

24   Platinum Partners Value Arbitrage Fund.  Please let me know

25   when you are available.

1            Do you recall this email?

2    A.   I do.

3    Q.   What was going on there?

4    A.   I had met -- give me one moment, please -- I had met Roy.

5    I told him about Norman's investment in that fund and that I

6    thought it was a good fund he should invest in, and he told me

7    to follow up with him by email, and he gave me his card.  This

8    was the follow up.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  So let's look at the e-mail just above that, Ms. Bustillo.

2           It says -- Mr. Richter says:  "Jona, little did I know

3   what a firestorm would come about the next morning.  Yes,

4   perhaps next week we can get together for a cup of coffee, if

5   you are in the city."

6           Do you recall the firestorm that Mr. Richter is

7   referencing here?

8   A.  Yes.

9   Q.  What has taken place?

10  A.  I think Phil Banks resigned immediately after I met him.

11  Q.  Let's take that down.  And you say:  "Hi Roy," to

12  Mr. Richter, copying Mr. Kalter, "just following up.  Let's put

13  something on the calendar."

14          To your knowledge, did Platinum ever get that fish

15  with Mr. Richter's union?

16  A.  No.

17  Q.  Did you ever sit in on a presentation involving

18  Mr. Richter's union?

19  A.  No.

20  Q.  Let's take that down.  Over the course of that year, in

21  2014, did you have conversations with Mr. Seabrook about his

22  getting paid?

23  A.  Yes.

24  Q.  And over the course of the year, what had Mr. Seabrook said

25  to you?

1   A.  He wanted to know when he was getting paid.  He wanted to

2   know the amount of money.  Towards the end of the year, I'd say

3   I was getting pressure from him.

4   Q.  How did Mr. Seabrook reach out to you in order to

5   communicate these things?

6   A.  We would meet in person.  I remember one time we met

7   outside of my office in his car.  His driver had brought him,

8   and Norman and I sat in the car and his driver went out.  And

9   he was telling me that he wants to get some of the money.

10  Q.  Now, I want to direct your attention specifically to

11  December 2014.  What happened with these conversations at this

12  time?

13  A.  It was a lot of pressure.  He kept saying that it's end of

14  the year, we should know what the numbers are.  They can't

15  change that much from where they are.  The holidays are coming

16  up.  He wanted to get paid already.  It's been a while, and he

17  would like to get paid.

18          MR. BELL:  Your Honor, I notice that it's maybe a

19  little after 1:30.  We've got, I think, another half hour left

20  going today?

21          THE COURT:  Yes, we do.

22          MR. BELL:  Okay.  Just making sure.

23          THE COURT:  Okay.  Keep going.

24  Q.  So what, if anything, did you do about the messages that

25  you were getting from Mr. Seabrook?

1    A.  I told Murray that I was getting a lot of pressure from

2    him, and that we had to come up and pay him.

3    Q.  What was Mr. Huberfeld saying as these things came up,

4    leading into December of 2014?

5    A.  At the end of the year, when we have our performance

6    numbers, he'll be paid.

7    Q.  Did there come a point where those performance numbers

8    came?

9    A.  Yes.

10   Q.  Did you have a conversation with Mr. Huberfeld at that

11   time?

12   A.  Yes.

13   Q.  During that conversation, what did you say to him and what

14   did he say to you?

15   A.  I said to Murray, Norman really needs to get paid.  We got

16   to figure this out.  We had met about that, and Murray said,

17   look, we didn't do as well as we thought we would have done

18   this year.  It's nowhere near the number that Norman is

19   expecting.  It came out that his cut comes out to like 40 or 50

20   grand, but don't worry, I'm going to throw more money on top of

21   it.  So I'm going to show good faith.  I'm going to give him

22   $60,000, but tell him, don't worry about it.

23        Moving forward, he doesn't have to worry how the fund

24   performs.  He doesn't have to worry if it's an up year or down

25   year.  Norman is going to get half a percent on anything that's

1    invested moving forward, and it will be an annuity, which means

2    he's paid annually.  Every year that it sits there, he'll get

3    half a percent.  It's not a one-time fee.  It's every year, and

4    that we can already start paying him throughout the year, from

5    the beginning of the year.  This way, he doesn't have to worry

6    about the fund's performance and doesn't have to wait until the

7    end of the year.

