HB1JSEA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

       v.                        16 Cr. 467 ALC

NORMAN SEABROOK AND MURRAY HUBERFELD,

          Defendants.

------------------------------x

                                 November 1, 2017
                                 8:57 a.m.

Before:

                 HON. ANDREW L. CARTER, JR.,

                               District Judge
                                 and a jury

                        APPEARANCES

JOON H. KIM,
     United States Attorney for the
     Southern District of New York
KAN MIN NAWADAY,
MARTIN S. BELL,
RUSSELL CAPONE,
     Assistant United States Attorneys

HB1JSEA1

BRACEWELL, LLP,
        Attorneys for defendant Seabrook
BY:  PAUL LEWIS SHECHTMAN, Esq.
        MARGARET EMMA LYNAUGH, Esq.
                Of counsel


MAZUREK LIPTON, LLP
        Attorneys for defendant Huberfeld
BY:  HENRY EDWARD MAZUREK, Esq.
        EVAN LOREN LIPTON, Esq.
                Of counsel


Also Present:
        BARD HUBBARD, Special Agent FBI
        YOLANDA BUSTILLO, Paralegal USAO
        AUGUSTA GRANQUIST, Paralegal




            (Trial resumes; jury not present)

            THE COURT:  Are counsel all here?

            MR. LIPTON:  Judge, Mr. Huberfeld is still making his

way through security.  He will be here any moment.

            MR. SHECHTMAN:  I can do one housekeeping matter and

Mr. Mazurek can waive his presence.  It truly is housekeeping.

            THE COURT:  Okay.

            MR. SHECHTMAN:  We began --

            THE COURT:  Use the mike, counsel.

HB1JSEA1

1          MR. SHECHTMAN:  -- we began by making our exhibits

2    Defendant Exhibit A, B, C.  We then realized that Mr. Huberfeld

3    was doing it MH, and so what we have switched to is NS, and

4    with the Court's permission, we'll relabel both our earlier

5    exhibits as NSA, NS, and what we thought we would try to do at

6    the end of the week is to give the court a list of the exhibits

7    that we referred to and the ones that are in evidence on the

8    defendants' side.

9          I think most of them are going to be used to refresh,

10   but I think the court would benefit if we can show which ones

11   are actually in so we can confirm with the record I know your

12   Deputy is keeping.  With the court's permission, we'll switch

13   to NS.  We will give the court a list of the exhibits at the

14   end.

15         THE COURT:  That is fine with me.  Does the government

16   have any objection to that?

17         MR. BELL:  We do not.

18         THE COURT:  It may make sense in terms of all those

19   exhibits at some point before closing arguments to read a list,

20   noting the changes for the jurors.  They have been paying

21   attention, and letting them now know Exhibit A is NS 1 or

22   whatever the change may be because they have been taking notes

23   and paying attention.

24         MR. SHECHTMAN:  The hardest thing, Judge, there has

25   been a lot of exhibits referred to on the Huberfeld side that

1   are just marked for identification.

2         THE COURT:  Those are fine.  If they're just marked

3   for identification, that is fine.  We want the ones in

4   evidence.  Are we ready?

5         Let me just say this as a housekeeping matter.  I had

6   asked the parties to have these other issues fully briefed by

7   9:00 o'clock.  At 9:00 o'clock last night I was waiting

8   patiently by the computer waiting to get on this, and nothing

9   came through at 9:00.

10        These were filed later.  The government's response to

11  the defense request regarding the racial animus was filed

12  around 9:45.  Mr. Huberfeld's motion that was supposed to be

13  filed at 6:00 was filed at 10:40, and the response was filed at

14  1:38.  All of this is to say you will wait on a decision on

15  this.  I have to take more time to look into these issues.

16        My intention is to, when the jury gets in here, to

17  continue with the trial.  Are there other issues we need to

18  address now?

19        MR. BELL:  I don't believe so.

20        MR. SHECHTMAN:  None, your Honor.

21        MR. MAZUREK:  None, your Honor.

22        THE COURT:  One other just sort of general concern

23  that I have, again in terms of pace of this case,

24  Mr. Huberfeld's counsel says that I think you indicated

25  yesterday you have another three hours of cross-examination for

HB1JSEA1

1    this witness.  That is right?

2               MR. MAZUREK:  It might be a little less than that.

3               THE COURT:  I will give you up to three hours.  This

4    has been a very lengthy cross-examination.  I am not going to

5    be likely to give you much more than that.  We need to kind of

6    move things along.

7               I know that it is in a case like this with a witness

8    that the defense has indicated is very important to them, it is

9    tempting as a trial lawyer to kind of get so focused on how

10   well you think you're doing or how frustrated you are and lose

11   track of what many lawyers think is most important in terms of

12   how it is affecting the jury now and how it will affect the

13   jury later, but I would just ask counsel just to kind of maybe

14   occasionally it might be a good idea to glance over at the

15   jurors because I think they're starting to get a little

16   exasperated.  Their attention is starting to wane a little bit

17   on this.  Let's make sure we keep this moving.

18              MR. BELL:  I know, of course, you're concerned about

19   the overall pace and, by extension, the length of the trial,

20   and I thought it might be helpful to offer an update in that

21   regard.

22              Assuming the remainder of the Rechnitz cross is not

23   longer than currently expected to be, given Mr. Mazurek's

24   projection and for Mr. Shechtman, I think we are on pace for

25   the government to be able to rest relatively early next week,

HB1JSEA1

1    that is to say, I guess that is a reasonable guess at this

2    point would be Tuesday.  We have had a fair number of

3    witnesses, but they're much faster witnesses, and so that is

4    just to say the end is at least in sight.

5         THE COURT:  Okay.  Counsel for Mr. Seabrook, do you

6    have an estimate as to how long your cross-examination of this

7    witness will be?

8         MR. SHECHTMAN:  Judge, I may need some help from the

9    court, to be blunt.  One of the reasons cross is long with this

10   fellow is if you say to him it was raining outside, he says no.

11   Then you say drizzling, and quibble with words.  I may ask on

12   occasion if these are yes or no questions, he answers them as

13   such.  If we get yes or no and not equivocations, I think my

14   cross is three hours.

15        THE COURT:  Okay.  All right.  We'll see where we are.

16   All right.  We'll just wait for the jurors to get here and

17   we'll start.  I don't know if there was much -- I think there

18   was a little press coverage on this case, thereby some other

19   issues that happened that took up the majority of the news

20   coverage yesterday, but I don't know if there is anything that

21   needs to be done regarding press coverage of this case.  There

22   was some I saw.

23        MR. BELL:  We'll note for just I guess for completing

24   the record that the issue that we raised yesterday morning that

25   was the subject of briefing last night did hit at least one of

1    the local papers.  I don't think the article was terribly long

2    and I don't think there was anything we can really ask the

3    court do other than the same instruction we have been offering.

4         THE COURT:  Yes, I did see a photograph posted in one

5    of the publications.  Anything from defense counsel on this?

6         MR. SHECHTMAN:  None, your Honor.

7         MR. MAZUREK:  No, your Honor.

8         MR. SHECHTMAN:  One other matter I may be getting

9    ahead.  That is the charge conference.  If they're finished, I

10   think they said they thought Tuesday of next week, at the

11   moment my sense is it will not be a long defense case.  There

12   may be something, but I don't expect a protracted defense case.

13        I wonder whether the court would want to hold an

14   instruction conference maybe the Friday afternoon.  I don't

15   know whether Mr. Huberfeld has to be here for that or not.  I

16   think getting that out of the way and resolved, my guess is we

17   are all going to spend the weekend preparing our summations, so

18   knowing what the instructions are might be helpful for that.  I

19   don't know what your Honor's schedule is Friday afternoon, but

20   if that is convenient for the court and the parties, since we

21   are breaking early, that might be a good time to do it.

22        THE COURT:  Okay.  I can make myself available Friday

23   afternoon.  Other counsel have any thoughts on this?

24        MR. BELL:  That sounds fine to us, your Honor.  I

25   think that at this point we don't have the entirety of the

HB1JSEA1

1    court's draft charge, sort of the substantive meat of it.  We

2    should all be mindful of that, but Friday sounds fine.

3                MR. MAZUREK:  That is fine for me.

4                MR. SHECHTMAN:  I didn't hear the part about the meat

5    on something?

6                THE COURT:  He said the parties have our drafts of the

7    elements of the offenses, but you don't have the rest of the

8    charge.  Again the reason I gave the parties our draft of the

9    elements of the offense is because that seems to be what is

10   probably going the most nuanced here.

11               The other things are going to be pretty standard and

12   we'll certainly get you our draft charge, try to get that to

13   you before Friday if we do this.  I should hear from

14   Mr. Huberfeld's counsel if you want to do this Friday.  If not,

15   we can do this Monday or Tuesday of next week, and counsel

16   should keep in mind I don't know how far we are going to get

17   next week, but next Friday is a holiday, a court holiday.  We

18   are closed then, but hopefully we'll be able to have summations

19   before then.

20               Huberfeld's counsel, any thoughts on this?

21               MR. MAZUREK:  Judge, think we would prefer to do this

22   on Friday because it would be helpful in terms of over the

23   weekend organizing our thoughts for summation.

24               THE COURT:  I see my Deputy in the back.  Are the

25   jurors here?

HB1JSEA1

1          THE CLERK:  No.  We are waiting for four.

2          THE COURT:  So that is fine.  I guess it would be

3     helpful perhaps maybe to schedule something, if counsel have

4     some thoughts right now about what we have given them not this

5     minute, to give me something in writing perhaps by Friday so we

6     can deal with that.  I think that is going to be the place

7     where we may be sort of pioneers in this regard in terms of the

8     elements of the offense.  Maybe counsel can give me something

9     Thursday regarding any objections to the elements of the

10    offenses.  Does that sound good for everyone?

11         MR. BELL:  Yes, your Honor.

12         MR. SHECHTMAN:  It does.  Although it is belated, we

13    have a short proposed instruction given the nature of the

14    testimony, and we will try to get that to you tonight.

15         THE COURT:  Given the nature of the testimony that has

16    already happened?

17         MR. SHECHTMAN:  Happened.

18         THE COURT:  All right.  That sounds good.  While we

19    are waiting for jurors, give me a sense of what we are talking

20    about.

21         MR. SHECHTMAN:  There has been a lot of testimony

22    about gifts that were conferred on Mr. Seabrook, Dominican

23    Republic trips and the like.  The jury should be instructed

24    that is not -- I don't mean to say it is irrelevant, it

25    certainly isn't.  If they find he went to the Dominican

1   Republic on Mr. Rechnitz's dime, that is not a crime.  The

2   crime here is the kickback of $60,000 and conspiracy to do

3   that.  So given that that is all that is floating around here,

4   we think it is important that the jury know that that is not in

5   itself a basis for an offense.  A short instruction.

6            THE COURT:  You want that as part of the final

7   instructions to the jury or you want that before then?

8            MR. SHECHTMAN:  No.  Very much part of the final.

9            THE COURT:  All right.  We'll wait for the jurors to

10  get here and then we'll start.  Thank you.

11           (Recess)

12           THE COURT:  Let's bring the witness in.  The jury is

13  all here.

14           (Jury present)

15           THE COURT:  Please be seated.  Welcome back.  Let's

16  continue with the case on trial.

17   JONA RECHNITZ,  (Continued)

18       having been duly sworn, testified as follows:

19  CROSS-EXAMINATION

20  BY MR. MAZUREK:

21  Q.  Mr. Rechnitz, last night before we broke, you testified

22  that you have been living life miserably over the past few

23  years.  Do you remember that?

24  A.  I do.

25  Q.  I am going to show you what has been premarked for

HB1JSEA1                    Rechnitz - cross

1    identification as MH-370, if we can put that on the screen just

2    for the witness.  (Pause)

3              Do you have that on your screen, sir?

4    A.  I do.

5    Q.  Do you recognize what is in that photograph?

6    A.  Yes, that is the house I'm renting.

7              MR. MAZUREK:  I move admission for MH-370.

8              MR. BELL:  Objection.

9              THE COURT:  Basis?

10             MR. BELL:  Relevance.

11             THE COURT:  Let's have a quick sidebar.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Before I hear more from the government, my

3    concern is I wanted to make sure there is nothing in this

4    document that would identify the location of his house given

5    this witness' notoriety.  I am concerned about any kind of

6    safety.  It doesn't seem there is anything there.  Let me hear

7    the government on your objection.

8              MR. BELL:  It is more than relevance, but it starts

9    with relevance.  There is a relevance objection because I don't

10   believe that Mr. Rechnitz's current residence, the fact he is

11   able to afford it has any relevance to anything at trial.

12             I don't think it is effective impeachment in any sort

13   of way.  If it is, it is awfully strained.  The notion I think

14   Mr. Rechnitz's response yesterday that he is miserable,

15   particularly when he articulated why and how is not the sort of

16   thing that the fact that oh, you're living in a nice house

17   speaks to it in any way.

18             I also think that this is an issue that was addressed,

19   albeit with respect to other prospective evidence in our

20   submission last night, so maybe it was this exact evidence, but

21   the upshot is that it is irrelevant.

22             MR. CAPONE:  The proffered basis on of Mr. Mazurek's

23   letter is impeachment by contradiction.  This contradicts

24   absolutely nothing.  The idea he cannot be suffering because he

25   has a nice house is absurd.

HB1JSEA1                    Rechnitz - cross

1            THE COURT:  Yes.  Let me hear from counsel on this.  I

2    do remember seeing that in your letter motion, and you

3    certainly were talking about the last couple of questions from

4    yesterday.

5            MR. MAZUREK:  Judge, he did answer yesterday that, in

6    response to my question of how his life hasn't really changed

7    at all since he pled guilty in June of 2016, that that is not

8    true, that his life has been miserable, his travel has been

9    restricted, he hasn't been able to do the things he could do

10   beforehand.

11           He disputed the amounts that he was paying for rent in

12   his California home.  He has identified this as now the home he

13   is living in.  I think it is relevant to show that this

14   witness, despite the fact that he said that his conditions

15   really haven't changed or he disputed that his conditions

16   haven't changed, that his lifestyle remains exactly the same as

17   it did in June of 2016.  He is suggesting to the jury in his

18   testimony that as a result of his guilty plea, what he has

19   already suffered has led him to be more of a truth-teller now

20   because he has nothing to lose.

21           THE COURT:  I don't think he said that, but go ahead.

22           MR. MAZUREK:  He testified that his life has changed

23   much for the worst, and that is the reason why you can believe

24   him now, he is bolstering his own credibility on testimony

25   related to the fact that over the course of the year he has

HB1JSEA1                    Rechnitz - cross

1    already suffered substantial punishment or change in life.

2              THE COURT:  I don't think this is inconsistent with

3    what he testified to yesterday.  If you want to lay a better

4    foundation to try to make this inconsistent, I will let you do

5    that, but his response, it was a sort of more long-winded

6    response to a question that sort of called for a question that,

7    called for a long-winded response, and that is what you got.

8              He told you house his life changed.  He didn't say he

9    he was no longer able to live in his house or that is not what

10   is in his house.  That is not what he said.

11             MR. MAZUREK:  He said his life was miserable.  This is

12   not an example of miserable living.

13             THE COURT:  You can ask.

14             (Multiple voices)

15             THE COURT:  That is not what he said yesterday in

16   terms of why he was miserable.

17             MR. BELL:  I also think the degree to which those

18   questions are asked should be hemmed in as well.  Here is why.

19             The idea here is to basically put out something that

20   will be prejudicial to our jury of workaday New Yorkers which

21   basically throws Mr. Rechnitz's affluence, perceived, opulence

22   in their faces, just to -- it is an opportunity for Mr. Mazurek

23   to say, without having to argue it, hey, this guy is really

24   rich, don't you hate him on top of everything else.

25             MR. MAZUREK:  That is not true.

1        MR. BELL:  I hope we don't spend real time on this.

2        THE COURT:  We don't need to go on that.  The

3   objection is sustained.  Let's move on.

4        (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HB1JSEA1                    Rechnitz - cross

1          (In open court)

2          THE COURT:  That objection is sustained.

3          MR. MAZUREK:  Thank you, your Honor.

4    BY MR. MAZUREK:

5    Q.  Mr. Rechnitz, you currently reside in Beverly Wood,

6    California, correct?

7    A.  I reside in Los Angeles, yes.

8    Q.  Yesterday you talked about -- I -- (inaudible) -- what is

9    it you paid for your rent in at this point?

10   A.  Not in full.

11   Q.  How much is the rent?

12         MR. BELL:  Objection.

13         THE COURT:  I will allow it.

14   A.  $17,000 a month.

15         THE COURT:  Can we take the exhibit off the screen,

16   please.

17   BY MR. MAZUREK:

18   Q.  Yesterday you said that your travel was restricted during

19   the time that this case has been pending against you.  Do you

20   remember that?

21   A.  I do.

22   Q.  That restriction is you get to travel anywhere you want in

23   the United States, right?

24   A.  Correct.  I am restricted from international travel.

25   Q.  You continued to enjoy attending the finest sports events

HB1JSEA1                    Rechnitz - cross

 1    since you pled guilty, correct?

 2    A.  I have been sports events.

 3    Q.  In the fall of 2016 you were in Chicago in the prime seats

 4    to watch the World Series between the Chicago Cubs and

 5    Cleveland Indians, right?

 6    A.  Yes.  I took my son.

 7    Q.  And you made sure that you were in a location that again to

 8    be photographed and published in places like New York Post,

 9    right?

10    A.  No.  That is false.

11    Q.  You were, right?

12                MR. BELL:  Objection.

13                THE COURT:  You were what, counsel?

14    BY MR. MAZUREK:

15    Q.  You were published in the New York Post, that photograph of

16    you attending the World Series game, right?

17    A.  Yes.

18    Q.  We saw yesterday that towards the end of 2016, after you've

19    already been pled guilty and cooperating with the government,

20    you were spending approximately 5 to $8,000 a month on your

21    Platinum American Express Card, right?

22    A.  I don't remember what I was spending.  I think you showed

23    me a whole I think a few hundred pages.  I didn't go through

24    them.

25    Q.  For the last two months of 2016, you reviewed screen-shots

1    of which Jason Nissen paid your American Express bill, and

2    those amounts were anywhere from -- multiple payments in two

3    months of 18,000, 23,000, 45,000, $50,000, right?

4    A.  I don't know.  I would have to see them again.  That is the

5    card I use for business and personal.

6    Q.  Mr. Rechnitz, over the course of the last year and a half,

7    you said you were able to continue to run your business,

8    correct?

9    A.  Yes.

10   Q.  You hoped to continue to do so after your testimony in this

11   trial, right?

12   A.  I would like to rebuild myself, yes.

13   Q.  You would like to not have to spend a single day in jail,

14   right?

15   A.  That's correct.

16   Q.  The means with which you seek to achieve that is the

17   cooperation agreement you have with the government, correct?

18   A.  If I honor the cooperation agreement, I will get a 5K

19   issued to the sentencing judge in the hopes for leniency, but

20   there is no guarantee.  I am facing 20 years in prison.

21   Q.  Your hope is not to spend a single day in prison if you get

22   that 5K letter, right?

23   A.  That's correct.

24   Q.  Let me ask you about work that you did in promoting the

25   Platinum Partners hedge fund, okay?

HB1JSEA1                    Rechnitz - cross

1      You knew Murray Huberfeld from the Orthodox Jewish

2  community in New York once you moved to New York.  Is that

3  right?

4  A.  That's correct.

5  Q.  Your grandfather and Mr. Huberfeld's father were from the

6  same community.  Is that correct?

7  A.  I know where my grandfather was from, but I believe so.

8  Q.  You got to know him, Mr. Huberfeld, through his reputation

9  in the community, right?

10  A.  No -- yeah, people introduced us.

11  Q.  You also got to know him in some business transactions,

12  correct?

13  A.  That is correct.

14  Q.  For example, you helped sell him some units from the

15  Apthorp Building in New York City?

16  A.  That's correct.

17  Q.  You testified on direct examination that you knew he was a

18  reputable person in the community.  Is that right?

19  A.  Yes.

20  Q.  That he was wealthy, right?

21  A.  Yes.

22  Q.  That he carried a certain stature in the community?

23  A.  Correct.

24  Q.  And being associated with Mr. Huberfeld would be good for

25  you, correct?

1   A.  Correct.

2   Q.  And you were hoping that other people in similar positions

3   as him would treat you on a higher caliber and do business with

4   you, right?

5   A.  Correct.

6   Q.  So one of the ways that you worked to get to know Mr.

7   Huberfeld better was to suggest to him that you could solicit

8   investors on behalf of his hedge fund, right?

9   A.  He asked me, and I was happy to do it.

10  Q.  And, in fact, during the end of 2013, you had come up with

11  a list of 25 investors that you proposed to solicit on behalf

12  of Platinum Partners? correct?

13  A.  Murray asked me to make a list.  I don't remember the exact

14  date and I provided one to make sure they weren't people

15  already affiliated with the fund.

16  Q.  And the list was of 25 investors, correct?

17  A.  I believe so.

18  Q.  Some of those investors were high net worth individuals,

19  right?

20  A.  I think most of them are.

21  Q.  And those are people that had connections you had made

22  while you were living your lifestyle in New York, right?

23  A.  I am not sure if I knew the people on the list.  These were

24  the target list he wanted me to approach.

25  Q.  These were people you came up with, correct?

HB1JSEA1                    Rechnitz - cross

1    A.   I believe so.

2    Q.   In addition to the high net worth individuals, there may

3    have been some labor unions on that as well, correct?

4    A.   I don't recall.  I am not sure.

5    Q.   At that point in time you were making your connections not

6    only in the business world in New York, but also in the

7    political world, right?

8    A.   That's correct.

9    Q.   And in the political world, you were getting to know, as

10   you said, high level officials in the New York City Police

11   Department, right?

12   A.   I was.

13   Q.   You met Norman Seabrook at the end of 2013, correct?

14   A.   Yes.

15   Q.   And you were also hoping to make contacts with people like

16   Tom Napoli, right?

17   A.   That was a person that Norman told me he would introduce me

18   to and introduced Platinum to.

19   Q.   You knew who Mr. Di Napoli was?

20   A.   Yes.

21   Q.   He was the head of the state, New York State Pension Fund

22   at the time, correct?

23   A.   I believe he is the controller of New York State.

24   Q.   And would have access to a potential investment in the

25   state pension fund, correct?

1    A.   That's correct.

2    Q.   Now, this list of 25 or something, that interested Mr.

3    Huberfeld, right?

4    A.   Yes, he asked me to make it.

5    Q.   And Mr. Huberfeld also knew that your work at JSR Capital,

6    a lot of what you did was middleman-type work, correct?

7    A.   I don't know what he knew about my business.

8    Q.   You didn't have conversations about your business with Mr.

9    Huberfeld?

10   A.   Yeah, he saw I sold product and I purchased buildings.

11   Q.   And in that way, you were acting as a middleman in

12   connecting investors to potential property, correct?

13   A.   No.  I was purchasing buildings and raising money from

14   investors as we discussed yesterday.

15   Q.   Well, with Mr. Huberfeld, you acted as a broker in helping

16   to sell his apartments, correct?

17   A.   To broker and I managed the construction process for him

18   and I managed the sales process for him and the purchase

19   process.

20   Q.   In arranging the sales of the apartments, you acted as a

21   broker, correct?

22        MR. BELL:  Objection.  Can we get clarify what Mr.

23   Mazurek means.

24        THE COURT:  Overruled.  You may answer.

25   A.   Can you repeat the question.

HB1JSEA1                    Rechnitz - cross

1  BY MR. MAZUREK:

2  Q.  In helping Mr. Huberfeld sell his Apthorp apartments, you

3  acted as his broker, correct?

4  A.  No.  I helped manage the broker process for him.  He hired

5  an outside brokerage, and I managed that process for him.

6  Q.  You managed brokers.  Is that your testimony?

7  A.  My testimony in this specific case you asked me about, I

8  found him a broker to sell his apartment.

9  Q.  And you received a commission for that, correct?

10  A.  No.  I received a fee for bringing him the opportunity.  We

11  always had made up I would get a piece of the profit once he

12  resold the apartment.

13  Q.  You received money in exchange for your services in

14  assisting Mr. Huberfeld to complete those transactions.  Is

15  that fair, sir?

16  A.  I received a fee for bringing him the opportunity, and once

17  he sold it and made a profit, that was the calculation we used

18  in order to figure out what I would be paid.

19  Q.  And you got paid, right?

20  A.  Yes.

21  Q.  When you went about or you came up with a list of 25

22  investors for Platinum Partners, you also were thinking of

23  getting paid for services you would be providing to Platinum,

24  correct?

