UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - x
                           :

UNITED STATES OF AMERICA,  :

                           :

          - v. -        :

                           :         16 Cr. 467 (AKH)

NORMAN SEABROOK AND  :
MURRAY HUBERFELD,        :

                           :

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - x

# NEW YORK CITY CORRECTION OFFICERS' BENEVOLENT ASSOCIATION, INC.'S MEMORANDUM OF LAW IN SUPPORT OF RESTITUTION

David M. Zornow
Andrew M. Good
Eli S. Rubin
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000

*Attorneys for New York City Correction*
*Officers' Benevolent Association, Inc.*

## PRELIMINARY STATEMENT

The New York City Correction Officers' Benevolent Association, Inc. ("COBA" or the "Union") through its counsel submits this memorandum of law to address two questions:

(1)     Under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, ("MVRA"), is COBA a victim of the offense to which Murray Huberfeld pleaded guilty?

(2)     If COBA is a victim of Huberfeld's offense under the MVRA, what is the appropriate amount of restitution?

We submit that COBA is a victim under the MVRA and entitled to restitution from Mr. Huberfeld for (i) the losses it sustained as a result of its investment in Platinum Partners, L.P. ("Platinum") ($19 million) and (ii) the attorneys' and other fees it incurred as a result of the government's investigation and prosecution of the conspiracy to which Mr. Huberfeld pleaded guilty.

## FACTUAL BACKGROUND

In 2014, Murray Huberfeld, a principal of Platinum, was intent on finding new investors in his hedge fund to meet mounting redemption pressure.  Complaint ¶ 22(a), *United States v. Seabrook*, No. 16-CR-467 (AKH) (S.D.N.Y. filed June 7, 2016), ECF No. 1 ("Complaint").  He therefore conspired with Jona Rechnitz, an associate of his, and Norman Seabrook, the then President of COBA, to bribe Seabrook with a portion of the management fees that Platinum would earn if Seabrook steered COBA funds to Platinum.  Seabrook, Rechnitz and Huberfeld hid this corrupt arrangement from COBA, and COBA was induced to invest a total of $20 million with Platinum over the course of 2014.[1]  In December 2014, Rechnitz paid Seabrook $60,000 in accordance with their agreement, and Huberfeld and Rechnitz submitted a false

---

[1]     COBA made three separate investments into Platinum: two, totaling $15 million, came from the Union's Annuity Fund; one, for $5 million, came from the Union's operating fund.  Complaint ¶ 13(b) – (f).

invoice for New York Knicks tickets to Platinum in order to reimburse Rechnitz. Huberfeld had accomplished his objective: by paying Seabrook, Platinum added $20 million of the Union's hard-earned retirement and operating money to a high-risk venture heading towards collapse.

On May 25, 2018, Huberfeld pleaded guilty to a superseding information charging conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. *See* Superseding Information, *United States v. Huberfeld*, No. 16-CR-467 (AKH) (S.D.N.Y. filed May 25, 2018), ECF No. 201 ("Information"). The Information alleged that Huberfeld caused Platinum to pay Rechnitz $60,000 on the basis of a false invoice for Knicks tickets. The Information also made clear that the offense had the broader objective of victimizing COBA by fraudulently inducing the Union's investment in Platinum:

> [Huberfeld] and Jona Rechnitz, through the use of interstate wires, caused the management company of the Platinum . . . hedge fund . . ., with which [Huberfeld] was affiliated, to pay $60,000 to Rechnitz's company by falsely representing, including through the use of a fraudulent invoice, that the money was to purchase courtside New York Knicks tickets, when in truth and in fact, and as Huberfeld and Rechnitz knew, *the actual purpose of the payment was to reimburse Rechnitz for having paid Norman Seabrook, the President of the Correction Officers Benevolent Association ("COBA"), for Seabrook's efforts to get COBA to invest millions of dollars in Platinum.*

Information ¶ 2 (emphasis added).

In August 2016, following its failure to honor numerous redemption requests, Platinum was placed into liquidation, and COBA has lost $19 million of the $20 million it invested in Platinum. Huberfeld should be required to make restitution to COBA in the full amount of those losses. COBA also has spent significant amounts on attorneys' fees and other expenses on its behalf and on behalf of its current and former officers and board members in responding to the U.S. Attorney's investigation and prosecution of Huberfeld and Seabrook. These too are losses for which COBA is entitled to restitution under the MVRA.

