UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- X
                                            :

UNITED STATES OF AMERICA,
                                            :
                                            :    No. 16 Cr. 467 (AKH)
                                            :

               -v-
                                              :
                                            :

MURRAY HUBERFELD,
                                            :
                       Defendant.
                                            :
------------------------------------------------------------------------- X

---

## MEMORANDUM IN AID OF SENTENCING

---

Henry E. Mazurek
Evan L. Lipton
**MEISTER SEELIG & FEIN LLP**
125 Park Avenue, 7th Floor
New York, New York 10017
(212) 655-3500
hem@msf-law.com
ell@msf-law.com

Alan S. Futerfas
**LAW OFFICES OF ALAN S. FUTERFAS**
565 Fifth Avenue, 7th Floor
New York, NY 10017
(212) 684-8400
asfuterfas@futerfaslaw.com

*Attorneys for Defendant Murray Huberfeld*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………………..………1

POINT 1: APPLICATION OF THE SECTION 3553(a) FACTORS STRONGLY SUPPORT A PROBATIONARY SENTENCE……………………………………………………..…...4

    A. The Nature and Circumstances of the Offense………………………………………………………..………………5

    B. General and Specific Deterrence……………………………………...………....11

    C. Avoidance of Unwarranted Sentencing Disparity…………………………....…15

    D. History and Characteristics of Murray Huberfeld…………………………...…16

        1. Family and Faith……………………………….…………………..……17

        2. Kosher Delight and the Founding of Platinum Partners…………………...…23

        3. Mr. Huberfeld's Business Success Translated to a Remarkable Record of Charity…………………………………………………………………25

            a. Shaare Zedek Medical Center…………………………………..………26

            b. Affordable Housing Project in Monsey, New York…………………………27

            c. Hurricane Sandy Relief Efforts…………………………………...………28

            d. Support and Care for Local Synagogue…………………………………...…29

            e. Providing Financial Assistance for Weddings and Bar Mitzvahs………...…29

            f. Service to Local Educational Institutions……………………………………30

            g. Service and Leadership at a Food Pantry…………………………...……30

            h. Sbarro Bombing Victim……………………………………...…………31

            i. Assistance Arranging the Recovery of Deceased from the Seas off Australia…………………………………………………...………………32

   j. Quietly Providing Funds and Advice to Aid People Following Setbacks in
    Life……………………………………………………………..………32

   k. Counseling Families and Children……………………………….……..35

   l. Mentoring Others in Business and Philanthropy…………………….………36

POINT II: THE PARTIES AGREE THAT THE CALCULATION OF THE ADVISORY
SENTENCING GUIDELINES RESULTS IN AN OFFENSE LEVEL IN ZONE B,
WHICH AUTHORIZES THE COURT TO IMPOSE A NON-INCARCERATION
SENTENCE……………….………………………………………………….……….37

CONCLUSION……………….……………………………………………………...…………38

We submit this sentencing memorandum on behalf of Murray Huberfeld, who is scheduled to be sentenced by this Court on January 25, 2019.

## Preliminary Statement

Murray Huberfeld submits this Sentencing Memorandum and the accompanying letters, exhibits, and video testimonials[1] to assist the Court in determining the fair and just sentence to impose at his sentencing hearing on January 25, 2019.

This memorandum is written with one goal in mind:  to present the Court with a complete picture of Murray Huberfeld as a person.  This Court has only met Mr. Huberfeld once before:  at the time he entered his guilty plea.  The only information the Court had about Mr. Huberfeld before the submission of these papers and his Presentence Report ("PSR") was that defined by the Government in its Superseding Information filed with the Court.  One thing is clear from the accompanying letters, video testimonials, and exhibits to this Memorandum:  Murray is not defined by his conduct in this case.  Murray Huberfeld's life is defined by his love and care for his family; his innumerable works of charity and good deeds towards others; his quiet acts of kindness to people who need it; his tireless work ethic to achieve success in whatever enterprise he puts his mind to; his love of the Jewish tradition and the community he lives in; and his desire to be the person others can rely on in times of need.

This memorandum begins and ends with presenting the Court a true picture of Murray Huberfeld as a person.

---

[1]     At the time of filing of this Sentencing Memorandum, defendant is providing the Court with two electronic copies of video files containing videotaped statements of character witnesses in support of Mr. Huberfeld.  The storage devices on which these files are kept have been screened for viruses and do not contain any files other than the video content described herein. Electronic copies of these same files have been produced to the government.

Accompanying this memorandum are over 150 letters in his support and approximately 20 minutes of video testimonials from some of his closest family members and friends and beneficiaries of his good works. We added the video testimonials so the Court could hear and see directly from some of the people who felt more comfortable speaking about their feelings towards Mr. Huberfeld, than they did reducing them in writing. These accounts combine to weave the complete fabric of the man. We respectfully urge the Court to consider as many of these accounts as it can, since they speak in ways that lawyers cannot. They touch every aspect of Mr. Huberfeld's life. They speak to devotion to family, the priorities of friendship and sharing; the contributions to community, both big and small; they speak to the value Mr. Huberfeld places on helping others in need; and they speak to his feelings of remorse for his prior conduct in committing this offense. Most notably, they tell how this crime has reshaped Murray's desire to become a better person, not only for himself, but for the people with whom he interacts in his daily life. As detailed herein, Mr. Huberfeld put aside the shame and humiliation he feels for committing this crime and has agreed to speak to others in his community about the total damage that committing crime inexorably creates: the harm to family, friends, professional career, and loss of reputation and trust.

This memorandum cannot possibly encapsulate the totality of the person, but we try to provide the Court a better means to measure the man other than through the lens of the bad decisions which led him to face criminal sentencing. The United States Supreme Court has instructed federal sentencing courts that "the principle" underlying sentencing is that "'the punishment should fit the offender and not merely the crime.'" Pepper v. United States, 562 U.S. 476, 487-88 (2011) (quoting Williams v. New York, 337 U.S. 241, 247 (1949)). To accomplish this legal objective, we examine each of the statutory sentencing factors that Congress enumerated

in 18 U.S.C. § 3553(a). We also include the parties' joint agreement on the calculation of the advisory federal Sentencing Guidelines, which results in a total offense level within Zone B of the Guidelines. See U.S.S.G. § 5C1.1(c), comment. n. 3, 7. The Sentencing Commission directs that for a defendant like Mr. Huberfeld, who has zero Criminal History points, the sentencing Court is authorized to impose substitutes to incarceration as punishment for this offense.

Finally, we respectfully advise the Court about Mr. Huberfeld's independent and voluntary decision to compensate members of the Corrections Officers Benevolent Association ("COBA") for losses they suffered from their pension fund's investment in Platinum Partners. In making this decision, Mr. Huberfeld recognizes the significant legal position of his counsel that the federal sentencing statutes and the Mandatory Victims Restitution Act ("MVRA") do not authorize the Court to impose restitution to COBA for the offense to which Mr. Huberfeld pled guilty. See ECF Doc. No. 273; In re Local 46 Metallic Lathers Union & Reinforcing Iron Workers & Its Associated Benefit & Other Funds, 568 F.3d 81, 87 (2d Cir. 2009). He certainly does not waive the arguments contained in that submission. Id.

Despite this legal position, Murray Huberfeld took it upon himself to voluntarily make redress to COBA. He informed counsel that regardless of legal obligation, he wanted to make amends to the COBA pensioners. Thus, consistent with how Mr. Huberfeld has lived his entire life, he took up the mantle of replenishing the COBA pension fund himself with an individual promise to pay a total of $7 million, including an immediate payment of $4 million. (This amount generally corresponds to an apportioned liability in the honest services conspiracy charged against Norman Seabrook, *i.e.,* one-third of COBA losses, as divided equally among Seabrook, Rechnitz and Huberfeld). No other person or entity has come forward to make this same gesture to COBA – not the other charged co-conspirators, not the former managers of Platinum, or the Platinum

Trustee. As the Government and undersigned counsel jointly agree, under the statutory sentencing factors of Section 3553(a), this unprecedented willingness of a party to make redress, regardless of legal obligation, is a factor this Court should strongly consider at sentencing. This voluntary contribution to COBA adds another important piece to the fabric of Mr. Huberfeld's life as he appears for sentencing.

