UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

UNITED STATES OF AMERICA         :

    -v.-                          :

MURRAY HUBERFELD,          :      S2 16 Cr. 467 (AKH)

                               :

                  Defendant.

                               :
--------------------------------------------------------------x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
Attorney for the United States of America

Martin S. Bell
Russell Capone
Lara Pomerantz
Assistant United States Attorneys
- Of Counsel -

Defendant Murray Huberfeld is to be sentenced on January 25, 2018 at 11 a.m. following his conviction for conspiracy to commit wire fraud.  The Government respectfully submits this memorandum in connection with the sentencing, and in response to the defendant's sentencing submission, dated January 17, 2019 ("Def. Mem.").

<u>**PRELIMINARY STATEMENT**</u>

The defendant's crime of conviction, on its face, is his role in a scheme to defraud the Platinum Partners hedge fund – a firm he helped found and remained associated with and invested in at the time of the offense – of $60,000 under false pretenses through the use of a fraudulent invoice.  Were that the entire gist of the scheme, it would still be a serious offense that required meaningful punishment.

But as the Court is well aware by now, there was more to it than that.  Murray Huberfeld committed an audacious fraud in the service of an *even more audacious* corruption scheme.  As Huberfeld himself admitted at the time of his guilty plea, he knew that the $60,000 was to go to co-conspirator Jona Rechnitz "as payment to Norman Seabrook for his efforts to get COBA to invest in Platinum Partners."  May 25, 2018 Huberfeld Plea Transcript at 28.  The payment was not a mere finder's fee.  It was a criminal payment.  As the Court is aware from the facts set forth in the Presentence Report, and from presiding over Seabrook's trial this past summer, the $60,000 was – as Huberfeld knew at the time – a kickback for Seabrook's having illicitly steered millions of dollars of his union's retirement funds into Platinum Partners ("Platinum").  The money was a reward for Seabrook's having betrayed his union – the Correction Officers Benevolent Association ("COBA") – for Seabrook's personal benefit.  And as set forth below, Huberfeld knew that the movement of COBA's money into Platinum pursuant to this corrupt bargain was not without risk – both the inherent risk of investing in a hedge fund instrument, and

the particular risk of investing in a hedge fund that, amidst struggles, desperately needed anchor institutional clients in order to shore up its cash reserves.  As a result of this broader scheme, Huberfeld secured for Platinum millions of dollars of COBA's money – and more than $1 million in fees – in an attempt to help keep the hedge fund afloat.  And COBA and its members, the clear losers in all of this, were left bereft of $19 million of its ultimate $20 million investment in Platinum when the hedge fund collapsed.

This unflattering but real context paints what might otherwise be a simple fraud with an altogether more severe brush.  It also adds potential wrinkles to the sentencing calculus that the Government seeks to clarify herein, mindful of the fact that Huberfeld's actual crime of conviction is his having defrauded Platinum of $60,000, and not more.  In order to appropriately frame the Court's consideration of these issues, the Government respectfully summarizes its position on a number of them at the outset, as follows:

- The applicable sentencing range under the United States Sentencing Guidelines is 6 to 12 months' imprisonment, reflective of the $60,000 loss figure to Platinum that appropriately drives the calculation.  The Court's contemplation of the appropriate sentence should begin there.

- The Court *can,* once it has calculated the Guidelines range to be 6 to 12 months imprisonment, vary upward or downward from that range at its discretion, in light of the factors articulated in Title 18, Section 3553(a) of the United States Code, provided that its sentence is below the five year statutory maximum for a violation of Title 18, Section 371 of the United States Code.

- The Court can, and should, consider the broader context within which the crime of conviction was committed in considering the "nature and circumstances of the

2

offense" under Section 3553, as opposed to under any alternative Guidelines analysis. The machinery of the broader kickback scheme, of which the $60,000 payment was a singular but pivotal cog, and Huberfeld's awareness of it, are relevant factors, as are the ramifications of that scheme.

