UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
                                :
UNITED STATES OF AMERICA,      :
                                :
                                :    Case No. 1:16-cr-00467-LJL
                v.             :
                                :
MURRAY HUBERFELD,         :
                                :
            Defendant.    :
                                :
                                :
-------------------------------------------------------- x

## SUPPLEMENTAL
## SENTENCING MEMORANDUM ON BEHALF OF MURRAY HUBERFELD

DECHERT LLP
Andrew J. Levander
David N. Kelley
Lindsay E. Ray
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
andrew.levander@dechert.com
david.kelley@dechert.com
lindsay.ray@dechert.com
Telephone: (212) 698-3500

MEISTER SEELIG & FEIN LLP
Henry E. Mazurek
Evan L. Lipton
125 Park Avenue
New York, New York 10017
hem@msf-law.com
ell@msf-law.com
Telephone: (212) 655-3500

*Attorneys for Defendant Murray Huberfeld*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................................ 3

I.  MURRAY HUBERFELD IS FUNDAMENTALLY A
    GOOD AND HONORABLE MAN .................................................................................. 3

    A.  Murray Huberfeld Is A Family Man ................................................................. 3

    B.  Murray Huberfeld Has Dedicated His Life To His Faith And His Community ............... 4

    C.  Murray Huberfeld's Generosity Knows No Bounds ......................................... 6

    D.  Murray's Dedication To His Family, To His Community, And
        To Acts Of Charity Has Only Strengthened During These Trying Times ....................... 9

II.  MURRAY HUBERFELD'S CONDUCT, THOUGH SERIOUS, WAS LIMITED ............. 11

    A.  The Government Initially Alleged That Mr. Huberfeld Was Involved
        In A Kickback Scheme, But The Result Was A Hung Jury And Mistrial ...................... 11

    B.  Mr. Huberfeld Accepted Responsibility For The Limited Role He Played In
        Submitting A False $60,000 Invoice For Reimbursement In December 2014 ............... 12

    C.  Mr. Huberfeld Was Subjected To A Sentencing That
        Erroneously Punished Him For The Uncharged Kickback Scheme .............................. 13

III. MR. HUBERFELD HAS PAID DEARLY FOR HIS MISCONDUCT ................................. 15

    A.  Mr. Huberfeld's Life Has Been In Limbo For Five Years ................................ 15

    B.  COVID-19 Infection Would Pose A Serious Risk
        To Mr. Huberfeld's Already Deteriorating Health .......................................... 16

LEGAL ANALYSIS ..................................................................................................................... 18

I.  THE 6 TO 12 MONTH GUIDELINES RANGE FOR THE CHARGED
    CONDUCT FALLS WITHIN "ZONE B" OF THE SENTENCING TABLE ...................... 19

II.  GIVEN THE "ZONE B" RANGE AND IN LIGHT OF THE CIRCUMSTANCES,
     A SENTENCE TO SIX MONTHS' HOME CONFINEMENT IS APPROPRIATE ............ 20

     A.  Mr. Huberfeld Is In Poor Health ..................................................................... 22

B.  Mr. Huberfeld Cares For His ██████
    ██ Mother, His Children, And His Grandchildren .......................... 23

C.  Mr. Huberfeld Will Continue To Live A Law-Abiding, Productive Life ...................... 24

D.  Mr. Huberfeld's Contributions To The Community Run Deep....................................... 25

E.  The Nature And Circumstances Of The Offense Do Not
    Outweigh Mr. Huberfeld's Exemplary History And Characteristics.............................. 26

F.  Six Months' Home Confinement Would Provide Just Punishment
    And Adequate Deterrence In Light Of Mr. Huberfeld's Five Years
    Of Pretrial Release And His Low Risk Of Recidivism................................................... 28

CONCLUSION............................................................................................................ 29

# TABLE OF AUTHORITIES

**CASES**

Gall v. United States,
    552 U.S. 38 (2007)................................................................................................18

Kimbrough v. United States,
    552 U.S. 85 (2007)................................................................................................18

United States v. Adelson,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)..................................................................26

United States v. Barnes,
    No. 1:09-cr-01053-LJL, Dkt. No. 83 (S.D.N.Y. Sept. 29, 2020) ...........................22

United States v. Booker,
    543 U.S. 220 (2005)..............................................................................................18

United States v. Chirico,
    No. 08-CR-0076, 2008 WL 5273977 (E.D.N.Y. Dec. 18, 2008) .....................20, 25

United States v. Edelman,
    No. 06-CR-0002, 2006 WL 1148701 (S.D.N.Y. Apr. 24, 2006)...........................21

United States v. Gamez,
    1 F. Supp. 2d 176 (E.D.N.Y. 1998) .....................................................................23

United States v. Gerard,
    782 F. Supp. 913 (S.D.N.Y. 1992) ......................................................................27

United States v. Hanna,
    No. 02-CR-1364-01, 2003 WL 22705133 (S.D.N.Y. Nov. 17, 2003)..............21, 24

United States v. Harris,
    38 F.3d 95 (2d Cir. 1994).....................................................................................27

United States v. Merritt,
    988 F.2d 1298 (2d Cir. 1993)...............................................................................26

United States v. Pena,
    No. 15-cr-551, Dkt. No. 340 (S.D.N.Y. May 8, 2020) ................................22, 23, 25

United States v. Polakoff,
    No. 08-CR-0076, 2008 WL 5273981 (E.D.N.Y. Dec. 19, 2008) ...........................20

United States v. Rioux,
    97 F.3d 648 (2d Cir. 1996)...............................................................................21, 25

United States v. Schaefer,
   No. 1:07-cr-00498-LJL, Dkt. No. 73 (S.D.N.Y. Apr. 6, 2020) .........................................22, 23

United States v. Simalavong,
   924 F. Supp. 610 (D. Vt. 1995)...........................................................................................21

United States v. Springer,
   684 F. App'x 37 (2d Cir. 2017) ...........................................................................................28

United States v. Stuck,
   419 F. Supp. 3d 373 (D. Conn. 2019)..................................................................................19

United States v. Vassallo,
   No. 08-CR-0076, 2008 WL 3925299 (E.D.N.Y. Aug. 19, 2008)...............................20, 23, 29

United States v. Volpe,
   78 F. Supp. 2d 76 (E.D.N.Y. 1999), *aff'd in part, dismissed in part, on other grounds*, 224
   F.3d 72 (2d Cir. 2000)..........................................................................................................28

United States v. Zimmerman,
   No. 10-CR-598 JG, 2012 WL 3779387 (E.D.N.Y. June 19, 2012).........................................28

## STATUTES

18 U.S.C. § 3553(a) .............................................................................................. *passim*

## OTHER AUTHORITIES

U.S.S.G. § 2B1.1..................................................................................................................19

U.S.S.G. § 3E1.1..................................................................................................................19

U.S.S.G. § 4A1.2 .................................................................................................................19

U.S.S.G. § 5C1.1.....................................................................................................3, 18, 20, 29

iv

## INTRODUCTION

Murray Huberfeld has acknowledged that he broke the law in directing Platinum to reimburse Mr. Rechnitz for a $60,000 invoice he knew to be false.  When he was arrested in June 2016, Murray's world came crashing down.  Even worse, he has brought shame to his family and community, and, although his family and community have forgiven him and stand by him, that shame will haunt him for the rest of his life.

