UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA          :

   -v.-                                              :

MURRAY HUBERFELD,                 :       S2 16 Cr. 467 (LJL)

                                                          :
                      Defendant.
                                                          :
------------------------------------------------------------x

## THE GOVERNMENT'S RESENTENCING MEMORANDUM

                                        AUDREY STRAUSS
                                        United States Attorney
                                        Southern District of New York
                                        Attorney for the United States of America

Lara Pomerantz
Assistant United States Attorney
- Of Counsel -

Defendant Murray Huberfeld is to be sentenced for a second time on May 24, 2021, following his conviction for conspiracy to commit wire fraud and a vacatur of his initial sentence of 30 months' incarceration. The Government respectfully submits this memorandum in connection with the resentencing proceeding.

## PRELIMINARY STATEMENT

The defendant was initially sentenced by the Honorable Alvin K. Hellerstein on February 12, 2019. At the time that Judge Hellerstein imposed his sentence, he noted that although he found that Huberfeld had lived a mostly laudable life—"one of the most noble people" ever to have come before that Court as a defendant (Sent. Tr. 58-59)—his offense, the context in which it occurred, and its ramifications cried out for serious punishment. Judge Hellerstein, who had at that point presided over the trial of co-defendant Norman Seabrook, sentenced the defendant to 30 months' incarceration, a sentence that mirrored the bottom of a United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range that the Second Circuit Court of Appeals has since invalidated, but a sentence that Judge Hellerstein noted he would have imposed irrespective of whether he had used that elevated Guidelines range or the lesser range that had been stipulated by the parties. (*Id*. at 59).

While the Government does not dispute (and has never disputed) that the defendant's applicable Guidelines range is correctly calculated as 6 to 12 months' imprisonment, the Government also has consistently taken the position that a meaningful term of imprisonment is necessary to fulfill the legitimate goals of sentencing. *See generally* 18 U.S.C. 3553(a). The defendant's crime of conviction stemmed from his role in a scheme to defraud the Platinum Partners hedge fund ("Platinum")—a firm he helped found and remained associated with and invested in at the time of the offense—of $60,000 under false pretenses through the use of a

1

fraudulent invoice.  But Huberfeld's fraud was also a pivotal part of a far greater crime: the bribery of Seabrook, then the president of the New York City Correction Officers Benevolent Association ("COBA"), which as detailed herein caused Seabrook to abdicate his duty to the union membership for personal benefit.  As Huberfeld himself admitted at the time of his guilty plea, he knew that the $60,000 from Platinum, obtained by way of false pretenses, was to go to co-conspirator Jona Rechnitz "as payment to Norman Seabrook for his efforts to get COBA to invest in Platinum Partners."  (Plea Tr. 28).  The payment was not a mere finder's fee.  It was a criminal reimbursement.  As the Presentence Report ("PSR") sets forth, and as Huberfeld knew at the time, the $60,000 constituted a payment to Rechnitz to supply Seabrook with a kickback for Seabrook's having illicitly steered millions of dollars of his union's retirement funds into Platinum over the course of the previous year.  (PSR ¶¶ 2, 17).  In short, the money was a reward for Seabrook's having betrayed his union for personal benefit.

And as set forth below, the broader context of the fraud led to a more widespread tragedy.  Huberfeld knew that the movement of COBA's money into Platinum pursuant to this corrupt bargain was not without significant risk.  Platinum was struggling, and badly.  Nineteen million dollars of union funds—nearly all of the investment money that flowed from the Huberfeld-Seabrook bribe arrangement—was lost when the hedge fund collapsed.  That money would never see its way back to the retiring corrections officers who were entitled to it.