8    Q.  Now, when Mr. Huberfeld told you that the fund had not

9    performed as well as hoped, and that Norman's cut was only 40

10   to $50,000, what was your reaction to that?

11   A.  I thought it would be a problem.  Norman was expecting

12   more.  I didn't want to under-deliver to him.

13   Q.  What was your understanding of how much Norman was

14   expecting?

15   A.  100 to $150,000.

16   Q.  And what was your understanding of why he was expecting 100

17   to $150,000?

18   A.  Because that's what I relayed to him that we spoke about

19   the amount before the investment.

20   Q.  What was your reaction to the new formula that

21   Mr. Huberfeld had proposed?

22   A.  I thought it was a better system than what was in place,

23   and I said, I will relay that to him.

24   Q.  Why did you think it was a better system?

25   A.  Because this way, it was a set fee.  It wouldn't have to be

1   reliant on how the funds performed that year, and it wouldn't

2   have to be paid at the end of the year.  Norman would

3   constantly be getting payments.

4   Q.  One moment, please.  Now, did you have a conversation

5   around this time, December 2014, about how Mr. Seabrook would

6   wind up getting paid that year?

7   A.  With whom?

8   Q.  I'm sorry.  Mr. Huberfeld.

9   A.  Yes.

10  Q.  During that conversation, what did you and Mr. Huberfeld

11  say to each other?

12  A.  I told him I would be fine laying it out for him, that I

13  had $60,000 in cash, but we had to figure out a mechanism how

14  I'm getting paid back for laying that out in his behalf.

15  Q.  Was there ever a conversation about a mechanism through

16  which Mr. Seabrook could get paid that did not involve you, in

17  other words, direct payment?

18  A.  No.

19  Q.  What was it that you came up with or, rather, what was

20  discussed with respect to how the payment involving you would

21  work?

22  A.  So I had a phone call with Murray from my office, and I

23  asked him -- this topic came up, we were discussing it, and I

24  said, if you want, you can give me a check to reimburse me.

25  And he said that wouldn't work because I'm not registered as a

1    broker with them.

2           Then he suggested, he said, I'll tell you what.  You

3    give a lot of charity.  The next 60,000 in charity that you are

4    going to give, I'll give you checks up to $60,000 for those

5    charities.  This way, you get paid back the money that you lay

6    out.  I told him that that wasn't an option.  It was a lot of

7    money.  It was already the end of the year.  I didn't need to

8    be giving more charity, and I just wanted to be paid back.

9           So he said, all right.  I have a better idea.  It will

10   be for sports events.  You took me to a Jets game, right?  You

11   took me -- you gave me tickets for my son-in-law to a Denver

12   Nuggets game.  I'd gone to many sports games with you.  I paid

13   for my own seats.  I said, Murray, I don't charge people for

14   their seats, and I don't want to start listing specific games,

15   in case someone looks at this.

16          So he said, okay.  I have a better idea.  Just sell

17   me -- you'll sell me, without listing the dates of the tickets.

18   You have Knicks' courtside seats.  You make an invoice to

19   Platinum for the Knicks ticket games, and we'll total it as

20   close as possible on the face value, and we'll total it to

21   $60,000.

22   Q.  What was your response to that proposal, Mr. Rechnitz?

23   A.  That worked.

24   Q.  Why did it work for you?

25   A.  Because I was able to figure out a way, with Murray, where

1    I would be reimbursed for the money I was going through laying

2    out for him.  Now, I knew that Murray gave me his word, there

3    was a mechanism for paying back.  I knew I would be paid back.

4    It's not something I would have to chase, and it was not too

5    detailed, in terms of which games.

6    Q.  What did that plan from Mr. Huberfeld allow you to do, if

7    anything?

8    A.  It allowed me to go pay Norman.

9    Q.  Did you -- At that time, did you expect to see Mr. Seabrook

10   again in the near future?

11   A.  Yes.

12   Q.  Did you expect to see him at any particular point for any

13   particular event?

14   A.  Yes.

15   Q.  What did you expect to see Mr. Seabrook for?

16   A.  Dinner that evening.

17   Q.  And what was the -- what was supposed to happen at dinner,

18   and who was supposed to be there?

19   A.  Jeremy, Phil, me and Norman, and we were going to be having

20   dinner, and then following dinner, going to my friend's party

21   that he was hosting for a new Torah dedication, which is their

22   religious bible, and nearby from the restaurant we were meeting

23   at.