25  A.  If this turned into something of material, yes.

1  Q.  Because Platinum Partners, just to be sure, was a

2  for-profit enterprise, correct?

3  A.  Yes.

4  Q.  You weren't doing charity work on behalf of Platinum

5  Partners, right?

6  A.  Correct.

7  Q.  You were in this so that Jona Rechnitz gets paid, right?

8  A.  It was more than that.  I was in this to keep the

9  relationship with Murray.  As you saw in one of the calls, he

10  asked me if I still needed help with a mortgage because I was

11  raising him funds.  There were a lot of reasons I was doing it,

12  not just for money.

13  Q.  All of those reasons are in order to better and advance

14  Jona Rechnitz, right?

15  A.  That's correct.

16  Q.  Now, the thing you wanted to do or one of the things you

17  wanted to accomplish I think you just testified about as to

18  Murray Huberfeld is to impress him, right?

19  A.  Yes.

20  Q.  Because you thought that that would have the effect of

21  getting you into Mr. Huberfeld's world, so to speak?

22  A.  Yes.

23  Q.  That you might be able to be introduced to a lot of wealthy

24  hedge fund people, right?

25  A.  No.

HB1JSEA1                    Rechnitz - cross

1   Q.  That is the one part of the world Mr. Huberfeld was in,

2   correct?

3   A.  That is not the one I was familiar with.

4   Q.  Mr. Huberfeld had lots of business connections, generally?

5   A.  Yes, within the Jewish Orthodox circles, I agree that it

6   would be beneficial for me to be close to Murray.

7   Q.  So you had conversations with Mr. Huberfeld about how much

8   money you could make from bringing in this series of up to 25

9   investors, right?

10  A.  I don't remember.  It is possible.

11  Q.  You knew or learned about the way that hedge fund managers

12  get paid, right?

13  A.  At what point?

14  Q.  At some point in this process?

15  A.  When it was time to create the invoice, I understood that

16  I'm not qualified to be paid.

17  Q.  I am sorry?

18  A.  When it was time to prepare the Nicks invoice, that --

19  Q.  We'll get to that.

20  A.  You asked me a question.

21          THE COURT:  Let him finish his answer.

22  A.  At some point in the process, correct.  When we had a

23  discussion about reimbursing me for the cash I was going to

24  outlay for Norman, one of the things that came up in that

25  discussion was paying me by check, and Murray said that

HB1JSEA1                    Rechnitz - cross

1    wouldn't work because I am not licensed to receive that money.

2    BY MR. MAZUREK:

3    Q.  Let me step back for a moment.  We'll get to those issues.

4         You had heard the phrase 2 and 20 at some point,

5    right?

6    A.  Yes.

7    Q.  2 and 20 was a phrase that was used for a formula for

8    determining how hedge fund managers would get paid for their

9    investment work, right?

10   A.  That was the formula that Murray told me Platinum would be

11   charging Norman for his investment.

12   Q.  But you had heard the phrase 2 and 20 before you talked to

13   Murray Huberfeld or discussed anything about Norman Seabrook,

14   right?

15   A.  I am not sure.  It is possible.

16   Q.  In fact, prior to that conversation, those conversations

17   that you had with Murray Huberfeld about Norman Seabrook, you

18   had visited Platinum Partners several times before then, right?

19   A.  Yes.

20   Q.  You had been getting -- at Mr. Huberfeld in their offices?

21   A.  Yes.

22   Q.  You had been told a little bit how hedge funds operate,

23   right?

24   A.  That's correct.

25   Q.  And you understood, and you testified on direct examination

1   your understanding of what 2 and 20 meant, right?

2   A.   That's the way it was explained to me by Murray, yes.

3   Q.   And 2 percent being administrative fee that hedge fund

4   managers get paid in order to fund things like operations and

5   overhead, right?

6   A.   Again I can't speak in general of other hedge fund

7   managers.  I can specifically talk about what I was explained

8   in this instance.

9   Q.   So Mr. Huberfeld explained to you the 2 and 20 formula,

10   correct?

11   A.   That's correct.

12   Q.   You had an understanding that hedge funds sometimes use

13   finders fees or placement agents in order to get paid for

14   bringing people into funds, correct?

15   A.   No.  Again the only real exposure I've had to hedge funds

16   and understanding was when we sat and spoke about these

17   specific cases.  I can't speak in general about hedge funds.

18   Q.   Let me ask you, Mr. Rechnitz, when you came up with this

19   list of 25 people, I think you've already testified you did it

20   because with an idea at least in part to get paid, right?

21   A.   Yes.  Murray asked me to come up with a list, and I did in

22   order to be paid.

23   Q.   When you syndicated deals, you always made a determination

24   beforehand of trying to calculate how much Jona Rechnitz would

25   get paid if you performed services in a transaction, right?

HB1JSEA1                    Rechnitz - cross

1   A.  What type of transaction?  This was the first type of

2   transaction of this nature.

3   Q.  Any business transaction you entered into, you want to know

4   how much you're going to get paid, right?

5   A.  Any business I enter, I like to make money, yes.

6   Q.  Yes.  In this business, this business was no different than

7   that, right?

8   A.  It was.

9   Q.  Sir, you wanted to get paid from Mr. Huberfeld, right?

10  A.  On certain investors.  I brought him other investors I did

11  not get paid.

12  Q.  You weren't doing it for charity purposes, right?

13  A.  No, I was not.  I was calculated in my reasoning.

14  Q.  You wanted to make sure that if you were going to raise 50

15  to a hundred million dollars to Platinum Partners, Jona

16  Rechnitz was going to get a piece of that, right?

17  A.  Again, if I was to bring money to Murray --

18          MR. MAZUREK:  Judge, may I ask the Court's

19  instructions that the witness answer the question that is

20  posed?

21          THE COURT:  That objection is sustained.  That answer

22  was already given.  The question was already asked.  Keep

23  moving.  Go ahead, counsel.

24  BY MR. MAZUREK:

25  Q.  Let me ask you this.  You knew that raising money into a

1   hedge fund was a potential source of income for you.  Is that

2   fair to say?

3   A.  Again are we talking about a general hedge fund?  I don't

4   understand your question.

5   Q.  With respect to Murray Huberfeld and the list of 25, sir?

6   A.  What is your question?

7   Q.  That that was a potential source of income for you,

8   correct?

9   A.  That's correct.

10  Q.  Now, in conversations that you had with Mr. Huberfeld about

11  payments, he would ask you if you wanted checks to go either to

12  your for-profit business or charity, correct?

13  A.  Not exactly the way you're structuring it.

14  Q.  Let me rephrase the question.

15         Mr. Huberfeld would ask if you wanted checks to go to

16  your for-profit organization, JSR Capital, or charity, correct?

17  A.  Again you're generalizing.  I don't know how to answer that

18  question.

19  Q.  Let me ask specifically.

20         With respect to raising money for the list of 25

21  investors for Platinum Partners, Mr. Huberfeld asked you if you

22  wanted checks to go to your for-profit or charity?

23  A.  No.

24  Q.  In your conversations with Mr. Huberfeld about the specific

25  investments with Norman Seabrook and COBA, did he ask you if

HB1JSEA1                    Rechnitz - cross

1   you wanted your checks to go to your for-profit or charity?

2   A.  No.  What happened was we had a conversation when it was

3   time to figure out how to reimburse me, and one of the options

4   laid out was through charity.  I did not want that idea for the

5   60,000.

6   Q.  But you understood, sir, that there were two options for

7   you to get paid, right, either into your for-profit business or

8   your charity, correct?

9   A.  No.  At the time three options were brought to the table,

10  and I chose Option 3 to reimburse me.

11  Q.  Isn't it true, sir, that you sat with these agents and

12  prosecutors on September 27th, 2017, about six weeks ago, and

13  you told them that with respect to the Norman Seabrook

14  investments through COBA, that Murray asked whether the checks

15  to you should go to your for-profit business or your charity?

16  A.  Again you're confusing the issue.

17          THE COURT:  Hold on.

18  Q.  That is not my question.

19  A.  I don't understand the question because there is --

20          THE COURT:  Don't make commentary on the question.

21          Please rephrase the question.

22  BY MR. MAZUREK:

23  Q.  Isn't it true on September 27th, 2017, in a meeting with

24  these prosecutors and FBI agents, you told them that with

25  respect to the COBA investment, Murray would ask whether the

HB1JSEA1                    Rechnitz – cross

1    checks to you should go to your for-profit or charity?

2    A.  No.

3    Q.  Is there anything that would refresh your recollection as

4    to what you told these agents in September 27th, 2017?

5    A.  No.

6    Q.  You, sir, are not a licensed or registered broker-dealer

7    for investment transactions that are regulated by the SEC,

8    correct?

9    A.  Correct.

10   Q.  You did not have a contract directly with Platinum Partners

11   in order to bring investors into the fund, right?

12   A.  Correct.

13   Q.  So you could not be paid or have an agreement directly with

14   Platinum Partners for that regard, right?

15           MR. BELL:  Objection.

16           THE COURT:  Overruled.  You may answer.

17   A.  I am not sure how it works.

18   BY MR. MAZUREK:

19   Q.  You didn't have an agreement, correct?

20   A.  With whom?

21   Q.  With Platinum Partners?

22   A.  I did with one of their subsidiaries.

23   Q.  With one of their subsidiaries?

24   A.  One of the companies they owned, I had a channel agreement

25   with a gara.

HB1JSEA1                    Rechnitz - cross

1    Q.  I am asking specifically with respect to the Platinum

2    Partners hedge fund.  Did you have an agreement with them in

3    order to get paid for services rendered in promoting the fund?

4    A.  No.

5    Q.  You put in because you couldn't because you didn't have a

6    license, correct?

7                MR. BELL:  Objection.

8                THE COURT:  I will allow it.

9    A.  Again I don't know how that works.

10   BY MR. MAZUREK:

11   Q.  But you did not have a license as a registered

12   broker-dealer in securities transactions?

13               MR. BELL:  Objection.

14               THE COURT:  Sustained; ask and answered.  Let's go,

15   counsel.

16   BY MR. MAZUREK:

17   Q.  So in terms of compensation from the fund, you pick

18   directly charity payments for the fund, correct?

19   A.  Is this a hypothetical?

20   Q.  No, it is not a hypothetical.

21               With respect to the COBA transaction, there were two

22   ways you could get paid, right, either by receiving or asking

23   for checks that would be contributed to charities of your

24   choice, right?

25   A.  Again I am sorry.  I don't understand you.  You keep saying

1    me getting paid.  There were several payments here, so I am not

2    really sure how to answer that.

3    Q.  Let me step back.

4            Platinum Partners wrote checks to several, to three

5    charities that you had asked Murray Huberfeld to direct payment

6    to through Platinum, correct?

7    A.  I remember one, but it is possible there were three or

8    more.

9    Q.  So when you asked Murray and Platinum Partners to write

10   charity checks for you, that was something for your benefit,

11   correct?

12   A.  I never asked for it.

13   Q.  You received charity checks that were directed to charities

14   of your choice, correct?

15   A.  That's correct.

16   Q.  From Platinum Partners, correct?

17   A.  Yes.

18   Q.  And in your mind, that was something that was for your

19   benefit, correct?

20   A.  It was for the charities' benefit.

21   Q.  But you got credit for it because it was in your name,

22   right?

23   A.  Credit with God?  Credit with who?

24   Q.  With the charities, right?

25   A.  Okay, yes.

HB1JSEA1                    Rechnitz - cross

1   Q.  The other thing, the other way that you could get paid by

2   Platinum Partners is reimbursement for expenses, correct?

3   A.  That never happened, no.

4   Q.  Well, in fact, you submitted an invoice from JSR Capital

5   $60,000 for Nicks tickets, right?

6   A.  Yes.

7   Q.  That invoice for Nicks tickets, you had Nicks tickets, a

8   season ticket subscription that you testified about, correct?

9   A.  Yes.

10  Q.  You had to lay out the payment for those tickets, correct?

11  A.  Okay, yes.

12  Q.  Part of your expenses in entertaining people at these games

13  is for investment purposes, right?

14          MR. SHECHTMAN:  Judge, can I talk to Mr. Mazurek?

15          THE COURT:  Sure.

16          (Off-the-record discussion)

17          MR. MAZUREK:  May I rephrase, your Honor?

18          THE COURT:  Yes.

19  BY MR. MAZUREK:

20  Q.  You incur expenses in your business at JSR Capital for

21  entertaining clients, other business associates, correct?

22  A.  Yes.

23  Q.  And sometimes you seek reimbursement for those expenses,

24  correct?

25  A.  No.  From who?  No.

HB1JSEA1                    Rechnitz - cross

1    Q.  You definitely take business expenses out of JSR, you

2    deduct that for your taxes, correct?

3    A.  Yes.

4    Q.  You also take expenses, you get paid by other people for

5    your own business expenses like Jason Nissen paying your

6    American Express bills, correct?

7    A.  No.

8    Q.  Jason Nissen did pay your American Express bills, correct?

9    A.  He did, but not for my business expenses.

10   Q.  One other reason why it is good for you to have expenses

11   paid by other parties is that you don't have to declare it as

12   income, correct?

13   A.  No.  I still have to declare that.

14   Q.  If you were to fill out your tax returns, correct?

15   A.  I don't understand the question.  If I were to file taxes?

16   Q.  I will withdraw it.

17           Now I am going to move to the end of 2013.  You were

18   cultivating a relationship --

19           MR. SHECHTMAN:  One moment, your Honor.

20           (Off-the-record discussion)

21   BY MR. MAZUREK:

22   Q.  I am going to move to the end of 2013.

23           You were cultivating your relationship with Norman

24   Seabrook at this time, correct?

25   A.  I was introduced to Norman in 2013, yes.

HB1JSEA1                    Rechnitz - cross

1    Q.  You testified on direct examination that as part of this

2    cultivation of the relationship, you went on a trip to the

3    Dominican Republic on December 17th, 18th, 2013, correct?

4    A.  Yes.  When I was at a place in the relationship that was

5    very strong, I decided to travel together.

6    Q.  You, in cultivating this relationship, this relationship

7    and others, you spent a significant amount of your resources of

8    your business of JSR Capital, correct?

9    A.  My personal money as well, yes.

10   Q.  For example, on direct testimony you said that you spent

11   $45,000 to charter this private plane into the Dominican

12   Republic, correct?

13   A.  Yes.

14   Q.  And just to be clear, sir, that trip to the Dominican

15   Republic, that was just one night, right?

16   A.  Yes.

17   Q.  So you spent $45,000 on a private plane for a one-night

18   excursion, correct?

19   A.  Yes.

20   Q.  And that was your money, right?

21   A.  Yes.

22   Q.  You spent lots of money on fancy cigars, thousands of

23   dollars, correct?

24   A.  Yes.

25   Q.  You spent money on a trip to Israel in March of 2014,

HB1JSEA1                    Rechnitz – cross

1    correct?

2    A.   Yes.

3    Q.   Where the airfare for that was approximately $27,000 alone,

4    correct?

5    A.   I don't remember the number, but that sounds about right.

6    Q.   You also took Mr. Seabrook and others on trips to Las

7    Vegas, correct, in July of 2014?

8    A.   Right.  Norman and Phil Banks on all these trips, correct.

9    Q.   You spent money in Burbank, California, correct?

10   A.   Pardon?

11   Q.   On that same trip you went on from Las Vegas to Burbank,

12   California, correct?

13   A.   Yes.

14   Q.   You leased a Porsche out there in California as part of the

15   trip, correct?

16   A.   Not for myself.

17   Q.   I am sorry?

18   A.   Can you repeat that.

19   Q.   Yes.  You leased a Porsche automobile that was used during

20   that period of time, correct?

21   A.   Yes.

22   Q.   And all of this money was your own money that was being

23   spent, right?

24   A.   Correct.

25   Q.   To cultivate these relationships, right?

HB1JSEA1                    Rechnitz - cross

1    A.  Yes.

2    Q.  You didn't ask Murray Huberfeld to reimburse you for those

3    expenses, did you?

4    A.  No.

5    Q.  Murray Huberfeld didn't go to the Dominican Republic, did

6    he?

7    A.  No.

8    Q.  Murray Huberfeld didn't go to Israel, right?

9    A.  No.

10   Q.  He didn't go to the Havana Club with you, right?

11   A.  No.

12   Q.  He didn't go to Las Vegas with you?

13   A.  No.

14   Q.  He didn't go to Burbank, California?

15   A.  No.

16   Q.  Now, on the trip on December 17th, 18th in the Dominican

17   Republic, you just testified that you had a conversation during

18   that one-night stay with Mr. Seabrook, right?

19   A.  Yes.

20   Q.  You went on this trip, I believe on your direct

21   examination, to relax and to get away especially from the Chief

22   of Police Banks, right?

23   A.  Can you repeat the question.

24   Q.  Yes.  The reason for you to go on this trip, you testified

25   on direct examination, was as a means of getting away, correct?

1    A.   Yes.  For Phil Banks, it worked out for his schedule.

2              (Continued on next page)

1    BY MR. MAZUREK:

2    Q.  This one-day excursion to the Dominican Republic would help

3    clear Phil Bank's mind.  That's the reason that you went, sir?

4    A.  One of the reasons.

5    Q.  And you left in the morning from Teterboro Airport, right?

6    A.  Yes.

7    Q.  In the private plane, correct?

8    A.  Yes.

9    Q.  You drove to the resort once you got there?

10   A.  Yes.

11   Q.  And you had a day of vacation and relaxation, right?

12   A.  Yes.

13   Q.  Golfing was one of the activities, right?

14   A.  Yes.

15   Q.  And drinking alcohol?

16   A.  Yes.

17   Q.  And eating fine food, right?

18   A.  Yes.

19   Q.  And you said that at the end of this day of excursion of

20   vacation you went to Mr. Seabrook's bedroom at night, right?

21   A.  Yes.

22   Q.  After a full evening of drinking and eating, right?

23   A.  I don't know how to answer that.  I don't know what a full

24   evening means.

25   Q.  Well, you drank a lot of alcohol?

HB1TSEA2                    Rechnitz - cross

1   A.  No, I did not.

2   Q.  Was Mr. Seabrook at that point in time -- I believe on

3   direct, on your direct testimony you said that you both had

4   been drinking, right?

5   A.  I said he had a couple of drinks and he was highly

6   emotional.

7   Q.  He was highly emotional and he was talking about things in

8   his personal past, right?

9   A.  In his past and present.

10  Q.  And after or in the midst of this emotional conversation

11  with Mr. Seabrook, is it your testimony, sir, that you started

12  to talk about the details of potential investments in hedge

13  funds?

14  A.  No, we spoke specifically about where the union was

15  investing currently, how the procedure worked, and I introduced

16  the idea of Platinum to him.

17  Q.  But this was a conversation that took place in the bedroom

18  of Mr. Seabrook on your vacation in the Dominican Republic,

19  that's your testimony?

20  A.  Yes.

21  Q.  Where you started talking about a formula for Mr. Seabrook

22  to get paid by the Platinum Partners hedge fund, is that your

23  testimony?

24  A.  No, we never discussed the formula on that trip.

25  Q.  You talked about details relating to what kinds of

1    investments would be good for the labor union?

2    A.  No, not exactly the way you're phrasing it.

3    Q.  You had a conversation, you're saying, on the night of your

4    getaway trip about getting COBA invested in Platinum Partners?

5    A.  No, about making the introduction to Platinum.

6    Q.  And you're saying at this conversation, this late night

7    conversation after drinks in the DR, that you introduced the

8    concept of a personal payment to Norman Seabrook, is that your

9    testimony?

10   A.  I told Norman he would make money, yes.

11   Q.  And you told Mr. Seabrook at that time you were a partner

12   in Platinum Partners, correct?

13   A.  Correct.

14   Q.  Now that was your sales tactic at the time, late at night

15   in the Dominican?

16   A.  I don't understand your question.

17   Q.  You're trying to impress Norman Seabrook after you had

18   flown him on a private charter and had a beautiful day in the

19   DR?

20   A.  He was impressed from that trip.

21   Q.  And you were impressing him more by telling him you also,

22   by the way, are a partner in a major hedge fund, right?

23   A.  No, that's not why I told him that.

24   Q.  Now you returned to New York after that trip, and you said

25   you had a conversation with Mr. Huberfeld, right?

1  A.  Yes.

2  Q.  And you said that one of the 25 people on that list of

3  potential investors you were going to be able to deliver was

4  Mr. Seabrook, correct?

5  A.  I don't know if he was on that list of 25.

6  Q.  Well, you were delivering the first potential investor in a

7  series of investors, right?

8  A.  Again, I don't know if Norman was part of that 25 list.  I

9  think what happened was after I mentioned the concept of Norman

10  to Murray, he said okay, let's get a list of 25.

11  Q.  But Mr. Seabrook was the first investor that you're

12  bringing to Murray Huberfeld and saying look, I could raise

13  money for Platinum Partners, right?

14  A.  I don't think so, no, there was somebody before.

15  Q.  Who was the someone before?

16  A.  Alphonse Malone.

17  Q.  So you already started the process of bringing investors to

18  Platinum Partners even before Mr. Seabrook?

19  A.  No, Murray had asked me to give him an extra push, and with

20  other people.  There was another fellow also who Murray asked

21  me to speak to.

22  Q.  And that -- during this period of time you were active in

23  trying to get money into Platinum Partners, right?

24  A.  Not really, no.

25  Q.  Well, as you just mentioned, Mr. Malone was one of the

HB1TSEA2                    Rechnitz - cross

1   people, right, who you're trying to bring in, correct?

2   A.  No, Murray asked me to help convince him at that time.

3   Q.  And you were doing that, correct?

4   A.  Correct.

5   Q.  But you also had a meeting scheduled on December 30 with a

6   potential investor by the name of Paul Raps, correct?

7   A.  Correct.

8   Q.  That meeting took place in the offices of Platinum Partners

9   on December 30, correct?

10  A.  Yes.

11  Q.  And this was all in the effort of you trying to impress

12  Mr. Huberfeld, at least in part?

13  A.  That was part of the reason, yes.

14  Q.  And also for you to have the potential of another area of

15  income for JSR Capital, correct?

16  A.  Yes.

17  Q.  Now you arranged a meeting after you returned from the

18  Dominican Republic so that you could introduce Norman Seabrook

19  to Murray Huberfeld, right?

20  A.  We had several meetings, yes.

21  Q.  Let's start with the first meeting.  That's after you came

22  back from the DR, correct?

23  A.  We did meet after the DR several times.

24  Q.  And in your direct testimony I believe we looked at a

25  calendar entry for December 24 of 2013, correct?

 1    A.  I don't know the exact date, sounds right.

 2              MR. MAZUREK:  Well, if we could put on the screen

 3    what's been I think admitted in evidence as 1015.

 4              We'll get to that in a second.

 5    Q.  Is it your memory, sir, that you had a meeting at Platinum

 6    Partners with Norman Seabrook on Christmas Eve of 2013?

 7    A.  I don't know what date, we met but we met sometime after my

 8    trip.  I can't tell you the exact date.

 9              MR. MAZUREK:  Your Honor, if we could publish what is

10    admitted in evidence as Government Exhibit 1014.

11    Q.  This is the calendar entry you were shown on direct

12    examination?

13              THE COURT:  Hold on.  Do the jurors have it?

14              JUROR:  No.

15              (Pause)

16              THE COURT:  Okay.  Go ahead, counsel.

17    Q.  This was the calendar entry in your Outlook email at JSR

18    Capital, correct?

19    A.  I don't know whose calendar entry this is.  It could be

20    mine, it could be Murray's.  How would I know?

21    Q.  Well, this was -- you testified to this on direct

22    examination, correct?

23              (Pause)

24    Q.  This document came in through stipulation that was read to

25    the Court at the time of your direct examination that it was

1    retrieved off the JSR Capital emails.

2              Do you recognize it, sir?

3    A.   Then yes, it's a calendar entry in my phone.

4    Q.   And the entry here is for 12:30 p.m. on December 24, 2013,

5    correct?

6    A.   That's what it says.

7    Q.   Do you know whether Mr. Seabrook took time out on Christmas

8    Eve to come to Platinum on this day?

9    A.   Again, I don't know if this is the exact date that we met.

10   I know that I met with Murray and Norman after the Dominican

11   Republic shortly after.  I can't tell you this is the exact

12   time and date.

13   Q.   But this was what was in your calendar, correct?

14   A.   Yes.  It shows time as tentative, not confirmed.

15   Q.   You testified on direct examination that you had a meeting

16   in the boardroom of Platinum Partners with Norman Seabrook,

17   correct?