**ARGUMENT**

**I.    COBA IS A "VICTIM" UNDER THE MVRA**

   The MVRA requires the Court to "order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). "Victim," in turn, is defined as "a person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). The statute specifies that "in the case of an offense that involves . . . [a] conspiracy . . . any person directly harmed by the defendant's criminal conduct in the course of the . . . conspiracy" is considered a "victim." *Id.*

   **A.    *The Second Circuit's Test to Determine Causality Supports COBA's Status As a Victim***

   The Second Circuit's test to determine when a fraud victim is "directly and proximately harmed" under the MVRA has expanded from a narrow inquiry focused on the elements of the offense, *see In re Local #46 Metallic Lathers Union & Reinforcing Iron Workers & Its Associated Benefit & Other Funds*, 568 F.3d 81, 86 (2d Cir. 2009), to an analysis of the object and impact of the underlying conduct, *see United States v. Paul*, 634 F.3d 668, 677 (2d Cir. 2011).

   In *Local #46,* the Second Circuit, on a writ of mandamus, held that the district court did not abuse its discretion in declining to order restitution where the conduct that caused the loss was not an element of the crime of conviction. 568 F.3d at 87. However, just two years later, the Second Circuit articulated an "expand[ed]" test in *Paul*. *United States v. Archer*, 671 F.3d 149, 170 (2d Cir. 2011). The defendant in *Paul* inflated the value of stock he held in nominee accounts and took out margin loans against the inflated value of the accounts. *Paul*, 634 F.3d at 670. After the inflated share price crashed, the lenders failed to recover on their loans. *Id.* The defendant pleaded guilty to securities fraud for inflating the share price. *Id.* at

671.  At sentencing, the government moved to have the defendant pay restitution to the lenders for the full value of the unpaid loans.  The district court granted the motion and the Second Circuit affirmed.  The Court of Appeals eschewed a strict elemental analysis and instead analyzed the fraud more broadly.  It concluded that the fraud caused the lenders' losses for two reasons.  First, the loans were "a significant part of the greater fraud" because they were the means by which the defendant profited from the scheme.  *Id*. at 677.  The Court held that "the necessary 'causal nexus' unquestionably exist[ed] between [the defendant's] conduct, the margin loans, and the [lenders'] losses."  *Id*.  Second, the lenders "would not have made the loans to [the defendant] had they known that the collateral for the loans was the stock he manipulated through the nominee accounts."  *Id*.

The Circuit's expansion of the test was explicitly recognized in *Archer*, where an attorney was convicted of visa fraud for submitting falsified documents.  671 F.3d at 170.  At sentencing, the district court granted restitution to all of the attorney's victims for "roughly" all fees they had paid him.  *Id*. at 158.  The Second Circuit held that the clients' payments could form the basis for restitution, but vacated the order and remanded the case to determine whether certain of the attorney's clients had known that the attorney was committing visa fraud, in which case those individuals would not be victims under the MVRA.  *Id*. at 174.  In so doing, the Court observed that "[f]or a number of years, our court determined whether a loss was part of the offense of conviction by reference to the elements of the crime: restitution was proper only if the conduct that caused the loss was an element of the crime."  *Id.* at 170.  "Our recent decision in [*Paul*], however, expands this test somewhat."  *Id*.  The Court explained that in *Paul*, restitution was granted, in part, because "the loans were part of the scheme Paul actually devised for profiting from his crime and because '[t]he brokerage houses would not have made the loans to

4

[the defendant] had they known that the collateral for the loans was the stock he manipulated.'"
*Id*. at 171 (alterations in original).  The Court held that this expanded analysis better "echoes the
statute, which provides that 'in the case of an offense that involves as an element a scheme,
conspiracy, or pattern of criminal activity, any person [who is] directly harmed by the
defendant's criminal conduct in the course of the scheme, conspiracy, or pattern [is a victim].'"
*Id*.  (quoting 18 U.S.C. § 3663A(a)(2)).  The Court concluded that although the crime of visa
fraud was "complete[d]" without receipt of the clients' payments, "[t]he fraud was not by any
means entirely separate; hence, restitution might nonetheless be available."  *Id.* at 172.