For all the reasons we note in considerable detail below, this Court has the authority under 18 U.S.C. § 3553(a) and accompanying case law to recognize that a "sufficient but not greater than necessary" sentence of Mr. Huberfeld, based on the full fabric of his person, is a sentence of probation. We respectfully urge the Court to conclude that, in this case, under these facts and with an individual who has done so much good in his life, a non-custodial sentence is appropriate. Society and the interests of justice will best be served by keeping Mr. Huberfeld in the community where he has demonstrated tremendous ongoing contributions and sincere remorse.

## I. APPLICATION OF THE SECTION 3553(a) FACTORS STRONGLY SUPPORT A PROBATIONARY SENTENCE

The federal sentencing system is ultimately governed by 18 U.S.C. § 3553(a). United States v. Booker, 543 U.S. 220, 233-34 (2005). According to that section: "[t]he court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in [the federal sentencing statutes]." According to those enumerated purposes, a fair and just sentence should:

> (A) Reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  Section 3553(a) goes on to provide a list of seven factors for courts to

consider in determining a reasonable sentence in addition to the general purposes set forth above.

Those factors include:

> (1) The nature and circumstances of the offense and the history
> and characteristics of the defendant; (2) the need for the
> sentence imposed [to reflect the above-stated general sentencing
> goals]; (3) the kinds of sentences available; (4) the kinds of
> sentences and the sentencing range established [under the
> Sentencing Guidelines] subject to any amendments made to
> such Guidelines by an act of Congress…; (5) any pertinent
> policy statement . . . issued by the Sentencing Commission
> subject to any amendments made to such policy statement by an
> act of Congress…; (6) the need to avoid unwarranted sentencing
> disparities among defendants with similar records who have
> been found guilty of similar conduct; and (7) the need to
> provide restitution to the victims of the offense.

18 U.S.C. § 3553(a).  More significant than the sentencing range established by the advisory

Sentencing Guidelines is consideration of the factors set forth in the statute against the

background of the directive to select a sentence "sufficient, but not greater than necessary" to

accomplish these statutory purposes.

This section of the submission will discuss several of the factors enumerated in the

sentencing statute that previously have not been discussed in connection with this case.

**A.  Nature and Circumstances of the Offense**

18 U.S.C. § 3553(a)(1) provides that in determining the appropriate sentence, courts

should consider "the nature and circumstances of the offense." With respect to the offense at issue

here, Murray Huberfeld pleaded guilty to defrauding his employer, Platinum Partners, by

knowingly submitting a false $60,000 invoice for payment to Jona Rechnitz. <u>See</u> Huberfeld Plea

Hearing, ECF Doc. No. 203, Tr. 27-29 (5/25/2018).  Mr. Huberfeld knew the payment was not for

Knicks tickets, but rather was intended to compensate Rechnitz in securing a COBA investment into Platinum.

The Court earlier asked the parties to broaden its view of this offense conduct. It directed inquiries regarding the "reasonable foreseeability" of any capital losses to COBA and its members based on the state of Platinum investments at the time that COBA and Norman Seabrook were solicited by Jona Rechnitz in 2014. <u>See</u> ECF Doc. No. 273, Dec. 20, 2018 (Defendant's Memorandum of Law). From Mr. Huberfeld's perspective, the "reds vs. subs," (the quarterly redemption calls by existing investors as compared to new investment subscriptions), was not atypical. Mr. Huberfeld understood that occasional imbalances between redemptions and subscriptions were common among hedge funds and did not indicate underlying fund instability. <u>See</u> Kalter testimony at Carter Tr. 503 ("Redemptions are just an ordinary part of running a hedge fund, correct? A. Yes."). As Gilad Kalter testified at trial, during this time period, in 2014-15, he would not even use the word "worry" in connection with redemptions. <u>Id.,</u> Carter Tr. 503 ("There were redemptions, but it sounded to me like Mark Nordlicht that I just described, who, you know, he had a way to meet these redemptions"; "they were working on how to meet those redemptions, but that's all I really know"). Mr. Kalter did not testify that these redemption requests signaled any particular crisis at Platinum, let alone an existential one.

Even if there were liquidity imbalances, Mr. Huberfeld never conceived that management of Platinum would allow the fund to collapse. Mr. Huberfeld specifically recalled that, in 2008, when PPVA had approximately $800 million in assets under management, the worldwide financial crisis hit. Investors made redemption requests totaling more than half the value of the fund's assets. Mr. Nordlicht created a special purpose vehicle to hold the assets of those investors seeking to redeem their interests. The vehicle Mr. Nordlicht created held and carefully liquidated

the assets of those investors who made redemption demands. Investors wishing to remain in the fund did so. Over time, Platinum accommodated all redemption requests and did not dissolve.

The market circumstances and redemption requests in 2014 do not compare to the total U.S. market collapse in 2008. There was nothing remarkable at all about the 2014 calls for new subscriptions. Six years following the greatest financial crisis to hit the U.S. capital markets since the Great Depression, Mr. Huberfeld knew and expected that PPVA could resolve a redemption issue, should one occur. And Mr. Huberfeld was not aware of fraud at Platinum, nor was he aware of misrepresentations to investors (including to himself) made by Platinum members or employees.

Indeed, Mr. Huberfeld's own investment history at Platinum corroborates his lack of knowledge of any pending substantial losses. In 2014, Mr. Huberfeld continued to re-invest his own earnings into the Fund. In 2016, when Platinum collapsed, Mr. Huberfeld and his family lost approximately $45 million of their money in investments and receivables (pending any recoveries by Platinum's Trustees, who continue to seek value in fund assets and in clawing back inequitable distributions).

Prior to submitting the $60,000 Knicks invoice to Platinum's accounts payable at the end of 2014, Mr. Huberfeld had firmly established himself as a successful businessman from his humble beginnings as the founder (together with his now departed father) of the local fast-food chain, "Kosher Delight." He did not need to improve his financial standing at Platinum by risking it all for COBA's possible investment into the Fund. In other words, he was not motivated by greed.

In retrospect, Mr. Huberfeld regrets his meetings with Jona Rechnitz, who convinced Murray that he had a "Midas touch" to find new investor money based on his supposedly

bottomless list of contacts in the city. And he regrets deeply the decision he made to pay Rechnitz in December 2014. This was Mr. Huberfeld's decision, and his alone, and it damaged the lives of so many people who mean everything to him: including his wife and five children, and his more extended cultural and religious community, for whom he has dedicated so much of his time and personal and family resources. To the people he loves, Mr. Huberfeld did permanent damage by succumbing to Rechnitz's plan.

Murray Huberfeld took the action he did in December 2014 because of personal insecurity, not greed. He was a proud man whose position at Platinum continued to diminish over time. Mr. Huberfeld took the money from Platinum to pay Rechnitz because he wanted to stay relevant in the eyes of his younger, analytical, and more sophisticated partners there. By 2014, Mr. Huberfeld was becoming a dinosaur at the very fund he established. He was an old-school lender who found himself surrounded by "quant-jocks"- people who analyzed coefficients and statistical spreads - not people who looked to the community to see who needed money in a pinch. The way Mr. Huberfeld had known to manage a lending fund was no longer relevant in the new millennium. Mr. Huberfeld's only contribution to Platinum by 2014 was occasionally finding new investors, and he wanted to show his partners that he still mattered. That desire to stay relevant at his own fund led to these events. He desired to show his colleagues and partners that Murray Huberfeld was still someone to turn to, even if only as a salesman to the fund. He wanted to remain "the man" even if his time had passed.

As explained in more detail in the defense memorandum filed on December 20, 2018, ECF Doc. No. 273, Mr. Huberfeld was one of the original founders of Platinum Partners. He, along with David Bodner, began this investment fund believing they could raise money to fund start-up businesses in the Orthodox Jewish community, or to finance real estate projects, or help

existing businesses through times of financial crisis. They initially called their investment group: Broad Capital Corporation. (PSR, ¶ 68.) Neither of these original partners had backgrounds in corporate finance, or investment trading, or securities transactions. They started as an alternative to commercial bank lenders for small business owners.

Their project, however, grew to levels of success that neither of them had dreamed about. Their success attracted new talents to the fund: people who had the background in trading arbitrage, complex securities transactions, and corporate finance. And with these new personnel, the mission of Broad Capital expanded and became Platinum Partners in 2002.

This evolution, however, eventually had the effect of nullifying Mr. Huberfeld's value to Platinum. He was no longer called upon to evaluate investment decisions, as the fund's assets grew and their investments expanded into complex oil and gas ventures, international businesses, and distressed asset purchases. Mr. Huberfeld did not have the training, background, or experience in these areas to judge his partners' decisions. The more that Mark Nordlicht and others moved Platinum to sophisticated private equity structures, the less that Mr. Huberfeld could contribute as an investment manager.