- As set forth below, the Government takes issue with Huberfeld's attempt to minimize his awareness of the broader scheme and its potential consequences.

- The Court should consider Huberfeld's acceptance of responsibility – which distinguishes him from Seabrook – including, while pleading guilty to the narrower offense, Huberfeld's acknowledgment before the Court that that offense was in service of a bribe to Seabrook.

- The Court can and should also consider Huberfeld's willingness to pay COBA $7 million, an amount representing a significant portion of the $19 million in loss to COBA resulting from the bribery scheme, to which Huberfeld did not plead guilty. Whether Huberfeld legally owes restitution given his offense of conviction is subject to reasonable dispute; however, he has decided to make a significant voluntary contribution to COBA in spite of his legal position that he is not obligated to do so. That Huberfeld is going above what his particular plea requires where the overall outlook for COBA's recovery is otherwise grim should not be ignored.

- The Court should order restitution in the amount of $7 million.

The Government respectfully submits that, in this case, a meaningful punishment is necessary. Murray Huberfeld stole $60,000 from Platinum in support of a multi-million dollar kickback scheme. He and Jona Rechnitz lied, by way of a fraudulent invoice, about the purpose

3

of the money to be issued by Platinum.  In so doing, they continued a chain of events that, at day's end, resulted in the victimization of COBA and its members, the corruption of a powerful union leader, and the unnecessary career demise of Huberfeld, who himself had already had a run-in with the criminal justice system and knew better than to get involved in such conduct. The Government respectfully submits that a sentence of one year – at the high end of Huberfeld's Guidelines range – would be sufficient but not greater than necessary to provide just punishment, to reflect the nature, circumstances, and seriousness of the offense, to promote respect for the law, and to afford adequate deterrence to Huberfeld and others who might make the same choices.

## BACKGROUND

### I.    The Defendant and the Offense Conduct

Murray Huberfeld was one of the founders of Platinum and an investor in Platinum's funds.  (PSR ¶ 12).  In 2013, and continuing throughout the relevant period, the Platinum Partners Value Arbitrage Fund ("PPVA") – the fund into which Seabrook would eventually direct $20 million of COBA's annuity fund and operating account money – began to see significant investor redemptions, that is, requests to withdraw money from the fund.  The redemptions were not exceeded by incoming subscriptions or new investor money.  E-mails admitted into evidence during the original trial of Huberfeld and Seabrook – and the eventual retrial of Seabrook – make clear that high-level individuals within Platinum saw this trend as a potential existential threat to the fund, and that Huberfeld was aware of that threat.  For example, in June 2014, Platinum's Chief Investment Officer sent an e-mail to the President of the PPVA, blind-copying Huberfeld, in which he wrote that

> I think we need to revamp the strategy on PPVA… **It can't go on like this or practically, we will need to wind down.**  This is not a rhetoric thing, it's just not

> possible to manage net outflows of this magnitude.  I think we can overcome this but **this is code red**, we can't go on with status quo.  **We need to be very aggressive if we want to stay open**.  We can't pay out 25 million in reds [redemptions] per quarter and have 5 come in.

(GX 1041) (emphasis added).[1]  This was not a new concern.  In August 2013, the CIO had e-mailed Huberfeld, attaching recent redemption data for the PPVA fund.  The CIO wrote, "Please note subs [subscriptions] vs. reds.  Need for new direction is clear."  (GX 1002).  And again, in November 2013, the CIO forwarded an internal analysis of year-end redemptions to Huberfeld, writing, "50 million in reds for Dec 31."  (GX 1006).  Huberfeld, who by this time was not involved in the day-to-day management of the PPVA, nonetheless had his own and his family's money invested in it; shared in profits generated by it; and solicited other investors for it. (Tr. 265-266).