But there is much more to Murray than the worst mistake of his life.  He is a devoted son, husband, father, and grandfather.  He has spent much of the COVID-19 pandemic caring for his family and their various special needs.  Most particularly, Murray -- despite his own medical and personal hardships -- has spent much of his time doting on his nearly 88-year-old mother, a Holocaust survivor ███████████████████████████████████████████████
████████████████████████████████████████████████████████████ Murray has also devoted both his days and evenings to his grandchildren to help ease his children's burden, as they struggle ████████████████████████████ while balancing the burden of working from home alongside their young children.

In addition to his deep commitments to his family, Murray has long served as a model of giving and support, particularly in his religious community, but also to those in need from other communities, whether he knows them or not.  For example, before COVID, Murray regularly volunteered at a food bank in Queens for many years, often bringing his family along to help remind them of the importance of giving back to society.  Current health and safety measures (strictly enforced by his loving children and brother, who -- as a pulmonologist -- is all too familiar with the health risks associated with exposure to COVID-19) prevent Murray from physically working at the food bank at the time, but he looks forward to returning when it is safe to do so.

1

And notwithstanding the pandemic, Murray has continued to set an example of generosity, giving his personal time and support to numerous causes, as confirmed by the extraordinary number and quality of letters submitted to the Court in support of this submission. Among those truly Herculean efforts, Murray has continued to participate in a volunteer mentorship program counseling (remotely, or at a distance, these days) struggling young families. He even personally hosted and catered a number of (outdoor and distanced) events in the backyard of his Long Island home so that isolated members of the community could participate safely in the traditional *tachlis* dating process in his community and enjoy some much needed socialization during this difficult time. Through it all, he continues to be a charitable volunteer and donor, giving of his time and money to causes both within and outside of his community, supporting those who have been less fortunate.

Murray readily admits that he lost sight of his moral compass in 2014, and he has paid dearly for it -- and not just the $7 million he has voluntarily agreed to pay to COBA. Murray has lived under an intense cloud for the nearly five years since his June 2016 arrest. Since then, he and his family have suffered through a highly publicized prosecution, culminating in a weeks-long trial that ended with a deadlocked jury and a mistrial late in 2017. He then accepted responsibility for his role by reaching a plea agreement with the Government in May 2018, which he did with anticipation that the agreement would bring closure to him and, more importantly, to his family. Unfortunately, the sentencing on the plea agreement did not bring closure. Rather, after a nine-month delay related to Mr. Seabrook's second trial, the district court imposed an improper sentence, ordering Murray to serve 2.5 to 5 times the Guidelines range agreed to by the parties and proposed by the Government. Murray successfully appealed that decision, and he and his family now long for closure of their personal nightmare.

In considering what the appropriate sentence should be in this case, we respectfully suggest that the Court also consider this global pandemic that is unlikely to end before 2022. Had Murray been sentenced within the Guidelines range for the charged conduct at his February 2019 sentencing, he would have long served any prison time by now (prior to the pandemic's onset), and perhaps even completed his term of supervised release.  Instead, he comes before the Court a weathered 60-year-old, suffering from various serious medical problems -- many of them exacerbated by the stress of it all -- that have put him, according to his doctor, "at extremely high risk for serious complications" should he become infected with COVID-19 or any of its emergent variants.  And recent reports confirm that federal prisons remain a hotbed for COVID infections and deaths. For these reasons, as outlined in more detail below, we believe a permissible guideline sentence of probation with a condition of 6 months of home confinement, pursuant to Section 5C1.1(c)(3) of the Guidelines, more than adequately addresses all the goals of sentencing.

## **FACTUAL BACKGROUND**

I.     MURRAY HUBERFELD IS FUNDAMENTALLY A GOOD AND HONORABLE MAN

     A.     Murray Huberfeld Is A Family Man

Murray's love for his family, and their love in return, cannot be understated.  No fewer than **eighteen** of his closest family members submitted letters on his behalf in advance of his initial sentencing hearing.  *See* Dkt. No. 278-3 ("Exhibit B: Family Letters").[1]  We respectfully

---

[1]     Unredacted, electronic copies of this sentencing memorandum, and all of the supporting materials cited herein, will be provided via a secure file share link, pursuant to the Court's COVID-19 Emergency Individual Practices in Civil and Criminal Cases and in light of the voluminous testimony offered in support of Murray.  In addition, pursuant to Chambers' instructions by e-mail dated April 9, 2021, hardcopies of the same materials will be provided via Federal Express.

encourage the Court to read them in their entirety but we highlight below for you some passages that convey Murray's "arduous dedication" to his family.  *Id.* at 49.

"*I have never known anyone more dedicated to his family*" writes his brother-in-law, Josh.  *Id.* at 3.  His son-in-law, Ezra, observes that "[t]he Huberfeld children are unusually close to one another, and their adoration of Murray is mirrored by Murray's love" for them in return. *Id.* at 1.  Noah, another brother-in-law of Murray's, admires his "remarkable work-life balance" that has always included "a nurturing environment of kindness and caring that enveloped the lives of his wife, children, extended family, and ever expanding circle of friends."  *Id.* at 5. Murray's mother-in-law notes that Murray "is *completely devoted* to my daughter, Laura," and his father-in law adds that Murray is "*an exceptionally loving and nurturing husband, father, and grandfather*."  *Id.* at 9, 12.  His other brother-in-law, Seth, writes that Murray "constantly showered [his parents] with love, respect and attention," and "[f]amily has always meant everything to him."  *Id.* at 10.  Put simply, "*Murray [is] their rock*."  *Id.*

These heartwarming observations from Murray's in-laws are supported by the loving letters of support written by his own mother, his siblings, his wife, and all five of his children, ██████████████████  *See id.* at 14-43.  Notably, every single one of Murray's family members has stood by him through this, his most difficult and humbling of times, just as he has steadfastly stood by each of them throughout his life.  Indeed, his devotion is now more important than ever for his mother, █████████████████████████████  and six young grandchildren.

B.    Murray Huberfeld Has Dedicated His Life To His Faith And His Community

Murray is a man of deep faith who is passionate in his involvement in his community.  Of the nearly 150 letters submitted on Murray's behalf in advance of his initial sentencing hearing, *over 100* of them were written by members from throughout the community -- from young men

he has mentored to others whom he has supported throughout the years. *See* Dkt. No. 279-1 ("Exhibit D: Charity, Good Deeds, Mentor Letters"); Dkt. Nos. 280-2 through 281-1 ("Exhibit F: Community Support Letters"); and Dkt. No. 281-2 ("Exhibit G: Spiritual Advisor Letters"). Murray is also a champion of women's rights in the Orthodox Jewish community, having organized protests that successfully won wives the ability to divorce their husbands, often because of abusive behavior. And, not just one or two, but *seventeen* venerated Rabbis took the time to write letters in powerful support of Murray. *See* Dkt. No. 281-2. As Rabbi Lau -- the Chief Rabbi of Israel -- told Rabbi Yaakov Feitman, *there is no one more deep and profound a "Tzadik" (a "righteous person") as Murray*. Testimonial Video at 7:00. Rabbi Lau also emphasized to Rabbi Feitman that "*the State [of Israel] is a better place because of Murray Huberfeld*." *Id.*