Judge Hellerstein—taking into account the significant toll the defendant's conduct ultimately took on union members—calculated an applicable Guidelines range of 30 to 37 months' imprisonment, imposed a sentence of 30 months' imprisonment, and ordered restitution of $19 million.  While the Second Circuit has since ruled that neither the applicable range under the Guidelines nor the restitution penalty can derive from the bribery offense, this court *can* consider

that conduct—and the "factual context" surrounding the crime of conviction more generally, *United States v. Seabrook*, 968 F.3d 224, 235 (2d Cir. 2020)—as part of its Section 3553(a) analysis in imposing sentence. As such, the appropriate Guidelines range remains 6 to 12 months' incarceration, as set forth in the parties' plea agreement. The Government remains of the view, consistent with the view of the U.S. Probation Department as set forth in its PSR, that a sentence of 12 months' incarceration—at the high end of Huberfeld's Guidelines range—would be sufficient but not greater than necessary to provide just punishment, to reflect the nature, circumstances, and seriousness of the offense, to promote respect for the law, and to afford adequate deterrence to Huberfeld and others who might make the same choices.

## BACKGROUND

### I. The Defendant and the Offense Conduct

Murray Huberfeld was one of the founders of Platinum and an investor in Platinum's funds. (PSR ¶ 13). By 2013, Huberfeld's principal role was to help solicit investors, which generated fees for Platinum and ultimately Huberfeld. (Tr. 265).[1] At that time, Huberfeld knew that Platinum was struggling. The Platinum Partners Value Arbitrage Fund ("PPVA")—the fund into which Seabrook would eventually direct $20 million of COBA's annuity fund and operating account money—had begun to see significant investor redemptions, that is, requests to withdraw money from the fund. These redemptions were not exceeded by incoming subscriptions or new investor money, creating an obvious—and increasingly dire—problem. (*See, e.g.*, GX 1002, 1041). E-

---

[1] Unless otherwise noted, and consistent with the record citations at the original sentencing proceeding, GX references are to Government Exhibits admitted into evidence in the August 2018 retrial of *United States v. Norman Seabrook*, 16 Cr. 467 (AKH), which were also admitted in evidence in the first trial against Seabrook and Huberfeld before the Honorable Andrew L. Carter, United States District Judge, in October 2017. Trial transcript references, unless otherwise noted, are to the transcript of the August 2018 retrial of Seabrook.

3

mails admitted into evidence during the original trial of Huberfeld and Seabrook—and the eventual retrial of Seabrook—make clear that high-level individuals within Platinum saw this trend as a potentially existential threat to the fund and that Huberfeld was aware of that threat. For example, in June 2014, Platinum's Chief Investment Officer sent an e-mail to the President of the PPVA, blind-copying Huberfeld, in which he wrote:

> I think we need to revamp the strategy on PPVA . . . . **It can't go on like this or practically, we will need to wind down.** This is not a rhetoric thing, it's just not possible to manage net outflows of this magnitude. I think we can overcome this but **this is code red**, we can't go on with status quo. **We need to be very aggressive if we want to stay open**. We can't pay out 25 million in reds [redemptions] per quarter and have 5 come in.

(GX 1041) (emphasis added). This was not a new concern. In August 2013, the CIO had e-mailed Huberfeld, attaching recent redemption data for the PPVA fund. The CIO wrote, "Please note subs [subscriptions] vs. reds [redemptions]. Need for new direction is clear." (GX 1002). And again, in November 2013, the CIO forwarded an internal analysis of year-end redemptions to Huberfeld, writing, "50 million in reds [redemptions] for Dec 31." (GX 1006). Huberfeld, who by this time was not involved in the day-to-day management of the PPVA, nonetheless had his own and his family's money invested in it; shared in profits generated by it; and solicited other investors for it. (Tr. 265-266).

According to the testimony of Government cooperator Jona Rechnitz, at around the very time that the PPVA was suffering from a significant redemption imbalance, Huberfeld told Rechnitz—Seabrook and Huberfeld's mutual acquaintance—that the fund needed larger institutional investor clients. In response, Rechnitz—a young real-estate businessman who sought to ingratiate himself to powerful figures like Huberfeld—suggested that he might be able to recruit institutional clients using his relationships with people in law enforcement. (Tr. 621-22). Rechnitz

4

told Huberfeld that he would approach Seabrook about investing COBA money in Platinum. (Tr. 634). In December 2013, Rechnitz took Seabrook and others on a trip to the Dominican Republic, during which Rechnitz suggested to Seabrook that Seabrook might be able to make money personally by investing COBA's money into Platinum. (Tr. 636). Seabrook agreed. (Tr. 637). Rechnitz traveled back to New York and updated Huberfeld, explaining that Seabrook would likely invest COBA money in Platinum if Huberfeld were willing to pay Seabrook money on the side. (PSR ¶ 15). Huberfeld signed on to the plan. (*Id.*). Huberfeld and Rechnitz worked out a formula under which Seabrook would be paid for his role in the scheme, based on how well the funds he had secured for Platinum performed. (Tr. 641-42, PSR ¶ 15). Huberfeld estimated that Seabrook would be paid between $100,000 and $150,000 per year. (*Id.*).