24   Q.  Why were the four of you going to go to your friend's Torah

25   dedication event?

A.  So the person who was throwing the ceremony, he had a

relationship with other police officers through Jeremy and on

his own.  It was something that I wanted to be there for him.

Jeremy wanted to be there, and we wanted to deliver for him

Phil Banks, which was a big honor in his role, and Norman would

be with us.

Q.  Where was the dinner going to take place?

A.  On a restaurant called La Brochette on Lexington between

38th and 37th.

Q.  Now, on the day of the Torah dedication -- well, first of

all, let's take a step back.  After Mr. Huberfeld spoke to you

about the Knicks ticket reimbursement plan, what did you do

with respect to that part of the plan?

A.  I called my assistant, Levin, and asked him to prepare the

invoice and to send it to me.  And then I forwarded the invoice

to Murray, and I told Levin to coordinate an arrangement when

he would go and pick up the check to reimburse me for the cash

I was laying out.

Q.  Your assistant, Levin, what was his last name?

A.  Levin Prado.

Q.  And where was he based?

A.  In my office.

Q.  Here in New York?

A.  Yes.  Now he lives in Los Angeles.

Q.  Now, Mr. Levin Prado, what instructions did you give him

1    about the invoice?

2    A.  I specifically told him what to put in the invoice, who to

3    address it to, the amount of the invoice, how many games, all

4    the details.

5    Q.  The amount of games that were on the invoice, was that

6    going to reflect an actual, true transaction?

7    A.  Yes.

8    Q.  What true transaction was that going to reflect?

9    A.  I didn't understand.  You said true transaction or

10   transaction?

11   Q.  Let me ask a better question because I think that was

12   confusing.  Was the invoice going to be real or fake?

13   A.  Fake.

14   Q.  In what way was it going to be fake?

15   A.  I never sold those games to Platinum.

16         MR. BELL:  Your Honor, the government intends to offer

17   1064, 1062 and 1063.

18         THE COURT:  Okay.  Any objection?

19         MR. MAZUREK:  No, your Honor.

20         THE COURT:  Okay.  Those are in.

21         MR. SHECHTMAN:  No, your Honor.

22         (Government's Exhibits 1064, 1062 and 1063 received in

23   evidence)

24         MR. BELL:  Can we publish 1064, please.  Can we just

25   focus in on the text, Ms. Bustillo.

1   BY MR. BELL:

2   Q.  This e-mail is from Levin Prado, LP@JSRcap.com.  The date

3   is Thursday, December 11th, 2014, at 6:30 p.m. and Mr. Prado

4   sends it to you.  The subject line is "Platnum Partners

5   invoice," and there is an attachment.  Do you recall this

6   e-mail?

7   A.  Yes.

8   Q.  And what's this e-mail?

9   A.  This is the invoice that we just spoke about.

10  Q.  That says, "please see attached."  Ms. Bustillo, can we go

11  to the attachment, the next page.  Can we focus in on the text.

12          So what is the date of this document?

13  A.  December 11th, 2014.

14  Q.  This is a JSR Capital bill.  Did that form already exist?

15  A.  Pardon?

16  Q.  Did this form already exist prior to the date of the

17  invoice?

18  A.  I've used this form for invoices, yes.

19  Q.  That says bill to:  "Platnum Partners."  It's spelled

20  "Platnum Partners," with no I.  At that point, by the way, was

21  Mr. Prado, himself, to your knowledge, familiar with Platinum

22  Partners?

23  A.  No.

24  Q.  There is then the description line, "QTY, 8 Knicks games at

25  $7,500 per game.  Seats 12AA, 9 and 10."  Now, are you familiar

1   with seats 12AA, 9 and 10 during the 2014 and '15 season?

2   A.   Yes.

3   Q.   What seats were those?

4   A.   Those were my seats.

5   Q.   Had you, in fact, sold eight Knicks games to Platinum

6   Partners at $7,500 a game?

7   A.   No.

8   Q.   Had you sold eight Knicks games to Platinum Partners at

9   all?

10  A.   No.

11  Q.   Have you given any Knicks games to Platinum Partners at

12  all?