18   A.   I did.

19   Q.   And that was a meeting where Mr. Huberfeld introduced the

20   fund to Mr. Seabrook on behalf of COBA, correct?

21   A.   That's the meeting where Mr. Huberfeld introduced the fund

22   and its products to Norman, yes.

23   Q.   There was -- and you were in attendance at that meeting?

24   A.   Yes.

25   Q.   And there was no conversation in that meeting about any

HB1TSEA2                    Rechnitz - cross

1    kind of payment to Mr. Seabrook, correct?

2    A.   No.

3    Q.   Did other members of Platinum Partners come in to introduce

4    the fund to Mr. Seabrook in your memory?

5    A.   I don't think so.

6    Q.   And you also testified that in this meeting there was a

7    discussion about which -- there were multiple funds at

8    Platinum, which fund might be proper for COBA, correct?

9    A.   There were two products that were pitched and I was

10   convincing the discussion to one of them.

11   Q.   And you were familiar at that point, based on your

12   conversations with Mr. Huberfeld, about his background with

13   respect to the credit fund?

14   A.   What does that mean, "as background," I don't understand.

15   Q.   You heard of the fund called Centurion, correct?

16   A.   Yes.

17   Q.   Centurion was the credit fund that Mr. Huberfeld

18   established, correct?

19   A.   I knew Centurion was the fund before it became Platinum, I

20   don't know more than that.

21   Q.   Before it came the Platinum Partners Credit Opportunities

22   Fund, correct, the PPCO Fund?

23   A.   I remember his office being Centurion and switching to

24   Platinum.  I don't know the specifics.

25   Q.   Did you know, sir, that in fact Mr. Huberfeld was the chief

1    investment officer of the credit fund at Centurion that became

2    Platinum?

3    A.   I did not know that was his title, no.

4    Q.   In the conversations that you had with Mr. Huberfeld when

5    you took tours of Platinum Partners, he didn't tell you that in

6    fact that was his baby, that was the fund that he created, the

7    credit fund specifically?

8    A.   No.

9    Q.   That never happened?

10   A.   Nope.

11   Q.   So when you testified on direct examination that it was

12   your suggestion to go to the credit fund, you didn't know at

13   the time that in fact it was Mr. Huberfeld's fund that he

14   started and had the investment responsibilities for?

15   A.   Sorry, I don't understand what you're saying.

16   Q.   Let me rephrase.

17        You testified on direct examination that at some point

18   Mr. Huberfeld wanted COBA to invest in the PPVA.  Was that your

19   testimony?

20   A.   That is not what I said.  I said that he was pitching two

21   products, and I suggested the credit fund would be the right

22   fit for Norman's fund, union.

23   Q.   And Mr. Huberfeld agreed with that, correct?

24   A.   Yes.

25   Q.   And he had a lot of knowledge on the credit fund when you

1    were in that meeting with him and Norman Seabrook, correct?

2              MR. BELL:  Objection.

3              THE COURT:  I'll allow it.

4    A.  He had knowledge on the entire fund that he was pitching.

5    That was the assumption.

6    Q.  In fact, on December 26, two days after your calendar entry

7    of Christmas Eve, Mr. Huberfeld, through Mr. Ritterman at the

8    Platinum Partners, sent you a description agreement, a private

9    placement memorandum for the Credit Opportunity Fund, correct?

10   A.  I don't remember which fund it was sent to, but I remember

11   it being sent to my personal name.

12   Q.  Meaning that the private placement memoranda had for the

13   exclusive use of Jona Rechnitz, correct?

14   A.  Yes.

15   Q.  And you understood that the purpose for that was for you to

16   be able to use those -- that agreement or that information in

17   order to continue to promote the credit fund on Platinum

18   Partners' behalf, correct?

19   A.  No, they were to forward to Norman, as Murray asked me to

20   do.

21   Q.  On that document there was nothing written about COBA,

22   correct?

23   A.  That's correct.

24   Q.  It was a private placement memorandum for your use,

25   correct?

HB1TSEA2                    Rechnitz - cross

1    A.  Yes.

2    Q.  And in fact, four days after December 26 on December 30,

3    you had a meeting with another potential investor, Mr. Raps,

4    correct?

5    A.  I did.

6    Q.  And that was consistent with your attempt to bring in as

7    many investors as you could to the Platinum fund, correct?

8    A.  Yes.

9    Q.  Now after the meeting that you had on the boardroom of

10   Platinum between Murray Huberfeld and Norman Seabrook, you

11   helped arrange a meeting where the Platinum Partners marketing

12   team could meet and present for the COBA board, correct?

13   A.  I don't remember if it was before or after the meeting, but

14   I made an intro by email to Murray and Norman which led to that

15   pitch in Norman's office.

16   Q.  And you did not attend that pitch at the COBA board?

17   A.  Nope.

18   Q.  All you did was put relevant parties together so that they

19   could coordinate when and how that meeting would take place?

20   A.  Correct.

21   Q.  Now you also testified on direct examination about the

22   formula that was going to be used in order for any payment to

23   go to Norman Seabrook, right?

24   A.  I testified to the formula that Murray had presented to me

25   to go back to Norman with.

HB1TSEA2                    Rechnitz - cross

1   Q.  And this related or this had as a component the two and

2   twenty formula that we talked about, right?

3   A.  Pardon?

4   Q.  As the calculation for this formula included the two and

5   twenty component we have been talking about?

6   A.  I remember two and twenty being used as the example and the

7   dollar amount of $100,000 being the example we were discussing.

8   Q.  And that $100,000 amount was an amount that you said that

9   you told Norman he could expect to be paid, correct?

10  A.  I told Norman it would be between 100 and 150,000.

11  Q.  And --

12  A.  Based on a $20 million investment.

13  Q.  Let me ask you, at the time of the meeting in the boardroom

14  with Murray Huberfeld and Norman Seabrook, there was no

15  discussion of $20 million, correct?

16  A.  I don't remember the amounts that were being discussed.

17  Q.  In fact, you testified that the amount of money that you

18  were talking to Norman Seabrook about was between 5 and $7

19  million at the end of 2013, correct?

20  A.  Yes, in the Dominican Republic he told me that was an

21  amount that he could possibly start with.

22  Q.  And that was the amount that you told Mr. Huberfeld that

23  was being discussed by Mr. Seabrook, correct?

24  A.  For the first investment, that was the amount that Norman

25  was looking to start with.

Q.  Well, when you spoke to Mr. Huberfeld of the first

investment of 5 to $7 million, that was the calculation on

which your two and twenty formula was based?

A.  No.  So that's why I said "start with," there was a

different conversation.

Q.  Well, there was no talk of $20 million from Norman

Seabrook, correct?

A.  There was not a limit set.

Q.  Well, the $20 million was the hypothetical that you

mentioned in your direct testimony.

A.  That's the number that Murray had come up with in his

hypothetical.

Q.  And he also, based on your testimony, your direct testimony

is that he mentioned the estimated rate of return would be

50 percent, is that correct, on the -- expected rate of return

on the investment in the credit fund?

A.  I remember him throwing that figure out, I don't remember

the exact amount of expected rate of return.  The case study

and example he gave me came out to $100,000.

Q.  The formula that you testified to on direct examination was

that if eventually the COBA invested $20 million and the money

makes 50 percent for the year, which means there would be a $10

million profit, then from the $10 million profit, 20 percent

would go to the union.  That was your understanding of the

formula?

HB1TSEA2                    Rechnitz - cross

1    A.  That's not what I said.

2    Q.  Well, you testified in court at the beginning of this week

3    on Monday morning, page 698 of the transcript --

4            MR. MAZUREK:  And for counsel and Court's benefit, I

5    am reading from lines starting line 19.

6    Q.  Isn't it true, sir, that you said in court under oath here

7    on Monday:

8    "Q. So he said" -- referring back to Mr. Huberfeld -- "for

9    example, if eventually he has $20 million invested and the

10   money makes 50 percent for the year, which means there's a $10

11   million profit, from the $10 million profit 20 percent would go

12   to the union and so on and so forth."

13   A.  No, 20 percent would go to the fund.  From their fee, 10

14   percent would go to the union.

15   Q.  So you were mistaken in your testimony on Monday?

16   A.  Again, I don't know exactly what was said.

17   Q.  Well, let me start with this on that formula.  First of

18   all, 50 percent return for the credit fund was not something

19   that that is realistic at all, is that true?

20   A.  That's exactly what Murray said, and that was his reason

21   for wanting the money by February.  He kept saying we're going

22   to have a huge month.  We could make 50 percent in the fund

23   this month.  I want Norman to make that.  Don't wait to March.

24   So that was something related to me on several occasions.

25   Q.  And the credit fund was the less volatile of the two funds

1   between that and the PPVA right?

2   A.  It was a more conservative fund.

3   Q.  More conservative fund that had lower rates of return than

4   the PPVA, correct?

5   A.  Yes, historically.

6   Q.  And had a more narrow band of highs and lows, correct?

7   A.  Can you repeat that?

8   Q.  Yes, it had a more narrow band of the highest rates of

9   return and the lowest rates of return, right?

10  A.  I don't understand.  It was a more conservative fund.

11  Q.  And less volatile, right?

12  A.  Yes.

13  Q.  And you knew that at the time, correct?

14  A.  Correct.

15  Q.  And that was the reason you were pitching it and saying

16  that's a good fund for COBA and the pension fund, right?

17  A.  The reason I was pitching it is because I thought there was

18  less risk.

19  Q.  Yeah.

20          MR. MAZUREK:  If we could publish for the jury what is

21  admitted in evidence as MH103.

22          And if we could expand the bottom third of that page.

23  Q.  And you see in the far right columns the year to date and

24  rate of return in the next to last column from the right?

25  A.  Yes.

HB1TSEA2                    Rechnitz - cross

1    Q.  You understand that they are rates of return for the years

2    identified from 2005 to 2013, correct?

3    A.  Excluding 2013, yes.

4    Q.  There was no annual rate of return anywhere near -- or even

5    monthly rate of return for the PPCO that came anywhere close to

6    50 percent, correct?

7    A.  Not through 2013, that's correct.

8    Q.  And Murray Huberfeld was associated with this hedge fund

9    from the time of its inception up until the time of your

10   meeting at the end of 2013, right?

11   A.  I think so.

12   Q.  And your testimony is that Mr. Huberfeld in that -- in

13   talking to you about this particular formula said I expect to

14   have a 50 percent return by February of 2014, is that your

15   testimony?

16   A.  He didn't say he expected it in that meeting, he said it at

17   other times.  But he it give me this chart which says past

18   performance is not necessarily indicative of future

19   performance.

20            MR. SCHECHTMAN:  I apologize to the Court.

21            MR. MAZUREK:  You can take that down.

22   Q.  Now back to this formula that was based upon a 50 percent

23   return for the fund, at a hypothetical $20 million investment,

24   you said that -- I mean 50 percent return on a $20 million

25   investment is $10 million, correct?

HB1TSEA2                    Rechnitz - cross

1    A.  Can you repeat it?

2    Q.  A 50 percent return on a $20 million investment is $10

3    million, correct?

4    A.  Yes.

5    Q.  And you said 80 percent of that money goes to the investor,

6    in this case COBA, correct?

7    A.  No, I said 20 percent of the profit goes to the fund.

8    That's what I said.

9    Q.  Which means 80 percent going to COBA, correct?

10   A.  You asked me what I said, I'll telling you what I said.

11   Q.  20 percent goes to Platinum Partners as the management fee

12   as part of the two and twenty formula, correct?

13   A.  Yes.

14   Q.  That would be $2 million, right?

15   A.  In the case you're saying, yes, I believe so.

16   Q.  And from that, your definition or your explanation of the

17   formula on direct examination was that ten percent of that

18   would go to Norman Seabrook, right?

19   A.  Again, ten percent of whatever the fund made would go to

20   Norman Seabrook.

21   Q.  Ten percent of the 20, correct?

22   A.  Of what 20?

23   Q.  The 20 percent management fee.

24   A.  Whatever management fee was earned, that 20 percent profit,

25   10 percent would go back to Norman.

1    Q.  In the hypothetical that you said Mr. Huberfeld was telling

2    you about in this meeting sometime in the end of 2013, we have

3    Platinum Partners getting $2 million of the profit, and

4    10 percent of $2 million dollars is $200,000, correct?

5    A.  That's what your math works out to, yes.

6    Q.  But that's not the number that you had discussed with

7    Norman.  You never said:  Norman Seabrook, you're going to get

8    $200,000.  Right?

9    A.  No, because there was no guarantee this is exactly how the

10   numbers would work out.  Murray was speaking hypothetically to

11   explain the formula and it came out of that meeting at

12   $100,000.

13   Q.  But that was the hypothetical that you testified on direct

14   examination that was part of your conversation with

15   Mr. Huberfeld?

16   A.  That was part of the conversation, yes.

17   Q.  And at that point in time, the amount of money that Norman

18   Seabrook actually told you that could potentially be an

19   investment in COBA is 5 to $7 million?

20   A.  No.

21   Q.  Well, that was your earlier testimony.

22   A.  No, he could start with 5 to 7.

23   Q.  He would start at 5 to $7 million, but that was the only

24   number that was actually discussed in your conversation,

25   correct?

1    A.  No.

2    Q.  The number that you testified about on direct examination

3    was 5 to $7 million was the amount that you said Norman

4    Seabrook was talking to you about COBA investing in the end of

5    2013.

6    A.  Again, he said he could start with 5 to 7 million, and see

7    how it goes, and once they're comfortable he could add more.

8    That was the conversation.

9    Q.  Okay, that he would start the 5 to $7 million.

10           Now at 5 to $7 million, the amount of money that even

11   under a very high rate of return of 50 percent, you would not

12   be able to get to $100,000 payment on the basis of your

13   formula, or the formula that you said to that Mr. Huberfeld had

14   with you, correct?

15   A.  Again, you're confusing me.  I don't know what you're

16   saying.

17   Q.  So let's just do the math.  At $5 million, if COBA had

18   contributed $5 million to Platinum fund at a 50 percent rate of

19   return, that would be $2.5 million?

20   A.  Again, this is a hypothetical, I don't know.

21   Q.  But it was the formula on which you said that any

22   compensation to Mr. Seabrook was going to be based, right, this

23   formula that was allegedly discussed with Mr. Huberfeld?

24   A.  Sorry, I'm not understanding.

25   Q.  Your testimony is that in the end of 2013 you had

conversations with Murray Huberfeld about a formula on which

any compensation would be paid to Norman Seabrook if COBA had

contributed to Platinum, right?

A.   Yes, I said it would be two and twenty based on the money

that was invested that year.

THE COURT:  Let's do this, let's take a quick

ten-minute bathroom break, and let me just see counsel in the

robing room briefly.

Again, members of the jury don't discuss this case

with anyone else, don't do any research regarding the people or

issues in this case, don't let anyone discuss the case with

you.  See you in ten minutes.

(Jury not present)

THE COURT:  Let me see counsel in the robing room are

briefly.

(Continued on next page)

1          (In robing room)

2          THE COURT:  I just wanted to take a break.  I don't

3    know if counsel was looking, the jurors are really struggling

4    over there.  I wanted to give them a break and stretch their

5    feet and get some coffee.  There's only so much coffee they can

6    drink, but let's keep this moving.

7          How much longer do you have of this witness?

8          MR. MAZUREK:  Maybe an hour.

9          THE COURT:  I don't know if counsel observed this as

10   well, but the jurors are really starting to fade.  So let's

11   just keep this moving and try to maybe kind of cut down on

12   going over the stuff that you have gone over before.  I don't

13   know if it's necessary to ask this witness what his testimony

14   is.  He's given his testimony, we know what it is.  I don't

15   know if it's necessary to keep going over having the witness do

16   math on the stand.  This is getting kind of cumulative.  Let's

17   keep this moving.

18         Anything else from counsel?

19         MR. BELL:  No, your Honor.

20         THE COURT:  Okay.

21         (Recess taken)

22         (In open court)

23         THE COURT:  For the people in the audience, no audible

24   outbursts at any time.

25         Okay, let's bring the jury in.

HB1TSEA2                    Rechnitz - cross

1    (Jury present)

2         THE COURT:  Let's continue.  Go ahead, counsel.

3         MR. MAZUREK:  Thank you, Judge.

4    BY MR. MAZUREK:

5    Q.  Mr. Rechnitz, after March of 2014 -- March of 2014 is when

6    COBA made its first investment of $10 million, correct?

7    A.  I believe so.

8    Q.  After the March 2014 investment was made by COBA into

9    Platinum, Murray Huberfeld emails you telling you you broke

10   through with Norman, now let's really get going, right?

11   A.  I don't remember the date, but I remember that email.

12   Q.  And you responded back by:  I think I can raise up to $50

13   million by April, right?

14   A.  No, not exactly to that question.  He said I should raise

15   100 million.  I said let's hope for 50, those are big

16   expectations.

17   Q.  And that was based on the work that you had done or at

18   least the conversations based on the work that you had done in

19   obtaining a COBA investment, right?

20   A.  Again, I don't remember the context of that email.

21   Q.  It was right after that COBA had invested $10 million,

22   right?

23   A.  If that's what you say.  I don't remember the date, but

24   that sounds right.

25   Q.  This was sort of a celebratory email, right, between you

HB1TSEA2                    Rechnitz - cross

1    and Murray?

2    A.  I don't know what that means.

3    Q.  You remember using the term ROGI in one of your

4    communications after the COBA investment had come in?

5    A.  I remember writing that to Jeremy after I was informed

6    Norman invested $10 million.

7    Q.  Because you were happy you achieved this accomplishment,

8    right?

9    A.  Yes.

10   Q.  And in your communications with Murray, he was indicating

11   that this could be the beginning of a longer relationship

12   between you and him, right?

13   A.  No, I understood it as between Norman and these types of

14   unions.

15   Q.  Well, you weren't getting 50 to $100 million from COBA,

16   correct?

17   A.  No.  I didn't know what to expect from COBA.

18   Q.  You were thinking of this in the long term as to other

19   investors that you could bring to Platinum Partners, correct?

20   A.  I don't know what I was thinking.

21   Q.  Mr. Huberfeld -- withdrawn.

22           You testified on direct examination that what you

23   meant by this email is that I think I will be successful at

24   this, right?

25   A.  Yes.

HB1TSEA2                    Rechnitz - cross

1  Q.  And "successful" meaning bringing investors to Platinum

2  Partners, right?

3  A.  No, "successful" meaning that I was successful with Norman,

4  I would be successful to get more from Norman and others.

5  Q.  And others, correct?

6  A.  Yes.

7  Q.  And the list of 25 people, Mr. Huberfeld wrote to you in an

8  email:  One down, 24 to go.  Do you remember that?

9  A.  He did, yes.

10  Q.  And you said:  Great job.  Right?

11  A.  Yes.

12  Q.  And that great job wasn't because you asked Mr. Huberfeld

13  to commit a crime by bribing Mr. Seabrook, right?

14  A.  I don't understand your question.

15  Q.  Sir, the great job meant you brought an investor to

16  Platinum Partners, right?

17  A.  "Great job" meant great job with Norman, we broke through,

18  Norman invested.

19  Q.  That's right.  But if it took a crime of bribery to do

20  that, there's no reason for Mr. Huberfeld to be saying "great

21  job."  There's nothing you did, right?

22          MR. BELL:  Objection.

23          THE COURT:  Sustained.  Could you rephrase that?

24          MR. MAZUREK:  Yes.

25  Q.  Mr. Huberfeld said "great job" because he was impressed

1    that you were able to bring big investor into Platinum.

2              MR. BELL:  Objection.

3              THE COURT:  Sustained.

4              Let's have a quick sidebar again.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In robing room)

2         THE COURT:  Again I'm worried about the pace here.

3    The witness said on direct, as you brought out, "great job,"

4    you brought out again on cross that the witness said "great

5    job."  Now you're trying to get the witness, it seems to me, to

6    agree with your reason as to why Mr. Huberfeld said "great

7    job."  The witness has said this.  I will certainly let you

8    argue in summation whatever you want to argue about what the

9    great job meant, and I won't stop that.  But if you're

10   attempting to get a hostile witness to agree with your

11   definition of "great job," we're going to be here for a while

12   again because he's not going to agree and we'll be here a long

13   time.

14        MR. MAZUREK:  I'll move on.

15        THE COURT:  Let's try to keep this moving.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Okay.  Go ahead, counsel.

3    BY MR. MAZUREK:

4    Q.  I want to direct your attention to the end of 2014.  This

5    was a point in time, you said, that you began to be pressured

6    by Norman Seabrook to have a payment made to him as a result of

7    the COBA investments, correct?

8    A.  Yes.

9    Q.  And at this point in time you were still in contact with

10   Mr. Seabrook?

11   A.  Yes.

12   Q.  The pressure that Mr. Seabrook, you said, was being placed

13   on you was based on the investments that COBA already had made,

14   is that true?

15   A.  Yes.

16   Q.  You said on direct testimony that you only knew about 10 to

17   $15 million being invested, is that right?

18   A.  No, I said I knew about 15.

19   Q.  15 million.  Okay.  So when you were determining how much

20   that you would have to pay Norman Seabrook based upon the

21   formula that you testified about, you couldn't even make that

22   calculation without knowing the full amount of the investment,

23   correct?

24           MR. BELL:  Objection.

25           THE COURT:  Overruled.

1  A.  Can you repeat the question?

2  Q.  The formula that you had discussed that was something that

3  you and Mr. Huberfeld talked about was based upon the total

4  investment amount, right?

5  A.  Yes.

6  Q.  You didn't even know what the total investment amount was

7  when you were talking with Mr. Huberfeld at the end of 2014,

8  correct?

9  A.  We did for that year.  We discussed it in detail.

10 Q.  But your testimony was you only knew about $15 million.

11 You were talking about $15 million back then?

12 A.  Yes.  $15 million had been invested, and that's what we

13 were discussing.

14 Q.  And that was in December of 2014, is that right?

15 A.  Yes.  Well, there were two -- I believe there were two

16 separate payments sent.  I think there was investment one for

17 10 million and investment two.

18 Q.  So $15 million was being discussed at the end of 2014?

19          MR. SCHECHTMAN:  Objection, asked and answered.

20          THE COURT:  Sustained.

21 Q.  And based on that, you made the calculations for how much

22 that Norman was going to get paid?

23 A.  Not exactly.  I'm not sure if it was 15 by that point in

24 time.  I thought you were asking me what I recall in terms of

25 payments.

1   Q.   That's all I'm asking is what you recall.

2   A.   I recall the first investment by that time definitely, not

3   sure if it included the second one.

4   Q.   But based on the calculations you had come up with, a

5   $60,000 payment was eventually what you decided that Murray

6   Huberfeld was going to provide to Norman Seabrook?

7   A.   No, that is not what happened.

8   Q.   Well, because there was a different formula, I think you

9   testified on direct examination, that came about sometime in

10  December of '14?

11  A.   Nope, that is not what happened.  I never decided on the

12  amount to give Norman.

13  Q.   You testified that there was some conversation you had with

14  Murray Huberfeld about a formula about one half of one percent.

15  Do you remember that?

16  A.   That was for the following year.

17  Q.   That was for --

18            The one half -- sorry, withdrawn.

19            At some point in December of 2014 you were getting

20  paid by or you received checks from Platinum Partners, correct?

21  A.   I did not receive checks personally, I --

22  Q.   JSR Capital received checks from Platinum Partners?

23  A.   I received a check for $60,000 for a fake Knicks invoice.

24  Q.   You received a check for $60,000.  Let's talk about that.

25            There were -- in December -- on December 14 or 15 of

 1   2014 you left New York City to travel to Israel.  Do you

 2   remember that?

 3   A.   When?

 4   Q.   On December 14 or 15 of 2014.

 5   A.   I don't remember.

 6   Q.   You traveled with Mr. Weinberger.  Do you recall that?

 7   A.   I remember going on a trip with him.

 8   Q.   You don't recall the time.  If I were to show you some of

 9   the emails, might that refresh your memory?

10   A.   I'm fine agreeing I went to Israel with Mr. Weinberger.

11   Q.   I'm sorry?

12   A.   I went to Israel with Mr. Weinberger.

13   Q.   So you were not in New York City when you were sending

14   emails to your office manager Levin Prado to obtain checks from

15   Platinum Partners around that time, correct?

16   A.   If you're telling me I was away at that time then I was not

17   in New York at that time.  That would make sense.

18   Q.   Do you have a memory, after reviewing emails on direct

19   examination, of Mr. Prado -- of asking Mr. Prado to pick up

20   checks from Platinum Partners?