   This broader test is now consistently applied throughout the Second Circuit.  *See*,
*e.g.*, *United States v. Skowron*, 839 F. Supp. 2d 740, 744 (S.D.N.Y. 2012) ("'The necessary
"causal nexus" unquestionably exists' where the loss is 'a significant part of the greater fraud' for
which the defendant was convicted." (quoting *Paul*, 634 F.3d at 677)), *aff'd*, 529 F. App'x 71 (2d
Cir. 2013); *United States v. Hamdan*, 559 F. App'x 59, 62 (2d Cir. 2014) (quoting *Paul*).  It is a
test that COBA readily meets.

    **B.**  *Under the Controlling Test, COBA Is a Victim*

   There is no aspect of Huberfeld's conspiracy more "significant" or "integral" than
that it induced COBA's investment.  According to the Information and evidence proffered during
Huberfeld's plea allocution, it was the sole reason for the conspiracy, and COBA is a victim
deserving of restitution.

   The Information specifically alleges that the false invoice was submitted, and the
$60,000 procured, "to reimburse Rechnitz for having paid Norman Seabrook, the President of
[COBA], for Seabrook's efforts to get COBA to invest millions of dollars in Platinum."
Information ¶ 2.  At the plea hearing, the government stated it would establish at trial that the

false invoice was "part of an effort to compensate Seabrook for steering his union's investments" towards Platinum, and, to meet its burden of proof, it would elicit "testimony from individuals involved in [COBA]" to address "how the union's investment in Platinum . . . ultimately came to be."  Hearing Transcript at 20:4-5; 17:17-21, *United States v. Huberfeld*, No. 16 CR 467 (AKH) (S.D.N.Y. filed June 4, 2018), ECF No. 203 ("May 25, 2018 Transcript").  Like the brokerage houses that made margin loans against inflated stock in *Paul*, COBA "would not have made" the investment in Platinum if it knew about Huberfeld's conspiracy to bribe Seabrook.  *Paul*, 634 F.3d at 677.  Huberfeld himself acknowledged to the Court that he paid Rechnitz because Rechnitz requested "the money . . . as payment to Norman Seabrook for his efforts to get COBA to invest in Platinum[.]"  May 25, 2018 Transcript at 28:5-7.

   The Second Circuit has twice held that the "mechanism" by which the defendant profits from the fraud is an "integral aspect" of the offense.  *Skowron*, 839 F. Supp. 2d at 745 (quoting *Paul*).  In *Paul*, the margin loans were considered a "significant part of the greater fraud," in part, because they were how the defendant was "able to profit from the scheme."  634 F.3d at 677.  In *Archer*, the clients' payments could be grounds for restitution because they "were the mechanism through which Archer profited from his conspiracy and, thus, were an integral part of the single scheme he devised."  671 F.3d at 172.

   The COBA investment was clearly the means by which Huberfeld sought to profit from the conspiracy.  He stood to gain from the management fees Platinum charged COBA and the addition of liquidity to the fund at a time when redemptions were outpacing investments.  *See* Complaint ¶ 22(a).  Thus, Platinum stood to benefit from a significant investment that could stabilize the funds.  Just as the causal nexus existed in *Paul* between the securities fraud and

margin loans, and in *Archer* between the visa fraud and client payments, so does it exist between Huberfeld's conspiracy and COBA's $20 million investment.[2]

## II.    COBA IS ENTITLED TO RESTITUTION FOR ITS LOST INVESTMENT IN PLATINUM

"The primary and overarching goal of the MVRA is to make victims of crime whole: to compensate these victims for their losses and to restore them to their original state of well-being." *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015).  Only if Huberfeld provides COBA restitution in the amount of $19 million will the union be "restored" to its "original state" prior to his conspiracy.

Huberfeld cannot limit the restitution owed because factors other than his fraud may have contributed to the loss that COBA suffered.  In *Paul*, the Second Circuit rejected the defendant's argument that he should pay restitution only for that portion of the decline in share price attributable to his manipulation and not the remainder caused by market forces.  634 F.3d at 677.  The Court held that the fraudulent procurement of the loans—which was not an element of the securities fraud to which he pleaded guilty—was the cause of the loss: "the loss to [the lenders] was not caused by the decline in value of [] stock but, rather, by the making of the loans in the first instance."  *Id*.  The Ninth Circuit reached the same result in *United States v. Berger*, where a borrower submitted false financial information in connection with a loan and external factors led to the borrower's failure.  473 F.3d 1080, 1107 (9th Cir. 2007).  These cases show that