In January 2011, Mr. Huberfeld was asked by his fund's partners to step aside from managing the last vestige he had some control over, the fund's debt investment portfolio, called Centurion Capital. He was asked to resign his title as managing partner of the credit fund, which changed its name to the Platinum Partners Credit Opportunity ("PPCO") fund. This was a disheartening and career disorienting moment for Mr. Huberfeld. It was reported in the investment press as a move to consolidate Platinum's management over all investments at Mr. Huberfeld's prior Centurion Capital fund. See "Platinum to Manage Centurion Fund," *Institutional Investor*, Jan. 5, 2011. To Mr. Huberfeld, it felt like a move by his partners to force

him to the sidelines.  To his investment community, it was perceived that his own partners no longer trusted him to make investment decisions at the fund he first founded.[2]

After January 2011, Mr. Huberfeld's visibility at Platinum continued to dwindle.  By the time of the events in this case in 2014, Mr. Huberfeld did not even have an office at Platinum.[3] He was not consulted on any new investments and the investment positions that he had brought into the credit fund, PPCO, were almost all closed out. He was not consulted on new investment decisions. Thus, by the time Mr. Huberfeld caused Platinum to pay Rechnitz, his only utility was to introduce investors to the Fund.

Pride in still being relevant – the one whom others could rely on for results – led to this offense.  In doing this, Murray Huberfeld lost his good judgment.  In trying to remain relevant to the very business he helped found, he acted in a way he now deplores.

Mr. Huberfeld has spent the last four years considering how foolish pride led to his bad decisions.  He and David Bodner spent decades building an investment platform and a reputation. This ended when Murray agreed to pay Jona Rechnitz. He deeply recognizes that, at that moment, he tarnished his business reputation, his sense of doing what is fair and just, and sullied the organization he proudly built on the modest capital derived from the Kosher Delight restaurants.

Mr. Huberfeld's actions here will carry forward with him for the rest of his days.  This is significant punishment for a man who has lived his life based on values instilled by his parents,

---

[2]    By 2011, David Bodner had long abdicated his involvement in the management of the Fund.

[3]    In 2014, Platinum moved its office from Carnegie Hall Tower to 250 West 55th Street. *See* Kalter's testimony at Carter Tr. 506, and Gus Delaporte, *Platinum Partners Inks 250 West 55th Street Lease,* Commercial Observer (March 14, 2014 9:30 am).  Mr. Huberfeld continued to maintain his office at Carnegie Tower.  <u>See</u> Kalter's testimony at Carter Tr. 410 and 506.  As Rechnitz testified, Mr. Huberfeld had his own gmail address - not a Platinum email address - for both work and personal use.  <u>See</u> Rechnitz's testimony at Carter Tr. 707.

Holocaust survivors, who taught Mr. Huberfeld to be honest and truthful in all his business and personal dealings. He is genuinely ashamed and remorseful for his conduct in this case.

**B. General and Specific Deterrence**

According to 18 U.S.C. § 3553(a)(2), an appropriate sentence should "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." Here, it is not necessary to incarcerate Mr. Huberfeld to ensure this objective.

Analysis of "specific deterrent" factors should properly include the consequences Mr. Huberfeld already has experienced over the last three years of criminal investigation and prosecution, including enduring the traumatic events of a criminal jury trial, which resulted in a hung jury and mistrial. More importantly, Mr. Huberfeld also has suffered the loss of business opportunities because of the damage to his reputation that his conduct caused; has seen his family suffer from the stress and uncertainty he created in their lives; has dealt with the enormous economic cost and pressures that arise out of three years of federal court litigation; and the public humiliation and loss of general reputation in his community – something he spent a lifetime creating. See United States v. Adelson, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006) (Rakoff, J.) (noting that "[w]ith his reputation ruined by his conviction, it was extremely unlikely that [the defendant] would ever involve himself in future misconduct"). These are real effects and consequences to Mr. Huberfeld's actions that greatly deter any future bad conduct.

Mr. Huberfeld has watched his family suffer the uncertainties of his possible separation from them that incarceration would bring. He also has seen how his young adult children are treated differently in their social and community circles because of his conduct. He has lost the ability to raise financing for future business endeavors that he envisioned before the events of this case. Mr. Huberfeld also still faces a barrage of civil cases and the need to defend these actions

possibly for years to come. Even after the final resolution of the last case based on the facts alleged here, Mr. Huberfeld will suffer lasting and permanent impact. He will never again hold professional licenses. He is 58 years old and a convicted felon. There is little opportunity for someone with those characteristics to build an enterprise like Platinum Partners ever again, or join another similar entity or organization. That path is now foreclosed forever.

These facts should be considered as part of the specific deterrence factor at sentencing, because in this case not only is Murray Huberfeld more than sufficiently personally deterred by the events charged here, but these events will actually prevent him from ever being in a position in which such conduct is even possible in the future.

Moreover, studies have repeatedly shown that recidivism rates also decrease markedly as an individual gets older.[4] Mr. Huberfeld is well beyond the age of offenders where crimes are most prevalent. He instead is facing the time in his life when he should be contemplating visiting grandchildren and enjoying his children's accomplishments, not imprisonment. See United States v. Hodges, No. 07 Cr. 706, 2009 WL 36231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting that "post-Booker, courts have observed that recidivism is markedly lower for older defendants" and collecting cases); United States v. Carmona-Rodriguez, No. 04 Cr. 667 (RWS), 2005 WL 84064, at *4 (S.D.N.Y. Apr. 11, 2005) (emphasizing that defendants who, like Murray, are over 50 "exhibit markedly lower rates of recidivism in comparison to younger defendants"); United States

---

[4]     David Farrington, "Age and Crime," Crime and Justice, Volume 7, 1987; *A General Theory of Crime* (Michael Gottfredson and Travis Hirschi, 1990); *Crime in the Making* (Robert Sampson and John Laub, 1993); Terri E. Moffitt, "Adolescence-Limited and Lifecourse-Persistent Antisocial Behavior," *Psychological Review*, 1993; American Youth Violence (Franklin E. Zimring, 1998) *see also* U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, http://www.ussc.gov/publicat/Recidivism-General.pdf: "Recidivism rates decline consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates").

v. Sanchez, No. 99 Cr. 338, 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) ("With regard to the necessity to protect society from future crimes of the defendant, this Court and others have previously declined to impose lengthy guidelines sentences on older defendants in light of the Sentencing Commission's conclusion that '[r]ecidivism rates decline relatively consistently as age increases.'") (citing U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 (2004) and collecting cases); see also United States v. Hamilton, No. 07 Cr. 2874, 2009 WL 995576, at *3 (2d Cir. April 14, 2009) (unpublished) (reversing and remanding for resentencing because "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); United States v. Cavera, 550 F.3d 180, 219 n. 4 (2d Cir. 2008) (affirming the district court's downward variance "when the district court varied from the Guidelines because of defendant-appellant's advanced age and the 'inverse relationship between age and recidivism,' the district court cited numerous cases, many of which, in turn, relied upon a recidivism study of over 6,000 individuals that was conducted in 2004 by the Sentencing Commission.").

As numerous letters enclosed herein have recounted, Murray Huberfeld is a man whose professional, intellectual and personal accomplishments earned him the appreciation and respect of large numbers of community organizers, religious clergy, neighbors, spiritual congregants, and business people. His achievements in these areas still pale in comparison to the love and protection he has showered on his own family since he was a young man (as described in heartwarming detail below). Now the reputation that Mr. Huberfeld had built over a lifetime of work as a business entrepreneur and financier has been severely damaged, if not destroyed, and his capacity to protect his family has been diminished because of the professional and personal

risks he created. During the course of the last almost four years, from the time that he was first identified as a target of a criminal investigation, he has endured the inability to guide his children through emotional and personal difficulties. Nothing can describe, much less rectify, the immeasurable suffering attendant upon these realities. As many who wrote on Mr. Huberfeld's behalf have recounted from encounters and observation, the pain Mr. Huberfeld has felt over these years has been real and, at times, overwhelming.

The emotional, mental, economic, and physical effects of four years of stress, uncertainty and turmoil resulting from the criminal investigation and trial in this case have been obvious to all those who have known Mr. Huberfeld both before and after trial. Under these circumstances, the sentencing policy of specific deterrence, like that of general deterrence, has already been largely accomplished by these lengthy proceedings and their real-world consequences.