At around the very time that the PPVA was suffering from significant redemptions, and according to the testimony of Jona Rechnitz, Huberfeld told Rechnitz that the fund needed larger institutional investor clients.  In response, Rechnitz suggested that he might be able to recruit institutional clients using his relationships with people in law enforcement.  (Tr. 621-22).  In December 2013, Rechnitz took Seabrook and others on a trip to the Dominican Republic, during which he suggested to Seabrook that he (Seabrook) might be able to make money personally by investing COBA's money into Platinum.  (Tr. 636).  Seabrook agreed.  Huberfeld did as well, and they worked out a formula under which Seabrook would be paid.  (Tr. 641, PSR ¶ 14).  Within weeks, Platinum was presenting to COBA at COBA's offices in Lower Manhattan.  (GX

---

[1] Unless otherwise noted, GX references are to Government Exhibits admitted into evidence in the August 2018 retrial of *United States* v. *Norman Seabrook*, 16 Cr. 467 (AKH), which were also admitted in evidence in the first trial against Seabrook and Huberfeld before the Honorable Andrew L. Carter, United States District Judge, in October 2017.  Transcript references, unless otherwise noted, are to the second Seabrook trial transcript.

1019, 1021).  The presentation, however, was just a formality; Seabrook, who wielded enormous influence over the affairs of COBA, had already committed to steering union money to Platinum. And over the next year, at Seabrook's instigation, COBA invested $20 million in Platinum in three separate tranches.

Toward the end of 2014, when it was time to pay Seabrook, Huberfeld told Rechnitz that the fund had underperformed and Seabrook would only get $60,000.  (PSR ¶ 16).  Rechnitz agreed to lay out the cash, and Huberfeld agreed to get Platinum to reimburse Rechnitz. Huberfeld suggested that to paper over the reimbursement, Rechnitz invoice Platinum for a number of Rechnitz's courtside tickets to New York Knicks games, in the amount of $60,000, for tickets that had not, in fact, been given to Platinum.  Platinum would then cut a check to Rechnitz.  (Tr. 684-88).

Rechnitz paid Seabrook the $60,000 kickback on December 11, 2014, memorably handing the union leader a newly purchased Ferragamo bag containing the cash.  (PSR ¶ 17).[2] On the same day, Rechnitz's assistant prepared a $60,000 invoice to Platinum for Knicks tickets, which Rechnitz forwarded by e-mail to Huberfeld.  Three days later, Platinum paid Rechnitz by check.  Huberfeld, through another associate named Jeremy Reichberg,[3] continued to lobby Seabrook for more money in 2015, but after a lawsuit by a former COBA board member was

_____

[2] Huberfeld's sentencing submission refers, in its most direct treatment of the topic, to the payment having been "intended to compensate Rechnitz in securing a COBA investment into Platinum."  Def. Mem. 6.  Huberfeld's allocution handles this more squarely than his sentencing submission.  It is beyond dispute, as Huberfeld acknowledged in his allocution, that the money was paid so that Rechnitz could pay Seabrook for having engineered COBA's investment.

[3] Reichberg was recently convicted at trial of honest services fraud conspiracy, bribery conspiracy, honest services fraud and obstruction of justice in connection with a separate scheme that did not involve Huberfeld in *United States* v. *Jeremy Reichberg*, 16 Cr. 468 (GHW).

filed and the Government's investigation of Seabrook became known, no further investments were made.  (PSR ¶ 17).

In total, Seabrook caused COBA to invest approximately $20 million of its funds into Platinum, including $15 million in retirement money and $5 million from a union dues account that was used to cover basic operating expenses and served as COBA's safety net.  In late 2016, the PPVA filed for bankruptcy; at the time, COBA had redeemed only $1 million of its $20 million investment.  (Tr. 530-31).  The remaining $19 million will likely never be recovered.[4]

## II.   The Charges, *Seabrook I*, Huberfeld's Guilty Plea, and *Seabrook II*

Indictment 16 Cr. 467 (ALC) charged Huberfeld and Seabrook in two counts, alleging honest services fraud conspiracy and the substantive crime of honest services fraud in connection with the kickback scheme.  A jury was unable to return a verdict against either defendant on either count at the conclusion of a trial that began in October 2017 ("*Seabrook I*").  The case was subsequently reassigned to this Court.