　　Murray's dedication to his faith and community stems from the lessons of his parents, who both survived the Holocaust and whose families gave their lives for their religious liberty. Because many doors had been closed to his parents and their generation, Murray's home has always had an "open-door" policy. There is always an extra seat at his table, whether for the Sabbath, over the High Holidays, or on any given day. Over time, Murray's welcoming nature has borne fruit that has grown into a loving, caring, supportive community that thinks of Murray as family -- from Mr. Avi Hagar, who has known Murray since he was six and fondly looks to Murray as a big brother (Dkt. No. 280-2 at 46), to Jacob Elbogen, who writes that his relationship with Murray began as that of a "quasi-uncle-you-wish-you-always-had" (Dkt. No. 279-1 at 10), and dozens of others who likewise think of Murray as their "own flesh and blood" (*see id.* at 57). For some, Murray's positive influence in their lives began with a phone call with a warm and friendly voice on the other end, and for others it was through his happening

into their place of business and striking up a conversation.  The way in which Murray has entered everyone's lives varies but the result is the same -- his **warm, kind, and caring nature** shines through.

One theme often recurring in the dozens upon dozens of letters written in support of Murray is that **he takes the time to listen**.  Whether the conversation is with a close friend or family member, a mere acquaintance, or even a stranger -- though no one he meets remains a stranger for long -- Murray engages in each conversation with his complete attention and an open heart, as if he has nowhere else to be and nothing else in the world could matter more.  And if someone with whom Murray speaks has a problem, Murray without hesitation works with them to solve it, no questions asked -- and he always follows through.  Some attribute Murray's kindness to his "being **a naturally warm and social person**" (Dkt. No. 278-3 at 11), and others to "**his sensitivity and his empathy for people's challenges and their needs**" (*id.* at 14).  A review of even a small sampling of the letters submitted on Murray's behalf will show this is simply Murray's uniquely generous way, and always has been.

C.    Murray Huberfeld's Generosity Knows No Bounds

Murray believes fervently that it is the duty of those who are blessed with good fortune to share their blessings.  Some share their time, some their fortunes, some their energy, and others their wisdom.  Murray shares them all.  In an effort to describe the remarkable extent of Murray's generosity, Rabbi Binyomin Eisenberger explained, in a video of some of Murray's many supporters prepared in advance of the last sentencing:  "Murray is just huge.  His heart doesn't pump blood just for himself; his heart pumps, and **his pulse is the pulse of many, many men**."  *See* Testimonial Video at 18:20.

Blessed with success at a relatively early age, Murray has made it his life's mission to help others on their way to success. He is relentless in this practice, and he ensures that his mentees pay it forward, instilling in them the lesson that "being 'successful' is not about being successful for yourself; *'success' is sharing success with others*." *See* Testimonial Video at 13:30. A review of just a fraction of the letters and video footage submitted in support of Murray shows that he has spent a lifetime living by this truism.

And Murray's generosity knows no political, racial or cultural bounds. The food bank in Queens, where he has worked for years, serves a hugely disparate population reflective of that borough. Several letters submitted to the Court confirm Murray's universal decency and humanism. For example, Bangalay Kourouma, from West Africa, writes glowingly not only of Murray's mentorship but of their many cross-cultural discussions. Dkt. No. 279-1 at 27-28. Likewise, Zoltan Magyar writes, "I happen to be Hungarian Catholic, and Murray treats me like I could be one of his family." *Id.* at 37. And in the words of John P. Ryan, who attests to still more of Murray's good deeds, "I am a born and raised Catholic writing a letter for an Orthodox Jew with the same feeling that I would write for my own flesh and blood brother." *Id.* at 57-58.

One particularly poignant vignette is shared by Samuel Grossman, whose son tragically was swept away by the ocean while in Perth for a mission trip. He and his wife were told that the local Australian authorities would stop looking for his son after two or three days, and that's when Mr. Grossman learned that Murray -- unbeknownst to them -- had stepped in "behind the scenes" to ensure their son was found. *See* Testimonial Video at 8:00. "*Murray extended himself, 24/7* at the time, to make sure that the United States Coast Guard [was] involved." *Id.* Because Murray had made it his "personal agenda," Mr. Grossman's son's body was eventually

found, and he was able to receive a proper funeral service and burial.  *Id.*  Mr. Grossman remains eternally grateful for Murray's compassion and dedication to their recovery efforts, to which Murray was **"*instrumental.*"**  *Id.*

Another example of Murray's generosity of his time and resources can be seen through his efforts to help improve the lives of the Kletzky family, who he only met while paying a *shiva* call after their young son, Leiby, had been kidnapped and gruesomely murdered -- a tragedy that "touched the whole community."  *See* Testimonial Video at 15:40.  ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████.  Not only did Murray write a check of his own to help get the family back on their feet, but "***Murray rolled his sleeves up***" and told Rabbi Eisenberger "I will help you solicit the funds.  I will talk to people, I'll do anything -- I'll come to Brooklyn, I'll take you anywhere, I'll go anyplace, I'll make any phone call, I'll come to any meeting to put this money together."  *Id.* at 17:00.  Murray didn't know the Kletzky family or even live in Brooklyn, but he knew the family needed help and that he was in a position to help them.  That was all he ever needs to know.  The family was eventually able to purchase a larger apartment and Mr. Kletzky secured a new job as a local business owner, thanks to community efforts led by Murray, who was "***the driving force***."

These moving stories are just a few examples of the extent to which Murray will go to help others who are in need, whether he knows them or not.  In the words of Mr. Jacob Sod, it was Murray who taught him that "purely check-writing" should not be the extent of one's charity work.  *See* Testimonial Video at 14:00.  Instead, Murray impressed upon him that "***Charity is***

*about giving from the heart*.  Charity is *about caring*.  Don't just write a check, that's the easy way out.  *Ask*, make it yours, *and take ownership of a cause*."  *Id.*

     D.      Murray's Dedication To His Family, To His Community, And
                To Acts Of Charity Has Only Strengthened During These Trying Times

When the pandemic hit, Murray -- like many of us -- turned to his family, and they to him.  Of particular importance, Murray has also continued to support his mother throughout this difficult and isolating time ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████

In addition, all of his five children are now in Lawrence with him.  Two of his daughters have permanently moved to Lawrence with their families, while his eldest son and third daughter have lived with Murray and his wife intermittently since last March.  *See id.* at 3, 5.  In truth, Murray and his wife provided a makeshift daycare service throughout much of 2020 to help care for their young grandchildren so their elder daughters -- ████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████ -- could continue to work as the pandemic dragged on.  *See id.* at 5.  ████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████  *See id.* at 5-6, 10.  It is a full house, but Murray

sees it as a blessing that he has been able to support his family in their time of need, as they have been supportive of him through his.