Within weeks of the trip to the Dominican Republic, Platinum presented to COBA's annuity fund board at COBA's offices in lower Manhattan. (GX 1019, 1021). The presentation, however, was just a formality; Seabrook, who wielded enormous influence over the affairs of COBA, had already committed to steering union money to Platinum. And over the next year, in 2014, at Seabrook's instigation, COBA invested $20 million in Platinum in three separate tranches—in March ($10 million), June ($5 million), and August ($5 million) of 2014. (PSR ¶ 16; Tr. 508-09, 528-29). The June investment was not even from the same source. (PSR ¶ 16). In addition to its benefit fund, COBA had a basic operating account that was used to keep the fund afloat, which including the union's emergency reserve. (*Id.*). In June, Seabrook diverted $5 million of that money to Platinum without the required authorization. (*Id.*).

Toward the end of 2014, when it was time to make the first kickback payment to Seabrook, Huberfeld told Rechnitz that the fund had underperformed and that Seabrook would only get $60,000. (PSR ¶ 17). Rechnitz agreed to lay out the cash, and Huberfeld agreed to get Platinum

5

to reimburse Rechnitz, knowing that he would do so in fraudulent fashion.  (*Id*).  In particular, Huberfeld suggested that to paper over the reimbursement payment from Platinum, Rechnitz invoice Platinum for a number of Rechnitz's courtside tickets to New York Knicks games, in the amount of $60,000, even though no tickets had, in fact, been given to Platinum.  (*Id.*).  Platinum would then reimburse Rechnitz pursuant to that sham invoice.  (*Id.*).

Consistent with that plan, Rechnitz paid Seabrook the $60,000 kickback on December 11, 2014, handing the union leader a newly purchased Ferragamo bag containing the cash.  (PSR ¶ 18).  On the same day, Rechnitz's assistant prepared a $60,000 invoice to Platinum for Knicks tickets, which Rechnitz forwarded by e-mail to Huberfeld.  (*Id.*; GX 1062, 1063).  Three days later, Platinum paid Rechnitz $60,000 by check.  (PSR ¶ 18; GX 1066).

Huberfeld, working through an associate of Seabrook's and Rechnitz's named Jeremy Reichberg,[2] continued to lobby Seabrook to invest more of the union's money in 2015.  (PSR ¶ 19).  Notably, a judicially authorized wiretap caught Huberfeld making frenzied requests for more money from "Norman."  (*See, e.g.*, GX 901-T, 903-T, 908-T).  However, after a lawsuit against COBA was filed by a former COBA board member and the Government's investigation of Seabrook became known, no further investments were made.  (PSR ¶ 19).

In total, Huberfeld and Seabrook caused COBA to invest approximately $20 million of its funds into Platinum, including $15 million in retirement money and $5 million from the operating account that was used to cover basic operating expenses and served as COBA's safety net.  (PSR ¶ 20).  In late 2016, the PPVA filed for bankruptcy; at the time, COBA had redeemed only $1

---

[2] Reichberg was convicted at trial of honest services fraud conspiracy, bribery conspiracy, honest services fraud and obstruction of justice in connection with a separate scheme that did not involve Huberfeld in *United States v. Jeremy Reichberg*, 16 Cr. 468 (GHW).

million of its $20 million investment. (Tr. 530-31; PSR ¶ 20). The remaining $19 million will likely never be recovered.[3]

## II. The Charges, *Seabrook I*, Huberfeld's Guilty Plea, and *Seabrook II*

Indictment 16 Cr. 467 (ALC), returned by the grand jury in July 2016, charged Huberfeld and Seabrook in two counts, alleging honest services fraud conspiracy and the substantive crime of honest services fraud in connection with the kickback scheme. A jury was unable to return a verdict against either defendant on either count at the conclusion of a trial that began in October 2017. The case was subsequently reassigned to Judge Hellerstein.