13  A.   No.

14  Q.   The line total is $60,000.  How was this figure reached,

15  Mr. Rechnitz?

16  A.   We needed to round up the cost to 60,000 to get to the

17  number to reimburse me for the cash I laid out.

18  Q.   And when you say round up, was your understanding that

19  these Knicks games tickets actually cost $7,500 per game?

20  A.   No.  They cost me $6,800 per game.

21  Q.   Let's take that down, and let's go to 1062.  So here,

22  there's a forward from you to Murray Huberfeld at December 11,

23  2014, at 6:30 p.m.  What e-mail are you forwarding,

24  Mr. Rechnitz?

25  A.   A copy of the invoice.

1    Q.  And let's take that down.  We already have, through an

2    earlier stipulation, Government Exhibit 204.  Can we publish

3    that, Ms. Bustillo.

4           So are you familiar with this document, Mr. Rechnitz?

5    A.  Yes.

6    Q.  And what is this document?

7    A.  This is an invoice from National Event Company to me for

8    the games of those seats that were on the invoice, with that

9    section, row that run invoice of the home games that belonged

10   to me.  I would split this season with Jason.  So this was my

11   half of my games.

12   Q.  Can we -- Ms. Bustillo, can we actually provide the witness

13   with a hard copy of this document just for a moment.

14          While Ms. Bustillo is doing that, how many tickets,

15   approximately, had you purchased out of the Knicks home

16   schedule that year?

17   A.  We had purchased the entire season; so I think it's 41

18   games.

19   Q.  And when you say "we," who's we?

20   A.  National Event Company, Jason and me.

21   Q.  And was there a split that took place between the two of

22   you?

23   A.  Yes.

24   Q.  What was that split?

25   A.  I believe I had 23 regular season games, or approximately,

1   and he had the rest.

2   Q.  And so what does this invoice reflect?

3   A.  This reflects the games that I had.

4   Q.  Can you give that to Mr. Rechnitz, Ms. Bustillo.  Thank

5   you.

6            So I want you to take a look at Government

7   Exhibit 204.  Ms. Bustillo, if you're back, would you focus on

8   the top half.  And so now that we have a document here, let's

9   be precise.

10           First of all, how many preseason games were there?

11  A.  Two.

12  Q.  And that's versus the Raptors on October 13th and the Bucks

13  on October 20th.  And how many regular season games were there?

14  You can take your time with this one and count.

15  A.  Okay.  22.

16  Q.  Okay.  Now, we will come back to the matter of the precise

17  configuration of games a little bit later on but, first,

18  Mr. Rechnitz, were the Knicks any good that year?

19  A.  No.

20  Q.  Had that already been established by --

21           MR. SHECHTMAN:  Your Honor, we'll stipulate to that.

22           THE COURT:  Okay.  Go ahead.

23  Q.  Had that already been established by December 11th, 2014?

24  A.  Yes.

25  Q.  And what was your understanding of what effect that would

1   have on the ticket resale market that year, that is the

2   secondary market?

3   A.   It would affect the price I was able to sell the games for.

4   Q.   Would you have expected to be able to sell the games for a

5   pair of tickets for more than $6,800 at that point?

6   A.   No.

7   Q.   Let's take that down.

8           MR. BELL:  I want to offer Government Exhibit 1061.

9   Is there an objection?

10           MR. MAZUREK:  No.

11           MR. SHECHTMAN:  None, Judge.  Sorry.

12           THE COURT:  Co-counsel?

13           MR. MAZUREK:  No, no, objection.

14           THE COURT:  It's in.

15           (Government's Exhibit 1061 received in evidence)

16   BY MR. BELL:

17   Q.   Can we publish 1061.  And are you familiar, Mr. Rechnitz,

18   with this calendar item from your e-mail?

19   A.   Yes.

20   Q.   What was this?

21   A.   This was the party that my friend was hosting that I spoke

22   about a few minutes ago for after our dinner plans.  We were

23   going to go to the Torah dedication ceremony at 509 Fifth

24   Avenue.

25   Q.   What time was the ceremony supposed to start?

1  A.  7:00 p.m.

2  Q.  What time did you anticipate it ending at that point, at

3  least according to this document?

4  A.  I just didn't bother to put the ending time.

5  Q.  So did the 7:30 fill by default?

6  A.  Yes.

7  Q.  Let's take that down.  Now, I want to direct your attention

8  specifically to that day, December 11th, 2014.  On that day,

9  did you take actions with respect to physically getting

10  Mr. Seabrook his payment?

11  A.  Yes.

12  Q.  I want to -- focusing you on that day -- ask you, what did

13  you do on that day first?