21   A.   I have a memory of asking him to coordinate with

22   Mr. Huberfeld to receive the $60,000 reimbursement check and

23   other charity checks that day.

24   Q.   On direct examination you talked about telling

25   Mr. Huberfeld that you didn't need to get paid for this

HB1TSEA2                    Rechnitz - cross

1   particular transaction, right?

2   A.   That's correct.

3   Q.   And the only thing that you asked for was the $60,000,

4   correct?

5   A.   No, again, you're mischaracterizing the $60,000, and that's

6   not the case.

7   Q.   The only amount of money you were talking about with

8   Mr. Huberfeld was the $60,000, correct?

9   A.   At what point?

10  Q.   In December of 2014.

11  A.   In December 2014 we were not only talking about $60,000,

12  no.

13  Q.   That was the amount of the check that you were asking for

14  JSR Capital based on the invoice, right?

15  A.   Again, we made an invoice for $60,000, a fake Knicks

16  tickets invoice, to reimburse me for the $60,000 that I was

17  going to be laying out to pay Norman on behalf of Murray.

18  Q.   And that was -- there was no other amount of money that you

19  were discussing at that point in time?

20  A.   That is not correct.

21  Q.   Did there come a time later that you talked about receiving

22  other money?

23  A.   There were many conversations that took place.  At that

24  time we discussed the 60,000 to reimburse me for laying it out

25  for Murray, and Murray also wanted to give charities checks in

1    my honor for doing this because I wouldn't take money

2    personally for this.

3    Q.  On direct examination you testified about a check of

4    $18,000 that was made out to your son's school, the Yeshiva

5    Ketana, correct?

6    A.  Correct.

7    Q.  And that was the charity check that you're testifying

8    about?

9    A.  What do you mean that I'm testifying about?  Your questions

10   aren't so clear to me, I'm sorry.

11   Q.  You said that you received a charity check for $18,000 for

12   Yeshiva Ketana, correct?

13   A.  Yes.

14   Q.  And a $60,000 checks from Platinum made out to JSR Capital,

15   correct?

16   A.  Correct.  There may have been some other charity checks as

17   well.  I don't remember the specific charities.

18   Q.  I show you what has been premarked for identification as

19   MH362.

20            MR. MAZUREK:  I just put that up for the witness.  If

21   we could flip through the pages.

22            THE WITNESS:  You're going very quickly.  Could I see

23   the first page again, please?

24            MR. MAZUREK:  Your Honor, pursuant to stipulation or

25   already admitted into evidence are the last three pages of this

1    exhibit.  They are a subset of GX103.  The first page is a

2    subpoenaed document that discussed with counsel, and I would

3    seek to move in the entire exhibit and identify it as MH362.

4              MR. BELL:  Your Honor, we have no objection to the

5    last few pages, which in fact are already in evidence as

6    government exhibits.  We object to the admission of the first

7    page on hearsay grounds.

8              MR. MAZUREK:  Your Honor, we could call a custodian.

9              THE COURT:  Okay, let's have a sidebar.  Bring a hard

10   copy with you.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In robing room)

2          THE COURT:  Okay.  The dispute is about how many

3    pages?

4          MR. BELL:  Just the first page.

5          THE COURT:  Just the first page?

6          MR. BELL:  Just the first page.

7          THE COURT:  Hold on a second.

8          Why the heck do you need the first page if the other

9    three pages are coming in showing the checks made to the

10   charities?  What's the purpose of the first page?

11         MR. MAZUREK:  These were subpoena response documents

12   from Platinum Partners.  The fist page is communication about

13   the four checks that are attached to this, and also directs the

14   payment for the four checks through Platinum Partners.  It's a

15   business record.  The government already submitted or has

16   conceded by stipulation that the documents received from

17   Platinum Partners were business records.

18         THE COURT:  My question is the checks are in evidence.

19   He said there may have been other charities.  That's what he

20   just said.  The checks are in evidence.

21         MR. MAZUREK:  It's certainly relevant to show that the

22   monies that were identified here in these four checks were

23   aggregated at a certain point in time and were sent for

24   approval, as per Mark sent to Murray 12/15/14.  This was the

25   timing of the checks, that the checks were aggregated as a

1    group in the approval process of Platinum Partners in order to

2    make the payment.

3           I mean I don't know that -- these are kept in the

4    regular -- these are records that are kept in the regular

5    course of business.  I could obtain --

6           THE COURT:  What is it you want from this witness

7    regarding this?  What is it you're trying to get is what I'm

8    trying to figure out.

9           MR. MAZUREK:  To identify that all four checks were

10   related to this single transaction.

11          THE COURT:  They're all dated the same day, correct?

12          MR. MAZUREK:  Yes, through an approval process of

13   Platinum.

14          THE COURT:  Who wrote this?  What is this?

15          MR. MAZUREK:  This is the record of the amounts of the

16   four checks that were sought to be issued by Platinum, and then

17   Platinum went through the process and eventually approved the

18   issuance of the four checks.

19          THE COURT:  What's the government's objection to this

20   thing?

21          MR. CAPONE:  Hearsay, your Honor.  No authenticity

22   objection.  It was provided by Platinum Partners.  We don't

23   know what it is or who wrote it, where it came from.  It's on

24   Centurion letterhead.  It was actually produced after

25   Mr. Huberfeld was arrested despite what I think is pretty

HB1TSEA2                    Rechnitz - cross

1    clearly responsive to many other subpoenas and document

2    requests.  I can't -- I'm not disputing it was authentically

3    produced by Platinum, but I can't agree it is a business record

4    without knowing if it's Platinum's practice to dictate on

5    Centurion letterhead expenses in this manner.

6            THE COURT:  Yes.

7            MR. MAZUREK:  Judge, this was in the Platinum files.

8            THE COURT:  We have that.  Let me make sure I fully

9    understand what the government's objection is.  You're not

10   saying that this wasn't produced, you're not saying it wasn't

11   contained.  Is there any dispute as to the order of this?  Was

12   this attached to these other documents like this?

13           MR. MAZUREK:  It was within nine pages with the Bates

14   stamp production.

15           MR. CAPONE:  Those are checks like after the checks

16   are already cashed, it seems to me, but that is like an

17   approval memo, which would suggest it comes before the checks

18   were cashed.

19           MR. MAZUREK:  You mean written?

20           MR. CAPONE:  Yeah, sorry, written.

21           THE COURT:  Let me find out clearly from defense

22   counsel:  What is the relevance of this?  Do you know who sent

23   this and who wrote this?

24           MR. MAZUREK:  The relevance is it was prepared around

25   the time of the checks for purposes of sending to the finance

HB1TSEA2                    Rechnitz - cross

department of Platinum and with the approval of Mark Nordlicht,
as indicated on the note, in order to be able to issue these
four checks.

          MR. CAPONE:  I think the substantive issue that
Mr. Mazurek is interested in, I don't know that the witness
necessarily remembers the last check as -- the Israel Cancer
Research check as being --

          THE COURT:  That's in evidence.  I'm not worried about
the documents that are in evidence.

          MR. MAZUREK:  This was the process, that the witness
came in, said I want these four checks written for my benefit.
These four checks were written down who the payee would be,
they were sent to Mark Nordlicht, he approved it and sent it
back to Murray with four checks.

          THE COURT:  Your objection is the foundation has not
been laid for this being a business record.  That's the
objection.

          MR. CAPONE:  Yes.

          THE COURT:  I'll admit it subject to connection.  It's
admitted subject to connection.

          MR. SCHECHTMAN:  Judge, could I add, I'm not sure this
document is being offered for its truth.  What I would have
thought here -- first of all, it's a direction, which is:  Cut
this check.  I don't know if that's for its truth.  It strikes
me as an order.  That's not usually thought of as for the

1  truth.

2       Second, the most important thing is that it indicates

3  that these four checks were thought of by somebody as a bundle.

4  And that's not really for its truth, that's just to indicate

5  that they were seen together.  It's particularly important

6  because the witness who on direct only remembered the one to

7  his son, which I think is the first one, didn't -- is I think

8  now going to remember the second one, because that goes to Ben

9  Brafman's wife's charity, and as Mr. Capone says, he doesn't

10  remember the third one, so all we're offering it for is not for

11  the truth, but to show it was a grouping.

12       MR. CAPONE:  In which case I ask your Honor to give a

13  limiting instruction.

14       THE COURT:  What limiting instruction?

15       MR. CAPONE:  This is not coming in for its truth.

16       THE COURT:  The first page.

17       MR. CAPONE:  The first page.

18       THE COURT:  Just being offered to show what?

19       MR. SCHECHTMAN:  To show the checks were grouped

20  together as a subset.

21       THE COURT:  All right.  Let's go.

22       Does it make sense -- I understand we're all lawyers

23  here.  Would it be more efficient, probably less confusing for

24  me to simply tell the jury that the first page of this document

25  is being offered purely to show that these checks were grouped

1    instead of telling them it's not being offered for the truth?

2    Because they don't know what the heck that means.

3              MR. SCHECHTMAN:  Sure.

4              MR. MAZUREK:  That's fine.

5              MR. BELL:  That's fine.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HB1JSEA3                    Rechnitz - cross

1           (In open court)

2           THE COURT:  That objection is overruled.  That entire

3    document is in evidence.  As to the first page of this

4    document -- hold on a second.  Members of the jury, do you have

5    that on your screen yet?

6           MR. MAZUREK:  Can we publish it to the jury, the whole

7    first page.

8           (Pause)

9           THE COURT:  Members of the jury, regarding this first

10   page, I want to give you a limiting instruction to let you know

11   that the first page of this document is being introduced to

12   show that these checks were grouped, okay?

13          (Defendant Exhibit MH-362 received in evidence)

14   BY MR. MAZUREK:

15   Q.  Mr. Rechnitz, on the first screen, on the first page on the

16   screen in front of you are a list of four checks.  Do you see

17   that?

18   A.  I do.

19   Q.  One is to the Congregation Ahavath Chesed, right?

20   A.  Yes.

21   Q.  For the amount of $3,600.  This was the congregation,

22   Ahavath Chesed was a synogogue on the Upper West Side -- still

23   is -- correct?

24   A.  Yes.

25   Q.  You would attend, correct?

HB1JSEA3                    Rechnitz - cross

1    A.  Yes.

2    Q.  JSR Capital, you're familiar with that at $60,000.  The

3    next one is Yeshiva Ketana Manhattan, $18,000.  This Yeshiva

4    Ketana is your son's school, correct?

5    A.  Yes.

6    Q.  The final check is the Israel Cancer Research Fund, also

7    for $18,000, correct?

8    A.  Yes.

9    Q.  You're familiar that that fund is a foundation that was

10   established by the criminal defense lawyer's wife, Ben

11   Brafman's wife, correct?

12   A.  Yes.

13   Q.  All four of these checks were issued on your behalf by

14   Platinum Partners, correct?

15   A.  These are all four checks that were issued to me.

16             MR. MAZUREK:  Then if we can look through the exhibit,

17   on Page 2 if we can publish Page 2 to the jury.

18   Q.  This is dated December 15, 2014, correct?

19   A.  December 15th, yes.

20   Q.  And in the memo line is your name, correct?

21   A.  Yes.

22   Q.  And the next page, and that is Check 2967 -- we can publish

23   the next page -- Check 2966 also dated December 15th, 2014,

24   correct?

25   A.  Yes.

HB1JSEA3                    Rechnitz - cross

1  Q.  This is the check made payable to the Israel Cancer Fund,

2  right?

3  A.  Yes.

4  Q.  We go to the next page.  Check No. 2965 also in the amount

5  of $18,000 payable to the order of Yeshiva Ketana Manhattan?

6  A.  Yes.

7  Q.  Also issued on December 15th, correct?

8  A.  Yes.

9  Q.  Then if we can go to the fourth page, is this the check to

10  JSR Capital Manhattan, 2964, also issued on December 15th,

11  2014, correct?

12  A.  Yes.

13           MR. MAZUREK:  We can take that off the screen.

14  Q.  You said on or about December 15th, 2014, you may have been

15  in Israel with Mr. Weinberger, correct?

16  A.  Yes.

17  Q.  So you were asking your office manager, Levine Prado, to

18  pick up or have delivered the checks from Platinum Partners,

19  correct?

20  A.  Correct.

21  Q.  That would be the four checks that we just reviewed,

22  correct?

23  A.  I believe so.

24  Q.  In fact, the check to the Israel Cancer Foundation was

25  something you sent two days later, on or about December 17th or

1  18th, to Mr. Brafman, correct?

2  A.  Yes.

3  Q.  You did that right after referring Mr. Brafman to represent

4  the Chief of Police Banks, correct?

5  A.  I am not sure of the timing.  It is possible.

6  Q.  That sounds about right, sir?

7  A.  No.  I am not sure.

8  Q.  You're not sure?

9        Now, we are going to move forward to the beginning of

10  2015.  You listened to some wiretap conversations, correct, on

11  direct examination?

12  A.  Correct.

13  Q.  You had these conversations were between Jeremy Reichberg

14  and Murray Huberfeld, correct?

15  A.  Yes.

16  Q.  Jeremy Reichberg during this time period, you were still in

17  the same offices at 580 Fifth Avenue.  Is that right?

18  A.  He had an office by me, yes.

19  Q.  The office in the same suite, right?

20  A.  Pardon?

21  Q.  He had an office in your same suite?

22  A.  Yes.

23  Q.  You were continuing to do business with Mr. Reichberg at

24  this period of time, December of 2014, at the beginning of

25  2015?

1  A.  We didn't really do business.  We still had a relationship,

2  yes.

3  Q.  With respect to the COBA deal that we have been talking

4  about, you had testified that it was Norman Seabrook's

5  instruction not to speak to Jeremy Reichberg about the deal.

6          Is that right?

7  A.  I testified that Norman did not want Jeremy to know about

8  the deal, correct.

9  Q.  You wanted to abide by Mr. Seabrook's instructions,

10 correct?

11 A.  Again that was in 2013 of December.  You're asking me about

12 then or are you asking me about 2015 because a lot changed

13 in-between.

14 Q.  I am asking you that in 2015 -- withdrawn.

15          By January of 2015, you had no knowledge that Jeremy

16 Reichberg was speaking to Norman Seabrook about anything

17 related to COBA investments in Platinum, correct?

18 A.  I don't think I knew about it, correct.

19 Q.  You had instructed Murray Huberfeld at that point in time

20 not to let Norman Seabrook know that Jeremy was involved in the

21 COBA investment, correct?

22 A.  At what point in time?

23 Q.  By "this point in time," we are talking about in January of

24 2015.

25 A.  I am not sure that is the case by then.  What I remember is

1    in December 2013 Norman did not want Jeremy to know.  Things

2    may have changed by January 2015.  I don't remember.

3    Q.  You don't remember discussing the matter with Jeremy

4    Reichberg?

5    A.  I discussed it with Jeremy right away from the beginning.

6    The idea was Norman would not know that Jeremy was in the loop.

7    Q.  You told Jeremy Reichberg about your deal, but you did not

8    want Jeremy Reichberg to get involved with Norman Seabrook at

9    all, right?

10   A.  Sorry.  I am getting confused again.  Can you be a little

11   more clear?

12   Q.  Yes.  Jeremy Reichberg, to your knowledge, was not involved

13   in the discussions with Norman Seabrook about COBA investments

14   as of January 2015?

15   A.  Again I don't know as of January 2015.  I think you just

16   asked me, and I think I just answered that.  As of 2013, I know

17   he definitely was not speaking to Norman about it.  I can't say

18   that for 2015.

19   Q.  In January of 2015 when you were having conversations with

20   Murray Huberfeld about potential additional investments in

21   COBA, do you remember that?

22   A.  No.

23   Q.  The call we listened to on or about January 15th of 2015,

24   do you recall that, sir?

25   A.  No.  Which call?

HB1JSEA3                    Rechnitz - cross

1    Q.  January 15th of 2015, you listened to a call between you

2    and Murray Huberfeld while you were in Los Angeles, right?

3    A.  Again which a call?  What was said?  I heard many calls.

4              MR. MAZUREK:  If I can ask you and for the jury to

5    look at the transcript binder of the wiretap calls which I

6    think is underneath their seats.

7              THE COURT:  Okay.  Any objection to that?

8              MR. BELL:  No, your Honor.  We provided the witness

9    with one as well.  We may need to get him one as well.

10             (Pause)

11   BY MR. MAZUREK:

12   Q.  You can specifically go to Tab 911-T.

13   A.  Okay.

14   Q.  The date of this call you see from the top half of the page

15   was January 15th of 2015, correct?

16   A.  Yes.

17   Q.  And in this call, if we can turn to the second page, you're

18   saying at Line 7, okay, what's happening?  You know I left him.

19   I texted him yesterday.  I texted him today and left him a

20   message.  Mr. Huberfeld responds who?  You say Norman, either

21   he is out of town or he is ignoring me.

22             Do you see that?

23   A.  Yes.

24   Q.  At this point in time you're not having any conversations

25   with Norman Seabrook about additional investments into COBA,

1    correct?

2    A.  Again I don't understand your question.  It says here that

3    I just said I texted him and I left him a message.  That was

4    talking about Murray was trying for me to convince Norman to

5    put more money into the fund.

6    Q.  At this point in time, sir, this is allegedly after the

7    $60,000 payment had occurred to Norman, correct?

8    A.  Yes.

9    Q.  And your testimony is that Norman was angry and

10   disappointed about the amount of money he was given, right?

11   A.  That was back in 2014.  At this point we had told him, I

12   had given him a message about Murray from annuity and starting

13   payments from the beginning of the year, and I think he was

14   expecting it right after New Year's.

15   Q.  There was no payments made to Norman Seabrook in January of

16   2015.  Is that correct?

17   A.  Correct.

18   Q.  Now if we could turn in the binder to the tab identified as

19   905-T.  This is a call on January 27th, 2015 between Jeremy

20   Reichberg and Murray Huberfeld.  Do you see that?

21   A.  I do.

22   Q.  Before we get to that specific call, at this point in time

23   you had not given any money to Jeremy Reichberg as a payment or

24   compensation for anything related to the COBA investments,

25   correct?

1   A.   Who, me or Murray?  I didn't hear.

2   Q.   You?

3   A.   No.

4   Q.   If we could turn on this call, January 27th, 2015, at

5   905-T, to the second page and start on Line 34.  Do you see

6   that, sir?

7   A.   I do.  I am just trying to read --

8              (Multiple voices).

9   Q.   -- I will, but I told you how we're going to have to do it.

10             I just want to understand that you told me that Jona

11  feels like he has an issue which I am trying and trying let you

12  know, to figure that out.  Mr. Huberfeld says no, but I am

13  telling you if you vest, if you close it up without, and then

14  the next page Jeremy Reichberg says yeah, but, in Yiddish, you

15  don't understand.  That is creating a big issue between me and

16  him.

17             The me and him that Jeremy is referring to is you and

18  Jeremy, correct?

19  A.   I don't know what he is referring to.  I can't speak to

20  what was on his mind.

21  Q.   At that point in time you had no idea that Jeremy was

22  speaking to Norman Seabrook, correct?

23  A.   I believe at that time I was not aware of it.  I am not

24  positive.

25             MR. MAZUREK:  We can close those binders.

BY MR. MAZUREK:

Q.  I want to go back to December 11th, 2014.

        You had, in your meetings with the government, you were asked many questions about that particular day, correct?

A.  Yes.

Q.  In one of the first meetings that you had with the government, the first month you started cooperating with the government was in May of 2016.  Is that right?

A.  Yes.

Q.  Your testimony on direct examination was that you met with Norman Seabrook sometime in the early evening of December 11th, 2014.  Is that right?

A.  Yes.

Q.  On May 25th, 2016, in one of your first sessions being interviewed by these prosecutors and agents, you told them that you paid Seabrook the money on December 11th, 2014, in the late morning or early afternoon.  Is that correct?

A.  I don't know.  It is possible.

Q.  In that same interview at the U.S. Attorney's Office between these prosecutors and the agent, you also told them that you spent approximately five minutes in a car with Mr. Seabrook.  Is that right?

A.  I think I told them I spent a few minutes in the car.

Q.  You also told them on May 25th, 2016 that you then parted ways.  Is that correct?

1    A.  Again I don't dispute that.  It is possible I said that.

2    Q.  Isn't it true, sir, on May 25th, 2016, you said that Norman

3    Seabrook may have driven you home then?

4    A.  I said it was possible, yes.

5    Q.  Now let me switch gears a bit.  I want to talk about the

6    cooperation agreement that you have with the government that we

7    looked at, at Government Exhibit 1601.

8              You signed that agreement on or about June 6th, 2016,

9    right?

10   A.  Yes.

11   Q.  That agreement requires you to testify when called by the

12   government, correct?

13   A.  Correct.

14   Q.  You believe that you need at least in part to do this to

15   save yourself from years in prison, correct?

16   A.  No.  I need to follow the cooperation agreement.

17   Q.  You have pled guilty to honest services wire fraud which

18   could get you up to 20 years in prison, right?

19   A.  That is not what I pled guilty to.  I pled guilty to

20   conspiracy to commit honest services fraud.

21   Q.  A conspiracy to commit honest services fraud, that is the

22   only count you were required to plead guilty to under the terms

23   of your cooperation agreement, right?

24   A.  That is what I pled guilty to, correct.

25   Q.  That count carries up to 20 years in prison, correct?

1    A.   That's correct.

2    Q.   Your hope is, as you testified before, not to spend a

3    single day in jail, right?

4              MR. BELL:  Objection.

5              THE COURT:  I will allow it.

6    A.   Correct.

7    BY MR. MAZUREK:

8    Q.   How old are you, sir?

9    A.   I am 34.

10   Q.   You're married, with five children?

11   A.   Correct.

12   Q.   The last of your children was born right around the time

13   that you were involved in all of this and around the time you

14   pled guilty, correct?

15   A.   No.  I think a year before.

16   Q.   The year before?  2015?

17   A.   Right.  So it wasn't around the same time.  It was June

18   2015.  I paid the bribe in December 2014.

19   Q.   Your children are all very young, correct?

20   A.   Correct.

21   Q.   You don't want to miss out on their childhood, do you?

22   A.   No.

23   Q.   You don't want to visit them through the screen of a prison

24   visiting room, right?

25   A.   No, I don't want to.

HB1JSEA3                          Rechnitz - cross

1    Q.  You never even visited a prison, have you?

2    A.  No, I have not.

3    Q.  You never spent a minute behind bars, have you?

4    A.  No.

5    Q.  It is hard for you to imagine even spending a day there,

6    let alone several years, right?

7    A.  It is not something I've thought of.

8    Q.  In going through this process, I bet you would wish you

9    could just close your eyes and make this whole thing go away,

10   right?

11   A.  I wish that none of this happened.  I wish we didn't do

12   what we did.

13            MR. SHECHTMAN:  Your Honor --

14            MR. BELL:  Objection.

15            THE COURT:  He asked the question.  Go ahead.

16            MR. BELL:  Objection to the --

17            THE COURT:  Overruled.  Overruled.  Overruled.  You

18   can continue your answer.

19            THE WITNESS:  I got cut off.  I don't remember the

20   question.

21            THE COURT:  Let's have the question read back.

22            MR. MAZUREK:  I will withdraw it.

23            THE COURT:  Are you withdrawing the question, counsel?

24            MR. MAZUREK:  Yes, I will withdraw it.

25            THE COURT:  Counsel, move on.

1  BY MR. MAZUREK:

2  Q.  Mr. Rechnitz, the position you're in now is the life you

3  created, right?

4  A.  I take full responsibility for everything I've done.

5  Q.  And now you can only save yourself by getting the

6  prosecutors to write a letter in your behalf to seek leniency

7  at your sentencing, correct?

8  A.  No.  Again there is no guarantees here.  The only way that

9  I believe I have the chance, the hopes of leniency is to follow

10  the agreement, my cooperation agreement of telling the truth

11  and not committing any further crimes and testifying when

12  called upon.

13          THE COURT:  Let's have a quick sidebar, counsel.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  I want to get a sense of how much longer

3   you have and where you're going because I am getting this, my

4   spide senses are tingling, and I am getting the sense you're

5   starting to start asking questions again, the sorts of things

6   you can say in your summation, that you will ask the witness to

7   agree with it.

8          He won't agree with it, and co-counsel will object,

9   and there will be all sorts of stuff going on.  I want to make

10  sure we are not going there.  If you are going there, you know

11  that is what you're doing, if you ask him a question why he

12  thinks it is going to happen or why he is cooperating or these

13  other kind of things.