---

[2]   Even under the test articulated in *Local #46*, COBA would still qualify as a victim.  The *Local #46* Court stated that conduct "identified" in the operative charging instrument is part of the offense.  568 F.3d at 87 & n.3 (rejecting the union's proposed test because it "would force the sentencing court to ascertain some overarching uncharged scheme or conspiracy" (emphasis added)).  Here, the Information clearly "identified" COBA's "millions of dollars" in investments, bringing the harm suffered by COBA within the scope of the scheme to which Huberfeld pleaded guilty.  Information ¶ 2.  The existence of the bribe to Seabrook in exchange for COBA's investment was the very information that Huberfeld and Rechnitz fraudulently withheld from Platinum.

when a defendant fraudulently induces a party to take on risks that it would not otherwise take on, and those risks materialize, the defendant is responsible for restitution for all of the losses that occur.  Huberfeld's fraud in procuring COBA's investment exposed COBA to a substantial risk of loss that it would not have taken on absent the fraud.  He was well aware of both the inherent risk in the investment vehicle and the added risk in light of the increasing redemption requests.  Those risks materialized and Huberfeld should pay restitution for COBA's $19 million in losses.

## III.   COBA IS ENTITLED TO RESTITUTION FOR ITS ATTORNEYS' AND OTHER FEES

The MVRA states that restitution under the statute must include "lost income and necessary child care, transportation, and other expenses *incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense*." 18 U.S.C. § 3663A(b)(4) (emphasis added).  The Supreme Court, the Second Circuit, and the district courts of the Second Circuit have all held that legal fees incurred by victims in connection with a government investigation and prosecution of the underlying offense are "other expenses" covered by the statute.  *See, e.g.*, *Lagos v. United States*, 138 S. Ct. 1684, 1687-88 (2018) (holding that defendant owed employer restitution for legal fees it incurred pursuant to the government's investigation and prosecution of defendant, but did not owe fees associated with an internal investigation and bankruptcy proceedings); *United States v. Battista*, 575 F.3d 226, 234 (2d Cir. 2009) (upholding order finding defendant liable for restitution to victim for "substantial attorneys' fees [incurred] as a direct result of [defendant's] criminal acts").

In response to the government's investigation of Huberfeld's conspiracy, the Union had to retain law firms to represent itself and certain officers and board members and an eDiscovery firm.  The undersigned represented the Union in connection with its cooperation with

the government in responding to subpoenas, requests for interviews and testimony, and questions and requests throughout the investigation and prosecution.  The law firms of Wilmer Cutler Pickering Hale and Dorr LLP, Cooley LLP, Bracewell LLP, Zuckerman Spaeder LLP, Martin Stolar Esq., and Martin J. Auerbach, Esq. separately represented Union board members in connection with the investigation and prosecution.[3]  The Union is entitled to restitution for the costs it incurred over the four-year period that relate to the investigation and prosecution of Huberfeld's conspiracy.

## CONCLUSION

"[T]he sine qua non of fraud is a *victim*."  *United States v. Ageloff*, 809 F. Supp. 2d 89, 91 (E.D.N.Y. 2011), *aff'd sub nom. United States v. Catoggio*, 698 F.3d 64 (2d Cir. 2012). In truth and in fact, there was one victim of Huberfeld's conspiracy: COBA.  While sophisticated investors were exiting the fund, Huberfeld bribed Seabrook to invest the Union's vulnerable members' retirement money without regard (indeed despite) the merits of the investment.  The Seabrook bribe reflects how desperate Huberfeld had become to bring in new funds that he well knew would be at considerable risk.  The men and women of COBA are legally entitled to restitution.

---

[3]    The Union is prepared to submit an affidavit setting forth the specifics of the fees incurred.

Dated:   New York, New York
         December 20, 2018

                                           Respectfully submitted,

                                              /s/ David M. Zornow
                                      David M. Zornow
                                      (David.Zornow@skadden.com)
                                      Andrew M. Good
                                      (Andrew.Good@skadden.com)
                                      Eli S. Rubin
                                      (Eli.Rubin@skadden.com)
                                      Skadden, Arps, Slate, Meagher & Flom LLP
                                      Four Times Square
                                      New York, NY 10036
                                      Telephone:  (212) 735-3000
                                      Facsimile:  (212) 735-2000

                                      *Attorneys for New York City Correction*
                                      *Officers' Benevolent Association, Inc.*