Finally, this case is not one in which the public faces any continuing risk from the defendant. Mr. Huberfeld has no criminal history points under the Guidelines, is not accused of committing a violent crime, and has voluntarily agreed to compensate COBA a total of $7 million (with an immediate up-front payment of $4 million) – the only conspirator charged by the Government in the honest services case against Norman Seabrook to make any gesture to compensate for COBA's losses from the Platinum investment.[5]

As to "general deterrent" factors, the Court should consider the fact that, here, the public has become well acquainted with the impact this case has had on these defendants. The public

---

[5]     For reasons stated in Mr. Huberfeld's December 20, 2018 Memorandum of Law to the Court (see ECF Doc. No. 273), and in the Preliminary Statement, *supra*, the defendant continues to maintain that because his offense of conviction was a fraud against Platinum only, the Court cannot impose a restitution order against him to compensate COBA for a separate honest services fraud committed by Norman Seabrook:  a crime that Mr. Huberfeld has not pleaded guilty to and for which a jury could not reach agreement to convict him. See 18 U.S.C. §§ 3663A, 3664.

already has received a strong and unambiguous message about Mr. Huberfeld's crimes and the grave consequences of his actions. Mr. Huberfeld's downfall has been widely reported in media sources across the country. There can be no doubt that the need for respect for the law has been duly conveyed based on lengthy litigation (spanning several cases involving multiple public figures and involving related acts by the government cooperator Jona Rechnitz) and its practical, real effects on the people involved, including Mr. Huberfeld. He will never again be able to operate in the finance industry in any licensed or non-licensed position because of the results of this case: a felony conviction and the mass distribution on the Internet and elsewhere of Mr. Huberfeld's fraud. See e.g., United States v. Schulman, No 16 Cr. 442 (JMA), ECF No. 155 (E.D.N.Y. Oct. 6, 2017) (variance is warranted from Guidelines where reputational ruin and being forced out of professional career and the industry in which defendant worked was "substantial and meaningful punishment," and where defendant's "emotional well-being has suffered as a result").

For the foregoing reasons, no period of incarceration is necessary for deterrent purposes to amplify these messages.

### C. Avoidance of Unwarranted Sentencing Disparity

18 U.S.C. § 3553(a)(6) requires the Court to consider sentences afforded to defendants "with similar records who have been found guilty of similar conduct." The primary purpose of this provision is to reduce unwarranted sentence disparities nationwide. United States v. Wills, 476 F.3d 103, 109 (2nd Cir. 2007). What the statute commands is for the Court to examine the criminal conduct upon which the defendant's conviction is based, and in sentencing the defendant, consider the sentences by other courts nationwide for similar criminal conduct. Thus, the linchpin of the disparity analysis is *the specific criminal conduct that formed the basis for the offense of conviction*, not the statutory provision that was violated, and not other unproven or

uncharged crimes.  (See Huberfeld's Memorandum of Law in Response to the Court's Request for Briefing, ECF Doc. No. 273, Dec. 20, 2018) (describing in detail reasons for this Court only to consider the offense of conviction as the appropriate measure for imposing sentence).

As set forth below, the parties have reached agreement, pursuant to the terms of a written plea agreement, on the advisory Guidelines range in this case.  The Guidelines range here results in a score in Zone B of the Guidelines.  Accordingly, for a defendant in Criminal History Category I, substitutes to incarceration are recommended by the Sentencing Commission without the need for a departure or variance. See U.S.S.G. § 5C1.1(c), comment. n. 3, 7 (describing substitutes for imprisonment within ranges provided in Zone B and noting that these substitutes are only not recommended for offenders with a criminal history category of III or above).

Thus, by the Commission's own account, to punish a defendant to a period of incarceration who has zero criminal history points would create a national disparity from what the Guidelines themselves preach:  for those defendants with minimal criminal history points, sentencing substitutes should be considered by the Court as the recommended outcome.

### D.  History and Characteristics of Murray Huberfeld

18 U.S.C. § 3553(a)(1) provides that in determining the appropriate sentence, courts should consider "the history and characteristics of the defendant."  As part of this analysis, a sentencing court must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 50 (2007).

Murray Huberfeld's life is not defined by his conduct in this case.  Instead, he is defined by the innumerable good deeds and indefatigable spirit that marks every aspect of his remarkable life.  Murray has a contagious and inviting spirit that has made him a resource and friend in his

community.  His desire to help others has spawned a truly inspiring record of charitable work.  This is who Mr. Huberfeld really is.

1.  <u>Family and Faith</u>

Murray Huberfeld, 58 years old, resides in Lawrence, New York, with his wife, Laura Berkowitz-Huberfeld, ███████████████████ and his eighty-five-year-old mother, Rae Huberfeld.  He and Laura's adult children, Jessica (26), Rachel (24), Alexander (22), and Ariella (20), all reside nearby, either in Manhattan or Lawrence.  His father, Philip Huberfeld, also lived close to the family in Lawrence until his recent death, at age 93, in March 2017.

Murray's parents are both Holocaust survivors.  Philip Huberfeld was imprisoned in Auschwitz and Buchenwald.  Rae Huberfeld spent three years of her childhood hidden within a barn in Poland, resulting in lifelong physical ailments.  Rae and her brother were the only two children from their town to survive the war.  Both lost most of their families.

Philip and Rae met in Germany and married in 1953.  Alarmed by the continued presence of Nazi collaborators in German society, they soon decided to immigrate to the United States, settling in Borough Park, Brooklyn.  Philip trained as a social worker and worked at Jewish community centers and synagogues while Rae was a homemaker.  Their first child, Bina, was born in 1957, just a few years after their arrival in this country.  Murray was born in 1960, and his younger brother Seymour, in 1965.  All were raised in and continue to practice the Orthodox Jewish tradition.

Murray's faith, and his acute knowledge of and relationship to the Holocaust and the history of the Jewish people has informed every aspect of his life.  It underlies his charitable works which focus on (but are not limited to) Jewish families and institutions, and it drives his sense of empathy for the hardships of others.  Murray's religious beliefs are also relevant to his

acceptance of responsibility for the offense conduct in this case. As part of the process of repentance, or *teshuva*, he has given a series of speeches to the Orthodox community entitled *Dina D'Malchuta Dina*, Hebrew for "the law of the land is the law," in which he acknowledges that his actions violated not only the laws of this country, but also strict religious teachings. Murray counsels others in his community that to ignore secular law is an offense against God. (See Letters of Moshe Brody, Ex. I, p. 1; Joseph Posner, Ex. I, p. 2; Menachem Posner, Ex. I, p. 3; Aaron Teitelbaum, Ex. F, pp. 95-96.)

Murray's faith also has led to a particularly strong relationship with his family. He daily interacts and spends considerable time with his ███████████████. Since the death of his father, Murray also has taken up caring for his mother, who moved into Murray's family home after the loss of her husband, with whom she had been married for 63 years. Murray makes it a point to speak with his adult children at least once daily, and the family regularly spends Shabbos and holidays together.

Murray's children describe their father as a role model. (Ex. B, pp. 20-22, Letter of Ariella Huberfeld.) ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ Murray's oldest son, Avi, writes that "every day that he is walking the earth it's as if a lightning rod turns on for him each morning with the sole job of helping our family succeed and making the world a better place." (Ex. B, p. 18, Letter of Alexander "Avi" Huberfeld.) His daughters both write of his "constant presence" in their lives. Despite his demanding schedule of business and community events, he takes time each night to bless them with the Shema, asking God to watch over them as they sleep. (Ex. B, pp. 34-36, Letter of Rachel Huberfeld.) Ariella writes that during her year studying abroad in Israel, her father called her

every day: "It did not matter how busy his schedule was… I knew that when he was speaking to me that was what mattered, as if he had no other place to be or no other call to take."  (Ex. B, p. 20, Letter of Ariella Huberfeld.)

Jessica, the eldest daughter, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

Murray's wife, Laura, describes him as a "born nurturer." (Ex. B, p. 15, Letter of Laura Huberfeld.) This trait has been evident since Murray's teenage years, when he began working to help his family financially. His older sister Bina writes that the family lived a "simple life" and were "not moneyed people." (Ex. B, p. 38, Letter of Bina Huberfeld Levy). "If we wanted something, we had to work for it." (Id.) Murray worked as a waiter and at various jobs "in the Jewish catering world in Boro Park." (Id.)