On May 17, 2018, the grand jury returned Superseding Indictment S2 16 Cr. 467 (AKH), which added an additional count of wire fraud against Seabrook, alleging, on a right-to-control theory, that he deprived COBA of its right to control its assets.[5]  On May 25, 2018, Huberfeld pled guilty to the instant Superseding Information, S2 16 Cr. 467 (AKH), which charged one

---

[4] The circumstances of Platinum's collapse led to the indictment of several individuals in *United States* v. *Mark Nordlicht, et al*, 16 Cr. 640 (BMC) (EDNY), in which Huberfeld was not among those charged.  Trial in that case is scheduled to begin next month before the Honorable Brian M. Cogan, United States District Judge for the Eastern District of New York.  The Government is not asking the Court to consider the reasons behind Platinum's collapse in fashioning Huberfeld's sentence beyond Huberfeld's knowledge of the risks involved in COBA's investment at the time this scheme was taking place.

[5] This Court subsequently dismissed the right-to-control fraud count against Seabrook.

count of conspiracy to commit wire fraud based on Huberfeld's defrauding Platinum of $60,000 by way of the false Knicks tickets invoice.

On August 15, 2018, after a second trial ("*Seabrook II*"), a jury found Seabrook guilty of conspiracy to commit honest services fraud and the substantive crime of honest services fraud.

## III.   The Applicable Guidelines Range

In every case, the Guidelines range is the "starting point and the initial benchmark" for a sentence. *Gall* v. *United States*, 552 U.S. 38, 49 (2007); see also 18 U.S.C. § 3553(a)(4) (requiring consideration of applicable Guidelines range in determining appropriate sentence). As set forth in the parties' plea agreement and by the Probation Office, the base offense level is 6; a six-level increase is warranted due to the amount Huberfeld defrauded Platinum by way of the invoice scheme ($60,000); and a two-level decrease is warranted pursuant to U.S.S.G. § 3E.1 due to Huberfeld's acceptance of responsibility prior to trial.   Combined with a criminal history category of I, the Guidelines range is 6 to 12 months' imprisonment.

The Probation Office offers an "alternative" Guidelines calculation in which the millions of dollars invested by COBA are included as reasonably foreseeable losses to Huberfeld.  For three reasons, the Government asks the Court not to employ that calculus.

First, the Government notes, as it did in its December 11, 2018 submission (Dkt. No. 274), that it is bound by the plea agreement, and does not ask the Court to consider any Guidelines analysis other than that contained in the plea agreement.  Second, the Government reaffirms its position that, as a matter of law, the Court cannot simply apply the full $19 million of loss because the applicable Guideline for loss would be Section 2B4.1, the commercial bribery Guideline.[6]  Under Section 2B4.1, there is no enhancement for loss, but rather for the "benefit

---

[6] As noted in the Government's December 11, 2018 submission, this is a private honest services fraud case, rather than one involving misconduct by a public official in that capacity.  *See*

conferred" as a result of the misconduct.  That figure would be well short of the amount used in the Presentence Report's alternative calculation, and by the Government's estimate would be approximately $1.2 million, which is the amount of fees that COBA's investment generated for Platinum.