The pandemic has also afforded Murray the opportunity to continue to give back to the community.  For example, upon hearing of families who have been hit hard financially by the pandemic, Murray has anonymously made donations or sought other contributions to ensure that suffering families are still able to enjoy a hearty Passover Seder or afford the gravestones and inscriptions for the family members they have lost during this pandemic.  *See* Ex. 1 at 7-8.  And last year over Passover, Murray -- knowing that many in the community were unable to celebrate in the traditional sense because of strict COVID restrictions at the time -- hired a singer to perform throughout the Five Towns from the back of a truck to help lift everyone's spirits.  *See id.* at 12-13.  A "caravan" of roughly 150 cars ended up following the procession, and Murray's ingenuity and caring made the holiday a special one for many.  *Id.*

In addition, during the warmer months, Murray and his family have hosted several "nights out" in his backyard (with the necessary COVID restrictions in place) so that young singles could participate in the traditional dating process practiced in Murray's community.  *See id.* at 3-4.[2]  Yet another way Murray has been able to give back is by acting as a (virtual and/or distanced) mediator to families in the community in need of guidance and, when needed, through their divorce.  *Id.* at 9-10.  Murray himself took it upon himself to ensure his local synagogue was "retrofitted" so that the community could safely resume prayer services as health and safety regulations allowed.  *Id.*  Consummate community leader and "rock and foundation of the

---

[2]    Murray is so self-effacing and humble in his giving that, on one occasion, an anxious attendee, unaware that Murray was the sponsor and homeowner for the event and not just the waiter, complained to Murray that he wasn't serving the attendee's date fast enough.

family" that he is (*id.* at 6), Murray has stepped up his dedication to his family and community in these difficult times.

## II.    MURRAY HUBERFELD'S CONDUCT, THOUGH SERIOUS, WAS LIMITED

### A.    The Government Initially Alleged That Mr. Huberfeld Was Involved In A Kickback Scheme, But The Result Was A Hung Jury And Mistrial

Before Murray pleaded guilty to the single count of conspiracy to commit wire fraud with an associated loss of $60,000, for which this Court will soon sentence him, a broader "kickback scheme" was alleged against him and Norman Seabrook, as co-defendants. *See* Dkt. Nos. 10 (the original "Indictment," filed on July 7, 2016) and 194 (the "Superseding Indictment," filed on May 17, 2018). Both Indictments alleged, in relevant part, that Murray "was a founder of Platinum and investor in Platinum's funds, and at relevant times participated in the management of Platinum" and that (Government informant and key witness) Jona Rechnitz "facilitated a kickback scheme between Norman Seabrook and Murray Huberfeld, the defendants." *Id.* ¶¶ 5-6. Specifically, the Government alleged that, in or around 2014, Rechnitz and Murray agreed that, if Seabrook could direct COBA to invest money into Platinum, Platinum would pay kickbacks to Seabrook in the amount of between $100,000 and $150,000 per year in exchange for facilitating the investments. *Id.* ¶¶ 14-15.

According to the indictments, it was when Seabrook "began demanding his first kickback payment from Platinum" in December 2014 that Murray "agreed to facilitate an initial payment of $60,000 to Seabrook on Platinum's behalf, using [Rechnitz] as an intermediary who would hand the money directly to Seabrook." Indictment ¶ 18; Superseding Indictment ¶ 23. The Government therefore charged both defendants with conspiracy to commit, and the commission of, honest services wire fraud (in both indictments), and added an additional charge of wire fraud

to the Superseding Indictment. *Id.* The loss associated with the "kickback scheme" was COBA's $19 million loss attributable to its investment in Platinum. *See id.*

A two-week trial against both Murray and Seabrook eventually began on October 24, 2017, and was presided over by the Honorable Andrew L. Carter, Jr. After six days of deliberation, the jury was deadlocked, and Judge Carter declared a mistrial. For scheduling reasons, in or around December 2017 the matter was reassigned to the Honorable Alvin K. Hellerstein for retrial. *See* Dkt. No. 333 at 8.

      B.     **Mr. Huberfeld Accepted Responsibility For The Limited Role He Played In** <u>**Submitting A False $60,000 Invoice For Reimbursement In December 2014**</u>

In May 2018 and before the case was re-tried, Murray accepted the Government's offer and pleaded guilty to a one-count, Superseding Information for conspiracy to commit wire fraud in the amount of $60,000. *See* Dkt. No. 201. The substantive factual allegations are straightforward:

> Huberfeld and Jona Rechnitz . . . caused the management company of the Platinum Partners hedge fund ("Platinum"), with which Huberfeld was affiliated, to pay $60,000 to Rechnitz's company by falsely representing, including through the use of a fraudulent invoice, that the money was to purchase courtside New York Knicks tickets, when in truth and in fact, and as Huberfeld and Rechnitz knew, the actual purpose of the payment was to reimburse Rechnitz for having paid Norman Seabrook, the President of the Correction Officers Benevolent Association ("COBA"), for Seabrook's efforts to get COBA to invest millions of dollars in Platinum.

Dkt. No. 201 at 2. Specifically, two Overt Acts are set forth: (a) "On or about December 11, 2014, Jona Rechnitz e-mailed a fraudulent invoice to Huberfeld, which on its face billed Platinum $60,000 for tickets to eight Knicks games at $7,500 per game," and (b) "On or about December 15, 2014, Huberfeld coordinated the delivery of a check from Platinum for $60,000 addressed to Rechnitz's company." *Id.* at 2-3.

At his allocution, Murray further explained:

> "In December 2014, I was a limited partner through an interest in a trust of the management company of Platinum Partners. As a limited partner of the management company, I occasionally introduced potential investors to the Platinum Partners marketing staff.  In this capacity, Jona Rechnitz approached me to assist the fund in finding new investors for Platinum. In December 2014, Rechnitz asked me to submit a false invoice from his company, JSR Capital, to Platinum's management company in the amount of $60,000 for New York Knicks tickets.
>
> I agreed to forward to Platinum's management company this invoice, knowing that no one at Platinum received the tickets. I knew the Knicks tickets invoice was false when I submitted it to Platinum's management company for payment. Instead, the money was requested by Rechnitz as payment to Norman Seabrook for his efforts to get COBA to invest in Platinum Partners[.]  Based on my misrepresentation, Platinum issued a check to Rechnitz's company in the amount of 60,000. At the time I submitted the invoice, Platinum's management company, its offices, were located within the Southern District of New York."

Dkt. No. 203 at 27:16-28:14.  The Court then accepted Murray's guilty plea and declared him "guilty of the charge[s] specified in the [superseding] information."  *Id.* at 29:8-12.

C.    Mr. Huberfeld Was Subjected To A Sentencing That
      Erroneously Punished Him For The Uncharged Kickback Scheme

Both Murray and Seabrook were sentenced in February 2019 -- Seabrook on February 8 and Murray on February 12.  Seabrook, who was convicted at the retrial of Counts One and Two of the Superseding Indictment, was sentenced to 58 months in prison, within the 51-63 month United States Sentencing Guidelines ("Guidelines") range, which factored in the $19 million loss to COBA.  Seabrook was sentenced to five months less than the Government's 63-month recommendation.  Dkt. No. 302 at 46:20-47:5.