On May 17, 2018, the grand jury returned Superseding Indictment S1 16 Cr. 467 (AKH), which added an additional count of wire fraud against Seabrook, alleging, on a right-to-control theory, that he deprived COBA of its right to control its assets.[4]

On May 25, 2018, Huberfeld pled guilty, pursuant to a written plea agreement with the Government, to Superseding Information S2 16 Cr. 467 (AKH), which charged Huberfeld with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, based on Huberfeld's defrauding Platinum of $60,000 by way of the false Knicks tickets invoice. As a part of his plea, Huberfeld acknowledged knowing that the $60,000 stolen from Platinum was being used to reimburse Rechnitz for having bribed Seabrook. During his plea allocution, Huberfeld described his participation in the fraud, stating, in substance and in part, "I knew the Knicks tickets invoice was false when I submitted it to Platinum's management company for payment. Instead,

---

[3] The circumstances of Platinum's collapse led to the indictment of several individuals in *United States v. Mark Nordlicht, et al*, 16 Cr. 640 (BMC) (EDNY). Huberfeld was not charged in that case, which resulted in a mixed verdict that is currently under appeal. The Government is not asking the Court to consider the reasons behind Platinum's collapse in fashioning Huberfeld's sentence beyond Huberfeld's knowledge of the risks involved in COBA's investment at the time this scheme was taking place.

[4] Judge Hellerstein subsequently dismissed the right-to-control fraud count against Seabrook.

the money was requested by Rechnitz as payment to Norman Seabrook for his efforts to get COBA to invest in Platinum Partners." (Plea Tr. 28).

On August 15, 2018, after a second trial, a jury found Seabrook guilty of conspiracy to commit honest services fraud and the substantive crime of honest services fraud. Seabrook was ultimately sentenced to 58 months' incarceration.

Huberfeld was sentenced on February 12, 2019. Prior to his sentencing, and with his restitution obligation still the subject of active litigation before Judge Hellerstein, Huberfeld reached an agreement with COBA pursuant to which he voluntarily agreed to pay COBA $7 million. At the sentencing proceeding, Judge Hellerstein *sua sponte* decided to apply the Guideline for commercial bribery rather than the standard fraud guideline under U.S.S.G § 2B1.1, citing a need for both the Guidelines and the actual sentence to reflect the bribery conduct. (Sent. Tr. 10). Judge Hellerstein thus arrived at an applicable range of 30 to 37 months before imposing a term of 30 months' imprisonment. In so doing, Judge Hellerstein noted that, "whether I start with a 12-month guideline and vary upwards from it or whether I use the guideline calculation that led to 30 to 37 months of a guideline," he would nonetheless impose a sentence of 30 months' imprisonment. (*Id.* at 59). Judge Hellerstein also imposed a $19 million restitution order to COBA, reflecting the amount COBA had lost as a result of the bribery scheme of which the fraud conviction was but a part.

Huberfeld appealed his sentence. On August 4, 2020, the Second Circuit Court of Appeals vacated the sentence and remanded to the District Court for further proceedings. *See Seabrook*, 968 F.3d 224. The Second Circuit ruled that Judge Hellerstein had erred by using the Guidelines range for commercial bribery, as the bribe scheme was not either the offense of conviction or included within the offense of conviction. *Id.* at 232-35. Similarly, the Second Circuit determined

that Judge Hellerstein had erred by imposing a restitution order against Huberfeld as if he had been convicted of the bribery scheme. *Id.* at 236. The sentence was vacated, the restitution order was reversed, and the case remanded for these resentencing proceedings.[5]

### III. The Applicable Guidelines Range

As the Court is well aware, the Guidelines range is the "starting point and the initial benchmark" for a sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also* 18 U.S.C. § 3553(a)(4) (requiring consideration of applicable Guidelines range in determining appropriate sentence). The parties (through their plea agreement) and the Probation Office agree that U.S.S.G. § 2B1.1 applies, and indeed, the Second Circuit directed that "[o]n remand, the district court must use Section 2B1.1, the fraud guideline." *Seabrook*, 968 F.3d at 235. Under that Guideline, the base offense level is 6; a six-level increase is warranted due to the amount Huberfeld defrauded Platinum by way of the invoice scheme ($60,000); and a two-level decrease is warranted pursuant to U.S.S.G. § 3E.1 due to Huberfeld's acceptance of responsibility prior to the second trial. (PSR ¶¶ 29-37). With Huberfeld's Criminal History Category of I, the Guidelines range is 6 to 12 months' imprisonment. (PSR ¶¶ 40, 88).