14  A.  I went to the Ferragamo store.

15  Q.  Why did you go to the Ferragamo store?

16  A.  Because, as discussed before, I knew it was Norman's

17  favorite brand, and I new I was not coming with great news for

18  him, in terms of the amount of money he was making that year.

19  Q.  At that point, had you told him about the returns that

20  Mr. Huberfeld had told you about?

21  A.  No.

22  Q.  So why go to the Ferragamo store because we're bringing bad

23  news?

24  A.  To get him a bag to put the cash in before delivering to

25  him that was from Ferragamo; so that he can at least appreciate

1   the bag and feel good about it.

2   Q.  Did you get in touch with Mr. Seabrook at any point that

3   day?

4   A.  I did.

5   Q.  What did you tell Mr. Seabrook when you got in touch with

6   him?

7   A.  That I would be meeting him before dinner, and that I had

8   something to bring him.

9   Q.  How did you get in touch with Mr. Seabrook?

10  A.  I called him.

11  Q.  What did you do -- do you recall about how much the bag

12  cost?

13  A.  I don't.

14  Q.  What did you do after you purchased the bag?

15  A.  I took the bag a few blocks away to my office.  I went to

16  the safe in my office.  I had $60,000 of cash waiting in the

17  safe.  I filled it in the bag, and then I left the office with

18  the bag and cash to go meet Norman.

19  Q.  Now, was it unusual for you to have $60,000 in cash in your

20  office safe?

21  A.  No.

22  Q.  Why not?

23  A.  I had the money from various sources.

24  Q.  Such as?

25  A.  Hamlet.  I had a lot of cash from Hamlet.

1   Q.  So after you filled the bag, the Ferragamo bag, with the

2   cash, what did you do with it?

3   A.  I went to meet Norman.

4   Q.  Now, when you went into your building to get the cash,

5   through what entrance of the building did you go?

6   A.  The front entrance.

7   Q.  And when you left in order to give Norman the bag, in what

8   direction did you go?

9   A.  I left the front entrance.

10          MR. BELL:  Now, at this time, I think we've got time

11  here, your Honor.  We have another stipulation.  It's

12  Government Exhibit 1508.

13          THE COURT:  Okay.

14          MR. BELL:  It's stipulated and agreed between the

15  parties, Government Exhibit 1404, it's a disk containing true

16  and correct video recordings of the entrance of 580 Fifth

17  Avenue, New York, New York.

18  Q.  Mr. Rechnitz, is that where your office was located?

19  A.  Yes.

20          MR. BELL:  For the time period of approximately

21  5:00 p.m. to approximately 6:34 p.m. on December the 11th,

22  2014.  The video recordings in Government Exhibit 1404 consist

23  of recordings from four cameras, two of which were located

24  outside the entrance of 560 Fifth Avenue, and two of which were

25  located inside the vestibule area of the entrance of 580 Fifth

1    Avenue.

2           Government Exhibit 1405 is a disk containing true and

3    correct video recording of the lobby of 580 Fifth Avenue for

4    the time period of approximately 6:26 p.m. to approximately

5    6:34 p.m. on December 11th, 2014.

6           The video recording on Government Exhibit 1405

7    consists of a recording from a camera which was located in the

8    lobby of 580 Fifth Avenue.

9           Government Exhibits 1404A, B, C and D are true and

10   correct still images from the recordings in Government

11   Exhibit 1404.

12          Government Exhibits 1405A and B are true and correct

13   still images from the recording on Government Exhibit 1405.

14          It is further stipulated that this evidence may be

15   received in evidence.  The government offers the stipulation,

16   1508, 1404, 1404A through D, 1405 and 1405A through B.  I

17   believe, no objection.

18          MR. MAZUREK:  No objection.

19          MS. LYNAUGH:  No objection.

20          THE COURT:  Stipulation.  Go ahead.

21          (Government's Exhibits 1508, 1404, 1404A through D,

22   1405, 1405A through B received in evidence)

23          MR. BELL:  Now, can we pull up Government Exhibits

24   1404, please.  Can we publish that to the jury.  Would it be

25   possible for us to go to the time signal?