14         MR. MAZUREK:  I will just go through the cooperation

15  agreement.

16         THE COURT:  All right.  How much longer do you have on

17  this?

18         MR. MAZUREK:  Probably about 15 minutes.

19         MR. SHECHTMAN:  My Lord!  Can I call my wife and tell

20  her she doesn't have to come after lunch?

21         THE COURT:  Yes.

22         MR. SHECHTMAN:  I don't want to be difficult.

23         THE COURT:  You have gone through the cooperation

24  agreement.  This is the third time through.

25         Do you have something new you were go over with the

1    cooperation agreement with him?  I will give you a little

2    latitude, but let's move this along because you have already

3    gone through this whole stuff with him.  This is at least the

4    third time you asked him about he doesn't want to spend any

5    time in jail.  You gave a little bit more color to it this

6    time, but I am getting concerned you are going to give him an

7    opportunity, a proper opportunity, to start saying things that

8    you are not going to like and your co-counsel is not going to

9    like.

10            I am concerned about what we talked about here

11   yesterday in terms about other cases and these other kinds of

12   things.  I am trying to avoid any unwilling opening of doors.

13   If it is a willing opening of doors, that is fine, that is what

14   we'll do.  Let me get a sense from you where else you're going

15   with the cooperation agreement?

16            MR. MAZUREK:  I would like to get into the terms of

17   the cooperation agreement that says the determination of who

18   makes the decision as to whether to issue the 5K1 letter is

19   solely in the hands of the prosecutors.

20            THE COURT:  Is that written in the agreement which is

21   in evidence?

22            MR. MAZUREK:  It is, Judge, but I don't think I should

23   be forced to just argue it.

24            THE COURT:  You are not forced to.  If you want to ask

25   that question, you can ask that question.  You might not like

HB1JSEA3                    Rechnitz - cross

1    what else you get from it, but that is fine, you can ask that.

2                MR. BELL:  Your Honor, while we are here, I have

3    respect and affection for Mr. Shechtman.  If I was still

4    keeping posters in my room as a young boy, he would be there

5    instead of John Starks.  I would ask him to keep his reactions

6    bottled in.

7                MR. MAZUREK:  I might be able to streamline this if we

8    take our break now.  I will promise --

9                MR. SHECHTMAN:  Judge --

10               MR. MAZUREK:  I need to speak to my client before I

11   sit down.  I have that obligation to at least consult with him

12   before I sit down.

13               MR. SHECHTMAN:  Can I start fresh right after the

14   break?  Can we go out?

15               MR. MAZUREK:  I am sorry, I can't.  I need to speak to

16   my client.

17               THE COURT:  It may be better to avoid having more

18   issues to go ahead and take this break.  Obviously, you speak

19   to your client and do whatever.

20               Obviously, the sorts of decisions that are made in

21   terms of cross-examining witnesses are counsel's decisions.

22   You can consult with your client about that, but you are an

23   attorney.  You make those sort --

24               MR. MAZUREK:  I certainly do, but I would like to

25   consult with my client.

1          THE COURT:  We'll take this break, and hopefully that

2     can shorten some of this later because again I have that sense

3     we are about to go into some grounds that are going to cause

4     more objections and more stuff.

5          While we are back here, we'll give the jury a break.

6     Should we give the jury a little bit of a longer break today so

7     that we can start discussing some of these other issues?

8          Does counsel wish to get into the racial animus stuff

9     today?

10         MR. SHECHTMAN:  It is towards the end of direct.  He

11    is a hard witness because -- I can't tell you for sure whether

12    I will get to it.  If he says yes, we can get there.

13         THE COURT:  I am trying to figure out if I need to

14    decide this now or if you are not going to get to it today and

15    hold off, we can decide it in the morning and I have more time

16    to look at the cases.

17         MR. SHECHTMAN:  I think I probably won't get to it

18    given where we are, but the one thing I would like some

19    guidance on is, and we both apologize for it, we sent an email

20    as opposed to an ECF filing this morning, that the Second

21    Circuit has said that where subjects are raised on direct, the

22    extrinsic evidence Rule 608 doesn't apply with full force.  I

23    do want the ability to just -- and I have 14 points I will go

24    through.  On two of them I would like to be able to just show

25    the jury what he said on direct so they understand those two I

1    talked about yesterday.

2              THE COURT:  Okay.

3              MR. SHECHTMAN:  Those are the only two I need guidance

4    on today.

5              THE COURT:  Let's go ahead and give the jury maybe a

6    40 minute break today and have them come back at 12:04.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Members of the jury, go ahead and take our

3     break, and I will give you a slightly longer break.  Let's take

4     a 40 minute break today and I will ask you to come back at

5     12:05.  Don't read anything about this case or listen to

6     anything about this case.  Don't discuss this with anyone or

7     let anyone discuss this with you.  Don't do any independent

8     research regarding the issues or people in this case.

9          I'll see you at 12:05.

10          (Jury excused)

11          THE COURT:  Please be seated.  Any reason the witness

12     shouldn't be excused?

13          MR. BELL:  No, your Honor.

14          THE COURT:  The witness is excused.

15          (The witness left the courtroom)

16          THE COURT:  Anything else we need to address?

17          MR. BELL:  No, your Honor.

18          THE COURT:  Anything else we need to address, your

19     Honor?

20          MR. SHECHTMAN:  In the continuing effort to make a

21     record, I want to point out the witness's lawyers were with him

22     early this morning and are now going back to enjoy the lunch

23     hour.

24          THE COURT:  Okay.  Anything else?

25          MR. BELL:  No, your Honor.

1    THE COURT:  Let's have counsel get here at 12:00

2  o'clock to avoid any unnecessary bumping into the jurors.

3  Thanks.

4             (Luncheon recess)

5             (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HB1TSEA4                          Rechnitz - cross

                              AFTERNOON SESSION

 1                               (12:00 p.m.)

 2

 3          (Jury not present)

 4          THE COURT:  Counsel, are we ready to proceed?

 5          MR. BELL:  Yes, your Honor.

 6          MR. MAZUREK:  Your Honor, I only have four or five

 7   questions and I'm through and everybody can be happy.

 8          THE COURT:  Okay.  Let's go ahead and bring the

 9   witness out.  As soon as the jury gets in we'll bring them out.

10          Are the jurors here?

11          DEPUTY CLERK:  No, we're waiting for one.

12          THE COURT:  Okay.

13          (Pause)

14          THE COURT:  They're all here?

15          DEPUTY CLERK:  Yes.

16          THE COURT:  Okay, let's bring them in.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  Okay, let's continue.

3    MR. MAZUREK:  Thank you, your Honor.

4  BY MR. MAZUREK:

5  Q.  Mr. Rechnitz, in the spring of 2016 before you began

6  cooperating with the government your name was reported in the

7  press, correct?

8  A.  Yes.

9  Q.  In fact, your face was on the front page of some

10  newspapers, right?

11  A.  Yes.

12  Q.  And you knew there were articles about investigations of

13  NYPD officers who you had relationships with, correct?

14  A.  Yes.

15  Q.  You saw articles about COBA being investigated for its

16  investment in Platinum Partners, correct?

17  A.  At one point, I don't think it was the same time.

18    MR. MAZUREK:  If we could put on the screen, just for

19  the purposes of the witness, what's been premarked for

20  identification as MH900.

21  Q.  Take a look at what's on your screen, sir.  Does that

22  refresh your memory about the dates on which the press was

23  reporting the FBI probing COBA's union over investments?

24  A.  Yes.  It's not the same time as the articles came out with

25  me on front page.

HB1TSEA4                    Rechnitz - cross

1    Q.  But the time that the articles regarding COBA's -- the

2    investigation of the COBA investments was in May of 2015,

3    correct?

4    A.  That's correct.

5    Q.  And that was well before -- that was before you went in to

6    cooperate with the government, correct?

7    A.  Correct.

8    Q.  You also read articles about your contributions to Mayor de

9    Blasio's campaign, correct?

10   A.  Yes.

11   Q.  And after reading these articles you made the decision to

12   cooperate with the government, correct?

13   A.  Not that simply put, no.

14   Q.  It was -- the timeline was after you read those articles in

15   the spring of 2016 you went in to cooperate with the government

16   in or about May 9 of 2016, correct?

17   A.  Correct.

18   Q.  And that was part of your plan to save yourself, correct?

19   A.  No.

20   Q.  I asked you at the beginning of our lengthy time together,

21   sir, whether you knew the difference between the truth and a

22   lie.  You still don't, do you?

23   A.  I do.

24            MR. MAZUREK:  I have nothing further.

25            THE COURT:  Okay.  Any cross-examination by counsel

1    for Seabrook?

2              MR. SCHECHTMAN:  May I proceed, your Honor?

3              THE COURT:  Yes, you may.

4              MR. SCHECHTMAN:  Judge, just give us one minute to set

5    up.

6              THE COURT:  Okay.

7              (Pause)

8              MR. SCHECHTMAN:  Judge, while we're –– I think we're

9    ready, but it might be easier –– Ms. Lynaugh is going to bring

10   a binder of the exhibits to the witness so he will have them in

11   front of him, if it's okay with the Court.

12             THE COURT:  Fine.

13   CROSS–EXAMINATION

14   BY MR. SCHECHTMAN:

15   Q.  Mr. Rechnitz, I'm Paul Schechtman and I represent Norman

16   Seabrook, and I take it we have never met or spoken before.

17   A.  I don't think that's the case.

18   Q.  Pardon?

19   A.  I contacted you to potentially represent me in this matter

20   when it first came about, and you said you were conflicted.  I

21   want to be technical.

22   Q.  That's fair.  I didn't remember.

23   A.  Eric Goldstein referred us.

24   Q.  Pardon?

25   A.  Eric Goldstein gave me your name.

1  Q.  Now you were asked on cross-examination by Mr. Mazurek a

2  question about a meeting with the FBI agents and the government

3  lawyers in May 2016, and you were asked whether you told them

4  then that you had gave Mr. Seabrook, on December 11, gave him

5  the money in the late morning or early afternoon, and you said

6  I don't know, it's possible.

7         Do you remember that question and that answer?

8  A.  I don't remember which meeting you were referring to with

9  the FBI.

10  Q.  Do you remember that question and that answer?

11  A.  I remember the question, I don't remember the answer.

12  Q.  You don't remember saying 30 minutes ago, 40 minutes ago, I

13  don't know, it's possible.

14  A.  It's possible that's what I said.  I don't remember my

15  exact language.

16  Q.  So as you sit here today, in May of 2016 did you tell the

17  government lawyers and the FBI that you paid Norman Seabrook on

18  December 11, 2014, you paid him in the late morning or early

19  afternoon?

20  A.  It's possible.

21  Q.  Okay.  So that's what you said before, right?

22  A.  Again, I don't know exactly what I said, but that is

23  possible because that is the day --

24  Q.  You agree with me the following, sir, there's an expression

25  in English, "Anything is possible."  Do you know that

HB1TSEA4                    Rechnitz - cross

1    expression?

2    A.   No.

3    Q.   First time you heard it?

4    A.   I think so.

5    Q.   So when you say it's possible, right, does that mean you

6    said it?

7    A.   It means I said I paid Norman that day, that I'm positive.

8    Q.   That I understand.  Did you tell the FBI that you paid him

9    in the late morning or early afternoon?

10   A.   I'm not sure if I made that statement, that's why I'm

11   saying it's possible.  I can't be certain.

12   Q.   Good.  And you were also asked:  Did you tell the agents

13   that you met for approximately five minutes in Mr. Seabrook's

14   car, you then parted ways or Norman may have driven you home.

15   I think you were asked that question, and was your answer:

16   It's possible?

17   A.   Yes.

18   Q.   Now you said it's possible.  Does that mean you did tell

19   them that?

20   A.   It means it's possible that's what I said, but I'm not

21   certain exactly what I told them.

22   Q.   Now there was testimony about four checks that you received

23   in mid-December of 2014 from Platinum, and three of them were

24   the amount of 18,000 -- two were the amount of $18,000.  You

25   didn't receive them personally, they went to charity.  Two of

1    them were in the amount of 18,000, one was in the amount of

2    3,600.  Am I correct about that?

3    A.  Yes, December --

4    Q.  That's a yes.  Make this easy.

5              THE COURT:  There's not another question.  Go ahead.

6    Q.  Now 18, as in 18,000, has significance in the Jewish

7    religion?

8    A.  Yes.

9    Q.  And the significance -- I may get this wrong, I'm not that

10   religious, but the significance is that the 18th letter in the

11   alphabet is chai and means life.

12   A.  Is that a question?

13             THE COURT:  Yes, that's a question.

14   A.  Yes.

15   Q.  And 36 is a variant of 18, it's 18 times two?

16   A.  Yes.

17   Q.  Now I want to take you back to 2009, and I would be correct

18   that in 2009 you lost a watch that you had on the window in

19   your apartment, you either lost it or it was stolen?

20   A.  Yes.

21             THE COURT:  Let me remind the witness to speak into

22   the microphone.

23             Go ahead, counsel.

24   Q.  It was on the window, you went out and you came back and it

25   wasn't there.

HB1TSEA4                    Rechnitz - cross

1    A.  I don't remember the specifics.  I misplaced the watch or

2    it was stolen, correct.

3    Q.  From the window, you thought?

4    A.  Again, I don't remember.

5         MR. SCHECHTMAN:  Would you show the witness what I

6    think is NSO just to refresh his recollection.

7         Just look at the book at NSO while we take time to get

8    warmed up here.

9    A.  It's labeled by alphabetical, A, B, C, D.

10   Q.  O.

11   A.  Okay.

12   Q.  Does that refresh your recollection that you left it on the

13   window ledge and when you came out it wasn't there?

14   A.  No, it does not.

15   Q.  Well, I would be correct that you had a police report

16   filled out for that.

17   A.  I did.

18   Q.  Pardon?

19   A.  Yes, I did.

20   Q.  A complaint report.  Yes?

21   A.  Yes.

22   Q.  And you said that the value of that watch was $59,000.

23   A.  That's what it says here, yes.

24   Q.  And then -- and the reason you did that wasn't because you

25   wanted it investigated, it was because it was a prerequisite

1   for the insurance claim you were going to make?

2   A.   What was?

3   Q.   Filling out the police report.

4   A.   Yes.

5   Q.   And once you had that police report, you asked the

6   insurance company for insurance because you lost your watch or

7   it was stolen.

8   A.   Correct.

9   Q.   And they settled with you?

10  A.   Yes.

11  Q.   And then after they settled with you, miraculously you

12  found your watch.

13  A.   I found my watch, if that's what you're asking.

14  Q.   That's what I'm asking you, you found it.

15  A.   Yes.

16  Q.   On the same window?

17  A.   No.

18  Q.   And by that point you had settled.  Did you tell the

19  insurance company you found your watch?

20  A.   No, I think it was a few --

21  Q.   That one is easy.  Did you tell the insurance company that

22  you found the watch?

23            THE COURT:  Just a yes or no answer.

24            MR. BELL:  Sorry, your Honor, is this currently on the

25  jury's screens?

1          MR. SCHECHTMAN:  It shouldn't be.

2          JUROR:  It is.

3          THE COURT:  Take that off the screen.

4          MR. SCHECHTMAN:  Our apologies.

5   A.   No, I did not.

6   Q.   So you wound up with a watch and the insurance money?

7   A.   Yes.

8   Q.   Now I'm going to move you forward in 2009 to 2014, and in

9   the early part of 2014 you were close to the mayor of the city,

10  Mayor de Blasio?

11  A.   Yes.

12  Q.   And so close that in April of 2015 you sent him an email

13  telling him that you were interested in serving on his

14  committee to combat police corruption.

15  A.   Correct.

16  Q.   And that's because you thought you were a good candidate

17  for that committee?

18  A.   No, that's a position I wanted.

19  Q.   You didn't think you were a good candidate when you

20  applied?

21  A.   That's a position I wanted, no.

22  Q.   Did you think you were a good candidate?

23  A.   No, not particularly.

24  Q.   Would it be fair to say you applied for that position

25  because you knew a thing or two about police corruption?

1    MR. BELL:  Objection.

2    THE COURT:  Overruled.

3    A.  No.

4    Q.  At that time you had corrupted several police officers,

5    hadn't you?

6    A.  No.

7    Q.  And given them gifts?

8    A.  Yes.

9    Q.  Had them drive you to the airport?

10   A.  Yes.

11   Q.  So that's not corrupting them?

12   A.  I don't think so.

13   Q.  Well, that's what you pled guilty to, sir.  Part of your

14   guilty plea is about honest service fraud connected with those

15   police officers.  Is your testimony today that that's not

16   corrupting them?

17   MR. BELL:  Objection.

18   THE COURT:  Overruled.

19   A.  I pled to conspiracy.

20   Q.  So you didn't actually corrupt them, you just agreed to

21   corrupt them?

22   A.  No, I bestowed gifts upon them and I had the expectation

23   that I would get favors in return.

24   Q.  And you did get favors in return?

25   A.  Yes.

HB1TSEA4                    Rechnitz - cross

1   Q.  So when you applied to be on the committee to combat police

2   corruption, you were corrupting police officers, is that fair?

3   A.  Nope.

4   Q.  In that same email you told the mayor that in addition to

5   being the chaplain for Westchester County, you were a concerned

6   citizen of New York that wants to ensure the community safety.

7   That's the reasons that you gave them, right?

8   A.  Yes.

9   Q.  Did you tell him that you bought your chaplaincy?

10  A.  No.

11  Q.  You just thought telling him that might encourage him to

12  put you on this committee?

13  A.  No, I did not buy my chaplaincy.

14  Q.  Sorry, one question at a time.  Did you tell him that?  Did

15  you tell him that you had done no services whatsoever as a

16  chaplain?

17  A.  No, I did not.

18  Q.  Did you tell him that you became a chaplain because you

19  paid the Westchester County Executive?

20  A.  I did not say that.

21  Q.  And did you think being a chaplain in Westchester County

22  qualified you to be on that police corruption committee?

23  A.  No.

24  Q.  Now not only did you want to be on it, but I take it that

25  in May you wrote the mayor saying that you deserved to be on or

1   to head up his commission on police corruption.  Did you write

2   that to the mayor?

3   A.  I don't think I wrote that I deserved it, no.

4   Q.  Did you say, as a question, do I deserve to be on the head

5   of your commission?

6   A.  I'm not sure.

7   Q.  Let's look at the email in your binder, which is Q, we

8   could make it easy and we don't have to put anything up on the

9   screen, just take a look at Q.

10  A.  Okay.

11  Q.  So you told the mayor that you deserved to be the head of

12  his commission for police corruption?

13  A.  I asked him a question.

14  Q.  The question was:  Do I deserve to be on or head up your

15  commission for police corruption?

16          That the question you asked?

17  A.  Yes.

18  Q.  And was that what we call a rhetorical question or just

19  trying to get his opinion on whether you deserved it?

20  A.  I don't remember the circumstances of that email.

21  Q.  The subject of that email was a little smiley face that you

22  wrote.

23  A.  Is that question?

24  Q.  You can assume that's a question.  That's how we'll do this

25  because I want to try to go as fast as we can because these

1 | people would like me to.  So that's a question.
2 | A.  Sounds great.
3 |          MR. BELL:  Objection.
4 |          THE COURT:  Overruled, go ahead.
5 | A.  Yes, that is a smiley face.
6 | Q.  In the subject line?
7 | A.  Yes, it is a smiley face.
8 | Q.  And I take it what you said is you weren't doing this
9 | because you thought you were qualified, you were doing this
10 | because you thought if you got on this committee it would
11 | promote your image?
12 | A.  There were other reasons.
13 | Q.  Tell me what they were.
14 | A.  I discussed this with several of the inner circle that we
15 | spoke about, Mike, Phil, Jeremy, and that would be also a good
16 | way of having more influence and power in the police department
17 | and know what's going on.
18 | Q.  So you were meeting in Phil Bank's office sitting there
19 | smoking cigars, but it's your testimony that if you were the
20 | head of the police corruption committee then you would really
21 | know what was going on?
22 | A.  Yes.
23 | Q.  There was also some testimony that you gave about health
24 | insurance.  Do you remember that?
25 | A.  Yes.

1  Q.  And I think what you told us was that for two or three

2  years you got your health insurance through a jewelry company

3  owned by Mr. Turkomen, a friend of yours.

4  A.  Yes.

5  Q.  And you also told us that you didn't know that was illegal.

6  A.  Correct.

7  Q.  So let's talk about that for a second.  I take it what you

8  did was, or what was done was that your name was put on the

9  records of that company, that jewelry company, as an employee.

10 A.  I believe so.

11 Q.  So that their business records showing you as an employee

12 were false.

13 A.  Well, technically I was an employee.

14 Q.  No, technically you weren't an employee, were you, because

15 you got paid and you then you sent the money back, and you

16 weren't an employee in any real sense of that word, were you?

17 A.  It was a no-show job.

18 Q.  It was a no-show job for which you got no money.

19 A.  Correct.

20 Q.  So it was a no-show, no-pay job?

21 A.  Correct.

22 Q.  So you agree with me it wasn't really a job?

23 A.  Correct.

24 Q.  But you told the insurance company you were an employee?

25 A.  I didn't tell them anything.

1    Q.  Well, somebody had to tell them because you were insured by

2    that insurance company as an employee.  Do you agree with me?

3    A.  Yes.

4    Q.  So the insurance company was told you were an employee and

5    you weren't, right, then you were paid, right, $2,000 a month

6    as an employee?

7    A.  Yes.

8    Q.  And then -- and this is just the first couple of years this

9    happened, correct?

10   A.  Yes.

11   Q.  And then you reimbursed him $2,000 a month?

12   A.  Yes.

13   Q.  And then he paid your insurance premiums?

14   A.  Yes.

15   Q.  And then you reimbursed him for the insurance premiums?

16   A.  Yes.

17   Q.  And it's your testimony as you sit here today that you

18   didn't think that was illegal?

19   A.  No.

20   Q.  Now can I ask -- and presumably what you got out of this

21   was you were on their group insurance policy?

22   A.  Yes.

23   Q.  And because they thought you were an employee?

24   A.  Yes.

25   Q.  Now again, you didn't think this was illegal?

1  A.  No.

2  Q.  How old were you at this time?

3  A.  I think in my late 20s.

4  Q.  This is 2012, 2013, and you had gone to college?

5  A.  Yes.

6  Q.  And it's your testimony before this jury that you didn't

7  think that was illegal?

8  A.  Correct.

9  Q.  And you learned it was illegal one day when you were

10  cooperating with the government?

11  A.  Yes.

12  Q.  And you must have been shocked that it was illegal.

13  A.  That didn't shock me, no.

14  Q.  Because you thought it might be illegal?

15  A.  No.

16  Q.  But you learned it for the first time sometime after

17  June 16 when you're cooperating with the government that

18  putting you on that insurance company, making you a sham

19  no-show, no-paid employee paying him back for the first time

20  you learned it was illegal?

21  A.  Yes.

22  Q.  And you said this happened for two or three years you were

23  on this policy?

24  A.  I think so.

25  Q.  And the way it worked, I take it, is they would pay your

HB1TSEA4                    Rechnitz - cross

1    premiums and then you would reimburse them?

2    A.  Yes.

3    Q.  So if there is a reimbursement check for January of 2013,

4    that means this had to start in late 2012.

5    A.  Yes.

6    Q.  And so if you do the math with me, you did it in 2012, you

7    did it in 2013, you did it in 2014, you did it in 2015, you did

8    it in 2016 and you did it until July of 2017.

9    A.  I did what?

10   Q.  Let me uses the vernacular, you defrauded the insurance

11   company.

12   A.  Yes.

13   Q.  Now my math isn't great, but you agree that's more than two

14   or three years.

15   A.  Yes.

16   Q.  Now you did it all the way to June of 2017?

17   A.  Yes.

18   Q.  And indeed, in June of 2017 you paid one of these

19   reimbursement checks to the jewelry company.

20   A.  It's possible.

21   Q.  Well, let's see, because I don't know what possible means

22   for you, so we'll put it up on the screen for you.

23           MR. BELL:  Objection.

24           THE COURT:  Sustained.

25   Q.  I think it's AAA.

 1              Sorry, would you look at ZZ in your binder.

 2   A.  Sure.

 3              THE COURT:  Again, this is just for the witness.

 4              MR. SCHECHTMAN:  My apologies.

 5   Q.  Look at AAA.

 6              THE COURT:  Just for the witness and counsel.

 7              MR. SCHECHTMAN:  That's fine.

 8   Q.  Your last check you wrote here to reimburse was in June of

 9   2017.