Informed by the knowledge of his parents suffering during the war, Murray was driven to provide them with financial stability. At nineteen, while attending Brooklyn College at night, Murray and his father opened a restaurant in Borough Park called Kosher Delight. Kosher Delight eventually expanded to several locations throughout the city. For 36 years, until it closed in 2014, the restaurant became his parents' livelihood, providing them with financial security through their

retirement. (Ex. B, p. 14-17, Letter of Laura Berkowitz-Huberfeld.) Laura writes that this was "Murray's way of making sure that his parents were taken care of." (Id.) The Kosher Delight stores also gave Murray the confidence he needed to create new businesses and accomplish even greater financial successes. He did these things all on his own.

To this day, Murray continues to respect, honor and care for his mother and honors the memory and dignity of his father. As a young man starting out in his own business ventures, he would run errands for them that could easily have been delegated to others, and would help at Kosher Delight with the other staff until late into the nights. (Ex. F, pp. 19-20, Letter of Naomi Bodner.) During business meetings he would excuse himself to take his parents' calls and address their needs. (See Ex. F, p. 17, Letter of David Bodner.) "To Murray, they always came first. It did not matter what level the meeting. He took care of his parents in the most incredible fashion." (Id.) His sister, Bina, writes, "Murray's day always began with picking my father up to go to synagogue." (Ex. B, p. 40, Letter of Bina Huberfeld Levy.) After dropping off his father, Murray would then visit with his mother, or, if running late, speak with her on the phone. (Id.) "Bereft of family, Murray would always make an incredible effort to make his parents feel so special, almost as if to make up for the missing generations that they would have had around them had history been so different." (Ex. F, p. 100, Letter of Moshe Wagh.)

Philip Huberfeld passed away in March 2017, during the pendency of this case. In the months preceding his death, Murray arranged for daily prayer services to be held at his bedside. Murray's "love and devotion" for his father brought him "great joy and solace, even on his worst days." (Ex. B, p. 42, Letter of Bina Huberfeld Levy.) "Upon his father's death, Murray was singularly focused on completing his filial responsibility to bury him in Israel, and was, frankly, panicked that the circumstances of the case might prevent that." (Ex. F, p. 63, Letter of Simcha

Lyons.)  As his father's health declined while he was released on bail conditions, Murray worked

with his attorneys to reach an agreement with the government to allow him to depart for Israel

right after his father passed away.  "Thankfully the Court allowed him to take this important trip."

(Id.)  Murray is incredibly indebted to the good graces of the Court to enable him to complete his

duties as a son.

Since his father passed, Murray has taken the central role in his mother's care. ██████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████

                    ████████████████████████████████

                    ██████████████████████████████

                    ████████████████████████████████

                    ████████████████████████████████

                    █████████████████████████████████

                    ████████████████████████████████

                    ████████████████████████████████

                    ████████████████████████████████

Murray Huberfeld knows that he only has a limited time with his mother now, and that any period of separation will cause a tremendous sense of loss – not only for Murray, but more importantly for his mother. Rae Huberfeld committed no wrong, and the fact she might suffer for her son's bad deeds, has been a significant burden. Mr. Huberfeld asks less for leniency from this Court for himself, than he does for the sake of his mother and her health.

2. <u>Kosher Delight and the Founding of Platinum Partners</u>

Murray's first experience in the business world was running the fast-food restaurants, "Kosher Delight" with his parents. Opening the restaurant, in 1979, was Murray's father's idea, but, as Bina, writes, "very quickly it was clear that my father, while a hard worker, could not keep up with the demands of running the business." (Ex. B, p. 37, Letter of Bina Huberfeld Levy.) While the entire family worked there, "it was Murray who really was the business." (<u>Id.</u>) Nonetheless, Murray "always told everyone it was my father who made it happen" and "never took any credit for himself." (<u>Id.</u>) After one year at Brooklyn College, Murray left to take on responsibility for daily operations at the restaurant. His sister Bina writes, "to this day I know he regrets not finishing college, but he believed in his heart that this sacrifice was worth it for my parents." (<u>Id.</u>)

Murray's primary motivation for the restaurant was to provide a business to support them. But the role he took on in its operations, and the community he created around it, are emblematic of the approach he would take to business and charity over the next 40 years. Kosher Delight was the first kosher fast food restaurant in Brooklyn. (Ex. F, pp. 41-42, Letter of Joseph Green.)

Murray created the business with a vision of a "classy" place with good food served fast and fresh. "His stated goal at the time was to provide a place where a family with children could come and purchase a delicious meal at affordable prices." (Id.)

"Kosher Delight went on to become a real success and served the community as no other family restaurants did." (Id.) Murray eventually expanded to five locations. Solomon Mayer first met Murray at the location on Broadway in Manhattan. He writes to the Court to share a story from that meeting. (Ex. F, pp. 66-69, Letter of Solomon Mayer.) ████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

Former employees of Kosher Delight speak of Murray's kindness, work ethic, and respect for all faiths. Younus Ali, who immigrated to the United States from Bangladesh in 1983, found his first job at the Kosher Delight on Broadway. He remained there for thirty years. (Ex. C, pp. 1-2, Letter of Younus Ali.) He describes Murray and Philip as "all friends like a big family" and writes of how Murray allowed time for his daily Muslim prayers: "The workers at KD were from all religions. Murray is good to us all and shows us kindness and respect." (Id.) When Younus did not have enough money to pay his monthly expenses, Murray paid him extra. (Id.) Desire

Thomas, who worked at Kosher Delight for thirty-two years, writes: "What we all liked about Murray was that when it was busy he would come to the store and work behind the counter with us. He never told us to do a job he would not do.  It was never that Murray was the boss and could not help also."  (Id.)

With Kosher Delight up and running, Murray turned his efforts towards the finance industry.  He worked as a securities clerk for several years, learning the ropes of the trade. Eventually, he founded an investment partnership called Broad Capital Corp. with a long-time friend, David Bodner. They managed this modest investment fund until approximately 2002. From this humble start, in about 2003, Murray and David Bodner hired an upstart and sophisticated young trader named Mark Nordlicht and branded the new investment fund: Platinum Partners.[6]

3.  Mr. Huberfeld's Business Success Translated to a Remarkable Record of Charity

Murray has demonstrated an extraordinary commitment to charitable giving and community service. In 1989, he and David Bodner established the Bodner Huberfeld Fund, a donor-advised charitable fund, through Congregation Ahavas Tzdokah V'Chesed.  In the three decades of the fund's existence, it has directly distributed more than $107 million of donations to thousands of individuals and organizations. (Ex. J, Table of annual donations, 1989 through 2017.)  In the last decade alone, the Bodner Huberfeld Fund has directly dispensed nearly $50 million. (Id.)  Fifty percent of this fund's donations are attributable to Mr. Huberfeld and his family.

---

[6]     A detailed description of Platinum Partners and Mr. Huberfeld's role in the business is included in the defendant's Memorandum of Law in Response to the Court's Request for Briefing, Dec. 20, 2018, ECF Doc. No. 273, pp. 3-5.

The Huberfeld Family Foundation separately has donated an additional $16 million, over the last ten years, most significantly to Shaare Zedek Medical Center in Jerusalem (discussed below) and to Yeshiva University. (See Ex. E, p. 7, Letter of Paul Glasser.) Mr. Huberfeld also founded and served on the boards of religious schools and the Simon Wiesenthal Center; built and managed a community synagogue; and funded, planned and built a low-income housing development designed to provide dignified, spacious homes to large families. But the true distinction of Mr. Huberfeld's charitable giving is his personal involvement. Mr. Huberfeld does not just write a check. He becomes involved in people's lives, spending hours speaking with them and taking on their problems as his own.

Rabbi Mendy Kotlarsky writes: "I've given out Murray's email address to hundreds of families. They're always surprised – 'isn't there a secretary he'd rather me contact?'" (Ex. G, p. 14, Letter of Rabbi Mendy Kotlarsky.) "But Murray gives more than just a check to help them with their financial struggles. He connects with each person, giving them personal encouragement and moral support in their work." (Id.) When money isn't the issue, he spends his time, counseling people through personal crises, mentoring, using his contacts to muster resources, or providing shuttle diplomacy between feuding factions of a family. And he does so quietly, without seeking public recognition. "He doesn't just do acts of kindness, he has a unique ability to sense just what others need – even seemingly small things – that show respect and caring." (Ex. D, p. 8, Letter of David Cohen.)

    a. *Shaare Zedek Medical Center*

In 2007, Murray and Laura Huberfeld funded the development of the Neonatal Intensive Care Unit at the Shaare Zedek Medical Center in Jerusalem. (Ex. E, pp. 21-22, Letter of Rachel Wolf, CEO, Shaare Zedek Medical Center.) In 2014, they made another substantial donation to

fund the birthing unit. Rachel Wolf, CEO of Shaare Zedek, describes being "struck at the time by their commitment and sensitivity to doing all they could to bring healing to our smallest and most helpless patients." (Id.) "For a hospital responsible for delivering more babies than any other hospital in the Western World" this gift made significant and continuing impact on the hospital's work. (Id.) Murray is not a "hands off" donor, but regularly comes to check on the unit when he is in Israel. (Ex. E, p. 8, Letter of Jonathan Halevy, MD, Director General, Shaare Zedek Medical Center.)