Third, employing the alternative Guidelines analysis would needlessly require the Court to decide the disputed issue of foreseeability.  Specifically, Huberfeld makes several representations that put at issue whether he could have reasonably foreseen the collapse of the hedge fund.  The Government submits that the answer to that question is "yes," based on a plain reading of Platinum officials' own e-mails to Huberfeld at the time of the scheme regarding the fund's tenuous state.  Further, if the fund's continued survival was contingent on the recruitment of a slew of institutional investors bearing substantial quantities of cash, COBA faced risks particular to being the first of those investors.  One can imagine COBA's ultimate predicament if no other institutional investor came to the rescue, but its money was still locked into the fund.  However, Huberfeld's protestations to the contrary would require the Court to make a number of factual findings regarding the foreseeability of the full loss to Huberfeld, on matters arguably collateral to the core of the conduct of the crime of conviction.  The question of whether the collapse was foreseeable to Huberfeld,[7] such that any investors Huberfeld corruptly solicited were victims of his efforts is one that the Court need not resolve.

---

U.S.S.G. § 2B1.1(c)(3) and Application Note 17 (where offense conduct more aptly covered by a guideline within Chapter Two other than § 2B1.1, more specific guideline should be used); U.S.S.G § 2B4.1 Application Note 1 ("This guideline covers commercial bribery offenses and kickbacks that do not involve [public] officials. . . .").

[7] The Government emphasizes that this is separate from the issue of what caused Platinum's demise and the resulting losses, which the Court need not consider in any event.

Instead, the Government respectfully submits that the better course would be to adhere to the original Guidelines calculation and consider the larger bribery scheme and loss to COBA in the context of the Section 3553 factors, varying – but not employing any Guidelines enhancements – should the Court desire.   Whether Huberfeld could have truly foreseen Platinum's bankruptcy and COBA's loss of nearly all of its investment, the basic facts remain the same and suitable for analysis under that provision: that Huberfeld knew of significant redemptions, that he bribed Norman Seabrook as part of an effort to attract institutional investors, and that there was always some possibility that the investment would not work out. These essential facts have been proven and are not reasonably subject to dispute.  They are sufficient to inform the Court's calculation of an appropriate sentence.

## DISCUSSION

### I.    A Twelve-Month Guidelines Sentence is Warranted

A sentence at the top of the Guidelines range of 6 to 12 months is appropriate and would meet the objectives set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.  *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(C).

As a threshold matter, the offense was serious.  As the Court is aware, the defendant's brazen scheme to extract $60,000 from his company based on false pretenses was part of an even more brazen corruption scheme meant to benefit the company and himself.  The Court can and

should consider the totality of the conduct in fashioning an appropriate sentence for Huberfeld. The $60,000 sham was, at its core, a theft; while Huberfeld intended to benefit Platinum by facilitating a large institutional investor, he did so by stealing $60,000 from the company to facilitate a bribe to that investor's principal.  That bribery scheme was even more serious, in that it led Seabrook, one of the City's most powerful labor leaders, to betray his rank-and-file followers and ultimately leave them without a significant portion of their retirement money. Passing a fraudulent invoice for courtside New York Knicks basketball tickets and causing a company to pay $60,000 on false pretenses would be worthy of punishment in its own right; the fraud that Huberfeld ran in the service of one of the more infamous union bribery schemes in the history of New York City cries out for a still more serious response.

Whether viewed as an act committed out of sheer greed and desperation given his investment in a fund that was endangered, or as an act of "pride" as characterized by the defense in its written submission, Huberfeld's criminality is made worse by the fact that it was utterly unnecessary.  By any measure, the defendant's prior business dealings had made him a massive financial success.  This turn toward criminality was not necessary in order for Huberfeld to stay afloat or for him to preserve a comfortable lifestyle for his family.  The question of whether the fund succeeded was not, for a man of his means, an existential issue, on a par with whether a civil servant's promised retirement benefit would be there one day when he or she walked away from a dangerous job.  There was no real need for this to happen.

But when Norman Seabrook put his duty to represent the men and women of COBA up for sale, Huberfeld nevertheless became a willing buyer.  It did not matter that this would amount to a betrayal of thousands of correction officers to whom Seabrook had a fiduciary obligation, men and women that Huberfeld at best chose not to see or imagine.  It did not matter that

Huberfeld was no longer formally affiliated with the fund, and that he himself would remain a very rich man whether or not Platinum was forced to unwind.  All that mattered was the chance to get a bit of an advantage at a time of need for the fund Huberfeld had helped create. Huberfeld entered into the corrupt bargain, and paid Seabrook using Platinum's  money.