When sentencing Murray, the Court disregarded the fact that the kickback scheme for which Seabrook had been convicted and sentenced was no longer part of the charged conduct against Murray.  Instead, throughout the sentencing hearing, the Court repeatedly referred to the

"act of bribery" for which Murray was to be sentenced and -- over objections made by both the Government and defense counsel -- applied the sentencing guidelines for commercial bribery instead of fraud.  *See* Dkt. No. 300 at 11:15-18; 41:24-42:11; 43:18-23; 48:23-24.  The Court ultimately sentenced Murray to 30 months in prison -- many multiples of the 6 to 12 month Guidelines range for the conduct charged in the Superseding Information and pursuant to which Murray pleaded guilty.  *See id.* at 59:18-21.  The sentencing Court also ordered Murray to pay $19 million in restitution to COBA, jointly and severally with Mr. Seabrook and Mr. Rechnitz, even though COBA was not a victim of Murray's crime.[3]  *Id.* at 63:5-13.

Murray appealed the errors made at his sentencing, and, on August 4, 2020, the Second Circuit issued its decision, agreeing that "the district court erred at sentencing by applying the commercial bribery sentencing guideline based on an uncharged bribery scheme that the government dropped in exchange for Huberfeld pleading guilty to the wire fraud."  Dkt. No. 333 at 3.  The Second Circuit further held that the Court had erred in ordering that Murray be held jointly and severally liable for the $19 million loss suffered by COBA, "an entity that was not a victim of the convicted conduct."  *Id.*  Accordingly, the Second Circuit vacated the judgment against Murray, reversed the restitution order, and remanded the matter for resentencing.  *Id.* at 4.

---

[3]   Despite his firm belief that he was under no obligation to pay COBA any restitution (a belief that was affirmed on appeal), Murray nevertheless offered voluntarily, and prior to his initial sentencing, to pay COBA $7 million -- $5.5 million of which he has already paid -- in an effort to help make COBA whole.  Ironically, Murray is the ***only*** one who has made any payments to COBA, as neither Mr. Seabrook nor Mr. Rechnitz have made any payment to COBA.

III.     MR. HUBERFELD HAS PAID DEARLY FOR HIS MISCONDUCT

      A.     Mr. Huberfeld's Life Has Been In Limbo For Five Years

Murray Huberfeld now comes before the Court for his second sentencing hearing.  He was arrested nearly five years ago, in June 2016, and, in late 2017, he and his family suffered through the pain and uncertainty of a long and difficult trial that ended with a deadlocked jury. Instead of subjecting his loved ones to a second trial, Murray accepted responsibility for his actions and, in May 2018, accepted the Government's offer to plead guilty to a $60,000 wire fraud against Platinum.  When Seabrook chose to have his case re-tried, Murray was left to wait another nine months before his sentencing hearing, only to have the Court erroneously apply the wrong Guidelines, necessitating an appeal that, while successful, resulted in yet another two years spent waiting to have his fate decided.

During these five years of waiting, Murray has lived under the watchful eye of pretrial services and has obeyed all the associated requirements and restrictions.  Murray surrendered all his travel documents and is unable to travel outside of the country without pre-approval or outside of the Southern and Eastern Districts of New York and the District of New Jersey without advance notice to pretrial services.  Because of these restrictions, Murray has not been able to visit his father's grave in Israel in more than three years.  Every Monday, or more than 200 times since his June 2016 arrest, Murray has dutifully checked in with pretrial services.  Of course, had he been sentenced in February 2019 to a sentence within the prescribed Guidelines range of 6 to 12 months, Murray would have long served any prison sentence by now, and before COVID-19 gripped the nation.

B.      COVID-19 Infection Would Pose A Serious Risk
        To Mr. Huberfeld's Already Deteriorating Health

Now, some two years later, the world continues to be ravaged by the coronavirus and its

variants.  While news of several effective vaccines and their ongoing rollout is encouraging,

recent news regarding the rapid appearance and spread of several "super strains" of the virus that

causes COVID-19 is of great concern.  Notably, it is possible for fully-vaccinated persons to fall

ill with COVID-19, especially given the early indications that available vaccines may not protect

against certain emerging variants, which are becoming more prevalent by the day.  Ex. 2 at 1 (the

"more contagious" B.1.1.7 variant (dominant in the UK) is now the most prominent strain

circulating in the U.S.); 2-3 (the "highly contagious" P.1 variant (dominant in Brazil) has now

been reported in New York, along with more than a dozen other states); 4-5 (fully vaccinated

individuals can still become infected), 6-7 (available vaccines may not protect against the

B.1.351 variant (originating in South Africa)).  Moreover, a recent report in the New York Times

confirms that COVID-19 infection and death rates in federal prisons are many multiples of the

comparable rates among the population at large.  *See id.* at 8 (infection rates 3 times greater in

federal prison).  *See also id.* at 8-26 (reporting that prisons remain a "hotbed" for COVID

spread).  Among the reasons for such high rates of sickness and death are the basic conditions in

prisons and the apparent reluctance of many inmates and correctional personnel to be vaccinated.

*Id.*  As prison officials have acknowledged, "It's inevitable once that new strain gets here [in the

prison system], it's going to spread like wildfire."  *Id.* at 8.  And even outside the prison system,

various reports predict that the pandemic will not ebb until sometime in 2022.  *See id.* at 27-33.

While he has avoided COVID-19 infection up to this point and has thankfully been

vaccinated, the fact of the matter is that Murray "is at extremely high risk for serious

complications" should he become infected.  Ex. 3 at 1.  In addition, in light of the incredible

stress of his ongoing legal battle, Murray "has gained significant weight" and now finds himself, to put it in clinical terms, "severely obese (BMI greater than 40kg/m$^2$)." *Id.* His doctor further noted that his latest lab results indicated "markedly elevated blood sugars in the Diabetic/Prediabetic range." *Id.* On top of those risks, Murray is being treated for hypertension and hyperlipidemia (and taking daily medications for both), and a Pulmonary Functioning Test performed in October 2020 showed a "mixed obstructive-restrictive pattern consistent with asthma and minimal/mild Coronary Artery Disease." *Id.* His brother, a pulmonologist, and other family members are extremely concerned of what may happen if Murray were to be exposed to COVID-19, and they have gone through great lengths to keep him safe from the disease.

And more recently still, on January 4, 2021, Murray fell in his home and suffered a full tear of his left quadriceps tendon, requiring surgery. Ex. 3 at 2-5. His physical therapist confirms that "it is imperative that Murray continue physical therapy 4x a week for the duration of 6-9 months as this is an extensive injury that requires long term care." Ex. 3 at 6. The recovery has been slow and painful, and it will be months before Murray is again able to regain any reasonable degree of mobility.

Under normal circumstances, and as acknowledged by the Government during the initial sentencing hearing, "[f]or someone with Mr. Huberfeld's life, for his exemplary giving" and in light of the charges against him and his Criminal History Category I, "no jail time" would be typical in order to ensure that the sentence imposed is no greater than necessary. *See* Dkt. No. 300 at 49:5-8. Given present circumstances -- including the condition of his dependent mother, delayed justice suffered by Murray (through no fault of his own), his need for months of intensive physical therapy so that he can independently walk again in light of his recent surgery, the "extremely high risk" to his health should he be exposed to COVID-19 or any of its variants,

and his voluntary agreement to pay $7 million to COBA -- a sentence to home confinement would surely serve the necessary and appropriate goals of sentencing.