As the Second Circuit pointed out, "[i]f the district court desires to impose an upward variance based on the seriousness of the crime, it may." *Seabrook*, 968 F.3d at 235. This Court thus can consider the bribery scheme; indeed, as the Second Circuit suggested, this Court, in crafting a sentence that reflects the "nature and circumstances" of the offense, remains free to consider the "factual context of the fraud." *Id*.

---

[5] Seabrook challenged his conviction on appeal, principally on evidentiary grounds. The Second Circuit upheld his conviction. *See United States v. Norman Seabrook*, 814 F. App'x 661 (2d Cir. 2020).

## DISCUSSION

### I. A Twelve-Month Guidelines Sentence is Warranted

A sentence at the top of the Guidelines range of 6 to 12 months is appropriate on the facts of this case and would meet the objectives set forth in 18 U.S.C. § 3553(a).

The offense was serious. As detailed above, the defendant's brazen scheme to extract $60,000 from his company based on false pretenses was part of an even more brazen corruption scheme meant to benefit the company and himself at the ultimate expense of thousands of rank-and-file union members. The $60,000 sham was itself, at its core, a theft; while Huberfeld may have intended to benefit Platinum by facilitating a large institutional investor, he did so by stealing $60,000 from the company to facilitate a bribe to that investor's principal. Moreover, Huberfeld's role in the invoice fraud was central: he devised the fraud on Platinum with Rechnitz, helped devise the cover story under which Rechnitz would create a sham invoice for Knicks tickets, and then arranged for the submission of the invoice to Platinum and ultimately for payment from Platinum to Rechnitz.

That conduct alone is worthy of significant punishment. But in considering the nature and seriousness of the offense, the Court should not ignore that the $60,000 theft was in furtherance of a bribery scheme of substantial impact on COBA's membership and in which Huberfeld played a pivotal role. Huberfeld agreed to pay Seabrook, devised the formula that would govern the size of the bribe, met with Seabrook in person in advance of his fund's pitch to COBA (Tr. 648-50), and helped execute the invoice fraud to reimburse Rechnitz for his cash payment to Seabrook. Moreover, he did so at a time when he knew that the fund was in trouble and suffering from a significant redemption imbalance, and that the movement of COBA's money into Platinum pursuant to this corrupt bargain was not without risk.

Whether viewed as acts committed out of sheer greed or desperation given his investment in a fund that was endangered, it bears mention that Huberfeld's criminal conduct came despite, not in order to generate, his massive financial success. In particular, his criminal conduct was not necessary in order for Huberfeld to stay afloat or for him to preserve a comfortable lifestyle for his family. The question of whether the fund succeeded was not, for a man of his means, an existential issue, on par with whether a civil servant's promised retirement benefit would be there one day when he or she walked away from a dangerous job.

But Huberfeld was nonetheless happy to have Rechnitz recruit Seabrook into their scheme, and when Seabrook put his duty to represent the men and women of COBA up for sale, Huberfeld became a willing buyer. It did not matter that this would amount to a betrayal of thousands of correction officers to whom Seabrook had a fiduciary obligation, men and women that Huberfeld at best chose not to see or imagine fully. It did not matter that Huberfeld was no longer formally affiliated with the fund, and that he himself would remain a very rich man regardless of whether Platinum was forced to unwind. All that mattered was the chance to get a bit of an advantage at a time of need for the fund Huberfeld had helped create. Huberfeld entered into the corrupt bargain, and paid Seabrook using Platinum's money.