1      THE COURT:  Let's just make sure, do the jurors have

2  it?  Okay.  Great.  Go ahead.

3  BY MR. BELL:

4  Q.  Could we go about 30 seconds back with that, and as we're

5  doing that, Ms. Bustillo -- Mr. Rechnitz, are you familiar with

6  the area depicted in these screens?

7  A.  Yes.

8  Q.  Let's start with the top screen.  What do we have there?

9  A.  The top left is the outside doors to 580 Fifth Avenue.

10  Those are the top two.

11  Q.  And the bottom?

12  A.  The bottom two are the mantrap in between the outside doors

13  and the lobby doors.

14      MR. BELL:  Why don't we go ahead and hit play,

15  Ms. Bustillo.

16      (Pause)

17      I guess 6:15 or 10:15 and 23 seconds.  Can we --

18  actually, take it just about 15 seconds back to 6:15 even.

19  Okay.  Can we go ahead and play it?

20      (Videotape played)

21  BY MR. BELL:

22  Q.  Let's stop right there.  Mr. Rechnitz, do you recognize

23  anybody in the bottom two fields of vision?

24  A.  Yes.

25  Q.  Who is that?

1   A.  Me.

2   Q.  Do you recognize -- and I'll direct your attention to the

3   bottom right here -- anything that you're holding?

4   A.  Yes, a bag.

5   Q.  What bag are you holding?

6   A.  The one I purchased at Ferragamo.

7   Q.  Now, Mr. Rechnitz, is the bag itself inside of any other

8   bag, for example, a Ferragamo shopping bag or some other

9   shopping bag?

10  A.  No.

11  Q.  Okay.  Can we go to 1404B.  And just to be clear, which

12  direction were you going in that first image, in or out of the

13  building?

14  A.  I was going into the building.

15  Q.  We're looking to go to about the 6:15 and, let's say, 15

16  seconds mark in 1404B, Ms. Bustillo.  Thank you.

17          (Pause)

18          I'm sorry.  You know what, let's do this in a

19  different way.  1404A and B are the stills.  Can we put up

20  1404A, please.

21          MR. BELL:  One moment, please, your Honor.

22          (Pause)

23          Ms. Bustillo, can you set up the ELMO?

24          THE COURT:  Counsel, it's 1:55, maybe this is a good

25  time to break for the day.

1          MR. BELL:  I've got, I guess, two minutes, two stills,

2     Judge.

3          THE COURT:  Okay.  Then let's make it quick.

4          MR. BELL:  Do we have the ELMO up?  You know what,

5     this may be as good a time to break as any.

6          THE COURT:  So members of the jury, we're going to let

7     you go for the day.  I'll instruct you, as I have before.  Do

8     not read anything about this case.  If you come across anything

9     in writing about this case, stop reading.  Do not listen to

10    anything about this case.  If you hear anything about this

11    case, on the radio or over the Internet or on television, stop

12    listening.  Do not talk to anyone about this case.  Don't allow

13    anyone to talk to you about the case.  Don't do any research

14    regarding any of the people or the issues involved in this

15    case.

16         Have a wonderful evening.  We're going to go to the

17    regular schedule on Monday.  We're going 9:00 to 2:30 again.

18    It's important to get here at 9:00 so we can start here on

19    time.  Have a wonderful weekend.

20         (Jury excused)

21         THE COURT:  Okay.  Please be seated.  Let's, as

22    always, give the jurors a three-minute head start so they can

23    collect their belongings and get on their way.  Is there

24    anything that counsel need to discuss now that doesn't involve

25    the witness?

1          MR. BELL:  Your Honor, should the witness probably not

2     be here for this?

3          THE COURT:  That's fine.  The witness can be excused.

4          (Witness temporarily excused)

5          Okay.  Is there anything that counsel need to discuss

6     at this point?

7          MR. BELL:  No, your Honor.

8          THE COURT:  Okay.  All right.  So, again, we'll just

9     wait a couple of minutes.  I'll ask counsel again to get here

10    Monday at like ten minutes to 9:00 to avoid any unnecessary

11    bumping in of jurors.

12         Let me get a sense from the government -- the witness

13    isn't here -- how much longer do you have with this witness on

14    direct?

15         MR. BELL:  Assuming the AV cooperates, we'll be done

16    before the half hour break, I'm pretty confident.  How far

17    before the half hour break, I'm not sure.