10   A.  Correct.

11   Q.  So you continued this all the way to June of 2017, a year

12   after you were cooperating and learned that this was wrong?

13   A.  Yes.

14   Q.  Now on direct examination what you said was you really

15   didn't have any alternative because you were locked in, is that

16   right?

17   A.  I did not say that.

18   Q.  Do you remember this question and this answer:

19   "Q. How did you nevertheless find yourself still on the same

20   health insurance plan past that point?

21   "A. I began cooperating after the 1st of June, and the policy

22   was renewed June 2016 until June 2017, so I had already been

23   locked in for a year."

24              Do you remember that question and that answer?

25   A.  Yes, that question and answer is what happened.

1  Q.  That's what happened.  So you were locked in and you had no

2  choice but to continue this.

3  A.  That's not correct.

4  Q.  Well, then let me ask a different question.  You had a

5  choice to continue this.

6  A.  I did.

7  Q.  And you didn't, you kept on going.

8  A.  That's correct.

9  Q.  During the period of a cooperation agreement that said you

10  couldn't commit new crimes.

11  A.  Correct.

12  Q.  And you committed new crimes during that period.

13  A.  I don't think so.

14  Q.  Because you didn't think it was illegal?

15  A.  Because I didn't cancel.  I had done it prior to my

16  cooperation.

17  Q.  You paid, reimbursed Taly Diamonds $14,000 in June of 2017

18  a year after your guilty plea, right?

19          Was that an illegal act?

20  A.  I don't think so.

21  Q.  It wasn't an illegal act to have them pay for your health

22  insurance and you reimburse them during your cooperation

23  period?

24  A.  That was illegal.

25  Q.  Pardon?

A.  You're asking me different questions.  I'm trying to answer

each one.

Q.  Pick any of them.

A.  I'm happy to explain what happened.

Q.  Let's do it simple.  You continued on this policy that you

weren't entitled to for a year.

A.  Yes.

Q.  And the reason you did, your testimony is, because you were

locked in?

A.  Yes.

Q.  And I take it what that means is you couldn't write -- let

me put it differently.  If a real employee working for a real

company leaves that company, his insurance or her insurance is

canceled, is that right?

A.  Unless they go with COBRA, yes.

Q.  Unless they go with COBRA, right.  So if a real employee

leaves a real company, the insurance is canceled.

        You could have written this insurance company a letter

that said I'm no longer an employee.

A.  Yes.

Q.  And you didn't?

A.  I did not.

Q.  You just continued on the policy?

A.  Yes.

Q.  You could have written them a letter that said I have been

1  defrauding you for four and a half years, I just learned about

2  it in June of 2016, please cancel me, and if I owe you any

3  money, let me know.  You could have done that.

4  A.  I could have.

5  Q.  And you didn't?

6  A.  I did not.

7  Q.  Now on direct examination you told us about the fact that

8  you had this incident involving Andrew Penson in which you

9  embellished an email.

10 A.  Yes.

11          MR. SCHECHTMAN:  Judge, this is the one that I asked

12 about yesterday.  Can I show this to the jury?

13          MR. BELL:  We object, your Honor, same reason.

14          THE COURT:  Quick sidebar.

15          MR. SCHECHTMAN:  Judge, no thanks.

16 Q.  So here we go.  Mr. Penson was a significant player in the

17 real estate industry.

18 A.  Yes.

19 Q.  He owned, I think you testified, the ground rights under

20 Grand Central and the air rights above it.

21 A.  Correct.

22 Q.  So that's a significant player.

23 A.  Correct.

24 Q.  And he sent you an email in May of 2014, and the email

25 complained about the way he was being treated by the city.

1  A.  Yes.

2  Q.  And this all involved an air rights dispute?

3  A.  Yes.

4  Q.  And indeed, he said to you that the city was treating --

5  Mayor de Blasio was treating him worse than the Bloomberg

6  administration?

7  A.  I don't remember the email.

8  Q.  But you do remember that he sent you an email saying that

9  he was treated shabbily.

10 A.  I don't remember specifics --

11 Q.  I hear you, but he did send you an email saying that he had

12 been treated shabbily.

13 A.  Treated what?

14 Q.  Badly.

15 A.  Yes.

16 Q.  Pardon?

17 A.  Yes.

18 Q.  You forwarded that email to the mayor later that afternoon

19 and you said Andrew just sent this to me, three dots, FYI,

20 correct?

21 A.  Yes.

22 Q.  FYI is for your information?

23 A.  Yes.

24 Q.  Then you took that same email and you went in and you added

25 to it?

1    A.   Yes.

2    Q.   And what you added was this -- so this is an email that

3    looks like it's from you to Mayor de Blasio, am I correct?

4    A.   Correct.

5    Q.   And indeed it bears the same time as the email that you

6    actually sent to Mayor de Blasio.

7    A.   That's correct.

8    Q.   And the email that you actually sent simply says Andrew

9    just sent me this, FYI.

10   A.   Yes.

11   Q.   Then what you added is this:  How can you allow this to

12   happen under your watch and embarrass me like this?  When I

13   introduced you to Andrew, I told you he is a very close friend,

14   like family.  I expect you to take this matter seriously or

15   this will become a PR disaster for you and your administration.

16   And I will help Andrew because the process lacked democratic

17   procedures.  Call me ASAP, and three explanation marks.

18             That's what you added?

19   A.   Yes.

20   Q.   And you didn't send that to the mayor?

21   A.   No.

22   Q.   What you did was send that to Mr. Penson?

23   A.   Yes.

24   Q.   So he thought you sent it to the mayor?

25   A.   Yes.

1  Q.  And then he wrote back and he said:  Zowie, you got big

2  ones.

3  A.  Yes.

4  Q.  Now "big ones" meant that you were ballsy?

5  A.  Yes.

6  Q.  But you were ballsy on an email that you never sent to the

7  mayor?

8  A.  Correct.

9  Q.  That you just sent to him and his wife?

10  A.  Right.

11  Q.  Good.  And then after you got zowie, you got big ones, you

12  wrote:  He called me -- this is you to Mr. Penson.  He called

13  me, I didn't pick up.  I want you to be present when I speak to

14  him next week.

15       So I take it the "he" in that sentence was

16  Mr. de Blasio?

17  A.  Yes.

18  Q.  And that was a lie, too, wasn't it?

19  A.  No, it was not.

20  Q.  Wasn't it a lie that between 7:00 and 7:27 the mayor called

21  you?

22  A.  The mayor had called me when I wrote it to Andrew.  I don't

23  know the times of the email.

24  Q.  And you hadn't picked up?

25  A.  Yes.

1  Q.  And you really expect the jury to believe that the mayor

2  called you about this and you didn't answer?

3          MR. BELL:  Objection.

4          THE COURT:  Sustained.  Please rephrase that.

5  Q.  That's your testimony, the mayor called you about this and

6  you didn't answer the phone?

7  A.  Yes.

8  Q.  And you were happy when you got that response "Zowie, you

9  got big ones," because you impressed an important person?

10 A.  Yes.

11 Q.  Now this is not the only time that you doctored an email.

12 A.  Correct.

13 Q.  Indeed, I would be correct that the mayor sent you or you

14 sent the mayor an email on Thanksgiving and you said, from Jona

15 to Mayor de Blasio, happy and healthy Thanksgiving.  You sent

16 that around 8:22 p.m.

17 A.  Okay.

18 Q.  And that's the kind of thing you would do, happy

19 Thanksgiving, maybe?

20 A.  Yes.

21 Q.  And he sent back, 45 minutes later, thanks, and to you and

22 your family.

23 A.  Yes.

24 Q.  And then you took that email and you added this to it:

25 Please call me when you can.  Important.

1   A.   If I see the email I can speak to it.

2   Q.   Take a look in your binder at O, H and I, and you will see

3   thanks to you and your family, and then you will see the

4   embellishment.

5   A.   I'm on H.

6   Q.   H and I.

7   A.   What am I looking at?

8   Q.   You see H?

9   A.   Yes.

10  Q.   And H says happy and healthy Thanksgiving, right?

11  A.   I wrote happy and healthy Thanksgiving.

12  Q.   And he wrote back?

13  A.   Thanks, and to you and your family.  And I wrote back

14  thanks.

15  Q.   Now look at I and tell me what his email says in I.

16  A.   I wrote happy and healthy Thanksgiving.

17  Q.   And his email.

18  A.   Thanks and to you and your family.  Please call me when you

19  can.  Important.

20  Q.   And those are the words you added?

21  A.   Correct.

22  Q.   And then you sent the email to yourself?

23  A.   Okay.

24  Q.   So that you have it in storage?

25  A.   Okay.

1    Q.   That was a yes, yes?

2    A.   Yes.

3    Q.   Did you tell the mayor that you were doctoring his email?

4    A.   Nope.

5    Q.   Now do you remember telling the government that this was

6    all done to create an impression?

7    A.   What was?

8    Q.   Sending emails that you added stuff to.

9    A.   Yes.

10   Q.   Do you remember telling the government most success in life

11   is based on impressions?

12   A.   Nope.

13   Q.   May 9, 2016, do you remember telling the government most

14   success in life is based on impressions and it was good to

15   impress current and potential clients and developments?

16   A.   I remember saying the second part but not the first part.

17   Q.   Let's see if this refreshes your recollection.

18   A.   Sure.

19        No, it does not.

20   Q.   So if the agent wrote it there, the agent got it wrong?

21        MR. BELL:  Objection.

22        THE COURT:  Sustained.

23   Q.   You saw it there, right?

24        MR. BELL:  Objection.

25        THE COURT:  Sustained.

1   A.  He makes mistakes.

2           THE COURT:  Hold on.  There's not a question for you.

3           THE WITNESS:  I thought he asked me a question.

4           THE COURT:  I sustained the objection.

5   Q.  Now you would agree with me that when it came to politics,

6   the police, you played the game well?

7   A.  I think so.

8   Q.  And indeed, if we look at another one of your emails with

9   the mayor at 10:23 p.m. on New Year's Eve, December 31, 2014,

10  you wrote the mayor, Happy New Year, my friend, thank you for

11  leading the city with dignity.

12  A.  Yes.

13  Q.  And he wrote back at 10:35, so he responded twelve minutes

14  later, and he wrote back:  Thank you for always being a voice

15  of encouragement.  A very happy New Year to you and your

16  family.

17  A.  Yes.

18  Q.  And you forward that email to Mr. Penson, who is your

19  friend who you're trying to impress?

20  A.  Yes.

21  Q.  And Mr. Penson wrote -- and you wrote to Mr. Penson:  I

22  play the game well.

23  A.  Yes.

24  Q.  And he wrote back:  I just threw up.

25  A.  Yes.

1   Q.  And you said:  Me, too.  Ha, ha, ha.

2   A.  Yes.

3   Q.  And that's because playing the game well was a joke?

4   A.  No.

5   Q.  Now I'm going to try not to belabor this because you

6   already have been asked about this, but you were asked a lot of

7   questions about your being a police chaplain in Westchester,

8   correct?

9   A.  Yes.

10  Q.  And I think we agreed on the following:  You had no

11  training to be a chaplain?

12  A.  Yes.

13  Q.  Weren't qualified in any way?

14  A.  Correct.

15  Q.  Didn't perform a single service up there?

16  A.  Correct.

17  Q.  Didn't live in Westchester?

18  A.  Correct.

19  Q.  Got this in order to get a parking permit?

20  A.  Correct.

21  Q.  And I think you were asked about the duties of a chaplain

22  as set out on the website and your answer was you didn't know.

23  A.  Correct.

24  Q.  And in a certain sense, that was an unfair question of

25  Mr. Mazurek because you had no intention of performing any

HB1TSEA4                    Rechnitz - cross

 1   duties.

 2   A.   I don't agree with that question.

 3           MR. BELL:  Objection, form.

 4           THE COURT:  I'll allow it.

 5   A.   Can you repeat the question?

 6   Q.   I said it was an unfair question about whether you knew

 7   about the duties because you had no intention of performing any

 8   duties.

 9   A.   No.

10   Q.   You didn't have any intention of performing duties, did

11   you?

12   A.   I did not.

13   Q.   So it was a fair question?

14   A.   Yes.

15   Q.   That makes Mr. Mazurek feel better.

16           MR. BELL:  Objection, your Honor.

17           I'll withdraw that objection.

18           THE COURT:  I'll allow it.

19   Q.   Now you had a card made up, I think, after -- here, your

20   friend Jeremy Reichberg made up a card that showed you're a

21   chaplain?

22   A.   Yes.

23   Q.   And it had an email address on it that was -- this is your

24   card, chaplain.wcpd@gmail.com?

25   A.   Yes.

1   Q.  And that was a card you carried?

2   A.  I didn't really carry it.

3   Q.  But it was a card that you sent to your father?

4   A.  Could be.

5   Q.  Well, could be's don't help much.

6   A.  I sent it many places.  I don't remember.

7   Q.  Let's take a look, and you can look in your binder at NSL.

8   A.  Which one?

9   Q.  L.  And you sent it to your father.

10  A.  I forwarded him an email.

11  Q.  And the email had your card on it?

12  A.  Correct.

13  Q.  And so you had a completely phony card made up that had a

14  phony email address and forward it to your father, I take it

15  because you were proud of what you had done?

16  A.  It wasn't phony.  I was a police chaplain, so I made up a

17  card.

18  Q.  Did you tell your father I perform no duties, I don't know

19  what the duties are, I have never had a single meeting up

20  there, I have done zero work, and I got this just for my

21  parking plaque?

22  A.  No.

23  Q.  So you sent it to your father so your father would think

24  you were actually a chaplain?

25  A.  No.

1  Q.  Why did you send it to your father?

2  A.  I don't know.  I forwarded it him.  I'm not sure why.

3  Q.  You forwarded it to him so he wouldn't think you were a

4  chaplain?

5  A.  Again, I don't remember why I sent it to him.

6  Q.  Now there have been also -- I will try to move this

7  quickly.  There has also been testimony about your application

8  for a gun license.  Do you remember that?

9  A.  Yes.

10  Q.  And I think what you testified to is you don't know what

11  statements are on the application because you just signed it.

12  A.  Correct.

13  Q.  And let me just be clear, did you know that that

14  application was being submitted to show that your employer was

15  the diamond company?

16  A.  Yes.

17  Q.  So you knew that it was false because your employer was not

18  the diamond company.

19  A.  Correct.

20  Q.  So if you testified that you didn't know it was false, that

21  would be wrong?

22  A.  Correct.

23  Q.  So you knew it was false?

24  A.  Yes.

25  Q.  And you submitted it to get a gun permit?

1    A.  Yes.

2    Q.  And I take it the reason you submitted it is because you

3    just wanted a gun.

4    A.  Yes.

5    Q.  Now so you then -- and you submitted pay stubs from that

6    diamond company?

7    A.  Not that I'm aware of.

8    Q.  Let's take a look.

9             Would you look with me at what is NSN.

10   A.  Okay, I'm on N.

11   Q.  N?

12   A.  Yes.

13   Q.  If you look through that you will see your pay stubs.

14   A.  I do see that.  This is news to me.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1  Q.  Jeremy got your pay stubs?

2  A.  Right.

3  Q.  He just went and got your pay stubs and he submitted it?

4  A.  Right, we were in the same office.

5  Q.  I understand --

6          (Multiple voices)

7  Q.  -- he went and got them and didn't tell you?

8  A.  Yes.

9  Q.  He also didn't tell you, I take it, when asked for the

10 reason you shouldn't have to make this public, he also didn't

11 tell you the reason that he gave was because you were a police

12 chaplain in Westchester County?

13 A.  Correct.

14 Q.  And you never knew that that that was his reason?

15 A.  Correct.

16 Q.  You just signed this?

17 A.  Yes.

18 Q.  Do me a favor.  The same document, right, NSN, look at Page

19 25 of 40.

20 A.  Which page?

21 Q.  20 of 40.

22 A.  Okay.

23 Q.  You see your signature down the bottom there?

24 A.  I do.

25 Q.  No doubt that is your signature?

1   A.  Yes.

2   Q.  That Jeremy didn't do?

3   A.  Correct.

4   Q.  You would agree with me that one inch above that, in

5   capital letters is written, "I am a Police Chaplain in

6   Westchester County in the State of New York"?

7   A.  Yes, in my handwriting.

8   Q.  That is in your handwriting?

9   A.  Yes.

10  Q.  But you didn't know that that is what it said on the

11  application?

12  A.  That is not what I said.  I didn't know that is the reason

13  that we disclosed for having it not publicized.  That is what I

14  testified.

15  Q.  So it says please, if I have a reason to believe that I may

16  be subject to unwarranted harassment upon the disclosure, and

17  you said in your own handwriting, I am a police chaplain in

18  Westchester County in the State of New York.

19          You are telling me you filled that in, but you didn't

20  know what the question was?

21  A.  It wasn't a question.

22  Q.  That you're right about.  It is a statement.

23          "I have reason to believe that I may be subject to

24  unwarranted harassment upon disclosure," right?

25          And you wrote -- please provide any additional

1    information -- you wrote, "I am a police chaplain in

2    Westchester County in the State of New York"?

3    A.   I still don't understand what No. 4 even means.  Jeremy

4    told me to write that there.  That is what I wrote.  I relied

5    on him for this entire process.

6    Q.   I understand.  So when you were asked one of the positions

7    that you put down -- question, one of the positions you put

8    down in that application as a reason for needing the gun permit

9    is that you were a police chaplain in Westchester County,

10   correct?  And you said I didn't know that was was in the

11   application.

12           That was the testimony you gave two days ago?

13   A.   Right.  This reminds me of that, yes.

14   Q.   Now you remember you wrote it there in your own

15   handwriting?

16   A.   I didn't remember it before.  I see it now and I am telling

17   you that is my handwriting.

18   Q.   So we can agree on the following:  You knew the form, the

19   application was false?

20   A.   Yes.

21   Q.   Because it said you worked for a diamond company, and you

22   didn't?

23   A.   Correct.

24   Q.   And you knew it had on there that you were a chaplain in

25   the Westchester Police, and except for political contributions,

1   you did nothing to be a chaplain?

2   A.  I did not know it was on there.

3   Q.  Now, you would agree with me that in addition to playing

4   the game well in politics, you played the game well in real

5   estate?

6   A.  I think so.

7   Q.  You owned some apartment units in a building called the

8   Apthorp?

9   A.  Yes.

10  Q.  That is a historic building in the Upper West Side?

11  A.  Yes.

12  Q.  Near the Natural History Museum?

13  A.  Yes.

14  Q.  Now, one of those apartments was Apartment 6 E.  Am I

15  correct?

16  A.  Yes.

17  Q.  Now, there was a tenant in 6 E at the time, right?

18  A.  I don't remember the exact apartment.

19  Q.  Do you remember writing to Peter O'Connor and saying the

20  following to him:  The tenant can't know that we bought the

21  apartment or it will ruin my buying, buy out leverage.  We need

22  rent to still go to you and you reimburse us for the closing

23  credits on six month rent and you collect for those six months.

24          Do you remember that that?

25  A.  I remember writing that to Andrew Ratner, but not Peter,

1    but I remember that.

2    Q.  The Andrew is CC, written with Peter with a CC to Andrew.

3    That makes sense?

4    A.  Yes.

5    Q.  The games you were playing there was not to tell this

6    tenant you were the owner so that you would have better

7    bargaining leverage with him?

8    A.  Correct.

9    Q.  Because you were trying to buy him out of that apartment?

10   A.  Right.

11   Q.  If he knew you were the owner, you might not be able to get

12   as much, you might have to pay more?

13   A.  Correct.

14   Q.  Now, the scheme you proposed was not to tell him you were

15   the owner, to have them pay the rent to the old owner?

16   A.  Correct.

17   Q.  And then the old owner would pay you?

18   A.  Would reimburse me, yes.

19   Q.  Would reimburse you?

20        What you said to Mr. O'Connor was look, if that

21   doesn't work, we can find another way?

22   A.  It is possible.  I don't remember that.

23   Q.  Do you want to look at that in your binder on the second

24   page.

25   A.  Sure, okay.

HB1JSEA5                    Rechnitz - cross

1    Q.  You see you said to him what we'll do, I'll just take a

2    credit as a purchase for your rent to them?

3    A.  I don't know where you are.

4    Q.  Four or five lines from the bottom.  It is highlighted on

5    your screen?

6              THE COURT:  Your screen is working.

7              (Inaudible)

8    A.  This is on the second page?

9    Q.  Yeah, that is what I said.

10   A.  Can we go to the first to I can refresh my memory what this

11   is about?

12   Q.  We'll do it.

13   A.  Thank you.  (Pause)  Okay, next page. (Pause)  Okay.

14   Q.  So the original plan you proposed was that he would

15   continue to collect the rent, you would hide the fact you were

16   the owner so that you had more leverage in negotiating with the

17   tenant?

18   A.  That's correct.

19   Q.  If he didn't like that for some reason, you could figure

20   out another way to do it?

21   A.  I proposed another way, yes.

22   Q.  You proposed another way?

23              And what you said to him is there's a way around it

24   always, you know what I mean?

25   A.  Yes, that's what I wrote.

1  Q.  Would it be fair to say that that sentence, there's a way

2  around it always, was part of your philosophy of life?

3  A.  No.  It goes together with the sentence before that you

4  didn't read out loud.

5  Q.  Which is well, if not, what we'll do is I'll just take a

6  credit.  So what you were saying to him is if we can't skin

7  this cat one way, we'll skin it another?

8  A.  No.  You still didn't read the complete sentence.

9  Q.  What, if not, what we'll do is I'll just take a credit as

10 to the purchase price for your rent to them and you'll just get

11 yourself reimbursed every month.  There is a way around it

12 always, you know what I mean?

13 A.  Correct.

14 Q.  What I am saying to you is what you're saying to him is if

15 we can't do it one way, there is an alternative way?

16 A.  Correct.

17 Q.  What you said to him is there is a way around it always?

18 A.  Correct.

19 Q.  And my question to you is, is it fair to say that that was

20 a philosophy of life for you?

21 A.  Yeah.

22 Q.  Now, you told us that you owned some apartments in the

23 Apthorp, correct?

24 A.  Yes.

25 Q.  Did you own them outright or with a group of people?

HB1JSEA5                    Rechnitz - cross

1   A.  LLC.

2   Q.  In an LLC, which was your business entity?

3   A.  Yes.

4   Q.  Now, you owned them at least as far back as what, 2012?

5   A.  I don't remember the year.

6   Q.  Let's take a look.  Would you take a look on the screen,

7   take a look in your book, we'll do it simple, at NSB.

8   A.  B is empty.

9   Q.  B is empty?

10          THE COURT:  Look on your screen.

11          THE WITNESS:  Okay, yes.

12  BY MR. SHECHTMAN:

13  Q.  At least as far back as December of 2012, you had an

14  ownership interest in some apartments in the Apthorp?

15  A.  Not exactly, no.

16  Q.  Tell me.

17  A.  I had profit participation.

18  Q.  You had profit participation?  Is that an ownership

19  interest?

20  A.  Again I can't see what page you're referring to.

21  Q.  I am asking you, is that profit participation an ownership

22  interest?

23  A.  It is debatable.  It is a profit participation interest.

24  Q.  So in January, by 2014, did you own some buildings in the

25  Apthorp?

1         MR. BELL:  Objection.

2    Q.  Some apartments?

3    A.  Again as you see here, I --

4    Q.  No.  I am asking the question.  By 2014, did you own some

5    apartments in the Apthorp?

6    A.  I don't remember what year I purchased the package of

7    apartments.

8    Q.  But you did purchase some?

9    A.  Eventually.

10   Q.  Before 2014 or after 2014?

11   A.  I am not really sure.  I am confused if it is 14, 15.

12   Q.  Before 2014, you had some profit participations?

13   A.  Correct.

14   Q.  At some point, right, you owned them?

15   A.  Different apartments.

16   Q.  I agree.  At some point you owned some apartments?

17   A.  That's correct.

18   Q.  In January of 2014 when you wrote to Brad Wildauer, this

19   email shop concerns that I or any entities that I owned or have

20   an interest in do not -- (inaudible) -- own any apartments in

21   the Apthorp, and that was a lie?

22   A.  That was not a lie.

23   Q.  Because?

24   A.  I did not own apartments at that date.

25   Q.  Because you didn't own apartments at that date?

1      You just testified that in 2012, you had profit

2  participation and you bought some after, but your testimony is

3  as of that date you had nothing?

4  A.  That is not what I said.  You asked me if I own them.

5  Q.  Pardon?

6  A.  I was not on the title, I did not own them, I did not get a

7  K1.

8  Q.  (Inaudible) -- or have any interest, do not own any

9  apartments in the Apthorp, never owned any and currently do not

10  own any.  Is that correct?