      *b. Affordable Housing Project in Monsey, New York*

      In addition to their charitable giving, Murray and David Bodner have endeavored to create business ventures that serve a community purpose. In 2009, Murray and David had the opportunity to purchase 50 townhouses and 78 condominiums in the Monsey area from two distressed sellers, at prices twenty-five percent below market value. (Ex. D, pp. 73-75, Letter of Morton Silberberg.) They invested $42 million to purchase the units, without bank financing. (Id.) "The interest on that sum, plus the profits that could have been realized from selling the condos at fair market value, amounts to millions." (Id.) But Mr. Huberfeld and David Bodner chose to forego these profits, selling the units at reduced costs to low income buyers so that the purchasers, in addition to owning homes larger than they would have otherwise been able to obtain, could realize the "significant upside price potential" from their investment. (Id.) In order to keep costs low, Murray ran building operations himself. (Id.) Recently, a number of these early condominium purchasers, whose families now have outgrown their homes, have sold them to purchase larger homes, realizing an average profit of $400,000. (Id.)

      Hersh Greenzweig, who knew Mr. Huberfeld from his charitable giving in the Rockland County community, writes about his leadership: "With all these dealings, nothing prepared me for

his gesture to give people a chance at the American Dream. Not only that, but he gave up a chance of profits amounting to millions of dollars. Had I not been involved in facilitating these opportunities I would not have believed that regular people do such kindness." (Ex. D, p. 21, Letter of Hersh Greenzweig.)

Sara Silver, who purchased one of these homes, writes: "I will never forget the day we moved in. Even then we could not believe we had our own beautiful home, in my wildest dreams I could never have imagined it." (Ex. D, p. 77, Letter of Sara Silver.) Asher and Chana Weiss write: "We could never have dreamed to own a 5-bedroom town house. Our kids have grown up here and the quality of the neighbors is far beyond any of our expectations. It has been like a dream. It also gave me the peace of mind to develop the Yeshiva." (Ex. D, pp. 85-86, Letter of Rabbi Asher and Chana Weiss.)

Though Mr. Huberfeld was a visible presence on the work site, no one knew that he had financed half of the venture. "It was just some three weeks ago that we discovered the other half of the equation that gave us and all our neighbors the opportunity to acquire our beautiful homes. It was the person who labored to ensure the physical state of the apartments was all up to par, and who had partnered with David Bodner to ensure the finances were covered… that person was Mr. Murray Huberfeld." (Id.)

   c.   *Hurricane Sandy Relief Efforts*

In the aftermath of Hurricane Sandy, which devastated Lawrence and the surrounding areas, Mr. Huberfeld reached out to area religious and secular leaders and invited them to a meeting in his home. (Ex. G, p. 13, Letter of Rabbi Kenneth Hain.) From there, he launched an initiative that salvaged and restored buildings and infrastructure. (Id.) Rabbi Kenneth Hain, of Congregation Beth Sholom in Lawrence, writes: "To me, the primary take away from Murray

Huberfeld's leadership, was that it was done without any public recognition or praise. His motive was clearly genuine concern for fellow community members regardless of their background, religion or status. It was in the best sense of our tradition an action motivated by "true kindness." (Id.)

### d. Support and Care for Local Synagogue

Seeing a need in his community, Mr. Huberfeld purchased a building to house a new synagogue, Bais Avrohom Zev of Lawrence. (Ex. E, pp. 16-17, Letter of Michael Lebor.)  In addition to sustaining the synagogue financially: "Murray can be found at all hours of the day and night serving as its custodian, stocking the synagogue with supplies, handling its bookkeeping, conducting fundraising, cleaning up after functions, and beautifying the sanctuary before holidays." (Ex. D, p. 43, Letter of Elliot Moskowitz.) Murray recently concluded renovations and refurbishment of the synagogue infrastructure, completing in six months what "would have taken a regular person a year to eighteen months." (Ex. F, p. 10, Letter of Ezra Birnbaum.) "Murray's synagogue and its Rabbi continue to play a vital role in our community at large, all thanks to Murray." (Ex. F, p. 98, Letter of Ely Tendler.)

### e. Providing Financial Assistance for Weddings and Bar Mitzvahs

When Mr. Huberfeld prepared a wedding for one of his children, he would arrange to sponsor 25 weddings for those less fortunate to take place in Israel on the same night. (Ex. F, pp. 9-11, Letter of Ezra Birnbaum.) "This arrangement by Murray was not common knowledge, because he felt it was just something to enhance and give greater personal meaning to the family wedding of his children." (Ex. F, p. 48, Letter of Robert Herskowitz.)  When he made a Bar Mitzvah for his son, he anonymously arranged for Bar Mitzvahs for 26 disadvantaged children in Israel, paying for the celebrations, new outfits for each child, and a *tallit* and *tefillin*. (Ex. G, pp.

9-10, Letter of Rabbi Yaakov Grossman and Ex. G, pp. 11-12, Letter of Rabbi Yitzchak David Grossman.)

   *f.   Service to Local Educational Institutions*

Mr. Huberfeld served on the board of directors for the Manhattan High School for girls. "He used his business acumen to benefit our school's fiscal responsibility." (Ex. E, p. 4, Letter of Estee Friedman-Stefansky.) "As many schools, we had some difficult economic times, and without Murray's involvement and dedication to the institution, we may not have succeeded." (Ex. E, p. 15, Letter of George Klein.) He was also an active member of the board of directors of the yeshiva his son attended, where he was the "first to roll up his sleeves and help." (Ex. F, p. 1, Letter of Daniel Bak.)

   *g.   Service and Leadership at a Food Pantry*

During the past several months, Mr. Huberfeld has been volunteering at the "Masbia" food pantry and soup kitchen in Queens. Masbia works "to provide free, wholesome, and delicious meals for people in a restaurant style environment with volunteer waiters serving each person with respect and dignity." (Ex. E, p. 20, Letter of Alexander Rappaport, founder.) The founder of the program describes Mr. Huberfeld as an exemplary volunteer. (Id.) "Murray rolls up his sleeves at least once a week. He knows no bounds, whether it is carrying heavy boxes, unpacking, helping with the meals, serving customers, or cleaning up." (Id.) Using his background in food service from Kosher Delight, Murray has designed a training program, and has created a proposal to modernize and expand services. (Id.) He has committed to raising funds for and overseeing the project. (Id.) Mr. Huberfeld's proposal is appended to Mr. Rappaport's letter to the Court. (Id.) Masbia's volunteer director reports that Murray is "pleasant and nice" to all the people he encounters and describes him as an excellent volunteer. (Id.)

*h.  Sbarro Bombing Victim*

On August 9, 2001 a suicide bomber struck a Sbarro restaurant in downtown Jerusalem, killing fifteen and wounding scores of others.  Lea Schijeveshuurder, eleven years old at the time, survived the bombing.  Both parents and three of her siblings were among those killed.  The next year, Mr. Huberfeld connected with Lea's family in an effort to provide a measure of comfort and support.  Almost eighteen years later, Lea recalls Murray's act of kindness as "one of the rays of light that illuminated the period after the attack." (Ex. D, p. 64, Letter of Lea Schijeveshuurder.) Mr. Huberfeld learned that Lea was turning twelve just a few months after the tragedy.  She writes that "with my parents and half my siblings gone, and in the midst of recovering from my injuries, I had no reason to look forward to my birthday." (Id.)  "Mr. Huberfeld heard about the terror attack and in particular about our family." (Id.)  "He took the trouble to find out more about us and decided to organize a bat mitzvah celebration that would raise our spirits and give us something positive to remember." (Id.)  Mr. Huberfeld arranged a full-day trip to Tiberius. (Id.) "He organized the celebration on his own, down to the smallest detail, and also accompanied us, together with his wife and children, for the whole time." (Id.)  Mr. Huberfeld remains in contact with Lea and has visited with her and her family many times in Israel. (Id.) This has had a lasting impact on the young woman: "He took a genuine interest in our progress and constantly encouraged us." (Id.)