Beyond the seriousness of the offense and need for just punishment, both specific and general deterrence militate in favor of a meaningful sentence.  The defense points to the consequences Huberfeld has endured and to studies that suggest that the rate of recidivism is lower in offenders Huberfeld's age or older.  Concerns about ageism aside, a problem with all of this is that Huberfeld has distinguished himself by already managing to defy those trends, as this conviction is not his first adverse brush with the law.  In 1992, Huberfeld was convicted of causing the fraudulent use of an identification document in order to defraud the United States, specifically for having had another individual take his Series 7 examination for him.  Huberfeld received a sentence of two years' probation for that offense.  (PSR ¶ 17).  This event should have caused Huberfeld to avoid future wrongdoing; instead, his career in the financial services industry has been bookended by criminality, with the more recent episode being the more severe misconduct.[8]  Because Huberfeld now has a record of lawbreaking consisting of more than one data point, and has failed to be deterred by his previous brush with the justice system, this new sentence must represent a step beyond his earlier punishment in order to be meaningful enough to reliably deter him.  The Probation Office, appreciating these concerns, specifically notes its hope that its proposed incarceratory sentence "will impress upon Huberfeld the seriousness of his

---

[8] Huberfeld's previous sentence of probation for substantially less serious conduct tends to render the possibility of a probationary sentence here for vastly more serious conduct incongruous, at best.

actions and deter him from letting his desire for financial gain lead him down a path involving criminal conduct."   (PSR at 24).

The cause of general deterrence also demands a reminder, through this Court's sentence, that those who would raise their hands as willing, illicit buyers for the loyalty of union leaders do so at great peril.  It cannot be that it is only the fiduciaries who face the possibility of serious prison sentences for receiving bribes.  In the world of bribery, it truly does take two to tango. Although kickback recipients who barter away what should be a sacred trust are often, and reasonably, seen as the most culpable parties, these corrupt bargains do not happen in the absence of corrupt partners.  Although Huberfeld points to the significant media coverage that the case, and others related to it, have received as sufficient to send the desired signal to the broader public, the public has in fact not yet received the most important signal it could receive: that bribing a union leader is punishable by the loss of one's liberty and is likely to be met with profound personal consequences.  Only the Court can send that message, and it can only do so at this stage.  Indeed, precisely because this case has received publicity, a below-Guidelines sentence would send the opposite message, and undercut whatever general deterrent effect Huberfeld trumpets has already occurred.

Further, the nature of this offense as a calculated, difficult-to-detect white collar offense also makes it a prime candidate for general deterrence.  *See*, *e.g.*, *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or

opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States* v. *Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

The Court should also consider Section 3553(a)'s command to avoid unwarranted sentencing disparities. The closest comparison to Huberfeld's crime of conviction in the recent history of local corruption defendants may be John Galbraith "Braith" Kelly, whom the Honorable Valerie E. Caproni, United States District Judge, sentenced to 14 months' imprisonment for his role in the conduct at issue in *United States* v. *Joseph Percoco*, 16 Cr. 776 (VEC). In that case, Joseph Percoco, one of the Governor of New York's closest associates, and others were charged with two bribery schemes, one of them the result of Percoco's efforts to help Kelly and the energy company for which he worked obtain assistance from state government in exchange for a low-show job for Percoco's wife. Percoco was convicted of conduct involving both schemes at trial. Originally charged with participating in the energy company scheme, Kelly pled guilty to a different crime: defrauding his employer in order to facilitate the low-show job. As a result of the lesser offense of conviction, Kelly's Guidelines called for a sentence of between 12 and 18 months' imprisonment, significantly lower than Percoco's. The analogy with Huberfeld's crime of conviction, and its proximity to still worse conduct, is clear, and a one-year sentence would be similar to what Kelly received.[9]