## <u>LEGAL ANALYSIS</u>

Upon confirmation of the applicable Guidelines range and sentencing options available, the Court "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested." <u>Gall v. United States</u>, 552 U.S. 38, 49-50 (2007). The Supreme Court, in <u>United States v. Booker</u>, emphasized the non-binding nature of the Guidelines and instructed that courts consider each of the factors listed in 18 U.S.C. § 3553(a) in fashioning an appropriate sentence. 543 U.S. 220, 245 (2005). And so, the Sentencing Guidelines' advisory range is just one factor in the Court's determination of a reasonable sentence. Indeed, Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing district courts to impose a sentence ***sufficient, but not greater than necessary,*** to accomplish the goals of sentencing." <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007) (emphasis added).

As detailed below, application of these principles and the relevant case law to Murray's unique circumstances strongly supports imposition of a non-custodial sentence. Specifically, in light of (i) Murray's acceptance of responsibility and contrition (including $7 million in voluntary restitution), (ii) his multiple medical conditions, (iii) the needs of his family ████ ███████████ (iv) his deep ties to the community, (v) his low risk of recidivism, (vi) his long history of exemplary acts of charity, and (vii) the tortuous five-year history of this case, we respectfully suggest that the proper sentence for Murray is a sentence of probation with a condition of 6 months of home confinement, pursuant to Section 5C1.1(c)(3) of the Guidelines.

18

I.     THE 6 TO 12 MONTH GUIDELINES RANGE FOR THE CHARGED
       CONDUCT FALLS WITHIN "ZONE B" OF THE SENTENCING TABLE

       The terms of the plea agreement reflect the following Guidelines calculation:

| GUIDELINES PROVISION | POINTS/RANGE |
|---|---|
| Section 2B1.1 – Offenses involving fraud or deceit | - |
| Section 2B1.1(a)(2) – Base offense level | 6 |
| Section 2B1.1(b)(1)(D) – Resulting loss of $60,000 | +6 |
| Section 3E1.1(a) – Acceptance of responsibility | -2 |
| **Total offense level:** | **10** |
| Section 4A1.2(e)(3) – Criminal History Score | 0 |
| **RESULTING GUIDELINES RANGE** | **6-12 MONTHS** (Zone B) |

*See* Dkt. No. 367 ¶ 3.

       Significantly, Murray's crime caused no substantial financial hardship and involved no

theft, misrepresentation to a consumer, or any other element requiring further increase of the

base offense level aside from Platinum's $60,000 loss.[4]  Instead, Murray received a 2 point

reduction in light of his acceptance of responsibility, and in light of his criminal history score of

---

[4]     Although the PSR explains in extensive detail the kickback scheme of which Seabrook and Rechnitz were
       convicted, it is not a scheme for which Murray stands convicted.  Indeed, the Government ultimately decided
       not to pursue a prosecution of Murray for the same offenses as Seabrook and Rechnitz.  While it is appropriate
       for the Court to consider the scheme described in the PSR as some context in determining the appropriate
       sentence within the range identified in the PSR, it would not be fair under the circumstances of this case for that
       consideration to drive the Court's ultimate determination of an appropriate sentence.  *See* United States v.
       Stuck, 419 F. Supp. 3d 373, 376 (D. Conn. 2019) (a sentence should not be "driven and dominated" by
       uncharged conduct "to which the defendant has not admitted as part of his plea agreement.").

0 the Guidelines suggest 6-12 months' imprisonment.  The Amended Presentence Investigation

Report ("PSR"), issued on March 16, 2021, further confirms that, "[s]ince the applicable

guideline range is in Zone B of the Sentencing Table, the minimum term [of imprisonment] may

be satisfied by . . . a sentence of probation that includes a condition or combination of conditions

that substitute . . . home detention for imprisonment."  *Id.* ¶ 88.  Indeed, the Guidelines are clear

that, as acknowledged in the PSR, a Zone B guideline range can be satisfied by a term of home

confinement, as a condition to probation, in lieu of imprisonment.  U.S.S.G. § 5C1.1(c)(3).  Such

a sentence is therefore entirely consistent with the plea agreement that the government proposed

and Murray accepted in May 2018.

II.     GIVEN THE "ZONE B" RANGE AND IN LIGHT OF THE CIRCUMSTANCES, A
        SENTENCE TO SIX MONTHS' HOME CONFINEMENT IS APPROPRIATE

Factors weighing in favor of a sentence to home confinement include (a) the defendant's

poor health, (b) the defendant's ongoing responsibilities in caring for his or her family, (c) the

defendant's productive work history / minimal criminal history, and (d) the defendant's

contributions and close ties to the community.  *See, e.g.*, United States v. Polakoff, No. 08-CR-

0076, 2008 WL 5273981, at *2 (E.D.N.Y. Dec. 19, 2008) (defendant, convicted of extortion,

sentenced to 6 months' home confinement given ***his productive work history*** as a general

manager in the construction industry and his ***responsibilities caring for his ill wife and their***

***young child***); United States v. Chirico, No. 08-CR-0076, 2008 WL 5273977, at *2 (E.D.N.Y.

Dec. 18, 2008) (defendant, whose crimes "contributed to the support of a dangerous organized

crime family," sentenced to 6 months' home confinement given his engagement in "***several***

***altruistic activities***," his family's and the ***community's support***, and his operation of a restaurant

employing 25 people) (emphasis added); United States v. Vassallo, No. 08-CR-0076, 2008 WL

3925299 (E.D.N.Y. Aug. 19, 2008) (defendant, who ran an illegal gambling operation that

"economically supported the mob," sentenced to 4 months' home confinement in light of his "*serious diabetes*" that resulted in foot surgery and *required ongoing treatment*, which were "*best provided outside prison*") (emphasis added); <u>United States v. Edelman</u>, No. 06-CR-0002, 2006 WL 1148701, at *6 (S.D.N.Y. Apr. 24, 2006) (defendant, convicted of illegal trading on material nonpublic information, sentenced to 6 months' home confinement "in light of his *steady employment history* and lack of prior criminal convictions") (emphasis added); <u>United States v. Hanna</u>, No. 02-CR-1364-01, 2003 WL 22705133 (S.D.N.Y. Nov. 17, 2003) (defendant, convicted for his sale of counterfeit handbags -- his second known conviction -- sentenced to 6 months' home confinement, where he suffered from *asthma and heart disease, for which he took medication*); <u>United States v. Simalavong</u>, 924 F. Supp. 610, 611 (D. Vt. 1995) ("Because of the defendants' *involvement in their communities*, their extensive *work history*, their placement in *Criminal History Category I*, and their *secondary role in this conspiracy*, the Court has determined that incarceration is not appropriate" despite their conviction of "conspiring to transport illegal aliens") (emphasis added).

While one factor alone may be sufficient in the appropriate case to support a sentence of home confinement, the "combination" of relevant factors in this case -- including Murray's "*medical condition,*" his "*charitable and civic good deeds,*" his voluntary restitution, and the needs of his ▮ mother and other family members -- strongly justify a sentence of probation, with a condition of 6 months' home confinement.  <u>United States v. Rioux</u>, 97 F.3d 648, 663 (2d Cir. 1996) (emphasis added).