Beyond the seriousness of the offense and need for just punishment, both specific and general deterrence militate in favor of a meaningful sentence. It bears mentioning that this conviction is not his first brush with the law. In 1992, Huberfeld was convicted of causing the fraudulent use of an identification document in order to defraud the United States, specifically for having had another individual take his Series 7 examination for him. (PSR ¶ 39). Huberfeld received a sentence of two years' probation for that offense. (*Id.*). This event should have caused Huberfeld to avoid future wrongdoing; instead, his career in the financial services industry has

11

been bookended by criminality, with the more recent episode being the more severe misconduct. Huberfeld's previous sentence of probation for substantially less serious conduct tends to render the possibility of a probationary sentence here for vastly more serious conduct incongruous. Because Huberfeld has failed to be deterred by his previous brush with the justice system, and indeed has only gone on to commit a more serious crime, this new sentence must represent a step beyond his earlier punishment in order to be meaningful enough to reliably deter him. The Probation Office, appreciating these concerns, specifically notes its hope that its proposed incarceratory sentence "is warranted to punish the defendant, promote respect for the law, and convey a message of general deterrence" and "to adequately take into account the full scope of the overall scheme." (PSR at 32).

The cause of general deterrence also weighs heavily in favor of a meaningful term of incarceration. In particular, this Court in imposing sentence is well positioned to remind even the financially well off and professionally successful that those who engage in financial misconduct and that those willing to funnel bribe payments to union leaders in misguided efforts to further their own success, do so at great peril.

Further, the nature of this offense as a calculated, difficult-to-detect white collar offense also makes it a prime candidate for general deterrence. *See*, *e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks

omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

The Court should also consider Section 3553(a)'s command to avoid unwarranted sentencing disparities. One point of comparison is John Galbraith "Braith" Kelly, whom the Honorable Valerie E. Caproni sentenced to 14 months' imprisonment for his role in the conduct at issue in *United States v. Joseph Percoco*, 16 Cr. 776 (VEC). In that case, Joseph Percoco, one of the Governor of New York's closest associates, and others were charged with two bribery schemes, one of them the result of Percoco's efforts to help Kelly and the energy company for which he worked obtain assistance from state government in exchange for a low-show job for Percoco's wife. Percoco was convicted of conduct involving both schemes at trial. Originally charged with participating in the energy company scheme, Kelly pled guilty to a different crime: defrauding his employer in order to facilitate the low-show job. As a result of the lesser offense of conviction, Kelly's Guidelines called for a sentence of between 12 and 18 months' imprisonment, significantly lower than Percoco's. The analogy with Huberfeld's crime of conviction, and its proximity to still worse conduct, is clear, and a one-year sentence would be similar to what Kelly received.

To be clear, the Government does not dispute that Huberfeld is differently situated from Seabrook in a manner that requires his sentence to be the lesser of the two. First, and importantly, Huberfeld ultimately accepted responsibility for his offense of conviction, whereas Seabrook has never accepted responsibility for any component of his conduct. And beyond accepting responsibility for the offense of conviction, Huberfeld publicly acknowledged that he submitted the fraudulent invoice to Platinum to paper over a kickback paid to Seabrook. Second, while Huberfeld was well aware that his conduct entailed corrupting a union leader, he was not convicted of a bribery offense, while Seabrook was. And finally, Huberfeld's voluntary agreement to pay

13

$7 million to COBA (of which, to date, Huberfeld has made payments of $5.5 million, PSR ¶ 99)—which will restore a substantial amount of the union members' losses—is a real step towards contrition that merits real consideration by the Court. While that admirable step should factor into the Court's analysis of the appropriate sentence, it should not absolve him of all punitive consequences.

**II.     The Court Should Order Restitution in the Amount of $60,000 to Platinum**

Consistent with the Second Circuit's ruling, the Court should order restitution in the amount of $60,000, payable to Platinum.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a twelve-month sentence, at the high end of Huberfeld's Guidelines range, is appropriate and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Dated:  New York, New York
        April 12, 2021

                                    Respectfully submitted,

                                    AUDREY STRAUSS
                                    United States Attorney

By:  s/_____
      Lara Pomerantz
      Assistant United States Attorney
      Southern District of New York
      (212) 637-2343

cc:     Andrew Levander, Esq.
       David Kelley, Esq.
       Henry Mazurek, Esq.