18         THE COURT:  Can you give me an estimate in minutes or

19    hours or?

20         MR. BELL:  I think inside of 90 minutes or so,

21    possibly under an hour.

22         THE COURT:  Okay.  All right.

23         MR. BELL:  That's just taking into account the

24    inevitable AV issues.  If everything goes smoothly, it will be

25    under an hour.

1        THE COURT:  Okay.  Let me just ask this again, so we

2   can try to expedite things.  I assume there are other exhibits

3   that you're going to seek to introduce into evidence.  It would

4   be helpful if you can go through that with the defense ahead of

5   time and, therefore, if there are no objections, just move them

6   in, say there's no objection, and let's get them in so we can

7   get them in front of the jury immediately.

8        MR. BELL:  We'll do that.

9        MR. SHECHTMAN:  Fine.

10        THE COURT:  I guess another thing, as a housekeeping

11   matter.  I mean, we have a ways to go before we charge this

12   jury.  I just want to confirm that the counsel has seen our

13   draft jury instructions regarding the law on the counts in  the

14   indictment that we sent out on Monday.  I Just want to make

15   sure that counsel have received them.

16        MR. SHECHTMAN:  Yes.

17        MR. BELL:  Yes.

18        MR. MAZUREK:  Judge, there's one other item to notify

19   the Court.  We have received the items in response to the 17C

20   subpoenas yesterday.  Honestly, I just have not had the chance

21   to go through them.  If there are any issues with those, I'll

22   try to work it out with counsel for the subpoenaed parties, and

23   we'll inform the Court if there are any issues.

24        THE COURT:  Okay.  All right.  Okay.  Free to go.

25        (Adjourned to October 30, 2017, at 9:00 a.m.)

1                    INDEX OF EXAMINATION

2    Examination of:                              Page

3    JONA SOLOMON RECHNITZ

4    Direct (Resumed) By Mr. Bell . . . . . . . . . 592

5                    GOVERNMENT EXHIBITS

6    Exhibit No.                              Received

7     1504, 101 through 109   . . . . . . . . . . . 591

8     1601    . . . . . . . . . . . . . . . . . . . 594

9     1602, 1401 and 1402   . . . . . . . . . . . . 664

10    1004    . . . . . . . . . . . . . . . . . . . 669

11    1005    . . . . . . . . . . . . . . . . . . . 671

12    1012    . . . . . . . . . . . . . . . . . . . 673

13    1010    . . . . . . . . . . . . . . . . . . . 675

14    1009    . . . . . . . . . . . . . . . . . . . 677

15    1008    . . . . . . . . . . . . . . . . . . . 678

16    1013    . . . . . . . . . . . . . . . . . . . 705

17    1014    . . . . . . . . . . . . . . . . . . . 705

18    1015    . . . . . . . . . . . . . . . . . . . 707

19    1016    . . . . . . . . . . . . . . . . . . . 708

20    665   . . . . . . . . . . . . . . . . . . . . 711

21    1001    . . . . . . . . . . . . . . . . . . . 714

22    1017    . . . . . . . . . . . . . . . . . . . 716

23    1018    . . . . . . . . . . . . . . . . . . . 717

24    1019    . . . . . . . . . . . . . . . . . . . 718

25    1020 and 1021   . . . . . . . . . . . . . . . 718

1    1022    . . . . . . . . . . . . . . . . . 720

2    1024    . . . . . . . . . . . . . . . . . 722

3    1029    . . . . . . . . . . . . . . . . . 725

4    1025    . . . . . . . . . . . . . . . . . 726

5    667    . . . . . . . . . . . . . . . . . 731

6    1030    . . . . . . . . . . . . . . . . . 732

7    1401    . . . . . . . . . . . . . . . . . 733

8    701    . . . . . . . . . . . . . . . . . 735

9    1073, 1074 and 1075    . . . . . . . . . . . 737

10   1037, 1043 and 1044    . . . . . . . . . . . 741

11   1055    . . . . . . . . . . . . . . . . . 746

12   1064, 1062 and 1063    . . . . . . . . . . . 756

13   1061    . . . . . . . . . . . . . . . . . 761

14   1508, 1404, 1404A through D, 1405,    . . . . . 765

15            1405A through B

16

17

18

19

20

21

22

23

24

25