11  A.  That is correct.

12  Q.  And that is because in your partnership participations you

13  had weren't ownership?

14  A.  It is the view of the law, not my view.

15  Q.  It wasn't the view of the law four minutes ago because you

16  said it was debatable?

17          MR. BELL:  Objection.

18          THE COURT:  Sustained.

19  BY MR. SHECHTMAN:

20  Q.  You told us four minutes ago that it was debatable whether

21  you owned it.  Now it is the view of the law?

22  A.  You're playing with my words.  That is not what I said.

23  You asked me specific questions and I gave you specific

24  answers.

25  Q.  It is your view that the partnership interest you had

1    wasn't an ownership interest?

2    A.   They're not partnership interests.  Again you're playing --

3    Q.   You're saying they're not partnership interests?  Are they

4    ownership interests?

5    A.   That is not what I wrote; profit participation.

6    Q.   So when you wrote him, this email shall confirm I or any

7    interests I own or have an interest in do not own any

8    apartments in the Apthorp, never owned any, that is because

9    what you were saying to yourself is, I can write that because I

10   just have profit participation?

11   A.   I am just following the law.

12   Q.   Like you did with your health insurance?

13              MR. BELL:  Objection.

14              THE COURT:  Overruled.  You can answer that.

15   A.   No.

16   BY MR. SHECHTMAN:

17   Q.   Like you did with your gun permit?

18   A.   No.

19   Q.   Now, there came a time that you got some notoriety because

20   you won a Super Bowl bet?

21   A.   Yes.

22   Q.   It was actually quite an extraordinary bet.  You bet that

23   the first score in the game would be -- (inaudible)?

24   A.   Correct.

25   Q.   And it was?

HB1JSEA5                    Rechnitz - cross

1   A.  Correct.

2   Q.  And you won $50,000?

3   A.  That's correct.

4   Q.  You told people you were giving it to charity?

5   A.  Correct.

6   Q.  You also said that one of the things that made this

7   extraordinary was you only make one bet a year on the Super

8   Bowl, right, one bet each year and this year it finally paid

9   off?

10  A.  That is what I said.

11  Q.  Now, that also wasn't true?

12  A.  That is not true, no.

13  Q.  Because you were a fairly active gambler?

14  A.  Correct.

15  Q.  When you said you only made one bet a year, right, that was

16  just to make the story even bigger than it was?

17  A.  And that was to look good, to hide the fact of gambling.

18  Q.  I am having trouble.  Was it to make the story look smaller

19  than it was?

20  A.  No.  It was to --

21          (Multiple voices)

22  Q.  It was to hype the story?

23  A.  No.  It was the opposite, to die it down.

24  Q.  So it is your testimony that you told the reporters that

25  you only made one bet a year so that the story would be quiet?

 1    A.  Yes.  I didn't want people to feel that I gamble.  It is

 2    frowned upon.

 3    Q.  It is your testimony you did it so that everybody wouldn't

 4    pay attention to the story?

 5    A.  No.  What I said -- that is not what you asked me and not

 6    what I answered.

 7    Q.  Did you think it was hyping the story down when you stood

 8    up with a Giants hat on with the cash in your hand?

 9    A.  Yes.

10    Q.  And you got the picture taken?

11    A.  Yes.

12    Q.  And that was, the purpose of that was so that the story

13    wouldn't be a big story?

14    A.  No.  That was to make the story down.

15    Q.  What you wanted to do here was make the story known, but

16    unknown at the same time?

17    A.  That is not what I said.

18    Q.  My question to you is, the reason that you said you only

19    made one bet a year was to hype the story?

20    A.  Correct.

21    Q.  Now, you made many bets a year, correct?

22    A.  Yes.

23    Q.  And in 2013 you lost more than $500,000 gambling?

24    A.  I don't know if that is the case.

25    Q.  Let's take a look.  Would you take a look with me at NSY.

1    I should be more precise because I know that is important to

2    you.  This is at the MGM Hotel, so you lost more than $500,000

3    in 2013?

4    A.  It is possible.

5    Q.  No, no.  Everything is possible.  Let's try it.

6           MR. BELL:  Objection.

7           THE COURT:  Sustained.  Please rephrase the question.

8    BY MR. SHECHTMAN:

9    Q.  You lost more than $500,000 in 2013?

10   A.  Again, I don't see that based on this document.

11          THE COURT:  You can look at the screen.

12   A.  There is four pages.  I don't know what I am looking at.

13   Q.  Look at the screen.

14   A.  Okay.

15   Q.  Okay?  In 2013 your tax information for these hotels, the

16   Aria, the MGM Grand Las Vegas, right?

17   A.  Ah-huh.

18   Q.  You lost $502,700?

19   A.  That is what this paper said.  I don't know what it is.

20   Q.  Can you pull up to the top.  This paper comes from a tax

21   information statement.  Dear Jona, in response to your request

22   for information, our records indicate that the following

23   estimated gambling activity, right?

24          MR. BELL:  Objection.

25          THE COURT:  Sustained.  Look at that first page.  Look

HB1JSEA5                    Rechnitz - cross

1    at what is highlighted there and you can answer the question.

2             MR. BELL:  While we are doing that, we ask again that

3    your Honor admonish the gallery.

4             THE COURT:  Okay.  Again, folks in the gallery, please

5    do not make any sort of audible noises at all.

6             THE WITNESS:  That is what this says, yes.

7    BY MR. SHECHTMAN:

8    Q.  So you lost $502,700 at the MGM Resorts hotels that year?

9    A.  According to this letter, I did, yes.

10   Q.  And then in 2015 you won $417,800?

11   A.  Okay.

12   Q.  Do you want to look at anything or you're okay with it?

13   A.  I am saying okay, sure.

14   Q.  In 2016, you lost $201,092?

15   A.  Okay.

16   Q.  So if you told somebody that you only placed one bet a

17   year, right, that wasn't true?

18   A.  No, that was not true.

19   Q.  You also bet illegally on sports?

20   A.  I did.

21   Q.  You're not being prosecuted for that?

22   A.  That's correct.

23   Q.  That is part of your deal?

24   A.  Yes.

25   Q.  Now I should stop.

1      The health insurance that you didn't know was a crime,

2  that is also part of your deal?

3  A.  What do you mean, part of my deal?

4  Q.  You're not going to get prosecuted for it?

5  A.  No.  I have to admit my conduct.

6  Q.  Let's be simple here.  You're not getting prosecuted for

7  it, are you?

8  A.  Correct.

9  Q.  Now, just a little bit to help the jury.  Did you use

10  markers when you gamble?

11  A.  I have used markers, yes.

12  Q.  A marker is like a loan from the bank, right, from the

13  casino?

14  A.  Not always.  It depends.

15  Q.  It is, but it can be, right?

16  A.  It can be many things.

17  Q.  I know it is possible, but --

18      MR. BELL:  Objection, your Honor.

19      THE COURT:  Sustained.

20  BY MR. SHECHTMAN:

21  Q.  -- it can a marker be a loan from the bank, the casino?

22  A.  Yes, it can be.

23  Q.  What happens is that you essentially are borrowing money

24  from the casino and playing, and then you have to pay the

25  casino back in a period of time, and the casino in many of

1   these places can go right into your bank account and take the

2   money?

3   A.  Only in the event it was a loan, I didn't pre-fund it.

4   Q.  That can happen, right?

5   A.  It can.

6   Q.  Indeed, it is possible if you take out a marker, that you

7   can lose in a night and still walk out with cash?

8   A.  Yes.

9   Q.  Typically, the picture of you has hundred dollar bills, the

10  gambling when you won the Super Bowl bet?

11  A.  Yes.

12  Q.  That is not surprising, right?

13  A.  What is not?

14  Q.  Most of these casinos pay with hundred dollar bills?

15  A.  Okay.

16  Q.  "Okay" is not the best answer for the record.  Is that a

17  yes?

18  A.  I don't know what most casinos do.

19  Q.  The casino you play at pays in $100.00 bills?

20  A.  If that is what you request.

21  Q.  Mr. Seabrook you know was also a gambler?

22  A.  I know that he gambled, yes.

23  Q.  Mohican Sun?

24  A.  I don't know where he gambled.  I only knew that Atlantic

25  City.

1    Q.   Pardon?

2    A.   All I know is he played in Atlantic City.

3    Q.   He played in Atlantic City?

4    A.   Yes.

5    Q.   Did he sports bet?

6    A.   I don't know.

7    Q.   Now, yesterday --

8              (Off-the-record discussion)

9    BY MR. SHECHTMAN:

10   Q.   -- yesterday you were taken through the workings of your

11   relationship with Mr. Peralta, the liquor man, and with

12   Mr. Nissen, the ticket man, right?

13   A.   Yes.

14   Q.   You said that what would be really helpful to you, because

15   it is hard to do this with hypotheticals, would be a case

16   history?

17   A.   I said a case study.

18   Q.   A case study would be what would be really helpful?

19   A.   Correct.

20   Q.   Now, I am going to ask the case study that involves Michael

21   Weinberger -- and Michael Weinberger was a friend of yours?

22   A.   Yes.

23   Q.   I think yesterday you were asked whether he was your best

24   friend, and you said you wouldn't say that?

25   A.   No.  I met him a few years ago.

HB1JSEA5                    Rechnitz - cross

1    Q.  You remember saying to Mr. Weinberger in February of 2014

2    that he was your BFF?

3    A.  It is possible, yes.

4    Q.  "That is possible" doesn't help the jury much.  Take a look

5    at NSC.

6    A.  Yes.

7    Q.  Now, you remember saying to him, look at NSAA --

8    A.  Actually, no, that is not what I said.  Please read it

9    again.

10   Q.  You said -- he said to you -- I am sorry -- he called you

11   his BFF?

12   A.  No, that is not what happened, either.

13   Q.  The sentence is okay, let's cut it here.  Don't even

14   thinking he's BFF with you, correct?

15            MR. BELL:  Objection.

16            MR. SHECHTMAN:  We have --

17            THE COURT:  Overruled, overruled.

18   BY MR. SHECHTMAN:

19   Q.  So he said don't thinking BFF with you and he said no, that

20   is you?

21   A.  We are not talking about each other.  I remember the

22   context of the email.

23   Q.  You know that is you, meaning that you are his BFF?

24   A.  No, not me and him.  You are missing --

25            (Multiple voices).

HB1JSEA5                     Rechnitz - cross

1   Q.  You also said to him, "and you know I love you like a

2   brother"?

3   A.  Okay, yes.

4   Q.  Look at the next one, which is BB, and you also said, "We

5   feel close like family with you and Arienne."  That was his

6   wife?

7   A.  Yes.

8   Q.  Look at the next one, which is CC.  You wrote him, "Thank

9   you, Moshe" -- Moshe was his Hebrew name?

10  A.  Yes.

11  Q.  "That is very nice for you to write that.  I don't get

12  close to many people and even though we only really met this

13  past year, I know we will have a close friendship."

14          You wrote that to him?

15  A.  Yes.

16  Q.  And he wrote back, "and likewise, I really mean it, I

17  consider you a close friend I can trust and I have few of

18  those"?

19  A.  Yes.

20  Q.  You wrote him in March 2014 and you said, "When I'm out of

21  town, who do I miss" -- question mark -- "Rachel and you."

22  A.  Yes.

23  Q.  So I take it what that meant is when you were out of town,

24  the two people that you miss were your wife and him?

25  A.  No, that is what I wrote to him.

1    Q.  But you didn't mean it?

2    A.  No.

3    Q.  You just wrote it to him?

4           THE COURT:  Do you want an answer to that question,

5    counsel?

6           MR. SHECHTMAN:  I will withdraw it.  Okay.

7    BY MR. SHECHTMAN:

8    Q.  So this wasn't somebody that you, when you were out of

9    town, you cared about him and your wife, you just said that to

10   him?

11   A.  Correct.

12   Q.  Now, what I want to do, and this is a bit complicated, but

13   I want to take a case study -- I think that is your word,

14   right?

15   A.  Yes.

16   Q.  So I am going to ask you to look at FF and GG and just take

17   a minute and study those, a case study.

18           THE COURT:  Counsel, do you want to take a quick

19   break?

20           MR. SHECHTMAN:  It might be good.  If there is trouble

21   here, the tapes may help him, too.  We may do that in the

22   jury's absence.  A 10-minute break?

23           THE COURT:  Let's take a 10 minute bathroom break.

24   Don't discuss this case or do anything research related to the

25   people in this case.  See you in 10 minutes.

1          (Jury excused)

2          THE COURT:  Please be seated.

3          Counsel, maybe it makes sense to excuse the witness

4    and allow the witness to take the binder with him.  Does that

5    make sense?

6          MR. SHECHTMAN:  Does he take counsel with him when he

7    is reviewing the binder?

8          THE COURT:  Have a seat.  I would think not, no.

9          MR. SHECHTMAN:  That is fine.

10         THE COURT:  Counsel does not go with him while he

11   reviews the binder.

12         MR. BELL:  No objection.  That makes sense.

13         THE WITNESS:  I would like to review it afterwards

14   with my counsel.

15         MR. SHECHTMAN:  I ask he take those two with him, FF

16   and GG, not the whole binder.

17         THE COURT:  The witness made a request he wants to

18   review it with his counsel.

19         THE WITNESS:  That is not what I said.

20         I like to speak with my counsel and review this when I

21   come back.

22         MR. SHECHTMAN:  I object.  This is in the middle of

23   cross-examination and that he can't do, Judge.

24         MR. BELL:  Mr. Rechnitz has been right in the middle

25   of cross-examination for a couple of days, but I am fine with

1    Mr. Rechnitz -- (Inaudible).

2              THE COURT:  Is Mr. Rechnitz's counsel here?

3              MR. LEVINE:  Yes.

4              THE COURT:  Is there anything you want to say on this?

5    I am inclined to not allow you to speak.

6              MR. LEVINE:  I wouldn't talk to my client if there is

7    a pending question, your Honor, but I don't think it is

8    particularly fair to put my client in the position where he has

9    given him the documents, then called for a break so he can make

10   the application a little different than it was made the other

11   day when it was denied.

12             THE COURT:  Stop, stop.

13             THE WITNESS:  I deserve a break.

14             THE COURT:  Mr. Shechtman, just stop.  Let's do this.

15   Let's ask the witness to step out while we have this colloquy

16   and we can leave this binder here.  Step out there.

17             (The witness left the courtroom)

18             THE COURT:  So counsel for Mr. Rechnitz, that

19   application is denied.  You cannot speak to this witness for

20   this brief break.  It does seem to me that this is now

21   encroaching upon the manner of cross-examination.  What we can

22   do, we can leave the binder here and we'll take this break, and

23   when we come back, the witness can look at the binder and then

24   counsel may ask the question.

25             MR. SHECHTMAN:  If he wants to look at just those two

1    pages back there, that is fine.

2              THE COURT:  He doesn't want to.  He indicates he

3    doesn't want to look at the binder if he can't talk to his

4    counsel before doing that.

5              MR. SHECHTMAN:  Understood.

6              THE COURT:  For this brief period of time, I will use

7    my discretion and not allow Mr. Rechnitz's counsel to talk to

8    him during this very brief break.  We'll come back.  Counsel,

9    you mentioned something, whatever technical things you need to

10   do, do them.

11             MR. BELL:  Can I raise something, your Honor?

12             THE COURT:  Sure.

13             MR. BELL:  It is our observation right now that at

14   least a couple of the jurors, the way things are situated right

15   now, can and we believe sometimes do see materials on that

16   screen in particular.  We have tried to solve this problem over

17   the last few days by turning this thing 45 degrees.

18             MR. SHECHTMAN:  We'll do the same thing.

19             THE COURT:  They just turned it.

20             MR. LEVINE:  May I tell my client that I am not going

21   to speak to him?

22             THE COURT:  No.

23             MR. SHECHTMAN:  It seems to me your Deputy can do

24   that.

25             THE COURT:  That is right.  My law clerk can inform

1   the witness his counsel is not going to be talking to him.  I

2   don't know if it is necessary to do that.

3              MR. LEVINE:  I would appreciate for him to know that.

4              THE COURT:  I will ask my law clerk to let the witness

5   know that his lawyer is not going to be talking to him during

6   the break.  Before we come back, I plan to give the jury the

7   usual instructions.

8              Anyone have any objection to that?

9              MR. BELL:  No, your Honor.  It occurs to me it might

10  be helpful to get an update from Mr. Shechtman as to whether he

11  expects to address topics, subjects pending your Honor's

12  ruling.  My assumption is no.

13             THE COURT:  My assumption is no as well.  I will give

14  the jury the usual instructions at the end of any day unless

15  counsel wants something different.  The other matters which

16  there is pending motions don't need to be addressed now.

17             MR. SHECHTMAN:  Actually, I am moving pretty quick.

18  My guess is -- what time is it?

19             MR. BELL:  1:30.

20             THE COURT:  1:25.

21             MR. SHECHTMAN:  I may get done, if you want to rule on

22  the last one?

23             THE COURT:  We can wait.  If the jury leaves a little

24  early today, they will not be upset.  To flush this out

25  further, tell the jury to get here at 9:30 in the morning

1    tomorrow.  Sound good?

2              MR. BELL:  Sure.

3              THE COURT:  All right.

4              (Recess)

5              THE COURT:  Okay, let's get counsel and the parties

6    back in.  Counsel, Mr. Shechtman, can you give me a sense of

7    what time you think we're going to break for the day before you

8    get to this other stuff?  How much longer you have on the other

9    matters?

10             MR. SHECHTMAN:  Judge, this piece is complicated and I

11   don't know how -- (inaudible) -- it could be 20 minutes and I

12   think I have probably about maybe 45 minutes more today.

13             (Inaudible)  Then I am just about done.  It is

14   possible that I get through everything but that issue, and I

15   conclude today subject to tomorrow, but I think I am going to

16   fall short.

17             THE COURT:  Does it make sense to bring the witness

18   back out now with the witness starting to look at this binder

19   again?

20             MR. BELL:  Assuming for the moment it doesn't sound

21   like I am redirecting under any circumstances.

22             THE COURT:  No.

23             MR. BELL:  Is that the right understanding?

24             THE COURT:  That's correct.

25             MR. BELL:  Thank you.

HB1JSEA5                    Rechnitz - cross

1        THE COURT:  We'll bring the witness out.  Is the jury

2    read here?

3        THE CLERK:  Yes.

4        MR. SHECHTMAN:  One second.  This will go much quicker

5    if he gets to review these and just two pages of the

6    transcript, and if he has trouble, it will go even quicker if

7    he listens to the tape.  We have the tape set up with

8    earphones.  Can we bring him out and have him just refresh

9    himself first and then so he doesn't sit there doing it while

10   the jury is waiting?  I think if we give him five minutes, he

11   will have a chance.

12       THE COURT:  With the government?

13       MR. BELL:  At this point, sure, your Honor.

14       THE COURT:  Let's bring the witness out -- and hold up

15   on the jury for a moment.  What is it?

16       MR. SHECHTMAN:  I want him to look at FF and GG.

17       THE COURT:  We'll have just have him look at that.  If

18   there is another issue, we will have to do the rest of that in

19   front of the jury.

20       MR. SHECHTMAN:  We have the earphones for him.

21       THE COURT:  Let's bring the witness out.

22       (Pause)

23       THE WITNESS:  May I look at this now?

24       THE COURT:  The witness, you can have a seat and look

25   at -- what are the documents, counsel?

HB1JSEA5                    Rechnitz - cross

1              MR. SHECHTMAN:  FF and GG.

2              THE COURT:  You can look at FF and GG, and we'll bring

3    the jury out.

4              (Pause)

5              THE WITNESS:  Okay.

6              MR. SHECHTMAN:  Judge, I think it would be helpful to

7    ask the witness whether that refreshes his recollection or

8    whether he would like to hear the tapes themselves.

9              THE WITNESS:  This is fine.

10             THE COURT:  Let's bring the jury in.

11             (Jury present)

12             THE COURT:  Please be seated.  Let's continue.  Go

13   ahead, counsel.

14             MR. SHECHTMAN:  Judge, I think both sides agree that

15   we should tell the jury that during the recess, Mr. Rechnitz

16   had a chance to review what is FF and GG in evidence.

17             MR. BELL:  That's right, your Honor.

18             THE COURT:  So stipulated.

19   BY MR. SHECHTMAN:

20   Q.  Now, what you reviewed, Mr. Rechnitz, is a Nissen ticket,

21   right?

22   A.  Yes.

23   Q.  It is one for the Super Bowl in 2015?

24   A.  Yes.

25   Q.  Let me see if I understand how this was supposed to work.

1    Mr. Nissen needed $1.25 million to invest in tickets?

2    A.   What is the letter in here again?

3    Q.   FF and GG, at the very bottom of that?

4    A.   He said he needed about 1.25 million for the Super Bowl.

5    Q.   The way you structured this, he was going to send you an

6    email, correct?

7    A.   Yes.

8    Q.   And, indeed, you were dictating the terms of that email to

9    him?

10   A.   Correct.

11   Q.   And what you did was to say that this was a $3.9 million

12   deal, not a $1.25 million deal?

13   A.   Correct.

14   Q.   And then what was going to happen was of the 3.9, you were

15   going to say that a hundred thousand dollars of that was taken

16   by your father-in-law?

17   A.   Correct.

18   Q.   The way this was going to work is he -- let me keep

19   going -- so now we are at 3.8 million?

20   A.   Correct.

21   Q.   That is 3.9 minus a hundred thousand?

22   A.   Yes.

23   Q.   Now, of the 3.8, what you were going to tell Mr. Weinberger

24   was that you were going to split it 1.9/1.9?

25   A.   Correct.

HB1JSEA5                    Rechnitz - cross

1   Q.  So Mr. Weinberger was going to invest 1.9 million in this?

2   A.  Correct.

3   Q.  You only needed 1.25 for the tickets?

4   A.  That's correct.

5   Q.  So of the remainder you were going to take somewhere

6   around -- help me with my math here -- 1.9, you only need 1.25,

7   I think you said that leaves $650,000?

8   A.  Correct.

9   Q.  Of that 650, you were going to take a little more than

10  400,000?

11  A.  For money I was owed from the past from him, yes.

12  Q.  You were going to take a little more than 400, some was

13  what you were owed in the past and some was a new thing?

14  A.  Correct.

15  Q.  He was going to get about $250,000?

16  A.  Correct.

17          MR. SHECHTMAN:  So let's put up a demonstrative here

18  that is II, so that the jury can see this deal.  I ask

19  permission for the jury to be able to see so they can see this

20  case study.

21          THE COURT:  Any objection?

22          MR. BELL:  No, your Honor.

23          THE COURT:  Okay.  Go ahead.

24  BY MR. SHECHTMAN:

25  Q.  So what was announced to Mr. Weinberger was that this was a

1    $3.9 million deal?

2    A.  Sorry.  This is Peralta on the bottom.

3    Q.  You are totally correct.

4         THE COURT:  Do the jurors have it now?

5         MR. SHECHTMAN:  So can I, where it says Peralta, would

6    you -- thank you very much -- substitute in Nissen.  We

7    wouldn't do it now.

8    Q.  We'll do it when we break, if that is okay?

9    A.  Yes, that is fine.

10   Q.  This was a $3.9 million deal as it was proposed to Mr.

11   Weinberger?

12   A.  Correct.

13   Q.  Then the way you set this up was you were going to send an

14   email, have Mr. Nissen send an email to you and Mr. Weinberger

15   that said that, and you were going to respond no, no, a hundred

16   thousand dollars from my father-in-law?

17   A.  Correct.

18   Q.  Then that left 3.8?

19   A.  Correct.

20   Q.  And of the 3.8, Weinberger was supposed to put in half?

21   A.  Correct.

22   Q.  Which is a $1.9 million investment, and you told him you

23   would put in half?

24   A.  That's correct.

25   Q.  And then Mr. Weinberger's 1.9, right, 1.25 would go to

1    Nissen for the Super Bowl tickets?

2    A.   Correct.

3    Q.   And that would leave 650?

4    A.   It would all go to Nissen.

5    Q.   It would all go to Nissen, but 1.25 would go for the

6    tickets?

7    A.   He said approximately 1.25.

8    Q.   He said approximately 125?

9    A.   Correct.

10   Q.   That leaves approximately 650,000?

11   A.   Extra money, right.

12   Q.   You would get 300,000, which was to pay off old

13   indebtedness?

14   A.   Yes.

15   Q.   The money that Nissen owed you?  You would get 125,000

16   more?