A friend of the Huberfeld family recalls being invited to dinner on one of the floating restaurants of Galilee and being surprised on arriving to learn that a bat mitzvah party was to take place. (Ex. D, pp. 35-36, Letter of Jason Lyons.)  He writes: "No one of Murray's circle other than Laura and me knows of this story. Today, Your Honor, you are the only other person with

whom it has been shared. There are numerous such special kindnesses performed by Murray that go unreported, and that is typical Murray." (Id.)

> i. *Assistance Arranging the Recovery of Deceased from the Seas off Australia*

Samuel Grossman, a resident of Cedarhurst, writes to share a painful anecdote of an extraordinary action Mr. Huberfeld took for his family. In 2006, Samuel's teenage son, Avinoam, was swept into the sea while hiking on the shores of Perth, Australia during a religious outreach mission. (Ex. D, pp. 23-24. Letter of Samuel Grossman.) After three days, the Australian government intended to end the search. The family's grief was multiplied as they faced the prospect of not bringing their son's body to a proper Jewish burial. (Id.) Mr. Huberfeld "selflessly pleaded and put every possible effort forth" to lobby for resources to be sent to the site. (Id.) Avinoam's body was recovered by United States Coast Guard divers and returned to his family for burial. The family did not learn of Murray's involvement until many weeks later. (Id.)

David Safier, an American who was part of Avinoam's travelling group, recalls receiving a call from Mr. Huberfeld soon after his friend went missing. (Ex. D, pp. 59-61, Letter of David Safier.) Mr. Huberfeld had tracked down his number and called to offer assistance. (Id.) David writes, "I am forever grateful as I know Avinoam's family is, that Mr. Huberfeld cared enough to ease some of that trauma by helping to find Avinoam and ensure a proper burial for him." (Id.)

> j. *Quietly Providing Funds and Advice to Aid People Following Setbacks in Life*

Aside from large acts of charity and interventions following public disasters or tragedies, Mr. Huberfeld works to help others through the hardships of everyday life. He does these acts discretely, and often without being asked.

Joshua Mendlowitz writes about becoming disabled and homebound. He had prayers in his house every Sabbath. Mr. Huberfeld attended one weekend and observed that his living

conditions had deteriorated. "Without mentioning anything to me, Murray swung into action to make the necessary home improvements. I did not even find out until months later that Murray was involved." (Ex. D, p. 40, Letter of Joshua Mendlowitz.) Joshua knows of prior similar acts: "It was most important to Murray that he did these things in a way that protected the dignity and pride of the person in need. I watched, for many years, how Murray took of his own day-to-day life to personally see to it that families going through hardships would be able to keep their daily routines without having to lose their dignity." (Id.)

Mr. Huberfeld learned that the owner of a local restaurant he frequented had been forced to sell his family home to repay a business debt. Mr. Huberfeld provided him with an interest free loan for a down payment on a house. (Ex. D, pp. 1-2, Letter of Zvi Ben-Yosef.)

During the recession of 2008 and afterwards, Mr. Huberfeld led a small group of individuals who provided financial assistance to Lawrence residents who had suffered financially. (Ex. F, p. 25, Letter of Michael Fragin and Ex. G, pp. 7-8, Letter of Rabbi David Greenblatt.)

Upon learning that there were two graduating students of his daughter's high school who would not be able to afford to attend a "gap year" of seminary study in Israel, Murray reached out to the director to fund an anonymous scholarship to pay their costs. (Ex. E, pp. 4-5, Letter of Estee Friedman-Stefansky.) The school's director writes: "As an educator, I see Mr. Huberfeld's quiet act of kindness as remarkable. I have experienced many financially blessed people who are willing to pay for another's basic needs, but I have never experienced anyone who, unsolicited and anonymously, elected to afford others such an experience just to uplift and nurture them." (Id.)

After a difficult divorce left a friend financially unable to remain near his children in Lawrence, Murray offered him a home to live in at below market rent and a job. "He was determined not to let me buckle under." (Ex. D, p. 17, Letter of Brian Golomb.)

A father with four children at home and a wife suffering from breast cancer lost his job and reached out to Murray for help. (Ex. F, p. 55, Letter of Chaim Kiss.) "I felt desperate, very vulnerable and afraid. I was not looking for a handout but desperately wanted a job with health benefits." (Id.) Murray spent two days calling his contacts, eventually arranging for a successful job interview. "The fact that Murray spent so much of his valuable time to find me a job meant everything to Carole and me." (Id.)

While Murray was volunteering at a food pantry, he overheard the manager speaking about his inability to finance his children's yeshiva education and his plan to enroll them in public school. (Ex. D, p. 51, Letter of Ariel Mullodzhanov.) Murray immediately approached him and told him that he would call some friends and make sure his kids would be able to go to the school. (Id.) He writes, "I will never forget what Murray did for us. He didn't know us from before. But he heard me speaking and saw how worried I was, and he did everything to help me and the kids." (Id.)

Michael Schick first met Murray as a teenager when he worked alongside him as an elevator operator at the Schick family catering hall in Brooklyn. (Ex. D, pp. 62-63, Letter of Michael Schick.) Michael writes to the Court about the criminal conviction, and eight-year prison sentence imposed on his brother, leaving a family of ten children without a breadwinner, and the extended family's resources severely depleted. (Id.) "Very privately and full of concern" Murray approached the family to determine how he could help them continue to function as normally as possible and undertook to provide a monthly check. (Id.) "Each and every month, for eight years,

Chani received a check from Murray for her and the kids.  Until his last day my father never

forgot Murray's kindness, and neither will I." (Id.)

     *k.   Counseling Families and Children*

     Mr. Huberfeld has received calls from frantic parents, concerned that their kids were on

drugs or mixing with bad crowds.  (Ex. F, pp. 16-18, Letter of David Bodner.) Murray would

invite these children into his office to speak with them.  He gave some of them jobs in the office,

and others were invited into his home. (Id.)  "You can often see these kids in Murray's home,

gently finding their way back to normalcy… He has not only saved the integrity of their families,

but helps ensure their futures so they may marry, settle down, and have normal and stable

families." (Id.)



     A mother of five children from Lawrence writes to the Court to describe Murray's

intervention in her divorce proceedings.  (Ex. D, pp. 31-32, Letter of Gitty Lowinger.) Her

husband threatened to leave her and the children with almost no financial support.  She "felt all

alone with nowhere to turn to and no end in sight to court battles with my husband." (Id.) For more than six months, Mr. Huberfeld spent countless hours trying to mediate the divorce, coming up with creative proposals and working with a local lawyer. (Id.) "Most importantly, he gave me and my kids hope – there was someone in the neighborhood who took an interest in our problems and devoted his precious time to help." (Id.) Even during the trial in this matter, Mr. Huberfeld checked on her and tried to move negotiations forward. "That is who Murray is – he finds it more rewarding to help a friend in need then to worry about himself. His entire focus is on the wellbeing of others." (Id.) "Today, thanks to Murray's efforts, I am on a new path in life." (Id.)

*l. Mentoring Others in Business and Philanthropy*

Mark Mueller writes of meeting Murray when he was nineteen years old and felt that he had no direction in life. Knowing that Murray worked in finance, Mark introduced himself. (Ex. D, pp. 48-49, Letter of Mark Mueller.) "Unlike the others, he did not just make polite conversation with an eager kid. He immediately noticed that I was confused with no direction or sense as how to proceed." (Id.) "Without any exaggeration, he gave me hundreds of hours of his time without ever asking for anything in return. Incredibly, he allowed me to go along with him to meetings and ask as many questions as I needed. I must emphasize that I was not an intern or anything else of value to him." (Id.)

Jacob Sod credits Mr. Huberfeld with his transformation from an "at-risk" youth who had stopped keeping a religious way of life to the owner of a successful real estate company and an observant Jew. (Ex. D, pp. 77-79, Letter of Jacob Sod.) He writes of meeting Murray at a time when he was on the "fast track to self-destruction." (Id.) "Murray opened his heart and home to me. While he was caring, he gave it to me straight, and I took it from him." (Id.) "I look back now and am amazed at how he responded to this loser kid." (Id.)