Finally, the Government takes no issue with Huberfeld's description of his relationships with his friends and family, which are doubtless important to the parties involved if not unusual,

---

[9] It is the Government's intention to furnish the Court with a longer list of comparable defendants in connection with the sentencing of Seabrook, who, having had a fiduciary relationship with his union members akin to a "public trust," is more readily comparable to numerous corruption defendants convicted within this District in recent years.

or Huberfeld's charity – both past donations and recent efforts while his sentence has been pending.  This conduct is laudable and worthy of consideration by the Court pursuant to 3553(a).  But the Government respectfully submits that allowing Huberfeld's recent charitable works and his past record of donating money from his significant holdings to charitable endeavors prevail entirely over the need for a punishment commensurate with the crime would send the wrong message to society.  It would suggest that, for someone of Huberfeld's means, leniency can be purchased as easily as Huberfeld sought to purchase Seabrook's loyalty.  That cannot be the take-away message from all of this.   Huberfeld's offense was serious.  Its consequences were serious.  And his sentence should likewise reflect the reality of his choices and their ramifications.

To be clear, Huberfeld is differently situated from Seabrook in a manner that requires his sentence to be the lesser of the two.   First, and importantly, Huberfeld accepted responsibility, whereas Seabrook did not.  And beyond accepting responsibility for the offense of conviction, Huberfeld publicly acknowledged that he submitted the fraudulent invoice to Platinum to paper over a kickback paid to Seabrook.  Second, and relatedly, Huberfeld was not convicted of the bribery scheme, whereas Seabrook was.  Third, while Huberfeld was well aware that the scheme involved corrupting a union leader, Seabrook alone, and not Huberfeld, violated a fiduciary duty.  And finally, Huberfeld's voluntary payment of $7 million to COBA – which will restore a substantial amount of the union members' losses – is a real step towards contrition that merits real consideration by the Court.  As the Government has previously acknowledged, particularly given that Huberfeld did not plead guilty to defrauding COBA, the question whether Huberfeld legally owes restitution under the Mandatory Victims Restitution Act ("MVRA") is a close one, subject to reasonable dispute.  But Huberfeld has contractually obligated himself to pay $7

million to COBA regardless of his legal obligation to do so.  That admirable step – while not one that should absolve him of all punitive consequence – should factor into the Court's analysis of the appropriate sentence.

**II.      The Court Should Order Restitution in the Amount of $7 Million**

Pursuant to its agreement with Huberfeld, COBA has withdrawn its claim to further restitution from Huberfeld as a result of Huberfeld's having agreed to pay it $7 million, an amount that represents roughly one-third of COBA's loss as a result of a conspiracy that principally involved three persons: Seabrook, Rechnitz, and Huberfeld.  *See* Dkt. No. 283. Consistent with the victim's position, the Government will ask the Court to order that Huberfeld pay precisely that amount – $7 million – in restitution, a sum that would include the $4 million Huberfeld has already paid.  Should any of these circumstances – including COBA's position – change, the Government reserves the right to seek further restitution from Huberfeld.

The Government also understands that Huberfeld's agreement with COBA provides that Huberfeld consents to the Court's ordering payment of the remaining $3 million he has agreed to pay COBA to be made a condition of his supervised release.  The Government does not object to that proposal.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a twelve-month

sentence, at the high end of Huberfeld's Guidelines range, is appropriate and would be sufficient,

but not greater than necessary, to serve the legitimate purposes of sentencing.

Dated: New York, New York
      January 24, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


By:   /s/ Martin S. Bell
      Martin S. Bell
      Russell Capone
      Lara Pomerantz
      Assistant United States Attorneys
      Southern District of New York
      (212) 637-2463/2247/2343




cc:    Alan Futerfas, Esq.
       Henry Mazurek, Esq.