As this Court has recognized, it is especially important now -- in light of the ongoing pandemic and prison conditions that compound one's risk of exposure to the virus and therefore the heightened risk of death -- to examine each defendant's health and their risk for

complications should they be exposed to COVID-19 while incarcerated.  Given the potentially

fatal nature of such an infection to a person in Murray's condition, the risk of contracting

COVID-19 is a critical factor to consider in determining whether imprisonment is, in fact,

"necessary," pursuant to Section 3553(a).  For example, this Court previously granted a

defendant's early release to 4 months' home confinement (of his 6 month sentence) because, as a

59-year-old with hypertension with a brief hospitalization in 2019 for a "heart irregularity," he

was at a "higher risk for severe illness" upon exposure to COVID-19.  United States v. Schaefer,

No. 1:07-cr-00498-LJL, Dkt. No. 73 (S.D.N.Y. Apr. 6, 2020).  This Court has likewise

concluded that home confinement during this pandemic is appropriate where a sixty-year-old

defendant, like Murray, suffers from hyperlipidemia and hypertension and has "a limited

criminal history, extensive involvement in the community, had engaged in charitable acts, had

substantial ties to his family, and most importantly had a low likelihood of recidivism."  United

States v.  Barnes, No. 1:09-cr-01053-LJL, Dkt. No. 83 (S.D.N.Y. Sept. 29, 2020) (citing United

States v. Pena, No. 15-cr-551, Dkt. No. 340 (S.D.N.Y. May 8, 2020)).

 A. Mr. Huberfeld Is In Poor Health

 Since Murray was first sentenced, his health has substantially deteriorated.  Now 60 years

old, Murray "has gained significant weight" and is now "severely obese," meaning his BMI is

greater than 40kg/m2.  Ex. 3 at 1.  Further, he now has "markedly elevated blood sugars"

indicating that he is "in the Diabetic/Prediabetic range," and he is taking medications for both

hypertension and hyperlipidemia.  Id.  Perhaps most concerning given COVID-19's proven

proclivity to cause severe pneumonia requiring the need for a ventilator, Murray's Pulmonary

Function Testing (performed in October 2020) "revealed a mixed obstructive-restrictive pattern

consistent with asthma" along with some mild coronary artery disease.  Id.  In the words of his

cardiologist, Murray "is at extremely high risk for serious complications" should he be exposed

to COVID-19.  *Id.*  Accordingly, home confinement would be both just and sufficient in light of the ongoing pandemic.  *See supra* at 22 (discussing <u>United States v. Schaefer</u> and <u>United States v. Pena</u>).

In addition to these chronic ailments, and as set forth above, Murray suffered a fall on January 4, 2021, that resulted in a complete tear of his left quadriceps tendon that required surgery.  Ex. 3 at 2-5.  Murray is undergoing intense therapy as he learns to walk again, and his physical therapist emphasizes that "it is imperative that Murray continue physical therapy 4x a week for the duration of 6-9 months, as this is an extensive injury that requires long term care."  *Id.* at 6.  Although he has seen some improvement, Murray has about 6 months of physical therapy remaining before he hopefully will be able to walk independently.  Like the defendant in <u>Vassallo</u>, Murray's ongoing treatment is "best provided outside prison."  2008 WL 3925299, at *2.  And so, both his chronic and acute medical conditions strongly weigh in favor of a sentence of home confinement.

> **B.**     Mr. Huberfeld Cares For His ███████████
>              <u>Mother, His Children, And His Grandchildren</u>

While any term of imprisonment will in some way affect the family, friends, and community of the defendant, it is unfair for innocent third parties to suffer unnecessarily when a term of home confinement would suffice.  *See* <u>United States v. Gamez</u>, 1 F. Supp. 2d 176, 184-86 (E.D.N.Y. 1998) ("Because sentences may have drastic collateral consequences for innocent third parties, courts should not be discouraged from departing for family reasons").  Murray is the father of five ███████████████ and grandfather of six, and he is an involved and supportive father and grandfather to all.  During the pandemic, Murray has stepped up to provide back-up childcare for his grandchildren so that his children ████████ ██████████████████████████ can work remotely.  Ex. 2 at 34-41.

Moreover, Murray has an extraordinarily close relationship with his mother.  They have always been close, but they have grown even closer since Murray's father passed away in 2017, during the pendency of this case.  In particular, Murray has in many ways filled the role of caretaker for his aging ███████████ mother, especially during the pandemic.  Although his recent injury to his quadriceps tendon has limited his mobility, Murray has spent much of his time caring for her throughout the past few years.  His mother's care has become an especially important issue given that, since her son's initial sentencing, ███████████████████████ ████████████████████████████████████████████.  Rae Huberfeld not only survived the Holocaust but she did so by hiding for months in a barn, including several days under an animal trough.  To not have her son by her side ███████████████ would add another tragedy to the many she already has suffered.  In light of Murray's extraordinary relationship with and support of his family, a sentence of imprisonment would be unnecessarily harsh not only to Murray but more fundamentally still to his family -- and especially to his ██████ mother -- where, as here, home confinement is available.

      C.      <u>Mr. Huberfeld Will Continue To Live A Law-Abiding, Productive Life</u>

As indicated by his Criminal History Category I and in light of his advancing age, Murray has a "low risk of recidivism."  Dkt. No. 367 at 32.  After acknowledging that Murray has one prior conviction for a minor offense committed in his early twenties, the probation officer emphasized that he has since lived a "productive, charitable, and law-abiding" life.  *Id.* To be clear, and as seen in <u>Hanna</u>, the existence of an ancient prior conviction does not disqualify a defendant from eligibility for home confinement in lieu of imprisonment, especially where the defendant is in Criminal History Category I.  *See* 2003 WL 22705133, at *1.  Indeed, throughout his life, Murray has emphasized doing things the right way to the countless young

men and women he has employed, counseled, and mentored throughout various stages of their careers.

Significantly, however, while his counseling and mentorship have continued undeterred despite this long running prosecution and the pandemic, Murray has been side-lined from business for five years now, as the sheer prospect of imprisonment has severely limited any options for Murray.  However, if sentenced to home confinement in lieu of imprisonment, Murray will be able to return to his life of productivity and job creation.

    D.    <u>Mr. Huberfeld's Contributions To The Community Run Deep</u>

As set forth above -- and as can be seen in greater detail in the overwhelming letters and statements submitted on his behalf -- Murray's "charitable and civic good deeds" are truly a unique phenomenon.  Throughout his lifetime, Murray has not only given of his fortune ██ ██████████████████████████████████████████████████████ ██████ but has spent hours upon hours of his time volunteering and mentoring within and beyond his community.  The breadth, number, and wide variety of Murray's good acts, both to those he knows and to complete strangers, from different communities, are remarkable. Although the Court imposed an improper sentence, Judge Hellerstein acknowledged that Murray's history and characteristics show him to be "one of the most noble people that has ever come before" him, in his more than twenty years on the bench.  Dkt. No. 300 at 58:24-59:1.  As observed by the courts in <u>Chirico</u> (2008 WL 5273977, at *2) and <u>Pena</u> (No. 15-cr-551, Dkt. No. 340 (S.D.N.Y.)), a clear history of charitable giving like Murray's weighs in favor of a sentence to home confinement in lieu of imprisonment.  *See also* <u>Rioux</u>, 97 F.3d at 663.  His charitable giving -- together with his medical conditions, as well as the needs of his family, and his low risk of recidivism -- only tips the scale further in favor of such a sentence.  The long and

unfortunate road to get here, including the mistrial, the delayed initial unlawful sentence, and the time for the appeal, only adds emphasis to the propriety of a sentence free of incarceration.