17   A.   No.  I think he gave me 5 percent on this deal.

18   Q.   Let's take a look.  If you look at -- my apology --

19   A.   I think it is 95,000.

20   Q.   -- look at what is FF, and so it says at 60, you owe me

21   three something after deducting, plus this deal, so you'll

22   probably end up with 250.  That must be 95 or 105?

23   A.   Correct, 95.

24   Q.   So now one more time, with apologies so the jury follows it

25   because I wasn't at my best, you are telling Mr. Weinberger

1    this is a $3.9 million deal?

2    A.   Correct.

3    Q.   You're telling him your father-in-law is putting in a

4    hundred thousand?

5    A.   Correct.

6    Q.   Not true?

7    A.   Correct.

8    Q.   You're telling him that his share is 1.9?

9    A.   Correct.

10   Q.   And your share is 1.9?

11   A.   Correct.

12   Q.   In fact, the 1.9 that goes to Mr. Nissen is going to pay

13   roughly 1.2 for the tickets, 1.25?

14   A.   Correct.

15   Q.   And the rest would be divided between the two of you?

16   A.   Correct.

17   Q.   Now let's see if we can do the following with this case

18   history.  This is the person that you told other than your wife

19   was the person when you left town, you thought about the most?

20   A.   Weinberger, yes.

21   Q.   And this is the person who said how much you mattered to

22   him and how much he trusted you?

23   A.   Yes.

24   Q.   And so the first line here was this was a $3.9 million

25   investment?

1  A.  Correct.

2  Q.  The second line was nothing was going to -- (inaudible)?

3  A.  Correct.

4  Q.  The third line was that you weren't taking half?

5  A.  Correct.

6  Q.  And the fourth line, the contract you gave him, all the

7  money was going for tickets?

8  A.  I am not sure about that specific wording, but that is what

9  his investment was, 1.9, and that was what he was to get back.

10  Q.  That is what he thought was all going for tickets?

11  A.  Yes.

12  Q.  In fact, some of it was going to you?

13  A.  Correct.

14  Q.  Which you didn't tell him you were getting a commission?

15  A.  Correct.

16  Q.  And some of it was going to Mr. Nissen?

17  A.  Mr. Nissen, yes.

18  Q.  So we have got many lies in there?

19  A.  That's true.

20  Q.  And these are lies to get someone who thought he was among

21  your closest friends to make this investment?

22  A.  Correct.

23  Q.  And so you would agree with me that this is a fraud?

24  A.  I don't know if it is considered fraud, but it is

25  dishonest.

1   Q.  Let me see if we can break it down.

2           You told him things to get him to invest that were

3   completely untrue?

4   A.  True, correct, partially untrue, correct.

5   Q.  Don't you want to do "completely" with me?  Don't you want

6   to go through those lines again?

7           MR. BELL:  Objection.

8   A.  We can do it as many times as you like.

9           THE COURT:  Sustained.

10  BY MR. SHECHTMAN:

11  Q.  There are a lot of lies in here, right?

12  A.  Yes.

13  Q.  All of them to induce him to invest in a deal?

14  A.  Yes.

15  Q.  And you would agree with me you defrauded your best friend?

16  A.  Again I don't know if it is fraud, but I lied to him.

17  Q.  What is fraud?

18          MR. BELL:  Objection.

19          THE COURT:  I will allow it.

20  A.  I am not sure what the legal ramifications are for fraud.

21  I lied to him and I misled him.  I am not sure if it falls

22  under fraud.

23  Q.  How old are you today?

24  A.  34.

25  Q.  At age 34, you don't know that if you lie repeatedly to

1  somebody who trusts in order to get them to invest, that is not

2  fraud?

3           MR. BELL:  Objection.

4           THE COURT:  I will allow it.

5  A.  No.  I think stealing from somebody is fraud.

6  Q.  This was stealing from him, right?  You took his money by

7  lying to him?

8  A.  No.  I lied.

9  Q.  Several times?

10  A.  Many times.  I lied to him many times.

11  Q.  I didn't hear you.

12  A.  Many times.

13  Q.  And this is a case study?

14  A.  Yes, I lied to him many, many times.

15  Q.  But you are not sure whether you defrauded him?

16  A.  That's correct.

17  Q.  You did the similar thing to Mr. Weinberger in the Peralta

18  liquor business?

19  A.  Yes.

20  Q.  You told him you were investing beside him half and half

21  when you weren't?

22  A.  That's correct.

23  Q.  I don't want to say your best friend because I know he

24  thought that, but you didn't, you were just lying to him?

25           MR. BELL:  Objection.

1          THE COURT:  Sustained.

2     BY MR. SHECHTMAN:

3     Q.  Mr. Weinberger lost about $2 million in the Peralta liquor

4     deal?

5     A.  It was $2.3 million.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. SCHECHTMAN:

2  Q.  He lost $2.3 million in the Peralta deals.  And he lost

3  about the same amount in the Nissen deals?

4  A.  I'm not sure what he lost in Nissen.

5  Q.  But he lost?

6  A.  I think so.

7  Q.  Millions?

8  A.  I'm not sure the number.

9  Q.  Now this is -- the Nissen deal or deals, and particularly

10  your transaction with Mr. Weinberger in which you lied to him

11  repeatedly to get him to invest, that's not something you had

12  to plead guilty to?

13  A.  Correct.

14  Q.  And indeed, that's not something that is covered by your

15  plea agreement?

16  A.  Correct.

17  Q.  So as you sit here today, do you think the government is

18  going to prosecute you for this?

19          MR. BELL:  Objection.

20          THE COURT:  Overruled, you may answer.

21  A.  I don't know what the government is going to do with me.

22  Q.  And Mr. Nissen was paying your American Express bills,

23  correct?

24  A.  Yes.

25  Q.  And the last payment which you got from him was in

1  December 2016?

2  A.  Yes.

3  Q.  And that was five months after you pled guilty and signed

4  that cooperation agreement?

5  A.  Correct.

6  Q.  Now we've spoken about this, or you have spoken about it

7  before, so I will be brief again.  Shortly after you met

8  Mr. Seabrook and you learned that his offices were at 75 Broad

9  Street, you sent him an email that said I own 23 Broad

10  Street -- 23 Wall Street/15 Broad, and I used to own 25 Broad.

11  Do you remember that email?

12  A.  Yes, I do.

13  Q.  And you said to him:  Small world.

14  A.  Yes.

15  Q.  And the notion was small world because you owned and used

16  to own buildings that were quite near to his?

17  A.  Correct.

18  Q.  And on direct examination you said well, that email was

19  false, and it is.

20  A.  I lied.

21  Q.  And what you said on direct examination is -- and this is

22  673 in the transcript -- the company I worked for owned it and

23  I managed it.  Do you remember that?

24  A.  Correct.

25  Q.  Now when you say the company you worked for, let's just be

1    clear, 23 Wall Street is a landmark building that used to be

2    the headquarters for JP Morgan?

3    A.   That's correct.

4    Q.   And 25 Broad Street is -- I think it's a 21, 20 story

5    building which is now almost 400 luxury apartments?

6    A.   That is correct.

7    Q.   And both landmarked?

8    A.   That is correct.

9    Q.   So that owning these buildings was to be a very wealthy

10   man?

11   A.   Yes.

12   Q.   Now what you said on direct was the company I work for

13   owned and I managed it, right?

14   A.   Yes.

15   Q.   Now I take it that the following is true, the company you

16   worked for you were talking about was Africa Israel?

17   A.   Correct.

18   Q.   And they sold it in 2007?

19   A.   Correct.

20   Q.   So when you said on direct the company I work for owned it,

21   what you meant was the company I work for owned it seven years

22   earlier than this email?

23   A.   Correct.

24   Q.   And when you said I managed it on direct, the company I

25   work for owned it and I managed it, even that was false because

1  your management agreement was terminated right about this time.

2  A.  It wasn't false.  The company I used to work for owned the

3  building and I managed it.

4  Q.  I know.  But you didn't say it was false because the

5  company I worked for owned it until 2007, and I managed it

6  until the week before this when my management agreement was

7  terminated.

8          MR. BELL:  Objection.

9          THE COURT:  Overruled.

10  A.  I don't follow.

11  Q.  When you said the company I worked for owned it, what you

12  meant to say was the company I worked for owned it until 2007.

13          MR. BELL:  Objection.

14          THE COURT:  I'll allow it.

15  A.  I meant what I said.  The company I used to work for owned

16  it and I managed it.

17  Q.  So now we'll do my question.  What you meant was the

18  company I worked for until 2007 owned it.

19  A.  No, I meant what I said.

20  Q.  Well, am I right that the company you worked for sold it in

21  2007?

22  A.  That's correct.

23  Q.  And am I right that your management contract was terminated

24  a week before this?

25  A.  A week before what?

1   Q.  A week before this email.

2   A.  I don't know when it was terminated.

3   Q.  Let's take a look.

4   A.  To save time, let's assume you're correct.

5   Q.  I don't like assumptions.  I don't like assumptions any

6   more than possibilities.

7           Let's look --

8           MR. BELL:  Objection.

9   Q.  Do you want to agree when he was terminated?

10          MR. BELL:  Objection.

11          THE COURT:  Hold on.

12  A.  I'll look.

13  Q.  This is tab --

14          THE COURT:  The objection is overruled, go ahead.

15  Q.  Tab NSMM.

16  A.  NN?

17  Q.  MM.

18          MR. BELL:  Your Honor, is the jury looking at this?

19          THE COURT:  No, they're not.

20          MR. BELL:  Just making sure.

21          THE COURT:  Okay.

22  BY MR. SCHECHTMAN:

23  Q.  So your management agreement was terminated --

24  A.  On October 3rd.

25  Q.  And the email that we're talking about was written on

1    October 18?

2    A.   Okay.

3    Q.   And so when you said that the company I worked for owned it

4    and I managed it, precision would have been to say the company

5    I worked for owned it until 2007 and I managed it until two

6    weeks before I wrote this email.

7    A.   That statement would be correct.

8              MR. SCHECHTMAN:  Good.  Okay.  Now your Honor, I'm not

9    sure it's in evidence, but the only one I want to put in

10   evidence is NSLL, which is the first email that --

11             THE COURT:  Hold on, let the government look at it.

12             MR. SCHECHTMAN:  Which is the first email that

13   Mr. Rechnitz wrote.

14             MR. BELL:  I think it's already in in some form.

15             THE COURT:  If it's not in, there's no objection, so

16   it's in.  If it wasn't in, it's in now.

17             (Defendant's Exhibit NSLL received in evidence)

18   Q.   Okay.  Now I take it, again to state the obvious, the

19   reason you wrote this email was to impress Mr. Seabrook.

20   A.   That is correct.

21   Q.   So he would think you were a multi multimillionaire?

22   A.   For many reasons.

23             THE COURT:  Do you want the jury to see this, counsel?

24             MR. SCHECHTMAN:  Yeah.

25             THE COURT:  Does the jury have it now?

1           Okay, go ahead, counsel.

2   Q.  Let me back up.  One of the reasons you wrote this was to

3   impress Mr. Seabrook so he would think you were a multi

4   multimillionaire?

5   A.  It was just to impress him.

6   Q.  Well, you didn't think that when he saw that you owned 23

7   Wall Street, a landmark building, and 15 Broad, and you used to

8   own 25 Broad, the purpose wasn't for him to think that you were

9   very, very rich?

10  A.  That is one of the explanations, sure.

11  Q.  Let's go back to the question I asked before, which is one

12  of reasons you did this was so Mr. Seabrook would think that

13  you were very rich.

14  A.  Yes.

15  Q.  And the same was true with the yacht ride that you gave

16  him?

17  A.  Correct.

18  Q.  And what you did there was to say:  I own this yacht.

19  A.  Correct.

20  Q.  And then what you did was to call the yacht company that

21  you rented it from and direct them to remove all signs of the

22  true owner so Mr. Seabrook would think it was your yacht?

23  A.  That's correct.

24  Q.  And all of that -- one of the reasons was so that he would

25  think you were very, very rich?

1    A.  Yes.

2    Q.  Now you said that you had dealings with the mayor, and as

3    part of those dealings you were in contact with Ross Offinger

4    who was very close to the mayor.

5    A.  Yes.

6    Q.  And a call to Ross could get you in contact with the mayor.

7    A.  Yes.

8    Q.  And a call to Ross and a complaint to Ross could get you in

9    contact with people in city government.

10   A.  Yes.

11   Q.  And so one of the things you did was pay for a trip to the

12   Dominican Republic for Ross and his wife?

13   A.  I didn't pay for his trip, I paid for part of his hotel

14   stay.

15   Q.  Part or all of it, sir?

16   A.  He was in another hotel before, I think, I switched him

17   once he was there.

18   Q.  You switched him and then you paid for that hotel?

19   A.  Yes.

20   Q.  And I take it you told him you were the owner of hotel that

21   you switched him into.

22   A.  Yes, I did.

23   Q.  And you didn't own that hotel any more than you owned those

24   two buildings.

25   A.  No, I did not.

1   Q.  Now I'm going to ask about when this investigation started,

2   and I would be correct that you were first approached by people

3   who at least said they were working for IAB, the Internal

4   Affairs Bureau of the New York City Police Department.

5   A.  That's correct.

6   Q.  And we have established that you lied to those people.

7   A.  Yes.

8   Q.  Now you were quite concerned about that investigation.

9   A.  Yes.

10  Q.  I think at times you told people it was nightmarish or

11  something.

12  A.  Yes.

13  Q.  And you spoke to your father often?

14  A.  Yes.

15  Q.  And he was your adviser?

16  A.  Yeah, one of them.

17  Q.  And there came a time in the course of that investigation

18  in about May that those investigators or investigators wanted

19  to talk to Mr. Nissen.

20  A.  Different investigators approached his office.

21  Q.  But investigators approached Mr. Nissen?

22  A.  Correct.

23  Q.  And that also concerned you?

24  A.  Yes.

25  Q.  Because it looked like this investigation that started out

1   focusing on Peralta, the liquor guy and the cops, was now

2   moving to the ticket guy, Mr. Nissen?

3   A.   That wasn't my concern.

4   Q.   Pardon?

5   A.   That was not what my concern was.

6   Q.   Well, you were concerned they were approaching Mr. Nissen?

7   A.   Yes, but for a different reason.

8   Q.   Okay.  And so you wanted to meet with Mr. Nissen and talk

9   to him before he talked to the government?

10  A.   Correct.

11  Q.   And indeed, on May 5th, 2014, your father flew in and you

12  met, you, your father and Mr. Nissen met before Mr. Nissen was

13  to talk to the government.

14  A.   I'm not sure what date, but I remember meeting the three of

15  us.

16          MR. SCHECHTMAN:  You want to put up OO?

17  Q.   And I think that would give you the date that would be

18  helpful here.  I think it's up in the left-hand corner.

19  A.   Okay, yes.

20  Q.   And the three of you met on the West Side?

21  A.   Yes.

22  Q.   And then you had a conversation after that where you told

23  Mr. Nissen -- and this is OO -- you met with me but not with my

24  dad.

25  A.   Correct.

1    Q.  So that was telling Mr. Nissen that if anybody asked who

2    you met with, keep your dad out of it?

3    A.  Correct.

4    Q.  And have you been prosecuted for that crime of instructing

5    Mr. Nissen to lie to investigators?

6    A.  No.

7    Q.  But you did instruct Mr. Nissen to lie to investigators?

8    A.  I did.

9    Q.  Now I think it was brought out on cross-examination that --

10   and maybe on direct that you lied to your father-in-law.

11   A.  Yes.

12   Q.  One of the lies you told to your father-in-law was right

13   around the same period that you told him he had nothing to

14   worry about, that he would get his money back from Nissen?

15   A.  Right.

16   Q.  And you knew that to be a lie?

17   A.  At which point?

18   Q.  Well, when you spoke to your father-in-law.

19   A.  At what date?  What point in all of this?

20   Q.  Let's see if we can help you.  You spoke to your

21   father-in-law on April 30, 2015.

22   A.  Okay.

23   Q.  And you told him not to worry because Peralta had assets.

24   A.  Yes.

25   Q.  And that was a lie?

1    A.  No.

2    Q.  Well, about two months before that you had spoken to Ben

3    Brafman, who was representing Mr. Peralta.  Do you remember

4    that?

5    A.  That's correct.

6    Q.  And he said this to you, do you remember this:  He's not

7    going to pay his taxes.  He doesn't have any money.  I think

8    it's a pipe dream if you think you're going to be able to pay.

9    The only way he's going to be able to pay anybody is if he

10   starts stealing from somebody.

11        Is that what Mr. Brafman told you about Mr. Peralta?

12   A.  Yes.

13   Q.  And that was two months before you told your father that he

14   had assets and he could pay?

15   A.  Yes.

16   Q.  As we sit here today, Mr. Peralta owes people millions of

17   dollars?

18   A.  That is correct.

19   Q.  Now some small topics.  Mr. Seabrook told you that he was

20   interested in running for mayor of New York.

21   A.  Yes.

22   Q.  And you had a very close relationship with Mr. Seabrook and

23   Mr. Banks, the senior police officer, all through 2014?

24   A.  Correct.

25   Q.  And then in January 2015 you shut them both down?

1   A.  Correct.

2   Q.  Now Mr. Seabrook -- let me start first:  You like a good

3   cigar?

4   A.  Yes.

5   Q.  And we can agree that's not a crime.

6   A.  Okay.

7   Q.  Just checking.

8            Mr. Seabrook liked a good cigar.

9   A.  Yes.

10  Q.  He came to your office to smoke cigars?

11  A.  Correct.

12  Q.  And you had some very fine Cuban cigars there?

13  A.  Yes.

14  Q.  On one occasion I think you gave him some in a bag?

15  A.  On many occasions.

16  Q.  Many occasions.  And he enjoyed your cigars because he

17  enjoyed a good cigar?

18  A.  Yes.

19  Q.  I want to talk to you briefly about your schedule in

20  December of 2014.

21  A.  Okay.

22  Q.  And it's a while back, so I may have to refresh your

23  recollection some, but let's start.  December 11, 2014 is the

24  night that you told us about, correct?

25  A.  Yes.

HB1TSEA6                      Rechnitz - cross

1    Q.  And that was Thursday night?

2    A.  I don't know what night of the week it was.

3            MR. SCHECHTMAN:  Well, Judge, if we could put up on

4    the screen a calendar, and I think the calendar is VV, I think

5    this is actually something the Court can take judicial notice

6    of December 11 was a Thursday.

7            MR. BELL:  We'll stipulate to it, your Honor.

8            THE COURT:  There's a stipulation.

9    A.  Yes, this was a Thursday night.

10   Q.  And the 12th was the Shabbat?

11   A.  Yes.

12   Q.  And the 13th, the day was Shabbat, it was Saturday?

13   A.  Correct.

14   Q.  And you, like -- I don't know if you were like

15   Mr. Huberfeld like this, but you weren't 24/6, you didn't work

16   on the Shabbat?

17   A.  That's correct.

18   Q.  Sunday night you flew with a person who thought he was your

19   close friend, Mr. Weinberger, to Israel?

20   A.  Yes.

21   Q.  And you stayed there a couple of nights and actually went

22   to a wedding?

23   A.  Okay.

24   Q.  And you were there on the first night of Hanukkah?

25   A.  Okay.

1    Q.  And then just so we're clear, the okays mean yes, that's

2    true?

3    A.  Yes.

4    Q.  And then you flew back with Mr. Weinberger on the 17th?

5    A.  I don't remember which date, but we flew back a few days

6    later.

7    Q.  Do you want to look at something to refresh your

8    recollection?

9    A.  That's fine.

10   Q.  And then there, on the 18th, I think, you went with

11   Mr. Weinberger to see a resort?

12   A.  Yes.

13   Q.  And you were there for the weekend?

14   A.  With our families, yes.

15   Q.  In Utah?

16   A.  Yes.

17   Q.  With the two families through the weekend?

18   A.  Correct.

19   Q.  So that was your schedule from the 11th to the 21st?

20   A.  Yes.

21   Q.  And I think we can take judicial notice that the 16th was

22   the first night of Hanukkah.

23   A.  Yes.

24           MR. BELL:  We'll stipulate for sure.

25           THE COURT:  There's a stipulation.

1  Q.  Now Mr. Rechnitz, have you heard the expression "Desperate

2  people do desperate things?"

3  A.  Yes.

4  Q.  And indeed, you used that expression yourself?

5  A.  Yes.

6  Q.  More than one occasion?

7  A.  Yeah.

8      MR. SCHECHTMAN:  Judge, subject to the one issue that

9  needs to be resolved, I can happily ask you to send the jury

10  home tonight.

11      THE COURT:  Let's do this, we'll break for the day.

12  Again I'll tell you, as always, don't read anything about this

13  case.  If you see anything about this case in the newspaper or

14  on the internet, stop reading.  Don't listen to anything about

15  this case.  If you hear anything on television or the radio or

16  the internet, stop listening.  Don't do any independent

17  research regarding any of the people or the issues in this

18  case.  Don't discuss this case with anyone.  Don't let anyone

19  discuss this case with you.  Make sure that you remove any

20  personal items from the jury room.  Tomorrow our schedule will

21  be slightly different.  I want you to get here at 9:30

22  tomorrow, but get here promptly at 9:30 and we will continue

23  with the trial.

24      Have a great evening.

25      (Jury not present)

1          THE COURT:  I'll ask everyone to give the jury a

2    three-minute head start.  Any reason the witness can't be

3    excused?

4          MR. BELL:  No, your Honor.

5          THE COURT:  The witness is excused.

6          So while we're here, we have those other issues.  I

7    will be able to decide those in the morning.  I haven't had a

8    chance to look at the cases cited by counsel, and I'll have a

9    decision on that in the morning.  I may a few questions for

10   counsel about this in the morning, but is there anything else

11   that we need to deal with tonight?

12         MR. SCHECHTMAN:  No, Judge.  We are going to meet with

13   the government we hope on Thursday afternoon to talk about jury

14   instructions.  We have one additional jury instruction that

15   we'll get you, but I think otherwise, nothing more tonight.  We

16   know who the next witnesses are.  I don't know how long the

17   redirect will be, but we're ready for the next witnesses.

18         THE COURT:  Okay.  And does counsel have a sense as to

19   how lengthy the cross-examination is expected to be tomorrow?

20   Obviously some of this depends on a ruling, but --

21         MR. SCHECHTMAN:  There's a witness that is going to

22   say that Mr. Rechnitz bought a Ferragamo bag, and Ms. Lynaugh

23   tells me her cross-examination will not be lengthy.  So I don't

24   think our cross will be lengthy of any witnesses tomorrow.

25         MR. BELL:  I suspect your Honor was asking about --

1          THE COURT:  I'm asking about Rechnitz.

2          MR. SCHECHTMAN:  I could be done except for the one

3  issue that I hope I can cross on, and I may have five minutes

4  of something else just because it's hard to have a closing, but

5  I think I'm largely done.

6          THE COURT:  Okay.  And who is up next after this?

7  Well, I guess before we get that, do you have a sense to how

8  long or short your redirect will be of this witness?

9          MR. BELL:  Not precisely at this point, your Honor,

10  but we're definitely going to be calling other witnesses

11  tomorrow unless the recross is incredibly long, which I don't

12  expect.  I will -- assuming that Mr. Schechtman is through with

13  Mr. Rechnitz within the first ten minutes or so, I tend to

14  think that we'll be done with the redirect; if not before the

15  morning break, shortly after.

16          THE COURT:  Okay.

17          MR. SCHECHTMAN:  Judge, it isn't my place to instruct,

18  but I was told when I was his age if your witness did well, you

19  should have a short redirect.

20          MR. BELL:  Your Honor, this cross was days long.  That

21  is a short redirect.

22          THE COURT:  Anything else that we need to deal with?

23          MR. SCHECHTMAN:  Nothing, Judge.

24          THE COURT:  Let's get counsel here at 9:00, the jury

25  will be here at 9:30, and I may have a couple of questions for

1    counsel.  Thank you.

2            MR. BELL:  Thank you.

3            (Adjourned to November 2, 2017 at 9:00 a.m.)

4

5                      INDEX OF EXAMINATION

6    Examination of:                        Page

7    JONA RECHNITZ

8    Cross By Mr. Mazurek . . . . . . . . . . . . .1199

9    Cross By Mr. Schechtman  . . . . . . . . . .1292

10

11                     DEFENDANT EXHIBITS

12   Exhibit No.                           Received

13    MH-362   . . . . . . . . . . . . . . . . .1268

14    NSLL   . . . . . . . . . . . . . . . . . .1365

15

16

17

18

19

20

21

22

23

24

25