Moshe Bodner, son of Mr. Huberfeld's business partner, David, was inspired to do charitable works by Murray. (Ex. D, pp. 3-7, Letter of Moshe Bodner.) "Murray believed in me." (Id.) "His words and advice were worth more than the dollars." (Id.) Moshe writes of how Murray's inspiration led him to create a non-profit project called Dressed With Dignity to provide quality clothing to low income people. (Id.) They decided to charge a nominal amount for the clothes so that recipients would not feel as if they were receiving charity. (Id.) Today the project has supplied 17,500 families in twenty cities and towns. (Id.) "This service has been a life and dignity saver for all these families. They can hold their head up high." (Id.)

## II. THE PARTIES AGREE THAT THE CALCULATION OF THE ADVISORY SENTENCING GUIDELINES RESULTS IN AN OFFENSE LEVEL IN ZONE B, WHICH AUTHORIZES THE COURT TO IMPOSE A NON-INCARCERATION SENTENCE

Mr. Huberfeld and the Government are in perfect unison on the calculation of the advisory Sentencing Guidelines in this case as they were originally calculated in Mr. Huberfeld's Presentence Report ("PSR"). See PSR, ¶¶ 28-37. The total offense level is 10, which at Criminal History Category I, results in a recommended Guidelines range of 6-12 months in Zone B. Under this Zone, the Guidelines provide for substitutes to incarceration for the period in months recommended by the Guidelines. For example, in Mr. Huberfeld's range of 6-12 months, the Court can impose a sentence of probation with a condition requiring six months of home detention. See U.S.S.G. § 5C1.1(c), comment. n. 3, 7.

For the many and substantial reasons stated herein, we respectfully recommend the Court apply a variance from the Guidelines under the Section 3553(a) factors because of the particular history and characteristics of this defendant. However, even if the Court declined to exercise its authority in this way, under a strict Guidelines sentence the Court is recommended not to impose a term of incarceration for a defendant with no criminal history points.

## **CONCLUSION**

Through his plea of guilty, Murray Huberfeld accepted responsibility for his actions in this matter.  But through his actions outside of the courtroom, he has gone much further.   Mr. Huberfeld has spoken with friends and family about his remorse and regret for violating the law and has sought to serve as an example to deter others from following a similar path.  These actions are relevant and important to the sentencing calculus in this case because they demonstrate both specific and general deterrence.

Having admitted committing a criminal offense, Murray Huberfeld is a changed man. Many of his friends and acquaintances have observed this.  They write that the "spring in his step has gone" and that he "stands with a bowed head over what he brought about."  (Ex. F, p. 101, Letter of Moshe Wagh.) An old friend writes that he has "been through the crucible of public humiliation" and is "truly humbled."  (Ex. E, p. 17, Letter of Michael Lebor.)  A rabbi who had counseled him writes that he is "totally humiliated" from what he has done.  (Ex. G, p. 29, Letter of Rabbi Zevi Trenk.)  The rabbi notes that this is felt acutely because Murray believes he has brought "our faith into disrepute" and has "poured out his heart during prayers, beseeching G-d for forgiveness."  (Id.)  But perhaps most importantly, Mr. Huberfeld has taken specific action to repair the damage he caused.

In his letter to the Court, Mr. Huberfeld accepts full responsibility for his wrongdoing. (Ex. A, Letter of Murray Huberfeld.)  He continues to work hard to make amends. (Id.)  He does so spiritually through self-reflection and prayer; in the community through service and by holding himself out as an example and warning to others; and practically, through his voluntary payment and commitment to restore $7 million to COBA's pension fund.

Mr. Huberfeld writes that the Rabbis with whom he has been working have repeatedly challenged him to explain what he was thinking when he committed the offense in this case. (Id.) "It has taken me some time to answer them, to come to terms with my wrongdoing because the truth is, I never anticipated or intended anyone to be harmed. That is not an excuse or an answer. What I thought would happen does not in any way excuse my conduct." (Id.) Mr. Huberfeld understands that his actions had consequences, and he is sincerely remorseful:

> I am deeply sorry for my misdeed and the consequences to all that are affected. I own that and it is a bitter pill to swallow. I maybe understand now why my parents were never bitter, after all they endured. They did nothing wrong at all, nothing to deserve their suffering. As for me, I am the one who caused my suffering. My actions or lack thereof hurt my parents, my wife and my five precious children, myself and, ultimately, my investors and others who lost money.
>
> Since these events, I have been speaking to groups of people about my crime and its consequences. I provide a cautionary tale. These meetings, and there have been many, are painful. I have brought my children and my sons-in law to my talks. I try to communicate Dina D'malchusa Dina (a commandment that literally translates as "the law of the land is the law"), and if what I said is helpful and if I am able to prevent someone from crossing the line as I did, then I have accomplished something.

(Id.)

Solomon Mayer, a longtime friend, attended one of Mr. Huberfeld's speeches in Borough Park, which was attended by hundreds of people. (Ex. F, pp. 66-69, Letter of Solomon Mayer.) Mr. Huberfeld admitted his wrongdoing and spoke openly about his failures. (Id.) Ashamed and humiliated, he directly appealed to his audience: "Please don't take this country and its freedoms for granted. As Jews, for so many hundreds of years we were shunted from country to country and we did not have the freedom to practice our own religion like we do here in the USA. All should resolve to be law abiding citizens and to give back as much as we can." (Id.)

Mr. Huberfeld has used this negative event to teach his children "to learn from his transgression and that they must think through every decision they make in life." (Ex. B, pp. 14-17, Letter of Laura Huberfeld.)  He has put himself out in his community as an example and warning for others and has brought his children along with him when he speaks to groups about his crime.  (Id.)  Laura Huberfeld writes that she is "proud of Murray for his decision to take responsibility for his wrongdoing and for turning his remorse into positive action." (Id.)  His eldest son, Avi, recognizes that it was not easy for his father to give these speeches in front of him.  "This helped me see him taking responsibility for his actions and how sorry he is. I recognized how difficult it is to admit guilt, especially in public, but he did." (Ex. B, p. 19, Letter of Alexander Huberfeld.)

Murray's son-in-law writes: "He has taught us about Dina D'Malkhusa Dina:  the law of the land is the land" and has spoken of his acceptance of responsibility for his actions. (Ex. B, p. 45, Letter of Daniel Jacobs.) "He has acknowledged this to each of us.  He tells us clearly that this is not a choice, but rather a commandment."  (Id.)

Murray's father-in-law, Walter Berkowitz, writes of attending Murray's trial one day without telling Murray he was coming. (Ex. B, pp. 12-13, Letter of Walter Berkowitz.)  "When the trial was adjourned everyone filed out and crowded around the elevator banks. Murray and I came face to face. He immediately burst into tears and expressed his remorse. He then started to wail. I hugged him tightly and felt his body convulsing. I literally felt his pain." (Id.)  Dr. Berkowitz writes: "I cannot weigh the implications of Murray's actions. But I am convinced of his remorse, humiliation and suffering." (Id.)

These demonstrations of acceptance of responsibility and remorse present an important piece in the overall fabric of determining a fair and just sentence of Murray Huberfeld.

In addition to the letters indicating Mr. Huberfeld's understanding of the wrongfulness of his actions, the other letters not referred to here are no less informative. They all present important pieces of the fabric that constitutes this Court's sentencing determination. Family members, friends, former colleagues, community members, neighbors, religious congregants and spiritual advisors, and all those who witnessed Murray's charity first-hand have written letters to the Court. These letters represent a truly remarkable outpouring of love and show of solidarity from every point in Murray's eventful life. The letters came from people who have known Murray his whole life; people who have worked with him professionally and on community service projects; and even those who have come to know him only as a result of this case and his need now for them to speak about his charitable deeds, because at the time of the charity, Murray never revealed his identity. The number and nature of the letters speak volumes about the type of person Murray is, and the life-changing impact he has had on so many lives.

These letter-writers, from a wide swath of his life, know Murray Huberfeld to be a good and decent man – and more tellingly, they are willing to stand up for him at this difficult time. We encourage this Court to recognize this tremendous love and support as the greatest marker of this man's life. His criminal conduct here does not accurately measure the true character of this man.

For all these very significant reasons, we respectfully ask this Court to be lenient with Mr.

Huberfeld and impose a sentence of probation.

Dated: January 17, 2019                Respectfully submitted,
      New York, New York

By:           /S/
                Henry E. Mazurek
                Evan L. Lipton
                Meister Seelig & Fein LLP
                125 Park Avenue, Suite 700
                New York, New York 10017
                hem@msf-law.com

                Alan S. Futerfas
                Law Offices of Alan S. Futerfas
                565 Fifth Avenue, 7th Floor
                New York, New York 10017
                asfuterfas@futerfaslaw.com

                *Counsel for Defendant Murray Huberfeld*