Indeed, even the Government has recognized Murray's impressive record of good works and charity.  At the initial sentencing, the lead prosecutor acknowledged that "[f]or someone with Mr. Huberfeld's life, for his exemplary giving prior to [2014], that $60,000 [loss] range for somebody in criminal history I would likely lead to a sentence of no jail time."  Dkt. No. 300 at 49:5-8.  We respectfully suggest that this observation is particularly trenchant here.  Without controverting the seriousness of Murray's offense, the combination of Murray's positive factors powerfully outweighs any need for incarceration.  In other words, a sentence of probation, with a condition of 6 months' home confinement, is an entirely appropriate way to satisfy the requirements of Section 3553(a).

     E.     The Nature And Circumstances Of The Offense Do Not
              Outweigh Mr. Huberfeld's Exemplary History And Characteristics

Section 3553(a)(1) indicates that the Court must weigh "the nature and circumstances of the offense and the history and characteristics of the defendant."  A defendant's history and character are therefore "a central consideration in the fashioning of a just sentence."  United States v. Merritt, 988 F.2d 1298, 1307 (2d Cir. 1993).  By engaging in this exercise, the sentencing judge partakes in an "elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice" because "surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."  United States v. Adelson, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

The nature and circumstances of the charged offense are straightforward: (1) In December 2014, the Government's informant (Jona Rechnitz) e-mailed an invoice to Murray billing Platinum $60,000 for Knicks tickets; (2) Murray knew that the purpose of the $60,000 payment "was to reimburse Rechnitz for having paid Norman Seabrook" for his efforts "to get COBA to invest millions of dollars in Platinum"; and (3) Murray nevertheless "coordinated the delivery of a check from Platinum for $60,000 addressed to Rechnitz's company."  Dkt. No. 201 at 2-3.  Although Mr. Seabrook was convicted of a "kickback scheme," Murray was not.  The jury simply was not persuaded by the Government's case against him.  In light of the facts and circumstances adduced at the first trial, the Government made a plea offer that fairly reflected Murray's limited role.  Thus, the nature and circumstances of the offense of conviction are narrow.  The charged conduct represents a single and limited event that took place in December 2014, among a lifetime of good deeds.  Given the uniquely strong history of generosity and remarkable contributions of his energy, time, and resources, the balance between Murray's life and Murray's offense clearly weighs in favor of a lenient sentence.

Moreover, Murray voluntarily agreed to pay $7 million in restitution to COBA -- more than one third of its loss -- even though, as the Second Circuit confirmed in its Mandate, COBA is not a "victim" of Murray's crime.  Such a substantial, voluntary act of good will and contrition is yet another factor weighing in favor of a non-custodial sentence.  *See* United States v. Gerard, 782 F. Supp. 913 (S.D.N.Y. 1992) (reducing a three-year Guidelines range to 5 years' probation in part based on defendant's attempts to arrange for "restitution of amounts in excess of those for which she is being held accountable under her plea").  *See also* United States v. Harris, 38 F.3d 95 (2d Cir. 1994) (noting that a voluntary payment of restitution would have weighed in favor of

leniency); United States v. Volpe, 78 F. Supp. 2d 76 (E.D.N.Y. 1999) (same), *aff'd in part, dismissed in part, on other grounds*, 224 F.3d 72 (2d Cir. 2000).

> F.  Six Months' Home Confinement Would Provide Just Punishment
> And Adequate Deterrence In Light Of Mr. Huberfeld's Five
> Years Of Pretrial Release And His Low Risk Of Recidivism

Section 3553(a)(2) counsels the Court to also consider "the need for the sentence imposed . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment[.]" Courts have acknowledged that even supervised release, also referred to as "conditional liberty," alone can be a sufficient and just punishment. *See* United States v. Springer, 684 F. App'x 37, 40 (2d Cir. 2017); *see also* United States v. Zimmerman, No. 10-CR-598 JG, 2012 WL 3779387, at *6 (E.D.N.Y. June 19, 2012) (reviewing the ways in which "[s]upervised release brings with it a series of significant restrictions on a defendant's liberty").

As noted above, the PSR emphasizes that Murray, now 60 years old, has been fully compliant throughout the nearly five years since his June 2016 arrest, during which he has been subjected to the conditions of pretrial supervision. Dkt. No. 367 at 32. In other words, Murray has already born nearly five years' worth of weekly check-ins -- more than 200 to date -- with the probation office and other significant limitations to his movement and liberty. Murray has also suffered through his mistrial, Mr. Seabrook's second trial, an unfair sentencing, and his ultimately successful appeal. Murray has thus been significantly burdened, if not punished, over the past five years, which alone serves as both a specific and general deterrent to others who might find themselves in a similar position.

In addition, the PSR acknowledges that Murray "appears to be at low risk for recidivism." _Id._ As such, there is no need to protect the public from any further crimes at the hand of Murray Huberfeld, and he is in no need of any training or treatment that would be available to him in prison. In fact, his situation is quite the opposite, since treatment for his serious and ongoing medical conditions are, as described above, "best provided outside prison." Vassallo, 2008 WL 3925299, at *2. And so, the need to impose a "just punishment" that is "no greater than necessary" also weighs in favor of a sentence of probation, with a condition of 6 months' home confinement.

## CONCLUSION

Murray Huberfeld pleaded guilty to a single count of conspiracy to commit wire fraud, with an associated loss of $60,000. Consequently, given his criminal history score of 0, Murray's suggested sentence falls in Zone B of the Sentencing Table, with a possible prison term of 6 to 12 months. The Guidelines are clear that, for this suggested range, "a sentence of probation with a condition requiring at least [6 months] of . . . home detention would satisfy the minimum term of imprisonment specified in the guidelines range." U.S.S.G. § 5C1.1 n.3. Given (i) Murray's acceptance of responsibility and contrition (including $7 million in voluntary restitution), (ii) his multiple medical conditions, (iii) the needs of his family ██████████ ████ (iv) his deep ties to the community, (v) his low risk of recidivism, (vi) his long history of exemplary acts of charity, and (vii) the tortuous five-year history of this case, home confinement in lieu of imprisonment is particularly appropriate. In the words of Section 3553(a),

a sentence to 6 months' home confinement would be *"sufficient, but not greater than*

*necessary*."

Dated:  April 12, 2021
New York, New York

Respectfully submitted,

By: _____/s/  *Andrew J. Levander*_____
    Andrew J. Levander
    David N. Kelley
    Lindsay E. Ray
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
andrew.levander@dechert.com
david.kelley@dechert.com
lindsay.ray@dechert.com
Telephone: (212) 698-3500

*Attorneys for Defendant Murray Huberfeld*